**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **SUSAN BYRNE,** | | |
| **Plaintiff** | **:** | **Civil Action NO.** |
| | | |
| **vs.** | **:** | **3:17-cv-01104-VLB** |
| | | |
| **YALE UNIVERSITY, INC.** | **:** | |
| **Defendant** | **:** | **SEPTEMBER 27, 2017** |

**<u>AMENDED COMPLAINT</u>**

**<u>INTRODUCTION</u>**

1.  **This is an action for money damages, reinstatement as Associate Professor with Tenure, costs, attorney's fees, and other relief as a result of Defendant's breach of contract and discriminatory conduct undertaken against Plaintiff on the basis of her gender and in retaliation for her opposition to discrimination in violation of federal and state law.**

2.  **Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA"), and the common law of the State of Connecticut.**

**<u>JURISDICTION</u>**

3.  **This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it presents a federal question under 42 U.S.C. §2000e *et seq.***

4. **This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.**

5. **Plaintiff dual filed her claims with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and Equal Employment Opportunity Commission ("EEOC") on August 1, 2016.**

6. **Plaintiff received a release of jurisdiction from the CHRO and the EEOC on or about June 26, 2017.**

**PARTIES**

7. **Plaintiff Susan Byrne is a female who presently resides in Henderson, Nevada and previously resided in Hamden, Connecticut.  At all times relevant to this Complaint, Plaintiff was an employee of Defendant.**

8. **Defendant, Yale University ("Yale" or "University"), is a specially-chartered corporation organized under Connecticut law and located in New Haven, Connecticut.  Defendant is an employer within the meaning of, and subject to the provisions of, Title VII and CFEPA.**

**BACKGROUND**

9. **Plaintiff was hired by Defendants following a national search wherein Defendant's Department of Spanish & Portuguese ("the Department") advertised for a "tenure track assistant professor appointment in Medieval/Golden Age Literature."**

10. On December 27, 2007, Plaintiff was interviewed for the position by a committee consisting of Professors Rolena Adorno, Noël Valis, and Roberto González Echevarría.

11. During the interview with Professors Adorno, Valis, and González Echevarria, Plaintiff described her completed research, including her first single-authored book, and her active in-process book projects, one on law and history in the writings of author Miguel de Cervantes, and another on the impact of Italian philosopher Marsilio Ficino on Golden Age Spanish authors.

12. During the interview, Professor González Echevarria asked Plaintiff if she would move to New Haven, Connecticut, if given the job. He said he knew he was not allowed to ask the question, but he was going to ask it anyway. Then he added that if Plaintiff ever said he asked the question regarding moving, he would deny that he had and so would "everyone else in this room," meaning Professors Valis and Adorno would lie for him.

13. Plaintiff was invited for the second stage of the process, a campus visit interview on February 4-5, 2008, where she met privately with Professor Adorno, Chair of the Department, for an hour and spoke at length about Plaintiff's research projects, and specifically Plaintiff's book on Cervantes.  During this visit, Plaintiff also gave a job talk at Yale's

Whitney Humanities Center to members of the Department on law and history in Cervantes' *Don Quijote.*

14. After the campus visit stage of the process Professors Adorno and González Echevarria completed a "Faculty Search Questionnaire" justifying Plaintiff's appointment.  The form as filed contains a description of the subfield in which Plaintiff works and an evaluation of how Plaintiff's qualifications fit the requirements of the advertised position.

15.  Plaintiff was offered the position of Assistant Professor of Spanish on February 8, 2008 in a phone call with Professor González Echevarria, then Acting Chair of the Department.  Plaintiff asked him why she was being hired since he had also written on Cervantes and had not indicated he intended to retire.  Professor González Echevarria replied that the position was available because the last person to hold it had not published anything.

16. By letter dated February 19, 2008, Plaintiff received an initial offer letter for the tenure track position of Assistant Professor of Spanish (hereinafter the "offer letter").  The offer letter established that Plaintiff was offered a four year term, from July 1, 2008 to June 30, 2012.  The letter instructed Plaintiff that, "[a] description of Yale's ladder faculty

ranks, including expectations and schedules for reappointment and promotion, information on leave policy, fringe benefits, and other matters are described *Faculty Handbook* … [and] is of continuing importance to all faculty members, and because the policies it contains represent essential employment understanding between you and the University, I urge you to read it with care."

17. Plaintiff's employment as an Assistant Professor on tenure track in Yale ladder faculty ranks was governed by oral and written communications between Plaintiff and Defendant as well as circumstances and academic customs or usage that served to define the terms and conditions of the employment agreement leading to tenure.

18. The probationary period, also referred to as the tenure track, is an appointment to the faculty that is offered to allow the candidate an opportunity to demonstrate that she has met the standards and criteria for tenure that have been communicated to her at the commencement of her appointment and during annual reviews of performance.

19. Prior to and during Plaintiff's employment at Yale University, Defendant formally adopted and then published documents governing the process for the tenure decision and the criteria applicable to that decision.

Plaintiff reviewed and relied upon these publications when conforming her plans to apply for tenure and probation during the probationary period and making adjustments to her teaching, service and scholarship.  These documents included, but were not limited to, the tenure track system of hiring and promotions set forth in the Yale Faculty of Arts and Sciences Tenure and Appointments Policy ("FASTAP") instituted in 2007.

