UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN BYRNE, | ) No. 3:17-CV-01104-VLB |
| | ) 450 Main Street |
| vs. | ) Hartford, Connecticut |
| | ) |
| YALE UNIVERSITY, INC. | ) November 9, 2018 |
| | ) |

TRANSCRIPT OF DISCOVERY DISPUTE TELECONFERENCE

BEFORE THE HONORABLE VANESSA L. BRYANT

UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        CLAIRE M. HOWARD, ESQ.
                          JACQUES J. PARENTEAU, ESQ.
                          MAGDALENA B. WIKTOR, ESQ.
                          Madsen, Prestley & Parenteau, LLC-NL
                          105 Huntington Street
                          P.O. Box 1631
                          New London, CT 06320

For the Defendant:        VICTORIA W. CHAVEY, ESQ.
                          DAVID C. SALAZAR-AUSTIN, ESQ.
                          Jackson-Lewis - P.C. Htfd, CT
                          90 State House Square
                          8th Floor
                          Hartford, CT 06103-3708

ECR Operator:             F. VELEZ

Lisa Thayne
eScribers
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020
(973) 406-2250

1                    I N D E X

2    RULINGS:                                    PAGE    LINE
     All documents related to the Title IX        35      10
3    investigation is discoverable
     The two additional professors must be        12       6
4    deposed, not interviewed

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

1

2          THE COURT:  Good afternoon.  May we have the

3    appearance of counsel for Ms. Byrne?

4          MS. HOWARD:  Yes, Your Honor.  This is Claire Howard

5    for the plaintiff, Susan Byrne.

6          THE COURT:  Okay.  And for Yale?

7          MR. SALAZAR-AUSTIN:  This is David Salazar-Austin

8    from Jackson-Lewis, on behalf of Yale University, Your Honor.

9          THE COURT:  All righty.  So I understand there are

10   three issues that you have set out here.  Just for future

11   reference, on the Court's website are my chambers practices,

12   and although I reserve Friday afternoons for discovery

13   conferences, as stated in the chambers practices, the parties

14   are asked to call chambers on Wednesday to request the

15   conference and to file a letter brief setting forth the

16   discreet legal issue or issues they seek rulings on, and the

17   legal basis for their respective positions.  So going forward,

18   if you would abide by that, I would very much appreciate it.

19          So let's begin.  I understand that there are three

20   issues that you'd like resolved today.  The first pertains to

21   whether or not Attorney Howard, on behalf of Ms. Byrne, can

22   speak confidentially with Professors Johnson [sic] and Salazar

23   [sic] in the -- without the defense counsel being present and

24   without memorializing the interview; is that correct?

25          MS. HOWARD:  Yes, Your Honor, in essence.  We're

Colloquy

1   seeking permission from the Court to speak with two professors

2   who -- Professors David Jackson and Anibal Gonzalez, who are

3   likely favorable witnesses as it's very well-known they voted

4   in favor of plaintiff's tenure (indiscernible).  And what we

5   are seeking to do by first conferring with defense counsel,

6   was avoid use -- (indiscernible) use of judicial resources, by

7   just -- and avoiding additional expense of two additional

8   depositions -- by simply interviewing these favorable

9   witnesses as part of conducting discovery.  And part of that

10  agreement was to -- as far as we understand, neither of these

11  professors -- you know, we certainly wouldn't be asking

12  professors for any privileged information, these do not bind

13  the University in the matter.  And so we simply seek

14  permission from the Court to interview them.

15          THE COURT:  These two professors play a role in the

16  tenure decision?

17          MS. HOWARD:  Yes.  These two professors both voted as

18  part of a committee.  So these were the two professors who

19  voted in favor -- of the five members of the committee -- to

20  grant our client tenure.

21          THE COURT:  So they are witnesses to the relevant

22  events here?

23          MS. HOWARD:  They're witnesses to some of the

24  relevant events.

25          THE COURT:  Yes.

1          MS. HOWARD:  So they are witnesses to the

2     deliberations of the tenure committee meeting about our

3     clients tenure application.  But other events, such as

4     retaliation we allege, sexual harassment, we do not believe

5     they are direct -- as far as we understand -- that they are

6     direct witnesses of those issues.

7          THE COURT:  Well, no one's a witness to every event

8     that occurred that relates to this case.

9          MS. HOWARD:  Yes, Your Honor.

10         THE COURT:  But they are witnesses and parties to

11    events that occurred here and they participated in events that

12    are the subject matter of this litigation in their role as

13    managers of the Yale University, correct?

14         MS. HOWARD:  Well, they're not managers, Your Honor.

15    They're tenured professors, so we'll actually be conducting

16    depositions of managers, such as the Dean of the College that

17    our client worked under, the Provost, individuals who are

18    managers within the Title IX department who conducted

19    investigations.

20         THE COURT:  How do you --

21         MS. HOWARD:  Our position is that tenured professors

22    are not managers.

23         THE COURT:  -- okay.  How do you define a manager?

24    What does Webster say a manager is?

25         MS. HOWARD:  So our position is that a manager would

Colloquy

1    be someone who would be responsible for -- for binding

2    University legally.  And our position is that casting a vote

3    on a tenure application has multiple steps, and the process is

4    not -- would not bind the University.

5            THE COURT:  A manager --

6            MS. HOWARD:  Does not -- do not bind the University.

7            THE COURT:  A manager is a person who can bind the

8    organization?  Isn't that an officer?

9            MS. HOWARD:  I'm sorry, Your Honor, I didn't hear the

10   last part of your question.

11           THE COURT:  Isn't a person who can bind an

12   organization an officer of the organization?  You don't have

13   to be -- there are managers that can't bind an organization,

14   isn't that correct?

15           MS. HOWARD:  My understanding of the application of

16   Rule 4.2 is that the purposes of defining a manager is someone

17   who binds -- has the authority to bind or settle disputes for

18   the defendant.

19           THE COURT:  Okay.

20           MS. HOWARD:  And so part of this is that they are not

21   able to.

22           THE COURT:  Is a tenure decision a decision of a

23   managerial nature?  Does that not bind the University?

24           MS. HOWARD:  In this matter it did and it did not,

25   Your Honor.  Because there was also review committee who then

1    reviewed --

2        THE COURT:  Attorney --

3        MS. HOWARD:  -- the decision, which also attempts

4    review the entire decision, giving (indiscernible) this

5    committee.

6        THE COURT:  Attorney Howard --

7        MS. HOWARD:  But the tenure decision did not end with

8    the committee.

9        THE COURT:  Attorney Howard, I'm not asking you about

10   this specific fact scenario, I'm trying to define what is

11   meant by the word manager.  What kind of role does a person

12   have to play in order to be a manager?  A person who conducts

13   more than the rudimentary business of the organization, a

14   person who is a decision maker, a person who makes decisions

15   that are of some significance or moment to the organization.

16   And certainly anyone who participates in a process as critical

17   as the tenure process is a manager.  Obviously in an academic

18   institution people play different roles, but if you consider

19   the corporate context, if a person is involved in the

20   determination as to whether a person should or should not be

21   promoted, they are managers.

22       MS. HOWARD:  Yes, Your Honor.

23       THE COURT:  You don't call someone subordinate into a

24   meeting and ask them whether their boss should be promoted;

25   you call their manager, you call their superior, you call a

1　person whose responsibility it is to manage the organization

2　by hiring, supervising, evaluating, and promoting people to do

3　the work of the organization.  So in that sense both of these

4　gentlemen, in playing a role and determining who is going to

5　have the coveted role of a tenured professor, are making the

6　kind of managerial decisions that are made by people in

7　comparable organizations, albeit profit-motivated

8　organizations.  So there's no question that they are managers.

9　And they're managers that played a critical role in the

10　decision at issue here.

11　　　　MS. HOWARD:  Your Honor, they -- we certainly agree

12　that both professors had a role in the decision that was made

13　here.  However, that alone is not sufficient -- we would

14　argue -- to render them as managers.  So, for instance, in

15　Jahari v. Sacred Heart University (ph) which is the case of

16　Judge Squatrito -- is -- is coming before Judge Squatrito,

17　this issue came up before him with respect to the department

18　chairs who had evaluated the plaintiff annually, provided a

19　very substantive letter of recommendation for the plaintiff

20　with respect to her tenure application, and shepherded her

21　tenure application.

22　　　　THE COURT:  Attorney Howard.  Attorney -- Attorney

23　Howard.

24　　　　MS. HOWARD:  Yes, Your Honor?

25　　　　THE COURT:  When that case got to Judge Squatrito,

Colloquy

1    the horse was already out of the barn.  But Judge Squatrito

2    closed that barn door, did he not?  He said no further

3    communication should take place.  So that doesn't --

4                MS. HOWARD:  But he also --

5                THE COURT:  -- that doesn't --

6                MS. HOWARD:  I'm sorry, Your Honor.

7                THE COURT:  -- that doesn't support your position.

8    The horse was already out of the barn, the conversations had

9    already occurred, certainly he did not bring down the sword of

10   Damocles; he was differential, and lenient, and careful as

11   Judges, especially in this district, often are.  Certainly if

12   that occurred in some other district, I'm not certain that the

13   outcome would have been the same.  In any event, he certainly

14   ruled that no further communications should take place.  We're

15   ahead of the curve now, the barn door isn't open.  And so the

16   fact that he said that you may not reopen the door, in my view

17   is consistent with him likely having said that the door cannot

18   open, had he been asked to begin with.  So that's, I think,

19   the only case that's in your favor; and I don't think that

20   case bodes well for you at all.

21               MS. HOWARD:  Your Honor, if in fact Judge Squatrito

22   had felt that way, he would have granted the defendant's

23   motion to exclude the affidavit.  He in fact allowed the

24   affidavit to be used because he was allowing the barn door to

25   still be opened, in all due respect, Your Honor.

Colloquy

1    THE COURT:  I'm sorry, but my mind reading

2  capabilities are not as strong as yours.  I can't -- I have no

3  idea.  Certainly if he thought that there was no issue there

4  he would not have closed the door.  So, but that's how I read

5  the case, all right?  And that is, obviously, that isn't

6  controlling upon me in any event.  I have to conduct my own

7  analysis, and looking at Federal Rule of Professional Conduct

8  42, in representing a client a lawyer is not allowed to

9  communicate about the subject matter with a party the lawyer

10  knows is represented by another lawyer, unless that lawyer has

11  given their permission.  Now, I don't know whether these two

12  professors are, you know, potential subjects of a lawsuit by

13  the plaintiff.  I don't know whether Yale considers itself to

14  be representing them in anticipation of a potential

15  litigation, that could very well occur.

16    However, the commentary which was not adopted by

17  Massachusetts, but was adopted by Connecticut, makes clear

18  that in the case of an organization, the Rule prohibits

19  communication by a lawyer of a party concerning a matter in

20  the representation who is in a managerial position, that is

21  has managerial responsibility on behalf of the organization.

