## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **SUSAN BYRNE,** | : | |
| **Plaintiff** | : | **Civil Action NO.** |
| | : | |
| **vs.** | : | **3:17-cv-01104-VLB** |
| | : | |
| **YALE UNIVERSITY** | : | |
| **Defendant** | : | **APRIL 1, 2019** |
| | : | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT


DEFENDANT,

YALE UNIVERSITY

By:  */s/David C. Salazar-Austin*
Victoria Woodin Chavey (ct 14242)
David C. Salazar-Austin (ct 25564)
Jackson Lewis P.C.
90 Statehouse Square, 8th Floor
Hartford, CT  06103
Tel: (860) 522-0404
Fax: (860) 247-1330
chaveyv@jacksonlewis.com
salazard@jacksonlewis.com

## TABLE OF CONTENTS

I.  STATEMENT OF FACTS.........................................................................3

    A.  Plaintiff Commences Employment At Yale.........................................3

    B.  Yale Appoints Plaintiff as Associate Professor on Term.................3

    C.  The Department Rejects Plaintiff's Leave Proposal. ......................4

    D.  Plaintiff Seeks the Recusal of Two Professors...............................5

    E.  Yale Follows Its Tenure Process to Consider Plaintiff's Candidacy..............6

    F.  Yale Receives Negative Feedback on Plaintiff's Tenure Case. .....................8

    G.  The Standard for Tenure................................................................11

    H.  The Internal Review Committee Does Not Find Plaintiff Tenurable.............11

    I.  The Department Votes Against Granting Plaintiff Tenure...........................12

    J.  Plaintiff Appeals the Decision to Deny Her Tenure ......................14

    K.  Plaintiff's Alleged Protected Activity .............................................15

II. ARGUMENT....................................................................................17

    A.  Summary Judgment Standard........................................................17

    B.  Plaintiff Cannot Prove Her Title VII and CFEPA Retaliation Claims.
        (Counts One and Two). ...................................................................18

        1.  Plaintiff Cannot Premise Her Retaliation Claim on Three
            "Generic" Complaints She Relies Upon as Incidents of
            Protected Activity. ...................................................................20

        2.  Plaintiff Cannot Premise Her Retaliation Claim on Her
            Communications with a Student Newspaper. .....................22

        3.  Yale Has Provided a Legitimate, Non-Retaliatory Reason for
            the Decision to Deny Plaintiff Tenure. .................................23

        4.  Plaintiff's Pretext Arguments are Fatally Flawed.................26

            a.  There is No Evidence of a Retaliatory Motive..........26

> ***b.*** ***There is No Evidence that the Decision-Makers Were Even Aware of Her Alleged Protected Activity at the Time of the Tenure Vote.*** ............................................................. ***26***
>
> ***c.*** ***The Passage of Time Between Her Alleged Protected Activity and the Tenure Vote Undercuts any Inference of Retaliation.*** ***28***
>
> ***d.*** ***Plaintiff's Reliance on the Fact That She Had Been Promoted to Associate Professor on Term in July 2013 is Unavailing.*** ... ***30***
>
> ***e.*** ***Differing Opinions as to the Quality of Plaintiff's Scholarship are Not Evidence of Pretext.*** ......................................... ***31***

**5.** **Plaintiff Cannot Establish a Prima Facie Case of Retaliation with Regard to the Denial of her Associate Professor Leave (APL).** ........................................................................... **33**

**C.** ***Plaintiff Cannot Establish Breach of Contract (Count Four).*** ...................... ***34***

**1.** **Any Technical Deviations From the Tenure Process Do Not Constitute a Breach of Contract.** ........................................... **34**

**2.** **Plaintiff Cannot Establish Breach Where Her Only Evidence is Her Personal Opinion.** ........................................................... **36**

**3.** **Plaintiff has not Established a "Conflict of Interest" Sufficient to Trigger Section IV.H.1 of the Faculty Handbook.** ........................... **38**

**4.** **Plaintiff Has No Evidence that Yale Ignored Evidence of Her Scholarship.** ............................................................................. **39**

**5.** **As to Each Alleged Breach, Plaintiff Cannot Prove The Damages Element of Her Claim.** .............................................. **40**

**D.** ***Plaintiff Cannot Establish Negligent Misrepresentation (Count Three).*** ....... ***43***

**1.** **Yale's Alleged Promise to Plaintiff That She Would Have a "Fair Hearing" on Her Tenure Case.** ........................................ **44**

**2.** **Professor Adorno's Alleged Statement to Plaintiff That "Things Were Going Perfectly."** ........................................................... **44**

**3.** **Yale's Alleged Promise that There Would Be No Negative Effect of Her Involvement in the Climate Review and Title IX Process.** ................................................................................... **45**

**4.** **Yale's Alleged Misrepresentation Regarding Its Ability to Require Professors to Recuse Themselves.** ....................................... **46**

ii

**III.    CONCLUSION** ..................................................................................... **46**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abney v. Univ. of the V.I.*,
   No. 08-116, 2016 U.S. Dist. LEXIS 59947 (D.V.I. May 3, 2016)............................ 43

*Adelman-Reyes v. Saint Xavier Univ.*,
   No. 05 C 3269, 2006 U.S. Dist. LEXIS 24558 (N.D. Ill. Apr. 28, 2006) ................. 36

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................. 18

*Arch Ins. Co. v. Centerplan Constr. Co., LLC*,
   No. 3:16-CV-01891 (VLB), 2019 U.S. Dist. LEXIS 23274 (D. Conn.
   Feb. 13, 2019) ......................................................................................... 37

*Bazile v. City of N.Y.*,
   215 F. Supp. 2d 354 (S.D.N.Y. 2002) ....................................................... 22

*Bickerstaff v. Vassar Coll.*,
   196 F.3d 435 (2d Cir. 1999) ..................................................................... 24

*Brown v. Trs. of Bos. Univ.*,
   891 F.2d 337 (1st Cir. 1989) ..................................................................... 43

*CAS Construction Company v. Town of East Hartford*,
   82 Conn. App. 543 (2004) ........................................................................ 41

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................. 17

*Dister v. Continental Group, Inc.*,
   859 F.2d 1108 (2d Cir. 1988) ................................................................... 18

*Falcon v. State of Conn. Judicial Branch*,
   2018 U.S. Dist. LEXIS 196230 (D. Conn. Sept. 25, 2018) ...................... 19

*Fishman v. Smartserv Online*,
   No. X05CV0172810S, 2003 Conn. Super. LEXIS 338 (Super. Ct.
   Feb. 11, 2003) ................................................................................. 35, 36

*Frillici v. Westport*,
   264 Conn. 266 (2003) ............................................................................. 41

*Gordon v. New York City Bd. of Educ.*,
  232 F.3d 111 (2d Cir. 2000) ................................................................. 27

*Gray v. City of N.Y.*,
  No. 08-CV-2840 (NGG) (JMA), 2011 U.S. Dist. LEXIS 142427
  (E.D.N.Y. Dec. 12, 2011) .................................................................... 26

*Gyadu v. Progressive Cas. Ins. Co.*,
  No. CV145016049S, 2015 Conn. Super. LEXIS 2955 (Super. Ct.
  Dec. 1, 2015) ................................................................................... 41

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010) ........................................................ 18, 19

*Hiramoto v. Goddard Coll. Corp.*,
  184 F. Supp. 3d 84, 100 (D. Vt. 2016) ................................................ 24

*Hussein v. Hotel Employees & Restaurant Union, Local 6*,
  108 F. Supp. 2d 360 (S.D.N.Y. 2000) ................................................. 29

*Jackson v. Harvard Univ.*,
  721 F. Supp. 1397 (D. Mass. 1989) ................................................... 32

*Jackson v. Post Univ., Inc.*,
  836 F. Supp. 2d 65 (D. Conn. 2011) .................................................. 19

*Lieberman v. Gant*,
  630 F.2d 60 (2d Cir. 1980) ............................................................... 24

*Maynard v. Stonington Cmty. Ctr.*,
  No. 3:15-CV-483, 2018 U.S. .............................................................. 19

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) .............................................................. 18

*Mills v. S. Conn. State Univ.*,
  No. 3:08-cv-1270 (VLB), 2011 U.S. Dist. LEXIS 88384 (D. Conn.
  Aug. 10, 2011) ................................................................................. 28

*N. Trade United States, Inc. v. Guinness Bass Imp. Co.*,
  No. CIVIL 3:03CV1892 (CFD) (TPS), 2006 U.S. Dist. LEXIS 54435
  (D. Conn. Aug. 7, 2006) .................................................................... 27

*Negussey v. Syracuse Univ.*,
  95-CV-1827, 1997 U.S. Dist. LEXIS 3853 (N.D.N.Y. Mar. 24, 1997) ...... 33

*Ponticelli v. Zurich American Ins. Group,*
    16 F. Supp. 2d 414 (S.D.N.Y. 1998) ..................................................... 29

*Rafalko v. Univ. of New Haven,*
    129 Conn. App. 44 (2011) ............................................................. 43, 45

*Rafalko v. Univ. of New Haven,*
    No. NNHCV054016528S, 2009 Conn. Super. LEXIS 2557 (Super. Ct.
    Sep. 25, 2009) ............................................................................ 44

*Ragin v. East Ramapo Cent. Sch. Dist.,*
    No. 05-CV-6496, 2010 U.S. Dist. LEXIS 32576 (S.D.N.Y. Mar. 31,
    2010) ....................................................................................... 27

*Rajaravivarma v. Bd. of Trs. for the Conn. State Univ. Sys.,*
    862 F. Supp. 2d 127 (D. Conn. 2012) (VLB) ....................... 32, 34, 37, 43

*Rojas v. Roman Catholic Diocese of Rochester,*
    660 F.3d 98 (2d Cir. 2011) ................................................................ 20

*Rosato v. Mascardo,*
    82 Conn. App. 396 (2004) ................................................................ 40

*Ruiz v. City of Bridgeport,*
    No. 3:15-cv-253(AWT), 2018 U.S. Dist. LEXIS 190650 (D. Conn.
    Sep. 4, 2018) .............................................................................. 18

*Saliga v. Chemtura Corp.,*
    No. 12-cv-832, 2015 U.S. Dist. LEXIS 133135 (D. Conn. Sep. 30,
    2015) ................................................................................... 20, 23

*Setelius v. Nat'l Grid Elec. Servs. LLC,*
    No. 11-CV-5528 (MKB), 2014 U.S. Dist. LEXIS 134789 (E.D.N.Y.
    Sep. 24, 2014) ............................................................................ 33

*Shanbrom v. Orange Bd. of Educ.,*
    No. 30 18 81, 1991 Conn. Super. LEXIS 1614 (Super. Ct. July 11,
    1991) .................................................................................... 45, 46

*Tori v. Marist Coll.,*
    344 F. App'x 697 (2d Cir. 2009) ........................................................ 32

*W. Haven Sound Dev. Corp. v. W. Haven,*
    201 Conn. 305 (1986) .................................................................. 41, 42

*Weinstock v. Columbia Univ.,*
    224 F.3d 33 (2d Cir. 2000) ............................................................ 23, 31

*Wood v.* Strickland, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214
    (1975) ............................................................................................... 24

*Ya-Chen Chen v. City Univ. of N.Y.,*
    805 F.3d 59 (2d Cir. 2015) ............................................................ 19

*Zahorik v. Cornell Univ.,*
    729 F.2d 85 (2d Cir. 1984) ...................................................... 31, 32

**Other Authorities**

First Amendment ........................................................................ 38, 43

Fed. R. Civ. P. 56 ........................................................................ 1, 3

Fed. R. Civ. P. 56(c) ...................................................................... 18

Fed. R. Civ. P. 56(e) ...................................................................... 17

## SUMMARY OF ARGUMENT

Pursuant to Fed. R. Civ. P. 56, Defendant Yale University ("Yale") respectfully moves for summary judgment on each count of Plaintiff Susan Byrne's Second Amended Complaint.  Yale is one of the preeminent universities in the world.  As befits such an institution, the standard for obtaining tenure is extremely high; only those among the "foremost leaders in their fields throughout the world" qualify.  Plaintiff sought tenure within the Department of Spanish and Portuguese, but, after a robust evaluation of Plaintiff's scholarship, five of the seven professors who reviewed her tenure case concluded her scholarship did not meet Yale's high standard. Three external referees also had strong criticisms that echoed that majority view, with one stating succinctly: "her unchanging adherence to a well-established but seriously limiting scholarly paradigm will not place her among the leading scholars in the general field of Spanish literary studies." As a result, the Department rejected Plaintiff's tenure case. Accordingly, she never reached the subsequent levels of tenure review, including consideration by Yale's Humanities Tenure and Appointments Committee.

