```
 1                  UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3
     * * * * * * * * * * * * * * * *
 4   SUSAN BYRNE,                    )
                                     )
 5                   Plaintiff,      )
                                     )  Civil Action No.
 6        -vs-                       )  3:17-CV-01104 (VLB)
                                     )
 7   YALE UNIVERSITY, INC.,          )
                                     )
 8                   Defendant.      )
     * * * * * * * * * * * * * * * *
 9

10

11

12

13
             DEPOSITION OF:  NOEL VALIS
14
             DATE:      FEBRUARY 21, 2019
15
             HELD AT:   MADSEN, PRESTLEY & PARENTEAU, LLC
16                      402 Asylum Street
                        Hartford, Connecticut  06103
17

18

19        Reporter: Bethany A. Carrier, RMR, CRR, CSR #071

20

21

22

23
                    CASSIAN REPORTING, LLC
24                  21 Oak Street - Suite 307
                    Hartford, Connecticut 06106
25                      (860) 595-7462
                 scheduling@cassianreporting.com
```

```
 1   on the faculty in the Department of Spanish and

 2   Portuguese?

 3        A    It's not a big department, as far as ladder

 4   faculty go.  Robert was there, RGE; Rolena Adorno; David

 5   Jackson; Josefina Ludmer, who then retired a number of

 6   years later.

 7        Q    Can you spell that last name, please?

 8        A    L-u-d-m-e-r.  And let's see, that's one, two,

 9   three, four.  I'm forgetting somebody.  Who am I

10   forgetting?  A junior member was Cristina Moreiras.  And

11   she's since got a tenured job at Michigan.  She left quite

12   a few years ago.  But she was there when I came on board.

13   Had to have been somebody else.  Who am I forgetting?

14        Q    Was Anibal Perez --

15        A    No.  No.  No. He came later.  He came later.

16        Q    Maria?

17        A    Oh, Maria Rosa Menocal.  Of course.  I knew

18   there was -- I don't know how I could forget Menocal.

19   Yes, Menocal was there.

20        Q    And since then, since 1999, Maria has left

21   and --

22        A    No.  Maria died.

23        Q    Maria passed away?

24        A    Yes.

25        Q    And then there -- was one other individual who
```

1    you mentioned who left?

2        A    Ludmer retired and then also died a couple years

3    ago.

4        Q    And since 1999 who has joined the faculty?

5        A    As far as senior faculty go, it's Anibal

6    González Perez, who I think came on board in either '08 or

7    '09.  I'm not absolutely certain.  And then of course

8    there have been junior faculty.

9             Since I came -- let's see.  There was Paola

10   Moreira.  Before him there was Lidia Santos.  And then

11   Paola Moreira, they were in Portuguese.  There was a

12   fellow in Peninsula named Ernesto Estrella.  And Elizabeth

13   Armann, who took a position after one year with us and

14   didn't get tenure.  She should have stayed.

15            But at any rate -- and then, of course, Leslie

16   Harkema, Poole.

17       Q    Kevin Poole?

18       A    Yes, Kevin Poole.  These are all junior members.

19   And they didn't always necessarily coincide because we're

20   talking about 20 years practically here.  So I think

21   that's about it.  I mean, there may have been a couple of

22   other junior people, but I don't remember.

23       Q    During the time that Professor Byrne was a

24   tenure track employee, were you her mentor at all?

25       A    I would say informally, yes.

1    colleagues agreed that Byrne's research and scholarship

2    are extremely well focused, that her archival work is

3    solid, and made meaningful by her ability to connect it to

4    literary text.

5              Do you see where I'm reading from?

6        A    Yes.

7        Q    Now, how does that statement mesh with your

8    earlier testimony regarding the agreements that the

9    committee had come to regarding Professor Byrne's

10   scholarship?

11       A    It meshes fine.  I think that this is in part a

12   question of understanding academic language and the way we

13   speak about the quality of somebody's research.  Saying

14   that at that point in time that her research and

15   scholarship were extremely well focused is accurate enough

16   for the most part; and certainly that her archival work

17   was and is solid, I would agree with that.  Made

18   meaningful by her ability to connect it to literary text,

19   well, one would hope so.

20             But what does this sentence say?  It says that

21   she's a competent scholar.  That's what this says.  That's

22   what this says.  You have to -- sort of in a way it's like

23   reading another language, and you have to interpret it.

24   And what this means for academics is that this is a

25   competent scholar.  And nothing more.

1        Q     So the statement, We see a clear trajectory in

2    her work that opens out onto ever large vistas is also a

3    statement just that Professor Byrne is a competent

4    scholar?

5        A     No.   I would say that in this case, this

6    sentence, We see a clear trajectory in her work that opens

7    out to ever larger vistas, was an aspirational statement.

