SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1                   UNITED STATES DISTRICT COURT

2                              for the

3                      DISTRICT OF CONNECTICUT

4

5
      SUSAN BYRNE,              } Civil Case Number:
6          Plaintiff,           } 3:17-cv-01104-VLB
                                }
7           vs.                 } CONFIDENTIAL TESTIMONY
                                } Page 211 through 214
8     YALE UNIVERSITY,          }
          Defendant.            }
9

10

11

12

13     DEPOSITION OF: Susan Byrne
       TIME:          10:05 a.m.
14     DATE:          October 19, 2018
       HELD AT:       Jackson Lewis, PC
15                    90 State House Square - 8th Floor
                      Hartford, Connecticut
16

17

18

19

20

21

22
            Reporter:  Annette Brown, LSR, No. 0009
23         Brandon Huseby Reporting & Video
                    249 Pearl Street
24         Hartford, Connecticut  06103
              Telephone:  860.549.1850
25               Fax:  860.549.1537

1     A     A woman who was fairly young, maybe 17, 18,
2    hit me in a car.  I think -- well, I don't know
3    exactly why she did it, but she turned as I was
4    walking in a crosswalk and sent me to the hospital.
5     Q    I want to ask you some questions about your
6    legal claims in this case starting with your claim of
7    retaliation.  Do you understand that in your claim is
8    a claim of retaliation?
9     A    Yes.
10    Q    And in your own words, what do you understand
11   that claim to be asserting?
12    A    My concept of it is that there was one
13   judgment of my work.  I spoke out about abuses in the
14   department and the judgment changed, the tune
15   changed.  So the retaliation is denying me tenure and
16   promotion because I spoke out.  That was in a
17   nutshell.
18    Q    So I want to focus on the middle part of that
19   which is what you characterize as speaking out about
20   abuses in the department.
21         List for me all of those occasions that you
22   spoke out, in your view.
23    A    Okay.  The first that I remember is I spoke to
24   the person who was then dean of Yale College.  Her
25   name is Mary Miller, and she -- every three years

1    when the chairmanship of the department became

2    something that had to be renewed she would ask each

3    member of the department who they thought should be

4    chair.

5          So this was at least the second time that I'd

6    been through that process, and I told her that I

7    thought she should change the chair of the

8    department.

9    Q    And you characterize this, what you just

10   described, as the first of the occasions on which you

11   spoke out.

12         Do you mean chronologically first, or this is

13   just the first one you're listing or did you --

14   A    Chronologically it's the first one I remember.

15   Q    Okay.

16   A    Yes.

17   Q    And can you place that discussion with Mary

18   Miller in time by year, month, day?

19   A    Yes, it was May 2014.

20   Q    Do you have any notes of that conversation?

21   A    I don't think I took notes, no.

22   Q    Have you seen anyone else's notes?

23         MR. PARENTEAU:  Object to form.

24   A    I think in the documents that you sent there

25   might have been notes, but I don't think they were

```
 1    identified as to where they were from or anything
 2    like that.
 3    BY MS. CHAVEY:
 4        Q    But there was something you saw in the
 5    production that looked like they might be notes of
 6    the conversation that you're recalling with Mary
 7    Miller?
 8        A    Yes, it made me think that.
 9        Q    Okay.  But you don't have your own notes?
10        A    No.
11             MR. PARENTEAU:  Objection to form.
12    BY MS. CHAVEY:
13        Q    And so that conversation with Mary Miller in
14    May of 2014 is one that you would put into the
15    category of a time you spoke out about abuses in the
16    department?
17        A    Yes.
18        Q    And what abuses in the department are you
19    talking about with regard to that May of 2014
20    conversation with Mary Miller?
21        A    I told her that I thought the continued chair
22    of Rolena being chair, Rolena Adorno being chair, was
23    a mistake because Rolena -- there are a number of
24    reasons, but she would seek dirt from me on other
25    colleagues, and she had these little wars that she
```

```
 1    was waging with two other colleagues in the

 2    department.

 3        Q    Who were they?

 4        A    One is Anibal Gonzalez and the other one is

 5    the David Jackson.  I probably also said something

 6    about students because I think she harassed students

 7    as well.

 8        Q    Are you sure you mentioned that to Mary

 9    Miller?

10        A    No.  Given that I am speaking under oath this

11    is my best memory of what --

12        Q    Sure.

13        A    -- I would have told her.

14        Q    I understand what you're saying.  Let me ask

15    you this: Do you remember what you for sure told Mary

16    Miller in May of 2014?

17        A    Only that she should not make Rolena chair

18    again.

19        Q    Okay.

20              MS. CHAVEY:  Would you mark that?

21

22                   (Defendant's Exhibit 1, E-mail

23                   dated May 8, 2014 with redactions,

24                   was marked for identification.)

25
```

1    she wouldn't or my thought -- that would be

2    projecting, but I don't think I ever heard of her say

3    those words.

4        Q   I'm really just asking about your memory and

5    what your memory is of that meeting, and it sounds

6    like you don't remember those being said?

7        A   Correct.

8                MR. PARENTEAU:   Object to form.

9    BY MS. CHAVEY:

10       Q   And you don't remember every word that was

11   said at the meeting either, right?

12       A   Correct.

13       Q   And does the term "Simms replacement" mean

14   anything to you?

15       A   No.

16       Q   Do you remember talking with Mary Miller about

17   whether Noël Valis would potentially be the next

18   chair of Spanish and Portuguese?

19               MR. PARENTEAU:   Object to form.

20       A   Mary Miller asked me -- I do remember that she

21   asked me who else could be chair?

22   BY MS. CHAVEY:

23       Q   And did you identify Noël as a potential next

24   chair?

25       A   I believe I identified all three of the people

```
 1    who were not Rolena and Roberto, so Anibal, David,
 2    and Noël.
 3        Q    Was there an discussion about who would be
 4    the DUS?  Is that the director of undergraduate
 5    studies?
 6        A    Undergraduate studies, yes, and Rolena kept me
 7    as DUS.  She told me I was good at it, but I don't
 8    remember that topic in this meeting, no.
 9        Q    And when did your third book come out?
10        A    It was 2015.  I'm trying to remember the
11    month.  I think spring 2015.  Again, that's a guess;
12    I shouldn't guess.  Sorry.
13        Q    A was it published by Toronto?
14        A    Yes.
15        Q    When did you learn that Toronto would publish
16    your third book?
17        A    April 2014.
18        Q    Did you learn Latin as an adult?
19        A    Yes.  I actually -- I should temper that just
20    a little bit.  I think I took a year or two when I
21    was in high school a long time ago.
22        Q    Did you talk with Mary Miller in May of 2014
23    about Paulo Moreira not getting promoted?
24        A    2014, I probably did.
25        Q    And were you looking for jobs outside of Yale
```

| | |
|---|---|
| 1 | Q   So if I understand your testimony correctly, |
| 2 | what you were characterizing as abuses in the |
| 3 | department that you mentioned to Mary Miller in |
| 4 | May of 2014 were Rolena's conduct in -- Rolena's |
| 5 | conduct as chair of the department in seeking dirt |
| 6 | from you about other colleagues and waging war with |
| 7 | two other faculty members and some harassment of |
| 8 | students? |
| 9 | A   Correct. |
| 10 | Q   Was there anything else that you mentioned to |
| 11 | Mary Miller besides those things? |
| 12 | A   As I said, not that I remember. |
| 13 | Q   And what was the nature of the harassment of |
| 14 | students that you discussed with Mary Miller? |
| 15 | A   Graduate students would complain -- I don't |
| 16 | remember precisely what I told her, so I guess that's |
| 17 | what I should say. |
| 18 | Q   Okay.  Fair enough.  What was the harassment |
| 19 | of students by Rolena Adorno that concerned you in |
| 20 | May of 2014? |
| 21 | A   Rolena had a tendency to tell students what |
| 22 | they had to work on as opposed to getting them to |
| 23 | produce their best work.  So that was a topic that, |
| 24 | for me, would have made a difference as far as how |
| 25 | students were treated. |

1    Q    Was there anything else that you think of as

2    harassment by Rolena Adorno of students in around the

3    time of May of 2014?

4    A    Not that I can remember.

5    Q    And the waging of war on Anibal Gonzalez and

6    David Jackson took what form?  You can address them

7    separately or together.

8    A    Well, Rolena would come to me and ask -- as

9    director of undergraduate studies, I had direct

10   contact with students.  So she would ask me if

11   students had any negative things to say about either

12   Anibal or David.  That was a fairly constant thing.

13   Q    And to your knowledge, based on those

14   interactions with Rolena Adorno, was there something

15   in particular she was looking to learn a certain type

16   of information?

17              MR. PARENTEAU:  Object to form.

18   A    I can't say what she wanted, so I don't know.

19   BY MS. CHAVEY:

20   Q    So her questions to you were general

21   about student feedback on those two faculty members?

22   A    No.  It was more particular about how they

23   worked with students, what students said about them,

24   do students have any negative comments about these

25   two people.

```
 1    characterize as abuses in your department?
 2       A    Not that I remember.
 3       Q    So if we go back to your statement earlier
 4    that you feel that you spoke out about abuses in the
 5    department and you characterized the May of 2014
 6    conversation with Mary Miller as chronologically
 7    first.
 8            What was chronologically second, if you
 9    remember?
10       A    That would have been the Yale Daily News
11    reporter.
12       Q    When was that?
13       A    The following academic year so '14-'15.
14       Q    Was that around March of 2015?
15       A    It was the whole 2014-'15.
16       Q    Okay.  So in that regard what abuses in the
17    department did you -- well, withdrawn.
18            Can you be more specific about when you spoke
19    out about abuses in the department to the Yale Daily
20    News reporter?
21       A    I remember she started contacting me in the
22    fall of 2014.
23       Q    When did you speak out about what you call
24    abuses in the department to the Yale Daily News
25    reporter?
```

```
1     A    It was in between fall 2014 when she first
2   started contacting me and spring 2015 when she
3   published a story that included me in it.  There were
4   a couple of different moments of setting up the
5   appointment.
6         We exchanged e-mails, and she told me at first
7   that she wanted to speak to me about two specific
8   topics:  The study of Spanish at Yale, and that
9   related to my role as director of undergraduate
10  studies; and the second topic that she said she
11  wanted to include was -- this is a bit technical.
12        There's a Modern Language Association and they
13  put out reports about the study of languages, study
14  of foreign languages in the United States.  I don't
15  think they deal with other countries.  Well, anyway
16  my idea is that they are Modern Language Association
17  in the United States.  And they had put out a survey
18  that showed a decline in the study of foreign
19  languages, and so that --
20    Q    Modern languages only or all foreign
21  languages?
22    A    The details on something like that distinction
23  that you're trying to make it's something that
24  departments across the country have gone from calling
25  them foreign languages to calling them modern
```

1     A    Correct.

2     Q    How many such meetings did you have?

3     A    One.

4     Q    And would the date of that meeting be in your

5   paper agenda?

6     A    That would be easier to find through e-mails.

7     Q    Okay.  But it might be in the paper agenda as

8   well?

9     A    It probably would be, but if I were to look

10   for it, I would go through the e-mails.

11     Q    What abuses in the department did you

12   disclose to the Yale Daily News reporter in that one

13   meeting?

14     A    There was a lot related to Roberto and sexual

15   harassment.

16     Q    Can you be -- withdrawn.

17          Please be as specific as you can be about what

18   you told the reporter.

19     A    I remember her asking me if I'd seen instances

20   of sexual harassment, and I remember saying, Yes.

21     Q    Did the reporter ask you any questions about

22   particular conduct?

23     A    I don't remember precisely, but my memory is

24   that she did.

25     Q    So you told the reporter that you had seen

1    such conduct by Roberto?

2        A    Correct.

3        Q    And did you mention any particular

4    observations that you had had or anecdotes?

5        A    Yes, I -- well, I can tell you what I had

6    seen.  Exactly what I told her I wouldn't be able to

7    say these were my exact words to her.

8        Q    So let's take it in two different pieces.

9    Let's first focus on what you remember telling the

10   reporter, and if you don't remember the words, that's

11   fine, but if you remember the subject matter, that's

12   the topics that you mentioned to her, that's what I'd

13   like to focus on first.

