```
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3    * * * * * * * * * * * * * *
      SUSAN BYRNE,                    )
 4                                    )
                  Plaintiff,          )
 5                                    )  Civil Action No.
           -vs-                       )  3:17-CV-01104 (VLB)
 6                                    )
      YALE UNIVERSITY, INC.,          )
 7                                    )
                  Defendant.          )
 8    * * * * * * * * * * * * * *

 9

10

11

12

13        DEPOSITION OF:   ROBERTO GONZÁLEZ ECHEVARRÍA

14        DATE:        DECEMBER 14, 2018

15        HELD AT:     MADSEN, PRESTLEY & PARENTEAU, LLC
                       402 Asylum Street
16                     Hartford, Connecticut   06103

17

18

19        Reporter: Bethany A. Carrier, RMR, CRR, CSR #071

20

21

22

23
                       CASSIAN REPORTING, LLC
24                  21 Oak Street - Suite 307
                    Hartford, Connecticut 06106
25                      (860) 595-7462
                  scheduling@cassianreporting.com
```

1    Q    In the fifth paragraph of your letter, on the
2    second page of the document -- so it's the last paragraph
3    on page Bates No. 5105.
4    A    Yes.
5    Q    You start that paragraph by saying, Susan's
6    forthcoming book project on Ficino in Spain is ambitious
7    in scope and depth.  I believe that it will become the
8    standard book on the topic for years to come and that it
9    will have an impact on scholarship both in the United
10   States and Europe.
11        Do you see where I'm reading from?
12   A    Yes.  I was wrong.  I was wrong in my prophecy
13   there.  I was wrong in my prophecy.
14   Q    And then in a couple more sentences down from
15   that sentence that I read, the middle of the paragraph,
16   you say, I would like to begin by praising the
17   concreteness of her research.  Her studies are always
18   based on solid textual evidence that she gathers from
19   original sources.
20        Do you see where I'm reading from?
21   A    Yes, I do.
22   Q    Was that also wrong?
23   A    No.  That is right.  I mean, I would say now
24   that she focuses too much on the marginalia and bases too
25   much of her interpretations on an accumulation of details

1  because the course is free on YouTube.

2         So I do look at my emails, but I am not attached

3  to them as some people that I know are.

4      Q    Would you say that you check your email daily?

5      A    Yes.

6         MS. HOWARD:  Mark this 28.

7         (Plaintiff's Exhibit 28, Letter,

8  October 17, 2014:  Marked for identification.)

9  BY MS. HOWARD:

10     Q    You've been handed what's been marked Exhibit

11 28.

12        MS. HOWARD:  I am sorry, Tori, I do

13 not have an extra copy.  It's the October 17th

14 letter that Professor González wrote to

15 Professor Adorno.

16        MS. CHAVEY:  May I take a look,

17 Professor?  Thank you.

18        MS. HOWARD:  Take a brief moment for

19 you to look at it, Tori.  I'm sorry.  I do

20 have a copy.  I don't know why I didn't see it

21 sitting there.  Too many documents stacked up.

22 BY MS. HOWARD:

23     Q    So you've had a moment to look at Exhibit 28?

24     A    Yes.

25     Q    And do you recognize this document?

| | | |
|---|---|---|
| 1 | A | Yes, I do. |
| 2 | Q | And this is an October 17th letter that you |
| 3 | wrote to Professor Adorno.  Correct? | |
| 4 | A | An email, yes. |
| 5 | Q | And this is after you met with Sue Byrne, it |
| 6 | says at the beginning of your letter -- | |
| 7 | A | Yes. |
| 8 | Q | -- in the morning? |
| 9 | A | Yes. |
| 10 | Q | And did Professor Adorno write you -- ask you to |
| 11 | write this letter? | |
| 12 | A | No.  I had been asked by them to communicate to |
| 13 | Sue Byrne our objections to her proposal.  And I went -- | |
| 14 | we went to my office and I went over them with her.  And I | |
| 15 | decided to write this as a record, since I had been | |
| 16 | deputized to do that because they were not present, which | |
| 17 | is why I wrote to Professor Adorno.  Yes. | |
| 18 | Q | So you decided to write this letter? |
| 19 | A | Yes.  This email. |
| 20 | Q | Had you ever me alone with Professor Byrne in |
| 21 | the past? | |
| 22 | A | I'm sure we have. |
| 23 | Q | And did you ever write letters documenting those |
| 24 | meetings with Professor Byrne? | |
| 25 | A | Yes.  But not a meeting like this that was as a |

```
 1   committee member to explain to her our objections.  If
 2   you're saying in general have we ever met?  Yeah, sure.
 3   At one point or another we must have met in her office, in
 4   mine.  We had a friendly relationship.
 5        Q    So this is the only time that you've written a
 6   letter documenting meeting with Professor Byrne.  Is that
 7   correct?
 8        A    Yes.
 9        Q    And who deputized you to convey the committee's
10   comments to Sue Byrne?
11             MS. CHAVEY:  Objection.  Go ahead.
12             THE WITNESS:  My two colleagues,
13        Noël Valis and Adorno.
14   BY MS. HOWARD:
15        Q    And when did you actually write this letter?
16   Was it on the same day?
17             MS. CHAVEY:  Objection.
18             THE WITNESS:  I can't remember.
19   BY MS. HOWARD:
20        Q    Was the word "deputized" used by Professor
21   Adorno?
22        A    No, no.  I am using it here now.
23        Q    How did you come up with the word deputized?
24        A    Out of my own English vocabulary.  I was asked
25   by these two colleagues to do this and I called that
```

