```
 1                   UNITED STATES DISTRICT COURT
                              for the
 2                    DISTRICT OF CONNECTICUT

 3      _____

        SUSAN BYRNE,                       )
 4                                         )
                         Plaintiff,        )CIVIL CASE NO.:
 5                                         )3:17-cv-01104-VLB
        v.                                 )
 6                                         )
        YALE UNIVERSITY,                         )
 7                                         )
                         Defendant,        )
 8      _____         )

 9

10

11        VIDEOTAPED DEPOSITION OF RALPH HOWARD BLOCH

12                        (Confidential)

13      DATE:            February 28, 2019

14      TIME:            10:13 a.m.

15      HELD AT:         Yale University Office
                         of General Counsel
16                       2 Whitney Avenue
                         6th Floor
17                       New Haven, Connecticut

18        By:            Sarah J. Miner, RPR, LSR #238
                         Huseby Global Litigation
19                       249 Pearl Street
                         Hartford, Connecticut
20

21

22

23

24

25
```

Confidential

```
 1        A. No.
 2        Q. So you said that you served on the
 3   Appointments and Tenure Committee for the Humanities?
 4        A. (Witness nods head, yes.)  Uh-huh.
 5        Q. So we just want to make sure we got --
 6           MS. CHAVEY:  Did you get the answer?
 7           THE COURT REPORTER:  I got the nod yes.
 8   BY MS. CHAVEY:
 9        Q. Okay.  Was your answer yes?
10        A. To what?
11        Q. You said that you were a member of the
12   Appointments and Tenure --
13        A. Oh, yes.  Yes.
14        Q. -- Committee for the Humanities?
15        A. Yes.
16        Q. And can you just briefly describe what the
17   function of that committee is?
18        A. Well, that committee, which consists of a
19   number of people, usually I think seven or eight, from
20   different departments, receives the materials of a
21   candidate for promotion.  I should say that the
22   function has changed slightly now.  But at the time,
23   receives all the materials of a person who comes up
24   for tenure or for initial tenured employment.
25           Since there are two ways to go to tenure,
```

```
 1   either from within the university or as an outside
 2   appointment.  Receives all the materials, all the
 3   reading material, and as well receives the
 4   departmental vote, and is supposed to be there as a
 5   kind of gatekeeper for the university in matters of
 6   tenure above the departmental level.
 7           And in that committee, everybody reads a
 8   portion of the candidate's scholarship.  And one
 9   person reads everything and makes a report.  And then
10   there is an elaborate discussion, a thorough
11   discussion among the committee members and with the
12   department chair.
13           And on the basis of those informations, then
14   a vote is taken and it is forwarded at that point to
15   the whole faculty, which in the ceremonious way votes,
16   and finally the corporation ratifies.
17       Q. And what happens if the vote in the Tenure
18   and Appointments Committee for the Humanities is
19   unfavorable to the candidate, does the case advance?
20       A. No.
21       Q. And at the time you were serving on the
22   Tenure and Appointments Committee for the Humanities,
23   did that committee receive tenured cases that had not
24   received positive votes in their departments?
25       A. No, I can't remember such a case, although it
```

 1    did turn down people within its own deliberations.

 2         Q. Okay. And when you served as chair of the

 3    Tenure and Appointments Committee for the Humanities,

 4    what was, generally speaking, your function?

 5         A. My function was -- at that time was to

 6    designate the principal reader and to -- at that time,

 7    to -- really to lead the discussion. That has now

 8    diverted to the -- the dean. There was always one

 9    dean who was a member of that committee and had a sort

10    of auxiliary role in my time there. But now, the dean

11    has taken over and really runs the meetings.

12         Q. Currently?

13         A. Currently.

14         Q. Do you recall the years during which you

15    served on the committee either as chair or a member?

16         A. It started probably in my second or third

17    year here. I would say 2000 and then running through

18    -- I was chair -- it probably ran through 2007 when I

19    became chair of the humanities program, which is a new

20    program. And you can't both be a departmental chair

21    and serve on that committee.

22         Q. So you became chair of the humanities

23    division in around 2007?

