1

Meeting of the Senior Faculty of the Department of Spanish and Portuguese

Sue Byrne Tenure Promotion Case

February 9, 2016, 4:00 p.m., Departmental Library

Notes by Noël Valis

I conducted the meeting of the senior faculty to discuss and vote on Sue Byrne's tenure case, from Assoc. Prof. on term to Assoc. Prof. with tenure. Present: K. David Jackson, Rolena Adorno, Roberto González Echevarría, Aníbal González Pérez, Noël Valis (Chair). Also present were the following non-voting colleagues: Howard Bloch (French), Giuseppe Mazzotta (Italian), and Jack Dovidio (FAS Dean of Academic Affairs). Howard and Giuseppe served on the Internal Review Committee, along with David Jackson and myself as Chair (we met on Feb. 3rd). Dovidio was there to observe on the 9th. He counted the votes at the end of the meeting. The vote was: 3 no; 2 yes; no abstentions. The vote did not carry.

The only people that I observed taking notes during the Feb. 9th meeting were myself and Rolena Adorno.

I e-mailed Dean Tamar Gendler, copying Dovidio, the results of the voting, noting that perhaps a meeting with General Counsel was in order, before informing the candidate of the outcome. The Departmental Faculty Vote form was also uploaded onto Byrne's case file on Interfolio on Feb. 11. On Feb. 11, Jack Dovidio informed me by e-mail that at this point there was no need to meet with General Counsel and that I should proceed to inform the candidate. To that end, a meeting for Jack and myself to inform Sue Byrne was set up for Monday, Feb. 15, 2016, at 1:00 pm., in my office. I also wrote up a one-page letter informing her of the same, to be hand delivered to her after the meeting.

At the beginning of the Feb. 9th meeting, I noted that our charge was to discuss and then vote formally on the Byrne tenure case. I then read aloud the Confidentiality notice and the Criteria for Promotion material. AG asked if this was now going to be a new thing in the department, implying that I had introduced something new all on my own. I responded that both the Confidentiality and the Criteria for Promotion statements were official Yale policy and that Connecticut law on confidentiality was also applicable (as Yale so states).

I gave a Summary of the findings of the Internal Review Committee. In a word, the Committee, which included two outside members, found her case underwhelming.

**David Jackson** agreed with much of the other members' assessment, but nonetheless, at both meetings supported her promotion. At the Feb 9th meeting, he said that her most successful book was the one on Cervantes, that it was a suggestive literary study, and that there are favorable outside letters on the book. He agreed that she had run into problems in dealing with law and history in Cervantes, but observed that she was not a lawyer. He lauded her archival approach and suggested that some of the outside evaluators had a bias against archival research. He added that her productivity should be considered and that we should look at her whole record—

BYRNE009051

teaching, service, and scholarship—in reaching a decision on her tenure. He offered few substantive comments on SB's scholarship.

**Aníbal González Pérez** launched baseless allegations of non-transparency and unfairness in the evaluation of SB's candidacy. (We followed, to the letter, the steps-for-promotion guidelines. We even allowed far more time than usual for external evaluators to read the materials; deadline extensions were given to two outside evaluators who asked for them. All the outside evaluator names were vetted and approved by the Administration.) Apparently, he felt that some faculty had been dismissive of the external evaluators, though I pointed out that at the earlier Feb. 3 meeting of the Internal Review Committee we had discussed the eight letters. (Later, in the Feb. 9th meeting, Rolena Adorno went through each one of the letters.) Jackson questioned whether the Internal Review Committee had reviewed the letters, but both Howard Bloch and I observed that we did. I had prepared notes for that purpose. AG stated that 6 of the 8 letters were positive, though there was some disagreement on that point. He said that the system should be applied clearly and cleanly, though he did not explain what he meant by that. He reiterated that he was puzzled by the dismissive attitude toward the outside letters and that such an attitude was a common tendency in the Department of Spanish and Portuguese, though he offered no examples. He suggested that if we did not recommend SB's promotion to tenure, that would send the wrong signal to the world outside Yale, that Hispanists were concerned and were watching this case. Yale, he said, had "to prove" that we can promote a candidate from within. Other than to say that the case was meritorious, he did not offer any particulars on SB's scholarship to recommend her promotion. His entire point was negative rather than positive, a defense based on implied threats and unproven allegations. It should be pointed out that, after claiming other faculty had been dismissive of the outside letters, once the outside letters were discussed during this meeting, he himself then tended to dismiss the letters.

