**Yale** *Department of Spanish & Portuguese*

Susan Byrne
Associate Professor of Spanish
203-432-1162
susan.byrne@yale.edu
http://suebyrne.com

PO Box 208204
New Haven CT 06520-8204
T 203 432-1151
F 203 432-1178
span-port.yale.edu

*courier*
82–90 Wall Street
New Haven CT 06511

Ben Polak
Provost
William C. Brainard Professor of Economics
Office of the Provost
Yale University
2 Whitney Avenue, Suite 400, Room 432
New Haven, Connecticut

March 8, 2016

Dear Provost Polak,
Pursuant to Yale Faculty Handbook ("FH") section III.L.3.a, I submit this petition for review of a determination regarding my tenure review that was communicated to me on February 15, 2016. In voting to deny me tenure, three senior faculty members of the Department of Spanish & Portuguese violated University policy regarding eligibility for voting (FH III.L.3.a.i), failed to provide adequate and fair consideration in the matter of my promotion (FH III.L.3.a.ii), and retaliated against me for having spoken out against abuses of university and public policy perpetrated by them (FH III.L.3.a.iii), including sexual harassment and discrimination, and witnessed by me.

All Yale procedures governing promotion and tenure are subject to the implied covenant of good faith and fair dealing and thus afford me the reasonable expectation of a fair and equitable process on the merits for tenure review. Simply put, actions taken in the implementation of the tenure review process that defeat reasonable expectations grounded in the FASTAP procedures violate the implied covenant, and by extension, the process established for tenure in the Faculty Handbook. The participation in my tenure review of Noël Valis ("NV"), Rolena Adorno ("RA"), and Roberto González Echevarría ("RGE") improperly defeated my reasonable expectation of a fair hearing on the merits. The negative outcome of my tenure review was predetermined in the minds of those three faculty members who, together, conform a majority bloc of the five senior voting faculty in the department. A climate review of the Department of Spanish & Portuguese ("the department") conducted from March through December of 2015 revealed multiple instances of those same three senior faculty members working together to stifle the voices of other department members, colluding so as to unreasonably deny tenure in earlier cases, denying junior faculty benefits in the form of mentoring and leaves, and consistently violating Yale policy and procedures in the service of their own political agenda to obsessively guard their power base in the department. By the time my tenure

review began in March of 2015, the departmental climate of intimidation and bias created and maintained by RA, RGE, and NV precluded the possibility of my tenure case being evaluated on fair, professional criteria.

During a meeting held on December 15, 2015 to discuss the results of the departmental climate review, Faculty of Arts and Sciences ("FAS") Dean Tamar Gendler stated that the department has a known problem with rejecting qualified candidates for tenure while masking those rejections as issues of "professional judgment." Gendler assured department members that such "subjective judgments used as cover for improper motivations" can be appealed and will be heard by your office. The non-specific "quality of my research" critique in the notification of denial of tenure to me is just that: a specious pretext made in bad faith to disguise improper motivations.

On February 23, 2016, prior to filing this appeal and pursuant to FH III.L.3.b, I sought an equitable solution to this problem through informal consultation with Dean Gendler, who told me that my case "was sufficiently complicated for me to go ahead and appeal" to your office.

On March 2, 2016 I filed a first appeal ("Appeal 1") regarding Dean Gendler's Jan. 19, 2016 determination to not grant a recusal request I had filed on April 1, 2015. I will incorporate Appeal 1 by reference at various points below. I now file this second appeal asking your office to reverse and vacate the senior faculty vote to deny me tenure, of which I received official notice on February 15, 2016.

RELEVANT POLICIES AND PROCEDURES

STANDARDS FOR APPOINTMENTS AND PROMOTIONS

The Yale Faculty Handbook ("FH") is faculty policy, and it describes the standards for all faculty in ladder (tenured and tenure track) ranks. For initial appointment as Assistant Professor on Term, a candidate must demonstrate "promise as a teacher and scholar" (FH IV.H.1), and reappointment to the same rank "requires evidence of success as a teacher and achievement as a scholar" (FH IV.H.1). That first move through the ladder ranks at Yale is from "promise" to "evidence of success... and achievement." The third step in the ladder ranks is promotion to Associate Professor on Term, and the standard for that promotion:

> **Associate Professor on Term.** Associate professor on term is normally the rank of promotion from assistant professor or the rank of initial appointment at Yale for an individual with scholarly or artistic achievement and substantial previous teaching experience. To be considered for this appointment candidates must present significant published research and scholarship representing early demonstrations of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university citizenship. These

BYRNE009153

accomplishments will be assessed by the relevant departments and programs and by experts outside Yale. (FH IV.H.1)

Thus, a faculty member who holds the rank Associate Professor on Term at Yale has already been judged by his or her department, and by experts outside of Yale, to have "significant published research and scholarship representing early demonstrations of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university citizenship" (FH IV.H.1).

