Notes from tenure deliberation and vote meeting: Susan Byrne   Tuesday, February 9, 2016, 5 pm, Dept Library

Present: Noël Valis, chair; Jack Dovidio, FAS Dean for Academic Affairs, Giuseppe Mazzotta, Sterling Professor of Italian, Howard Block, Sterling Professor of French, Departmental colleagues: Roberto Gonzalez Echevarria, Anibal Gonzalez Perez, K. David Jackson, Rolena Adorno.

Noël called the meeting to order and read the FAS Confidentiality statement and noted that this is not only Yale policy but also Connecticut State Law. Noël added that confidentiality is binding and has no time limit ("expiration date").
 Anibal claimed he had never heard the confidentiality statement and questioned its source. He also questioned its presence in the laws of the State of Connecticut. Noel stated that this was available online, and FAS policy as well as state law.

Jack Dovidio added that, regarding the voting, any abstention would not be counted and so a single abstention could result in a non-affirmative result (2-2 and one abstention).

Regarding the standards for tenure, Noël read the FAS Handbook statements about the successful candidate's competitiveness with foremost leaders around the world, that the vote to tenure was a recognition of accomplishment and also further promise, with the expectation that the successful candidate would be ready for promotion to the rank of full professor in five years.

Noël read the summary of the internal review committee's findings, that committee consisting of Valis, Bloch, Jackson, and Mazzotta, who had convened on February 3, 2016, for the discussion that resulted in this summary report.

David Jackson spoke about the Cervantes book, but not a word about the Ficino book.

After hearing the summary report of the internal committee, Anibal objected that the external letters of "recommendation" should not be dismissed, that in fact they were important; there were, by his count, six positive letters, two negative ones.

Anibal (?) said he could not recognize Sue in the report's comments. He went on: "There is a common tendency in this department. . . Yale has to prove it can promote people from within the system; it has to prove it can do what the great state universities do. This case is meritorious; and there may be 'other issues.' The whole country is looking at this department."

Jack asks if the letters were considered, and the answer was a resounding, collective yes. Noël pointed out that they were on the server for the committee to read and that she had the full set with her, on paper.

David commented on the letters by citing adjectives he had read, but he did not quote any of the letters.

David was working from a half sheet of paper with a few words scribbled on it; Anibal had a stack of paper in front of him that was apparently a section of the Faculty Handbook. He glanced at it a couple of times but did not cite from it.

Roberto presented his comments on the case, making the point that Americo Castro was represented only by two footnotes, that Sue had not cited his important *El pensamiento de Cervantes* (1925) that examined Neoplatonism in Spain not only through Ficino but many other authors as well and that tere could have been multiple sources. How could Sue have overlooked that fundamental study?

Confidential - Attorneys' Eyes Only

BYRNE009059

He indicated that he did not find the Cervantes book very good (never had), that it hinged on a single source and revealed her essentially positivistic approach to scholarship. The Cervantes book lacked "hermeneutical energy" and it was also, like the rest of her work, very poorly written.

In the Ficino book, she argued that MMP "excised" Ficino from Spanish scholarship, but added that only [*Roberto*] someone far from the study of Spanish literature could believe that. Since the Generation of '98, MMP has been the *bête noire* of Spanish criticism. An arch-Catholic conservative, MMP would not have preferred the Jew Leon Hebreo to Ficino, a Catholic priest, as the most influential Neoplatonist. (*but he did!*)

The weakness of her catalogues of quotes and authors is that we have no way of comparing numbers: How do the number of mentions of Ficino, for example, compare with those of Hebreo? But the main weakness is that there is no comparison of systems of thought. *Ficino in Spain* does not contain a single idea.

Citing Sue's conclusion, "The persistent idea that Ficino was not a fashion in Spanish thought and letters is, frankly, an obsolete anachronism." Then why, asked Roberto, devote a whole book to refuting it?

On the letters of evaluation, Roberto cite                          as being "very descriptive,"              on the book's limited interpretive power and its partially digested research                  letter as "real fluff,"
                  as "devastating," and he found, despite her intentions, a damning criticism in              letter.
He quoted "It does not draw out their [insights] place in what is a vast and complex historiographic field as considering the consequences for the interpretation of a slippery burlesque text [Don Quijote]
he continued called Ficino work "a reference book"; he dismiss  d                          for claims about her "collegiality" and "work in the classroom": How would   know? Or         he cite       remark about the first book as a "minimally revised dissertation" and a "catalogues of attributions"; on the Ficino book, 'admirable erudition, disappointing execution."

He concluded that Byrne was not tenurable at Yale.

My report, after the characterization of the Cervantes and Ficino books, quoted directly from all eight letters. I concluded that I did not find Byrne tenurable.

Noël's report pointed out with great effectiveness Byrne's ignorance of Spanish twentieth-century history, which is where Byrne's story takes place, after all. Noël got our attention by pointing out that Sue made the colossal error of calling Franco's tenure one of forty-five years.

Following Noël's report (she noted that she would not go through the letters, since I had done so, but was prepared to do so), Anibal claimed that the letters were unfair: unfair in the readings by us and in their contents; that if the writers had known the weight they would carry, they would not have written them as they did (!). In short, he contradicted completely his earlier concern that the letters were being dismissed; now finding out that they were taken seriously, his only defense was to claim that they were unfair.

Jack said, "Let's get this on the table. Are the letters fair or unfair? Howard said they were fair, not only in our readings but in the letters themselves. I remarked that the letters were based on content, and were substantive. They were not ad hominum attacks' on Sue's work.

Giuseppe brought in the principle that the letters were significant, but that it was, after all, the department that was making the decision here. To mollify Anibal. But Anibal did not seem comforted by this.

Confidential - Attorneys' Eyes Only

David objected to the claims about the quality of scholarship that I had cited from †
letters. He said paradigm shifts and such were irrelevant; that Sue had a narrow focus and she achieved
what she intended. Not convincing!

Anibal went back to his attack mode, speaking about the hostility in the department. Roberto replied that
there was no hostility in the department, but that Anibal had created, had invented it.

Regarding standards, it was pointed out the Howard had been the chair of the senior appointments
committee in the Humanities division, and that Roberto, Noël, Giuseppe and I had all served on it.
Roberto asked Anibal if he had and he replied, "at other universities," which Roberto dismissed; it was
Yale that mattered.

Giuseppe and Howard left, with our thanks, and Noël distributed the ballots. Jack counted them: 3
against, 2 for; the vote did not carry.

With a reminder about the confidentiality of the proceedings, the meeting was adjourned at approximately
6:30 pm.

Confidential - Attorneys' Eyes Only

BYRNE009061