20. Defendant's Faculty Appointment Procedures, Sections FH III.K.1 and FH III.C, provide that "specific details and documents … found on the Faculty of Arts and Sciences Web site" are to be followed for all appointments of ladder faculty, so as to provide "written documentation of the entire search process" and those documents "must be reviewed by the Provost's authorized representative before an appointment is offered."

21. Defendant's Faculty Appointment Procedures, Section FH III.K.1 require Defendant's departments to begin a faculty appointment with a consideration of its programmatic needs and discuss any ladder faculty search with the relevant dean, who will authorize the appointment.

22. Defendant's Faculty Appointment Procedures, Section FH III.D provides that "[n]o offer or appointment or promotion is final until approved by the Corporation upon the recommendation of the President or Provost."

23. In 2008, pursuant to Defendant's policies and procedures, Plaintiff was appointed to a four-year tenure track position of Assistant Professor of Spanish.

24. Defendant's Faculty Handbook delineates Yale's standards for reappointments and promotions.  Section FH III.G of Defendant's Faculty Handbook specifies that, "Schools and departments are expected to make a careful evaluation of each candidate's work and promise, as well as the programmatic needs of the school or department, before deciding whether or not to recommend reappointment or promotion."

25. In 2012, pursuant to Defendant's policies and procedures, Plaintiff was reappointed to the same rank of Assistant Professor of Spanish, with the same field of specialization in Golden Age Studies.

26. To promote a faculty member to Associate Professor on Term, after a department votes on the candidate's application, Section H III.K.1.a mandates that the Tenure Appointments and Promotions Committee of

the Divisional Committee for the Humanities must also approve the candidate for promotion.

27. Section H III.K.1.a requires that after the Tenure Appointments and Promotions Committee of the Divisional Committee for the Humanities approves the candidate, the Joint Board of Permanent Officers and the Yale Corporation must vote to approve the candidate's promotion in their department.

28. In 2013, pursuant to Defendant's policies and procedures, Plaintiff submitted a dossier to be considered for the rank of Associate Professor on Term, with the same field of specialization in Golden Age Studies. Included in that dossier was Plaintiff's 2012 book publication, *Law and History in Cervantes*' Don Quixote.

29. On April 22, 2013, Professor Adorno completed a Departmental Case Summary and Department Faculty Vote Form with the Divisional Committee for the Humanities in support of Plaintiff's application for promotion to Associate Professor on Term.

30. In the Departmental Case Summary and Department Faculty Vote Form, Professor Adorno justified the department's need for Plaintiff as well as

the programmatic need for Plaintiff's field of specialization.  In the form Professor Adorno also praised the quality of Plaintiff's scholarship.

31. .The Department unanimously voted in favor of Plaintiff's promotion and praised Plaintiff's research, including her 2012 book on Cervantes: "the colleagues agreed that Byrne's research and scholarship are extremely well focused, that her archival work is solid and made meaningful by her ability to connect it to literary texts... she writes in competent, clear Spanish as well as her native English, and that her competence in Latin is noteworthy"; "there is no question of the significance of the authors and topics she has chosen to study, nor of the enthusiasm with which the external referees have commented in detail upon her work. Her focus is significantly interdisciplinary. We see a clear trajectory in her work that opens out onto ever larger vistas."

32. In July 2013, Plaintiff was promoted to Associate Professor on Term. The Department praised Plaintiff's second book publication, offering that it would be further judged by experts in Plaintiff's specific field. Department Chair Adorno informed Plaintiff that all eight letters of recommendation from external reviewers for her promotion, all specialists in Plaintiff's particular field of expertise, had been uniformly, and highly positive.

33. From 2008 through 2013, at every step of hiring, reappointment and promotion, Plaintiff was fully vetted by the Department, by the deans

and Humanities division of the Faculty of Arts and Sciences, by the Provost's and President's offices, by the Joint Board of Permanent Officers, and by the Yale Corporation for programmatic need and scholarly accomplishments. During that same time frame, Department Chair Adorno submitted positive and praise-filled yearly reviews on Plaintiff's performance to the Yale administration.

34. After the Departmental Case Summary and Department Faculty Vote document was submitted to the university, and prior to Plaintiff's tenure review, that same 2012 book on Cervantes received eight reviews in peer-reviewed journals, all uniformly positive, written by experts in Plaintiff's field who said "a most important and original study that deserves a central and special place in the vast bibliography on Cervantes" (Lerner, CUNY); "Stimulating and illuminating... a major contribution" (Ganelin, Miami U of Ohio); "obliged reading for every Cervantes scholar" (Ardila, U Edinburgh); "Learned and insightful... thoughtful and discerning... clear and precise analysis" (de Armas, U Chicago); "remarkable work" (de Sutter, Vrije U Brussels"); "a substantive work of investigation, analysis, and metacriticism" (Friedman, Vanderbilt U); "a philological *tour-de-force*" (Quinn, U NM); "Having studied *Don Quixote* for twenty-five years, I cannot recall a more efficient delivery of its meaning" (Graff, U Francisco Marroquin); "erudite analysis of the text (Polchow, U So.Carolina); "impressive

philological analysis of key narrative sequences of *Don Quijote*" (Rabell, U Puerto Rico).