22  Now clearly, as we've indicated, someone's who's making and

23  participating in the tenure decision, having input, weighing

24  in on that, is in a managerial position, and is a manager of

25  that organization in that context, and in the context of this

Colloquy

1  case.

2          And certainly you would be interested in speaking to

3  these people, because you believe that the statements that

4  they make can be inpuded to the University; in other words,

5  your purpose in speaking with them is to elicit from them

6  their belief that the plaintiff should have been hired, that

7  the University should have hired her as a tenured professor.

8  So you are seeking to implicate the University through your

9  questioning and examination of those individuals.

10          I don't consider it to be judicially inefficient to

11  proceed with interviews rather than depositions, especially

12  since we are here now using judicial resources.  It may be

13  less expensive for you to interview them rather than to depose

14  them, but I'm not even certain that that would be a particular

15  benefit to you, because to the extent they say anything

16  favorable to your client, you would want that on the record.

17  I think you're skating on very thin ice if you persist in, you

18  know, efforts to speak to them without counsel for Yale being

19  present.  Both because of the potential professional

20  responsibility implications, and also from the standpoint of,

21  you know, failing to nail down facts that could be beneficial

22  to your client.

23          I would also note that the Crane (ph) case is very

24  close to the facts of the case here and however, the decision

25  was not consistent with the ruling that I'm in the process of

Colloquy

1  making because Mass had not adopted the commentary which

2  Connecticut has adopted.  And then there's Simineto (ph) which

3  is extremely analogous to our case, and in that case the Court

4  did -- it denied the protective order which would have

5  permitted the interview to take place.  So my ruling is that

6  the interviews may not take place.  If you'd like to depose

7  them and you can accomplish that within a reasonable time

8  frame, you know, within the permissible time frame, you can

9  certainly do that.

10          MS. HOWARD:  Yes, Your Honor.

11          THE COURT:  Now, turning to, is it question number

12  13?  I think my --

13          MS. HOWARD:  Your Honor, I would just --

14          THE COURT:  -- excuse me.

15          MS. HOWARD:  -- like to ask one question for

16  clarification?

17          THE COURT:  Yes, yes.

18          MS. HOWARD:  Would you mind, Your Honor?  So we have

19  noted and we are in the process of finishing scheduling

20  depositions for, I believe, 10 different witnesses, which

21  means we are at the maximum number of depositions allowed

22  under the federal rules.  We would like to then depose these

23  two professors, Professor Jackson and Gonzalez.  Would Your

24  Honor prefer that we file a motion to Court, or would Your

25  Honor be willing to rule on whether we are allowed to take two

Colloquy

1    additional depositions?

2        THE COURT:  You may take two additional depositions.

3        MS. HOWARD:  Thank you, Your Honor.

4        THE COURT:  All right.  Turning to number 13.  I

5    don't know what's unclear about the ruling on number 13.  My

6    ruling says that 13 falls within the permissible scope of

7    discovery; what seems to be the dispute there?

8        MS. HOWARD:  Your Honor, the dispute is on request

9    for production -- on that request for production 15.  So from

10   our perspective your ruling is very clear.  You very quite

11   clearly state what is responsive and discoverable, that

12   material gathered as part of the Title IX investigation, the

13   (indiscernible) repair only the portion of the report relating

14   to the department, that that information is relevant and

15   discoverable, you enumerate about four or five categories of

16   information that's relevant and discoverable.

17        Our understanding, as far as we can tell from the

18   view of all of the documents, this goes from the defendant,

19   the defendant interpreted your ruling as only requiring them

20   to produce documents relating to our clients, and only

21   documents relating to our client in the Title IX investigation

22   prior to the tenure decision.  Our understanding temporally,

23   it is in fact, anything that is prior to or contemporaneous

24   with the tenure decision, but there's more categories than

25   simply our client, that are included in your ruling.

Colloquy

1    THE COURT:  Attorney Salazar, is that your position?

2    MR. SALAZAR-AUSTIN:  First, Your Honor, I just wanted

3 to clarify the number, because I think there were two

4 different numbers used.  Request for production number 13, I

5 think, has already been resolved by the parties.  We did

6 produce the letter that was an issue there; Attorney Howard

7 can correct me if I'm wrong.  But turning to request for

8 production number 15, which relates to Title IX report,

9 Attorney Howard has captured it in part.  But, Your Honor, as

10 we were interpreting your decision dated May 14th, 2018 Docket

11 number 44, you said any report relating to the department of

12 Spanish and Portuguese, you know the investigation into that

13 department.

14    THE COURT:  Yes.

15    MR. SALAZAR-AUSTIN:  And though, in fact there was no

16 investigation into the department, the only investigation

17 we're aware of is into one specific professor, Roberto

18 Gonzalez Echevarria.  So our position, Your Honor, is that any

19 investigation into him, which again, you know, arose after the

20 tenure decision and stemmed from a complaint filed after the

21 tenure decision, and continued for months after the tenure

22 decision was made, is not within the proper scope of

23 discovery.

24    THE COURT:  Okay.  So let me clarify that.  It was my

25 understanding that there was a -- that there was an

Colloquy

1   investigation and report that went beyond the department of

2   Spanish and Portuguese, that it was university-wide, or multi-

3   department-wide investigation and report.  If I'm wrong about

4   that, then I stand corrected.

5          But, I think if you read the rationale in the ruling,

6   it makes clear that to the extent that Mr. or Dr. Echevarria

7   was aware of criticisms that were being made about him by the

8   plaintiff, and others, which criticisms could have been

9   perceived by him to have been either encouraged or supported

10  by the plaintiff, could have formed the motivation or the

11  impetus for him to stave off any kind of negative consequence,

12  including an investigation and/or report in the future, by

13  silencing Ms. Byrne through denying her tenure.

14         I think I explain that in the decision as part of the

15  basis for the reason.  The decision essentially says that the

16  discovery decision was based upon a finding, that the tenure

17  decision could have been causally connected to the Title VIII

18  investigation and it's impetus because they occurred, that is

19  the criticisms and the like, occurred within very close

20  proximity, that is within the cycle of information, of the

21  tenure decision.  That the Court's ruling was based upon the

22  fact that Mr. Echevarria's knowledge of the criticism could

23  have motivated him to attempt to prevent a Title IX, excuse

24  me, Title IX complaint from being filed, an investigation from

25  being conducted, and any report from being prepared by

Colloquy

1 silencing Professor Byrne, who he reputedly believed was

2 encouraging or fostering these criticisms, and who in fact was

3 critical of him.

4 So that being the basis of my ruling, it is a ruling

5 that requires disclosure of information beyond information

6 concerning the plaintiff and any criticisms that she made of

7 Mr. Echevarria.

8 MS. HOWARD: Your Honor, I would like to ask a

9 question for clarification.

10 THE COURT: Yes.

11 MS. HOWARD: So our request for production asks for

12 documents concerning the Title IX investigation, which is

13 separate from the climate review, which was a University-wide

14 investigation of the department. The Title IX investigation

15 was specifically, with respect to Professor Echevarria. And

16 so, our understanding, our reading of your ruling was that any

17 materials gathered, used, information around the Title IX

18 investigation, whether it is information sent to the

19 department chair or information sent to Professor Echevarria

20 within the department, as long as that information was

21 produced/created before the tenure decision, or

22 contemporaneous to the tenure decision, that that information

23 was ruled relevant and discoverable.

24 THE COURT: Well, I --

25 MS. HOWARD: Is that accurate or --

Colloquy

1    THE COURT:  Well, let me ask a question, what's the

2  relationship between the climate review and the Title IX

3  investigation?  Are they related in any way?

4    MR. SALAZAR-AUSTIN:  They are not, Your Honor.

5    MS. HOWARD:  They are, Your Honor.  So the email we

6  produced as an exhibit to our earlier motion, earlier this

7  year, is an email from a Title IX officer to our client,

8  stating that the climate review -- issues raised in the

9  climate review -- have sparked a Title IX investigation.

10    THE COURT:  Yes.

11    MS. HOWARD:  And so they were contacting our client

12  to see if she was willing to testify, to be interviewed, as

13  part of their Title IX investigation.

14    THE COURT:  And when did that occur, before or after

15  the denial of tenure?

16    MS. HOWARD:  Before, Your Honor.

17    THE COURT:  Before.  And the criticisms of Dr.

18  Professor Echevarria occurred as part of the climate review?

19    MS. HOWARD:  As part of the climate review and the

20  Title IX investigation, Your Honor.

21    THE COURT:  But --

22    MS. HOWARD:  So our client was -- sorry, Your Honor.

23    THE COURT:  -- it started -- the criticisms that you

24  believe may have motivated Echevarria to vote against your

25  client, were lodged during the climate review process; is that

Colloquy

1   correct or incorrect?

2        MS. HOWARD:  They began in the climate review

3   process, that's correct, Your Honor.

4        THE COURT:   They began.

5        MS. HOWARD:  Yes.

6        THE COURT:  And your client was denied tenure before

7   the Title IX investigation, correct?

8        MS. HOWARD:  No.  After -- during the Title IX

9   investigation, Your Honor.

10       THE COURT:  Okay, okay, okay.  All right.

11       MS. HOWARD:  And our client was interviewed as part

12  of the Title IX investigation before she was denied tenure.

13       THE COURT:  And how much time elapsed between the end

14  of climate review and the beginning of the Title IX

15  investigation?

16       MS. HOWARD:  A few months, Your Honor.  This all

17  happened in 2015.  So in, I believe, around the spring of

18  2015, the climate review was taking place and we know that our

19  client was interviewed as part of the Title IX -- well she was

20  reached out -- the Title IX office reached out to our client

21  in November of 2015, and she was interviewed by the Title IX

22  office in December of 2015.

23       THE COURT:  I see.  Okay, okay, I have a better

24  picture now.  I have a better picture now.  All righty.  So --

25  yes.

Colloquy

1      MR. SALAZAR-AUSTIN:  I'm sorry, Your Honor.

2      THE COURT:  Yes?

3      MR. SALAZAR-AUSTIN:  If I may, it is true that issues

4  that were raised during the client review did lead in part to

5  the Title IX investigation, but they are two completely

6  separate processes and that's why I answered the question the

7  way I did when you posed it.  You know, they're conducted by,

8  you know, the investigation is conducted by an entirely

9  different group of individuals than those that were involved

10  in the climate review.  And the climate review related to an

11  entire department, whereas the Title IX investigation was into

12  one specific professor only.

13      THE COURT:  I see.  All righty.  And so tell me now,

14  would there have been a Title IX investigation had the climate

15  review been favorable or positive toward Echevarria?

16      MS. HOWARD:  No, Your Honor.  As I've mentioned, the

17  emails that we provided as an exhibit earlier this year, the

18  Title IX officer quite clearly links both of those issues and

19  states that the issues raised in the climate review are what

20  spurned them to undertake the Title IX investigation.  So

21  without these issues coming to bear in the climate review,

22  they never would have surfaced and then been further

23  investigated in the Title IX investigation.