Nonetheless, Plaintiff alleges that Yale's tenure decision violated the law. First, she alleges Title VII and CFEPA retaliation claims. The record demonstrates, however, that the decision-makers were not even aware of her alleged protected speech at the time of the tenure decision. To the contrary, the record is clear Plaintiff's scholarship was the focus of the Department's review of Plaintiff's tenure case.  Given the deference the Court must afford Yale's judgment in assessing who meets the tenure standard, there is no material issue of fact with

1

regard to the real reason for the negative tenure decision: Plaintiff's scholarship simply did not rise to the level Yale demands.

Second, as to her breach of contract allegations, Plaintiff's core claim must fail because she *did* receive the type of fair tenure review that she claims Yale denied her.  Further, although she demanded the recusal of two professors whom she suspected would not support her, she cannot prove breach because there was no conflict of interest sufficient to warrant recusal, and the professors' decision not to recuse themselves fully complied with Yale's contractual obligation.  Finally, Plaintiff cannot establish the damages element of her contract claim, because any potential damages in this case are too remote and too speculative to survive summary judgment.  Plaintiff's tenure case failed at the very first level; she does not and cannot know what would have happened at the three higher levels of review that Yale's rigorous process requires, even if the Department had voted in her favor.  This gap precludes her from establishing contractual damages.

Third and finally, Plaintiff's negligent misrepresentation claim fails because she has no evidence that she justifiably relied on any false statement attributed to Yale. She cannot show she acted differently in reliance on any representation made to her, and, even if she could, her claim still fails because Yale's written policies render any alleged reliance unjustifiable.

Accordingly, as set forth more fully below, the Court should grant summary judgment in Yale's favor on each count of the Complaint.

2

I.      **STATEMENT OF FACTS**[1]

  A. *Plaintiff Commences Employment At Yale.*

  On February 19, 2008, Yale informed Plaintiff of its intent to appoint her as an Assistant Professor of Spanish in the Department.  Plaintiff's initial term was to be for four years, from July 1, 2008 to June 30, 2012.[2]

  During this timeframe, the senior faculty members in Yale's Department of Spanish and Portuguese (the "Department") were Rolena Adorno, David Jackson, Roberto Gonzalez Echevarria, Anibal Gonzalez Perez, and Noel Valis.[3]

  B. *Yale Appoints Plaintiff as Associate Professor on Term.*

  In July 2013, Yale appointed Plaintiff to the position of Associate Professor on Term.[4] Under the Handbook, the standard for this appointment was that:

> …candidates must present significant published research and scholarship representing early demonstrations of disciplinary and interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university citizenship.[5]

  The Case Summary summarizing the Department's view of Byrne's candidacy was tepid in its praise of her scholarship.  While acknowledging that her work was "extremely well focused," it described her archival work as merely "solid," and her written Spanish as merely "competent."  The Case Summary goes on to question whether her approach to scholarship impeded her ability to

---

[1] The facts set forth in this motion are, in accordance with Federal Rule of Civil Procedure 56, stated in the light most favorable to Plaintiff. Yale reserves the right to dispute these facts in the event this case proceeds to trial.
[2] Byrne Offer Letter, at Byrne000010 – 11 (attached as Ex 2).  Exhibit 1 to this memorandum is a Table of Contents detailing the exhibits in this memorandum, per the Court's Chambers Practices.
[3] Valis Tr., p. 17:25 – 18:22.  Cited pages from Professor Valis's deposition are attached as Ex. 3.
[4] Byrne Tr., p. 170:5-10. Cited pages from Plaintiff's deposition are attached as Ex. 4; Department Case Summary, at Byrne003397 – 99 (attached as Ex. 5).
[5] Faculty Handbook, July 1, 2014, p. 31 (attached as Ex. 6).

offer interpretive insights, and noted the aspirational hope that her work would "open out to onto ever larger vistas."[6]  As Professor Valis explained, the Case Summary stated Plaintiff was a "competent scholar.  And nothing more."[7]

       **C.**    ***The Department Rejects Plaintiff's Leave Proposal.***

In September 2013, Plaintiff submitted a proposal pursuant to which she sought an Associate Professor Leave ("APL") to work on her fourth book.[8] Professors Adorno, Gonzalez Echevarria and Valis reported to Mary Miller, Dean of Yale College, that they found the initial proposal "quite poor."[9]  These three professors spoke to Plaintiff about their views on the proposal.[10]  Plaintiff agreed the proposal was inadequate.[11]

The next year, in or about September 2014, Plaintiff submitted another APL proposal.  On October 17, 2014, Professor Gonzalez Echevarria responded with a written summary conveying the concerns the Department had with her proposal – including, in part, that the proposal was "badly written," a systemic issue she could not resolve by correcting a select few mistakes.[12]

After receiving a copy of this written summary, Plaintiff responded the next day.[13]  Her response labeled some of the Department's concerns "disingenuous," asked the Department members not to "close [their] minds to a fresh, modern

---

[6] Ex. 5, Byrne003397 – 003399; Valis Tr., p. 34 (Ex. 3).
[7] Valis Tr., p. 33 (Ex. 3).
[8] Byrne Tr., pp. 226 – 228 (Ex. 4).
[9] Adorno E-mail, at BYRNE004813 (attached as Ex. 7); Byrne Tr., p. 227:1-9 (Ex. 4).
[10] Byrne Tr., p. 227:1-9 (Ex. 4).
[11] Byrne Tr., p. 227:1-25 (Ex. 4)
[12] 10/17/14 Letter, at BYRNE008973-74 (attached as Ex. 8); RGE Tr., pp. 60:23 – 61:9. Cited pages from Roberto Gonzalez Echevarria's ("RGE") deposition are attached as Ex. 9.
[13] 10/18/14 Byrne Letter, at BYRNE008975 – 77 (Ex. 10); Byrne Tr., p. 239:17 – 240:3 (Ex. 4).

4

perspective," and expressed that she "heartily disagree[d]" with their critiques of her writing style, instead quoting various third-party reviews she had received on her earlier work. She stated that the Department had not expressed "any sound concerns" and that she "expected" the Department to approve her proposal.[14]

Ultimately, after Plaintiff submitted a third, revised proposal,[15] the Department rejected her proposal, thus denying her the leave she had requested.[16]  When asked in her deposition when the alleged retaliation had begun, Plaintiff pointed to the denial of her APL leave as the first instance of "anger" directed towards her by the Department.[17]

### D.    Plaintiff Seeks the Recusal of Two Professors

On April 1, 2015, Plaintiff requested that Professors Adorno and Gonzalez Echevarria recuse themselves from any involvement in her tenure case. Citing Section IV.H.1 of the Faculty Handbook regarding conflicts of interest, she asserted that the professors had demonstrated an "incapacity or unwillingness to give [her] tenure case a fair and equitable hearing," and that they had an "ideological adversion [sic]" to the Faculty of Arts and Sciences Tenure and Appointments Policy ("FASTAP").[18]

Plaintiff set forth a variety of reasons why she believed they held a bias against her, but notably made no mention of retaliation, or the fact that she had

---

[14] Ex. 10, at BYRNE008975 – 77.
[15] Byrne Tr., pp. 242:1-243:19 (Ex. 4); Byrne APL Proposal, at BYRNE008978 – 87 (Ex. 11).
[16] Valis Tr., pp. 58:21 – 59:2 (Ex. 3).
[17] Byrne Tr., p. 88:3 – 7 (Ex. 4).
[18] Byrne Recusal Letter, at BYRNE000464-465 (attached as Ex. 12).

allegedly complained of gender discrimination or otherwise engaged in some type of protected activity.[19]

Yale's policy is for professors to recuse themselves if they believe they have a conflict of interest; there is no third-party mechanism to require recusal.[20] Professor Adorno informed Plaintiff, on April 13, 2015, that she and Professor Gonzalez Echevarria would not recuse themselves from Plaintiff's tenure case.[21]

### E.   Yale Follows Its Tenure Process to Consider Plaintiff's Candidacy

Although Professor Adorno declined to recuse herself from the tenure process, she did recuse herself from chairing the smaller committee that was to assess Plaintiff's tenure case in the first instance (the "Internal Review Committee").[22]  Professor Valis took on this role in July 2015.[23]

Before Professor Valis filled this role, Professor Adorno had informed Plaintiff of the tenure process, as Step 1 of the FASTAP process requires.[24] (Professor Valis later repeated this step, in an abundance of caution.)[25]  Professor Adorno also called for Plaintiff to submit preliminary materials, consistent with Step 2;[26] Professor Valis received the requested materials.[27]

---

[19] Ex. 12.
[20] Dovidio Tr., p. 84:9 – 85:12. Cited pages from Jack Dovidio's deposition are attached as Ex. 13.
[21] 4/13/15 Adorno Letter, at P1416 (attached as Ex. 14).
[22] Byrne Tr., p. 200:9 – 23 (Ex. 4).
[23] Adorno Tr., p. 199:12-16. Cited pages from Rolena Adorno's deposition are attached as Ex. 15.
[24] Adorno Tr., p. 199:20 – 200:5 (Ex. 15); FASTAP Steps for Promotion, at BYRNE012566-574, attached as Ex. 16.
[25] Valis Tr., p. 90:17 – 23 (Ex. 3).
[26] Adorno Tr., p. 200:6 – 23 (Ex. 15); Ex. 16; 3/30/15 Adorno Letter, at BYRNE006632 – 35, attached as Ex. 17.
[27] Valis Tr., p. 90:24 – 91:7 (Ex. 3).