8    Because at that time we didn't have the book Ficino in

9    Spain and it is clearly referring to that next

10   publication, as the following lines indicate.

11       Q     But how is that statement aspirational when it's

12   in present tense, not in future tense?

13                    MR. SALAZAR-AUSTIN:   Objection.

14                    THE WITNESS:   What does that mean?

15        If you have an objection, what am I supposed

16        to do?

17                    MR. SALAZAR-AUSTIN:   If I object,

18        you should answer.   Unless I instruct you not

19        to, which I will very rarely do.

20                    THE WITNESS:   I see.   I just wanted

21        to make sure I understood the procedure.

22   BY MS. HOWARD:

23       Q     And I can repeat the question or rephrase it if

24   you don't understand.

25       A     No.   The question about the verb.   It is in the

1    submitted a third revised APL proposal in early 2015.  Is

2    that correct?

3         A    She provided it, yes.  She provided another

4    proposal.  I guess that would have been the third.  I

5    don't remember the date.

6         Q    We'll just say early 2015, if that's easier.

7         A    Sounds good.

8         Q    And then you, Professor Adorno, and RGE met to

9    consider this third and final proposal in approximately

10   January, 2015.  Does that sound correct?

11        A    Not entirely.  Because now I do recall because

12   you've now given me the time frame.  In January, 2015, I

13   had a meeting in New York with the PMLA editorial board.

14   I was at the time a member of the editorial board.  And it

15   meets three times a year.  And those dates are set well in

16   advance.

17             So I communicated my views to Rolena.  She

18   incorporated those views into, again, what we talked

19   about, you know, the committee's views.  But I was not

20   actually present at that meeting.

21        Q    And at some point in early February, 2015, did

22   you participate in a meeting with Professor Adorno, RGE --

23   and RGE to discuss Professor Byrne's last APL proposal?

24        A    I expect so, yes.

25        Q    And you voted to reject this final proposal, APL

1   proposal.  Is that correct?

2        A    I believe so, yes.

3        Q    And throughout the entire APL proposal process,

4   with the multiple iteration of proposals that were

5   submitted, in each instance you submitted your comments to

6   Professor Adorno or RGE to be included in an aggregate set

7   of comments to Professor Byrne.  Is that correct?

8        A    Yes.  I submitted them to Professor Adorno.  And

9   then she aggregated my comments, RGE's, and her own into

10  this single document.

11       Q    For each APL proposal?

12       A    I believe so.  I believe so.

13                  (Plaintiff's Exhibit 130, Email

14  exchange:  Marked for identification.)

15  BY MS. HOWARD:

16       Q    And you've been handed what's been marked

17  Plaintiff's Exhibit 130.  And please take a moment to read

18  through it and let me know when you're done.

19       A    I guess these are emails.  I should start at the

20  end here.  Right?

21       Q    That probably would be the best way.  The end is

22  the -- sequentially.