14       A    Okay.

15       Q    Do you remember what observations you

16   mentioned to the Yale Daily News reporter about

17   Roberto's conduct?

18       A    I remember her asking me questions:  Have you

19   seen this, have you seen that.

20       Q    Do you remember what the "this" and the "that"

21   are?

22       A    Not precisely.

23       Q    Generally?

24       A    Not in that specific conversation.

25       Q    Did you have a separate conversation with the

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1   reporter?
 2     A   No.
 3     Q   So the reporter asked if you had seen this or
 4   if you had seen that, and you responded yes, I have
 5   or no, I haven't, according to what your memory
 6   allowed at that time?
 7     A   Correct.
 8     Q   But at least as to some of the this and that
 9   that she asked you about you said yes; is that
10   correct?
11     A   Correct.
12     Q   How many -- maybe you can remember the number.
13   Was it 50 things that she asked you?  Was it 50 this
14   and that's?  Was it four?  How many was it?
15     A   I don't remember a precise number.  It was a
16   fairly long time.  She was in my office for an hour,
17   hour and a half, something like that.
18     Q   Was the door closed in your office?
19     A   Yes.
20     Q   Did anyone come in during the meeting?
21     A   No.
22     Q   I should ask you the same about your meeting
23   with Mary Miller.
24         Was the door closed when you were meeting with
25   her as it was when Roberto was meeting with her
```

```
 1    before your meeting?
 2        A    Yes, it was.
 3        Q    And when Roberto was meeting with Mary Miller
 4    could you hear what he was talking about with her --
 5        A    No.
 6        Q    -- before the door opened?
 7        A    No, I could not.
 8        Q    And when you came out of your meeting with
 9    Mary Miller was there anyone in the hallway waiting
10    as you had been previously?
11        A    No, there wasn't.
12        Q    And do you have any information to indicate
13    that the reporter told Roberto what you had said?
14        A    No.  The reporter, no.
15        Q    Do you have any reason -- or do you have any
16    information to suggest that the reporter told Rolena
17    Adorno what you had said during your meeting with the
18    reporter?
19        A    She wrote about it, the reporter, and I know
20    that they read it.
21        Q    That I know, but I'm asking you something
22    different right now.
23        A    I'm sorry.  I must have missed what the
24    question was.
25        Q    Do you have any information to suggest that
```

```
 1   the reporter for the Yale Daily News with whom you

 2   met spoke with Rolena Adorno about what you had told

 3   the reporter?

 4       A    I know the reporter wrote in her stories --

 5   I'm not sure if it was exactly this story.  She wrote

 6   that she had made contact with Rolena as chair, but

 7   that's the extent of what I know about that.

 8       Q    Do you have any information to suggest that

 9   Mary Miller spoke to Roberto about what you had told

10   Mary Miller during your meeting in May of 2014?

11       A    For that I would have to guess, and I guess I

12   shouldn't.

13       Q    And the reason that you would have to guess is

14   you have no information to suggest that Mary Miller

15   did tell Roberto what you had told her?

16               MR. PARENTEAU:  Object to form.

17   BY MS. CHAVEY:

18       Q    Correct?

19       A    I don't know that Mary Miller spoke to Roberto

20   about particularly what I had said.

21       Q    And do you have any information to suggest

22   that Mary Miller spoke to Rolena Adorno about what

23   you had told Mary Miller in May of 2014?

24       A    Yes.

25       Q    What information is that?
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1     A    Yes, I do know.

 2     Q    And was it your understanding that your

 3   conversation with the reporter was on the record?

 4     A    Yes.

 5     Q    Did you have any concerns about speaking on

 6   the record with the Yale Daily News reporter about

 7   the topics that you did discuss with her?

 8     A    No, I didn't.

 9     Q    Why was that?

10     A    She came to talk to me about the study of

11   Spanish at Yale.  She had questions that seemed

12   related to other matters, but I answered, in my

13   estimation, judiciously and truthfully.

14     Q    And did you think that there may be any

15   negative reaction to the things that you told the

16   reporter on the record?

17     A    Not at that time, no.

18     Q    The reporter was an undergraduate student?

19     A    Yes.

20     Q    Did you know her before that meeting?

21     A    Just through e-mails, the e-mails to set up

22   the meeting.

23     Q    She hadn't been your student, for example?

24     A    No, she hadn't.  At least I don't think so.

25     Q    Do you remember what other topics you
```

```
 1    discussed with the reporter during that on-the-record
 2    meeting?
 3        A    It was about the study of Spanish and the
 4    usefulness of the career.  So one of the things that
 5    I noticed when I was the director of undergraduate
 6    studies at Yale was that students who double majored
 7    with Spanish as the second major got into better med
 8    schools, better law schools, so that type of thing
 9    was definitely something we spoke about.
10        Q    So you found that people who double majored,
11    let's say, in Biology and Spanish got into better med
12    schools than people who just majored in Biology?
13        A    I didn't have comparative data of people who
14    just measured in -- measured? -- majored, sorry, in
15    biology, but I did know that students who had those
16    double majors had good success afterwards.
17        Q    So just so that I am clear on what you're
18    saying, what were -- what do you characterize as the
19    abuses in the department that you spoke with the Yale
20    Daily News reporter about?
21        A    Roberto's sexual harassment.
22        Q    Anything else?
23        A    There might have been something but it would
24    have -- mostly I think she was interested in the
25    sexual harassment.  That's my memory of the
```

1    conversation.

2    Q    And as you're sitting here today, you don't

3    remember what incidents and what conduct you told the

4    reporter about as it related to Roberto, right?

5    A    Correct.

6    Q    So what is it that leads you to remember that

7    you talked about Roberto's sexual harassment if you

8    don't remember what it was exactly that you talked to

9    the reporter about?

10   A    It was her questions, the reporter's

11   questions.

12   Q    So the topic of sexual harassment or sexual

13   conduct was one that the reporter brought up?

14   A    Correct.

15   Q    And in addition to confirming or -- withdrawn.

16       In addition to responding to the incidents of

17   alleged sexual conduct that the reporter asked you

18   about, did you affirmatively or voluntarily bring up

19   any other incidents with the reporter?

20   A    Not to my memory.

21   Q    So have we covered now all of what you

22   consider to be the abuses in the department that you

23   talked about with the Yale Daily News reporter?

24   A    I believe so.

25   Q    Okay.  So was there any other occasion on

1    which you spoke out about the abuses in the
2    department besides Mary Miller, besides the Yale
3    Daily News reporter meeting, was there another
4    occasion of your speaking out?
5       A    Yes.
6       Q    What was that?
7       A    Shortly after that news story came out, that
8    was in spring 2015, the provost, Ben Polak, tasked a
9    pair of lawyers with conducting a climate review, a
10   departmental climate preview.
11      Q    So what was your act of speaking out about
12   abuses in the department?
13      A    I spoke to the climate review reporters.
14      Q    How many meetings did you have with them?
15      A    One.
16      Q    And did you voluntarily go to that meeting?
17      A    Yes.
18      Q    Did you feel it was required?
19      A    We were asked by the provost to help in the
20   sense of participation will help the department, will
21   help the university.
22      Q    Do you remember the month or the year of the
23   interview?
24      A    It was spring of 2015.
25      Q    So it was within a few months after the Yale

```
 1      Q    During the course of the deposition today, if
 2   you need to take a break, restroom, water, coffee,
 3   just stretch your legs, that's fine.  Just let me
 4   know that you'd like to take a break and we'll do
 5   that.
 6      A    Okay.
 7      Q    Did you bring any papers with you to that
 8   meeting?
 9      A    Yes.
10      Q    What did you bring?
11      A    I brought a whole pile of papers related to
12   the denial of my associate professor leave that had
13   happened over the period of fall 2014 to January
14   2015.
15      Q    Why did you bring those to the interview?
16      A    Because it was a particular abuse in the
17   department, and that's part of what the interviews
18   were supposed to be about, as I understood it.
19      Q    So you understood the purpose of the interview
20   was to elicit views of --
21      A    Problems.
22      Q    -- yours and other people's about abuses in
23   the department among other things?
24      A    Correct.
25      Q    And what abuses in the department did you
```

1   discuss with the interviewers?

2      A    This would be a whole list.  The intellectual

3   harassment and that to me was very obvious in what

4   had happened with the associate professor leave,

5   Roberto's sexual harassment definitely, Rolena's kind

6   of social harassment -- I don't know what else to

7   call it -- social demands.  I don't think I called it

8   social harassment but social demands on a colleague,

9   on me as well for a while but on this other

10  colleague.   I think those were the three big topics

11  for me.

12     Q    Who was the other colleague on whom Rolena

13  placed social demands?

14     A    He was a junior colleague.  He came in the

15  year after I did, and his name was Kevin Poole.  His

16  name still is Kevin Poole.

17     Q    Okay.  Let's start with what you characterized

18  as intellectual harassment.

19     A    Okay.

20     Q    What do you mean by that?

21     A    I would say it took two forms.  The one that

22  was directly relevant to me was everything was good

23  with my work up until the point where I told Mary

24  Miller that Rolena should not be chair, and then all

25  of a sudden kind of whiplash head-turning change in

| | |
|---|---|
| 1 | opinion.  All of a sudden the same work that was good |
| 2 | is no longer good. |
| 3 | Q   And is there anything else you mean when you |
| 4 | use the term "intellectual harassment"? |
| 5 | A   The second piece -- I did say there were two. |
| 6 | The second piece would be the same thing I spoke |
| 7 | about a little bit earlier today about kind of |
| 8 | imposing things on graduate students rather than |
| 9 | allowing graduate students to nurture and hone their |
| 10 | own instincts. |
| 11 | Q   Can you give me an example of that? |
| 12 | A   Sure.  I forget which graduate student this |
| 13 | was, but one came to me and said that she wanted to |
| 14 | work on a certain project for her doctoral |
| 15 | dissertation, and Rolena told her she couldn't, that |
| 16 | she had to do something else. |
| 17 | Q   Was there any explanation for that? |
| 18 | A   No. |
| 19 | Q   By Rolena? |
| 20 | A   No.  It was -- that's the intellectual |
| 21 | harassment part of it.  It's the imposition of one |
| 22 | person's thoughts on another person, kind of |
| 23 | irrational in my mind. |
| 24 | Q   And who perpetrated the intellectual |
| 25 | harassment against you, in your opinion? |

1     A    Rolena, Roberto, and Noël.

2     Q    And what are the actions that you consider to

3    be intellectual harassment by any or all of those

4    three?

5     A    It's that turnabout that I just said a minute

6    ago.  The idea that a particular idea or a particular

7    plan for work, in this case it was specifically the

8    APL proposal.

9     Q    Anything else?

10     A    Not particularly.  In that meeting with those

11    climate review attorneys, no.  There were -- as far

12    as the intellectual harassment that was my main

13    concern at that point.  It was an attempt to change

14    their tune on my work without any fundamental

15    legitimate reason to it.

16     Q    And you also mentioned something that you

17    called social harassment or social demands by Rolena

18    on you and Kevin Poole.

19          What was that as it related to you?  And I'll

20    ask you separately about Kevin Poole.

21     A    Okay.  During my second year at Yale that was

22    when Kevin was hired.  He came in the -- or my second

23    year, and Rolena one day early on in that semester

24    came and asked if the two of us wanted to go out for

25    a drink after we finished office hours or whatever we

1   were doing, and we both said yes.  And so we did, and

2   we went out for a drink, probably two drinks.  I'm

3   not -- I can't remember particularly.

4        And then, okay, we have -- Rolena said, We

5   have to go have some dinner, so we went and had

6   dinner.  And then she said, We have to go back to my

7   house and have an after-dinner drink.

8        So going out for drinks after office hours

9   turned into a six- or seven-hour festival of dining

10  and drinking.  That's not anything bad at all in a

11  one-time kind of thing, but at the end of that night

12  Rolena looked at both of us and said, Oh, this was so

13  much fun, we'll have to do it every Thursday night,

14  and my heart sank.

15    Q   So did that pattern repeat every Thursday?

16    A   And then some, yes.

17    Q   Did you ever tell her you didn't want to

18  continue that?

19    A   I started saying I can't because I have to

20  work, or I can't because I can't afford it.  By that

21  time it had gotten up to two or three times a week.

22    Q   And so when you said you couldn't do it or

23  couldn't afford it were you then able not to

24  participate?

25    A   Correct.

| | |
|---|---|
| 1 | secondhand information.  Kevin would tell me that he |
| 2 | wanted to stop the constant -- the consistent social |
| 3 | activities but he felt that he couldn't, and Rolena |
| 4 | would call him at eight -- seven, eight in the |
| 5 | morning I think even as early as seven, and say, When |
| 6 | are you coming in to the office today?  So she was |
| 7 | pretty demanding of his time, and he should have been |
| 8 | using that time to get work done as I saw it. |
| 9 |     Q    Did he tell you that there was any sexual |
| 10 | nature to Rolena's attention on him? |
| 11 |     A    No.  Not particularly, no. |
| 12 |     Q    Was there anyone else or anything else that |
| 13 | you related to the climate review interviewers that |
| 14 | you're putting in the category of social harassment |
| 15 | or social demands? |
| 16 |     A    No. |
| 17 |     Q    And the other topic, the third topic that you |
| 18 | said you discussed with the climate review |
| 19 | interviewers, was Roberto González Echevarría's |
| 20 | sexual harassment? |
| 21 |     A    Yes. |
| 22 |     Q    And what did you tell the interviewers about |
| 23 | that topic? |
| 24 |     A    I told them everything that I had seen or |
| 25 | experienced. |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
1     Q    What was that?

2     A    My first year at Yale as I was putting the key

3     into my office door and I felt someone behind me

4     playing with my hair, and I turned around it was

5     Roberto grinning.  After that --

6     Q    So that was what year?

7     A    2008-2009, that academic year.

8     Q    And who witnessed that?

9     A    Just me.

10    Q    Did you address it with him at any time?

11    A    No.

12    Q    How close was he standing to you when you

13    turned around and saw him there?

14    A    Directly behind me.

15    Q    Was he touching you physically other than --

16    A    Yes, my hair.

17    Q    -- your hair?

18         Was his body touching yours?

19    A    Not that I remember.

20    Q    So when you turned around he was --

21    A    He was literally right there.

22    Q    Was he --

23    A    Grinning.

24    Q    Let me finish the question.

25    A    Sorry.
```