1   request with Professor Stith?

2       A    I don't recall doing it, but maybe I did.  I
3   don't remember.

4       Q    And did you discuss Sue Byrne's recusal request
5   with Professor Valis?

6       A    No.

7       Q    Tell me about your -- tell me about your
8   discussion -- your first discussion with Professor Adorno
9   about Sue Byrne's recusal request.

10              MS. CHAVEY:  Objection.  Go ahead.

11              THE WITNESS:  No.  We discussed it
12       and decided to say no.

13  BY MS. HOWARD:

14      Q    Did you and Professor Adorno talk about writing
15  a letter together to convey this refusal to recuse
16  yourselves?

17      A    No.  I think she wrote a letter.

18      Q    Did you review the letter that Professor Adorno
19  wrote before she sent it out?

20      A    I assume I did, but I can't recall.

21      Q    But you did not write a letter?

22      A    No.  Not myself, no.

23      Q    Why not?

24      A    I didn't feel that I had to if Professor Adorno
25  was doing it.

1  apply to the Department of Spanish and Portugese?
2                  MS. CHAVEY:  Objection.
3                  THE WITNESS:  I'm sure it applies to
4       the whole university.
5  BY MS. HOWARD:
6        Q     Including the department you work within?
7        A     Both departments that I work for.
8        Q     I'm just going to hand you Plaintiff's Exhibit
9  15.  I don't have questions about the substance of the
10 letter.  I just want to have you confirm that this was the
11 recusal request that you received?
12       A     You gave me two copies here.
13       Q     Oh.  Can you please hand a copy to Attorney
14 Chavey.
15             This was previously marked Plaintiff's Exhibit
16 15.  This is a letter from April 1, 2015, from Sue Byrne
17 to Professor Adorno, and you are copied on the letter.
18 And I just would like for you to confirm that this is the
19 recusal request --
20       A     Yes.  It looks like it.  Yes.
21       Q     -- you received.
22                  (Plaintiff's Exhibit 31, Letter,
23       April 13, 2015:  Marked for identification.)
24 BY MS. HOWARD:
25       Q     All right.  Sir, you have been handed what's

1  been marked Plaintiff's Exhibit 31. That is a letter from
2  Professor Adorno to Sue Byrne dated April 13, 2015. Is
3  that correct?
4        A   Excuse me. I was reading. I didn't hear your
5  question.
6        Q   Let me know when you're done reading Exhibit 31.
7        A   Yes.
8        Q   So have you seen Exhibit 31 before?
9        A   I don't recall, but --
10       Q   Do you recognize Exhibit 31?
11       A   Yes.
12       Q   And this is the letter from Professor Adorno to
13  Sue Byrne denying her recusal request. Correct?
14       A   I understand that Dean Miller also wrote a
15  letter about this.
16       Q   Dean Mary Miller?
17       A   Yes.
18       Q   What letter did Dean Miller write about the
19  recusal request?
20       A   I think that she replied to Rolena Adorno
21  agreeing with her not to recuse ourselves.
22       Q   And did you get a copy of this letter from Dean
23  Miller from Professor Adorno?
24              MS. CHAVEY:  Objection.
25  BY MS. HOWARD:

```
 1   BY MS. HOWARD:
 2       Q    Sir, you've been handed what's been marked
 3   Exhibit 43.  My question is very simple, which is whether
 4   this is your handwriting -- whether these are your
 5   handwritten notes?
 6       A    Yes, it is my handwriting.
 7       Q    If you can read your handwriting, to read your
 8   notes in the record, I would appreciate it.  But only if
 9   you're able to read the copy that I've given to you.
10       A    The whole thing?
11       Q    Let's start with the first two paragraphs and
12   see.
13       A    I don't think that Sue Byrne is tenurable at
14   Yale because of the poor quality of her work, which shows
15   that hers is an ordinary mind lacking critical insight and
16   sophistication.
17            I have always thought that her Cervantes book
18   was not very good; that it ultimately hinged on a minor
19   trouver -- meaning a find in French -- revealing her
20   essentially positivistic approach to scholarship.  There
21   is no hermeneutical energy in the book, as there isn't in
22   any of her work.  It is also like the rest of her work:
23   very poorly written.  She has a penchant for clichés,
24   malapropisms, and very inelegant turns of phrase.
25       Q    If you wouldn't mind continuing on to the next
```