24         A. No. The humanities program.

25         Q. Okay.

1       Q. That is okay.  We are just making sure the
2    record is clear.
3       A. Yes.
4       Q. And is the tenure standard as stated here on
5    pages 31 and 32 the tenure standard with which you
6    were familiar in your time at Yale?
7       A. Yes.
8       Q. And can you identify for us in your own words
9    how you characterized the tenure standard?  There are
10   a lot of words here, but how do you conceive of the
11   tenure standard at Yale?
12      A. Well, the standard in terms of scholarship,
13   the teaching has to be excellent.  Service has to be
14   there, but it is not a vital criterion.  But the
15   scholarship has to distinguish the faculty member as
16   one of not only the leaders in his or her field, but
17   someone who has made an original and significant
18   contribution to that field and whose work also appeals
19   to scholars outside of a narrow field.
20          Yale is a very lean and mean place, and
21   each -- that is to say the departments are small.  And
22   each -- each appointment has a transformative effect
23   upon -- each tenured appointment has a transformative
24   effect upon a department.  That is to say if you have
25   a department of five or six, that person is 15 or 20

1   every note in full, but in reading the body of the

2   work, I read the notes as needed.

3        Q. Did you make any notes as you were reading

4   her books?

5        A. Yes, I did.

6            (Bloch Exhibit No. 1 marked for

7   identification.)

8   BY MS. CHAVEY:

9        Q. We have marked this as Bloch Exhibit 1.

10  Professor Bloch, is this one-page document a

11  representation of the notes you took?

12       A. It is not a representation.  It is a

13  reproduction.

14       Q. It is actually the notes.  Okay.  Perfect.

15           The handwriting is legible in spots and

16  illegible in other spots.

17       A. Uh-huh.  Is -- that is not a question?

18       Q. No.  I am giving you a chance just to look

19  through it.

20       A. Oh, yeah, yeah.

21       Q. Would you read to us what you have written

22  here so we have it for the record?

23       A. Okay.  Beginning at the top, you know, the

24  method is philological and historical close readings

25  followed by full contextualization.  And then I had

Confidential

```
 1   marked here -- that's probably a copy of what she
 2   claims to be her method.  I wrote down, "Not so, but
 3   more thematic."  I didn't really feel that the -- the
 4   actual book lived up to the statement of its
 5   conceptual premises, being philological and
 6   historical.  Okay.
 7        Q. Then on the left side, it looks like it says
 8   "DQ"?
 9        A. Most Italiano -- yeah, so the most is the
10   custom, the Italian custom, the customs of -- she
11   mentions the "Customs of Italy", the "Customs of
12   France" and the "Customs of Spain".  These were
13   customary law books that are merely compilations of
14   practice, which -- not theoretical law discussions,
15   but rather what are known as custumals, what has been
16   done traditionally as setting the criteria by which
17   someone is -- is judged, rather than any sort of
18   theoretical statutory statement of the law.
19        Q. So would that be the rules of practice of
20   law?
21        A. Yes, not of law, but actually of what is
22   done.  Oh, there's procedure is in there, too, yeah.
23   And the criteria sometimes are there, but not -- not
24   ones you want to hear about.  They are mostly trial by
25   ordeal.
```

```
 1          Q. Let me -- let me just take a step back.
 2              Did you make the notes that are represented
 3    on Exhibit 1 while you were reading --
 4          A. Yes.
 5          Q. -- the Law and History in Cervantes book?
 6          A. Yes, I did.
 7          Q. And what were you indicating there as you
 8    were noting the --
 9          A. Well, in some --
10          Q. Just a second -- the law customs of Italy,
11    France and Spain?
12          A. What was I noting?
13          Q. Yes, what -- what were you indicating here as
14    you were writing this note?
15          A. That -- that I was interested in the -- in
16    the -- sort of the mention of the -- the -- the
17    Pan-European scope, though I didn't think that the --
18    the actual book itself responded to those, nor -- nor
19    did it really need to.  It -- it mostly concentrated
20    on the -- on Spain, you know.
21          Q. Okay.  So the next line I cannot read.
22          A. "Biographical connections of Cervantes to the
23    law."  Yeah, so this I felt was fine.  It is not new
24    material.  It is not a discovery of anything that is
25    unknown, but Cervantes had several scrapes with the
```

1    law.  He actually went to prison at one point.  And so

2    we find out by way of introduction, you know, what his

3    connections to the actual law biographically was.