**Roberto González Echevarría** spoke next. He said she was not tenurable, citing the poor quality of her work, the lack of critical insight and sophistication. The book on Cervantes, for example, hinged on a minor *trouvaille* and, overall, was not very good. Her writing is redolent with clichés and malapropisms. In the book on Ficino, she uses a strawman argument, targeting the late nineteenth-century literary historian, Marcelino Menéndez y Pelayo, for being responsible for the presumed excision of Ficino from Spain's literary history. RGE pointed out that critics today no longer take M y P seriously because of his nationalistic Catholicism. He noted that she left out important Italo-Hispanic relations in the book and failed to bring into the discussion Américo Castro's important work on Cervantes from 1925; 41 % of the book, moreover, was bibliography and notes. There is a plethora of quotations, making the book read like a catalogue. There were no comparisons of thought, no ideas, no literary analysis. The Conclusion repeats the Introduction. He observed that 3 of the letters were negative. Cascardi pointed to her critical limitations. De Armas's letter was fluff, focusing on mere details. The letters from Folger and Weber were devastating. Gaylord's lacked substance, but still managed to criticize her work, despite the overall positive view.

**Rolena Adorno** noted that SB's achievements were modest. The Cervantes book relies on a single source. The Ficino book is a compilation of sources. SB appears to be waging a campaign, based on a kind of conspiracy theory, that Ficino was deliberately "excised" from Spain. SB ignores critics like Dámaso Alonso and Alan Trueblood who do not confirm her view of things.

Confidential - Attorneys' Eyes Only

SB documents the presence of Ficino in Spain, but not the impact or significance. The book is superficial. RA observes, for example, that she cites Ficino as a base text for Bartolomé de las Casas, noting 4 or 5 mentions, but what SB fails to note is that those 4 or 5 mentions are out of over 300 sources cited in the *Apologética*. This is an unsustainable claim. And there are other examples of this kind of selective citing as well. The Cervantes book does not include major jurists like Suárez or Vitoria and returns to the undead romantic approach to *Don Quijote*.

RA then went through the 8 external letters of evaluation:

. is positive, but he repeats and quotes liberally from SB herself, thus using *her* claims to make his judgment.

praises her work, maintaining that SB has established a clear relation between thought in Italy and Spain, but RA observes that she fails to make those larger claims of an Italo-Hispanic dialogue and does not appear to be in dialogue with Italian scholars.

notes that she has only partially digested the scholarship on the topic and does not offer the big picture. The book on Cervantes is very worthwhile, but . points out a number of false assumptions.

is highly critical on substance and methodology, noting that SB's approach is positivistic. "Leading scholars,"    writes  "are characterized by original approaches, and a reach beyond their area of specialization..."     does not see this in SB.

barely talks about the research, confessing    has only read the "history half" of the book on Cervantes. The letter lacks credibility.

is positive, but cites a luke-warm review of the Ficino book to buttress :  . claims.

, is big on superlatives, very small on substance. .    barely talks about the books.

is not persuaded by the Cervantes book. Cervantes wrote fiction, not history.    notes the thicket of citations, the narrow philological approach, though    loes not disparage philological rigor. But SB cannot see the forest for the trees.

RA also discussed SB's case in relation to the comparison candidates     that outside evaluators were asked to comment on. '      makes a gratuitous comparison between SB and the historian David Nirenberg, who writes on medieval Spain and the Jews      was favorable in his assessment     placed SB behind the three comparison candidates, noting that she offers no paradigm shift or new vision. Scholarly leadership entails an original approach, a broad reach beyond the field of specialization, and/or the establishment of a new field. SB does not make the grade. The Ficino book, which is an influence study, is a lesser achievement than the Cervantes book. This is an indication that the scholarly promise hoped for, with the publication of the Cervantes book, was not fulfilled with the Ficino book. She is not tenurable.

**Noël Valis** then spoke, focusing on the Ficino book, but observed that some of the problems noted therein are also to be found in the Cervantes book. She noted that she had thirteen pages of comments, but would only read a few parts of it, as much of it details page after page of specific examples of poor writing. Overall, this is a competent and conventional study of Ficino in Spain, often focused on bibliography and source hunting and performing far more glosses than in-depth analyses. There is very little real literary analysis either.