Cumulative time in the ranks "on term" at Yale "may not exceed nine years," and associate professors "must be reviewed for promotion to tenure no later than during their penultimate year in the rank of associate professor on term" (FH IV.H.2). The Yale standard for Associate Professor with Tenure is:

> **Associate Professor with Tenure.** Candidates for this rank are expected to have shown evidence of exceptional accomplishments and future promise that makes the sponsoring department confident that within five years they will merit promotion at Yale to the rank of professor. (FH IV.H.2)

That promotion from Associate Professor on Term to Associate Professor with Tenure indicates that a faculty member's work has been judged to have graduated from "significant" to "exceptional" in quality, and that within five years the candidate will merit the rank of Professor, a standard that is defined:

> **Professor.** Candidates for the rank of professor are expected to stand among the foremost leaders in their fields throughout the world. It is expected that professors will continue to develop the qualities of scholarship, creativity, teaching and university citizenship that earned them their appointments. (FH IV.H.2)

Of both ranks with tenure, Yale specifies:

> The criteria for appointment or promotion to the rank of associate professor with tenure differ from those for professors in degree rather than in kind. Tenured faculty at Yale are expected to stand among the foremost leaders in their fields throughout the world. Associate professors with tenure are expected to develop the qualities of scholarship that earned them their permanent appointments, so that within a reasonable period of time their value to the University and their national or international standing will make them suitable candidates for professor. (FH IV.H.2)

### FASTAP PROCEDURES

In 2007, Yale University instituted a tenure track system of hiring and promotions called the Faculty of Arts and Sciences Tenure and Appointments Policy ("FASTAP"). Details

Byrne 3

are found in a 2007 Report to the Faculty (http://facultyadmin.yale.edu/checklists-forms-templates, FASTAP Report Feb. 2007 ("Report")). FASTAP governs recruitment, review, and promotions of Yale ladder faculty, and the 2007 Report begins by insisting that the procedures for tenure and appointments: "must be rigorous, clear, and fair, and must be perceived as such" (Report 2).

Changes in Yale's recruitment, appointment, and promotion process introduced with FASTAP include the very important point that "Consideration for promotion to tenure will be detached from resource issues. All new non-tenured appointments to the ladder faculty will be understood to carry the resources required for tenure, should tenure be warranted on the basis of merit" (Report 3). Pursuant to FASTAP, the determining factor in a tenure position at Yale is "merit."

The third- and sixth-year reviews for reappointment, then promotion to Associate Professor on Term, are key to the FASTAP system: "these reviews will be buttressed by strengthening mentoring by senior faculty and improving leaves to aid the research and scholarship of non-tenured faculty" (Report 10). Yale prides itself on "guaranteeing leaves for research and scholarship [that] necessitate and should stimulate effective, empathic, and discerning mentoring for non-tenure faculty by the University's distinguished senior faculty" (Report 14). Regarding the Associate Professor Leave ("APL"): "Assistant professors in the Faculty of Arts and Sciences who are promoted to the rank of associate professor on term are eligible for an Associate Professor Leave, a full year's leave at full salary... [that] may be awarded to associate professors who present, during the fall of the previous academic year, a research proposal that is approved by the department chair and the FAS Dean" (FH XVII.B.5.b). The importance of the APL to FASTAP is highlighted with the following statement: "Morse Fellowships, Junior Faculty Fellowships, and Associate Professor Leaves – where the benefit to the faculty member is paramount – will not be disallowed or delayed by reason of adverse effect on the department, program, or school" (FH XVII.A.1). Yale promises its associate professors on term a fair hearing for an APL request, and recognizes the benefits – of "paramount" importance – such a leave will bring.