35. In 2015 Plaintiff published her third single-authored monograph, titled *Ficino in Spain*. This was the third book project she had discussed with Department Chair Adorno and other members of the department when she interviewed in late 2007 and early 2008. To date, this book has garnered seven reviews from specialists in Plaintiff's field, all uniformly positive: "an authoritative compendium... scrupulous study and cogent analysis... critical insight and a solid analytical methodology... a signal service to students and scholars alike" (Damiani, Catholic U of America); "impressive archival research" de Armas, U Chicago); "rich, well-researched and thought-provoking volume... erudite and original work deserves to be considered a landmark in the history of Ficino's reception in Spanish culture" (Maggi, U Chicago); "is and should be viewed as an exemplary and pioneering work... remarkable depth and breadth... an interdisciplinarity which few contemporary scholars have demonstrated" (Ponce-Hegenauer, Wesleyan); "excellent study, richly annotated and carefully argued... plenitude of archival references... a significant book" (Allen, UCLA).

36. Defendant's Faculty Handbook Section IV.H.2 provides the standard for promotion to Associate Professor with Tenure as follows:

> **Associate Professor with Tenure. Candidates for this rank are expected to have shown evidence of exceptional accomplishments and future promise that makes the sponsoring department confident that within five years they will merit promotion at Yale to the rank of professor... Associate professors with tenure are expected to develop the qualities of scholarship that earned them their permanent appointments, so that within a reasonable period of time their value to the University and their national or international standing will make them suitable candidates for professor.**

37. **Defendant's Faculty Handbook Section IV.H.1 specifically forbids faculty members from voting on matters for which they have a conflict of interest, stating:**

> **A member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all votes taken on that individual.**

38. **The Yale Faculty of Arts and Sciences Voting Policies regarding "Steps for Promotion" also state:**

> **A member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual.**

39. **During 2008-2013, Plaintiff observed harassment and discriminatory acts in the Department but neither spoke out publically nor complained privately to the administration, fearing that doing so would expose her to retaliatory actions by the senior members of the department engaging in said acts. Those acts included sexual intimidation and bullying, violations of federal anti-age discrimination statutes, and professional and intellectual harassment of colleagues and students.**

40. **For example, during the spring semester of 2009, Plaintiff felt someone playing with her hair from behind her as she entered her office. She turned around to see Professor González Echevarría grinning, with his hand on her hair.**

41. **From 2009 through 2014, Plaintiff witnessed Professor González Echevarría play with the hair of undergraduate and graduate students on multiple occasions.**

42. **In spring 2012, at a department party held at the home of Department Chair Adorno, Professor González Echevarría made multiple unsavory**

13

comments about the body parts of several female members of the department, while sitting at a table with Plaintiff and her husband, as well as another junior faculty member and his young wife.

43. Following Professor González Echevarría's hip replacement surgery, Plaintiff asked how he was recovering. His reply was that he was doing all he could to heal quickly, so as to return to his favorite kind of sex, standing up, a technique he pantomimed as he said it.

44. In May 2014 Plaintiff began to register her opinions and complaints about discrimination and harassment by Professor Roberto González Echevarría, Department Chair Rolena Adorno, and Professor of Spanish Noël Valis.

45. On May 7, 2014 Plaintiff recommended to Yale College Dean Mary Miller, in confidence as provided by the rules, that she change the chair of the Department of Spanish & Portuguese because of said issues of discrimination and harassment.

46. A week later, Department Chair Adorno told Plaintiff that she knew that Plaintiff had made the recommendation to Dean Miller because Dean Miller had so advised her in violation of the rule regarding confidential communication regarding changes to the chair of the Department.

47. On May 13, 2014, Professor González Echevarria surprised Plaintiff with a kiss on the mouth at a party held for Mary Miller, in front of hundreds of colleagues and administrators from across the university.

48. On August 13, 2014, Professor González Echevarria told Plaintiff that, "As to this mentoring thing: no one ever gets tenure at Yale, so you should keep looking for another job." This statement directly contradicted Department and University assurances when hiring Plaintiff seven years earlier, regarding a fair and equitable hearing on the merits for tenure review.

49. On October 17, 2014, when Plaintiff met with Professor González Echevarria to discuss Plaintiff's 2014 Associate Professor leave proposal, he directed her to sit down on the "love couch" in his office. The small, two-person couch has extra pillows arranged to force close seating. Plaintiff moved the pillows to avoid contact with Professor González Echevarría's lap.

50. Beginning later that night and continuing through February 2015, Professors González Echevarría and Valis, along with Department Chair Adorno, made unsupported and negative statements regarding Plaintiff's research work.  These falsehoods were propagated in retaliation for Plaintiff's speaking out against discrimination and harassment and to deny Plaintiff a full-year sabbatical leave awarded

under Yale University's tenure-track system to all Associate Professors on Term.

51. FAS Associate Dean Jack Dovidio later certified to Plaintiff that the denial of her Associate Professor Leave was "unique," and that it was the only case of a Yale Associate Professor on Term ever being denied this leave in University history. That unique denial happened immediately following Plaintiff's spurning of the "love couch" setup.

52. Plaintiff complained to Faculty of Arts & Sciences ("FAS") Dean Tamar Gendler about the unsupported and negative statements from October 2014 through February 2015. Professors Adorno, Valis, and González Echevarría were made aware of these complaints made by Plaintiff.

53. The project against which Department Chair Adorno and Professors González Echevarría and Valis levied unfounded criticisms had already been praised, and awarded over $12,000 in funding from Yale University sources.

54. On February 5, 2015, Plaintiff spoke at an open University forum about the Department's discriminatory practices in tenure cases. That meeting was attended by a number of faculty members and administrators.