24      MR. SALAZAR-AUSTIN:  If I may, Your Honor?

25      THE COURT:  Yes.

Colloquy

1      MR. SALAZAR-AUSTIN:  I would say that's a

2  hypothetical, in that we don't know if those complaints would

3  have been raised.  But what's critical to remember here is

4  that Professor Byrne was not the person who initiated, you

5  know, the Title IX investigation.  The Title IX office reached

6  out to her to see if she might have relevant information,

7  which, you know, she did meet with them.  But there were

8  others as well, who also reached out.  And whether any of

9  those may have raised any, you know, complaints sufficient to

10  spark a Title IX investigation, you know, we just do not know

11  the answer to that.  That's a hypothetical that I don't think

12  anybody can answer.

13      THE COURT:  What --

14      MR. SALAZAR-AUSTIN:  But the important thing I think,

15  is that these are two completely separate processes.  And you

16  know, the latter, the Title IX investigation into Professor

17  Gonzalez Echevarria specifically, again, pertains solely to

18  him and the bulk of that process took place after the

19  committee had already met and decided Professor Byrne's

20  tenure -- or made a tenure decision.  Now I understand that

21  whether or not Professor Gonzalez Echevarria had knowledge of

22  the complaint, or Professor Byrne's communication with the

23  Title IX office, that's a factual issue that of course will

24  come out during the remainder of the discovery.  Our position,

25  as you might imagine, is that he had no idea, but we

1  understand that plaintiff's have the right to establish that

2  there's some connection there.  But that would only be, you

3  know, communications that occurred prior to the tenure

4  decision, the meeting of the committee that results in her not

5  being recommended for tenure.  Anything that sort of plays

6  after that, including the entire Title IX complaint and -- and

7  subsequent investigation process, we would argue, Your Honor,

8  plainly could not possibly have any relation to the tenure

9  decision that Professor Gonzalez Echevarria was involved in.

10           THE COURT:  You know, I --

11           MS. HOWARD:  Except,  Your Honor -- actually --

12  sorry, Your Honor.

13           THE COURT:   Yeah.  I don't know that that is

14  necessarily true.  In other words, since the criticisms were

15  occurring long before --  months before, at the very least --

16  the Title IX investigation, the Title IX investigation was

17  prompted by the climate review, there may very well be

18  material gathered during the Title IX investigation that --

19  well, obviously the material they gather predated the

20  initiation of the investigation.  And so there could be

21  statements made by individuals, records provided by

22  individuals during the Title IX investigation pertaining to

23  periods of time during and prior to the climate review

24  process.

25           So -- because the Title IX investigation was really a

Colloquy

1   follow-up, a deeper dive, into the issues that emerged during

2   the climate review, I don't think that I can conclude that Mr.

3   Echevarria would not have been motivated by anything that was

4   documented or created during the Title IX investigation after

5   the tenure decision had been made.  Because it could have

6   existed beforehand, it could have been communicated

7   beforehand, it could have been an impetus for the Title IX

8   investigation, and occurred beforehand.

9           MR. SALAZAR-AUSTIN:  Your Honor --

10          MS. HOWARD:  Your Honor --

11          MR. SALAZAR-AUSTIN:  -- I'm sorry, Claire.  Thank

12  you.  The Title IX investigation is somewhat far ranging.  I

13  believe, if memory serves, there was actually one allegation

14  dating back to, like, the 1980's, plainly having nothing to do

15  with Professor Byrne.  The scope of what would need to be

16  produced -- if anything is indeed to be produced -- is

17  really -- it's a difficult thing for us to wrap our arms

18  around collectively.

19          And besides, I think we would agree, we have

20  produced, you know, the specific emails -- or sorry, the

21  notes -- that relate to the Title IX investigation.  You know,

22  conversations with -- between Professor Byrne and Title IX

23  investigators, you know, those are documents that makes sense

24  to produce.  And if we haven't produced them already -- I

25  believe we have -- but if there are any other of those

Colloquy

1  conversations we would produce them.

2       The -- what I would argue is not responsive or

3  potentially within the proper scope of discovery are, you

4  know, documents, for example, for allegations back in the

5  1980's, or even the ultimate, you know, letter regarding the

6  decision after the investigation was completed, which I think

7  is from August of 2016, you know, several months after the

8  tenure decision was made.  I would argue those could not

9  plausibly be within the scope of discovery here.

10      THE COURT:  Why not?  If the ultimate decision of the

11  Title IX investigation was predicated upon an investigation

12  that was prompted in part by the climate review, how could it

13  not be relevant?  I mean, that's like saying a jury verdict is

14  not relevant to the facts and circumstances that gave rise to

15  the trial.

16      MR. SALAZAR-AUSTIN:  Your Honor, I think the trouble

17  is that we don't see the Title IX and the climate review --

18  the Title IX investigation and the climate review as

19  connected.  The Title IX office certainly became aware of

20  allegations, and, you know, perhaps, you know, some of the

21  allegations were, you know, first, you know, set light on

22  during the climate review, but they're still completely

23  separate processes.  It isn't as though the climate reviewers

24  turned it over, okay, now we're done, Title IX investigators,

25  here you go, it's time for you to pick it up.  They're

Colloquy

1    completely separate processes.  The Title IX office became

2    aware of concerns, we reached out to Professor Byrne, spoke to

3    Professor Byrne, and, you know, the process continues from

4    there, but it was far ranging.  And, you know, the bulk of

5    that investigation had absolutely nothing to do with Professor

6    Byrne.

7              THE COURT:  I mean, an arrest by a police officer is

8    a totally different process from a trial before a judge and

9    jury, but that doesn't mean they're not connected.  They're

10   clearly connected.

11             MR. SALAZAR-AUSTIN:  Well, for example --

12             THE COURT:  The Title IX team investigation occurred

13   in part because of the statements made during the climate

14   review.  And I am having a hard time conceiving of your

15   inability to comprehend that.

16             MR. SALAZAR-AUSTIN:  Your Honor, the Title IX

17   investigation -- you know, for example, many times in criminal

18   cases the analogy that you're drawing there, there is an

19   evidentiary dispute about prior arrests and whether those

20   prior arrests would be admissible, ultimately, in the trial.

21   Here we've got a situation where the Title IX investigation

22   might spread, you know, back 30 years.  And plainly, could not

23   have any connection at all to Professor Byrne, and what we're

24   really trying to avoid here is a fishing expedition into this

25   wide-ranging history that, again, doesn't have any connection

Colloquy

1  to Professor Byrne.

2       Our other trouble is that we articulated our position

3  on this issue to opposing counsel in May of this year, and we

4  received no response until the build-up to this call that they

5  disagreed with that -- that position.  In the interim we

6  reviewed tens of thousands of pages of documents and, you

7  know, for them to revisit this issue now after we've already

8  gone through that extensive effort is going to require a

9  significant amount of rework at significant expense to Yale,

10  which I don't think is justified, given the fact that we did

11  articulate our position in a timely manner back in May of this

12  year.

13       THE COURT:  Well had --

14       MS. HOWARD:  We never --

15       THE COURT:  -- had the dispute emerged in May of this

16  year, would the cost to Yale have been different?  Would it

17  have been lower?  And if so --

18       MR. SALAZAR-AUSTIN:  Well, Your Honor, we could --

19       THE COURT:  -- and if so, how much lower?

20       MR. SALAZAR-AUSTIN:  The cost differential is that,

21  had we known in May, then during our initial review of all the

22  documents our review team could have, you know, pulled and

23  marked responsive documents relating to the Title IX

24  investigation.  Now, those documents will have to be re-

25  reviewed for this purpose.  So any, you know, re-review of the

Colloquy

1   data from this point forward is going to be a cost incurred

2   because they didn't articulate their position in May when we

3   disclosed our position.

4           MS. HOWARD:  I'd like to clarify something.  We

5   were -- we were not aware of defendant's position.  Your order

6   came out on May 14th, and the Party's began conferring about

7   ESI.  It wasn't until we finished reading all of the ESI

8   review and all ESI, the defendants finished producing, during

9   October, that we realized that we were not getting any

10  additional information, because the defendants did not finish

11  producing the documents that were responsive to Title IX

12  issues until October.  Because it was in October that

13  defendants produced hand-written notes from some interview of

14  our client, that we're not actually clear on and we won't be

15  clear on until we depose defendants witnesses.  So to state

16  that everything responsive was produced in May, that we knew

17  defendants position in May, is simply not accurate.

18          MR. SALAZAR-AUSTIN:  Your Honor, if I may?

19          THE COURT:  Attorney Salazar, do you know what the

20  size of Yale's endowment?

21          MR. SALAZAR-AUSTIN:  The size of Yale's endowment?

22  I -- I do not, Your Honor.

23          THE COURT:  Well, I doubt that Yale is, you know,

24  going to notice the nit of the additional costs associated

25  with producing this information.  I think my decision is very

1    clear that the defendant was to produce any information that

2    may have had a bearing on Mr. Echevarria's potential

3    motivation to attempt to silence, and banish, distance,

4    punish, what have you, the plaintiff.  And, you know, if we

5    look at the dictionary definition of connection, it's

6    ineluctable that the climate review and the Title IX

7    investigation are connected, related, derivative, intertwined.

8    I don't understand the lack of clarity on this issue, frankly.

9          MR. SALAZAR-AUSTIN:  Okay.  We understand, Your

10   Honor.  And I -- and forgive me if this is apparent to

11   everyone else but me -- are you asking us to produce -- or

12   instructing us to produce documents, you know, interview

13   notes, for example, from witnesses who had complaints

14   unrelated to Professor Byrne?  You know, for example, if

15   there -- and I don't know this to be true -- but I believe

16   there was one allegation stemming back, you know, several

17   decades, if there was a meeting with that individual, or

18   attempts to contact that individual so that she could raise

19   her own individual complaint, would that fall within the scope

20   of what we're required to produce?

21         THE COURT:  Well let me -- you know, I can't really

22   answer that hypothetical question, but let me ask you this.

23   My recollection from our discussion in May was that there were

24   some who believed that the plaintiff was inciting criticism or

25   fermenting dissent, or in some way prompting, or encouraging,

1    or supporting those who were criticizing Echevarria; is that

2    true?

3            MR. SALAZAR-AUSTIN:  I don't believe so, Your Honor.

4            MS. HOWARD:  There -- from our review of the

5    documents produced by the defendants, at this point there

6    certainly is.  It certainly is obvious that there was a belief

7    that our client was inciting criticism against the department,

8    including Professor Echevarria.

9            THE COURT:  Can you be specific so that Attorney

10   Salazar can understand why you've come to that conclusion?

11           MS. HOWARD:  So there are email communications

12   between the department chair and other professors within the

13   department, discussing our client and taking an antagonistic

14   view towards our client and certain emails or letters she may

15   have written, and highlighting them as the sample -- these

16   communications as the samples of our client inciting or

17   causing problems; including interviews she may have done with

18   Yale Daily News, letters she may have written to other

19   administration officials, that sort of thing.