When Professor Adorno decided not to chair the Internal Review Committee, Senior Associate Dean John Mangan informed her that, consistent with Step 3 of the FASTAP process, the Faculty of Arts & Sciences ("FAS") Dean's Office would oversee composition of that committee.[28] The purpose of this "smaller" committee was to read the materials associated with Plaintiff's tenure case, and make a recommendation to the "larger" committee, which would then vote on tenure.[29]

Ultimately, the Internal Review Committee's members were Professors Valis and Jackson, and Professors Howard Bloch and Giuseppe Mazzotta from Yale's departments of French and Italian, respectively.[30] Mazzotta's expertise made him familiar with the work of Ficino, the subject of Plaintiff's third book.[31]

The larger committee, which voted on Plaintiff's tenure case, included the senior faculty of the Department, plus Professors Bloch and Mazzotta as nonvoting members.[32] Jack Dovidio, FAS Dean for Academic Affairs, also attended as an observer, to ensure that those participating in the tenure review did not "deviat[e] from the faculty handbook, and the FASTAP 2007 guidelines, and the promotions handbook as well."[33]

---

[28] Adorno Tr., p. 204:4 – 13 (Ex. 15); Valis Tr., p. 101:2 – 17 (Ex. 3).
[29] Valis Tr., pp. 99:13 – 100:19 (Ex. 3).
[30] Valis Tr., pp. 92:15 – 93:13 (Ex. 3).
[31] Valis Tr., p. 93:18 – 24 (Ex. 3).
[32] Valis Tr., pp. 100:24 – 101:1, 106:19 – 25, 107:1-5 (Ex. 3).
[33] Dovidio Tr., pp. 5:17-20, 134:2 – 135:8 (Ex. 13); Valis Tr., pp. 100:6 – 101:1 (Ex. 3).

As required by the FASTAP process and in conjunction with Amy Hungerford, Divisional Director of Humanities,[34] Professor Valis worked to secure, contact and then track responses from the external referees – individuals from outside of Yale asked to review Plaintiff's scholarship.[35]   Professor Valis also scheduled a Tenure Appointments Committee review date;[36] submitted and reviewed Plaintiff's tenure case materials;[37] ensured that the external referees received Plaintiff's tenure case materials;[38] tracked the substantive responses from external referees asked to opine on Plaintiff's scholarship;[39] and ensured that the tenure case materials were uploaded and available on Interfolio, Yale's document management system.[40]   At that point, all that remained was for the Internal Review Committee and Department faculty to deliberate on Plaintiff's case, and to inform Plaintiff of the Department's decision on tenure.[41]

**F.**   *Yale Receives Negative Feedback on Plaintiff's Tenure Case.*

Although the FASTAP process requires external referee letters, those familiar with the tenure process know that external referees "don't write negative letters but very rarely…."[42]   In general, external referee letters "tend to be highly laudatory because the people writing them tend to suppress their reservations…and…tilt them to the positive side in order to not harm someone

---

[34] Hungerford Tr., p. 10:9-18. Cited pages from Ms. Hungerford's deposition are attached as Ex. 18.
[35] Valis Tr., p. 113:9 – 16 (Ex. 3).
[36] Valis Tr., pp. 113:17- 114:3 (Ex. 3)(describing compliance with Step 5 of the FASTAP process, which would have been necessary had Plaintiff's tenure case passed the Departmental level)
[37] Valis Tr., p. 114:4 - 15 (Ex. 3)(describing compliance with Step 6 of the FASTAP process)
[38] Valis Tr., p. 114:18 – 115:4 (Ex. 3)(describing compliance with Step 7 of the FASTAP process)
[39] Valis Tr., pp. 115:5 – 116:11 (Ex. 3)(describing compliance with Step 8 of the FASTAP process)
[40] Valis Tr., pp. 117:12 – 118:1 (Ex. 3)(describing compliance with Step 9 of the FASTAP process).
[41] *See* FASTAP Steps, Ex. 16, at BYRNE012573 -74.
[42] Hungerford Tr., pp. 188:9 – 10 (Ex. 18).

who is in the position of coming up for tenure."[43]   Even a review that seems

"lukewarm" to an outsider would be "unusual" in the context of the external

review process.[44]

Ultimately, Yale received eight letters from external referees who reviewed

Plaintiff's work.[45]   Divisional Director Hungerford testified that she has read

hundreds of external referee letters, and more than two negative letters in a

single tenure case is "noticeable."[46] At least three of Plaintiff's letters contained

strong criticisms of her work, including:

*External Referee RF [47]*

  o **"…the initial reception of Byrne's book has been generally positive. Having myself studied the intersection of the legal discourses, institutions and literary texts, and Spanish historiography, I have some reservations."**

  o **"In her studies I have found no theoretical or methodological grounding; she appears to be working with the assumption that philology and historicist contextualization are a method of study that needs no justification."**

  o **"…her unchanging adherence to a well-established but seriously limiting scholarly paradigm will not place her among the leading scholars in the general field of Spanish literary studies."[48]**

*External referee AC*

  o **"…the interpretive power and insights demonstrated in this book are somewhat limited.  The work strikes me as the effort of someone who was still discovering her own critical voice."**

---

[43] Bloch Tr., pp. 42:6 – 23.  Cited pages from Howard Bloch's deposition are attached as Ex. 19.
[44] Bloch Tr., p. 43:2 – 9 (Ex. 19).
[45] Valis Tr., 115:11 – 116:11 (Ex. 3).
[46] Hungerford Tr., p. 187:11 – 188:16 (Ex. 18).
[47] Because Yale promises external referees confidentiality, Yale uses initials instead of full names in this memorandum.  The cited letters, however, have not been redacted.
[48] RF External Referee Letter, at Byrne003634-39 (attached as Ex. 20).

- ○ **"I think there are some false assumptions at work in the [Cervantes] book that cloud an otherwise successful project."**

- ○ **"And yet, for a number of reasons, the [Ficino] book falls short of what it might have been."**

- ○ **"A good bit of the research presented is only partially digested, so that while it is cogently laid out we are often left wondering about the importance and impact of Ficino's ideas."**

- ○ **"…in my view [the Ficino book] lacks the interpretive insight that the Cervantes book demonstrates."** [49]

***External Referee AW***

- ○ **"Unfortunately, the book reads very much like a minimally revised dissertation.  It is often difficult to see the forest for the trees."**

- ○ **"Although this is a solid contribution to Cervantes scholarship, I do have some reservations."**

- ○ **"Byrne's most recent book, *Ficino in Spain*, is also admirable in its erudition but somewhat disappointing in its execution."**

- ○ **"…I think her work would have greater impact if she were a more engaging writer."**

- ○ **"…I would not say that her work has resulted in a paradigm shift, opened up a new field, or attracted the attention of scholars beyond specialists in early modern Spanish literature."[50]**

Professor Bloch – who estimated that he has reviewed as many as 320 external referee letters during his career[51] – explained that of the roughly 40 tenure cases he had been involved with, the AC letter was among the ten worst letters he had read.[52] Similarly, Professor Bloch expressed that the final line of

---

[49] AC External Referee Letter, at Byrne003618-20 (attached as Ex. 21).
[50] AW External Referee Letter, at Byrne003650-53 (Ex. 22).
[51] Bloch Tr., pp. 42:13-23 (Ex. 19).
[52] Bloch Tr., pp. 42:6 – 43:9 (Ex. 19).

the RF letter was "as damning as one can find in any" set of letters, and that the

RF letter "would fall in the bottom percentile of such letters" that he has seen.[53]

### G.    The Standard for Tenure

As set forth in the Faculty Handbook, the standard applied in tenure cases

is as follows:

> A candidate for appointment or promotion to a tenure position…must have attained scholarly or creative distinction of a high quality as demonstrated by both written work and teaching. Consideration for tenure emphasizes the impact and continuing promise, at the very highest levels, of the candidate's research and scholarship, as well as excellent teaching and engaged University citizenship within and beyond a department….[54]

The Faculty Handbook emphasizes that: "Tenured faculty at Yale are expected to

stand among the foremost leaders in their fields throughout the world."[55]

Professor Bloch, in describing his view of the tenure standard, explained that

"the scholarship has to distinguish the faculty member as one of not only the

leaders in his or her field, but someone who has made an original and significant

contribution to that field and whose work also appeals to scholars outside of a

narrow field."[56]

As Plaintiff admitted, Yale has a "high standard" for promotion to tenure,

and "[t]here's more expected of people in the Ivy League than [is expected of]

people not in the Ivy League."[57]

### H.    The Internal Review Committee Does Not Find Plaintiff Tenurable.

---

[53] Bloch Tr., pp. 52:15 – 53:20 (Ex. 19).
[54] Faculty Handbook, pages 31-32 at Byrne000052-53 (Ex. 6).
[55] Ex. 6, at BYRNE000053.
[56] Bloch Tr., p. 17:8-19 (Ex. 19).
[57] Byrne Tr., pp. 100:22 – 101:5, 215:2 – 22 (Ex. 4).

As Step 10 of the FASTAP process requires, the Internal Review Committee met on February 3, 2016 to deliberate about Plaintiff's tenure case.[58] At the conclusion of the meeting, Professors Valis, Bloch and Mazzotta determined that Plaintiff was not tenurable; Professor Jackson thought she was.[59]

As Professor Bloch explained, Plaintiff's work was "marginally competent, but that is not enough for…tenure at Yale."[60]  He concluded that the external referee letters did not "shine" and were "not a high-ranking set of letters."[61] When asked why he did not find her tenurable, he explained that he "felt her scholarly work was not of the level that one expects from a tenured faculty member at Yale."[62]  Professors Valis and Mazzotta shared a similar view. When asked if he found Plaintiff to have met Yale's tenure standard, Professor Mazzotta stated, "I really didn't think that I was dealing with an exceptional figure."[63] Similarly, Professor Valis expressed that Plaintiff "did not meet the very highest standards that Yale wanted for somebody to be tenured."[64]

### I.     *The Department Votes Against Granting Plaintiff Tenure*

On February 9, 2016, the five senior faculty members of the Department, and Professors Bloch and Mazzotta, met to deliberate on Plaintiff's tenure case,

---

[58] Valis Summary of 2/3/16 Meeting, at BYRNE000374 – 376 (attached as Ex. 23); Valis Tr., p. 130:5-16 (Ex. 3)(authenticating summary of February 3rd meeting).
[59] Ex. 23, at Byrne000376.
[60] Bloch Tr., pp. 36:8 – 37:22 (Ex. 19).
[61] Bloch Tr., pp. 36:8 – 37:22 (Ex. 19).
[62] Bloch Tr., pp. 54:24 – 55:3 (Ex. 19).
[63] Mazzotta Tr., pp. 19:19 – 20:10. Cited pages from Giuseppe Mazzotta's deposition are attached as Ex. 24.
[64] Valis Tr., p. 220:19 – 25 (Ex. 3).

as contemplated by Step 11 of the FASTAP process.[65]   Dean Dovidio observed the proceedings to ensure they met all procedural requirements, but did not opine on Plaintiff's qualifications for tenure.[66]

Professors Adorno and Gonzalez Echevarria shared the majority view of the Internal Review Committee.  Professor Gonzalez Echevarria's view was that Plaintiff was not "tenurable at Yale because of the poor quality of her work," and that she lacked "critical insight and sophistication."[67] He believed that her Cervantes book, the second of her three books, was "like the rest of her work: very poorly written.  [Plaintiff] has a penchant for clichés, malapropisms, and very inelegant turns of phrase."[68]

Professor Adorno, when asked why she voted against granting Plaintiff tenure, explained that she had reached that decision because of the "quality of [Plaintiff's] academic work at that point." Specifically, Professor Adorno noted that Plaintiff's third book, on Ficino, failed to demonstrate the "upward trajectory" that Professor Adorno had expected to see after reading the Cervantes book and voting in favor of Plaintiff's 2013 promotion.[69]

Professor Valis drafted a summary of the meeting after its conclusion.[70] The notes reflect that the five voting members of the committee—senior faculty members Adorno, Jackson, Gonzalez Echevarria, Gonzalez Perez and Valis—

---

[65] Valis Summary from 2/9/16 Departmental Vote Meeting, at BYRNE9051-57; Valis Tr., pp. 99:13 – 100:13, 143:23 – 144:2 (Ex. 3) (authenticating summary); Ex. 16, at Step 11.
[66] Dovidio Tr., p. 134:2 – 135:8 (Ex. 13).
[67] RGE Tr., pp. 205:2 – 205:16 (Ex. 9).
[68] RGE Tr., p. 205:2 – 24 (Ex. 9).
[69] Adorno Tr., p. 208:24 – 209:10 (Ex. 15).
[70] Ex. 25; Valis Tr., pp. 143:23 – 144:7 (Ex. 3) (authenticating summary of February 9 meeting).

voted three against tenure, and two in favor.  Dean Dovidio counted the votes. The 3-2 vote resulted in an unfavorable decision on Plaintiff's tenure case at the Department level.[71]  Thus, her case did not proceed to any higher levels of review.