23       A    It's a chain here.

24       Q    Yes.

25                  MR. SALAZAR-AUSTIN:  I think that

```
 1    you conduct Step 1?  So I can read the description if the
 2    font is a little hard to read.
 3         A    Let me put my glasses on.  It's also grayish, so
 4    it makes it harder.  Yes.  I informed the candidate of the
 5    process.
 6         Q    Did Professor Adorno also inform the candidate
 7    of the process while she was operating as chair of the
 8    review committee before you became appointed to the
 9    position?
10                   MR. SALAZAR-AUSTIN:  Objection.
11                   THE WITNESS:  I don't know.  And I
12         don't know that there was an actual review
13         committee before then.
14    BY MS. HOWARD
15         Q    Strike that.  So I should ask a better question,
16    then.
17                   So did Professor Adorno tell you that -- whether
18    she informed Professor Byrne of the process, tenure
19    process in accordance with Step 1?
20         A    I don't remember whether she did or not.
21         Q    But just to be -- just to be safe, you also
22    informed Professor Byrne of the process?
23         A    Yes.
24         Q    And then Step 2, submit slash receive
25    preliminary materials.
```

```
 1              Did you, in fact, receive preliminary materials

 2   from Professor Byrne?

 3        A     I received these materials.  And I don't

 4   remember whether some of these materials were already in

 5   the hands of Professor Adorno because -- then she handed

 6   them to me.  So whether they came directly from Sue or

 7   whether they came through Rolena, I did receive them.

 8        Q     So did you ever ask Professor Byrne to provide

 9   names of three individuals who could serve as an arm

10   length candidate -- arm length referee?  Excuse me.

11        A     I don't know whether Rolena had already asked

12   her for that, you know, earlier than the time that I

13   assumed being the chair of this committee or whether I

14   did.  But she certainly was asked.  And she gave us --

15   actually, I was reading this.  It says three names, but if

16   I remember correctly, she offered four names.  And we took

17   two of them.

18        Q     So if you recall Professor Byrne -- you do

19   recall Professor Byrne --

20        A     Yes.  I recall the materials.  But I don't

21   remember whether she gave them to me directly or whether

22   she had already given them to Rolena.  Because some of

23   these materials had been requested before I became chair

24   of this committee.  And they're the routine materials that

25   you would ask for.  And I don't remember which ones they
```

```
 1    were at this point.

 2         Q    Right.  Because in Exhibit 131, Professor Adorno

 3    in fact mentioned that she will be giving you materials.

 4         A    Yes.  That's what I'm talking about.  And it may

 5    have been that's some of it.  At this point I don't

 6    remember specifically those contents.  But they were all

 7    the things that are in this document -- or at least they

 8    were among the things, I should say, that were -- that are

 9    listed here.

10         Q    And then for Step 3, which is selection of the

11    departmental committee, earlier you testified that Amy

12    Hungerford was responsible for approval of the review

13    committee members.

14         A    Yes.

15         Q    Did you suggest review committee members to

16    Ms. Hungerford?

17         A    I very well may have.  It turned out that David

18    Jackson became a member.  And I remember, of course,

19    writing to ask him.  So that means that I consulted with

20    Amy to see whether this, I guess, was a good -- was

21    acceptable to her.  And it was.  And I wrote to David in

22    an email.  He was away, I think, because it was the

23    summer.  He was probably in Brazil.  There's a program

24    that he directs there.  And he accepted that invitation to

25    be part of the committee.
```

```
 1              And then there was discussion between myself and
 2   Amy about other -- the other members of the committee.
 3   And as I recall, I think she made the suggestion of two
 4   outside members, you know, outside our department.  I
 5   think one of them was from the department of English,
 6   maybe, or department of classics.  I can't remember
 7   anymore.  But the person did not accept -- could not
 8   accept it.  I don't remember the reasons.
 9        Q    So Larry --
10        A    -- Manley, something like that.  And then there
11   was another person.  And then eventually we ended up with
12   Giuseppe Mazzotta from Italian and Howard Bloch from
13   French, nonvoting members.
14        Q    And did you suggest Professor Bloch's name for
15   the review committee?
16        A    I don't remember at this point, but I thought he
17   was a good choice.
18        Q    And did you suggest Professor Mazzotta's name
19   for the review committee?
20        A    Again, I don't remember which person did that.
21   This has become a little fuzzy over the years because of
22   the time having passed.  But I also thought that he was a
23   good choice, particularly since he is a great expert,
24   Medieval and Renaissance and knows Ficino extremely well.
25   Not personally didn't shake his hand, but he knows his
```

```
 1    emails?

 2                    MR. SALAZAR-AUSTIN:  Objection.

 3                    THE WITNESS:  Yes.  As far as I can

 4        see.

 5    BY MS. HOWARD

 6        Q    So it does look like Professor Adorno also did

 7    at least part of Step 3 under the FAS steps?

 8        A    I wouldn't say that.  Because this committee

 9    never got constituted.  This committee that she

10    recommended with Mazzotta, RGE, and myself never was

11    constituted, as far as I know.  I don't remember being

12    part of this committee.

13        Q    But the three of you were on the actual

14    committee that ended up being constituted.  Isn't that

15    correct?

16        A    No.  We're talking about the Tenure Review

17    Committee.  And the Tenure Review Committee that I ended

18    up chairing did not have RGE on it.  It had David Jackson,

19    myself, Howard Bloch, and Giuseppe Mazzotta.

20             Are we talking about the same thing?

21        Q    The Tenure Review Committee that met in February

22    of 2016.

23        A    Yes.  Yes.  Are we talking about the smaller

24    committee, not the full -- the one that was constituted in

25    July of 2015 that I headed up.  That ended up being
```

```
 1   myself, David Jackson -- if I'm remembering all this
 2   correctly -- Giuseppe Mazzotta, and Howard Bloch.  Right?
 3        Q    I'm --
 4        A    Did I remember it wrong?  It's possible.  Maybe
 5   you could clarify for me.
 6        Q    I'm referring to the committee that voted on
 7   Professor Byrne's tenure application.
 8        A    Okay.  You're talking about the larger
 9   committee.  There are two committees here.  One was the
10   smaller one that met before the larger one in February,
11   and the smaller one was constituted by those people that I
12   just mentioned.  The larger one included them and Anibal
13   González Echevarría, Rolena Adorno, and RGE.
14        Q    What's the difference between these two
15   committees?
16        A    The first one was the one that was instituted or
17   constituted to read all the materials and make some sort
18   of a recommendation to the larger body of senior
19   faculty.
20        Q    But the larger body voted -- conducted the
21   actual vote on Professor Byrne's tenure application?
22        A    That's right, with the exception of, of course,
23   Howard Bloch and Giuseppe Mazzotta.
24        Q    And Jack Dovidio who was present and did not
25   vote?
```

1       A    Of course. Yes.

2       Q    So who decided that there would be two

3 committees?