| 1 | do that to an undergraduate student was with an |

1    do that to an undergraduate student was with an

2    undergraduate student named Julie Blindauer.  She was

3    majoring in Spanish.  Roberto, Julie, and I were the

4    only three there.  We were in the general area of

5    call it a lobby of the department, and Roberto had

6    that same grin on his face as he was doing that to

7    Julie's hair, and he said, Isn't she pretty or isn't

8    she beautiful, some word like that, and I said, I

9    think what's beautiful is what's inside that head

10   trying to turn him away from that particular creepy

11   aspect of it.

12        So if Roberto were asked -- and this is how I

13   would mentally conceive it.  If Roberto were asked

14   did you ever do this to Julie Blindauer and did Sue

15   Byrne say this, then he would know who had told them

16   because the only three of us who were there were

17   those three.

18   Q    So it could have been Julie or you in your

19   example there?

20   A    Correct.

21   Q    So do you have any information that the

22   climate interviewers told Roberto directly what you

23   had told the interviewers?

24   A    I don't have any information, no.

25   Q    So you told the interviewers that Roberto had

```
 1    she started the social things.
 2       Q    But you don't actually remember when it was?
 3       A    The precise date, no.
 4       Q    But you're certain you do remember telling
 5    Rolena about that?
 6       A    Yes.
 7       Q    What are the other acts by Roberto that you
 8    advised the climate reviewers about?
 9       A    Okay.  There was the hair thing.  My -- there
10    are two others.  I don't know which came first when I
11    spoke with them.  There are at least two others.  One
12    was when he kissed me on the mouth.
13       Q    Did you tell Rolena about that?
14       A    I don't remember telling her that.
15       Q    Okay.  And what was -- you said there were at
16    least two more?
17       A    And --
18       Q    And I think that was one them, so what is the
19    other?
20       A    The other would have been the hip operation
21    little pantonine of sex standing up.
22       Q    And when was that?
23       A    After he had his second hip operation.  He had
24    two hip operations.  The first time they put in one
25    of those metal-on-metal hip replacements.  He had to
```

```
 1              Roberto was at the same celebration for Mary
 2     Miller?
 3        A    Correct.
 4        Q    And what -- do you know what his position was
 5     that led him to be invited?
 6        A    He was chair during Rolena's sabbaticals.
 7        Q    Were there any other acts of what you're
 8     calling sexual harassment that you related to the
 9     climate review interviewers?
10        A    I think we've covered the hair touching, the
11     sex standing-up joke, and the kiss on the mouth, and
12     that is my memory of what I told them.
13        Q    Okay.  Why don't we take just a short break,
14     and we'll come back in about five minutes.
15        A    Okay.
16
17                        (Off the record from approximately
18                         11:24 a.m. to 11:28 a.m.)
19
20     BY MS. CHAVEY:
21        Q    Are you ready to proceed Professor Byrne?
22        A    Yes.
23        Q    We just took a short break.  I'd like to
24     continue the line of questioning that we left off
25     with, and so I'll start by asking if there were any
```

1  other matters that you consider to be abuses of your

2  department, Spanish and Portuguese, that you related

3  to the climate review interviewers, other than what

4  you've already mentioned?

5      A    Okay.  Roberto's sexual harassment that we

6  already did, the intellectual social that we already

7  did, the APL that was part of the intellectual

8  harassment.  We were in there for pretty long so I

9  don't -- but I don't remember particularly.  I know

10  as part of the overall interview I spoke about -- I

11  spoke in detail about the APL leave, about Rolena and

12  Roberto, Rolena's negative attitude towards Anibal

13  and David Jackson.

14          They asked me about specific things like

15  courses that had been canceled, and that was one of

16  the things that enabled me to realize who had made

17  comments to them earlier.

18          I told them about -- this would have been part

19  of the APL, and actually it also tied into Roberto's

20  sexual harassment, the particular moment during the

21  APL saga it was in October of 2014, and Rolena asked

22  me if I would go speak to -- well, she told me that

23  she wanted me to go speak to Roberto the following

24  morning about the APL proposal, and I said yes.

25          And when I went to his office he directed me

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1    -- I went in and said "hello."  He said "hello."  We

2    each had a copy of the proposal itself, and he

3    directed me to this little couch that he had in his

4    office -- so this actually ties the two them

5    together.  It's a little two-person couch, and he

6    said let's go sit on the couch it will be more

7    comfortable, and I went in that direction and I saw

8    that little two-person couch had a big pillow on one

9    side of it, and that pillow was the side I was being

10   directed to sit on.  Had I sat there with that pillow

11   behind me I would have literally been pushed into

12   Roberto's lap which was something that didn't seem

13   attractive to me, so I picked up the pillow, sat down

14   on the side, and stuck that pillow in between us.  So

15   that -- I also told them about that.

16       Q    What color was that couch?

17       A    Memory is it's some kind of blue.

18       Q    And the pillow?

19       A    Similar.  I don't remember any particular

20   color standing out at me.  It was the structure of it

21   more than the color that I remember.

22       Q    Do you remember if the pillow was one of those

23   pillows that's kind of part of the couch, or was it

24   like an accent pillow, if you know what I mean?

25       A    I remember it being a fat pillow, a thick

1    fine.

2        A    Okay.

3        Q    So was there any other action that you took

4    that you characterize as speaking out about abuses of

5    your department?

6        A    Yes.

7        Q    So we've had the conversation with Mary Miller

8    that you related.  We had the discussion that you had

9    with the Yale Daily News reporter, and you were just

10   describing your interview with the climate review

11   interviewers, and now there's something else?

12       A    Yes.

13       Q    What is that?

14       A    The Title 9 process against Roberto's sexual

15   harassment or related to Roberto's sexual harassment.

16       Q    Okay.  And was there one occasion when you

17   spoke out about what you call abuses in your

18   department as part of that Title 9 process?

19       A    I believe I was interviewed on four separate

20   occasions about it.

21       Q    And do you remember the dates of those

22   interviews?

23       A    I remember the first.  It was December 1st.

24       Q    Of what year?

25       A    2015.

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| | | |
|---|---|---|
| 1 | Q | But did it also have a door? |
| 2 | A | Closed door, yeah. |

3    Q    So to your knowledge, it was just the three of

4    you in the meeting?

5    A    Yes.

6    Q    No one else could hear what you were saying?

7    A    Correct, as I understood it.

8    Q    And do you have any information to suggest

9    that Stephanie Spangler told Roberto Gonzalez

10    Echevarria what you told her and this other person?

11    A    I know what standard procedures are -- well --

12    oh, there were further interviews after that, and

13    Roberto was told what I had said, yes.  During that

14    first interview Stephanie Spangler asked me if I

15    wanted to be the one to bring a complaint against him

16    in my name.

17    Q    What did you say?

18    A    I said, No.  I said my complaint with him was

19    more the intellectual harassment, and I might have

20    said something else about that process, but I don't

21    remember particularly, but I also -- she asked if I

22    was okay with my name being used, and I said, Yes.

23    Q    So if I understand what you just said, you

24    told Stephanie Spangler, No, I don't want to bring a

25    complaint with my name attached to it, but I am okay

1    with my name being used?

2        A    No, I think you wrote it down wrong.  I told

3    her I did not want to be -- I didn't want to bring an

4    individual complaint in my name, but I was fine with

5    them -- she told me they were going to bring the

6    complaint at one point.  I don't remember if it was

7    during this meeting, and she said that they had

8    decided to bring a complaint and could she use my

9    name or did I want to remain anonymous, and I said

10   she could use my name.

11       Q    Okay.  So do you have any information to

12   suggest that Stephanie Spangler or her colleague told

13   Roberto what you had said to them on December 1st of

14   2015?

15       A    The last interview that I had with the fact

16   finder whose name was Miriam Berkman I think.  I'm

17   not sure about the spelling, but I think it's the way

18   it sounds.  She had me come back to respond to what

19   Roberto had said to my complaints.

20       Q    What was the date of that meeting?  I think

21   you said it was the last of these four.

22       A    It was in spring 2016.

23       Q    Do you remember the month?

24       A    No, I don't.

25       Q    Where was that meeting held, the one with

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1   Miriam Berkman?

 2       A    That was in a different office.  I think it

 3   was back at the other one on Whitney, not the tall

 4   building but the other one.

 5       Q    Was it just the two of you in the meeting?

 6       A    Yes.

 7       Q    Do you remember how long that meeting lasted?

 8       A    No, I don't.

 9       Q    And did you tell Miriam Berkman anything

10   different -- well, withdrawn.

11            Did you tell Miriam Berkman anything new as

12   compared with what you had told Stephanie Spangler on

13   December 1st?

14       A    Yes.

15       Q    Okay.  So you had said that as part the

16   Title 9 process there were four interviews.  So far

17   you've said there was the December 1st, 2015

18   interview with Stephanie Spangler, and the last one

19   was the meeting with Miriam Berkman in the spring of

20   2016.

21            When were the other two meetings?

22       A    In between those there was another meeting

23   with Miriam Berkman.  I don't remember what the

24   fourth one was.  My memory is that there were four.