1  paragraph, please.  It's a little difficult to read your
2  handwriting, sir, which is why I'm asking you to read it.
3      A    Please.  I'm offended.
4           The Ficino book has its point of departure --
5  has as its point of departure a strawman that Ficino was
6  excised -- her word -- from early modern Spanish literary
7  history by the judgment of Marcelino Menéndez y Pelayo,
8  M-a-r-c-e-l-i-n-o, first name, Menéndez, M-e-n-é-n-d-e-z,
9  and next word is y, next word is P-e-l-a-y-o.  But only
10 someone far from the study of Spanish literature could
11 believe that since -- could believe that.
12          Since the generation of '98 -- it's a group of
13 writers who wrote in the wake of the defeat of Spain by
14 the Americans in the Spanish-American War.  Since the
15 generation of '98, Menéndez y Pelayo has been the bête
16 noire -- French is one of my languages and I use French
17 words.  Bête noire, bête with a circumflex on the first
18 "e," noire, n-o-i-r-e -- of Spanish criticism.  Rejection
19 of him has been the starting point of much work.  He is a
20 joke.  Not a Gustave Lanson, G-u-s-t-a-v-e with an "e" at
21 the end, Lanson, L-a-n-s-o-n.  He was the great historian
22 of French literature.
23          Menéndez y Pelayo was very nationalistic,
24 Catholic, and conservative.  Spanish criticism has been,
25 on the whole, liberal.  He has been the object of scorn.

```
 1    It is curious that Menéndez y Pelayo would have preferred
 2    Leone Hebreo, L-e-o-n-e, H-e-b-r-e-o, a Jew, over Ficino,
 3    a Catholic priest, as the most influential neoplatonist.
 4    He was right, by the way.  Amicus plato sed magis amica
 5    veritas.  That's Latin meaning, I am the friend of Plato,
 6    but I am more of a friend of the truth.
 7                    THE WITNESS:  Do you want me to get
 8         you the latin spelling?
 9                    THE COURT REPORTER:  I'll get it
10         after.
11                    MS. HOWARD:  Actually, let's take a
12         five-minute break here.  I may have you read
13         the rest of it.  Let's take a five-minute
14         break.  And I do not think I have many
15         questions.  We're off the record.
16                    (Recess 4:24 p.m. to 4:35 p.m.)
17    BY MS. HOWARD:
18         Q    So off the record and actually you earlier
19    testified that Rolenda Adorno is no longer the chair of
20    the department.
21                    MS. CHAVEY:  Did you say we're off
22         the record?
23                    MS. HOWARD:  So I said, "Off the
24         record and actually earlier you testified."
25                    MS. CHAVEY:  I thought you said
```

```
 1                        STATE OF CONNECTICUT

 2        I, Bethany A. Carrier, RMR, CRR, CSR #071, a Notary

 3   Public, duly commissioned and qualified in and for the

 4   State of Connecticut, do hereby certify that pursuant to

 5   Notice, there came before me on the 14th of December,

 6   2018, the following-named person, to wit:   ROBERTO

 7   GONZÁLEZ ECHEVARRÍA, who was by me duly sworn to testify

 8   to the truth and nothing but the truth; that he was

 9   thereupon carefully examined upon his oath and his

10   examination reduced to writing under my supervision; that

11   this deposition is a true record of the testimony given by

12   the witness.

13        I further certify that I am neither attorney nor

14   counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is taken,

16   and further that I am not a relative or employee of any

17   attorney or counsel employed by the parties hereto, or

18   financially interested in this action.

19        IN WITNESS THEREOF, I have hereunto set my hand

20   this 2nd day of January, 2019.

21                                     [signature]

22

23                        _____
                          Bethany A. Carrier, RMR, CRR, LSR #071
                                      Notary Public
24
     My Commission Expires:
25   October 31, 2023
```