4         Q. Okay.  And the next line?

5         A. "The convergence" -- "convergence of the

6    legal and the historical" and here -- gosh, got me.

7         Q. Okay.

8         A. I don't remember.  It would have jogged my

9    memory then, but it doesn't anymore.

10        Q. And what does that mean, "convergence of the

11   legal and historical"?

12        A. Well, it -- it meant that she was undertaking

13   to give some kind of account of how -- of the

14   difference between legal records, legal accounts,

15   whether it is, you know, accounts actually of trials,

16   and historical records, which would be in the form of

17   chronicles or annals or some -- some form of writing

18   that we class today as -- as history.

19        Q. The next line?

20        A. "Usage and custom versus state imposed Roman

21   statute."  This is a period in which, you know, the

22   Roman law is coming back into practice as the -- the

23   state itself becomes more powerful and more

24   centralized versus usage or custom, which tends to be

25   local.  There can be local custom in -- in much

1    smaller areas that -- that still have the force of

2    law, but when there is no king to impose the -- what

3    you think of as -- as the law of the land, one -- one

4    -- one has recourse to these local customs.

5         Q. Let me see -- let me ask you something

6    different.  I am just going to ask you to literally

7    read what is on the page and then I will --

8         A. Okay.

9         Q. -- go back and ask you about various pieces

10   of it.

11        A. I don't want to give you a lesson in law.

12        Q. It is very interesting.

13        A. I took note that there was really no

14   discussion in her book, and I thought this was a great

15   lack of procedure, proof, either the criteria of proof

16   or the techniques of proof, you know, which might

17   involve testimony.  And the whole question of who can

18   testify is a very interesting one in the period.

19   There is no attention to the teaching of law really,

20   or maybe -- maybe a little attention to the teaching

21   of law, or "teaching of a little," I wrote.

22            There was no -- oh, no discussion of

23   jurisdiction, which is an incredibly important issue

24   in the feudal law, whether the -- the local lord or

25   the over lord or the king has jurisdiction.  And

```
 1    especially, there -- there was really no discussion of
 2    whether law was ecclesiastical or lay.  That is what
 3    that note says here.  That is one of the key
 4    questions, whether we are dealing with canon law or
 5    local secular law.  And there was no discussion of the
 6    relationship of dueling to procedure there, yeah.
 7         Q. So starting with the next line, just read the
 8    words on the page and then we will come back.
 9         A. "Giovio's histories" -- I believe it's
10    translated by Baeza, B-A-E-Z-A.  That was -- you know,
11    it seemed to me -- I wasn't really familiar with
12    either, but these -- this is -- seemed to be a law
13    book that was important for Cervantes' time.
14         Q. Okay.  The next line.
15         A. "Don Quixote shows keen historical
16    consciousness."
17         Q. Okay.  The next line?
18         A. "Visigothic custom as in the Fuera Juego."
19         Q. How do you spell that?
20         A. I think it is J-U-I-G-O.  J-U-I-G-O (sic).
21    And the next one is the Siete Partidas, which is --
22    was a Castilian statutory code.  That is the big law
23    book of the -- of the Spanish Middle Ages, the Siete
24    Partidas.  And then I made a note, "see page 50 to
25    51".
```