Confidential - Attorneys' Eyes Only

But it is also poorly written, as the many examples of SB's prose offered here [in the 13-page document] make clear.  She was reminded of what one of the outside evaluators said of another scholar's writing: "The clear and fluid prose conceals the immense amount of work that it took to write [her book], while giving us the essence of her findings." That is one of the several things that is missing from *Ficino in Spain.* The approach is constipated, as the author drills down repeatedly on minor details, jumps from topic to topic in the effort to accumulate a miscellany of evidence. SB doesn't simply miss the forest for the trees. She frequently pokes around in the underbrush and thereby fails to offer a larger vision of Ficino's presence in Spain.

Where is the originality, the exciting new vision of the field, or, failing that, a spirited new polemic? What NV sees as well are an intellectual narrowness, a lack of depth, and a lack of literary sensibility. SB has been diligent, done a good deal of work in libraries and made good use of a resource like CORDE, but there's no spark. It often feels like one long, extended gloss. It's simply not compelling.

NV then offered comments on specific chapters, contained in the 13-page document noted above, only some of which is noted here. She also observed that she reviewed the external letters at the Internal Review Committee meeting and did not deem it necessary to repeat that review, as Adorno had already done a splendid job summing up the import of the letters.

Introduction. P.3:  **Poor opening sentence**: "A consistent presence in Spanish letters in the centuries following his death, Marsilio Ficino was decisively written out of that literary history at the end of the nineteenth century as those who began to fashion what would come to be the Spanish literary canon excised his voice in favour of a purist, all-Spanish approach."

An intemperate, unproven statement. "Excised", "decisively written out", and "purist" are all loaded terms, ascribing intentionality to the disappearance of Ficino from Spain's literary history. Did such histories excise other non-Spanish voices? She does not say.

After this maladroit opening, the Introduction just goes downhill and has to be one of the worst introductions NV has read. First, the writing is frequently illegible and unclear. Second, instead of laying out in a broad sweeping manner her vision and argument, as one would expect in an introduction, SB gets lost in disparate details. She gets down into the weeds and leaves her reader floundering in them. A turgid, tunnel-vision presentation. What is she doing with all these examples? Where's the depth, the analysis? Where is the larger picture? Indigestible writing.

p. 13: A whopping bad error. SB talks about Francisco Franco's "forty-five year [spelled out by SB] dictatorship." He governed as a dictator from 1939 to 1975, a span of 36 years. Even if one started from 1936, the first year of the civil war, that still isn't 45 years. And he only had control of a part of the country during the war. These are dates that any Hispanist should have engraved in her head.

This page also indicates that SB doesn't know very much about modern Spain. She says that "a considerable part of that political battle [the ideological struggles of modern Spain] concerned movements like socialism, communism, industrialism, workers' rights, and modernization in any form, however defined." "Modernization in any form"?? This is poor, vague writing, showing

Confidential - Attorneys' Eyes Only

BYRNE009054

little knowledge of Spanish history, the kind of thing you might expect in an unprepared undergraduate's paper.

She also claims, in broad, unfounded strokes, that Spain in this period did not rewrite its literary history, giving the impression that the country was sunk in an unilluminated state. But the pre-civil war period, the 1920s especially, was a golden era for Spain culturally and artistically. One thinks of the rediscovery of Góngora by the brilliant Generation of 1927. And what about Américo Castro's 1925 magnificent work on Cervantes, just to give one example (as well as several other books of his, all from the 1920s)? One needs to look at more than conventional literary histories to understand how the literary past was being rewritten.

p. 13 SB talks about the use of "Platonic" as a "frightening epithet" in this period, but gives no examples. (In the Conclusion, she returns to the same topic, again without much proof of any kind.) As a specialist in this period, NV has never heard of this pejorative use of the term. It may very well be true, but you have to give concrete examples. It is not clear what she is talking about. And even if true, this usage must have been a minor phenomenon, because it doesn't show up in discussions of the period.

Chapter 1 Ficino in Spanish Libraries

This chapter is largely unreadable. Shows good archival work, but this is uninspiring, intellectually dull. Tunnel-visioned. Basically just bibliography. Stultifying in detail. This is bibliography, but not brilliant or original work. Thirty-three pages of dense bibliographical material. Descriptive, little analysis.