*GENERAL PROCEDURES GOVERNING APPOINTMENTS AND PROMOTIONS*

Specific procedures ensure that university standards are met so as to guarantee fairness in matters of appointments, reviews, and promotions: "The definition and standards for appointment at each rank and the procedures that govern appointments, reviews, and promotions constitute the means by which the fairness and quality of faculty appointments and promotions are ensured" (FH III). Those procedures include mentoring and careful evaluation by a department chair and other senior faculty members at each and every stage in the non-tenured ladder ranks:

> Reappointment of persons holding term appointments is not automatic and requires careful evaluation of a candidate's work by the members of the

BYRNE009155

department eligible to vote on reappointment. Chairs, in consultation with the Dean of the FAS and the Deputy Provost for Faculty Development and Diversity, are responsible for ensuring the development and effectiveness of mentoring programs for non-tenured faculty. They are expected to keep non-tenured faculty members informed of the department's procedure for appointments and promotions and every year to discuss with each individual the department's assessment of his or her progress and prospects. (FH IV.H.1)

A department chair bears the responsibility for formal reviews, mentoring, and notification of "progress and prospects" to non-tenured ladder faculty at each stage of their professional career at Yale. Initial appointment is for a four-year term, reappointment is for a three-year term, and a faculty member's promotion to Associate Professor on Term is "for a term equal to his or her remaining eligible time in the non-tenure ranks" (FH IV.H.1). At each of those stages, a faculty member's work is carefully evaluated for quality and promise, and the faculty member is informed of those results. Conduct inconsistent with Yale Standards for Faculty includes: "Failure to meet the generally accepted responsibilities of an appointed faculty leadership position" (FH II.B.3.l), such as the responsibility of an appointed department chair to develop and ensure the effectiveness of mentoring programs for non-tenured faculty. In the Department of Spanish & Portuguese, the mentoring program consists of a once-a-year meeting of all junior faculty together with the department chair, to review en masse the "Default Clock" for non-tenured faculty (Report 23, figure 2).

Yale policy regarding voting on appointments and promotions is governed by FH II.K.2 and the document titled "Yale Voting Policies" linked to Step 3 of the FAS Steps for Promotion document: http://facultyadmin.yale.edu/fas-voting-policy. On voting irregularities in my tenure review, violative of those policies as well as both FH III.L.3.a.i, and FH III.L.3.a.iii, I refer your office to my Appeal 1, and add here the name of NV to those others (RA and RGE) addressed in my April 1, 2015 recusal request, which is discussed in detail in Appeal 1. Those three faculty members all violated Yale policy on voting by allowing a personal and political conflict of interest to interfere with their determination on my tenure review, contrary to FH III.L.3.a.i. In violation of FH III.L.3.a.iii, they retaliated against me for having spoken out against abuses of university and public policy perpetrated by them, including sexual harassment and discrimination, and witnessed by me. Further, they failed to provide adequate and fair consideration to my review, approaching it instead with prejudgmental bias, in violation of FH III.L.3.a.ii, and as further discussed below.

PROCEDURES FOR TENURE REVIEW

The specific steps for a tenure review at Yale are listed in a document on the Faculty Administrative Services website: http://facultyadmin.yale.edu/resources/reappointments-promotions, "Steps for Initial Promotion to tenure." The dates governing my tenure review are those found on an earlier iteration of that document, the "Promotion Tenure

BYRNE009156

Timetable," and they are: April 1, notification to candidate; April 15, candidate submits initial materials; April 22, select dept. review committee; June 8, identify referees and comparison candidates; by June 30, secure referees; by June 15, schedule TAC review date; Aug. 18, candidate's materials due; Sep. 1, materials to referees and committee; by Nov. 1, dept. review committee recommendation; early to mid-Nov., departmental vote; December-March, present successful cases to TAC.

Yale considers a candidate's scholarly writings "the most tangible and enduring demonstration of a scholar's distinction" (FH IV.H.2), and specifies that a "tenure review will include assessments by experts outside of Yale" (FH IV.H.1). External reviewers (referees/ experts) are asked to address a candidate's "original contributions to research" in both general terms and in the precise "area of specialization," by evaluating the "breadth, depth, and impact" of a candidate's scholarship and research as deserving a place "among the leaders in his or her field throughout the world" (http://facultyadmin.yale.edu/resources/reappointments-promotions, "Follow-up Letter to External Referees"). The same document asks external reviewers to compare a candidate's work "with that of leading scholars in this field" by making comparisons to specific scholars selected by the internal review committee at Yale and, if they choose to do so, by suggesting further comparison candidates. The external reviewer is asked to assess the evidence in a candidate's existing dossier, and to comment on his/her ongoing and possible future work in the discipline.