55. On February 6, 2015, Plaintiff wrote to the chair of a committee studying FASTAP with further specific detail about the same discriminatory practices in the Department.

56. On February 27, 2015, Yale Daily News ("YDN") reporter Emma Platoff interviewed Plaintiff about the intellectual and general climate in the Department.

57. On March 6, 2015, graduate students in the Department wrote an anonymous letter to the administration, copying senior and junior faculty members of the department, regarding an atmosphere of fear and intimidation, as well as acts of discrimination, including sexual and intellectual harassment, inside the Department. The letter complained about sexual harassment by Professor González Echevarría, and stated that Department Chair Adorno and Professor Valis had ignored, then covered up their complaints about those acts.

58. Due to these complaints, on March 24, 2015, Yale Provost Benjamin Polak initiated a "climate review" of the Department.

59. On March 25, 2015, the YDN published a story about the anonymous student letter of complaint.  A section of the story subtitled "Harassment Allegations" reported on the letter's assertions that the

Department "is rife with sexual harassment" with Professor González Echevarria identified as the "main perpetrator."

60. In the March 25, 2015 YDN article, Plaintiff was referenced as having "heard harassing comments made by professors both to their colleagues and to students."  In a later section of the article subtitled "Tenure Troubles," Plaintiff was referenced on the point that "hearing that no junior faculty member will be granted tenure in the department is troubling," and was quoted as saying, "I would hope that anyone who has anything to do with my tenure case will give me a fair and equitable hearing."

61. On March 30, 2015, Department Chair Adorno sent Plaintiff a letter requesting submission of her materials for tenure review.

62. On April 1, 2015, Plaintiff responded to Department Chair Adorno, and copied the FAS Dean and Provost, requesting that both Professor González Echevarría and Department Chair Adorno recuse themselves from all matters related to her tenure review, pursuant to Section  IV.H.1 of Defendant's Faculty Handbook and to the Yale Voting Policies on "Steps for Promotion."

63. On April 2, 2015, FAS Dean Tamar Gendler told Plaintiff that her office "will not make any final decisions about the composition of the review committee or the eligibility of other departmental faculty to participate in the process until the climate review that is currently underway in Spanish and Portuguese is completed."

64. Later that week, on April 4th or 5th, 2015, Plaintiff saw Yale Law School professor Kate Stith consulting with Department Chair Adorno in Adorno's office.

65. In subsequent messages over the following nine months, FAS Dean Gendler and other members of her office repeatedly linked Plaintiff's recusal request to the ongoing climate review of the Department's atmosphere of sexual and intellectual harassment.

66. On April 13, 2015, Department Chair Adorno replied to Plaintiff's recusal request with a specific note regarding the number and names of administrative and departmental persons who had been copied on that request.  Department Chair Adorno alleged that Plaintiff's request for her recusal from Plaintiff's tenure review was the equivalent of Plaintiff harassing her.

67. On April 16, 2015, in front of multiple faculty members, Department Chair Adorno accused Plaintiff of being responsible for the anonymous graduate student letter with its complaints about sexual, intellectual and professional harassment.  Department Chair Adorno yelled at Plaintiff in the Department in front of multiple witnesses.  During this Department Chair Adorno told Plaintiff to follow her as she stormed into Professor González Echevarria's office, leaving the door to the hallway open. Professor González Echevarria muttered about Plaintiff in her presence: "Oh it doesn't matter, she'll soon be gone anyway."  Plaintiff informed FAS Dean Gendler of the events set forth in this paragraph as grounds for recusal.

68. On April 22, 2015, Plaintiff was interviewed by Defendant's attorneys, Jamaal Thomas and Barbara Goren, who were conducting the climate review at the behest of Provost Polak.

69. Plaintiff's testimony to Attorneys Thomas and Goren included but was not limited to the following topics:

- Department Chair Adorno's violation of University policy by considering the age of applicants during annual recruitment of graduate students;

- **Department Chair Adorno's demands for extra nighttime social activities two to three times per week;**

- **Department Chair Adorno's April 16th 2017 explosion of anger towards Plaintiff, with her attempt to blame Plaintiff for the anonymous student letter;**

- **Professor González Echevarria's sexual intimidation and bullying of undergraduate students, graduate students and colleagues;**

- **Professor González Echevarria's sexual intimidation and bullying of Plaintiff; and**

- **Department Chair Adorno's cover-up of Professor González Echevarria's sexual harassment.**

70. **When Plaintiff was interviewed by Attorneys Thomas and Goren as part of that climate review, she was asked specific questions about previous testimonies given by others.  Those questions allowed Plaintiff to deduce the identities of those who had given that earlier testimony.**

71. **Department Chair Adorno was interviewed repeatedly throughout the summer.  Department Chair Adorno would have, as easily as Plaintiff had, been able to deduce from those questions which earlier**

interviewees had provided that testimony.  Specific details and documents Plaintiff had provided to the Attorneys could not have come from anyone but Plaintiff.

72. Plaintiff also informed the climate review committee of harassment by Professor González Echevarria, including his unwanted playing with the hair of female students and colleagues, his unsavory comments regarding female body parts, his juvenile attempt to impress his friend Giuseppe Mazzotta by surprising Plaintiff with a kiss on the mouth in front of Giuseppe and hundreds of other colleagues during a party held for Mary Miller on May 13, 2014, the use Professor González Echevarria tries to make of the little "love couch" in his office, most recently with Plaintiff when they met to discuss Plaintiff's 2014 Associate Professor leave proposal, and his dirty jokes, such as wishing to recover from a hip replacement surgery so that he might return to his favorite kind of sexual activity, standing up, a technique he pantomimed as he described it to Plaintiff.