20           MR. SALAZAR-AUSTIN:  Yes, Your Honor.  We're aware, I

21   believe, of the emails that Attorney Howards' referring to.

22   But as I think she just said, those were specifically in

23   reference to other issues, not the Title IX investigation.

24   She mentioned the Yale Daily News article, which really

25   relates specifically to the climate review, not the Title IX

1  investigation that occurred, you know, many, many, many months

2  later.

3      THE COURT:  What --

4      MR. SALAZAR-AUSTIN:  Because I'm not aware of any --

5  any emails or documents that suggest that she was inciting

6  other people to participate in the Title IX investigation.

7      THE COURT:  Again they are --

8      MS. HOWARD:  That is true because we don't have any

9  documents around the Title IX investigation, which is why

10  we're here today.

11      THE COURT:  And they are connected.  They are

12  connected.  Okay?  There's no question that they are

13  connected.  Connected.

14      MS. HOWARD:  Your Honor, I have one question, and I

15  think it's very similar to my earlier question, I apologize if

16  you've answered it.  But I just would like to make it clear

17  for the record whether communication that the Title IX office

18  had with members of the department around the Title IX

19  investigation are within the scope of what you're relaying is

20  relevant and discoverable?  Because our concern is not just

21  Professor Echevarria's knowledge of the investigation of him,

22  but also other department member's, including the department

23  chair's knowledge of this investigation of Professor

24  Echevarria.

25      THE COURT:  Why?

Colloquy

1    MS. HOWARD:  These are all the members who voted on

2    our clients tenure application.  So for instance, if the

3    department chair was notified by the Title IX office, which is

4    the standard practice at Yale, that a Title IX investigation

5    was occurring of one of her professors, we believe that that

6    would go -- that would be part of, essentially, part of the

7    reason why a department member would vote against granting our

8    client tenure.  And so to the extent that department members

9    knew of the Title IX investigation before they voted on the

10   tenure -- on our client's tenure application, we believe that

11   that would be relevant and discoverable.

12       THE COURT:  Because you have evidence that they were

13   aware of her involvement with or lodging of criticisms against

14   him during the climate review process?

15       MS. HOWARD:  Yes, Your Honor.

16       THE COURT:  Then the answer to that question would be

17   yes.  The Title IX investigation is causally linked to the

18   climate review.  The Title IX investigation is derivative of

19   the climate review; they are connected by any common

20   definition of the word.  And so anything, any information,

21   concerning either that may have affected the decision making

22   of any decision maker is discoverable.

23       MR. SALAZAR-AUSTIN:  By that definition, Your Honor,

24   the report generated six months after the decision could not

25   have affected their decision making?

Colloquy

1          THE COURT:  It could reflect facts that affected

2    their decision making.  I'm assuming the report states facts

3    that were gathered, and draws conclusions, perhaps makes

4    recommendations.  Some of the facts that were gathered, some

5    of the conclusions that were drawn, and perhaps even some of

6    the recommendations that may have been made could be

7    derivative of, connected to, derived from, criticisms lodged

8    during the climate review, and the Title IX investigation.

9    You've read the Title IX investigation report, I'm assuming,

10   Attorney Salazar, correct?

11         MR. SALAZAR-AUSTIN:  I do have it, Your Honor.

12         THE COURT:  Does it not use the term "climate review"

13   at all?

14         MR. SALAZAR-AUSTIN:  I'm looking at the letter now,

15   Your Honor, it does not mention the climate review.

16         THE COURT:  It's just a letter?

17         MR. SALAZAR-AUSTIN:  It is a letter to Professor

18   Gonzalez Echevarria --

19         THE COURT:  That's the report?  It's just a letter to

20   Professor Echevarria?  There must be more.  That's the report,

21   a letter?

22         MR. SALAZAR-AUSTIN:  Let's see, I'm just checking,

23   Your Honor.  No, it's a letter; July 29th, 2016 letter to

24   Professor Gonzalez Echevarria.

25         THE COURT:  And where's -- is that the report?

Colloquy

1  That's it?  A letter?

2      MR. SALAZAR-AUSTIN:  Yes, Your Honor.

3      THE COURT:  There are no findings?  Well how long is

4  the -- okay.  Who commissioned the report?  The Title IX

5  investigation?

6      MR. SALAZAR-AUSTIN:  The Title IX office initiated

7  the report.

8      THE COURT:  So no report was made to the Title IX

9  office?

10      MR. SALAZAR-AUSTIN:  There is a UW -- well, I'll just

11  use the word Title IX.  UWC is also a -- it's also used but it

12  refers to the same thing.  So there's a panel -- a UWC panel

13  report to the provost, if that's what you're asking about.

14  But the final letter to Professor Gonzalez Echevarria with the

15  findings, is a letter, yes, to the professor.

16      THE COURT:  I'm not as concerned about the, you know,

17  sanitized, senseisized, whatever, letter to Mr. Echevarria;

18  I'm sure Attorney Howard is interested in that.  But I would

19  imagine that a lengthy Title IX report would be just that, a

20  report, which described why it was prepared, that would

21  describe the modus operendi of the investigation, that would

22  describe the information that was gathered during the

23  investigation, that would describe some analysis of that

24  information, that would include some conclusions, some

25  findings from the investigation, and perhaps even have some

Colloquy

1    recommendations.  Is there no such thing?

2         MR. SALAZAR-AUSTIN:  No there is, Your Honor, I'm

3    sorry.  That's the panel report that I was referring to.

4         THE COURT:  Well -- all righty.  Well, excuse my

5    naivete from not knowing the nomenclature, but I think I did

6    say the Title IX investigation report, by whatever name you

7    call it.  I think, yes, have you disclosed that?

8         MR. SALAZAR-AUSTIN:  No, Your Honor.  That report was

9    generated a month after, it was in June of 2016, so we have

10   not -- we have not produced that, Your Honor.

11        THE COURT:  And does that report not explain why it

12   was prepared?

13        MR. SALAZAR-AUSTIN:  If you're asking me if it has

14   any -- if it mentions the climate review, I'm looking at it

15   now, and I do not see any reference to the climate review.

16        THE COURT:  How long is it?

17        MR. SALAZAR-AUSTIN:  Just bear with me, Your Honor,

18   I'm just scrolling through it.

19        MS. HOWARD:  And Your Honor, actually while Attorney

20   Salazar-Austin is scrolling through that --

21        MR. SALAZAR-AUSTIN:  Nine pages, Your Honor.

22        THE COURT:  Okay.

23        MS. HOWARD:  -- I would like to just add that after

24   my client was denied tenure, she actually appealed it.  And

25   there was a review by the provost who apparently got a copy of

Colloquy

1  this report, and there was a panel committee commissioned to

2  review the tenure decision, and that committee did not

3  actually finish the reviewing the decision until July of 2016,

4  which is apparently after the Title IX report was completed.

5          THE COURT:  So how long was this investigation?

6          MR. SALAZAR-AUSTIN:  I believe -- I -- I can't give

7  you the exact time frame, Your Honor.  I know that -- I

8  believe that the first conversation with Professor Byrne from

9  the -- with the Title IX office was December of 2015, and the

10 report -- whether there was some leg work done before that, I

11 don't know.  I believe the actual complaint, you know,

12 initiating the investigation, was the week after the tenure

13 decision, so February, I think -- I believe, 16th, of that

14 year.  And then the panel report that I'm looking at is from

15 June of that year, 2016.

16         THE COURT:  So they spent --

17         MS. HOWARD:  The Title IX office actually reached out

18 to her in November.

19         THE COURT:  So they did that --

20         MR. SALAZAR-AUSTIN:  Oh right, I'm sorry.  The

21 conversation with Professor Rambly (ph) was December 1st.

22         THE COURT:  So it took them about six months to

23 conduct the investigation and they wrote a -- what'd you

24 say -- a nine-page report?  That's it?

25         MR. SALAZAR-AUSTIN:  It's difficult, Your Honor,

Colloquy

1  because there's several different types of reports.  You know,

2  the one report is nine pages.  There's a fact finders report,

3  which appears to be, let's see -- and I appreciate that you

4  don't know the name of the nomenclature, Your Honor -- but

5  there's a fact finder reports that is a little bit longer.

6  Looks to be, you know, over -- at least over 30 pages.  Yeah,

7  so about 33 pages.

8          THE COURT:  All of that is discoverable.  All of it.

9  The work product of the Title IX investigation is

10  discoverable, by whatever name you label it.

11          MR. SALAZAR-AUSTIN:  Yes, Your Honor.

12          THE COURT:  Are there any other issues that need to

13  be resolved?

14          MS. HOWARD:  No, Your Honor.

15          MR. SALAZAR-AUSTIN:  No, Your Honor, thank you.

16          THE COURT:  You're welcome.  Thank you both.  Good

17  luck.

18          MS. HOWARD:  Thank you, Your Honor.

19          (Whereupon the above matter was concluded at 3:58

20  o'clock, p.m.)

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3        I, Lisa Thayne, Official Court Transcriber for the

4    United States District Court for the District of Connecticut,

5    do hereby certify that the foregoing pages are a true and

6    accurate transcription of the proceedings in the

7    aforementioned matter to the best of my skill and ability.

8

9

10   Date: December 8, 2018

11

12

13

14   _____

15                    LISA THAYNE

16                   eScribers, LLC
                352 Seventh Avenue, Ste. #604
17                   New York, NY 10001
                       (973)406-2250
18               operations@escribers.net

19

20

21

22

23

24

25

**[**

**[sic] (2)**
3:22,23

**A**

**abide (1)**
3:18
**able (1)**
6:21
**above (1)**
35:19
**absolutely (1)**
24:5
**academic (1)**
7:17
**accomplish (1)**
12:7
**accurate (2)**
16:25;26:17
**actual (1)**
34:11
**actually (8)**
5:15;21:11;22:13;
26:14;33:19,24;34:3,
17
**add (1)**
33:23
**additional (6)**
4:7,7;13:1,2;26:10,
24
**administration (1)**
28:19
**admissible (1)**
24:20
**adopted (4)**
10:16,17;12:1,2
**affected (3)**
30:21,25;31:1
**affidavit (2)**
9:23,24
**afternoon (1)**
3:2
**afternoons (1)**
3:12
**again (4)**
14:19;20:17;24:25;
29:7
**against (4)**
17:24;28:7;30:7,13
**agree (2)**
8:11;22:19
**agreement (1)**
4:10
**ahead (1)**
9:15
**albeit (1)**
8:7
**allegation (1)**
22:13;27:16
**allegations (3)**
23:4,20,21
**allege (1)**
5:4
**allowed (4)**
9:23;10:8;12:21,25
**allowing (1)**
9:24
**alone (1)**
8:13
**although (1)**
3:12
**amount (1)**
25:9
**analogous (1)**
12:3
**analogy (1)**
24:18
**analysis (2)**
10:7;32:23
**and/or (1)**
15:12
**Anibal (1)**
4:2
**annually (1)**
8:18
**answered (2)**
19:6;29:16
**antagonistic (1)**
28:13
**anticipation (1)**
10:14
**apologize (1)**
29:15
**apparent (1)**
27:10
**apparently (2)**
33:25;34:4
**appealed (1)**
33:24
**appearance (1)**
3:3
**appears (1)**
35:3
**application (7)**
5:3;6:3,15;8:20,21;
30:2,10
**appreciate (2)**
3:18;35:3
**argue (4)**
8:14;21:7;23:2,8
**arms (1)**
22:17
**arose (1)**
14:19
**around (5)**
16:17;18:17;22:18;
29:9,18
**arrest (1)**
24:7
**arrests (2)**
24:19,20
**article (1)**
28:24