As required by Step 12 of the FASTAP process, Professor Valis and Dean Dovidio later met with Plaintiff to tell her about the results of the tenure vote.[72]

### J.    Plaintiff Appeals the Decision to Deny Her Tenure

On March 2 and March 8, 2016, Plaintiff submitted appeals of the decision to deny her tenure, alleging retaliation for the first time, and other perceived flaws in the Department's review of her tenure case.[73]  In April 2016, Provost Benjamin Polak appointed a Faculty Review Committee to investigate the appeal.[74]

On July 25, 2016, after a review of Plaintiff's appeals, the Faculty Review Committee provided a report to the Provost.[75]  The report concluded, in part, that the committee "found no evidence that the decision in this case was based on anything other than academic grounds."[76] The Review Committee noted the steps Yale had taken to ensuring a fair process.  For example: the appointments of Professors Bloch and Mazzotta to evaluate Plaintiff's tenure case, based on their "independence and relevant expertise;" the active role taken by the FAS Dean's Office and Humanities Divisional Chair in selecting external referees; and the

---

[71] Ex. 25, at BYRNE009057.
[72] Valis Tr., p. 173:14-18 (Ex. 3).
[73] Byrne 3/2/16 Appeal Letter, at P755 – P770 (attached as Ex. 26); Byrne 3/8/16 Appeal Letter, at BYRNE009152 – 9165 (attached as Ex. 27).
[74] Polak Tr., p. 29:8 – 30:13. Cited pages from Benjamin Polak's deposition are attached as Ex. 28.
[75] Faculty Review Committee Report, dated 7/25/16, at Byrne009113 – 9117, attached as Ex. 29.
[76] Ex. 29, at Byrne009115.

Dean of Academic Affairs attending the departmental meeting and final vote.[77] The Review Committee also determined that it could "not find evidence that [Plaintiff] suffered retaliation in this tenure review process because of anything she may have said or not have said specifically regarding sexual harassment or discrimination in the workplace."[78]

On August 23, 2016, Provost Polak accepted the committee's findings of fact and conclusions and communicated that decision to Plaintiff.[79]

Plaintiff had applied for a position with the University of Nevada-Las Vegas in Fall 2015,[80] well before the tenure decision.  On March 16, 2016, just two weeks after submitting her first appeal, Plaintiff accepted UNLV's employment offer.[81] In his August 23rd letter, the Provost approved Plaintiff's request for an unpaid leave, with permission for her to work at another institution.[82]

### K. Plaintiff's Alleged Protected Activity

On or about March 24, 2015, Yale launched a Climate Review of the Department.[83] Yale tasked two trained attorneys, Barbara Goren (a New Haven-area practitioner) and Jamaal Thomas (a representative of Yale's Office for Equal Opportunity Programs), to assess the "educational and employment environment in the department of Spanish and Portuguese."[84] As part of this process,

---

[77] Ex. 29, at Byrne009115.
[78] Ex. 29, at Byrne009115.
[79] 8/23/16 Polak Letter, at P652, attached as Ex. 30.
[80] 11/9/2015 E-mail from Ileana Jara Yupanqui, at BYRNE018980 (attached as Ex. 31).
[81] 3/7/16 Offer Letter from UNLV, at BYRNE018999 – 19001 (attached as Ex. 32).
[82] Ex. 30.
[83] 3/24/15 E-mail from Polak, Cooley and Gendler, at P1374 (attached as Ex. 33).
[84] Ex. 33.

Attorneys Goren and Thomas asked people associated with the Department to speak to them voluntarily;[85] Plaintiff agreed to do so in the spring of 2015.[86]

Plaintiff spoke to Attorneys Goren and Thomas about "intellectual harassment," "social harassment," and alleged sexual harassment by Professor Gonzalez Echevarria.[87] Plaintiff principally described "intellectual harassment" as her telling Dean Miller that Professor Adorno should no longer be chair, followed by the Department's determination that "all of a sudden the same work that was good is no longer good."[88]  More broadly, she described it as the "imposition of one person's thoughts on another person…."[89] She described "social harassment" as having to socialize with Professor Adorno. [90]

Finally, with regard to sexual harassment, Plaintiff stated that Professor Gonzalez Echevarria had once played with her hair; that Professor Gonzalez Echevarria had kissed her on the mouth at a party celebrating Dean Miller; and that Professor Gonzalez Echevarria had once told her a joke about having sex while standing up.[91] She also alleged an incident in 2014 when Professor Gonzalez Echevarria had asked her to sit next to him on a two-person couch.[92]

Plaintiff has no evidence the Climate Reviewers told Professor Gonzalez Echevarria what she had told them during her interview.[93] To the contrary,

---

[85] 3/27/15 E-mail from Office of the Provost, at BYRNE003138 (attached as Ex. 34).
[86] Byrne Tr., p. 44:7 – 24 (Ex. 4).
[87] Byrne Tr., p. 46:25 – 47:11 (Ex. 4)
[88] Byrne Tr., p. 47:21 – 48:2 (Ex. 4).
[89] Byrne Tr., p. 48:19-49:1 (Ex. 4).
[90] Byrne Tr., p. 49:16 – 50:25 (Ex. 4).
[91] Byrne Tr., pp. 52:17 – 53:9; 61:7-21; 63:7 – 63:12 (Ex. 4).
[92] Byrne Tr., pp. 63:23 – 65:15 (Ex. 4).
[93] Byrne Tr., pp. 57:21-24 (Ex. 4).

Attorney Thomas testified that he never spoke to Professors Gonzalez Echevarria, Adorno or Valis regarding Plaintiff's sexual harassment allegations.[94]

Similarly, Plaintiff alleges she engaged in protected activity by participating in the Title IX process that Yale initiated in connection with allegations against Professor Gonzalez Echevarria.[95]  She recalled three or four separate meetings with the Title IX office, beginning on December 1, 2015 and ending in Spring 2016.[96]  During this Title IX process, she shared the same details she had previously shared with Attorneys Goren and Thomas during the Climate Review.[97] Plaintiff first spoke with University Title IX Coordinator, Deputy Dean Stephanie Spangler, who asked Plaintiff if she wished to bring a complaint against Professor Gonzalez Echevarria. Plaintiff declined, explaining that her "complaint with him was more the intellectual harassment…."[98]

In Spring 2016, a Title IX investigator told her that Professor Gonzalez Echevarria had responded to her allegations.  This is the only information she has to suggest that the Title IX office had shared her complaints with the Department.[99]  This occurred after the Department had voted against tenure and after it had informed Plaintiff of the outcome of the vote.[100]

## II.   ARGUMENT

### A.   *Summary Judgment Standard.*

---

[94] Thomas Tr., p. 107:11 – 20. Cited pages from Mr. Thomas's deposition are attached as Ex. 42.
[95] Byrne Tr., pp. 70:2 – 15 (Ex. 4).
[96] Byrne Tr., pp. 70:15 – 25; 74:15 – 74:24 (Ex. 4).
[97] Byrne Tr., pp. 78:8 – 17 (Ex. 4).
[98] Byrne Tr., p. 72:8 – 72:22 (Ex. 4).
[99] Byrne Tr., p. 73:11 – 22 (Ex. 4).
[100] Byrne Tr., p. 81:3 – 25 (Ex. 4).

Defendant is entitled to summary judgment because there is no genuine dispute as to any material factual issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . and . . . it should be interpreted in a way which allows it to accomplish this purpose.").  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the <u>evidence</u> is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (emphasis added).  *See also Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

B.  *Plaintiff Cannot Prove Her Title VII and CFEPA Retaliation Claims. (Counts One and Two).*

Plaintiff's Title VII and CFEPA retaliation claim fails for two reasons.  First, much of the alleged protected activity she relies upon is not, in fact, protected activity; rather, to the extent she "spoke out," she did so regarding matters wholly unrelated to Title VII. Second, her claims must fail because she has no evidence that Yale's legitimate, non-retaliatory reason for the tenure decision was pretext for retaliation.

Courts evaluate a "Title VII retaliation claim…using the same three-step *McDonnell-Douglas* burden-shifting framework as a Title VII discrimination claim." *Ruiz v. City of Bridgeport*, No. 3:15-cv-253(AWT), 2018 U.S. Dist. LEXIS

18

190650, at *37 (D. Conn. Sep. 4, 2018).  At the first step, Plaintiff bears the burden of establishing "a *prima facie* case of retaliation." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). In order to do so, Plaintiff must prove four elements: "(1) participation in a protected activity; (2) that [Yale] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

If Plaintiff establishes a *prima facie* case of retaliation, then in order to rebut the presumption of retaliation, Yale must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (quoting *Jute*, 420 F.3d at 173). Once Yale does so, the burden shifts back to Plaintiff. *See id.* At this point, Plaintiff must show that the reason offered by the employer is merely pretext, and that the employer's "desire to retaliate" was the actual "but-for cause of the challenged employment action." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). If Plaintiff fails to do so, her claims must be dismissed. *See id.*[101]

---

[101] "Retaliation claims under Title VII…and the CFEPA are analyzed under the same burden-shifting framework described above." *Maynard v. Stonington Cmty. Ctr.*, No. 3:15-CV-483, 2018 U.S. Dist., LEXIS 64027, at *19–20 (D. Conn. Mar. 31, 2018).  "Because federal law guides analysis of Connecticut's anti-discrimination statutes, including CFEPA," the Court should analyze Plaintiff's federal and state discrimination claims together. *See Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 82 (D. Conn. 2011).  For this same reason, courts have applied the but-for causation standard to both Title VII and CFEPA retaliation claims, and the Court should do so in this case as well.  *See, e.g., Maynard*, 2018 U.S. Dist. LEXIS 64027, at *19–20; *Falcon v. State of Conn. Judicial Branch*, 2018 U.S. Dist. LEXIS 196230, at *25–26 (D. Conn. Sept. 25, 2018) (describing the elements of a Title VII retaliation claim as including but-for causation, and then noting that the elements of a retaliation claim are identical under CFEPA and Title VII). If this Court determines, however, that the standard of proof on a CFEPA retaliation claim is not clear as a matter of state law, this issue should be certified to the Connecticut Supreme Court.