4       A    Can I go back and look at this?

5       Q    Yes, please.

6       A    I think this is in here. This is not unusual at

7 all. This is fairly typical. Certainly it was the way we

8 had done it. Select the departmental review committee.

9       Q    What page are you reading?

10       A    I'm on page 012567 of the FASTAP procedures.

11 And says, Number 3, select the departmental review

12 committee: the departmental chair or department chair,

13 departmental faculty review committee typically composed

14 of three faculty members drawn from the pool of faculty

15 members eligible to vote on the case.

16       And that's what I'm talking about. That's the

17 smaller committee.

18       Q    But Professor Bloch was not eligible to vote on

19 the case?

20       A    Yes. But that -- that wasn't my decision. You

21 would have to speak with Tamar Gendler. I don't know if

22 you have or not, but --

23       Q    So there were three individuals on the smaller

24 committee that you're calling the "departmental review

25 committee"?

```
 1   internal review committee, the smaller committee?
 2        A    That was done in consultation with myself and
 3   Amy Hungerford.
 4        Q    Who made the actual decision, though?
 5        A    Well, ultimately I guess you could say she did
 6   because she held the ultimate approval.
 7        Q    And then, similarly for the larger committee,
 8   who made the decision on the individuals that would be on
 9   the larger committee?
10        A    Well, that is partly a departmental decision in
11   that it is automatic that all the senior faculty would be
12   part of that committee.
13        Q    And are all of the members that are on the
14   smaller internal review committee automatically on the
15   larger committee even if they are not faculty members?
16        A    You mean faculty members --
17        Q    Within the department.
18        A    Yes.
19        Q    So once Professor Bloch was appointed to the
20   smaller internal review committee, he was automatically
21   appointed to the larger faculty committee as well?
22        A    Yes.
23        Q    And he was a nonvoting member of both
24   committees?
25        A    Yes.
```

```
 1        Q     Okay.  And Professor Mazzotta was also a
 2   nonvoting member of both committees?
 3        A     Yes.  Even though we didn't take a vote, as I
 4   said, on the smaller committee.  But, regardless, they did
 5   not vote at any time.
 6        Q     Do you recall if you submitted any names for
 7   consideration for the internal review committee?
 8        A     I probably did, yes.
 9        Q     Well, do you have an actual independent
10   recollection of submitting the name for the independent
11   review committee?
12        A     There was emails that went back and forth
13   between Amy Hungerford and myself and probably at least
14   one or two conversations on the phone as well in which we
15   put names back and forth.  It would not surprise me that I
16   would have suggested names, as she also obviously
17   suggested names.  And this is the way it's supposed to
18   work.
19        Q     So this is an inference you're drawing?
20        A     Hmm?
21        Q     This is an inference you're drawing, not an
22   independent recollection?
23        A     What is an inference?
24        Q     That you would have naturally suggested names as
25   you and Amy Hungerford were talking by email about various
```

```
 1    I'm trying to say.

 2        Q     Did you have any interactions with John Mangan

 3    with respect to selecting external referees?

 4        A     I mean, it's possible, but I just don't

 5    remember.  I just don't remember.

 6        Q     So... .

 7        A     My memories of those times are so connected with

 8    Amy Hungerford because we had so many emails.

 9        Q     So the next steps, the 4B, 4C, and 4D, are about

10    securing referees, contacting referees, and tracking the

11    referee responses, it looks like.

12              Am I missing anything for 4B, C, and D?

13        A     Secure referees -- yeah.  That's right.

14        Q     And these appear to be primarily administrative

15    tasks, 4B, C, and D?

16        A     Yes.

17        Q     Then Step 5 is to schedule a tenure appointments

18    committee review date?

19        A     Yes.

20        Q     Is that the larger committee that you were

21    referring to earlier?

22        A     That's the committee -- no.  That's the

23    committee outside of the department.  Yes, tenure -- the

24    tenure committee.  And that date was scheduled.

25        Q     That's if --
```

```
 1        A     -- if it passed our department.  If we approved

 2   the tenure, then it would have gone to the tack, the

 3   TAC.

 4        Q     And so then Step 6, submit slash review case

 5   materials, this was all done through Yale's online system.

 6   Correct?

 7        A     Submit -- yes.  We use the online system.  But

 8   we also had a hard -- one hard copy of her materials that

 9   were kept under lock and key in the main office of the

10   department in case somebody wanted simply to sit there in