25       Q    And was the other meeting with Miriam Berkman,
```

1    Q    So on December 1st of 2015 you told Stephanie

2    Spangler that you were okay having your name attached

3    to the things that you were saying?

4    A    Saying.

5    Q    You didn't want to be the named complainant in

6    a Title 9 case?

7    A    Correct.

8    Q    And what were the -- what would you

9    characterize as abuses in your department that you

10   related to Stephanie Spangler and her colleague on

11   December 1st, 2015?

12   A    That would be all of the same things that I

13   told the climate review reporters.  They were the

14   ones that referred the case to Stephanie Spangler and

15   Title 9.  That person, Jamaal Thomas, was the one who

16   contacted me and asked me if I would be willing to

17   speak to the Title 9 office.

18   Q    Did you have any hesitation about doing so?

19   A    No.

20   Q    Did you talk with anyone other than Jamaal

21   Thomas about whether you would be willing to go talk

22   to Stephanie -- to the Title 9 office and in

23   particular Stephanie Spangler?

24   A    No, I didn't.

25   Q    Did you consult with anybody about whether

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
1    into 2016?

2        A    No.

3        Q    And then when you met with Miriam Berkman the

4    second time, which you said was in the spring of

5    2016, the purpose of that meeting was a little bit

6    different?

7        A    Yes.

8        Q    And what was the purpose of that meeting as

9    you understood it?

10       A    Miriam told me that she wanted me to come back

11   and respond to what Roberto had said to my

12   allegations, I think she called them.

13       Q    So tell me everything you remember about that

14   second meeting with Miriam Berkman.

15       A    She told me that Roberto had -- I don't

16   remember what she told me about Roberto saying except

17   for that he blamed the tenure review for my saying

18   what I said.  He somehow linked them together.  He

19   said, She's only doing this because before of her

20   tenure review or something along those lines.

21       Q    And as of the date that you met with Miriam

22   Berkman that second time what was the status of your

23   tenure review?

24       A    My memory is that that was after the -- I had

25   been told that the vote had been negative.
```

| 1 | Q | Who do you think retaliated against you? |

1   Q   Who do you think retaliated against you?

2   A   Rolena, Roberto, and Noël.

3   Q   When did the retaliation begin?

4   A   As to when they started doing whatever they

5   did, I wouldn't be able to be say.  I do know that

6   the denial of the APL leave was the first instance of

7   their anger directed at me that I saw.

8   Q   And besides the denial of the APL leave what

9   else do you believe was a negative consequence of

10   your having spoken out about these abuses of your

11   department?

12   A   They denied me tenure.  Rolena yelled at me.

13   There were various instances of that.

14   Q   Do you have any information to suggest that

15   Mary Miller told Noël what you had told Mary Miller

16   in May of 2014?

17   A   No, I don't have any information about that.

18   Q   Do you have any information to suggest that

19   the Yale Daily News reporter directly told Noël what

20   you had told the reporter during your meeting with

21   her?

22   A   Are you talking about do I have any

23   information now, right?

24   Q   Yeah.

25   A   All of the discovery that you sent shows that

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1      A    When you ask for information my information

2    comes from the change in their attitude towards me

3    and their anger towards me and their hostility

4    towards me that became more and more evident all

5    along the way.

6    BY MS. CHAVEY:

7      Q    Anything else?

8      A    Can you repeat the question?

9      Q    Sure.

10     A    The original part of it.

11     Q    Do you have any information to suggest that

12   Stephanie Spangler told Rolena Adorno what you had

13   told Stephanie Spangler specifically about abuses in

14   the department?

15     A    Only that I can infer from the behavior

16   towards me, not anything in writing or anything of

17   that sort, no.

18     Q    Okay.  And do you have any information to

19   suggest that Stephanie Spangler told Noël Valis about

20   what you had told Stephanie Spangler related to

21   abuses in the department?

22     A    My understanding of how those cases work is

23   that they interview all of the people in the

24   department, so that would be the only information I

25   would have.

| | |
|---|---|
| 1 | Q    Okay.  So this is also your assumption that |
| 2 | the process would involve Stephanie Spangler telling |
| 3 | Noël Valis, but you don't have any particular |
| 4 | information that that happened here? |
| 5 | A    I was not invited to those meetings, no. |
| 6 | Q    Okay.  And do you have any information about |
| 7 | who if anyone Miriam Berkman disclosed information |
| 8 | about what you had told her? |
| 9 | A    I would have to go back to that same answer. |
| 10 | Q    Okay.  Let's switch gears for a second because |
| 11 | my understanding is that another one of your claims |
| 12 | in addition to retaliation is breach of contract; is |
| 13 | that your understanding? |
| 14 | A    Yes. |
| 15 | Q    And in your own words what are you -- what is |
| 16 | the employment agreement that you believe Yale |
| 17 | University breached? |
| 18 | MR. PARENTEAU:  Object to form. |
| 19 | A    I was hired for a position identified as |
| 20 | tenure track and the documentation said that I would |
| 21 | have a fair hearing on the merits when it came time |
| 22 | for that tenure review. |
| 23 | BY MS. CHAVEY: |
| 24 | Q    And so you believe that you had an employment |
| 25 | agreement that required the university to give you |

```
 1    discovery.  The information that Kevin found in the

 2    handbook or whatever he consulted was not correct and

 3    Pam Schirmeister from the graduate college told

 4    Rolena and said, You can give this graduate student a

 5    third chance.  That was Sara Piazza, and Rolena did

 6    not.  She chose not to.

 7       Q   And do you know -- do you have any information

 8    about what Rolena's motivation was with regard to

 9    Sarah Piazza?

10       A   That -- my only -- I can't guess as to her

11    motivation.

12       Q   Right.  So I understand that, but I'm asking

13    do you have any information about what her motivation

14    was?  Did she tell you?  Did somebody else reveal

15    that to you in some way?

16       A   My only conjecture is that she was always out

17    to get Anibal and this was part of it.

18       Q   And when you say "out to get Anibal," what do

19    you mean?

20       A   I don't know what she hoped, but she attacked

21    him, attacked his students so...

22       Q   What's the standard for promotion -- well,

23    what's the standard for tenure at Yale when you were

24    there anyway?

25       A   It's written in the FASTAP document.  It has
```

```
 1   to do with a leader in your field, evidence of
 2   good scholarly work and promise of future scholarly
 3   work.
 4       Q    It's a high standard.
 5       A    Yes.
 6             MR. PARENTEAU:  Object to form.
 7   BY MS. CHAVEY:
 8       Q    And it's a higher standard than the standard
 9   for promotion to associate professor on term?
10             MR. PARENTEAU:  Object to form.
11       A    Different promotion ranks, each have different
12   things that are said about them.  It's seen as a
13   progression.  So after you've become associate
14   professor on term you're one step closer to associate
15   professor on tenure -- with tenure, et cetera.
16   BY MS. CHAVEY:
17       Q    So but what I'm asking you is do you believe
18   that at Yale being promoted to associate professor on
19   term is a guarantee that you -- that a person would
20   then be promoted in the progression to associate
21   professor with tenure?
22       A    I don't understand that any of it as
23   automatic, no.
24       Q    Okay.  So there's a difference then in the
25   standards that the university applies to the
```

```
 1    A    Yes.
 2    Q    Okay.  So you're aware that there's a vote at
 3   the department level?
 4    A    Yes.
 5    Q    And then are you aware of any other levels of
 6   review that are required for tenure at Yale?
 7    A    The -- yes, I am.
 8    Q    Okay.  What are you aware of?
 9    A    The department level, the division level.  I
10   think the third is it's -- I forget the exact name of
11   this.  It's the full faculty of Yale, so there's a --
12   I can't remember the name of what they call that
13   group when they get together.  It will come to me --
14   and then the final step is a -- the corporation
15   counsel ratifies.
16    Q    Corporation counsel meaning the lawyers, or
17   you mean the Yale corporation?
18    A    It's a body -- Yale corporation, that's right.
19   Because corporation counsel is -- yeah, Yale
20   corporation.
21    Q    Okay.  And along the way are you familiar with
22   any recommendations that are made by administrators
23   at Yale to those various bodies?
24    A    The divisional director of humanities, Amy
25   Hungerford, she would be involved in the step after
```

```
 1    Q    It was produced in --
 2    A    You sent it to me, yes.
 3    Q    -- discovery?
 4         So until you saw that e-mail, which was
 5    sometime in the year 2018, your understanding was
 6    that the department of the tenure candidate had to
 7    vote on that tenure candidate?
 8    A    It wasn't my understanding.  I was told that
 9    when I asked if Renaissance Studies' faculty could
10    vote.  I was told, No, they couldn't, but I don't
11    think I had an understanding of this has to be in
12    your department.  That was the normal procedure; I
13    understood that.
14    Q    So in the normal procedure where the
15    department votes on a tenure candidate who's coming
16    up through that department, do you know whether
17    candidates who receive successful votes in their
18    department always gain tenure at Yale?
19    A    I don't believe so.  I believe there are cases
20    where the divisional committee turns down tenure
21    cases that have been granted in the department level.
22    Q    What cases are you familiar with?
23    A    I don't have the names of the people.  I heard
24    of someone in, I think it's, American Studies,
25    something like that.
```

1    Q    Let me withdraw the question.

2         So you said that you are familiar with this

3    document which is titled, at least in part, Steps for

4    Promotion?

5    A    I'm familiar with that title.  I know that

6    this is something that's up on the provost's website

7    that says "Steps for Promotion."

8    Q    Okay.  And you see at the bottom of the first

9    page it's says "Last updated February 16th of 2015"?

10   A    I do see that, but that's kind of contradicted

11   by the date handwritten just underneath it that says

12   "2014."

13   Q    And you didn't write that, did you?

14   A    No, I just saw the two dates when you pointed

15   out the 2015.

16   Q    So your tenure review was in the academic year

17   2015 -- excuse me.  Your tenure review was in the

18   academic year of 2015-'16?

19   A    The tenure review year?

20   Q    Yes.

21   A    Yes.

22   Q    And did you access a document called "Steps

23   for Promotion" as you were preparing for your tenure

24   review?

25   A    I probably did.  I remember accessing it at a

```
 1    different point in time later on, but I don't
 2    remember the exact time, so you could be right.  It
 3    could be the first one, the second one.  I remember
 4    seeing something that was Steps for -- yeah.
 5        Q    For what purpose did you refer to a document
 6    called "Steps for Promotion"?
 7        A    Because I was going through it.
 8        Q    Okay.  And if you look at the second page of
 9    the document you see the very first step of the
10    process is, Step 1, "Inform candidate of process."
11    Do you see that?
12        A    Yes.
13        Q    And it refers to department chair as
14    initiating this part of the process?
15        A    Yes.  The highlighting kind of makes it
16    difficult to read those parts --
17        Q    Yeah.
18        A    -- but yes, it does say that.  I see that.
19        Q    Then the steps basically relate to the
20    submission of materials; you did that, right?
21        A    This is a later document because the timing is
22    different here.
23        Q    What do you mean by that?
24        A    Well, the timing says, "Preliminary materials
25    would be submitted by the end of March break," so
```

1   mean by reservation though.  I should say that.

2       Q   Any hesitation about being colleagues on a

3   going-forward basis with any of those three?

4       A   No.

5               MR. PARENTEAU:  Object to form.

6       A   No.

7   BY MS. CHAVEY:

8       Q   So is there anything -- let's go back to the

9   question I had asked you before.

10              Is there anything in this document, Exhibit 2,

11  that you think represents a requirement imposed on

12  Yale that it failed to honor in your case?

13              MR. PARENTEAU:  You'll have to read the

14  whole thing.

15      A   I'm going to have to read it before I can

16  answer that.

17  BY MS. CHAVEY:

18      Q   Yeah, go ahead.

19      A   And the question is anything in here that

20  imposed something on Yale?

21      Q   Nope.  Is there anything in the exhibit that

22  imposed an obligation on Yale that it failed to meet

23  in your case?