Confidential

```
1          Q. Do you know -- well, I am come back to that.
2             Then what does the next line say?
3          A. "Breaking or keeping of the laws."  For
4    example, the law of mills, the transport of prisoners
5    or galley slaves.  That is one of the key episodes in
6    Don Quixote.  Legal insanity, since you have -- Don
7    Quixote was insane, but it only becomes a legal
8    question late in the book when -- when Cervantes has
9    to end it.
10            Barratry or corruption in the law.  And that
11   means --
12         Q. The next line?
13         A. "Cervantes" -- C was the abbreviation for
14   Cervantes -- "ironic intent."  In other words, how
15   serious is he about any of this since everything is a
16   joke in Cervantes.
17         Q. And then what does it say in the left margin,
18   word counts --
19         A. "Word counts and arbitrary inventories."  I
20   thought that there was much too much emphasis on sort
21   of, you know, counting words without -- without
22   explaining what the significance of -- of such word
23   counts was.
24         Q. Okay.  Then the next line looks like it
25   starts with asterisk and a DQ?
```

```
 1        A. Asterisk, "Don Quixote is a legal red
 2   herring."  And "The cover," -- this must have been a
 3   citation from her, "the cover for an incisive legal
 4   gloss."
 5        Q. And then you have three question marks.  What
 6   does that mean?
 7        A. I just -- I didn't know what she meant by
 8   that.  It seemed like an intriguing idea.  It was --if
 9   it is true, it would have been a significant
10   contribution, but it was never demonstrated in the
11   book, so --
12        Q. What does the next line say?
13        A. "Primer quality," having to do with history,
14   and I listed some pages.  I thought that much of the
15   book was just an explanation on -- on the level of a
16   primer of -- of -- of the historical context, the kind
17   of thing you might read in an undergraduate paper, but
18   not in a work of top scholarship.
19        Q. What does the next line say?
20        A. "Gems which beg elaboration."  Page 123.  I
21   thought there were some, you know, things thrown out
22   there that were very intriguing but needed to be
23   elaborated or -- or proven, such as that -- one of the
24   most that Don Quixote was a new genre, which was
25   stated on page 142.
```

1      Q. What does the next line say?

2      A. "Overcites two language sources."

3          THE COURT REPORTER:  Over what?

4          THE WITNESS:  Overcites, C-I-T-E-S, means too

5   many citations from only two sources, which -- the

6   book did not have a kind of broadness of scope, but

7   seemed like it had used a couple of documents or

8   sources, had relied too much on two -- only two

9   documents as sources.

10  BY MS. CHAVEY:

11     Q. What does the next line say?

12     A. "What is the relationship of Don Quixote to

13  legal writing?"  That was a question that I had

14  throughout in reading the book.

15     Q. And then you note --

16     A. Then I wrote --

17     Q. Just a second.  Then you note page 143.  And

18  what do you say after that?

19     A. "Makes fictional...very real juridical and

20  historical text."  That must be some note to myself

21  about the way that Cervantes fictionalized these

22  historical texts.

23     Q. Texts?

24     A. Texts, T-E-X-T-S, yes.

25     Q. What does the next line say?

Confidential

1          A. Page 146, Don Quixote, "DQ is a" -- this is a

2     quotation -- "personification of fears of the mos

3     gallicus" -- M-O-S  G-A-L-L-I-C-U-S -- "an ahistorical

4     misapplication of Roman statutes (sic)" -- instead of

5     statutes.  It must be in her -- a misprint in the

6     book. -- "in a contemporary setting."

7          And it looks like S-P -- the

8     personification -- oh, Sancho Panza.  SP, that's Don

9     Quixote's --

10          THE REPORTER:  What's it say?  What cho?

11          THE WITNESS:  "SP," it must be Sancho,

12     S-A-N-C-H-O, Panza, P-A-N-Z-A, "is a personification

13     of usage and custom based on the Fuera Juego with its

14     judgments based on past deeds brought to bear on

15     contemporary circumstances, the mos italicus."

16     BY MS. CHAVEY:

17          Q. That word M-O-S, that means customs?

18          A. Yes, customs.  Yeah, customs or ways, yes.

19          Q. Then towards the bottom of the page, it looks

20     like --

21          A. Oh.

22          Q. -- you have the word "letters" and then a

23     number of names that follow?

24          A. Yes.  I listed the -- the names of the letter

25     writers, and I put checkmarks by the letters which

Confidential

1   were negative just to try and do some kind of tally.

2   And in these letters, you rarely find negative

3   comments.  And I was struck by the relative percentage

4   of letters that one could consider to be negative or

5   full of reservations versus the -- the positive ones.

6        Q. So it looks to me like there is a check by

7   every person's name, but you tell me.  Is that -- do

8   you see that as well?

9        A. Yeah, that is funny, yeah.  No, it must have

10  just meant I checked them off as I read them.