Chapter 2 Ficino as Authority in Sixteenth-Century Spanish Letters

This chapter is like a silva de varia lección, a miscellany of topics. Jumps from one topic to the next. Topics and tópicos, commonplaces that could and do have sources other than Ficino (such as the evil eye, p.54). One quotation after another. On page 56, SB refers to a series of annotations, but her own approach in this chapter is also annotative, not analytical. Tiny details—not illuminating. What is the bigger picture here? Lots and lots of quoting from one topic to another, from cures for gout to the body-soul question to prudence. An indigestible hodge-podge. Deadly dull approach. A lot of quotations from other scholars. No strong SB presence here. A lot of quoting, not nearly enough analysis. Indeed, there is almost no textual analysis, except for two pages on the extraordinary Cervantes text, "Coloquio de los perros", which deserves much more than that. Later, SB does devote more space to La Galatea. She shows the Ficino influence, but she doesn't open the Cervantes text up. You could devise two columns (Ficino and Cervantes) to prove her point. This is workmanlike analysis at best. In the section, "On Beauty and Love," SB hangs her claim to offering something new by flogging one phrase, "love is a desire for beauty," but in truth, we are talking about a source study in these pages (and elsewhere). This chapter, like preceding ones, is not very readable.

[See the original 13-page document for the rest of this commentary.]

Confidential – Attorneys' Eyes Only

More discussion ensued. Sue's last promotion—to Associate Professor on term—was in 2013. The Cervantes book was considered at that time. The vote to promote was unanimous. Howard Bloch asked what we should conclude from such a vote.

Jackson said that the aim of her work was not to provide a broader reach, but a narrow focus, and that she did not intend to make a paradigm shift in the field. Her work should be judged, he suggested, on the basis of her intentions.

Valis noted that the earlier promotion to Associate Professor on term was self-contained and not a pre-tenure decision.

Adorno observed that SB did not fulfill the scholarly promise of her earlier work, as the Ficino book is a lesser achievement than the Cervantes one, notwithstanding the latter's flaws. (It should be noted that at the time of the earlier promotion, the weaknesses of SB's writing and scholarship were discussed. The positive outcome was premised on the hope of future scholarly promise.)

González Pérez said that outside letters were not infallible, but also asserted that the reading of the letters was "hostile." González Echevarría replied that there was no such hostile reading of the letters, that this assertion was an invention on González Pérez's part. The hostility appeared to be coming from González Pérez himself.

There was some discussion as to the overall tenor of ⸢            letter. Bloch and Jackson felt that it was half positive and half negative. Bloch noted that              could be considered negative in its effect, adding that he judged there to be 3 ½ negative letters out of 8.

Giuseppe Mazzotta observed that the external letters are very important, but that the opinion of the department's faculty is even more important.

González Pérez reiterated that fairness and transparency in the process were fundamental. He suggested that if supporting materials could be spun a certain way, then the outcome would spell failure.

Jack Dovidio observed that faculty can disagree on matters of substance, but that such disagreement does not by necessity indicate bias. He asked if the reading of the letters was unfair. Are the conclusions drawn from the letters fair and reasonable?

Adorno noted that it was important to see the distinction between substantive criticisms and superlative criticisms. A substantive criticism centered on the absence of the big picture in SB's work. Jackson replied that she wasn't looking at the big picture.

González Echevarría pointed out that neither González Pérez nor Jackson had served on Senior Appointments, unlike the rest of faculty present at the meeting.

Howard Bloch replied to Dovidio's question, observing that the reading of the letters was a fair one and that the letters themselves were fair.

Those present agreed at this point that they were ready to vote. The Chair thanked both Howard Bloch and Giuseppe Mazzotta for their service. Both left the room. Secret ballots were distributed to the five voting senior faculty of the department. Dovidio counted the votes: 3 no; 2 yes; and no abstentions. The vote was unfavorable.

The Chair then reminded faculty not to discuss the outcome of the case with the candidate, as Jack Dovidio and the Chair had as yet not informed her of the results of the vote. No details of the vote, of the discussion, of the confidential content of the external letters, should be conveyed to the candidate.

The meeting was adjourned at approximately 6:20 p.m.

Confidential - Attorneys' Eyes Only

BYRNE009057