A list of proposed referees is prepared by the department and approved by the FAS Dean. Those external referees are full professors in the candidate's precise field of research. Each receives a letter from the department, along with a dossier prepared by the candidate. A small department at Yale, such as the Department of Spanish & Portuguese, will not have two specialists in one field, and my department does not have another professor knowledgeable about current developments in my field. The letters from external referees are crucial in that they provide up-to-date expert opinion in the precise field and subfield of a candidate.

*STANDARDS OF CONDUCT REGARDING APPOINTMENTS AND PROMOTION*

Yale holds its faculty to high standards of conduct in all matters: "Members of this University have freely associated themselves with Yale and in doing so have affirmed their commitment to a philosophy of mutual tolerance and respect. Physical restriction, coercion, or intimidation of any member of the community is contrary to the basic principles of the University" (FH II.A).

Regarding appointments and promotions, the Yale faculty is charged with "the application of fair and consistent standards and processes in matters of promotion and tenure" (FH II.B), obliged to "participate constructively and without discrimination in hiring and promotion decisions" (FH II.B.3), and specifically instructed to not evaluate

BYRNE009157

"the professional competence of colleagues using criteria that do not directly reflect professional performance" (FH II.B.3.j).

Yale University also stresses the need for a process of tenure and appointments "guided by the principles of open access and diversity" (FH IV.E). In sum, Yale pledges fairness, consistency, non-discrimination, and high principles in all matters of appointments and promotions. A process that involved arbitrary and capricious determinations made in bad faith would be an insult to Yale's academic ideals of excellence, and contrary to the university's basic pledge of fairness to its faculty.

STATEMENT OF FACTS

In July of 2008, I began at Yale as Assistant Professor of Spanish in the Department of Spanish & Portuguese.

In September of 2009, I submitted a proposal for a Morse Fellowship to be taken in the year 2010-2011, for work on my project Ficino in Spain. An internal departmental review committee of RGE, NV, and Prof. David Jackson provided individual comments on an early draft of the proposal, then unanimously approved the final version in October of 2009.

For my third-year review in 2010-2011, my work received "careful evaluation" for reappointment (FH IV.H.1) by an internal departmental committee consisting of RGE, NV, and Prof. María Rosa Menocal.[1] I was later told by RA that all aspects of my performance were found to be exemplary, that the full department vote was unanimous in my favor, and that my progress and prospects were excellent. As indicated in the FH, I had shown "evidence of success... and achievement" (FH IV.H.1). Pursuant to FASTAP: "these reviews will be buttressed by strengthening mentoring by senior faculty and improving leaves to aid the research and scholarship of non-tenured faculty" (Report 10). In that respect, RA told me that my work: research, teaching, and service, was of such high quality that I would be "the model for all others to follow."

In fall 2011, I was again informed by RA that all aspects of my work: research, teaching, and service, were exemplary.

My term of reappointment as Assistant Professor of Spanish for an additional three years began in July of 2012.

On September 9, 2012, RA again praised my research work: "well done, Sue! Another banner year for you. I'm so pleased" (email, RA to Byrne). In that same month, my second book, *Law and History in Cervantes' Don Quixote*, was published.

---

[1] Prof. Menocal was the last person to receive tenure in the department, in 1992. The department rejected her candidacy, she appealed to the provost, and she was granted tenure.

BYRNE009158

In December of 2012, RA encouraged non-tenured ladder faculty in the department to put in for promotion to Associate Professor on Term during their fifth year of service, should we feel ready to do so.

In January of 2013, I submitted the materials for promotion review. RA told me that nine very positive letters of support were received from external referees, that on April 16, 2012, an internal committee of RA, RGE, and NV heartily recommended my promotion to the full departmental faculty, and that the full department vote was unanimous in my favor. I had reached the third step in Yale's ladder ranks, and had been judged to have "significant published research and scholarship representing early demonstrations of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university citizenship" (FH IV.H.1, criteria for Associate Professor on Term).