73. On July 16, 2015, Plaintiff asked FAS Dean Gendler for an update on her recusal request and noted that linking Plaintiff's recusal request to the climate review of the Department had led to a delay of three months in coming to a determination on the recusal request.  Plaintiff also noted

that in the interim, Department Chair Adorno had been making her animosity towards Plaintiff obvious.

74. In response to Plaintiff's letter, on July 24, 2015 FAS Dean Gendler responded in an email to Plaintiff stating that, "we have asked Noel Valis to serve as chair of your promotion committee at least until the conclusion of the departmental review.  Noel has accepted this request, and Rolena has been informed." Professor Valis was the third member of the committee that had, uniquely in Yale history, retaliated against Plaintiff by agreeing to the denial of the Associate Professor leave for Plaintiff.  FAS Dean Gendler's office had overseen that process, yet nonetheless appointed Professor Valis to chair Plaintiff's tenure committee.

75. On August 14, 2015, Plaintiff submitted her full academic dossier in consideration for promotion to the rank of Associate Professor with Tenure. The dossier included three of the most prestigious types of publication in her field, single-authored monographs, one of which (*Law and History in Cervantes' Don Quixote*) had been re-issued in paperback less than one year after its original publication; uniformly positive reviews of those books, along with evidence of media coverage for the same; sixteen scholarly articles published, in press and in process; a number of published reviews, translations and research findings; proof

23

of Plaintiff's election to the executive boards of three professional associations, two national and one international; six national and seven international speaking invitations; twenty-three conference presentations; evidence of her service as manuscript reviewer for scholarly book presses and peer reviewer for academic journal articles; and all documents related to her multiple successful teaching and service contributions to Yale and to the profession. The dossier clearly evidenced Plaintiff's having met Yale's standard for promotion to Associate Professor with Tenure, by demonstrating exceptional research accomplishments, future promise, and both national and international leadership in her field.

76. By fall 2015, because of information learned during the climate review of the Department initiated by Provost Polak, Yale's Title IX office began an investigation into sexual harassment and bullying by Professor González Echevarría.

77. During fall 2015, Plaintiff continued to inquire about the status of her recusal request.  After Plaintiff sent an email to FAS Dean Gendler on November 11, 2015, she was again told by Dean Gendler that, "We will soon be holding meetings with members of the department - faculty and students - to discuss the issues that emerged from the climate review.

**Once we have held those meetings, we will be in touch with you and the senior faculty regarding your promotion review."**

78. **On December 1, 2015, Plaintiff testified to Title IX coordinator Stephanie Spangler regarding Professor González Echevarria's sexual harassment of undergraduate students, graduate students, and colleagues, with specific identifiable detail regarding his acts towards Plaintiff. Plaintiff considered this type of crass sexual bullying juvenile.  Nonetheless, Plaintiff was asked to provide commentary and she did so, stating that Professor González Echevarria was "a liability to the university." Plaintiff informed Spangler that she was free to utilize that information in any way she saw fit.  Spangler specifically questioned Plaintiff's willingness to allow identifiable detail to be used and Plaintiff told her to use it, in the service of improving conditions for colleagues and students in the Department.**

79. **Both Professor González Echevarria and Department Chair Adorno were aware that Plaintiff had been interviewed and, as Title IX coordinator Spangler noted, the details Plaintiff offered were clearly identifiable as having come from her.**

80. **On December 15, 2015 ,during a meeting to inform Department members of the results of the climate review, FAS Dean Gendler stated that the**

written "Climate Review Report" clearly revealed the following problems in the Department: sexual harassment, lack of transparency, managerial abuses, failure to tenure qualified persons, and fear of retaliation.  FAS Dean Gendler told department members that prior to the acceptance of any future graduate students into the program, all tenured and tenure-track members of the department would have to attend a sexual harassment refresher course.

81. As a result of the findings in the Climate Review Report, Professor Noël Valis was removed as Director of Graduate Studies.  Despite that recognition of her unfitness pursuant to findings in the Climate Review Report, Professor Valis was left in place as the chair of Plaintiff's tenure review committee.

82. On December 16, 2015, Plaintiff attended a meeting of the Faculty of Arts and Sciences held to discuss the need for procedures to enforce ethical rules of conduct among faculty. In response to a question during this meeting, FAS Dean Tamar Gandler stated that no matter the behavior, her office had no power to enforce recusals in tenure cases.

83. During the January 19, 2016 refresher course on sexual harassment attended by all tenured and tenure-track faculty in the department, Plaintiff commented specifically on case scenarios, including one

directly reflective of Department Chair Adorno's excessive demands for extra social activities with a male subordinate "two and three" times a week.

84. That same day, January 19, 2016, FAS Dean Gendler informed Plaintiff that there would be no recusals of the members of the Department who Plaintiff had publicly and privately accused of sexual harassment and retaliation in her tenure case.

85. On February 11th and 12th 2016, Plaintiff was out of town interviewing for a position at another university and Professor Valis sent her two email requests for a meeting regarding the result of Plaintiff's tenure review.