**articulate (2)**
25:11;26:2
**articulated (1)**
25:2
**associated (1)**
26:24
**assuming (2)**
31:2,9
**attempt (2)**
15:23;27:3
**attempts (2)**
7:3;27:18
**Attorney (16)**
3:21;7:2,6,9;8:22,22,
22;14:1,6,9;26:19;
28:9,21;31:10;32:18;
33:19
**August (1)**
23:7
**authority (1)**
6:17
**avoid (2)**
4:6;24:24
**avoiding (1)**
4:7
**aware (8)**
14:17;15:7;23:19;
24:2;26:5;28:20;29:4;
30:13

**B**

**back (5)**
22:14;23:4;24:22;
25:11;27:16
**banish (1)**
27:3
**barn (5)**
9:1,2,8,15,24
**based (2)**
15:16,21
**basis (3)**
3:17;15:15;16:4
**bear (2)**
19:21;33:17
**bearing (1)**
27:2
**became (2)**
23:19;24:1
**beforehand (3)**
22:6,7,8
**began (3)**
18:2,4;26:6
**begin (2)**
3:19;9:18
**beginning (1)**
18:14
**behalf (3)**
3:8,21;10:21
**belief (2)**
11:6;28:6
**beneficial (1)**
11:21

**benefit (1)**
11:15
**besides (1)**
22:19
**better (2)**
18:23,24
**beyond (2)**
15:1;16:5
**bind (8)**
4:12;6:4,6,7,11,13,
17,23
**binding (1)**
6:1
**binds (1)**
6:17
**bit (1)**
35:5
**bodes (1)**
9:20
**boss (1)**
7:24
**both (6)**
4:17;8:3,12;11:19;
19:18;35:16
**brief (1)**
3:15
**bring (1)**
9:9
**build-up (1)**
25:4
**bulk (2)**
20:18;24:4
**business (1)**
7:13
**Byrne (15)**
3:3,5,21;15:13;16:1;
20:4;22:15,22;24:2,3,6,
23;25:1;27:14;34:8
**Byrne's (2)**
20:19,22

**C**

**call (7)**
3:14;7:23,25,25,25;
25:4;33:7
**came (2)**
8:17;26:6
**can (12)**
3:21;6:7,11;11:4;
12:7,8;13:17;14:7;
20:12;22:2;28:9,10
**capabilities (1)**
10:2
**captured (1)**
14:9
**careful (1)**
9:10
**case (12)**
5:8;8:15,25;9:19,20;
10:5,18;11:1,23,24;
12:3,3
**cases (1)**

24:18
**casting (1)**
6:2
**categories (2)**
13:15,24
**causally (2)**
15:17;30:17
**causing (1)**
28:17
**certain (3)**
9:12;11:14;28:14
**certainly (12)**
4:11;7:16;8:11;9:9,
11,13;10:3;11:2;12:9;
23:19;28:6,6
**chair (3)**
16:19;28:12;30:3
**chairs (1)**
8:18
**chair's (1)**
29:23
**chambers (3)**
3:11,13,14
**checking (1)**
31:22
**circumstances (1)**
23:14
**Claire (1)**
3:4;22:11
**clarification (2)**
12:16;16:9
**clarify (3)**
14:3,24;26:4
**clarity (1)**
27:8
**clear (7)**
10:17;13:10;15:6;
26:14,15;27:1;29:10
**clearly (4)**
10:22;13:11;19:18;
24:10
**client (23)**
4:20;5:17;10:8;
11:16,22;13:21,25;
17:7,11,22,25;18:6,11,
19,20;19:4;26:14;28:7,
13,14,16;30:8;33:24
**clients (3)**
5:3;13:20;30:2
**client's (1)**
30:10
**climate (34)**
16:13;17:2,8,9,18,19,
25;18:2,14,18;19:10,
10,14,19,21;21:17,23;
22:2;23:12,17,18,22,
23;24:13;27:6;28:25;
30:14,18,19;31:8,12,
15;33:14,15
**close (2)**
11:24;15:19
**closed (2)**
9:2;10:4

**collectively (1)**
22:18
**College (1)**
5:16
**coming (2)**
8:16;19:21
**commentary (2)**
10:16;12:1
**commissioned (2)**
32:4;34:1
**committee (10)**
4:18;19;5:2;6:25;7:5,
8;20:19;21:4;34:1,2
**common (1)**
30:19
**communicate (1)**
10:9
**communicated (1)**
22:6
**communication (4)**
9:3;10:19;20:22;
29:17
**communications (4)**
9:14;21:3;28:11,16
**comparable (1)**
8:7
**complaint (6)**
14:20;15:24;20:22;
21:6;27:19;34:11
**complaints (3)**
20:2,9;27:13
**completed (2)**
23:6;34:4
**completely (4)**
19:5;20:15;23:22;
24:1
**comprehend (1)**
24:15
**conceiving (1)**
24:14
**concern (1)**
29:20
**concerned (1)**
32:16
**concerning (4)**
10:19;16:6,12;30:21
**concerns (1)**
24:2
**conclude (1)**
22:2
**concluded (1)**
35:19
**conclusion (1)**
28:10
**conclusions (3)**
31:3,5;32:24
**conduct (3)**
10:6,7;34:23
**conducted (4)**
5:18;15:25;19:7,8
**conducting (2)**
4:9;5:15
**conducts (1)**

7:12
**conference (1)**
3:15
**conferences (1)**
3:13
**conferring (2)**
4:5;26:6
**confidentially (1)**
3:22
**connected (11)**
15:17;23:19;24:9,10;
27:7;29:11,12,13,13;
30:19;31:7
**Connecticut (2)**
10:17;12:2
**connection (4)**
21:2;24:23,25;27:5
**consequence (1)**
15:11
**consider (2)**
7:18;11:10
**considers (1)**
10:13
**consistent (2)**
9:17;11:25
**contact (1)**
27:18
**contacting (1)**
17:11
**contemporaneous (2)**
13:23;16:22
**context (3)**
7:19;10:25,25
**continued (1)**
14:21
**continues (1)**
24:3
**controlling (1)**
10:6
**conversation (2)**
34:8,21
**conversations (3)**
9:8;22:22;23:1
**copy (1)**
33:25
**corporate (1)**
7:19
**corrected (1)**
15:4
**cost (3)**
25:16,20;26:1
**costs (1)**
26:24
**counsel (5)**
3:3,23;4:5;11:18;
25:3
**course (1)**
20:23
**COURT (90)**
3:2,6,9;4:1,14,15,21,
25;5:7,10,20,23;6:5,7,
11,19,22;7:2,6,9,23;
8:22,25;9:5,7;10:1;

12:3,11,14,17,24;13:2,
4;14:1,14,24;16:10,24;
17:1,10,14,17,21,23;
18:4,6,10,13,23;19:2,
13,25;20:13;21:10,13;
23:10;24:7,12;25:13,
15,19;26:19,23;27:21;
28:9;29:3,7,11,25;
30:12,16;31:1,12,16,
19,25;32:3,8,16;33:4,
11,16,22;34:5,16,19,
22;35:8,12,16
**Court's (2)**
3:11;15:21
**coveted (1)**
8:5
**Crane (1)**
11:23
**created (1)**
22:4
**criminal (1)**
24:17
**critical (3)**
7:16;8:9;16:3;20:3
**criticism (3)**
15:22;27:24;28:7
**criticisms (10)**
15:7,8,19;16:2,6;
17:17,23;21:14;30:13;
31:7
**criticizing (1)**
28:1
**curve (1)**
9:15
**cycle (1)**
15:20

**D**

**Daily (2)**
28:18,24
**Damocles (1)**
9:10
**data (1)**
26:1
**dated (1)**
14:10
**dating (1)**
22:14
**David (2)**
3:7;4:2
**Dean (1)**
5:16
**decades (1)**
27:17
**December (3)**
18:22;34:9,21
**decided (1)**
20:19
**decision (40)**
4:16;6:22,22;7:3,4,7,
14;8:10,12;10:23;
11:24;13:22,24;14:10,

20,21,22;15:14,15,16,
17,21;16:21,22;20:20;
21:4,9;22:5;23:6,8,10;
26:25;30:21,22,24,25;
31:2;34:2,3,13
**decisions (2)**
7:14;8:6
**deeper (1)**
22:1
**defendant (4)**
6:18;13:18,19;27:1
**defendants (6)**
26:8,10,13,15,17;
28:5
**defendant's (2)**
9:22;26:5
**defense (2)**
3:23;4:5
**define (2)**
5:23;7:10
**defining (1)**
6:16
**definition (3)**
27:5;30:20,23
**deliberations (1)**
5:2
**denial (1)**
17:15
**denied (4)**
12:4;18:6,12;33:24
**denying (1)**
15:13
**department (20)**
5:18;8:17;13:14;
14:11,13,16;15:1;
16:14,19,20;19:11;
28:7,12,13;29:18,22,
22;30:3,7,8
**department-wide (1)**
15:3
**depose (2)**
11:13;12:6,22;26:15
**depositions (7)**
4:8;5:16;11:11;
12:20,21;13:1,2
**derivative (3)**
27:7;30:18;31:7
**derived (1)**
31:7
**describe (3)**
32:21,22,23
**described (1)**
32:20
**determination (1)**
7:20
**determining (1)**
8:4
**dictionary (1)**
27:5
**didn't (1)**
26:2
**different (7)**
7:18;12:20;14:4;

20,21,22;15:14,15,16,
17,21;16:21,22;20:20;
21:4,9;22:5;23:6,8,10;
26:25;30:21,22,24,25;
31:2;34:2,3,13
**19:9;24:8;25:16;35:1
**differential (2)**
9:10;25:20
**difficult (2)**
22:17;34:25
**direct (2)**
5:5,6
**disagreed (1)**
25:5
**disclosed (2)**
26:3;33:7
**disclosure (1)**
16:5
**discoverable (9)**
13:11,15,16;16:23;
29:20;30:11,22;35:8,
10
**discovery (8)**
3:12;4:9;13:7;14:23;
15:16;20:24;23:3,9
**discreet (1)**
3:16
**discussing (1)**
28:13
**discussion (1)**
27:23
**dispute (4)**
13:7,8;24:19;25:15
**disputes (1)**
6:17
**dissent (1)**
27:25
**distance (1)**
27:3
**district (2)**
9:11,12
**dive (1)**
22:1
**Docket (1)**
14:10
**documented (1)**
22:4
**documents (15)**
13:18,20,21;16:12;
22:23;23:4;25:6,22,23,
24;26:11;27:12;28:5;
29:5,9
**don't (2)**
10:13;34:11
**done (3)**
23:24;28:17;34:10
**door (6)**
9:2,15,16,17,24;10:4
**doubt (1)**
26:23
**down (2)**
9:9;11:21
**Dr (2)**
15:6;17:17
**drawing (1)**
24:18
**drawn (1)**
31:5