*1.* **Plaintiff Cannot Premise Her Retaliation Claim on Three "Generic" Complaints She Relies Upon as Incidents of Protected Activity.**

Three of the occasions on which Plaintiff allegedly spoke out against her Department have nothing at all to do with alleged sexual harassment, or any other subject matter that falls within the scope of Title VII.  Her retaliation claim must fail to the extent it relies on these three examples of purported protected activity.

Informal complaints can constitute protected activity only if they are "sufficiently specific to make it clear that the employee is complaining about conduct prohibited by law; generalized complaints about a supervisor's treatment are insufficient." *Saliga v. Chemtura Corp.*, No. 12-cv-832, 2015 U.S. Dist. LEXIS 133135, at *44-45 (D. Conn. Sep. 30, 2015).  "Complaints presenting general allegations of harassment unrelated to protected class are not protected activity under Title VII…or CFEPA."  *Id.*; *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011).

Plaintiff's own descriptions of the FASTAP review meeting, as well as her meetings with Mary Miller and Ben Polak, make it clear that her informal complaints presented general allegations of mistreatment, wholly unrelated to any protected class.  First, in early 2015, Plaintiff attended a University meeting regarding FASTAP.  There is no evidence that any tenured faculty member in her Department was present or otherwise was aware of her statements at the meeting. Plaintiff spoke about her concerns that the Department was not honoring the FASTAP process, and that certain professors were not acting

responsibly, not granting fair hearings, and were "retaliating" against people.[102] She later summarized her concerns in an e-mail to a Yale colleague, Kathryn Lofton, and did not refer to any Title VII issue.[103]

Second, in early 2015, Provost Benjamin Polak held a "listening session" meeting regarding the FASTAP process. Plaintiff was the only member of the Department who attended.[104] During this meeting, Plaintiff again complained that the FASTAP process was being abused in the Department, but she did not identify those responsible for abuse of the process.[105]

Third and finally, in May 2014, Dean Miller met with Plaintiff, as she did with all other members of the Department, as part of her effort to determine the next Department chair.[106] During the meeting, Plaintiff told Dean Miller that Professor Adorno should not continue as chair, because she engaged in "little wars" with two of her colleagues, Professors Jackson and Gonzalez Perez.[107] When asked what she "for sure" told Dean Miller, Plaintiff responded: "Only that she should not make Rolena [Adorno] chair again."[108] Later, she recalled identifying Professors Valis, Jackson and Gonzalez Perez as potential replacements for Professor Adorno.[109] Plaintiff also recalled discussing with Dean Miller the

---

[102] Byrne Tr., p. 202:10 – 203:5 (Ex. 4).
[103] Byrne Tr., pp. 203:23 – 204:2; BYRNE013578 – 579 (Ex. 4).  Plaintiff admits that the summary included all of the concerns she raised at the meeting.  Byrne Tr., pp. 203:23 – 204:2 (Ex. 4).
[104] Byrne Tr., pp. 204:3 – 16 (Ex. 4).
[105] Byrne Tr., p. 205:7 – 15 (Ex. 4).
[106] Byrne Tr., pp. 11:21-12:19 (Ex. 4).
[107] Byrne Tr., pp. 13:18-14:7 (Ex. 4).
[108] Byrne Tr., p. 14:14-18 (Ex. 4).
[109] Byrne Tr., pp. 22:16 – 23:2; 29:1-4 (Ex. 4).

"harassment" of graduate students.[110]   Although she could not remember the exact words she shared with Dean Miller, she did recall that, at the time, her concern was that Professor Adorno "had a tendency to tell students what they had to work on as opposed to getting them to produce their best work."[111]

All of these complaints, as Plaintiff herself described them in her sworn testimony, are too generic to rise to the level of Title VII protected activity.

### 2. Plaintiff Cannot Premise Her Retaliation Claim on Her Communications with a Student Newspaper.

Plaintiff also attempts to rely on her communications with a student newspaper. Although a "person's dealings with a newspaper reporter could conceivably qualify as opposing any practice made an unlawful employment practice by Title VII," this can only be so if the article reflects a complaint by the plaintiff "that [s]he was being subjected to discrimination…of a type prohibited by Title VII." *Bazile v. City of N.Y.*, 215 F. Supp. 2d 354, 384-85 (S.D.N.Y. 2002).

Plaintiff argues that she communicated with a student reporter from the Yale Daily News during Fall 2014 and Spring 2015, culminating in an article that mentioned Plaintiff's name.[112] In addition to e-mail exchanges, Plaintiff recalled one conversation in which she told the reporter—an undergraduate student—about the allegations of sexual harassment against Professor Gonzalez Echevarria.[113]  Plaintiff could not recall which examples of sexual harassment she

---

[110] Byrne Tr., p. 28:1-9 (Ex. 4).
[111] Byrne Tr., p. 28:18-25 (Ex. 4).
[112] Byrne Tr., pp. 31:18 – 32:5 (Ex. 4).
[113] Byrne Tr., p. 34:2 – 34:15; 41:18 – 19 (Ex. 4).

had shared.[114] Aside from the article published March 25, 2015,[115] Plaintiff has no information to suggest that the reporter informed Professors Gonzalez Echevarria or Adorno about her conversation with Plaintiff.[116]

The March 25, 2015 Yale Daily News article[117] includes a section regarding harassment allegations, but Plaintiff's contribution is only that she heard "harassing comments made by professors," unconnected to any protected class. She did not name any perpetrators and even stated that she had not seen any such behavior since December 2014.  Such general allegations fail to meet the standard for protected activity under Title VII.  *See id.*; *Saliga*, 2015 U.S. Dist. LEXIS 133135, at *44-45.

### 3. Yale Has Provided a Legitimate, Non-Retaliatory Reason for the Decision to Deny Plaintiff Tenure.

For purposes of this motion, Yale assumes that Plaintiff can establish a prima facie case of retaliation in connection *only* with respect to her alleged statements as part of the Climate Review and Yale's Title IX Office interview.  The burden thus shifts to Yale to provide a non-retaliatory reason for the tenure decision, and Yale has indisputably done so: after a full review of her work, the Department determined Plaintiff's scholarship was not at the level required for tenure.

The Second Circuit has held that a tenure candidate's insufficient level of scholarship is a legitimate reason for denying a candidate tenure. *Weinstock v.*

---

[114] Byrne Tr., p. 35:15 – 36:11; 42:17 – 43:5 (Ex. 4).
[115] 3/25/15 Yale Daily News Article, at BYRNE003123-3127 (attached as Ex. 35).
[116] Byrne Tr., p. 37:12 - 38:7 (Ex. 4).
[117] Ex. 35.

*Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) ("Columbia had a legitimate, non-discriminatory reason for denying Weinstock tenure – she lacked the requisite scholarship required").

Critically, academic freedom principles insulate Yale from Plaintiff's attempts to ask this Court to second-guess the reasons for the negative tenure vote. *Hiramoto v. Goddard Coll. Corp.*, 184 F. Supp. 3d 84, 100 (D. Vt. 2016). "Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals[.]" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 n.7 (2d Cir. 1999) (internal quotation marks omitted).

It is well established that "[a] university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom." *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (internal quotation marks omitted).  "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v.* Strickland, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975).

Here, the undisputed evidence in the record demonstrates as a matter of law that Plaintiff's scholarship did not meet the high standards required for tenure at Yale.  See Sections I.F. – I.I., *supra*.  As set forth in Section I.F., Yale solicited the opinions of eight external experts in the field, three of whom reported that they had "reservations" about Plaintiff's work.  In a criticism that

Professor Bloch labeled "damning,"[118] one of the external referees wrote explicitly that he did not believe Plaintiff's works had "resulted in a paradigm shift, opened up a new field, or attracted the attention of scholars beyond specialists in early modern Spanish literature."[119]  These types of criticisms are very rare at Yale, and on their own cast doubt on Plaintiff's scholarship. Professor Bloch considered the letters to be among the worst he had *ever* seen.

Further, the two non-members of the Department who participated in Plaintiff's tenure review both held the view that Plaintiff's scholarship fell below the required standard for tenure.  Professor Bloch—whose opinions even Plaintiff could not cast doubt upon[120] – expressed that Plaintiff's work was only "marginally competent"[121] and that "her scholarly work was not of the level that one expects from a tenured faculty member at Yale."[122]

Finally, three of the five voting members of the Department found Plaintiff's scholarship to be deficient, with specific concerns about her writing style (describing some of her work as "very poorly written"), and the lack of progress between her second book, on Cervantes, and her third book, on Ficino.

The Faculty Handbook makes clear that a tenure candidate must have "attained scholarly or creative distinction of a high quality," with emphasis on "the impact and continuing promise, at the *very highest levels*, of the candidate's

---

[118] Bloch Tr., 52:15 – 53:20 (Ex. 19).
[119] Ex. 20, at BYRNE003639.
[120] Byrne Tr., p. 293:17 – 294:11 (Ex. 4).
[121] Bloch Tr., 36:8 – 37:22 (Ex. 19).
[122] Bloch Tr., pp. 54:24 – 55:3 (Ex. 19).

research and scholarship."[123] Successful candidates must "stand among the foremost leaders in their fields throughout the world."[124]  The record makes clear that Yale had a legitimate, non-retaliatory reason for Plaintiff's negative tenure decision: her scholarship level did not rise to this very high standard.

### 4.  Plaintiff's Pretext Arguments are Fatally Flawed.

Plaintiff will attempt to muddy the record with irrelevant information that ultimately has no bearing on how the Department viewed her scholarship.  The evidence she points to cannot support a conclusion that her protected activity was the but-for reason for Yale's negative tenure decision.

### a.  There is No Evidence of a Retaliatory Motive.

Plaintiff has not identified any negative comments referring to her involvement in the Climate Review and Title IX processes.  Nor has she offered evidence of any comparators treated better than she was.  None of the witnesses testified that her protected activity came up during her tenure vote, and the notes capturing the contents of the Departmental vote meeting reflect that no one mentioned any alleged protected activity. Such evidence would be essential in any retaliation case, but is wholly absent here.

### b.  There is No Evidence that the Decision-Makers Were Even Aware of Her Alleged Protected Activity at the Time of the Tenure Vote.

Plaintiff allegedly engaged in protected activity on two occasions: she told the Climate Reviewers about Professor Gonzalez Echevarria's alleged misconduct, and then shared the same stories with Yale's Title IX office.

---

[123] Faculty Handbook, pages 31-32 at Byrne000052-53 (emphasis added) (Ex. 6).
[124] Faculty Handbook, pages 31-32 at Byrne000052-53 (emphasis added) (Ex. 6).