11   the department and read them, you know, as a hard copy.

12        Q     And Step 6 also appears to be a primarily

13   administrative task of -- so creating the online system,

14   making sure paper documents are available.

15        A     Yes.

16        Q     Is that a fair description?

17        A     Yes.

18        Q     So if we turn to Bates No. 12572, Step 7,

19   Distribute materials to referees, it looks like this is

20   primarily something your assistant did?

21        A     Yes.  At that time it would have been Susan

22   Wheeler, who was the administrative assistant of the

23   department.  And, of course, I oversaw this very closely

24   with her.  She prepared the packages.  She mailed out, you

25   know, hard copies of the materials to the outside letter
```

```
 1   writers.
 2        Q    Okay.  And it appears that Step 7 is also a
 3   primarily administrative task?
 4        A    Yes.
 5        Q    And then Step 8 is, Track referee responses,
 6   which it also looks like is the responsibility of the
 7   chair's assistant or in this case Susan Wheeler.  Is that
 8   correct?
 9        A    I actually track the referee responses myself
10   because I wanted to make sure that we got those letters.
11        Q    How did you track the responses?
12        A    Well, they were given a deadline in the letter.
13   And I can't tell you now what the deadline was, but they
14   were all given a deadline in the letter.  And it outlines
15   very clearly in here that at a certain point in time, if
16   you hadn't gotten a letter, that you're supposed to send a
17   reminder.  That's the tracking process.
18             You're supposed to send a reminder to that
19   letter writer saying, you know, we haven't gotten the
20   letter, something to that effect, if you could give me an
21   idea of when it's going to come.  Then there's another
22   moment you were supposed to do that.  I did every single
23   one of those.  Because Susan had an awful lot of work to
24   do as well.  And I thought this was -- this would be
25   easier.
```

```
1              And of the requests for outside letters, outside

2    evaluations, I think we sent out fourteen requests, if I

3    remember correctly, and we got back nine positive

4    responses, which was fairly typical.  And in the end, we

5    got eight of the nine letters.  And I also gave an

6    extended deadline to one of the nine who had asked for it

7    because he was just overwhelmed with other things.  And

8    they all had a deadline of actually longer than six weeks,

9    which is what is down here, to say that, you know, they

10   have six weeks to write their evaluation, to send it in.

11             And I gave them even more time than that.

12      Q    That's a good memory for this.

13      A    Yes.  Well, this is the kind of thing that, you

14   know, I really was in this part of it very much drilling

15   down.

16      Q    Who was the individual who got an extended

17   deadline?

18      A    I think it was Williamson, Edwin Williamson.

19   You can actually tell by elimination.  If you don't have a

20   letter from Williamson, that was the one, because he was

21   the one who got the extended deadline and never came

22   through.  This happens.

23             Actually, there was another person who got an

24   extended -- that's right.  I forgot.  Another person got

25   an extended deadline was Folger, but he did come through.
```

```
 1   We wanted to bend over backwards to make sure we got the

 2   letters and to give them enough time to do a thorough

 3   evaluation.

 4        Q    And it sounds like Step 8 was a bit onerous as

 5   tasks go?

 6        A    I didn't mind doing it.

 7        Q    But it also sounds like Step 8 was a primarily

 8   administrative task?

 9        A    Yes.

10        Q    Okay.

11        A    Yes.

12        Q    So Step 9, Managing documents and document

13   access.  And the step in fact refers to Interfolio, which

14   is the online system for managing access to materials.

15   Correct?

16        A    Yes.

17        Q    And it looks like the chair's assistant is also

18   designated as the individual responsible for Step 9.  Is

19   that correct?

20        A    Yes.  That certainly is correct.  My technical

21   expertise is very limited.  And I certainly didn't even

22   understand how Interfolio -- I still don't understand how

23   Interfolio works.  She was in charge of that.

24        Q    And is it a fair description to describe Step 9

25   as also administrative task?
```

1       A    Yes.

2       Q    And Step 10 is, Deliberate and recommend, where

3   the departmental faculty review committee, after

4   consulting the criteria for promotion and the departmental

5   confidentiality policy, reviews the candidate's materials

6   with the goal of making a recommendation as soon as

7   possible after the required set of letters have been

8   received and the stated deadline for receipt of any

9   outstanding letters has passed.

10           I'm just reading from the FASTAP on page 12573.

11           Is that an accurate description of in general

12   how the process unfolded for the faculty review

13   committee?