24      A   Got it.  (Witness reviews document.)

25              Can I stop and offer these along the way?

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1     Q   Sure.
 2     A   On page 2 in Point Number 2 where it says, I
 3   should also provide the names of up to three
 4   individuals who I believe would not offer a fair
 5   assessment, they did not do that.
 6     Q   And you didn't offer that?
 7     A   I was not asked to offer that.  The letter
 8   that I got did not say to offer that.
 9     Q   Well, if I'm reading -- if I'm looking at the
10   same place you're reading it says, "The candidate
11   provides the department chair with electronic copies
12   of:  Names of up to three individuals who might serve
13   as referees" --
14     A   And then after the close paren "names of up to
15   three individuals who the candidate believes would
16   not offer a fair assessment of his or her work."
17     Q   Right.  So you didn't do that?
18     A   I was not asked to do that.
19     Q   You didn't provide the department --
20     A   I was not asked to do that.  I was asked to
21   provide three yes, but I was not asked to provide
22   three no.
23     Q   And you had the Steps for Promotion available
24   to you you said, right?
25     A   This I did not have.
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1    Q   You didn't have --
 2    A   I think the date is later.  This is actually
 3  -- no, the date would be right.  I think the letter I
 4  get is supposed to tell me these things.  That's what
 5  the chair sends me a letter that says here's what you
 6  need to do, that's the informed candidate part, and
 7  that letter should have had that in it, but it
 8  didn't.
 9    Q   Was this document, Steps for Promotion,
10  available to you electronically?
11    A   I guess -- I know consulted it at other
12  points, and it was on the website.
13    Q   And you have never realized that you had the
14  opportunity to provide the department chair with
15  names of people who would not provide a fair
16  assessment?
17    A   I was not told to provide that.
18    Q   I'm not asking you that.  I'm saying you
19  didn't realize back in 2015 that you had the
20  opportunity to provide your department chair with the
21  names of up to three individuals whom you thought
22  would not provide a fair assessment?
23    A   No, this is the first time I'm seeing this.
24    Q   Okay.  Go ahead.
25    A   (Witness reviews document.)
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
1         The third point in that same place, "A brief
2    statement of research interest to help guide the
3    department in the selection of additional referees."
4         I did provide research interests, but Yale did
5    not select all external referees who were in
6    conformance with that list, with that research
7    interest section.
8         (Witness reviews document.)
9         The dates are also very different.  So the
10   third number on that same page that says, "No later
11   than April 22nd."  In my case that didn't happen
12   until mid July.
13   Q   Yeah, why don't we just -- we know that your
14   process was postponed, so we can just -- I will take
15   that as a given that the dates listed on this
16   document were not the dates related to your case?
17   A   Okay.  (Witness reviews document.)
18        I also understand that at same point, Number
19   3, Rolena was told that she would have nothing to do
20   with it, so she was not the person who selected.
21   Q   Was that a violation of Yale's obligation to
22   you?
23   A   I don't believe that I can comment on the
24   legal obligations to me, but this did not happen .
25   So this point did not happen.  I understood it did
```

```
 1    Q    Okay.

 2    A    So...

 3    Q    I understand your point, but I was asking

 4   about something different.

 5                MR. PARENTEAU:  Object to form.  Is that

 6   the question?  Object to the comment.

 7   BY MS. CHAVEY:

 8    Q    You can continue.

 9    A    (Witness reviews document.)

10         On the next page in the section that's

11   identified as 4-A, the second to the last sentence

12   says, "Proposed referee should be selected with the

13   aim of providing a fair, informed, and rigorous

14   review" --

15                THE COURT REPORTER:  I'm sorry.  Could

16   you slow down just a little?

17                MR. PARENTEAU:  Read slow.

18                THE WITNESS:  Yeah, I'm sorry.

19    A    So "Proposed referees should be selected with

20   the aim of providing a fair, informed, and rigorous

21   review reflecting a diversity of viewpoints."

22         I do not believe Yale selected candidates with

23   a fair informed approach.

24   BY MS. CHAVEY:

25    Q    And you don't know who the external referees
```

```
 1            So for me those approaches, not only do they
 2      leave out half of the population, the half that's
 3      male, but you also don't have -- you're adding a
 4      layer as opposed to going into -- my preference for
 5      scholarly work in my field and time frame is to see
 6      what the text says and to be informed by what was
 7      going on around the text when it was produced.  So I
 8      would say prior to the text and then reaction to the
 9      text but in the same time frame.
10            And both the feminine thing, people do it with
11      all kinds of topics now, mainly in the United States.
12      It's a tendency that I think they're moving away from
13      a little bit, thankfully, but they tend to look at
14      things today and then try to put that back on the top
15      of the work, and I think it distorts the works.
16       Q    And would that be -- what you're describing
17      would that be also in the category of a scholarly
18      quibble with Alison Weber's approach to literature?
19       A    I wouldn't quibble with her or her choice, but
20      it wouldn't be my choice.  Everyone is free to do
21      what they find fulfilling.
22       Q    So you were proceeding through --
23       A    I should keep on going.
24       Q    Yes, please.
25       A    So I got up to that far.  Okay.
```

```
1              (Witness reviews document.)

2              The part that begins on page 3 and continues

3       onto the top of page 4 about the list of comparison

4       candidates.  What I saw in the documents that you

5       provided indicates that all of the candidates had --

6       the only phrase I can use for it is chronological

7       advantage.

8              So my degree was granted in 2004, and their

9       degrees were all granted before 2000, 1997, 1998,

10      maybe even earlier, something like that.  So I don't

11      think that was a proper approach either.  Actually,

12      some of the letter writers commented on that.

13              MS. CHAVEY:  I'm just going to take a

14      quick break for a second.

15

16                      (Off the record from approximately

17                       2:01 p.m. to 2:07 p.m.)

18

19      BY MS. CHAVEY:

20      Q    Would you please continue answering the

21      question about Exhibit 2 please?

22      A    Sure.  I'm still on page 4.  I'll keep going.

23      (Witness reviews document.)

24              There are certain things here that I wouldn't

25      be able to comment on, like what other people were
```

```
 1    doing behind the scenes.
 2        Q    Yeah, yeah.  I'm asking what you believe to be
 3    violations of these steps by Yale.
 4        A    You don't have one that doesn't this
 5    highlighting on it, do you?
 6        Q    No.
 7        A    Because it's taking me longer to read it
 8    because of the highlighting or whatever the gray
 9    stuff is.
10              MR. PARENTEAU:  It's very hard to read.
11              THE WITNESS:  It is, isn't it?
12        A    (Witness reviews document.)
13            And again throughout the dates are off, but
14    you know that.
15    BY MS. CHAVEY:
16        Q    Yes.  Understood.
17        A    Okay.  (Witness reviews document.)
18            So page 7, Point 9.
19        Q    You're saying there's something called Point 9
20    on page 7?
21        A    Yes.  It's called "Manage Documents and
22    document access.  Beginning when the candidate
23    submits the materials and continuing as the referee
24    letters come in, the chair's assistant ensures that
25    all documents are uploaded in Interfolio.  Materials
```

1    should be organized in such a way that relevant

2    groups -- departmental review committee, eligible

3    department faculty, members of the area committee --

4    have access through the secure website to the

5    materials at suitable times."

6         They didn't do that.  They didn't give anybody

7    the letters until a very short time before.  I think

8    this was in January when they actually gave the

9    letters to the departmental review committee, and

10   Rolena had the letters before even the departmental

11   review committee did, and I think that was also a

12   violation of the process.

13        (Witness reviews document.)

14        That also kind of fits on page 8 with Number

15   10, "Deliberate and recommend."  The departmental

16   faculty review committee did not have those materials

17   until much later than they should have.

18        The same page 8, Number 11, Point 11, they

19   violated my right to a fair hearing by allowing

20   people to vote who should not have been eligible to

21   vote due to their hostility towards me, and by then

22   they had the climate review report, so they knew

23   about the bad faith actions that had gon on for

24   apparently decades before I even got there.

25        And then more specifically directed to me, the

1   vote and gone to the divisional level?

2     A   I'm sorry.  You asked for what I had as to

3   information?

4     Q   What information you have.  Was there any

5   information available to you about what your

6   candidacy would have looked like or how it would have

7   been received at the divisional level?

8     A   I think it would have been voted unanimously,

9   yes.  The same way it was for my last promotion.

10    Q   I understand that may be what you think, but

11  what information do you have -- other than the fact

12  that you had a unanimous vote at the divisional level

13  for your prior promotion, what information do you

14  have that suggests to you what the outcome would have

15  been at the divisional level for the tenure case?

16            MR. PARENTEAU:  Object to the form of

17  that question and also disregard comments.  Just

18  answer questions.

19    A   The weight of my scholarship and the

20  importance in the field is what I base my response

21  on, that yes, it would have been positive at the

22  divisional level.

23  BY MS. CHAVEY:

24    Q   And when say the weight of your scholarship,

25  what do you mean?

```
 1      A    I produce quality work that changes my field.
 2    I have changed my field in a number of ways.  That
 3    scholarship is what has gotten me the name that I
 4    have in my field.  It's why I get invited to
 5    international events.  It's why I get invited to give
 6    talks.  It's why all of that happens.
 7           People like what I do because it matters in my
 8    field, and that is why I believe fully and without
 9    any hesitation that I did deserve to be tenured at
10    Yale.
11      Q    And so when you said the weight of your
12    scholarship and the importance of your work, you're
13    talking -- you're basically saying the same thing,
14    the importance of your scholarship is what you just
15    described?
16      A    If I understand the question, yes.
17      Q    Okay.  So if you turn in --
18      A    Go ahead.  I'm just going to get more water on
19    the way.  I can hear you.  Sorry.
20      Q    If you turn to Exhibit 4 please and
21    specifically page 32.
22      A    I'm there.
23      Q    Okay.  This is -- this is Section H describing
24    each of the faculty positions at Yale, and there's --
25    you can see that there's a general description of the
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1    positions and appointments, and then starting on page

 2    233 there is a listing of each particular title,

 3    assistant professor and so on.  Do you see that?

 4         A    Yes.

 5         Q    So if you turn to page 234, there's a

 6    reference to an associate professor on term?

 7         A    Yes.

 8         Q    And that was the position to which you were

 9    promoted in 2013?

10         A    Yes.

11         Q    And I'll give you a minute to read this

12    couple of paragraphs here about associate professor

13    on term.

14         A    (Witness reviews document.)

15              I've read it.

16         Q    Okay.  So you see in the paragraph that begins

17    with the bold words "associate professor on term."

18    The second sentence says, "To be considered for this

19    appointment candidates must present significant

20    published research and scholarship representing early

21    demonstrations of disciplinary or interdisciplinary

22    leadership."

23              Do you see that?

24         A    Yes.

25         Q    And then in addition to that, "The candidate
```

```
 1   Miller, No, you shouldn't have Rolena as chair.  Six
 2   months, four, five months later he's telling me go
 3   look for another job, and then he does that
 4   ridiculous, ridiculous attack with the little memo on
 5   the APL leave.
 6        And then you go forward to the next semester
 7   in the spring of 2015 and they're just treating me
 8   worse and worse all the time.
 9        So we get the March 6th letter from the
10   graduate students and Rolena is getting more frantic
11   all the time, and she's refusing to speak to me.  She
12   doesn't even want to speak to me.  Then shortly after
13   that was the conference in Berlin where she literally
14   -- in the airport on the way back we were sitting
15   across from each other and she wouldn't even talk to
16   me at all.
17        And after that I filed the recusal letter, and
18   two weeks after that she blew up and said, You're the
19   one to blame for the anonymous graduate student
20   letter and pretty much everything else I think she
21   was blaming me for.  From what you've turned over it
22   looks like she blamed me for everything and
23   everybody.
24     Q   So it sounds from what you're saying like the
25   meeting that you had with Mary Miller was the
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1     Q    And --

 2     A    Utterly.

 3     Q    -- when you say that Rolena and Roberto with

 4   some assistance from Noël retaliated against you for

 5   speaking out, for speaking out about what is my

 6   question?

 7     A    About the harassment in the department, sexual

 8   harassment, the intellectual harassment, all of it.

 9   The abuses in the department.

10     Q    And when did you begin speaking out about that

11   if not when you spoke to Mary Miller?  That's the

12   part I don't understand.

13          MR. PARENTEAU:  Object to form.

14     A    I remember speaking to Mary Miller.  That's

15   the first that I remember.  Oh, there was another

16   speaking out that I never mentioned before when we

17   were talking about the speaking out.

18          In the '14-'15 academic year, and I think that

19   was at the beginning of '15, Yale held meetings.