11       Q. Okay.

12       A. I'm sorry.  I just -- there are not notes

13  about anything negative.  Strike that from the record,

14  Your Honor.  There -- as I read them, I must have

15  checked them off.

16       Q. Okay.  So in looking at your notes, are you

17  reminded that you did, in fact, read all of the

18  external records?

19       A. Yes.  Yes, I did.

20       Q. And you also read the Cervantes book?

21       A. Yes.

22       Q. And you said the Ficino book --

23       A. The Finico book, yes.

24       Q. -- you read through it, but it doesn't look

25  like you have any -- just a second.  Let me go off the

SUSAN BYRNE vs YALE UNIVERSITY
Ralph Howard Bloch on 02/28/2019
Confidential

```
 1    through these?  It is two and a half pages.  You can
 2    just glance through it or read it as carefully as you
 3    need to.  And I am going to ask you if you recall the
 4    meeting that is summarized on this -- this document.
 5         Do you remember the meeting on February 3rd
 6    that is depicted here?
 7         A. Yes.
 8         Q. And generally speaking, do these notes in
 9    Exhibit 78 reflect what you recall happening at the
10    meeting?
11         A. Uh-huh.
12         Q. They do?
13         A. Yes.  I am sorry.
14         Q. No, that is okay.
15         I would ask you to look at page 2.  The first
16    full paragraph says -- it refers to the Law and
17    History book and says, "One member found the book to
18    be 'almost unrecognizable,'" and then it goes on from
19    there.
20         A. That is me.
21         Q. Was that you?
22         A. Yes.
23         Q. Okay.  And does this paragraph capture the
24    views that you expressed about the Law and History
25    book at that meeting?
```

Confidential

```
 1      A. Yes.

 2      Q. Would you like to elaborate?

 3      A. Well, just -- I guess I must have said in the

 4   meeting, although it is not in my notes, this -- a

 5   well-done school exercise with no sophisticated

 6   articulation of the relationship between customary law

 7   and Cervantes' novel.

 8           I guess what -- that was me and elaborating,

 9   say the book struck me as marginally competent, but

10   that is not enough for a tenure at Yale.  But it

11   just -- it did not engage with the rather large body

12   of work on literature and law.  This is a whole --

13   this is a whole productive field of literary study.

14   And there have been many, many books about the general

15   relationship between literature and law.  In almost

16   every subfield there are numerous books on the topic.

17           There has been a book by even another member

18   of the Spanish and Portuguese department on the topic.

19   The book did not engage that large dialogue.  I felt

20   had it, it might have outlined a field of inquiry that

21   would have been much more meaningful for the treatment

22   of the topic, which is a good -- a good topic.

23      Q. Who was the member of the Spanish and

24   Portuguese department who had written on that topic

25   before?
```

SUSAN BYRNE vs YALE UNIVERSITY
Ralph Howard Bloch on 02/28/2019

```
 1          A. Roberto Gonzalez Echevarria.

 2          Q. And had you read his book?

 3          A. Yeah, I read in it.  I have not read the

 4     whole thing.

 5          Q. Okay.  Let's look at the next paragraph on

 6     page 2 of Exhibit 1.

 7          A. Uh-huh.

 8          Q. And there is a statement that, "A committee

 9     member was surprised to see," and then it goes on from

10     there.  Was that also a reference to you?

11          A. No.

12          Q. And then in the next paragraph, there is a

13     comment on the Ficino in Spain book and refers to the

14     views of the same committee member.

15              Do you remember who that was?

16          A. No.  No.  It might have been Mazzotta.  I

17     don't remember who it was, but this was also my view

18     of the Ficino book.  It is a compilation.

19          Q. Now, if you go down the page a few more

20     paragraphs, there is a one-sentence paragraph that

21     says, "The committee also discussed the external

22     letters but concluded that the set of letters do not

23     shine and are not a high-ranking set of letters."

24              Do you see that?

25          A. Yes.
```