My appointment as Associate Professor on Term began in July of 2013.

In September of 2013, RA told me that my research accomplishments over the previous year were "wonderful" (email, RA to Byrne).

On January 7, 2014, RA arbitrarily and capriciously changed the vetting standards for my position by telling me, six years after I was hired: "The problem with your tenure review is that we don't need another Cervantista in the department." See Appeal 1.

In January of 2014, RA, RGE, and NV arbitrarily and capriciously denied tenure to my colleague Paulo Moreira. For years, RA had told me: "Paulo is brilliant and will have no problem getting tenure." However, having failed to convince Paulo to turn against David Jackson by usurping the Portuguese summer program in Brazil, the trio of RA, RGE, and NV decided to unfairly deny him tenure. Their only consideration was their hold on power in the department, and they used the pretense of professional judgment as cover for those improper motivations.

On August 13, 2014 RGE, named as my official department mentor in 2008 by RA, told me directly that he intended to unfairly and arbitrarily deny me tenure:  "As to this mentoring thing: no one ever gets tenure at Yale, so you should keep looking for another job" (See Appeal 1). Witnesses to RGE repeating this blanket statement of contempt for FASTAP on multiple occasions during the annual "mentoring" meetings held by RA include Profs. Paulo Moreira and Kevin Poole. See Appeal 1.

From September of 2014 through February of 2015, in their roles as members of the internal committee reviewing my APL proposal, RA, RGE, and NV made unsupported statements defaming my research work that directly contradicted their previous praise for the same body of work. They denied me that year-long leave, which is a key part of the FASTAP system, and for which I had become eligible through my promotion to Associate Professor on Term.

BYRNE009159

Of the 140 APL requests filed from academic year 2009-2010 through academic year 2014-2015, only one is listed in the FAS Dean's office with a negative recommendation by the candidate's department: my own 2014 APL request. According to Dean of Academic Affairs Jack Dovidio, who graciously provided the full numbers for those years, "my records indicate that one proposal was received by the Dean's Office in the Fall of 2014 after having been rejected by the applicant's department -- your application" (Dovidio to Byrne, 4 March 2016). That sole exception to the norm, my APL proposal, had at the time already been awarded $12,000 in research grants by two different Yale sources, only to be rejected in bad faith by RA, RGE, and NV. That unique exception to the standard and norm for APLs demonstrates the malicious intent of those three faculty members, who chose to deny me the benefits – of "paramount" importance as Yale FH says – that such a leave would bring. For full details on their failure to abide by ethical standards during the process of unfair and inadequate consideration that led to that disconcerting determination, see Appeal 1.

On March 6, 2015, all ladder faculty in the department received an anonymous letter from graduate students listing problems in the department that ranged from lack of intellectual freedom to sexual harassment and unfair tenure denials. The professors criticized in that letter were RA, RGE, and NV.

On March 25, 2015, *Yale Daily News* published a story on the department and, specifically, on that anonymous letter. That and subsequent stories further attested to problems with RA, RGE, and NV.

On March 27, 2015, the Provost informed all members of the department that there would be a departmental climate review. As that review was carried out, over 60 persons would provide testimony confirming the crisis situation in the department. A number of those persons testified about RGE's deeply-entrenched bias against tenuring any junior colleague, a posture directly at odds with FASTAP, and about RA and NV aiding and abetting RGE in that prejudicial stance. I was interviewed on April 22, 2015 (see Appeal 1, and the "Climate Review Report" produced by attorneys Jamaal Thomas and Barbara Goren).

On March 30, 2015, RA sent me the required letter requesting materials for my tenure review.

On April 1, 2015, I requested that RA and RGE recuse themselves from my tenure review. Of interest for the facts below, RA and RGE refused to recuse themselves, while the FAS Dean insisted that her office would make the final determination on whether to grant my recusal request. For particular details and events related to the recusal request, its relationship to the departmental climate review, and retaliation against me for it and other pertinent reasons, see Appeal 1.