86. During the next four days, from February 11, 2016 – February 15, 2016, Department Chair Adorno, Professor Valis and Yale Law School professor Kate Stith strategized to extract the Internet Protocol Address ("IP address") from Plaintiff's emails, inadvertently copying her on some of those messages.

87. An email from Professor Stith that Plaintiff was inadvertently copied stated, "I'm having difficulty getting my email program to show me the full headers for these emails (the full headers will have the IP address).

I'm using an updated version of Outlook that no longer shows "properties" when I right click the email.  But I'll figure it out."

88. The IP address provides location, which would allow Department Chair Adorno, Professor Valis, and Professor Stith to surreptitiously identify the university where Plaintiff was interviewing.

89. Upon Plaintiff's return, she asked Department Chair Adorno, Professor Valis, and Professor Stith if they wanted her IP address, as Plaintiff knew what it was and could provide it.  They failed to respond to Plaintiff's inquiry.

90. On February 15, 2016, Plaintiff was given notice that the Department vote for her tenure had been negative.  The vote was three against, two in favor. The notice to Plaintiff failed to indicate any concrete grounds for the denial of tenure. There was no reference to the letters from external reviewers, the only reliable arbiters of Plaintiff's scholarship in her field.  Department Chair Adorno, Professor González Echevarria and Professor Valis all voted against Plaintiff in retaliation for Plaintiff's statements about discriminatory practices including sexual and other forms of harassment.

91. Following the denial of tenure, Plaintiff filed two appeals addressed to Provost Benjamin Polak pursuant to the Yale Faculty Handbook.  The Office of the Provost appointed a committee of senior faculty to review the process through which the determination to deny Plaintiff tenure had been reached. Pursuant to Yale policy and procedures for tenure reviews, the committee was prohibited from looking at any matters of substance. They did not review the dossier, nor the letters from external reviewers, nor any other substantial matter related to the denial of tenure.

92. On March 2, 2016, Plaintiff filed appeal 1, seeking review of FAS Dean Tamar Gendler's refusal to grant Plaintiff's recusal request, and to thus allow participation in her tenure review by persons known to be prejudicial against Plaintiff.

93. On March 4, 2016, through her attorney, Plaintiff filed a request with the Office of the Provost seeking records from her personnel file for use in appeal 2.  Requested records included, but were not limited to, all documents related to the tenure denial, including the letters written by external reviewers knowledgeable in her field, as well as all communications between and among those who participated in and handled matters related to her tenure review in the Department of Spanish & Portuguese, and in the FAS Dean's office.

94. In that same request, Plaintiff also obliged Defendant to provide a copy of the Climate Review Report that had been ongoing throughout her tenure review at the behest of Provost Polak.

95. In violation of Connecticut General Statutes § 31-128a, *et. seq.*, none of the specifically requested records were provided.

96. On March 8, 2016, Plaintiff filed appeal 2, seeking review of the negative determination on the tenure review itself, and of the retaliatory actions of those Plaintiff had asked be recused from it.   Plaintiff again requested that Provost Polak provide the review committee with the necessary documents as listed above and, additionally, with the emails exchanged between Department Chair Adorno and Professors Stith and Valis regarding her IP address. The Provost failed to provide the documents to the review committee.

97. On June 24, 2016, Plaintiff requested of Provost Polak a one-year unpaid leave with permission to hold a position at another university, as the uncertain situation at Yale was detrimental to her ability to work.

98. On July 25, 2016, without comment on the substance of Plaintiff's tenure review, the tenure-review committee submitted its report on the

process to Provost Polak. While finding that the process did not violate technical procedures, and thereby denying Plaintiff's appeals, the review committee highlighted as problematic the "continuing Climate Review of the Department," and found "poor judgment by the department" administrators regarding their having denied Plaintiff the Associate Professor Leave.

99. The review committee ended its July 25th 2016 report by stating that they "wish to make clear that our finding of facts and conclusions related to this specific tenure case and procedures should not be interpreted as an endorsement of either the way in which the department was being run or of its leadership" (Report, p. 4). Notwithstanding its denial of Plaintiff's appeals, the committee admitted the departmental problems that caused it.

100.   On August 10, 2016, Plaintiff responded to Provost Polak regarding the review committee report. She noted the committee's failure to interview eyewitnesses to the prejudicial statements made to her by Department Chair Adorno and Professor González Echevarría, as well as its failure to interview Professor Kate Stith regarding her part in the attempts to extract Plaintiff's IP address from her emails.

101.   On August 23, 2016, Provost Polak informed Plaintiff that the denial of tenure would stand. He also granted Plaintiff's request for an unpaid leave of absence for the 2016-2017 academic year, and granted permission for Plaintiff to hold a position at another university during that time frame.

102.   The Title IX investigation into sexual harassment by Professor González Echevarría resulted in his being suspended for one semester in fall 2016, and he was banned from coming to campus for that semester. He was also forbidden from holding administrative positions, and from taking on new students under his direct supervision, for a period of five years.

103.   On September 14, 2016, Dean of Humanities Amy Hungerford informed members of the Department of Spanish & Portuguese that the Department would be put into receivership, with an external chair coming in to replace Department Chair Adorno, and with an external committee of eight persons having votes in all Department matters for a three-year period beginning January 1, 2017.

104.   All three Department members who retaliated against Plaintiff by denying her tenure were removed from positions of leadership. Nonetheless, Yale allowed their retaliation against Plaintiff in the form of the denial of tenure to stand.