**draws (1)**
31:3
**due (1)**
9:25
**during (16)**
17:25;18:8;19:4;
20:24;21:18,22,23;
22:1,4;23:22;24:13;
25:21;26:8;30:14;31:8;
32:22

**E**

**earlier (4)**
17:6,6;19:17;29:15
**Echevarria (20)**
14:18;15:6;16:7,15,
19;17:18,24;19:15;
20:17,21;21:9;22:3;
28:1,8;29:24;31:18,20,
24;32:14,17
**Echevarria's (3)**
15:22;27:2;29:21
**effort (1)**
25:8
**efforts (1)**
11:18
**either (2)**
15:9;30:21
**elapsed (1)**
18:13
**elicit (1)**
11:5
**else (1)**
27:11
**email (3)**
17:5,7;28:11
**emails (5)**
19:17;22:20;28:14,
21;29:5
**emerged (2)**
22:1;25:15
**encouraged (1)**
15:9
**encouraging (2)**
16:2;27:25
**end (2)**
7:7;18:13
**endowment (2)**
26:20,21
**entire (3)**
7:4;19:11;21:6
**entirely (1)**
19:8
**enumerate (1)**
13:15
**ESI (3)**
26:7,7,8
**especially (2)**
9:11;11:11
**essence (1)**
3:25
**essentially (2)**

15:15;30:6
**establish (1)**
21:1
**evaluated (1)**
8:18
**evaluating (1)**
8:2
**even (4)**
11:14;23:5;31:5;
32:25
**event (3)**
5:7;9:13;10:6
**events (5)**
4:22,24;5:3,11,11
**everyone (1)**
27:11
**evidence (1)**
30:12
**evidentiary (1)**
24:19
**exact (1)**
34:7
**examination (1)**
11:9
**example (5)**
23:4;24:11,17;27:13,
14
**Except (1)**
21:11
**exclude (1)**
9:23
**excuse (3)**
12:14;15:23;33:4
**exhibit (2)**
17:6;19:17
**existed (1)**
22:6
**expedition (1)**
24:24
**expense (2)**
4:7;25:9
**expensive (1)**
11:13
**explain (2)**
15:14;33:11
**extensive (1)**
25:8
**extent (3)**
11:15;15:6;30:8
**extremely (1)**
12:3

**F**

**fact (11)**
7:10;9:16,21,23;
13:23;14:15;15:22;
16:2;25:10;35:2,5
**facts (6)**
11:21,24;23:14;31:1,
2,4
**factual (1)**
20:23

**failing (1)**
11:21
**fall (1)**
27:19
**falls (1)**
13:6
**far (5)**
4:10;5:5;13:17;
22:12;24:4
**favor (3)**
4:4,19;9:19
**favorable (4)**
4:3,8;11:16;19:15
**February (1)**
34:13
**Federal (2)**
10:7;12:22
**felt (1)**
9:22
**fermenting (1)**
27:25
**few (1)**
18:16
**file (2)**
3:15;12:24
**filed (2)**
14:20;15:24
**final (1)**
32:14
**finder (1)**
35:5
**finders (1)**
35:2
**finding (1)**
15:16
**findings (3)**
32:3,15,25
**finish (2)**
26:10;34:3
**finished (2)**
26:7,8
**finishing (1)**
12:19
**first (5)**
3:20;4:5;14:2;23:21;
34:8
**fishing (1)**
24:24
**five (2)**
4:19;13:15
**follow-up (1)**
22:1
**forgive (1)**
27:10
**formed (1)**
15:10
**forth (1)**
3:15
**forward (2)**
3:17;26:1
**fostering (1)**
16:2
**four (1)**

13:15
**frame (3)**
12:8,8;34:7
**frankly (1)**
27:8
**Friday (1)**
3:12
**further (3)**
9:2,14;19:22
**future (2)**
3:10;15:12

**G**

**gather (1)**
21:19
**gathered (6)**
13:12;16:17;21:18;
31:3,4;32:22
**gave (1)**
23:14
**generated (2)**
30:24;33:9
**gentlemen (1)**
8:4
**given (2)**
10:11;25:10
**giving (1)**
7:4
**goes (1)**
13:18
**Gonzalez (9)**
4:2;12:23;14:18;
20:17,21;21:9;31:18,
24;32:14
**Good (2)**
3:2;35:16
**grant (1)**
4:20
**granted (1)**
9:22
**granting (1)**
30:7
**group (1)**
19:9

**H**

**hand-written (1)**
26:13
**happened (1)**
18:17
**harassment (1)**
5:4
**hard (1)**
24:14
**hear (1)**
6:9
**Heart (1)**
8:15
**highlighting (1)**
28:15
**hired (2)**

11:6,7
**hiring (1)**
8:2
**history (1)**
24:25
**Honor (68)**
3:4,8,25;5:9,14;6:9,
25;7:22;8:11,24;9:6,
21,25;12:10,13,18,24,
25;13:3,8;14:2,9,18;
16:8;17:4,5,16,20,22;
18:3,9,16;19:1,16,24;
21:7,11,12;22:9,10;
23:16;24:16;25:18;
26:18,22;27:10;28:3,
20;29:14;30:15,23;
31:11,15,23;32:2;33:2,
8,10,17,19,21;34:7,25;
35:4,11,14,15,18
**horse (2)**
9:1,8
**Howard (66)**
3:4,4,21,25;4:17,23;
5:1,9,14,21,25;6:6,9,
15,20,24;7:3,6,7,9,22;
8:11,22,23,24;9:4,6,21;
12:10,13,15,18;13:3,8;
14:6,9;16:8,11,25;17:5,
11,16,19,22;18:2,5,8,
11,16;19:16;21:11;
22:10;25:14;26:4;28:4,
11;29:8,14;30:1,15;
32:18;33:19,23;34:17;
35:14,18
**Howards' (1)**
28:21
**hypothetical (3)**
20:2,11;27:22

**I**

**I'm (2)**
31:14;33:18
**ice (1)**
11:17
**idea (2)**
10:3;20:25
**imagine (2)**
20:25;32:19
**impetus (3)**
15:11,18;22:7
**implicate (1)**
11:8
**implications (1)**
11:20
**important (1)**
20:14
**inability (1)**
24:15
**inciting (4)**
27:24;28:7,16;29:5
**include (1)**
32:24

**included (1)**
13:25
**including (5)**
15:12;21:6;28:8,17;
29:22
**incorrect (1)**
18:1
**incurred (1)**
26:1
**indeed (1)**
22:16
**indicated (1)**
10:22
**indiscernible (4)**
4:4,6;7:4;13:13
**individual (3)**
27:17,18,19
**individuals (5)**
5:17;11:9;19:9;
21:21,22
**inefficient (1)**
11:10
**ineluctable (1)**
27:6
**information (18)**
4:12;13:14,16;15:20;
16:5,5,17,18,19,20,22;
20:6;26:10,25;27:1;
30:20;32:22,24
**initial (1)**
25:21
**initiated (2)**
20:4;32:6
**initiating (1)**
34:12
**initiation (1)**
21:20
**inpuded (1)**
11:4
**input (1)**
10:23
**instance (2)**
8:14;30:2
**institution (1)**
7:18
**instructing (1)**
27:12
**interested (2)**
11:2;32:18
**interim (1)**
25:5
**interpreted (1)**
13:19
**interpreting (1)**
14:10
**intertwined (1)**
27:7
**interview (6)**
3:24;4:14;11:13;
12:5;26:13;27:12
**interviewed (4)**
17:12;18:11,19,21
**interviewing (1)**

4:8
**interviews (3)**
11:11;12:6;28:17
**into (9)**
7:23;14:12,16,17,19;
19:11;20:16;22:1;
24:24
**investigated (1)**
19:23
**investigation (75)**
13:12,21;14:12,16,
16,19;15:1,3,12,18,24;
16:12,14,14,18;17:3,9,
13,20;18:7,9,12,15;
19:5,8,11,14,20,23;
20:5,10,16;21:7,16,16,
18,20,22,25;22:4,8,12,
21;23:6,11,11,18;24:5,
12,17,21;25:24;27:7;
28:23;29:1,6,9,19,21,
23;30:4,9,17,18;31:8,9;
32:5,21,23,25;33:6;
34:5,12,23;35:9
**investigations (1)**
5:19
**investigators (2)**
22:23;23:24
**involved (3)**
7:19;19:9;21:9
**involvement (1)**
30:13
**issue (9)**
3:16;8:10,17;10:3;
14:6;20:23;25:3,7;27:8
**issues (13)**
3:10,16,20;5:6;17:8;
19:3,18,19,21;22:1;
26:12;28:23;35:12
**IX (78)**
5:18;13:12,21;14:8;
15:23,24;16:12,14,17;
17:2,7,9,13,20;18:7,8,
12,14,19,20,21;19:5,
11,14,18,20,23;20:5,5,
10,16,23;21:6,16,16,
18,22,25;22:4,7,12,21,
22;23:11,17,18,19,24;
24:1,12,16,21;25:23;
26:11;27:6;28:23,25;
29:6,9,17,18;30:3,4,9,
17,18;31:8,9;32:4,6,8,
11,19;33:6;34:4,9,17;
35:9

**J**

**Jackson (2)**
4:2;12:23
**Jackson-Lewis (1)**
3:8
**Jahari (1)**
8:15
**Johnson (1)**

3:22
**Judge (6)**
8:16,16,25;9:1,21;
24:8
**Judges (1)**
9:11
**judicial (2)**
4:6;11:12
**judicially (1)**
11:10
**July (2)**
31:23;34:3
**June (2)**
33:9;34:15
**jury (2)**
23:13;24:9
**justified (1)**
25:10

**K**

**kind (3)**
7:11;8:6;15:11
**knew (2)**
26:16;30:9
**knowing (1)**
33:5
**knowledge (4)**
15:22;20:21;29:21,
23
**known (1)**
25:21
**knows (1)**
10:10

**L**

**label (1)**
35:10
**lack (1)**
27:8
**last (1)**
6:10
**later (1)**
29:2
**latter (1)**
20:16
**lawsuit (1)**
10:12
**lawyer (5)**
10:8,9,10,10,19
**lead (1)**
19:4
**least (2)**
21:15;35:6
**leg (1)**
34:10
**legal (2)**
3:16,17
**legally (1)**
6:2
**lengthy (1)**
32:19