Critically, however, she cannot establish that the Department was aware of this protected activity at the time of the tenure vote.  This simple fact undercuts any suggestion of retaliation.  *See Gray v. City of N.Y.*, No. 08-CV-2840 (NGG) (JMA), 2011 U.S. Dist. LEXIS 142427, at *41-42 (E.D.N.Y. Dec. 12, 2011) ("there is no evidence in the record from which it could be inferred that…the relevant decision-maker had any knowledge of the…letter," and thus decision-maker "could not have possibly retaliated against plaintiff for complaining of discrimination" in that letter).[125]

Plaintiff's testimony makes it clear, for example, that she cannot establish Professor Gonzalez Echevarria's knowledge of her protected activity during the Climate Review:

> Q:    So do you have any information that the climate reviewers told Roberto directly what you had told the interviewers?
>
> A:    I don't have any information, no.[126]

Similarly, Plaintiff admitted she has no information to suggest that, at the time of the tenure vote, Professor Gonzalez Echevarria was aware of what she had

---

[125] *See also Ragin v. East Ramapo Cent. Sch. Dist.*, No. 05-CV-6496, 2010 U.S. Dist. LEXIS 32576, at *75-78 (S.D.N.Y. Mar. 31, 2010) (holding that plaintiff's failure to offer evidence that decision-maker was aware of her protected activity at the time of promotion denial necessitated summary judgment on that retaliation claim); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (explaining that although corporate knowledge of a plaintiff's complaint is sufficient to satisfy the "knowledge" prong of a plaintiff's *prima facie* case, evidence that the specific decision-makers responsible for the adverse action were not aware of the plaintiff's protected activity is still relevant "as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment").

[126] Byrne Tr., p. 57:21-24 (Ex. 4). Plaintiff attempted to change this testimony in her errata sheet, but her original testimony remains part of the record.  *N. Trade United States, Inc. v. Guinness Bass Imp. Co.*, No. CIVIL 3:03CV1892 (CFD) (TPS), 2006 U.S. Dist. LEXIS 54435, at *5-7 (D. Conn. Aug. 7, 2006).  In any event, Plaintiff bases her entire revised response on her speculation after reviewing the Climate Review report, which she only read as part of the discovery process in this case; she never had access to it during her employment at Yale.

disclosed to the Title IX office.  When asked what information she had to suggest the Title IX office told Professor Gonzalez Echevarria about her allegations, Plaintiff responded only that the Title IX office told her about Professor Gonzalez Echevarria's responses to her allegations—but this occurred in Spring 2016, *after* the negative tenure decision.[127]  And even then, she merely assumes without any evidence that the Title IX office gathered information from Professor Gonzalez Echevarria in a way that implicitly must have implicated Plaintiff.[128]

Plaintiff's testimony regarding when the alleged retaliation began also crystallizes why the timing here undercuts any inference of retaliation.  Plaintiff testified that although she could not say when the retaliation truly began, she first noticed "anger" directed towards her when the Department denied her the APL leave.  As noted in Section I.C., the Department rejected her APL proposal in Fall 2014, several months *before* she participated in the Climate Review (March 2015) and a year before she participated in the Title IX Office's interview (December 2015).  This testimony establishes that even if she could establish that the Department had been "angry" with her – which Plaintiff cannot – then that anger had nothing to do with her protected activity.

### c. The Passage of Time Between Her Alleged Protected Activity and the Tenure Vote Undercuts any Inference of Retaliation.

---

[127] Byrne Tr., p. 73:11-22, 81:3-25 (Ex. 4).
[128] Plaintiff also admitted that – aside from her inadmissible and irrelevant assumptions – she had no evidence that Professor Valis and Professor Adorno, the other two senior faculty members who voted against her tenure case, were aware of Plaintiff's alleged protected activity at the time of the tenure vote.  Byrne Tr., pp. 90:11-91:9 (Ex. 4).

Plaintiff's first alleged incident of Title VII protected activity was her March 2015 participation in the Climate Review – speech that occurred almost a year before the tenure vote.  The "passage of time between [Plaintiff's] complaints and [Yale's] decision not to promote her defeats any retaliatory nexus in the circumstances of this case."  *Mills v. S. Conn. State Univ.*, No. 3:08-cv-1270 (VLB), 2011 U.S. Dist. LEXIS 88384, at *42-43 (D. Conn. Aug. 10, 2011) (holding that 18 and 30 months defeated retaliatory nexus); *Hussein v. Hotel Employees & Restaurant Union, Local 6,* 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months defeats any retaliatory nexus").  The temporal gap is especially fatal here because, during that gap, the University received the damning external review letters and Professors Bloch and Mazzotta (who Plaintiff does not even allege to have known of any protected activity or to have retaliated against Plaintiff) gave their views that Plaintiff did not meet Yale's tenure standard.  Accordingly, the intervening events that occurred between Plaintiff's Climate Review interview and the tenure vote broke any arguable causal connection between them.

Plaintiff's reports to the Title IX office in December 2015 do not revitalize the alleged retaliatory nexus, because she merely repeated the same complaints a second time.[129]  Even assuming the Department was aware of her speech (which there is no evidence it was), it did not learn anything "new" in December 2015.  Moreover, even her discussion with the Title IX office occurred on

---

[129] Byrne Tr., 78:8-78:17 (Ex. 4).

December 1, 2015, two-and-a-half months before the tenure vote.[130]  This is still too temporally remote to support a causal connection.  *See Ponticelli v. Zurich American Ins. Group,* 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (finding that two-and-a-half months is "hardly the close proximity of time contemplated . . . for allowing a plaintiff to establish the 'causal connection' element").

> ### d. Plaintiff's Reliance on the Fact That She Had Been Promoted to Associate Professor on Term in July 2013 is Unavailing.

Plaintiff argues that she was promoted in 2013, engaged in protected activity in 2015, and was then denied tenure in 2016 – a sequence she claims is suggestive of retaliation.  This argument misses the key point: the standard for promotion to associate professor on term is, on its face, much lower than the standard for promotion to the permanent position of tenure. *See* Sections I.B., I.G.

To achieve promotion in 2013, Plaintiff needed only to demonstrate "significant" scholarship representing "*early* demonstrations of disciplinary and interdisciplinary leadership."[131]  In contrast, tenure candidates "must have attained scholarly or creative distinction of a *high quality,*" must demonstrate the "impact and continuing promise, *at the very highest levels*, of the candidate's research and scholarship," and must "stand among the foremost leaders in their fields throughout the world."[132]

Professor Adorno made particular note of the fact that Plaintiff's third book, on Ficino, failed to improve on her Cervantes book (on the back of which

---

[130] Byrne Tr., 78:8-78:17 (Ex. 4).
[131] Faculty Handbook, July 1, 2014, p. 31 (attached as Ex. 6)(emphasis added).
[132] Faculty Handbook, pages 31-32 at Byrne000052-53 (Ex. 6)(emphasis added).

she earned promotion in 2013).[133] This was a concern that Professor Gonzalez Echevarria shared,[134] and that the external referee letters echoed as well.[135]  The fact that Plaintiff was successful enough to warrant promotion in 2013 has no bearing at all on the fact that the Department determined her to be unworthy of tenure in 2016.

> ### e.  Differing Opinions as to the Quality of Plaintiff's Scholarship are Not Evidence of Pretext.

In her deposition, Plaintiff relied heavily on her own belief that she is qualified for tenure, testifying: "I believe fully and without any hesitation that I did deserve tenure at Yale."[136]  For years, she has pointed to mere book reviews in support of the quality of her scholarship,[137] and she will inevitably rely on the fact that Professors Jackson and Gonzalez Perez voted in her favor.  The Second Circuit, however, has held that a split vote or differing opinions <u>cannot</u> support a conclusion of illegal animus in a tenure case.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 43 (2d Cir. 2000) (affirming summary judgment where university president denied tenure after the ad hoc committee voted *in favor* of Plaintiff by a 3-2 vote, and president considered the split vote to be a showing of "underwhelming" support).

Differences of opinion are commonplace when it comes to the question of scholarship in a tenure denial case. *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d

---

[133] Adorno Tr., p. 208:24 – 209:10 (Ex. 15).
[134] RGE Tr., pp.  51:5-13 (Ex. 9).
[135] Ex. 21, at BYRNE003619 ("…in my view [the Ficino book] lacks the interpretive insight that the Cervantes book demonstrates").
[136] Byrne Tr., pp. 168:8 – 169:10 (Ex. 4).
[137] *See, e.g.*, Ex. 10.

Cir. 1984).   "[T]enure decisions are a source of unusually great disagreement. Because the stakes are high, the number of relevant variables is great and there is no common unit of measure by which to judge scholarship, the dispersion of strongly held views is greater in the case of tenure decisions than with employment decisions generally."   *Id.*; *see also Rajaravivarma v. Bd. of Trs. for the Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 166 (D. Conn. 2012) (VLB).

For Plaintiff to carry her burden, "the evidence as a whole must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university."   *Id.* at 94.   In *Zahorik*, the Second Circuit affirmed summary judgment in favor of the defendant despite the fact that the "record amply demonstrate[d]" the existence of "arguments pro and con…framed in largely conclusory terms which lend themselves to exaggeration."   *Id.* at 93.   The Court acknowledged that "[w]here a broad spectrum of views is sought and the candidate suggests certain persons as referents, a file composed of irreconcilable evaluations is not unusual."   *Id.*

Crucially, however, these differences of opinion do *not* preclude summary judgment.   *See id.; Tori v. Marist Coll.*, 344 F. App'x 697, 700 (2d Cir. 2009) ("The fact that some scholars viewed Dr. Tori's scholarship as satisfactory or even exemplary does not create a genuine issue of material fact to preclude summary judgment"); *Rajaravivarma*, 862 F. Supp. 2d at 166 (granting summary judgment on Title VII retaliation claim, and rejecting Plaintiff's attempt to have the Court "engage in inappropriate substitution of its own judgment based upon its nascent

knowledge of CCSU tenure criteria"); *see also Jackson v. Harvard Univ.*, 721 F. Supp. 1397, 1443 (D. Mass. 1989) ("Pronouncements by plaintiff and her supporters that she was qualified for tenure, even more qualified than tenured males, may be true, but they do not constitute evidence of sex bias").

### 5. Plaintiff Cannot Establish a Prima Facie Case of Retaliation with Regard to the Denial of her Associate Professor Leave (APL).

Plaintiff's Amended Complaint alleges that, in addition to her denial of tenure, the department's decision to deny her APL was an act of retaliation.  This claim cannot survive summary judgment because the denial of her APL in 2014 occurred *before* her alleged Title VII protected activity in March and December of 2015. *See Negussey v. Syracuse Univ.*, 95-CV-1827, 1997 U.S. Dist. LEXIS 3853, at *38 (N.D.N.Y. Mar. 24, 1997) ("a plaintiff may not predicate a retaliation claim on acts that predate the protected activity").  Given this sequence of events, Plaintiff cannot establish the causal connection necessary to establish a *prima facie* case. *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528 (MKB), 2014 U.S. Dist. LEXIS 134789, at *75 (E.D.N.Y. Sep. 24, 2014) (holding that the plaintiff failed to establish causation at the prima facie stage where "there is no evidence that the decision-makers who investigated and ultimately terminated Plaintiff had actual knowledge of her complaint, acted with the encouragement of a superior with such knowledge, or at the behest of a subordinate with such knowledge").