14       A    Yes.

15       Q    And it looks like the step describes

16   responsibility to the entire departmental review

17   committee.  Is that accurate?

18       A    Yes.

19       Q    And then Step 11 is, Deliberate and vote?

20       A    Uh-huh.

21       Q    This is the full committee deliberation and

22   vote?

23       A    Yes.

24       Q    Okay.  And we've discussed this already.

25       A    Yes.

1          Q     Take a minute to look through the document.  Let

2    me know when you're done, please.

3          A     Yes.  Looks familiar.

4                Okay.

5          Q     So Exhibit 78 is a document produced by the

6    defendants during discovery.

7                Do you recognize this document?

8          A     Yes.

9          Q     And is it because you authored Exhibit 78?

10         A     Yes.

11         Q     Walk me through the process of drafting Exhibit

12   78.

13         A     It's not very complicated.  I took copious notes

14   during this meeting.  And as soon as the meeting was over,

15   went home and, while my memory was fresh from the meeting,

16   I drafted this document that you have here.

17         Q     Handwritten notes?

18         A     Yes.

19         Q     You said you took copious notes so that was --

20         A     Yes.  It was handwritten.  Yes.

21         Q     And did you send this document to anyone after

22   you drafted it?

23         A     No.  Not that I recall, let's put it that way.

24   I don't recall sending it to anyone.  I certainly -- but

25   this was the -- this is -- this is the record of what

1        A    I think that was probably me.

2        Q    And then the fifth full paragraph says, It was

3   also remarked that Sue was a competent scholar and a

4   productive one.

5             Who made that observation?

6        A    I believe that was David Jackson.

7        Q    But it was pointed out that competence is a

8   relatively low bar and quality is generally valued over --

9   quality is generally valued over quantity.

10            Who made that observation?

11       A    I think you can say that that was more than one

12  person.  This kind of summed up the fact that the other

13  three members of the committee were replying to David

14  Jackson's view that she was a competent scholar and a

15  productive one.  And the second sentence here reflects the

16  generally held view of all three of us, that that is to

17  say, those of us who didn't agree with David Jackson.

18       Q    And then the sixth full paragraph states, The

19  committee also discussed the external letters but

20  concluded that the set of letters do not shine and are not

21  a high ranking set of letters.

22            Do you see that?

23       A    Uh-huh.  Yes.

24       Q    Was that a conclusion unanimously reached by all

25  of the members of the committee?

```
 1        A     It was -- it was the consensus of the committee.

 2   I probably didn't word this completely accurately

 3   because -- but I would certainly say that Mazzotta, Bloch,

 4   and myself were of this opinion.

 5        Q     But not --

 6        A     David Jackson probably wasn't, I think.  Yes.

 7   So I should have been a little bit more precise here and

 8   say, The consensus of the committee was that the letters

 9   did not shine, et cetera.

10        Q     In the eighth full paragraph on page 2 in the --

11   actually, just the eighth full paragraph, I notice that

12   you then identify specific comments with the specific

13   individual who made the comments.

14              Why did you make that shift in the eighth

15   paragraph but not earlier in the document?

16        A     You know, that is the first time I actually

17   noticed this.  I think -- I don't know why I did.  There's

18   certainly no intention here to, you know, not give names

19   here and give names here.

20              Let me read over what I have -- I think that's

21   rather amusing, because I didn't even notice this until

22   you pointed this out.  I think I know why I did it,

23   though.  I can see why because of the tenor of this

24   paragraph.

25              The previous paragraphs that we have gone
```

```
 1        Q     Why was it a good thing to have --

 2        A     Because it's always -- sorry.

 3        Q     It's okay.

 4              Why was it a good thing to have Jack Dovidio

 5    present?

 6        A     Because it's always a good thing to have

 7    somebody who's looking on from the outside and to be there

 8    as a very objective presence, just as it was a very good

 9    thing to have included people outside the department,

10    Mazzotta and Bloch, because they had no axe to grind, any

11    possible axe to grind and because they were -- they were

12    not members of our department.  And that was a good

13    thing.

14        Q     So I'm going to hand you what's been previously

15    marked Plaintiff's Exhibit 80.  Take a moment to look

16    through it.  These are the notes from --

17              MR. SALAZAR-AUSTIN:  Got it.  I'm

18        just confirming it's the February 9th notes

19        which I have here.

20              THE WITNESS:  This is the bigger

21        meeting.  Yes.

22    BY MS. HOWARD:

23        Q     So Exhibit 80 was produced by the defendants

24    during discovery.

25              Are these your notes from the senior faculty
```

```
 1    meeting regarding Sue Byrne's tenure promotion case?

 2         A    Yes.

 3         Q    And were these notes -- walk me through how you

 4    created Exhibit 80.

 5         A    I took notes during the meeting, as I noted here

 6    on the first page of this document.  And as soon as I got

 7    home, had some dinner, I wrote them up.

 8         Q    Why did you note that only -- that the only

 9    people that I observed taking notes during the February

10    9th meeting were myself and Rolena Adorno?

11         A    Because it seemed to me important to note that

12    so that if we needed a record, the record -- there would

13    be two people.

14         Q    Were you concerned about future lawsuits?

15         A    Good Lord no.

16              MR. SALAZAR-AUSTIN:  Objection.

17    BY MS. HOWARD:

18         Q    What were you concerned about in terms of making

19    sure that there would be a record?

20         A    Because it's an important decision.

21         Q    But it's a confidential decision.  Correct?

22         A    Yes.

23         Q    And --

24         A    But you still need a record.

25         Q    You assumed your notes would be confidential
```

```
 1    what other -- I'm not sure what other notes there would

 2    be.

 3         Q    So you did read from personal notes that were

 4    not the February 3rd summary of the meeting?

 5         A    There would have been this summary of course

 6    already typed up, as you see it here, that I'm pretty sure

 7    I read from, because it was for the senior faculty

 8    meeting.  And whatever else I had on a piece of paper

 9    handwritten would have been essentially what you would

10    call the agenda, you know, saying we're going to do this.

11         I noted at the beginning of the meeting, you

12    know, the question of confidentiality and then the -- what

13    was the other question?  I'm just drawing a blank here.

14         Q    So did you --

15         A    I know it was just simply the steps you take to

16    conduct a meeting.

17         Q    So you didn't have an extensive document that

18    had a chapter-by-chapter analysis of Professor Byrne's

19    scholarship and her most recent book?

20              MR. SALAZAR-AUSTIN:  Objection.

21              THE WITNESS:  Well, what I had was I

22         had brought with me the extensive document

23         that I had made up for my own evaluation of

24         that book in particular.  And I -- as noted

25         here -- let me just find the page.  No.  But
```