20   Kathy -- Katie Lofton in -- she's in religious

21   studies -- was charged on a committee with reviewing

22   how FASTAP, the process, was working; and I went to

23   one of those meetings with Paulo and we both spoke

24   out about how that was being abused in our

25   department, how the group of three was retaliating
```

1    against people and just not acting responsibly in

2    regards to what the process was supposed to be, not

3    granting fair hearings.

4    BY MS. CHAVEY:

5        Q    Did you and Paulo both speak you said?

6        A    Yes, at that meeting we both did.

7        Q    And did you both present the same point of

8    view?

9        A    Within the difference that two people will

10   have on anything, yes.

11       Q    And was there something that you brought up

12   that he didn't or vice versa at that meeting with

13   Katie Lofton?

14       A    I don't remember.  I might have said more, but

15   I don't remember.

16       Q    Do you have any notes or outline of what you

17   said?

18       A    No, I don't.

19       Q    Did you speak contemporaneously?

20       A    Yes.  I sent a follow-up e-mail to Katie

21   Lofton afterwards, and she sent it to Amy Hungerford

22   I see in the documents you've provided.

23       Q    And did the e-mail follow-up that you sent to

24   Katie Lofton capture your concerns that you had

25   raised at the meeting where you and Paulo both

1   spoke?

2      A   I think so.

3      Q   So if I understand what you just said a few

4   minutes ago, you're still identifying the

5   conversation with Mary Miller as the first,

6   chronologically first, occasion when you spoke out

7   about the kind of abuses that you believe led

8   Roberto and Rolena to retaliate against you; is that

9   correct?

10              MR. PARENTEAU:   Object to form.

11      A   You're reminding me of another one that I

12   think happened just before the Mary Miller.  Ben

13   Polak had a listening session with junior faculty.  I

14   was the only one from my department there, and he

15   asked us what our impression of the system and how it

16   worked was.

17   BY MS. CHAVEY:

18      Q   Where was this meeting?

19      A   It was directly across from my office in

20   Silliman College, their dining room or one of their

21   dining rooms.  I'm not really sure how they classify

22   them.

23      Q   And was it kind of an impromptu session?

24      A   Uh-huh.  Yes.

25      Q   So you weren't specifically invited to go

```
 1    but a bunch of people just happened to come together?
 2        A    Oh, I'm sorry.  No, it wasn't impromptu in
 3    that sense.  He sent out an invitation, or somebody
 4    sent out an invitation.  It might have been a group
 5    of students who had invited him and he said yes, he
 6    would go.
 7        Q    So what did you say at that meeting with Ben
 8    Polak?
 9        A    That I thought the process was being abused in
10    my department.
11        Q    And did you mention by whom it was being
12    abused?
13        A    I don't think I did.  I would have tried to be
14    a little circumspect at that time at that point in
15    time.
16        Q    And who was present there besides you and
17    Mr. Polak?
18        A    I didn't know anyone else.  There were -- the
19    table wasn't this big and the chairs weren't this big
20    (indicating), but I'm guessing something like eight
21    to ten other junior faculty members.
22        Q    Do you remember any reaction that Mr. Polak
23    had to your statement?
24        A    I remember that everyone was kind of surprised
25    that was there, but that was it.  It wasn't a
```

| | |
|---|---|
| 1 | BY MS. CHAVEY: |
| 2 | Q    Okay.  Do you have any sense from being in |
| 3 | academia for your -- most of your adult life whether |
| 4 | City College's tenure standards would be the same as |
| 5 | those at Yale? |
| 6 | MR. PARENTEAU:  Object to form. |
| 7 | A    I would assume different. |
| 8 | BY MS. CHAVEY: |
| 9 | Q    Different in what way? |
| 10 | A    In the sense of more stringent.  There's more |
| 11 | expected of people in the Ivy League than are people |
| 12 | not in the Ivy League. |
| 13 | Q    And by the "Ivy League," do you mean strictly |
| 14 | the nine schools in the Ivy League, or are you |
| 15 | referring to something different? |
| 16 | A    There are other universities that would |
| 17 | probably match those types of stringent requirements. |
| 18 | I wouldn't be able to give them all to you.  I |
| 19 | wouldn't be able to name them to you, but I can think |
| 20 | of UCLA probably has, Berkley probably has, |
| 21 | University of Virginia probably has those or similar |
| 22 | standards. |
| 23 | Q    Now, if you look at Exhibit 3, which is your |
| 24 | lawsuit complaint, if you turn to page 35, you see |
| 25 | Count 3 is called "Negligent Misrepresentation"? |

```
1     A    Yes.

2     Q    Do you know what that claim asserts?

3     A    I can do a laymen's reading of the terms.

4     Q    Well, I'm not asking you to read the document.

5     I'm really asking you do you have any understanding,

6     and I understand you are a layperson, not a lawyer,

7     but do you have any understanding of what the

8     negligent misrepresentation claim is asserting?

9     A    Again, if I read the document I can tell you

10    that it looks to me like negligent misrepresentation

11    includes things like -- no, I'd have to read it.

12    Q    Okay.  You can go ahead and read it.

13    A    Okay.

14         (Witness reviews document.)

15         Okay.  So I can see in paragraph 114 that the

16    expectation of a fair and unbiased process on the

17    merits that's obviously part of negligent

18    misrepresentation because the university said I would

19    have that and then did not get me one of those.

20    Q    Is there anything else that you feel the

21    university represented you would have or be entitled

22    to but you didn't get?

23              MR. PARENTEAU:  Object to the form of the

24    question.

25    A    I don't think I understand the question
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1   either.

2   BY MS. CHAVEY:

3       Q    So it sounds like what you said in your answer

4   just can a moment ago is that Yale made

5   representations to you that you would have a fair and

6   unbiased process, but you did not have a fair and

7   unbiased process; is that correct?

8       A    Yes.

9       Q    Is there anything else that Yale told you or

10  represented to you that you would have or be eligible

11  for that you ended up not getting --

12              MR. PARENTEAU:   Object to the form.

13  BY MS. CHAVEY:

14      Q    -- other than a fair an unbiased process?

15              MR. PARENTEAU:   Object to form.

16      A    I'm trying to run through the question in my

17  head.

18  BY MS. CHAVEY:

19      Q    Sure.

20      A    Well, they failed me at various steps, so they

21  failed to give me a fair and unbiased process, and

22  then they failed to review the unfair and biased

23  process, and they failed to prevent the retaliation.

24  I think that's what the question is, is it?

25      Q    Did anyone at Yale ever tell that you would

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1   get tenure?

 2      A    Yes.

 3      Q    Who told you that?

 4      A    Rolena and Roberto.

 5      Q    When did they tell you that?

 6      A    Prior to my speaking out.

 7      Q    When?  By year?  Month?  Date?  Occasion?

 8      A    I know that by the year 2012 my husband and I

 9   sold our place in New York City and bought a house on

10   the basis of I had just -- or I was getting promoted,

11   and Rolena was telling me I was doing everything

12   absolutely perfectly.

13          Rolena actually said on a number of occasions

14   that she was certain -- not certain.  Sorry.  I

15   should retract that.  That she was sure perhaps --

16   it's the same word -- that things were going

17   perfectly.

18          They never said anything to me that was

19   negative.  Everything was positive before I spoke

20   out.  After I spoke out everything turned negative.

21      Q    And, again, when you say this speaking out

22   kind of became the pivot point for how you were being

23   viewed that was starting with your conversation with

24   Ben Polak at Silliman College?

25      A    Mary Miller was how I see the start of it.
```

1   The Mary Miller was the beginning, then the APL, and

2   then there was more -- there were more requests from

3   the administration that I spoke out.

4        Again, I guess I would call that, in laymen's

5   terms, negligent misrepresentation.  I was told that

6   that those processes would not have a negative impact

7   on me, and that was literally in the documents, and

8   then I spoke out and guess what, there was a negative

9   impact.

10   Q   You're referring to the climate review and

11  Title 9 process?

12   A   Yes.

13   Q   Not the Yale Daily News conversation?

14   A   I didn't have any promise of anything from the

15  administration with the Yale Daily News story, no.

16   Q   So just going back to what you were saying, I

17  think what I understand was that Rolena made

18  statements to you about how well things were going as

19  you were leading up to your promotion to associate

20  professor on term?

21   A   Up to that point and after that point as well.

22  The only change was the starting to speak out.  The

23  rest of it everything I was doing was hunky-dory.

24   Q   And in --

25   A   I'm not sure I could spell that.

```
 1    that opens out onto ever larger vistas"?
 2        A    I read the plain language of the statement,
 3    and I know what that means, yes.
 4        Q    So what does it mean to you even though you
 5    didn't write it?
 6        A    It means literally what it says.
 7        Q    Okay.
 8        A    That the person who wrote this says they see a
 9    clear trajectory in my work.
10        Q    Okay.  And you don't really know what that --
11    withdrawn.
12             MS. CHAVEY:  Jim, please stop.
13             MR. PARENTEAU:  No, I'm not going to
14    stop.
15             MS. CHAVEY:  I'd like you to mark this.
16
17             (Defendant's Exhibit 8,
18             Unidentified document, was marked
19             for identification.)
20
21    BY MS. CHAVEY:
22        Q    I'm asking to you look at Exhibit 8 please.
23        A    (Witness reviews document.)
24        Q    Have you had a chance to look at Exhibit 8?
25        A    Yes, I have.
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1      Q    And you were unaware in September of 2013 that
2   Rolena Adorno was reporting to Mary Miller that she
3   had found -- she and Noël and Roberto had found your
4   APL proposal quite poor?
5      A    Did you say I was unaware?
6      Q    Yes.
7      A    Is that the question?
8           No, I was aware.  We spoke about that
9   proposal, the four of us.
10     Q    So you knew in September 2013 that Roberto,
11  Noël, and Rolena considered your proposal to be quite
12  poor?
13     A    They asked for a proposal in five-days' time.
14  I told them it would be sketchy because I had asked
15  that the proposal be postponed to the next year.
16  After I asked that, Rolena said okay, but then she
17  changed her mind and said, Give me a proposal in five
18  days, can you?  And I said, Well, it's going to be
19  sketchy because I was in the middle of the final
20  proofs for my third book.  So I said, I can do it,
21  but it's going sketchy, and she said, Okay.
22          And then I produced it, and they said, It's
23  sketchy.  Actually, Noël said, It's sketchy, but she
24  told us that it was going to be sketchy.  There were
25  three individual comments on the proposal.

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1                  MS. CHAVEY:  Can you read back my
 2     question please?
 3
 4                       (The following was read back by the
 5                        court reporter: Q) So you knew in
 6                        September 2013 that Roberto, Noël,
 7                        and Rolena considered your proposal
 8                        to be quite poor?)
 9
10     A     Yes.  I see that's what I answered, yes.  We
11     had a conversation about the proposal.
12     BY MS. CHAVEY:
13     Q     Okay.
14                  MS. CHAVEY:  Could you mark that please?
15
16                       (Defendant's Exhibit 9, E-mail from
17                        Susan Byrne to Paulo Moreira in
18                        August of 2014, was marked for
19                        identification.)
20                  ^
21     BY MS. CHAVEY:
22     Q     I'm showing you -- you can just pile those in
23     the middle the table here.
24     A     Okay.
25     Q     Thank you.
```

```
 1    in his office that morning.

 2        Q    How did you reject the love couch setup?

 3        A    I moved the pillow and didn't let him get

 4    close to me.

 5        Q    Okay.  And did you ever address this memo with

 6    him?

 7        A    Yes.

 8        Q    And tell me about that.

 9        A    I wrote a reply to it.

10

11                      (Defendant's Exhibit 12, Document

12                      prepared by Susan Byrne, dated

13                      October 18th, was marked for

14                      identification.)

15

16    BY MS. CHAVEY:

17        Q    I'm going to give you Exhibit 12 and ask you

18    to confirm that that is the reply that you wrote?