Confidential

```
 1        Q. Do you agree with that characterization of
 2   the external letters?
 3        A. Yes.  Yes, I do.
 4        Q. You read them all, I think we just discussed.
 5        A. Uh-huh.
 6        Q. Is that right?
 7        A. Yes.
 8        Q. And you seem to have a recollection that
 9   there were some negative letters among the group?
10        A. Uh-huh.
11        Q. And do you remember which letters those were?
12   I have copies if you would like to look at them.
13        A. Well, let's see.  Tony -- Tony Cascardi from
14   -- from Berkeley.  Let's see.  I can --
15        Q. Professor, why don't I give you a copy.
16        A. I have a copy of the letters.
17        Q. Okay.  What I'd like -- do you have notes on
18   your copies?
19        A. Well, I just have check marks.  Some check
20   marks in the margins.
21        Q. Okay.
22        A. Cascardi, you know, when he says -- you know,
23   he goes through the motions of -- of saying what is
24   good about the Cervantes' book.  Do you want me to go
25   through this?
```

SUSAN BYRNE vs YALE UNIVERSITY
Confidential                     Ralph Howard Bloch on 02/28/2019

```
 1    the rhetoric of such letters -- he probably sees, you
 2    know, hundreds of such letters every year.  He knows
 3    that to say you have to really believe in the
 4    deficiencies of a work to put into writing something
 5    like he has.
 6         Q. So when you refer to the rhetoric of such
 7    letters, what do you mean?
 8         A. There -- they tend to be highly laudatory
 9    because the people writing them tend to suppress their
10    reservations and -- and I would say tilt them to the
11    positive side in order to not harm someone who is in
12    that position of coming up for tenure.
13         Q. And on what do you base that observation?
14         A. On my having read these letters over the
15    years, both at the departmental level, having read
16    them at every university that I have been with tenure
17    at the departmental level, and having read so many
18    letters at the level of the tenure committee.
19              I would say that if I had seen 40 -- 40
20    cases, say all told as chair of the humanities
21    appointments committee, and each one involved at least
22    eight letters, what is that -- that's -- is that 320
23    letters?
24         Q. 320.
25         A. Yeah.  This would fall in the category of
```

1    maybe 10 of those.  So this --

2        Q. Of the worst?

3        A. Yeah.  I mean, people do not express such

4    reservations about a book which is the key piece of

5    evidence for someone's tenure.  This really is in the

6    context of those letters.  I mean, someone from the

7    outside reading this could say, well, you know, it

8    feels sort lukewarm.  But putting something like these

9    reservations in writing is unusual.

10       Q. Did the letter from Dean Cascardi have an

11   influence of your evaluation of Sue Byrne's tenure

12   case?

13       A. No.

14       Q. Explain that, please.

15       A. I feel that he is not making the decision

16   about tenure at Yale.  It is -- it's the Yale faculty

17   that is making such a decision.  And I took it into

18   account.  I was interested to see that some of the

19   things that he observed in the book were things that I

20   had also observed.  But people have to make their own

21   decision, so I won't say it swayed me.  I read the

22   letters after I read the book in order not to be

23   swayed by someone of such authority as Tony Cascardi.

24       Q. Okay.  Were there other external letters that

25   you found to be negative on Sue Byrne's tenure case?

SUSAN BYRNE vs YALE UNIVERSITY
Ralph Howard Bloch on 02/28/2019

Confidential

```
 1    other issues.  And that sort of methodological
 2    approach is no longer viable.
 3            And then -- then there was a comparison with
 4    the other studies -- other people with whom the letter
 5    writers were asked to compare.
 6        Q. So you are looking at the last paragraph?
 7        A. Yeah, that must be the last paragraph.
 8        Q. Just a second.  You are looking at the last
 9    paragraph --
10        A. Right.
11        Q. -- of the fifth page --
12        A. Right.
13        Q. -- of Professor Folger's letter?
14        A. Yes.
15        Q. And what did you note in his comparison of
16    Professor Byrne to these other people?
17        A. Well, he says -- he says, "I think however
18    that leading scholars are characterized by original
19    approaches and a reach beyond their area of
20    specialization in terms of time period and
21    disciplines.  This is what distinguishes the work of
22    scholars like Barbard Fuchs, Laura Bass and Elizabeth
23    Wright."
24            And then he goes on to talk about their work
25    in comparison.  And he ends the letter by saying, "I
```