From April 15 through August 18, 2015, I submitted all documents and my full dossier according to the tenure review calendar and schedule. Through December of 2015, the

BYRNE009160

FAS Dean's office tied my recusal request directly to the ongoing departmental climate review, and repeatedly insisted that it could not decide on that request until after the conclusion of the climate review. The dates indicated for specific steps of recommendation and voting on my tenure review were not met by the committee, nor by the departmental faculty, due to the linking of the recusal request to the ongoing climate review.

In July of 2015, my third monograph study, *Ficino in Spain*, was published.

On July 24, 2015, Dean Gendler informed me that NV would be the chair of my internal review committee. That attempt to put a bandaid on a festering wound did not help. NV will always follow the instructions of RA and RGE on all departmental matters, as she had done in signing her name to the denial of my APL request in the fall 2014 semester. NV's blind obedience to RA and RGE was testified to by a number of department members, including me, during the climate review process. The same problem was highlighted in *YDN* stories, and in the anonymous graduate student letter that led to the departmental climate review. Rather than take my review out of the hands of the politically tainted group, the FAS Dean gave it directly to them, while ostensibly putting special procedures in place to delay any meetings or action on it. Defying those special procedures, throughout the summer and fall of 2015, RA, RGE, and NV held secret meetings to discuss my tenure review.

On August 13, 2015, Jack Dovidio wrote to inform me of the full composition of the internal committee for my tenure review: NV as chair, with Profs. David Jackson (Spanish & Portuguese), Howard Bloch (French), and Giuseppe Mazzotta (Italian). Without wishing to impugn the motives of any colleague, I must point out that Prof. Mazzotta is RGE's best friend. For an example of their sexually-tainted bullying and hijinks at my expense, see Appeal 1, page 13.

On August 14, 2015, I handed my tenure dossier to NV in her office. As I did so, NV told me that she had already consulted with RA. Less than one hour after giving NV the dossier, I returned to her office to deliver a book she had requested. RA was in the office consulting with NV about my dossier. I heard them speaking just prior to knocking on the door, which NV opened only slightly so as to hide RA from my view.

From approximately 9 to 10 a.m on August 17, 2015, NV and department administrative staffperson Susan Wheeler uploaded my dossier to Interfolio. Following that meeting, NV had a lengthy consultation with RA and RGE. in RA's office. Department registrar Virginia Gutiérrez is a witness to this meeting. At approximately 11:30 a.m., NV rushed out of that meeting. As she came out of RA's office, I approached NV to ask her if she had found everything in the dossier easily organized for upload. Flushed, she said yes, then hurried away.

On December 14, 2015, Dean of Academic Affairs Jack Dovidio told me that he would attend and oversee all meetings of the internal committee for my tenure review, as well

BYRNE009161

as all those held by the full faculty to discuss and vote on my review. He assured me that no such meetings had yet taken place, an assurance that I knew to be false given the examples of such meetings I had seen during the previous months, as detailed above.

On December 15, 2015, FAS Dean Gendler and Graduate School Dean Lynn Cooley held a meeting with ladder faculty in the department to inform us of the results of the departmental climate review. We were told that, to address the problems that led to the critical situation in the department, NV would relinquish her administrative role as Director of Graduate Studies. That determination strongly suggests that known problems regarding NV's judgment, fairness, and fitness were documented during the departmental climate review and are evidenced in the climate review report. Despite that knowledge on the part of the administration, NV was allowed to continue as chair of the internal committee reviewing my case for tenure, and to perpetuate an identical pattern of misconduct in that role, consulting regularly as she had and would continue to do with RA and RGE on all matters related to my review. The same majority bloc of senior professors in the department that had created and have perpetuated for years a climate of fear and intimidation, such that the drastic measure of a climate review became a necessity, was left in place to further and completely corrupt my tenure review.

On January 19, 2016, Dean Gendler responded to my April 1, 2015 recusal request to say that there would be no recusals. See Appeal 1.

On February 9, 2016, the internal committee and the department's senior faculty met to discuss my tenure review. Prior to the full meeting, Giuseppe Mazzotta met in private with NV in the department library. Virginia Gutiérrez is a witness to this private meeting.