105.   Plaintiff's employment with Defendant terminated on June 30, 2017. Had tenure been granted, Defendant would have been obligated to continue to offer Plaintiff employment until retirement.

106.   Defendant acted with reckless disregard for Plaintiff's right to be free of retaliation for her speech related to sexual harassment and discrimination involving members of the Department and students under the care and supervision of the Department.

107.   As a result of the retaliatory conduct engaged in by agents and employees of Yale, and condoned by the highest levels of the Yale administration, Plaintiff has suffered damages in the form of destruction of her academic career, and a diminishment of her opportunity to earn wages and benefits in the future, past and future loss of enjoyment of life, emotional distress, harm to reputation, and has incurred attorneys' fees and costs to vindicate her rights.

**COUNT ONE:**     **RETALIATORY DISCHARGE ON THE BASIS OF PLAINTIFF'S EXERCISE OF HER RIGHTS UNDER THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT IN VIOLATION OF CONN. GEN. STAT. § 46a-58 *et seq.***

108.   On any and all dates from the initiation of the Climate Review and

subsequent Title IX review, Department Chair Adorno, Professor

González Echevarria and Professor Valis were in a position to retaliate

against Plaintiff because she publicly and privately made statements

regarding illegal discriminatory practices involving members of the

Department and students under the supervision and care of the

Department, including testimony to both interviewing committees,

statements to FAS Dean Gendler, statements to Provost Polak and

members of the Office of the Provost, and statements to YDN.


109.   Following Plaintiff's testimony and statements about discriminatory

practices and sexual, intellectual, and professional harassment in public

forums and in communications with administrative offices and

personnel, Department Chair Adorno, Professor González Echevarria

and Professor Valis made their animosity towards Plaintiff known and

obvious to Plaintiff and to the highest officials in the Yale University

administration.  This retaliatory animus was made known in statements

indicating that Plaintiff would be denied tenure and gone from the

University even before Plaintiff submitted her case for tenure, in the

retaliatory denial of the sabbatical from Associate Professor on Term and by enlisting Professor Stith in a campaign of spying on Plaintiff so as to cause her further professional damage.

110.   FAS Dean Gendler and other members of the Yale University administration were aware of this retaliatory climate yet did nothing to prevent the Department's retaliatory actions against Plaintiff. In her oral report to Department faculty on the written Climate Review Report, FAS Dean Gendler stated openly that the Department has a known proclivity for rejecting qualified candidates for tenure while masking those rejections as issues of professional judgment.  The only reason given for Plaintiff's denial of tenure was just such a specious pretext made in bad faith to disguise precisely that type of improper motivations, specifically, retaliation for her having spoken out against abuses of University, state, and federal employment practices, including discrimination and sexual harassment by Department Chair Adorno, Professor González Echevarria and Professor Valis.

111.   Based on the foregoing, Defendant retaliated against Plaintiff because she cooperated in the investigation of discrimination and sexual harassment and complained about and opposed sexual harassment and discriminatory employment practices in violation of Conn. Gen. Stat. §46a-60(a)(4).

112.    Defendant retaliated against Plaintiff by, *inter alia*, harassing her, subjecting her to disparate treatment, and denying her application for sabbatical as Associate Professor on Term, by denying her tenure and promotion, and by ultimately terminating her employment.

**COUNT TWO:        RETALIATION IN VIOLATION OF CONNECTICUT GENERAL STATUTES § 31-51Q.**

1-110. Paragraphs 1 through 110 of Count One are incorporated herein as Paragraphs 1 through 110 of Count Two as though fully set forth herein.

111.    Plaintiff's statements regarding discrimination, sexual harassment and other harassment in the Department constituted protected speech on matters of public concern.

112.    Defendant retaliated against Plaintiff by disciplining her in violation of Connecticut General Statutes § 31-51q when Defendant (a) denied Plaintiff a full year sabbatical as an Associate Professor on Term, a sabbatical that Plaintiff had earned and was entitled to; (b) refused Plaintiff's request to mandate the recusal of Department Chair Adorno and Professor González Echevarria from Plaintiff's tenure case following the issuance of the departmental "Climate Review Report" as promised and as required by the Faculty Handbook based on their

expressed intent to deny a positive recommendation prior to the submission of Plaintiff's case for tenure and their conflict of interest following Plaintiff public speech accusing them of abuse, harassment and retaliation; (c) allowed Department Chair Adorno to verbally assault Plaintiff and falsely accuse her of authoring an anonymous letter in the presence of multiple faculty members in the department; and (d) allowed Department Chair Adorno and Professor González Echevarria to proceed with the vote on Plaintiff's tenure case before Plaintiff was given the opportunity to file an appeal of the denial of her request that these same individual recuse themselves from consideration of Plaintiff's tenure case based on bias and declared intent to vote against Plaintiff for reasons unrelated to the merits of her case.

113.   Defendant retaliated against Plaintiff by discharging her in violation of Connecticut General Statutes § 31-51q when Defendant terminated Plaintiff's employment relationship based on the denial of tenure.

114.   As a result of Defendant's violation of Connecticut General Statutes § 31-51q Plaintiff has suffered damages as set forth herein.

**COUNT THREE:      RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. 2000E AND THE CIVIL RIGHTS ACT OF 1991**

1-112. Paragraphs 1 through 112 of Count One are incorporated herein as Paragraphs 1 through 112 of Count Three as though fully set forth herein.