**lenient (1)**
9:10
**less (1)**
11:13
**letter (15)**
3:15;8:19;14:6;23:5;
31:14,16,17,19,21,23,
23;32:1,14,15,17
**letters (2)**
28:14,18
**light (1)**
23:21
**likely (1)**
4:3;9:17
**linked (1)**
30:17
**links (1)**
19:18
**litigation (2)**
5:12;10:15
**little (1)**
35:5
**lodged (2)**
17:25;31:7
**lodging (1)**
30:13
**long (5)**
16:20;21:15;32:3;
33:16;34:5
**longer (1)**
35:5
**look (1)**
27:5
**looking (4)**
10:7;31:14;33:14;
34:14
**Looks (1)**
35:6
**lower (2)**
25:17,19
**luck (1)**
35:17

**M**

**maker (2)**
7:14;30:22
**makes (5)**
7:14;10:17;15:6;
22:23;31:3
**making (6)**
8:5;10:22;12:1;
30:21,25;31:2
**manage (1)**
8:1
**manager (11)**
5:23,24,25;6:5,7,16;
7:11,12,17,25;10:24
**managerial (5)**
6:23;8:6;10:20,21,24
**managers (10)**
5:13,14,16,18,22;
6:13;7:21;8:8,9,14

**manner (1)**
25:11
**many (4)**
24:17;29:1,1,1
**marked (1)**
25:23
**Mass (1)**
12:1
**Massachusetts (1)**
10:17
**material (2)**
13:12;21:18,19
**materials (1)**
16:17
**matter (6)**
4:13;5:12;6:24;10:9,
19;35:19
**maximum (1)**
12:21
**May (27)**
3:2;9:16;11:12;12:6;
13:2;14:10;17:24;19:3,
24;20:9;21:17;25:3,11,
15,21;26:2,6,16,17,18;
27:2,23;28:14,17,18;
30:21;31:6
**mean (3)**
23:13;24:7,9
**means (1)**
12:21
**meant (1)**
7:11
**meet (1)**
20:7
**meeting (4)**
5:2;7:24;21:4;27:17
**member (1)**
30:7
**members (4)**
4:19;29:18;30:1,8
**member's (1)**
29:22
**memorializing (1)**
3:24
**memory (1)**
22:13
**mention (1)**
31:15
**mentioned (2)**
19:16;28:24
**mentions (1)**
33:14
**met (1)**
20:19
**might (3)**
20:6,25;24:22
**mind (2)**
10:1;12:18
**modus (1)**
32:21
**moment (1)**
7:15
**month (1)**

33:9
**months (7)**
14:21;18:16;21:15;
23:7;29:1;30:24;34:22
**more (3)**
7:13;13:24;31:20
**motion (3)**
9:23;12:24;17:6
**motivated (3)**
15:23;17:24;22:3
**motivation (2)**
15:10;27:3
**much (3)**
3:18;18:13;25:19
**multi- (1)**
15:2
**multiple (1)**
6:3
**must (1)**
31:20

**N**

**nail (1)**
11:21
**naivete (1)**
33:5
**name (3)**
33:6;35:4,10
**nature (1)**
6:23
**necessarily (1)**
21:14
**need (2)**
22:15;35:12
**negative (1)**
15:11
**neither (1)**
4:10
**News (2)**
28:18,24
**Nine (2)**
33:21;35:2
**nine-page (1)**
34:24
**nit (1)**
26:24
**nomenclature (2)**
33:5;35:4
**note (1)**
11:23
**noted (1)**
12:19
**notes (3)**
22:21;26:13;27:13
**notice (1)**
26:24
**notified (1)**
30:3
**November (2)**
18:21;34:18
**number (8)**
12:11,21;13:4,5;

14:3,4,8,11
**numbers (1)**
14:4

**O**

**obvious (1)**
28:6
**Obviously (3)**
7:17;10:5;21:19
**occur (2)**
10:15;17:14
**occurred (11)**
5:8,11;9:9,12;15:18,
19;17:18;21:3;22:8;
24:12;29:1
**occurring (2)**
21:15;30:5
**O'CLOCK (2)**
3:1;35:20
**October (3)**
26:9,12,12
**off (1)**
15:11
**office (12)**
18:20,22;20:5,23;
23:19;24:1;29:17;30:3;
32:6,9;34:9,17
**officer (5)**
6:8,12;17:7;19:18;
24:7
**officials (1)**
28:19
**often (1)**
9:11
**one (8)**
12:15;14:17;19:12;
22:13;27:16;29:14;
30:5;35:2
**one's (1)**
5:7
**only (7)**
9:19;13:13,19,20;
14:16;19:12;21:2
**open (2)**
9:15,18
**opened (1)**
9:25
**operendi (1)**
32:21
**opposing (1)**
25:3
**order (3)**
7:12;12:4;26:5
**organization (11)**
6:8,12,12,13;7:13,
15;8:1,3;10:18,21,25
**organizations (2)**
8:7,8
**others (2)**
15:8;20:8
**out (11)**
3:10;9:1,8;18:20,20;

20:6,8,24;24:2;26:6;
34:17
**outcome (1)**
9:13
**over (3)**
23:24;35:6,6
**own (2)**
10:6;27:19

**P**

**pages (5)**
25:6;33:21;35:2,6,7
**panel (5)**
32:12,12;33:3;34:1,
14
**part (18)**
4:9,9,18;6:10,20;
13:12;14:9;15:14;
17:13,18,19;18:11,19;
19:4;23:12;24:13;30:6,
6
**participate (1)**
29:6
**participated (1)**
5:11
**participates (1)**
7:16
**participating (1)**
10:23
**particular (1)**
11:14
**parties (3)**
3:13;5:10;14:5
**party (2)**
10:9,19
**Party's (1)**
26:6
**people (5)**
7:18;8:2,6;11:3;29:6
**perceived (1)**
15:9
**perhaps (4)**
23:20;31:3,5;32:25
**periods (1)**
21:23
**permissible (2)**
12:8;13:6
**permission (3)**
4:1,14;10:11
**permitted (1)**
12:5
**persist (1)**
11:17
**person (10)**
6:7,11;7:11,12,14,14,
19,20;8:1;20:4
**perspective (1)**
13:10
**pertaining (1)**
21:22
**pertains (2)**
3:20;20:17

ph (4)
8:15;11:23;12:2;
34:21
**pick (1)**
23:25
**picture (2)**
18:24,24
**place (6)**
9:3,14;12:5,6;18:18;
20:18
**plainly (3)**
21:8;22:14;24:22
**plaintiff (10)**
3:5;8:18,19;10:13;
11:6;15:8,10;16:6;
27:4,24
**plaintiff's (2)**
4:4;21:1
**plausibly (1)**
23:9
**play (3)**
4:15;7:12,18
**played (1)**
8:9
**playing (1)**
8:4
**plays (1)**
21:5
**PM (2)**
3:1;35:20
**point (2)**
26:1;28:5
**police (1)**
24:7
**portion (1)**
13:13
**Portuguese (2)**
14:12;15:2
**posed (1)**
19:7
**position (16)**
5:21,25;6:2;9:7;
10:20,24;14:1,18;
20:24;25:2,5,11;26:2,3,
5,17
**positions (1)**
3:17
**positive (1)**
19:15
**possibly (1)**
21:8
**potential (4)**
10:12,14;11:19;27:2
**potentially (1)**
23:3
**practice (1)**
30:4
**practices (2)**
3:11,13
**predated (1)**
21:19
**predicated (1)**
23:11

**prefer (1)**
12:24
**prepared (3)**
15:25;32:20;33:12
**present (2)**
3:23;11:19
**prevent (1)**
15:23
**prior (6)**
13:22,23;21:3,23;
24:19,20
**privileged (1)**
4:12
**problems (1)**
28:17
**proceed (1)**
11:11
**process (13)**
6:3;7:16,17;11:25;
12:19;17:25;18:3;
20:18;21:7,24;24:3,8;
30:14
**processes (4)**
19:6;20:15;23:23;
24:1
**produce (6)**
13:20;14:6;22:24;
23:1;27:1,11,12,20
**produced (9)**
17:6;22:16,16,20,24;
26:13,16;28:5;33:10
**produced/created (1)**
16:21
**producing (3)**
26:8,11,25
**product (1)**
35:9
**production (5)**
13:9,9;14:4,8;16:11
**Professional (2)**
10:7;11:19
**professor (33)**
8:5;11:7;12:23;
14:17;16:1,15,19;
17:18;19:12;20:4,16,
19,21,22;21:9;22:15,
22;24:2,3,5,23;25:1;
27:14;28:8;29:21,23;
31:17,20,24;32:14,15;
34:8,21
**Professors (15)**
3:22;4:1,2,11,12,15,
17,18;5:15,21;8:12;
10:12;12:23;28:12;
30:5
**profit-motivated (1)**
8:7
**prohibits (1)**
10:18
**promoted (2)**
7:21,24
**promoting (1)**
8:2

**prompted (2)**
21:17;23:12
**prompting (1)**
27:25
**proper (2)**
14:22;23:3
**protective (1)**
12:4
**provided (3)**
8:18;19:17;21:21
**Provost (3)**
5:17;32:13;33:25
**proximity (1)**
15:20
**pulled (1)**
25:22
**punish (1)**
27:4
**purpose (2)**
11:5;25:25
**purposes (1)**
6:16

**Q**

**quite (2)**
13:10;19:18

**R**

**raise (1)**
27:18
**raised (5)**
17:8;19:4,19;20:3,9
**Rambly (1)**
34:21
**ranging (2)**
22:12;24:4
**rather (2)**
11:11,13
**rationale (1)**
15:5
**re- (1)**
25:24
**reached (6)**
18:20,20;20:5,8;
24:2;34:17
**read (3)**
10:4;15:5;31:9
**reading (3)**
10:1;16:16;26:7
**realized (1)**
26:9
**really (5)**
21:25;22:17;24:24;
27:21;28:24
**reason (2)**
15:15;30:7
**reasonable (1)**
12:7
**received (1)**
25:4
**recollection (1)**

27:23
**recommendation (1)**
8:19
**recommendations (3)**
31:4,6;33:1
**recommended (1)**
21:5
**record (2)**
11:16;29:17
**records (1)**
21:21
**reference (3)**
3:11;28:23;33:15
**referring (2)**
28:21;33:3
**refers (1)**
32:12
**reflect (1)**
31:1
**regarding (1)**
23:5
**relate (1)**
22:21
**related (3)**
17:3;19:10;27:7
**relates (3)**
5:8;14:8;28:25
**relating (5)**
13:13,20,21;14:11;
25:23
**relation (1)**
21:8
**relationship (1)**
17:2
**relaying (1)**
29:19
**relevant (10)**
4:21,24;13:14,16;
16:23;20:6;23:13,14;
29:20;30:11
**remainder (1)**
20:24
**remember (1)**
20:3
**render (1)**
8:14
**reopen (1)**
9:16
**repair (1)**
13:13
**report (30)**
13:13;14:8,11;15:1,
3,12,25;30:24;31:2,9,
19,20,25;32:4,7,8,13,
19,20;33:3,6,8,11;34:1,
4,10,14,24;35:2,2
**reports (1)**
35:1,5
**representation (1)**
10:20
**represented (1)**
10:10
**representing (2)**