Even if Plaintiff could somehow establish a prima facie case of retaliation on the APL denial claim, the analysis in Section II.B.3 applies with equal force to this claim.  The Department made the APL decision based on its assessment of the flaws in her research proposal, as set forth in Professor Gonzalez

Echevarria's letter to Plaintiff dated October 17, 2014.[138]  This Court should not second-guess Yale's assessment of Plaintiff's scholarship efforts, particularly when that decision preceded Plaintiff's protected activity.

***

When "a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination [or retaliation] can be drawn." *Rajaravivarma*, 862 F. Supp. 2d at 166 (quoting *Lieberman*, 630 F.2d 60 at 67).  Here, Plaintiff disagrees with the views held by Professors Adorno, Gonzalez Echevarria, and Valis, as well as those of Professors Mazzotta and Bloch, and three external referees.  As a matter of law, that disagreement is not enough to establish that her protected activity was the "but-for" cause of her denial of tenure.

### C.   *Plaintiff Cannot Establish Breach of Contract (Count Four).*

Plaintiff alleges that Yale breached its contract with her – specifically by violating the FASTAP procedures, and Section IV.H.1 of the Faculty Handbook regarding conflicts of interest.  Many of the "breaches" she alleges, however, are technicalities that have no bearing on the ultimate decision here, or are based on her opinions. Moreover, Plaintiff cannot prove the damages element of her claim without relying on speculation.  Because speculative damages are insufficient to survive summary judgment, Plaintiff's breach of contract claim must fail.

### *1.* Any Technical Deviations From the Tenure Process Do Not

---

[138] Ex. 8; RGE Tr., p. 60:23 – 62:13 (Ex. 9).

34

Constitute a Breach of Contract.

In her deposition, Plaintiff alleged various hyper-technical deviations from the tenure process: that there were timing delays in her tenure case;[139] that Yale did not tell her that she could identify external reviewers whom she believed would not offer a fair assessment of her work;[140] and that Yale provided late access to the external referee letters.[141] This type of procedural deficiency does not reach the level of materiality necessary to sustain a breach of contract claim.

As an initial matter, Plaintiff has no real argument that any of these constitutes a "breach." First, as to timing, the FASTAP document makes clear that for 2015-2016 tenure cases, the timing was merely "aspirational."[142] Second, as to her ability to offer external referees she did not want to evaluate her, that was Plaintiff's obligation, not Yale's, as set out in the FASTAP steps to which Plaintiff had access.[143] Third, as to "late" access to the external referee letters, the evidence overwhelmingly establishes that those who participated in her tenure meeting had reviewed the letters.[144]

Regardless, Connecticut courts apply a materiality standard, and these alleged breaches do not meet it. *See Fishman v. Smartserv Online*, No. X05CV0172810S, 2003 Conn. Super. LEXIS 338, at *23-26 (Super. Ct. Feb. 11, 2003). Here, the ultimate purpose of the alleged contract between the parties was

---

[139] Byrne Tr., p. 136:9 – 136:12 (Ex. 4).
[140] Byrne Tr., pp. 133:21 – 135:12 (Ex. 4).
[141] Byrne Tr., pp. 145:19 – 146:12 (Ex. 4).
[142] Ex. 16, at BYRNE012566.
[143] Byrne Tr., pp. 119:16 – 120:7 (Ex. 4).
[144] Adorno Tr., p. 209:11-17 (Ex. 15); Valis Tr. pp. 136:18 – 137:4 (Ex. 3); Bloch Tr. pp. 38:19-39:7 (Ex. 19); Mazzotta Tr., pp. 18:10 – 19:1 (Ex. 24); Ex. 23, Ex. 25.

to ensure that Yale would grant or deny Plaintiff tenure based on a fair application of Yale's tenure standard. "A material as opposed to incidental breach of contract" only exists if the breach is so important that it vitiates or destroys the entire purpose for entering into the contract. *Id.* (internal quotations omitted.) Clearly, the "breaches" discussed in this section are only incidental to the ultimate purpose of the parties' agreement, and on their own are not enough to establish the "breach" element of Plaintiff's claim.  This is particularly so given that Plaintiff has no evidence linking these "breaches" to the ultimate decision to deny her tenure.  *See Adelman-Reyes v. Saint Xavier Univ.*, No. 05 C 3269, 2006 U.S. Dist. LEXIS 24558, at *19-21 (N.D. Ill. Apr. 28, 2006) (granting summary judgment where professor "failed to point to sufficient evidence that would show a causal link between any of the alleged breaches of [university's] contractual obligations and her denial of tenure").

> **2.  *Plaintiff Cannot Establish Breach Where Her Only Evidence is Her Personal Opinion.***

Plaintiff points to several other breaches based only on her personal opinion.  Specifically, she argues that, in violation of FASTAP, Yale did not select external referees who conformed with her research interests;[145] that Yale did not, in her opinion, select external referees "with a fair informed approach;" and that Yale, in her opinion, selected comparison candidates who had a "chronological advantage" over Plaintiff (i.e., had been in the field longer.)[146]

---

[145] Byrne Tr., p. 135:24 – 136:7 (Ex. 4).
[146] Byrne Tr., pp. 143:24 – 144:12 (Ex. 4).

As an initial matter, Plaintiff has no evidence to support any of these alleged breaches.  Rather, she relies on her opinions about the adequacy of the comparison candidates and the external referees.  Opinion, however, is not enough to defeat summary judgment.  *See Arch Ins. Co. v. Centerplan Constr. Co., LLC*, No. 3:16-CV-01891 (VLB), 2019 U.S. Dist. LEXIS 23274, at *60 (D. Conn. Feb. 13, 2019) (witness's opinion unsupported by any facts is not evidence," but rather is "insufficient to surmount summary judgment").

Moreover, each of these alleged breach arguments is transparently flawed:

- With regard to the external referees, Plaintiff argues that two of the negative letters came from "friends" or Professors Adorno and Gonzalez Echevarria. The actual evidence, however, is that RF spoke at Yale in 2002, and that Professor Adorno spoke at RF's university in 2017 (well after Plaintiff's tenure vote).[147]  There is no evidence of any impermissible relationship between the external referees and the Department, and beyond that, no evidence that any of the external referees held any bias against Plaintiff.

- As to her opinion about the selection of referees who matched her "research interests," the FASTAP document merely instructs Plaintiff to submit her research interests to help guide the selection of referees; it offers no promise that any of the referees will match those interests, let alone all of them.[148]

- As to the "fair, informed" selection of referees, Plaintiff stated in conclusory fashion: "I do not believe Yale selected candidates with a fair informed approach."[149]  Plaintiff's "belief" is not evidence.

- With regard to the comparison candidates, again, it is merely Plaintiff's opinion that these individuals had an advantage over her. The FASTAP document makes clear that one comparator was *supposed* to be aspirational (i.e., what Plaintiff could have become in the next decade), and all of them were to be "rising or established" stars.[150] This Court is not in the position to compare Plaintiff to the scholars Yale selected, and then to assess whether they were "fair" comparators.  *See Rajaravivarma*, 862 F. Supp. 2d at 166

---

[147] Adorno Tr., 206:9 – 207:18 (Ex. 15).
[148] Ex. 16, at BYRNE012567.
[149] Byrne Tr., p. 138:19-23 (Ex. 4).
[150] Ex. 16, at BYRNE012568.

(declining to engage in a "tired-eye scrutiny of tenure comparators given First Amendment academic freedom concerns).

### 3. Plaintiff has not Established a "Conflict of Interest" Sufficient to Trigger Section IV.H.1 of the Faculty Handbook.

Plaintiff alleges that Yale breached its contract with her by not forcing Professors Adorno and Gonzalez Echevarria to recuse themselves under Section IV.H.1 of the Faculty Handbook.  That provision simply reads: "A member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent himself or herself from all discussions and all votes taken on that individual."[151]

Yale's policy on conflicts relies on professors to absent themselves if they personally perceive that there is a conflict of interest.[152]  There is no mechanism, in policy or practice, for Yale to force the recusal of a professor.[153]  Plaintiff may not agree with the wisdom of this approach, but she has no basis upon which to dispute the Handbook's language.  Because Professors Adorno and Gonzalez Echevarria did not perceive themselves to have a conflict,[154] they did not violate the policy by declining to recuse themselves.  In short, there was no breach.

Moreover, there is no evidence that any objective conflict existed.  At Yale, a conflict of interest does not arise when there are mere disagreements about methodology or the subject matter of one's study.[155]  Such disagreements are the very life of a university.  Rather, "conflict of interest" encompasses situations

---

[151] Ex. 6, at Section IV.H.1, BYRNE000048.
[152] Dovidio Tr., p. 73:18-24, 83:20-24 (Ex. 13).
[153] Dovidio Tr., p. 74:15-23 (Ex. 13).
[154] RGE Tr., pp. 99:7 – 12, 101:25 – 102:25 (Ex. 9); 4/13/15 Adorno Letter, at BYRNE006209 (Ex. 36).
[155] Dovidio Tr., p. 76:8-23 (Ex. 13).

where, for example, a professor may have to vote on the tenure case of his spouse.[156] In contrast, as articulated in her recusal request letter, the conflicts Plaintiff alleged were: a) disagreements about her value to the department (i.e., whether she was "merely" a specialist in Cervantes); b) Plaintiff's opinion that the professors were "hostile" to Yale's tenure process; c) Plaintiff's opinion that Professor Adorno "flip-flopped" her view of Plaintiff's scholarship; d) Professor Gonzalez Echevarria's alleged comment that nobody gets tenure at Yale; and e) Professor Adorno and Professor Gonzalez Echevarria criticizing her work in a manner with which Plaintiff did not agree.[157]   This is perhaps evidence of disagreement, or even the basis for Plaintiff to appeal a negative tenure decision.[158]  It is not evidence of a conflict of interest.

Because Plaintiff cannot establish breach of a contractual promise, her breach of contract claim must fail.

### 4. Plaintiff Has No Evidence that Yale Ignored Evidence of Her Scholarship.

Plaintiff's main argument is that Yale ignored evidence of her scholarship and denied her a fair review of her tenure case.   As the record amply demonstrates, this is not true.   Procedurally, Yale added two additional committee members to ensure a robust discussion of Plaintiff's qualifications, appointed the Divisional Director to superintend the tenure process, and tasked the Dean of Academic Affairs to attend the department's tenure discussion

---

[156] Dovidio Tr., p. 82:8-12 (Ex. 13).
[157] Ex. 12.
[158] Dovidio Tr., p. 78:6 – 79:8 (Ex. 13).

meeting in order to allay any concerns about the process. See Section II.E., *supra*. Substantively, the record includes Professor Valis's notes regarding the Internal Review Committee and Departmental Tenure Meeting in February 2016, which demonstrate a robust discussion of Plaintiff's scholarship; external referee letters that discuss Plaintiff's scholarship; the notes of Professors Adorno, Bloch, Gonzalez Echevarria and Valis, each reviewing Plaintiff's scholarship;[159] and testimony from Professors Adorno, Bloch, Gonzalez Echevarria, Jackson, Mazzotta, and Valis, all of whom analyzed the quality of Plaintiff's scholarship. See Sections I.F. – I.I., *supra*.