1        you are interrupting me, and I needed to

2        finish answering that.

3    BY MS. HOWARD:

4        Q     Sure.  About what you brought to the meeting --

5        A     Yes.

6        Q     -- that's the standing question.

7        A     Yes.  Exactly.  And I brought that.  But I did

8    not read from that entire document because it was

9    something like 13 pages.  And many of those pages were

10   individual notations about particularly egregiously bad

11   writing in the book.  And I was the last person to give my

12   evaluation because I wanted to make sure that everybody

13   gave their's first.  I think the chair should always go

14   last with these kinds of things.

15         And what I did was I gave the -- what I thought

16   the significant parts of that 13-page evaluation.  And

17   it's here.  I simply -- for these notes I simply excised

18   and I took from  -- not excised, but I took from -- that

19   was the wrong word.  I took from the longer document the

20   things that I noted in my evaluation of her work.  And so

21   it's here.  What you see here is what I gave during that

22   meeting.

23         In other words, if you look at --

24       Q    I understand.  I was just going to ask another

25   question.

1              So in terms of what you've brought to the

2     meeting, you brought your 13-page document that has a

3     detailed analysis of Professor Byrne's most recent book,

4     notes from the February 3rd meeting, and some sort of

5     handwritten document of the agenda for the meeting.

6              Is that a fair description?

7     A     Yes.

8     Q     That you brought to the meeting?

9     A     Yes.  I would say so.  Yes.  Yes.  The notes

10    were that summary, the notes to that February 3rd

11    meeting.

12    Q     And in terms of what is contained on pages 4 and

13    5, Bates Nos. 9054 and 9055 of Exhibit 80, that is the

14    portion from the 13-page document that you read -- those

15    are the excerpts that you read out loud during the actual

16    February 9th meeting?

17    A     Yes.  Yes.  I may have skipped a phrase or two,

18    but it was -- it was basically what I gave as my

19    evaluation.

20             There's no rules about, you know, the manner of

21    presentation of an evaluation.  Some people can talk off

22    the cuff.  I like to have a prepared script.

23    Q     Why are you concerned about the rules for -- in

24    this particular context?