19        A    Yes, it is.

20        Q    And you wrote it the same day that you saw

21    Roberto's memo?

22        A    The date is the day after.  His memo says

23    October 17th, and this is October 18th.

24        Q    So you wrote this document the day after you

25    received a copy of Roberto's memo?
```

```
 1      A    By the date -- I couldn't give you the exact
 2   hour that I wrote it, but by the date it's the next
 3   day, yeah.
 4      Q    And what was your purpose in writing this
 5   memo?
 6      A    I was responding to the memo that I had
 7   received the night before.  I got this one the 17th,
 8   something like seven or eight o'clock at night,
 9   something like that.
10      Q    What were you hoping to achieve by writing
11   this memo?
12      A    I wrote it to respond to his.
13      Q    For what end?
14      A    I hoped to respond to the garbage criticisms
15   in the October 17th memo with facts.
16      Q    Did you think you would persuade -- well,
17   withdrawn.
18           To whom did you send this memo?
19      A    To Roberto, Rolena, and Noël.  They were the
20   three on the committee.
21      Q    And did you think that you would persuade them
22   by writing a memo like this?
23      A    I don't know that persuasion was what I did.
24   I wrote it to respond to his.
25      Q    Just set the record straight?
```

```
 1
 2                          (Defendant's Exhibit 13, Letter
 3                          dated November 6, 2014 from Rolena
 4                          Adorno to Tamar Gendler, was marked
 5                          for identification.)
 6
 7   BY MS. CHAVEY:
 8      Q    Showing you Exhibit 13, I'm not going to ask
 9   you to read every page of that package, but I will
10   ask you to peruse it and see if it appears to you to
11   be the November 6, 2014 letter that Rolena Adorno
12   forwarded to Tamar Gendler regarding your APL
13   research proposal?
14      A    It's dated November 6th, and it says "Dear
15   Tamar," and I'm guessing from what you're saying it's
16   signed Rolena Adorno.
17      Q    And you see that Rolena included your October
18   18th letter with the package that she forwarded to
19   the dean?
20      A    Yes.
21      Q    And did you think that this third proposal
22   that's attached here was a strong proposal?
23              MR. PARENTEAU:   Object to the form.
24      A    This wasn't the third proposal.
25   BY MS. CHAVEY:
```

```
 1      Q    Okay.  Which one was this?

 2      A    This was the fall 2014 proposal.  The 2013 I

 3   don't recall consider a proposal, but yes, it was a

 4   proposal I prepared in five days.  This (indicating)

 5   was the proposal that I prepared in the fall, and I

 6   submitted sometime in September I think.

 7      Q    So if you look at the second page of Exhibit

 8   13 where the attachments are listed, it says,

 9   "Attachments see Professor Byrne's third revised

10   proposal," you would disagree with that

11   characterization?

12      A    Revised I would agree.  Third I would disagree

13   with.  Roberto asked me to do five things in that

14   meeting I had with him in the morning.  I did those

15   five things and sent them another proposal.  I think

16   afterwards I found a typo or an apostrophe missing or

17   something like that.  So she might be calling that a

18   third proposal, but to me it was all that same

19   proposal.

20      Q    And did you think your proposal which is

21   incorporated in Exhibit 13 was a strong proposal?

22      A    Yes, I did.

23      Q    And did you think that your proposal needed to

24   be a strong proposal in order to be accepted?

25               MR. PARENTEAU:  Object to form.
```

1           MR. PARENTEAU:  Four minutes according to
2    my calculation.
3           MS. CHAVEY:  Four minutes?
4           THE COURT REPORTER:  I need to figure it
5    out.  Just one minute.
6           Yes, it's six hours and 56 minutes.
7           MS. CHAVEY:  Okay.  All right.  Let's
8    take a break.
9
10          (Off the record from approximately
11           6:11 p.m. to 6:14 p.m.)
12
13    A    Can I add one thing to what you asked me about
14    the speaking to Paulo?  I did speak to members of his
15    office, Stephanie Spangler.
16    BY MS. CHAVEY:
17    Q    So you know that Howard Bloch expressed views
18    about the quality of your scholarship?
19    A    No, I don't know that.
20    Q    So you don't know -- if he expressed an
21    opinion what the opinion was?
22    A    No, I don't.
23    Q    Would you have any reason to see that his
24    opinion was forced or pressured by anyone else?
25    A    I wouldn't have any information to make such

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1   an inference, no.
 2      Q    I mean you don't know him to be the kind of
 3   person who would express a view that was not his own
 4   just to go along with the crowd or something like
 5   that?
 6      A    I don't know --
 7             MR. PARENTEAU:  Object to form.
 8             THE WITNESS:  Sorry.
 9      A    I don't know him well enough to make any kind
10   of statement like that.  My contact with him is
11   fairly minimal.
12             MS. CHAVEY:   I don't have anything
13   else.
14             MR. PARENTEAU:  Okay.
15
16             (Deposition concluded at
17              approximately 6:15 p.m.)
18
19
20
21
22
23
24
25
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1                    CERTIFICATION

2         I, ANNETTE F. BROWN, LSR and Notary Public within
     and for the State of Connecticut, do hereby certify
3    that I took the deposition of SUSAN BYRNE, on October
     19, 2018.
4
          I further certify that the above-named deponent
5    was by me duly sworn to testify to the truth, the
     whole truth and nothing but the truth concerning
6    his/her knowledge in the matter of the case of, BYRNE
     v. YALE UNIVERSITY.
7
          I further certify that the testimony was taken by
8    me stenographically and reduced to typewritten form
     under my direction by means of COMPUTER ASSISTED
9    TRANSCRIPTION; and I further certify that said
     deposition is a true record of the testimony given by
10   said witness.

11        I further certify that I am neither counsel for,
     related to, nor employed by any of the parties to the
12   action in which this deposition was taken; and
     further, that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto,
     nor financially or otherwise interested in the
14   outcome of the action.

15        WITNESS my hand and my seal this 2nd day of
     November, 2018.
16

17

18

19

20

21
          Annette Brown, LSR No. 00009
22        Notary Public
          My Commission Expires:
23        November 30, 2019

24

25

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| 1 | JURAT |
|---|---|

2

3

4   I, SUSAN BYRNE, do hereby certify that the foregoing
    testimony given by me on October 19, 2018, is true
5   and accurate, including any corrections noted on the
    corrections page, to the best of my knowledge and
6   belief.

7

8

9

10

11
                                SUSAN BYRNE

12   State of Nevada
     County of Clark

13

     At Henderson, NV    in said county of Clark
14   this 7th day of December   , 2018, personally
     appeared, SUSAN BYRNE, and she made oath to the truth
15   of the foregoing corrections by her subscribed.

16

17

18   Before me, Frank L. St. Germain   , Notary Public.

19

20   My Commission Expires: June 11, 2022

21

22
                        FRANK L. ST. GERMAIN
23                 Notary Public - State of Nevada
                         County of Clark
                       APPT. NO. 18-3336-1
24                 My App. Expires June 11, 2022

25

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| | | | | |
|---|---|---|---|---|
| 1 | TRANSCRIPT CORRECTIONS | | | |
| 2 | REPORTER:  ANNETTE BROWN | | | |
| 3 | | | | |
| 4 | CASE STYLE:  BYRNE v. YALE UNIVERSITY | | | |
| 5 | | | | |
| | PAGE | LINE | CORRECTION | REASON |
| 6 | | | | |
| 7 | 10 | 1 | "was" should be "were" | transcription error |
| 8 | 21 | 13 | "No, I don't know" should read "No, I don't, no. | emphatic no, not lack of knowledge |
| 9 | | | | |
| 10 | | | | |
| 11 | 22 | 2 | delete "of" to read "heard her say" | transcription error |
| 12 | | | | |
| 13 | 22 | 13 | "Simms" should be SIMS | transcription error - the email reads SIMS |
| 14 | | | | |
| 15 | 24 | 6 | "list" should be plural "lists" | transcription errors |
| 16 | 24 | 21 | University should be capital | |
| 17 | 24 | 22 | University should be capital | |
| 18 | | | | |
| 19 | 27 | 7 | delete "is" to read "it was Roberto..." | transcription error |
| 20 | | | | |
| 21 | 31 | 10 | Add prior to existing text to read in full: In Fall 2014, I told department donor | remembered further episodes of speaking out prior to this one |
| 22 | | | Jaime Yordán what Roberto had said to | |
| 23 | | | me in August 2014, and I went to the | |
| 24 | | | FAS Dean's office to complain about | |
| 25 | | | mistreatment over my APL proposal. After that was the Yale Daily News reporter. | |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| | | | | |
|---|---|---|---|---|
| 1 | TRANSCRIPT CORRECTIONS | | | |
| 2 | REPORTER:  ANNETTE BROWN | | | |
| 3 | | | | |
| 4 | CASE STYLE:  BYRNE v. YALE UNIVERSITY | | | |
| 5 | | | | |
| 6 | PAGE | LINE | CORRECTION | REASON |
| 7 | 32 | 23 | insert comma after the word make, | transcription-punctuation |
| 8 | | | | |
| 9 | 36 | 2 | Delete "No." Insert "Not in person. We did have a follow-up phone call" | remembered that detail |
| 10 | | | | |
| 11 | 38 | 12 | Add after existing text: , but she did tell him what Anibal had said to her in confidence. I heard that sitting outside her office. | remembered that detail |
| 12 | | | | |
| 13 | | | | |
| 14 | 38 | 20 | Add after existing text: , but she did tell him what Anibal had said to her. | remembered that detail |
| 15 | | | | |
| 16 | 44 | 7 | [Add prior to existing text]:  In January and March 2015, I continued to speak out to the Dean's office about the problems with the department and my APL leave. Rolena saw that as a challenge to her authority, and she resented it. Then in April 2015, I requested a minor change to how the department reviewed graduate student prospectuses, and both Rolena and Noel resisted that request. [pick up with existing text, in full as is, no changes to existing] | remembered more detail about episodes of speaking out |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | 44 | 13 | "reporters" should be "attorneys" | I misspoke |
| 24 | | | | |
| 25 | 55 | 16 | invert "numerous to" to read "to numerous" | transcription error |

```
1    TRANSCRIPT CORRECTIONS

2    REPORTER:  ANNETTE BROWN

3

4    CASE STYLE:  BYRNE v. YALE UNIVERSITY

5
     PAGE      LINE       CORRECTION             REASON
6

7    55        24         "when" should be "what"    transcription error

8
     55        25         "let" should be "led"      transcription error
9

     57        24         Replace existing text: The    remembered
10                        Climate Review Report makes    more detail

11                        clear that they did ask him about
                          sexual harassment, touching, etc.
12                        Also, a later letter from Kate
                          Stith to Yale's General Counsel
13                        mentions that in a meeting
                          between Kate, Roberto, Rolena,
14                        Noel and maybe Kate's husband
                          Judge Jose Cabranes, who was
15                        also copied on the email, that
                          they were told about various
16                        accusations of sexual harassment
                          in a meeting they had with the
17                        administration. I was literally the
                          only person referenced in that
18                        Climate Review Report as having
                          experienced Roberto's unwanted
19                        attention in that way. Everyone
                          else asked for anonymity, but
20                        they used my name in that
                          Report, to reference specifically
21                        what I told them about the acts
                          of sexual harassment and
22                        bullying.

23

24

25
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| 1 | TRANSCRIPT CORRECTIONS |
|---|---|
| 2 | REPORTER:  ANNETTE BROWN |
| 3 | |
| 4 | CASE STYLE:   BYRNE v.  YALE UNIVERSITY |

| | PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|---|
| 7 | 59 | 10 | insert "the" to read "the next year" | I misspoke - my error |
| 8 | 61 | 21 | pantomime - both 'm' | transcription error |
| 10 | 65 | 4 | insert "of" to read "two of them" | transcription error |
| 11-19 | 70 | 6 | Add to read: Yes, also in May 2015, I told Associate Dean John Mangan, who had been involved with the APL process, that Rolena had blamed me for the anonymous letter, and that she had gotten mad and yelled at me over it. I told him things were getting worse in the department. He had been the first person in the Dean's office that I had spoken with about the APL, right after the Oct. 2014 flip-flop in attitudes on my work, and the meeting with Roberto and the love couch episode. | remembered more episodes of speaking out |
| 21-25 | 70 | 12 | Add to read: Yes, in November-December 2015, I tried to keep Rolena and Noel from disenfranchising students on the Graduate Studies Committee. That involved emails between the Graduate School, the committee members, and Yale's General Counsel Harold Rose. Rolena and Noel got irate. Then there was the Title IX process. | remembered more details and episodes |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| | | | | |
|---|---|---|---|---|
| 1 | TRANSCRIPT CORRECTIONS | | | |
| 2 | REPORTER:   ANNETTE BROWN | | | |
| 3 | | | | |
| 4 | CASE STYLE:   BYRNE v. YALE UNIVERSITY | | | |
| 5 | | | | |
| 6 | PAGE | LINE | CORRECTION | REASON |
| 7 | 71 | 4 | "le, le, le, le" should read: bla, bla, bla, bla | transcription error |
| 8 | | | | |
| 9 | 77 | 25 | Add after existing text: Later Spangler told the internal appeals committee working on my tenure appeals that she was recused from that process because she was working with me on the Title IX process. | remembered more detail |
| 10 | | | | |
| 11 | | | | |
| 12 | 81 | 19 | delete the word "before" | transcription error |
| 13 | | | | |
| 14 | 84 | 12 | Add after existing text: I sent Miriam an email after our last meeting | remembered this detail |
| 15 | | | | |
| 16 | 84 | 19 | Harkema | transcription error |
| 17 | 87 | 7 | University should be capital | |
| 18 | 87 | 8 | University should be capital | transcription |
| 19 | 88 | 5 | Delete "be" to read "able to say" | errors |
| 20 | | | | |
| 21 | 89 | 20 | Add after existing text: , and in Yale's discovery, Rolena specifically says that Title IX Officer Valarie Stanley told her about accusations against Roberto even before they were filed. | remembered this detail |
| 22 | | | | |
| 23 | | | | |
| 24 | 90 | 17 | Add after existing text: , except for what I've read in the discovery Yale has sent. The Title IX office was informing her all the time. | remembered more precise detail |
| 25 | | | | |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| 1 | TRANSCRIPT CORRECTIONS |
| 2 | REPORTER:  ANNETTE BROWN |
| 3 | |
| 4 | CASE STYLE:  BYRNE v. YALE UNIVERSITY |
| 5 | |