Confidential

```
 1    expect" -- this is the last paragraph, last page --
 2    "from leading Golden Age Scholars a broad perspective
 3    on Spanish literature and culture that takes into
 4    account Spain's role as hegemonic European power and
 5    colonial metropolis, and work that inspires scholars
 6    outside their specialization.  That requirement for
 7    this reach is a sound theoretical basis and a
 8    transdisciplinary scope.  Professor Byrne certainly is
 9    a productive scholar.  I can see a growing level of
10    sophistication and erudition, but her unchanging
11    adherence to a well-established but seriously limited
12    scholarly paradigm will not place her among the
13    leading scholars in the general field of Spanish
14    literary studies."
15              And that's -- that, you know -- as a kind of
16    final sentence, it is as damning as one can find in
17    any.  It is another letter that would fall in the
18    bottom percentile of such letters.
19         Q. Of letters that you have seen?
20         A. Yes.
21         Q. Okay.  And so when you were meeting on
22    February 3rd with the subcommittee --
23         A. Uh-huh.
24         Q. -- and this is referenced in Plaintiff's
25    Exhibit 78.
```

Confidential

```
1          A. Yes, I have it here, yes.

2          Q. Do you recall that there was, in fact, a

3    discussion of the external letters?

4          A. Yes.

5          Q. And was the discussion focused on all of the

6    external letters or only certain ones?

7          A. I think we went through all the letters,

8    yeah.

9          Q. And --

10         A. It would be unusual not to, and that would

11   have been remarked at the time.

12         Q. Okay.  And then if you turn to the last page

13   of Exhibit 78.

14         A. Uh-huh.

15         Q. The first full paragraph says, "Valis,

16   Mazzotta and Bloch did not find her tenurable."

17         A. Uh-huh.

18         Q. Do you see that?

19         A. Uh-huh.

20         Q. Yes?

21         A. Yes.

22         Q. And is that true?

23         A. Yes.

24         Q. And why did you not -- speaking for yourself,

25   why did you not find Sue Byrne tenurable?
```

SUSAN BYRNE vs YALE UNIVERSITY
Ralph Howard Bloch on 02/28/2019

Confidential

```
 1          A. I felt that her scholarly work was not of the
 2     level that one expects from a tenured faculty member
 3     at Yale.
 4          Q. And did you -- do you agree that your view in
 5     terms of tenurability was shared by Professors Valis
 6     and Mazzotta?
 7          A. Yes.
 8          Q. And do you remember what Professor Jackson's
 9     view was?
10          A. Well, yeah, he said all of these reservations
11     are valid that have been expressed by the -- the
12     committee members and the external evaluators, but he
13     supported her promotion to tenure.
14          Q. Did he explain why?
15          A. Well, he thought that she -- he admired her
16     projects, but not their execution, which he couldn't
17     defend on intellectual grounds.  He admired her
18     productivity which exceeded that of two of the
19     comparison candidates.  That is right.  You know,
20     someone like Elizabeth Wright, whose work I have read
21     as well, you know, has probably written only two books
22     and not three, but they are significant books.
23          One is -- one is -- you know, one is a
24     completely original book.  It is an examination of
25     race in Cervantes and in the Golden Age, both in -- in
```

```
 1                    C E R T I F I C A T E
 2         I hereby certify that I am a Notary Public, in
 3    and for the State of Connecticut, duly commissioned
 4    and qualified to administer oaths.
 5         I further certify that the deponent named in the
 6    foregoing deposition was by me duly sworn and
 7    thereupon testified as appears in the foregoing
 8    deposition; that said deposition was taken by me
 9    stenographically in the presence of counsel and
10    reduced to typewriting under my direction, and the
11    foregoing is a true and accurate transcript of the
12    testimony.
13         I further certify that I am neither of counsel
14    nor related to either of the parties to said suit, nor
15    of either counsel in said suit, nor am I interested in
16    the outcome of said cause.
17         Witness my hand and seal as Notary Public the 5th
18    day of March, 2019.
19
20
21    _____
22    Notary Public
23    My Commission Expires:
24    November 30, 2022
25
```