On February 11-12, 2016, I was out of town interviewing for a position at another university. On February 11, NV sent me an email request for a meeting on Feb. 15 to communicate to me the result of my tenure review. I replied with note to being out of town. For three days following my reply, RA, NV and Yale Law School professor Kate Stith ("KS") strategized to extract the Internet Protocol Address ("IP address") from my emails, inadvertently copying me on some of those messages. The IP address provides location, which would allow RA, NV, and KS to identify the university where I was interviewing, and to attempt to blacklist me there. On my return, I asked RA, NV and KS if they wanted my IP address, as I knew what it was and could provide it. They failed to respond. This was just the latest episode in a series of retaliatory measures taken against me by RA, RGE, and NV (see Appeal 1), now scheming with yet another colleague, KS.

On February 15, 2016, I received the official notification of denial of tenure from NV and Jack Dovidio. I told them both that I knew the entire process had been corrupt. RA, RGE, and NV were rife with bias towards me, and towards Yale's tenure track system itself. Both the FH guarantee of fair and adequate consideration (FH III.L.3.a.ii), and

BYRNE009162

FASTAP's pledge regarding procedures for tenure and appointments, specifically that they "must be rigorous, clear, and fair, and must be perceived as such" (Report 2), were mocked by my three senior colleagues, who approached the review vote with one predetermined mind. I am certain that Jack Dovidio can attest to that.

My curriculum speaks for itself and does not need defending. Nonetheless, it is worth highlighting that, in the eleven years since the awarding of my doctorate in December 2004, I have published three single-authored monograph studies, the most prestigious form of publication in my field, along with multiple articles in peer-reviewed journals and invited volumes. My publications have all been very well-received, very positively reviewed, and incorporated into critical conversation in my field by numerous scholars. I have successfully crossed disciplinary lines, such that my second book, which sold out twice in hardcover and was re-printed in a paperback edition within nine months of its first publication, is now held in over 800 libraries worldwide, a group that includes college, law, and supreme court collections. That book has received ten uniformly positive reviews. My third book, published just six months ago, has already earned two excellent reviews: it is a "ground-breaking book" (Fred de Armas, University of Chicago, *Renaissance Quarterly*, forthcoming), and "an interesting example of the kind of book that can result when someone takes a commonly received scholarly opinion and tests it against the actual data. All of us view the world through our various heuristic filters, some of which we construct ourselves and some of which we inherit from our teachers, but as this book shows, these filters can keep us from seeing important facts that are literally right in front of us" (Craig Kallendorf, Texas A&M University, *Neo-Latin News* 63.3-4 (2015). I am frequently invited to give lectures in national and international settings, and I am recognized and respected in those same circles. Within the last three years alone, I have been elected to the boards of three different professional associations: I am the Discipline Representative for Hispanic Literatures of the Renaissance Society of America, a Member of the Executive Council of the Cervantes Society of America, and a Vocal [Spokesperson] on the Board of Directors of the Asociación Internacional Siglo de Oro. I have just been asked to stand for election to a fourth council seat: the executive board of the Asociación Internacional de Hispanistas, the most important association for scholars of Hispanic Literatures in the world. There is no question as to the "quality of my scholarship" and the blatant falseness of that bland critique made by my senior colleagues shows disdain for Yale's ideals on academic excellence. At the last meeting of the Modern Language Association of America (Austin, TX, 2016), during the session on the status of the field in Golden Age Studies, two different speakers highlighted my work as new, innovative, and evidence of the direction research in my field is taking, and should take. Each speaker used one of my books as the prime example of trends in the field: for one, it was my *Law and History in Cervantes' Don Quixote* (2012), and for the other, my *Ficino in Spain* (2015). My work clearly demonstrates "evidence of exceptional accomplishments and future promise" (FH IV.H.2, criteria for Associate Professor with Tenure), and I am well on my way to being one of "the foremost leaders" in my field "throughout the world" (FH IV.H.2, criteria for Professor). As Yale says of its tenured professors, the difference between Associate Professor with Tenure and Professor with Tenure "is a difference in degree rather than

Byrne 12

BYRNE009163

in kind" (FH IV.H.2). I am already a respected leader in my field, both nationally and internationally, as the elected posts to boards and representative positions make clear. The facts of my curriculum vitae do not lie.