113.    Based on the foregoing, Plaintiff was retaliated against because she opposed discrimination and cooperated in an investigation of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et. seq.*, and the Civil Rights Act of 1991.

**COUNT FOUR:      NEGLIGENT MISREPRESENTATION**

1-110. Paragraphs 1 through 110 of Count One are hereby incorporated by reference and made paragraphs 1 through 110 of Count Four as though more fully set forth herein.

111.    Plaintiff reasonably relied upon communications she received during the probationary period and in the annual review process in making decisions regarding the process to be applied to her tenure review scholarship. Department Chair Adorno informed Plaintiff on multiple occasions during 2008-2013 that her scholarship, teaching, and service were exemplary.

112.   **All Yale University procedures governing appointment, reappointment and promotion afforded Plaintiff the reasonable expectation of a fair and unbiased process on the merits for tenure review. Having been harassed and retaliated against during the Associate Professor on Term leave process, Plaintiff asked FAS Dean Gendler's office to step in and prevent further retaliation by the same persons during her tenure review as specifically required by the conflict of interest provisions in the Yale University official documents mention herein above. Dean Gendler failed to do so.**

113.   **At a meeting following the announcement of the results of the Climate Review on December 15, 2015, FAS Dean Gendler announced to the faculty that the Dean did not have the power to require individuals with a personal or professional conflict of interest to recuse themselves from tenure reviews, contrary to her prior statements to Plaintiff and contrary to the rules on conflict of interest set forth in the University's Faculty Handbook Section IV.H.1 and Yale Faculty of Arts and Sciences Voting Policies regarding "Steps for Promotion"**

114.   **As indicated herein, Defendant failed to exercise due care in communicating the ability of the FAS Dean to require individuals with a personal or professional conflict of interest to recuse themselves from tenure decisions.**

115.   Had Defendant been accurate in communicating information regarding the FAS Dean's power to require recusal, Plaintiff would have immediately taken action to appeal or otherwise seek enforcement of the conflict of interest provisions.

116.   As a result of Defendant's negligent misrepresentation, Plaintiff suffered economic harm as indicated and non-economic damages in the form of emotional distress, loss of enjoyment of life and harm to reputation resulting from the denial of tenure.

COUNT FIVE:        BREACH OF THE EMPLOYMENT AGREEMENT

1-113. Paragraphs 1 through 113 of Count Four are hereby incorporated by reference and made paragraphs 1 through 113 of Count Five as though more fully set forth herein.

114.   Defendant breached the employment agreement when contrary to Plaintiff's reasonable expectations Defendant failed to recuse from Plaintiff's tenure review persons it knew to be openly prejudicial and, indeed, hostile to Plaintiff, contrary to the explicit requirements set forth in the University's Faculty Handbook Section IV.H.1 and Yale Faculty of Arts and Sciences Voting Policies regarding "Steps for Promotion" both of which specifically forbids faculty members from voting on matters for which they have a professional or personal conflict of interest.

Defendant nevertheless allowed hostile parties, namely, Professors Adorno, Valis and González Echevarria, to retaliate for Plaintiff's having spoken out about their sexual, intellectual and professional harassment of members of the Department and students under their care and supervision.

115.    Defendant breached the employment agreement when contrary to Plaintiff's reasonable expectations based on manifestations of Defendant, the Department of Spanish & Portuguese failed to review Plaintiff's performance for promotion consistent with the Faculty Handbook and official communications when it ignored the evidence of scholarship in the file from experts in Plaintiff's discipline regarding Plaintiff's work and when it failed to base the tenure decision on the evidence citing the quality of Plaintiff's scholarship.

116.    As a result of Defendant's breach of the employment agreement Plaintiff was denied tenure with an end date to her appointment falling on June 30 2017.

117.    As a result of Defendant's breach of contract, Plaintiff has and will suffer damages in the form of loss of benefits, loss of wages, destruction of her academic career, and a diminishment of her opportunity to earn wages in the future.

**DEMAND FOR RELIEF**

**WHEREFORE, Plaintiff claims judgment against Defendant Yale University, a TRIAL BY JURY, and:**

1. **Economic and Non-Economic compensatory damages, including but not limited to, damages to compensate Plaintiff for past and future lost wages and benefits, emotional distress, loss of enjoyment of life, and harm to reputation;**

2. **Punitive damages pursuant to 42 U.S.C. § 1981a and Connecticut General Statues § 31-51q;**

3. **Attorneys' fees pursuant to 42 U.S.C. § 2000e(5), 42 U.S.C. § 1988, Connecticut General Statues § 46a-104, and Connecticut General Statues § 31-51q;**

4. **Reinstatement to Associate Professor with Tenure;**

5. **Interest and costs;**

6. **Such other relief as in law or equity that may pertain.**

**Dated at New London, Connecticut this 27th day of September, 2017.**

**PLAINTIFF**
**SUSAN BYRNE**


**By:___/s/_____**
**Jacques J. Parenteau (ct09771)**
**Madsen, Prestley & Parenteau, LLC**
**105 Huntington St.**
**New London, CT 06320**
**Tel. (860) 442-2466**
**Fax (860) 447-9206**
**Email: jparenteau@mppjustice.com**

## CERTIFICATION OF SERVICE

I hereby certify that on this 27th day of September, 2017, a copy of the foregoing Appearance, was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].   Parties may access this filing through the Court's system.

/s/
Jacques J. Parenteau