10:8,14
**reputedly (1)**
16:1
**request (6)**
3:14;13:8,9;14:4,7;
16:11
**require (1)**
25:8
**required (1)**
27:20
**requires (1)**
16:5
**requiring (1)**
13:19
**re-review (1)**
25:25
**reserve (1)**
3:12
**resolved (3)**
3:20;14:5;35:13
**resources (2)**
4:6;11:12
**respect (4)**
8:17,20;9:25;16:15
**respective (1)**
3:17
**response (1)**
25:4
**responsibility (3)**
8:1;10:21;11:20
**responsible (1)**
6:1
**responsive (3)**
13:11;23:2;25:23;
26:11,16
**results (1)**
21:4
**retaliation (1)**
5:4
**review (42)**
6:25;7:4;16:13;17:2,
8,9,18,19,25;18:2,14,
18;19:4,10,10,15,19,
21;21:17,23;22:2;
23:12,17,18,22;24:14;
25:21,22;26:8;27:6;
28:4,25;30:14,18,19;
31:8,12,15;33:14,15,
25;34:2
**reviewed (3)**
7:1;25:6,25
**reviewers (1)**
23:23
**reviewing (1)**
34:3
**revisit (1)**
25:7
**rework (1)**
25:9
**right (5)**
10:5;13:4;18:10;
21:1;34:20
**righty (4)**

3:9;18:24;19:13;
33:4
**rise (1)**
23:14
**Roberto (1)**
14:17
**role (7)**
4:15;5:12;7:11;8:4,5,
9,12
**roles (1)**
7:18
**rudimentary (1)**
7:13
**Rule (4)**
6:16;10:7,18;12:25
**ruled (2)**
9:14;16:23
**rules (1)**
12:22
**ruling (12)**
11:25;12:5;13:5,6,
10,19,25;15:5,21;16:4,
4,16
**rulings (1)**
3:16

**S**

**Sacred (1)**
8:15
**Salazar (5)**
3:22;14:1;26:19;
28:10;31:10
**Salazar-Austin (42)**
3:7,7;14:2,15;17:4;
19:1,3,24;20:1,14;22:9,
11;23:16;24:11,16;
25:18,20;26:18,21;
27:9;28:3,20;29:4;
30:23;31:11,14,17,22;
32:2,6,10;33:2,8,13,17,
20,21;34:6,20,25;
35:11,15
**same (2)**
9:13;32:12
**sample (1)**
28:15
**samples (1)**
28:16
**sanitized (1)**
32:17
**saying (1)**
23:13
**scenario (1)**
7:10
**scheduling (1)**
12:19
**scope (7)**
13:6;14:22;22:15;
23:3,9;27:19;29:19
**scrolling (1)**
33:18,20
**seek (2)**

3:16;4:13
**seeking (3)**
4:1,5;11:8
**seems (1)**
13:7
**sense (2)**
8:3;22:23
**senseisized (1)**
32:17
**sent (2)**
16:18,19
**separate (5)**
16:13;19:6;20:15;
23:23;24:1
**serves (1)**
22:13
**set (2)**
3:10;23:21
**setting (1)**
3:15
**settle (1)**
6:17
**several (3)**
23:7;27:16;35:1
**sexual (1)**
5:4
**shepherded (1)**
8:20
**significance (1)**
7:15
**significant (1)**
25:9,9
**silence (1)**
27:3
**silencing (2)**
15:13;16:1
**similar (1)**
29:15
**Simineto (1)**
12:2
**simply (4)**
4:8,13;13:25;26:17
**situation (1)**
24:21
**six (2)**
30:24;34:22
**size (2)**
26:20,21
**skating (1)**
11:17
**solely (1)**
20:17
**someone (3)**
6:1,16;7:23
**someone's (1)**
10:22
**somewhat (1)**
22:12
**sorry (10)**
6:9;9:6;10:1;17:22;
19:1;21:12;22:11,20;
33:3;34:20
**sort (2)**

21:5;28:19
**Spanish (2)**
14:12;15:2
**spark (1)**
20:10
**sparked (1)**
17:9
**speak (3)**
3:22;4:1;11:18
**speaking (2)**
11:2,5
**specific (5)**
7:10;14:17;19:12;
22:20;28:9
**specifically (4)**
16:15;20:17;28:22,
25
**spent (1)**
34:16
**spoke (1)**
24:2
**spread (1)**
24:22
**spring (1)**
18:17
**spurned (1)**
19:20
**Squatrito (5)**
8:16,16,25;9:1,21
**stand (1)**
15:4
**standard (1)**
30:4
**standpoint (1)**
11:20
**started (1)**
17:23
**state (2)**
13:11;26:15
**stated (1)**
3:13
**statements (3)**
11:3;21:21;24:13
**states (2)**
19:19;31:2
**stating (1)**
17:8
**stave (1)**
15:11
**stemmed (1)**
14:20
**stemming (1)**
27:16
**steps (1)**
6:3
**still (2)**
9:25;23:22
**strong (1)**
10:2
**subject (2)**
5:12;10:9
**subjects (1)**
10:12

**subordinate (1)**
7:23
**subsequent (1)**
21:7
**substantive (1)**
8:19
**sufficient (2)**
8:13;20:9
**suggest (1)**
29:5
**superior (1)**
7:25
**supervising (1)**
8:2
**support (1)**
9:7
**supported (1)**
15:9
**supporting (1)**
28:1
**sure (1)**
32:18
**surfaced (1)**
19:22
**Susan (1)**
3:5
**sword (1)**
9:9

**T**

**team (2)**
24:12;25:22
**temporally (1)**
13:22
**tens (1)**
25:6
**tenure (39)**
4:4,16,20;5:2,3;6:3,
22;7:7,17;8:20,21;
10:23;13:22,24;14:20,
21,21;15:13,16,21;
16:21,22;17:15;18:6,
12;20:20,20;21:3,5,8;
22:5;23:8;30:2,8,10,
10;33:24;34:2,12
**tenured (4)**
5:15,21;8:5;11:7
**term (1)**
31:12
**testify (1)**
17:12
**thin (1)**
11:17
**though (2)**
14:15;23:23
**thought (1)**
10:3
**thousands (1)**
25:6
**three (2)**
3:10,19
**timely (1)**

25:11
**times (1)**
24:17
**Title (79)**
5:18;13:12,21;14:8;
15:17,23,24;16:12,14,
17;17:2,7,9,13,20;18:7,
8,12,14,19,20,21;19:5,
11,14,18,20,23;20:5,5,
10,16,23;21:6,16,16,
18,22,25;22:4,7,12,21,
22;23:11,17,18,19,24;
24:1,12,16,21;25:23;
26:11;27:6;28:23,25;
29:6,9,17,18;30:3,4,9,
17,18;31:8,9;32:4,6,8,
11,19;33:6;34:4,9,17;
35:9
**today (2)**
3:20;29:10
**took (2)**
20:18;34:22
**totally (1)**
24:8
**toward (1)**
19:15
**towards (1)**
28:14
**trial (3)**
23:15;24:8,20
**trouble (2)**
23:16;25:2
**true (5)**
19:3;21:14;27:15;
28:2;29:8
**trying (2)**
7:10;24:24
**turned (1)**
23:24
**turning (3)**
12:11;13:4;14:7
**two (12)**
4:1,7,15,17,18;
10:11;12:23,25;13:2;
14:3;19:5;20:15
**types (1)**
35:1

**U**

**ultimate (2)**
23:5,10
**ultimately (1)**
24:20
**unclear (1)**
13:5
**under (2)**
5:17;12:22
**undertake (1)**
19:20
**University (11)**
3:8;4:13;5:13;6:2,4,
6,23;8:15;11:4,7,8

**university-wide (2)**
15:2;16:13
**unless (1)**
10:10
**unrelated (1)**
27:14
**up (2)**
8:17;23:25
**upon (4)**
10:6;15:16,21;23:11
**use (4)**
4:6,6;31:12;32:11
**used (4)**
9:24;14:4;16:17;
32:11
**using (1)**
11:12
**UW (1)**
32:10
**UWC (2)**
32:11,12

**V**

**verdict (1)**
23:13
**view (3)**
9:16;13:18;28:14
**VIII (1)**
15:17
**vote (3)**
6:2;17:24;30:7
**voted (5)**
4:3,17,19;30:1,9

**W**

**way (4)**
9:22;17:3;19:7;
27:25
**website (1)**
3:11
**Webster (1)**
5:24
**Wednesday (1)**
3:14
**week (1)**
34:12
**weighing (1)**
10:23
**welcome (1)**
35:16
**well-known (1)**
4:3
**what'd (1)**
34:23
**what's (3)**
13:5;17:1;20:3
**whereas (1)**
19:11
**where's (1)**
31:25
**Whereupon (1)**

35:19
**who's (1)**
10:22
**whose (1)**
8:1
**wide-ranging (1)**
24:25
**willing (1)**
12:25;17:12
**within (13)**
5:18;12:7,8;13:6;
14:22;15:19,20;16:20;
23:3,9;27:19;28:12;
29:19
**without (4)**
3:23,24;11:18;19:21
**witness (1)**
5:7
**witnesses (10)**
4:3,9,21,23;5:1,6,10;
12:20;26:15;27:13
**word (3)**
7:11;30:20;32:11
**words (2)**
11:4;21:14
**work (3)**
8:3;34:10;35:9
**worked (1)**
5:17
**wrap (1)**
22:17
**written (2)**
28:15,18
**wrong (2)**
14:7;15:3
**wrote (1)**
34:23

**Y**

**Yale (11)**
3:6,8;5:13;10:13;
11:18;25:9,16;26:23;
28:18,24;30:4
**Yale's (2)**
26:20,21
**year (7)**
17:7;19:17;25:3,12,
16;34:14,15
**years (1)**
24:22

**1**

**10 (1)**
12:20
**13 (5)**
12:12;13:4,5,6;14:4
**14th (2)**
14:10;26:6
**15 (2)**
13:9;14:8
**16th (1)**

34:13
**1980's (2)**
22:14;23:5
**1st (1)**
34:21

**2**

**2015 (5)**
18:17,18,21,22;34:9
**2016 (5)**
23:7;31:23;33:9;
34:3,15
**2018 (1)**
14:10
**29th (1)**
31:23

**3**

**3:04 (1)**
3:1
**3:58 (1)**
35:19
**30 (2)**
24:22;35:6
**33 (1)**
35:7

**4**

**4.2 (1)**
6:16
**42 (1)**
10:8
**44 (1)**
14:11