Plaintiff is unhappy with the outcome, but she cannot establish breach. Yale did exactly what it promises tenure candidates it will do: evaluate their scholarly work to determine if it meets Yale's expectation of scholarship at the very highest level.

### 5. As to Each Alleged Breach, Plaintiff Cannot Prove The Damages Element of Her Claim.

Proof of damages is an essential element of a breach of contract claim. *Rosato v. Mascardo*, 82 Conn. App. 396, 411 (2004). Because Plaintiff cannot prove damages due to any alleged breach in this case, her contract claim fails.

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the

---

[159] RGE Notes dated 2/9/16, at Byrne000377-379, attached as Ex. 37; RGE Tr., 205:2 - 207:6 (Ex. 9) (authenticating notes); Adorno Notes from 2/9/16 Meeting, at BYRNE009059 – 61, attached as Ex. 38; Adorno Tr., p. 208:4-13 (Ex. 15) (authenticating notes); Valis Notes on Ficino Book, at BYRNE009037 – 49 (attached as Ex. 39); Valis Tr., pp. 149:17 – 151:7 (Ex. 3) (discussing her notes); Bloch Notes (attached as Ex. 40); Bloch Tr., pp. 23:9 – 33:19 (Ex. 19)(authenticating and discussing notes).

plaintiff's proof and must be proved with reasonable certainty." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 264 Conn. 266, 283 (2003). "Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. Thus, the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." *CAS Construction Company v. Town of East Hartford*, 82 Conn. App. 543, 556 (2004). In other words, "speculative claims for damages are not allowable in breach of contract cases." *Gyadu v. Progressive Cas. Ins. Co.*, No. CV145016049S, 2015 Conn. Super. LEXIS 2955, at *6 (Super. Ct. Dec. 1, 2015); *W. Haven Sound Dev. Corp. v. W. Haven*, 201 Conn. 305, 320 (1986) (explaining that the law does not permit prospective damages that are too "speculative and remote").

In this case, Plaintiff's damages argument impermissibly rests on speculation that if the alleged breaches had not occurred, she would have attained tenure. This argument is fatally flawed because it is completely unknown, and unknowable, what *would have* happened if Plaintiff's tenure case had been considered by the succeeding levels at Yale, from the Humanities Tenure and Appointments Committee to the Yale Corporation. For example, with regard to her central claim – that Yale breached a contract with her by not forcing the recusal of Professors Adorno and Gonzalez Echevarria – Plaintiff has no evidence to suggest that a reconstituted committee would have voted in her favor. If Yale had added Professors Bloch and Mazzotta as voting members, for

example, then the votes of Professors Bloch, Mazzotta and Valis (whom Plaintiff did not seek to recuse) would *still* have resulted in a negative tenure vote.

Even more egregiously, Plaintiff's damages claim requires the assumption that Plaintiff would have cleared the multiple levels of review *after* a favorable tenure vote from the Department.  Specifically, to obtain tenure, she would have needed approval from the Department, then the Tenure and Appointments Committee (which conducts a robust de novo review of the candidate's file),[160] then the Joint Boards of Permanent Officers, and finally a favorable vote from the Yale Corporation.[161] As Plaintiff herself acknowledged, not every candidate who clears the Department level gets tenure at Yale.[162] Indeed, Professor Bloch is the former chair of the Tenure Appointments Committee,[163] and his position on Plaintiff's tenure candidacy was clear: he did not find Plaintiff qualified.[164]

Accordingly, the relief Plaintiff seeks would put her in a *better* position than she would have been in had the alleged breaches not occurred. *Compare W. Haven Sound*, 201 Conn. at 319 ("The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, *in the same position* as that which he would have been in had the contract been performed").  In effect, to find cognizable damages in this case, the Court would have to substitute its judgment for Yale's, and assume that Plaintiff

---

[160] Bloch Tr., p. 10:11 – 11:20 (Ex. 19).
[161] FAS Ladder Faculty Promotion Handbook, at Byrne017192 (attached as Ex. 41); Byrne Tr., p. 111:5-20 (Ex. 4).
[162] Byrne Tr., p. 115:14 – 21 (Ex. 4).
[163] Bloch Tr., p. 11:17 – 12:11 (Ex. 19).
[164] Bloch Tr., pp. 54:24 – 55:3 (Ex. 19).

would have succeeded at all four levels of the tenure process – a conclusion wholly unsupported by any evidence and wholly at odds with academic freedom principles.  *See Rajaravivarma*, 862 F. Supp. 2d at 166 (acknowledging the "First Amendment interest of a university to determine for itself on academic grounds who may teach").

Because the law does not permit this type of "speculative and remote" damages claim, Plaintiff's breach of contract claim fails as a matter of law.[165] *See Abney v. Univ. of the V.I.*, No. 08-116, 2016 U.S. Dist. LEXIS 59947, at *21-22 (D.V.I. May 3, 2016) (granting judgment as a matter of law in tenure denial case because "Plaintiff's allegations of damages are wholly speculative" and thus "there is no genuine issue of material fact as to whether Plaintiff suffered damages"); *compare Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 341 (1st Cir. 1989) (affirming judgment in plaintiff's favor in tenure denial case, but only where department, tenure committee, and university-wide committee all voted in favor of tenure).

### D.    *Plaintiff Cannot Establish Negligent Misrepresentation (Count Three).*

To establish negligent misrepresentation, Plaintiff must establish that she relied on a misrepresentation, and that such reliance was justifiable. *Rafalko v. Univ. of New Haven*, 129 Conn. App. 44, 52 (2011). Plaintiff cannot satisfy these elements.

---

[165] Notably, Plaintiff admits that the only information she has to suggest that she would have cleared the higher levels of tenure review is her own opinion of her work, and how she believes she is perceived in the field.  Byrne Tr., pp. 168:10 – 169:10.  The fact that she has a different opinion of her work than Yale does is predictable, but is not evidence sufficient to survive summary judgment.

### 1. *Yale's Alleged Promise to Plaintiff That She Would Have a "Fair Hearing" on Her Tenure Case.*[166]

As an initial matter, because Yale *did* provide her with a fair review of her tenure candidacy, Plaintiff's first negligent misrepresentation claim must fail. *Rafalko v. Univ. of New Haven*, No. NNHCV054016528S, 2009 Conn. Super. LEXIS 2557, at *11 (Super. Ct. Sep. 25, 2009) ("As long as the university based their decision on the stated standard and the plaintiff cannot present any material facts to the contrary, then there is no negligent misrepresentation by the university").

Moreover, Plaintiff cannot establish justifiable reliance.  Before the meeting to vote on her tenure case, she had already applied for a position at UNLV, and she accepted that positon almost immediately after the tenure vote, but before the outcome of her two appeals.[167]  There is no evidence that she turned down other jobs, nor any other evidence of reliance.  Absent reasonable reliance, her negligent misrepresentation claim cannot survive.

### 2. *Professor Adorno's Alleged Statement to Plaintiff That "Things Were Going Perfectly."*[168]

Plaintiff has no evidence of justifiable reliance on this comment, either: she does not claim she turned down other offers, nor does she allege she would have done anything differently from what she ultimately decided to do based on these alleged comments made *years* before the negative tenure vote.

Moreover, even if she could establish some form of reliance, any such reliance would not be justifiable. Because Plaintiff knew the procedure and

---

[166] Byrne Tr., 215:23 – 216:19 (Ex. 4).
[167] Ex. 32 (reflecting acceptance of offer by Plaintiff).
[168] Byrne Tr., pp. 217:25 – 218:20 (Ex. 4).

standard for obtaining tenure – regardless of what Professor Adorno told her – she cannot establish justifiable reliance on Professor Adorno's statement that she was doing well. *Shanbrom v. Orange Bd. of Educ.*, No. 30 18 81, 1991 Conn. Super. LEXIS 1614, at *21-23 (Super. Ct. July 11, 1991) (where plaintiff teacher was led to believe "she was doing well" before non-renewal of her contract, court struck negligent misrepresentation claim, explaining that "plaintiff could not justifiably rely on any information that may have been given her, since Conn. Gen. Stat. § 10-151(c) provides the sole procedure for renewal"); *Rafalko,* 129 Conn. App. at 52-53 ("The absence of any dispute regarding the plaintiff's lack of reliance on the annual review with respect to his knowledge of the tenure process supports the trial court's granting of summary judgment").

### 3. *Yale's Alleged Promise that There Would Be No Negative Effect of Her Involvement in the Climate Review and Title IX Process.*[169]

As set forth at length in Section II.B., *supra*, there is no evidence of retaliation based on her participation in the Climate Review or Title IX process.  In other words, Plaintiff cannot establish that she received false information, which is the fundamental element of a negligent misrepresentation claim, about her participation in those processes.  Moreover, even if she could establish that any representations were false, there is no evidence that she would have done anything differently, and thus there is no evidence of reasonable reliance.

---

[169] Byrne Tr., pp. 218:21 – 219:12 (Ex. 4).

### 4. *Yale's Alleged Misrepresentation Regarding Its Ability to Require Professors to Recuse Themselves.*[170]

As an initial matter, Section IV.H.1 of the Faculty Handbook speaks for itself: it says nothing about administrative procedures to require the recusal of a professor, but instead places the burden on professors to recuse themselves. The plain language of the policy precludes Plaintiff from "justifiable" reliance on any "misrepresentation" about Yale's power to force a recusal. *See Shanbrom*, 1991 Conn. Super. LEXIS 1614, at *21-23.

Moreover, Plaintiff alleges that, but for the misrepresentations, she would have filed an immediate appeal, or otherwise sought to enforce Section IV.H.1. This is a red herring; she did not forego anything, because there *was* no other appeal or enforcement mechanism.[171]  The appropriate mechanism was to appeal the tenure decision if she was unhappy with the result – and that is precisely what she did.  Absent any evidence of reasonable reliance, the Court should dismiss Plaintiff's negligent misrepresentation claim.

## III.   CONCLUSION

For the reasons set forth above, Yale respectfully submits that the Court should thus grant summary judgment and dismiss Plaintiff's Complaint in its entirety.

---

[170] Second Amended Complaint, ¶ 113 – 117. When asked in her deposition about negligent misrepresentations made to her, Plaintiff did not refer to the recusal issue at all. Byrne Tr., pp. 215:23 – 219:15 (Ex. 4).

[171] Dovidio Tr., pp. 84:9 – 85:12 (Ex. 13).

**DEFENDANT,**

**YALE UNIVERSITY**

**By:**   ***/s/David C. Salazar-Austin***
       **Victoria Woodin Chavey (ct 14242)**
       **David C. Salazar-Austin (ct 25564)**
       **Jackson Lewis P.C.**
       **90 Statehouse Square, 8th Floor**
       **Hartford, CT  06103**
       **Tel: (860) 522-0404**
       **Fax: (860) 247-1330**
       **chaveyv@jacksonlewis.com**
       **salazard@jacksonlewis.com**

**47**

## CERTIFICATION OF SERVICE

I hereby certify that on April 1, 2019, a copy of foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

*/s/David C. Salazar-Austin*
**David C. Salazar-Austin**