25             MR. SALAZAR-AUSTIN:  Objection.

```
 1        A     Yes.

 2        Q     Okay.  And at some point Professor Byrne

 3   appealed the denial of tenure.  Is that correct?

 4        A     Yes.

 5        Q     And did you receive a copy of Professor Byrne's

 6   appeal of this denial?

 7        A     I believe so.  Yes.

 8        Q     What was your reaction when you received a copy

 9   of Professor Byrne's appeal?

10        A     I expected it.

11        Q     Why did you expect it?

12        A     First of all, she had the right to do so.  And

13   if one wants to take advantage of it, then one should.

14              But, second of all, when she met with myself and

15   Jack Dovidio, when we informed her of the tenure decision,

16   I think she said in so many words that she was probably

17   going to appeal it, if I recall.  And, again, this is her

18   right.

19                   (Plaintiff's Exhibit 134, Comments

20        and corrections to Professor Sue Byrne's March

21        8, 2016 letter:  Marked for identification.)

22   BY MS. HOWARD:

23        Q     So you're being handed what's been marked as

24   Plaintiff's Exhibit 134.  I don't have any substantive

25   questions about Exhibit 134.  I just want you to confirm
```

```
 1        A    Yes.

 2        Q    And would you agree that your assessment was

 3   only based on the procedures and process set forth by Yale

 4   University and the requirements set forth by Yale

 5   University for you as chair of the internal review

 6   committee?

 7        A    Yes.  If you were referring to the fact that the

 8   only thing that we judged was her scholarship.

 9        Q    I'm only referring to the scholarship.

10        A    Yes.

11        Q    There was also obviously teaching and service.

12        A    Yes.  But they won't get you tenure at Yale.

13        Q    Right.  So with respect to scholarship --

14        A    Yes.

15        Q    -- your assessment of scholarship was only based

16   on whatever rubric was set forth by Yale?

17        A    It was set forth by the high standards that Yale

18   set, which are in that document, the FASTAP.

19        Q    So your assessment was only based on those

20   standards?

21        A    No.  You can't base an assessment, a specific

22   assessment on the standards.  You follow those standards.

23   And I followed those standards.  And my assessment was

24   that she didn't meet the very highest standards that Yale

25   wanted for somebody to be tenured.
```

```
 1   STATE OF CONNECTICUT

 2        I, Bethany A. Carrier, RMR, CRR, CSR #071, a Notary

 3   Public, duly commissioned and qualified in and for the

 4   State of Connecticut, do hereby certify that pursuant to

 5   Notice, there came before me on the 21st of February,

 6   2019, the following-named person, to wit:  NOEL VALIS, who

 7   was by me duly sworn to testify to the truth and nothing

 8   but the truth; that she was thereupon carefully examined

 9   upon her oath and her examination reduced to writing under

10   my supervision; that this deposition is a true record of

11   the testimony given by the witness.

12        I further certify that I am neither attorney nor

13   counsel for nor related to nor employed by any of the

14   parties to the action in which this deposition is taken,

15   and further that I am not a relative or employee of any

16   attorney or counsel employed by the parties hereto, or

17   financially interested in this action.

18        IN WITNESS THEREOF, I have hereunto set my hand

19   this 5th day of March, 2019.

20

21

22                   _____

23                   Bethany A. Carrier, RMR, CRR, LSR #071
                                 Notary Public

24   My Commission Expires:
     October 31, 2023
25
```

```
 1                        J U R A T                    BAC

 2

 3

 4

 5

 6

 7

 8

 9

10          _____

11                    NOEL VALIS

12

13

14          Subscribed to and sworn before me on this

15   _____ day of ____MARCH_____, 2019.

16

17

18

19

20   My Commission Expires:   02/28/2021

21

22   Subscribed and sworn to before me
     this  9  day of MARCH, 20____
23        CESAR ZAPATA
24        Notary Public

25
```

```
1                    E R R A T A                    BAC

2      I, Noël Valis            , do hereby certify that the
    following corrections and additions are true and accurate
3   to the best of my knowledge and belief.

4

5   CORRECTION              PAGE        LINE        REASON

6   Roberto                  9           3          misspelling

7   Roberto           17,61,62/53   4,4,10,11   misspelling

8   Paulo             18/45           9,11         misspelling

9   Amann             18              13           misspelling

10  VAL-isch          56              20           misspelling

11  González Pérez    100             13           misspelling

12  candidate's case  105             8          incorrect citing

13  Robert         109,110,111    2,1,9           misspelling

14  director          209             14          wrong title

15  refutation        226             19           typo

16  strika "not everyone was present" p. 141, l. 5   transcription error (all members were
                                                     present)
17  character flaw  p.203 l.18            transcription error

18  03/09/2019                        Noël Valis

19  DATE                              NOEL VALIS

20      At NEW HAVEN  in said County of   NEW HAVEN   ,

21  this    9th   day of   MARCH   , 2019, personally

22  appeared   NOEL VALIS   , and she made oath to the

23  truth of the foregoing corrections by him subscribed.

24                                  Subscribed and sworn to before me
                                    this  9 day of MARCH , 2019
25                                  Cesar Zapata
                                    Notary Public
```