| | PAGE | LINE | CORRECTION | REASON |
|---|------|------|------------|--------|
| 6 | 90 | 25 | Add after existing text: Rolena would have told Noel and Roberto whatever Valarie Stanley was telling her. Plus, in mid-January 2015, all ladder faculty in the department had to attend a sexual harassment refresher course. During that session, I spoke out about the various scenarios as they were presented. Rolena got irate at what I was saying. Also, right around the same time, I contributed comments to an open-source request the Provost and President had made, about problems in ethical standards of conduct for faculty, and the need for procedures to address them. I signed that openly, as well. Then, in February and just before my tenure vote, another reporter from the YDN spoke with me, and quoted me in a story published just before the tenure vote. Rolena also hated it if anyone spoke to those reporters. | remembered more detail |
| 22 | 91 | 9 | Add after existing: , but Yale's discovery does seem to show that Miriam Berkman told Kate Stith what I had told Miriam, and Kate was passing all that information on to Rolena, Roberto and Noel - as well as her husband, Judge Jose. | remembered more detail |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| | | | | |
|---|---|---|---|---|
| 1 | TRANSCRIPT CORRECTIONS | | | |
| 2 | REPORTER:   ANNETTE BROWN | | | |
| 3 | | | | |
| 4 | CASE STYLE:   BYRNE v. YALE UNIVERSITY | | | |
| 5 | | | | |
| 6 | PAGE | LINE | CORRECTION | REASON |
| 7 | 101 | 22 | "as" should be "is" | transcription error |
| 8 | 104 | 12 | "two" should be "too" | transcription error |
| 9 | | | | |
| 10 | 114 | 14 | Delete "No" - should read: "Not all of them" | precision on detail |
| 11 | | | | |
| 12 | 116 | 25 | Add after existing text: After my tenure was denied, I spoke with various persons to find out how to appeal that injustice within Yale. I wrote to ask about filing a complaint with the University Tribunal (those go to the President), and I spoke with various members of the Faculty Senate: Katie Trumpener, Emily Greenwood, Bill Nordhaus. Greenwood told me I should also speak with Stephanie Spangler, so I had another meeting with her about retaliation and intimidation in the Department. All of those people, though, told me that I needed to file the appeal with the Provost, that that was the only way to contest the injustice. | remembered more speaking out, after the tenure vote but prior to the final provost decision |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | 124 | 8 | "The it was" should be "It was the" | transcription error |
| 24 | 126 | 15 | "corporation counsel" should read "General Counsel" | I misspoke |
| 25 | 126 | 16 | "corporation counsel" should read "General Counsel" | name of office |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| | | | |
|---|---|---|---|
| 1 | TRANSCRIPT CORRECTIONS | | |
| 2 | REPORTER:  ANNETTE BROWN | | |
| 3 | | | |
| 4 | CASE STYLE:  BYRNE v. YALE UNIVERSITY | | |

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 127 | 3 | "work out things" should be "work things out" | transcription error |
| 127 | 17 | delete the first instance of "when" to read: "said that day when..." | transcription error |
| 129 | 24 | "An" should be "In" | transcription |
| 131 | 1 | "It's'" should be "It" - not possessive | errors |
| 131 | 10 | "You're" should be "Your" | transcription error |
| 131 | 19 | Should read: "I don't think 'I want to be your colleague,' I think, 'I want this position.'" | embedded quote got lost |
| 135 | 5 | insert comma after me, | transcription errors |
| 135 | 6 | change "informed" to "inform the" | |
| 137 | 19 | insert "formally" to read: "she did not formally act..." | precision detail |
| 138 | 23 | Add after existing text: Also, the departmental committee did not select the external letter writers, as the document says they should have. They did even have any meetings until January, 2016. | remembered another detail |
| 142 | 7 | the first instance of "writing" should be "reading" - to read "reading and writing..." | transcription error |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
1    TRANSCRIPT CORRECTIONS

2    REPORTER:  ANNETTE BROWN

3

4    CASE STYLE:  BYRNE v. YALE UNIVERSITY

5
```

| | PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|---|
| 6 | | | | |
| | 142 | 17 | spelling should be no H | transcription error |
| 7 | | | | |
| 8 | 146 | 23 | "gon" should be "gone" | transcription error |
| 9 | 147 | 17 | "kit" should be "it" | transcription error |
| 10 | | | | |
| | 147 | 19 | "complaint" should be "complained" | transcription error |
| 11 | | | | |
| 12 | 148 | 22 | insert "what" to read: "Not apart from what Yale's..." | transcription error |
| 13 | | | | |
| 14 | | | | |
| | 151 | 24 | insert "an" before "updated" | transcription error |
| 15 | | | | |
| 16 | 153 | 25 | "Scribner's" should be "scrivener's" | transcription error |
| 17 | | | | |
| | 154 | 19 | "to" should be "in" | transcription error |
| 18 | | | | |
| 19 | 154 | 23 | "locks" should be "looks" | transcription error |
| 20 | 156 | 4 | insert "a" before "department" | I misspoke |
| 21 | | | | |
| | 160 | 7 | "saying" should be "say" | transcription error |
| 22 | | | | |
| 23 | 161 | 4 | insert "to" to read "disclose it to you" | transcription error |
| 24 | 166 | 18 | delete "the" | transcription errors |
| 25 | 166 | 19 | insert "and" after "philosopher" | |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

| 1 | TRANSCRIPT CORRECTIONS |
| 2 | REPORTER:  ANNETTE BROWN |
| 3 | |
| 4 | CASE STYLE:  BYRNE v. YALE UNIVERSITY |
| 5 | |

| | PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|---|
| 6 7 8 9 10 11 12 13 14 | 167 | 21 | Add after existing text: , and from the Office of the General Counsel, Harold Rose, who did make them recuse themselves as the Climate Review was going on, but then failed to do so even after the Climate Review Report came in, with my name in that Report as the only one who spoke on the record about Roberto's sexual bullying, and with all the very obvious references in that Report to Rolena's retaliation against me, and against others. | remembered more precise detail |
| 15 16 | 180 | 4 | "being" should be "Foulcaultian" | transcription - theoretical term |
| 17 | 184 | 8 | first word "associate" should be "assistant" | transcription error |
| 18 19 | 184 | 10 | "make tenure" should read "make "tenured" | transcription error |
| 20 | 184 | 14 | delete "have" | transcription error |
| 21 | 185 | 3 | "understand" should be "understood" | transcription |
| 22 | 187 | 23 | Cervantista - "i" not "e" | errors |
| 23 24 | 190 | 9 | "latter" should be "ladder" | transcription - Yale terminology |
| 25 | 191 | 6 | "student's" should be plural: "students' " | transcription error |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
1    TRANSCRIPT CORRECTIONS

2    REPORTER:  ANNETTE BROWN

3

4    CASE STYLE:  BYRNE v. YALE UNIVERSITY

5
```

| PAGE | LINE | CORRECTION | REASON |
|------|------|-----------|--------|
| 192 | 16 | "come" should be "go" | I misspoke |
| 193 | 2 | "American" should be "one" | transcription error |
| 196 | 4 | "Rolena and Roberto or Roberto" should read "Rolena and Roberto, or when Roberto" | I misspoke, or garbled this |
| 197 | 17-18 | should read "Their report says, 'she says they did; they say they didn't'." | embedded quote got lost without punctuation |
| 198 | 18 | Cervantista | |
| 198 | 21 | Cervantista | transcription |
| 198 | 25 | Cervantista | errors |
| 204 | 19 | insert comma after office, | precision |
| 205 | 5 | "students" should be "junior professors" | I misspoke |
| 211 | 4 | SUNY should be CUNY | reference to City U of NY |
| 212 | 14 | Celestina | |
| 212 | 20 | Celestina | transcription errors |
| 219 | 3 | "spoke" should be "speak" | transcription errors |
| 220 | 5 | Cervantista | |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1    TRANSCRIPT CORRECTIONS

 2    REPORTER:  ANNETTE BROWN

 3

 4    CASE STYLE:  BYRNE v. YALE UNIVERSITY

 5
```

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 221 | 12 | insert "as" to read "... as I said" | transcription error |
| 222 | 3 | Cervantista | transcription error |
| 232 | 8 | "see" should be "think" | I misspoke |
| 233 | 3 | insert "to" and correct spelling to read "... go forward to the Celestina" | transcription error |
| 233 | 4 | Celestina | transcription error |
| 233 | 7 | "stopped" should be "started" | I misspoke |
| 233 | 10 | Mio should be lower case mío | Spanish orthography |
| 233 | 13 | lower case for mío, libro, buen, amor | Spanish orthography |
| 233 | 14 | "has also as" should read "also has" - delete the first has, add 'h' to "as" | transcription error |
| 233 | 18 | delete "it" and add "in" to read: ... before. Theory in the..." | transcription error |
| 234 | 4 | "sill" should be "still" | transcription error |
| 235 | 20 | delete "with" | transcripion error |
| 238 | 16 | insert comma after before, | transcription punctuation |

```
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

1    TRANSCRIPT CORRECTIONS

2    REPORTER:   ANNETTE BROWN

3

4    CASE STYLE:   BYRNE v. YALE UNIVERSITY

5

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 240 | 15 | Add after existing text: , and to defend my work. | remembered more precise detail |
| 243 | 3 | "recall" should be "really" | transcription error |
| 247 | 9 | "were" should be "with" | transcription error |
| 250 | 10 | "rank" should be plural "ranks" | transcription error |
| 252 | 11 | should read ...says, "Thanks..." | embedded quote |
| 253 | 13 | should be possessive - group's | transcription error |
| 254 | 3 | question should be plural questions | transcription error |
| 254 | 10 | delete "Your" | transcription - original text quoted from does not include that word |
| 254 | 19-20 | "that that what's" should read "that that's what" | transcription error |
| 258 | 21 | insert "word" at the end of the line | I misspoke, or transcription |
| 267 | 6 | "Midlevel" should be "Medieval" | transcription error |
| 267 | 17 | insert "of" to read "lot of effort" | transcription error |
| 269 | 20 | insert "that" to read "something like that" | transcription errors |
| 275 | 11 | "there's" should be "there are" | |
| 285 | 16 | insert "I" to read "I did not want..." | transcription error |

SUSAN BYRNE vs YALE UNIVERSITY
Susan Byrne on 10/19/2018

```
 1    TRANSCRIPT CORRECTIONS

 2    REPORTER:  ANNETTE BROWN

 3

 4    CASE STYLE:  BYRNE v. YALE UNIVERSITY

 5
      PAGE       LINE        CORRECTION              REASON
 6
 7    288        1           last word on the line should    specific document
                             be "the" instead of "a"
 8

 9    288        13          Replace existing with: I did    more precise detail
                             not do so formally, no.
10

11    290        15          "latter" should be "ladder"     transcription error

12
      293        14          "Paulo" should be "Polak"       transcription error-
13                                                           this is a different
                                                             person
14

15

16

17

18

19

20

21

22

23

24                          NAME:  Susan Byrne
                            DATE:  December 7, 2018
25
```