Clear evidence of the improper motivations of RA, RGE, and NV are found in their inconsistent application of standards to the same book that has garnered applause from all other scholars in my field. In 2013 those three colleagues had nothing but praise for my *Law and History in Cervantes* Don Quixote (2012) as they promoted me to Associate Professor on Term, assuring the administration in their 2013 Departmental Case Summary for my promotion that with that book, I had attained the standards: "significant published research and scholarship representing early demonstrations of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university citizenship" (FH IV.H.1) necessary for that rank. Despite those encomiums, in their 2016 Departmental Case Summary denying me tenure, the same three faculty members inexplicably reverse course and attempt to smear and defame that very same book. Their inconsistent positions are evidence of bias and bad faith, contrary to FH III.L.3.a.ii, which calls for "fair and adequate consideration." The charges to Yale faculty regarding promotion reviews: "the application of fair and consistent standards and processes" (FH II.B), to "participate constructively and without discrimination" (FH II.B.3), and to evaluate the professional competence of colleagues using only criteria that directly reflect professional performance (FH II.B.3.j), were treated with contempt by those three senior colleagues. They ignored my professional performance, while acting and voting on the basis of unrelated, unfair, discriminatory and personal political motives. For their two-year long spate of retaliatory acts against me leading up to, and even continuing after that February 9, 2016 vote, see Appeal 1.

Far from Yale's "philosophy of mutual tolerance and respect" in which "Physical restriction, coercion, or intimidation of any member of the community is contrary to the basic principles of the University" (FH II.A), the departmental climate of intolerable intimidation and verbal bullying created and maintained by RA, RGE, and NV made a fair tenure review an impossibility. From fall 2014 through spring 2015, it was necessary for me to consult with the FAS Dean's office on multiple occasions regarding the irrational behavior of the same three faculty members, as they earned for themselves the dubious distinction of being the only department at Yale to ever deny the APL proposal of a junior colleague. Their scorn for FASTAP policy was evident then. On April 1, 2015, for obvious reasons, I had no recourse but to ask two of my colleagues to recuse themselves from my tenure review (see Appeal 1). RGE openly and shamelessly proclaims his contempt for FASTAP, broadcasting his fixed view that no tenure case at Yale should ever be granted. Given that biased predetermination, he cannot be a fair and impartial decision maker, and he should be barred from voting on any tenure case. RA has made me a scapegoat for her anger about negative publicity in the *YDN* and, in April of 2015, she publically shouted and hurled false accusations at me (see Appeal 1). The chair of my tenure review committee, NV, was disgraced by removal from departmental administrative office following negative findings in the report on the departmental climate review, yet inexplicably left as chair of my review committee. The

Byrne 13

BYRNE009164

denial of tenure vote was pushed through without even allowing me the procedural 45-day period to appeal the earlier denial of my recusal request, despite my expressed intent to do so. Even as she arranged the meeting at which she would inform me of the denial of tenure vote, NV continued plotting with RA and KS to cause me further professional damage. Those vindictive, retaliatory actions taken by my senior colleagues are deplorable, and provide clear evidence of their bias. The phrase itself, "arbitrary and capricious," suggests variance from a procedural norm and standard: to the contrary, the Department of Spanish & Portuguese at Yale is known for its open anti-procedural ideology flaunted by RGE and abetted by RA and NV. Together, they have a perfect record of arbitrary and capricious decisions, and their insolent, public defiance of Yale policy is an untenable posture for your office to support.

From start to finish, my tenure review was handled improperly. The plethora of complaints against RA, RGE, and NV should have led to my review being removed entirely from a department in crisis. Instead, it was left in the same unclean hands responsible for the creation of that critical situation. Those three senior colleagues used a farcical and flimsy pretense of judgment on substantive issues of professional competence as cover for their own improper motivations. Due to their malintent, and to the freedom they were given to exercise it, the Yale administration failed its promise to me of a fair review on the merits.

REQUESTED RELIEF

I ask your office to review my full dossier (returned to me on Feb. 15, and at your disposal), along with all documents filed for my tenure review, including the letters from external referees that surely attest to my original contributions to research in my field, as well as to the breadth, depth, and impact of my work. I also ask that you review carefully the inexplicable contradictions in filings by the same department for my 2013 promotion versus this 2016 determination, as well as the full departmental climate review report. This last will attest to the obvious incompatibility between the department's ongoing crisis situation and the possibility of a fair tenure process in the midst of it. I am certain that such a review will convince you of the need to reverse this corrupt decision, and to grant me the tenure that I have earned on my merits.

Yours truly,

Susan Byrne

8 March 2016

BYRNE009165