**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUSAN BYRNE,  Plaintiff | : : : | Civil Action NO. |
| vs. | : : : | 3:17-cv-01104-VLB |
| YALE UNIVERSITY  Defendant | : : : : | APRIL 1, 2019 |

                         **DEFENDANT,**

                         **YALE UNIVERSITY**

      **By:**   ***/s/David C. Salazar-Austin***
              **Victoria Woodin Chavey (ct 14242)**
              **David C. Salazar-Austin (ct 25564)**
              **Jackson Lewis P.C.**
              **90 Statehouse Square, 8th Floor**
              **Hartford, CT  06103**
              **Tel: (860) 522-0404**
              **Fax: (860) 247-1330**
              **chaveyv@jacksonlewis.com**
              **salazard@jacksonlewis.com**

## DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT

1. On 2/19/08, Yale hired Plaintiff for an initial term from 7/1/08 – 6/30/12.[1]

2. There were five senior faculty members in the Department of Spanish and Portuguese: Rolena Adorno, David Jackson, Roberto Gonzalez Echevarria, Anibal Gonzalez Perez, and Noel Valis.[2]

3. In July 2013, Plaintiff attained the position of Associate Professor on Term.[3] The Faculty Handbook states the applicable standard for such promotion.[4]

4. The Case Summary states Plaintiff's work was "extremely well focused," her archival work was merely "solid," and her written Spanish was "competent." It questions whether her "scholarship…competes with the task of interpretation," and notes the aspirational hope her work would "open out to onto ever larger vistas."[5]

5. In September 2013, Plaintiff sought an Associate Professor Leave ("APL").[6] Adorno, Gonzalez Echevarria and Valis told Mary Miller, Dean of Yale College, they found the proposal "quite poor."[7] They also told Plaintiff their views.[8] Plaintiff agreed the proposal was inadequate.[9]

6. The next year, Plaintiff submitted another APL proposal. On 10/17/14, Gonzalez Echevarria cited the Department's concerns – including that the proposal

---

[1] Byrne Offer Letter, at Byrne000010 – 11 (attached as Ex 2). Each exhibit is attached to Defendant's Memorandum in Support of its Motion for Summary Judgment.
[2] Valis Tr., p. 17:25 – 18:22. Cited pages from Professor Valis's deposition are attached as Ex. 3.
[3] Byrne Tr., p. 170:5-10. Copies of cited pages from Plaintiff's deposition are attached as Ex. 4; Department Case Summary, at Byrne003397 – 99 (attached as Ex. 5).
[4] Faculty Handbook, July 1, 2014, p. 31 (attached as Ex. 6).
[5] Ex. 5, Byrne003397 – 003399; Valis Tr., p. 34 (Ex. 3).
[6] Byrne Tr., pp. 226 – 228 (Ex. 4).
[7] Adorno E-mail, at BYRNE004813 (attached as Ex. 7); Byrne Tr., p. 227:1-9 (Ex. 4).
[8] Byrne Tr., p. 227:1-9 (Ex. 4).
[9] Byrne Tr., p. 227:1-25 (Ex. 4)

1

was "badly written," a systemic issue she could not resolve by correcting a select few mistakes.[10]

7.    Plaintiff responded by calling some of the concerns "disingenuous," and stating she "heartily disagree[d]", while quoting various third-party reviews on her earlier work. She denied the Department had expressed "any sound concerns" and said she "expected" approval.[11]

8.    After Plaintiff submitted a third, revised proposal,[12] the Department rejected it, thus denying her the APL.[13] Plaintiff pointed to the denial of her APL as the first instance of "anger" directed toward her by the Department.[14]

9.    On 4/1/15, Plaintiff requested Adorno and Gonzalez Echevarria recuse themselves from involvement in her tenure case.[15] Plaintiff explained why she believed they were biased, but did not mention having engaged in protected activity.[16]

10.    Yale has a policy on recusal in the event of a conflict of interest; it provides for no third-party mechanism to require recusal.[17]

11.    Adorno and Gonzalez Echevarria denied Plaintiff's recusal request on April 13, 2015.[18] Adorno, however, did recuse herself from the departmental review

---

[10] 10/17/14 Letter, at BYRNE008973-74 (attached as Ex. 8); RGE Tr., pp. 60:23 – 61:9. Cited pages from Roberto Gonzalez Echevarria's ("RGE") deposition are attached as Ex. 9.
[11] 10/18/14 Byrne Letter, at BYRNE008975 – 77 (attached as Ex. 10); Byrne Tr., p. 239:17 – 240:3 (Ex. 4).
[12] Byrne Tr., pp. 242:1-243:19 (Ex. 4); Byrne APL Proposal, at BYRNE008978 – 87 (Ex. 11).
[13] Valis Tr., pp. 58:21 – 59:2 (Ex. 3).
[14] Byrne Tr., p. 88:3 – 7 (Ex. 4).
[15] Byrne Recusal Letter, at BYRNE000464-465 (attached as Ex. 12).
[16] Ex. 12.
[17] Dovidio Tr., p. 84:9 – 85:12. Cited pages from Jack Dovidio's deposition are attached as Ex. 13.
[18] 4/13/15 Adorno Letter, at P1416 (attached as Ex. 14).

2

committee.[19]  Valis became chair of that committee.[20]  Yale complied with Steps 1 and 2 of the FASTAP process.[21]

12.     Senior Associate Dean John Mangan informed Adorno that, consistent with Step 3 of the FASTAP process, the FAS Dean's Office would oversee composition of the departmental review committee (i.e., the Internal Review Committee).[22] The purpose of this committee was to read Plaintiff's tenure materials and make a recommendation to the committee that would vote on tenure.[23] The members of the Internal Review Committee were Valis and Jackson, and Howard Bloch and Giuseppe Mazzotta from Yale's departments of French and Italian; Mazzotta was familiar with the work of Ficino, the subject of Plaintiff's third book.[24]

13.     The committee that considered Plaintiff's tenure case included the Internal Review Committee members plus Adorno, Gonzalez Echevarria, Gonzalez Perez, and Jack Dovidio, FAS Dean for Academic Affairs; Bloch, Mazzotta and Dovidio were nonvoting members.[25] Dovidio was there to ensure that those participating in the tenure review did not "deviat[e] from the faculty handbook, and the FASTAP 2007 guidelines, and the promotions handbook…."[26]

14.     As required by the FASTAP process and in conjunction with Amy Hungerford, Divisional Director of Humanities,[27] Valis worked to secure, contact and

---

[19] Byrne Tr., p. 200:9 – 23 (Ex. 4).
[20] Adorno Tr., p. 199:12-16. Cited pages from Rolena Adorno's deposition are attached as Ex. 15.
[21] Adorno Tr., p. 199:20 – 200:23 (Ex. 15); FASTAP Steps for Promotion, at BYRNE012566-574, attached as Ex. 16; Valis Tr., p. 90:17 – 91:7 (Ex. 3); Ex. 16; 3/30/15 Adorno Letter, at BYRNE006632 – 35, attached as Ex. 17.
[22] Adorno Tr., p. 204:4 – 13 (Ex. 15); Valis Tr., p. 101:2 – 17 (Ex. 3).
[23] Valis Tr., pp. 99:13 – 100:19 (Ex. 3).
[24] Valis Tr., p. 93:18 – 24 (Ex. 3); Valis Tr., p. 92:15 – 93:13 (Ex. 3).
[25] Valis Tr., pp. 100:6 – 101:1, 106:19 – 25, 107:1-5 (Ex. 3); Dovidio Tr., p. 5:17-20 (Ex. 13).
[26] Dovidio Tr., pp. 134:2 – 135:8 (Ex. 13).
[27] Hungerford Tr., p. 10:9-18. Cited pages from Amy Hungerford's deposition are attached as Ex. 18.

3

then track responses from the external referees.[28]  Valis also scheduled a Tenure Appointments Committee review date;[29] submitted/reviewed Plaintiff's tenure case materials;[30] ensured the external referees received Plaintiff's tenure case materials;[31] tracked the substantive responses from external referees;[32] and ensured the tenure case materials were available on Yale's document management system.[33]  The Internal Review Committee and Department faculty then had to deliberate on Plaintiff's case, and to inform Plaintiff of the decision on tenure.[34]

15.    Although the FASTAP process requires external referee letters, external referees "don't write negative letters but very rarely…."[35] In general, these letters "tend to be highly laudatory because the people writing them tend to suppress their reservations…and…tilt them to the positive side in order to not harm someone who is in the position of coming up for tenure."[36]  Even a review that seems "lukewarm" to an outsider would be "unusual" in the context of the external review process; Divisional Director Hungerford testified she has read hundreds of external referee letters, and more than two negative letters in a single tenure case is "noticeable."[37]

16.    Yale received eight letters from external referees who had reviewed Plaintiff's work.  The letters are documents that speak for themselves, and are quoted at length in the memorandum.[38]

---

[28] Valis Tr., p. 113:9 – 16 (Ex. 3).
[29] Valis Tr., p. 113:17- 114:3 (Ex. 3)(describing compliance with Step 5 of the FASTAP process)
[30] Valis Tr., p. 114:4 - 15 (Ex. 3)(describing compliance with Step 6 of the FASTAP process)
[31] Valis Tr., p. 114:18 – 115:4 (Ex. 3)(describing compliance with Step 7 of the FASTAP process)
[32] Valis Tr., p. 115:5 – 116:11 (Ex. 3)(describing compliance with Step 8 of the FASTAP process)
[33] Valis Tr., p. 117:12 – 118:1 (Ex. 3)(describing compliance with Step 9 of the FASTAP process).
[34] *See* FASTAP Steps, Ex. 16, at BYRNE012573 -74.
[35] Hungerford Tr., pp. 188:9 – 10 (Ex. 18).
[36] Bloch Tr., pp. 42:6 – 23.  Cited pages from Howard Bloch's deposition are attached as Ex. 19.
[37] Bloch Tr., p. 43:2 – 9 (Ex. 19); Hungerford Tr., p. 187:11 – 188:16 (Ex. 18).
[38] Valis Tr., 115:11 – 116:11 (Ex. 3); RF External Referee Letter, at Byrne003634-39 (attached as Ex.

17.     Professor Bloch – who estimated he has reviewed as many as 320 external referee letters during his career[39] – explained that of the roughly 40 tenure cases he had been involved with, the AC letter was among the ten worst letters he had read.[40] Professor Bloch expressed that the final line of the RF letter was "as damning as one can find in any" set of letters, and that the RF letter "would fall in the bottom percentile of such letters" he has seen.[41]

18.     The Faculty Handbook sets forth the standard to be applied in tenure cases.[42] Professor Bloch explained that "the scholarship has to distinguish the faculty member as one of not only the leaders in his or her field, but someone who has made an original and significant contribution to that field and whose work also appeals to scholars outside of a narrow field."[43] Yale has a "high standard" for promotion to tenure.[44] "There's more expected of people in the Ivy League than [is expected of] people not in the Ivy League."[45]

19.     Consistent with Step 10 of the FASTAP process, the Internal Review Committee met on 2/3/16 to deliberate about Plaintiff's tenure case.[46] At the conclusion of the meeting, Valis, Bloch and Mazzotta determined that Plaintiff was not tenurable; Jackson thought she was.[47]

---

20); AC External Referee Letter, at Byrne003618-20 (attached as Ex. 21); AW External Referee Letter, at Byrne003650-53 (Ex. 22).
[39] Bloch Tr., pp. 42:13-23 (Ex. 19).
[40] Bloch Tr., pp. 42:6 – 43:9 (Ex. 19).
[41] Bloch Tr., 52:15 – 53:20 (Ex. 19).
[42] Faculty Handbook, pages 31-32 at Byrne000052-53 (Ex. 6).
[43] Bloch Tr., p. 17:8-19 (Ex. 19).
[44] Byrne Tr., p. 100:22 – 101:5 (Ex. 19).
[45] Byrne Tr., p. 215:2 – 22 (Ex. 4).
[46] Valis Summary of 2/3/16 Meeting, at BYRNE000374 – 376 (attached as Ex. 23); Valis Tr., p. 130:5-16 (Ex. 3)(authenticating summary of February 3rd meeting).
[47] Ex. 23, at Byrne000376.

5

20. As Bloch explained, Plaintiff's work was "marginally competent, but that is not enough for…tenure at Yale."[48] He concluded the external referee letters did not "shine" and were "not a high-ranking set of letters."[49] Bloch explained that he "felt her scholarly work was not of the level that one expects from a tenured faculty member at Yale."[50] Mazzotta stated, "I really didn't think that I was dealing with an exceptional figure."[51] Valis expressed that her "assessment was that [Plaintiff] did not meet the very highest standards that Yale wanted for somebody to be tenured."[52]

21. On 2/9/16, the five senior faculty members of the Department, and Bloch and Mazzotta, met to deliberate on Plaintiff's tenure case, as contemplated by Step 11 of the FASTAP process.[53] Dovidio observed the proceedings to ensure they met all procedural requirements, but did not opine on Plaintiff's qualifications for tenure.[54]

22. Gonzalez Echevarria's view was that Plaintiff was not "tenurable at Yale because of the poor quality of her work, which shows that hers is an ordinary mind lacking critical insight and sophistication."[55] He believed her Cervantes book, the second of her three books, was "like the rest of her work: very poorly written. [Plaintiff] has a penchant for clichés, malapropisms, and very inelegant turns of phrase."[56] Adorno, when asked why she voted against granting Plaintiff tenure, explained she had reached that decision because of the "quality of [Plaintiff's]

---

[48] Bloch Tr., 36:8 – 37:22 (Ex. 19).
[49] Bloch Tr., 36:8 – 37:22 (Ex. 19).
[50] Bloch Tr., pp. 54:24 – 55:3 (Ex. 19).
[51] Mazzotta Tr., p. 19:19 – 20:10. Cited pages from Giuseppe Mazzotta's deposition are attached as Ex. 24.
[52] Valis Tr., p. 220:19 – 25 (Ex. 3).
[53] Valis Summary from 2/9/16 Departmental Vote Meeting, at BYRNE9051-57; Valis Tr., pp. 99:13 – 100:13, 143:23 – 144:2 (Ex. 3)(authenticating summary); Ex. 16, at Step 11.
[54] Dovidio Tr., p. 134:2 – 135:8.
[55] RGE Tr., pp. 205:2 – 205:16 (Ex. 9).
[56] RGE Tr., p. 205:2 – 24 (Ex. 9).

6

academic work at that point." Specifically, Adorno noted that Plaintiff's third book, on Ficino, failed to demonstrate the "upward trajectory" that Adorno had expected to see after reading the Cervantes book and voting in favor of Plaintiff's 2013 promotion.[57]

23. Valis drafted a summary of the meeting after its conclusion.[58] The notes reflect that the five voting members of the committee—senior faculty members Adorno, Jackson, Gonzalez Echevarria, Gonzalez Perez and Valis—voted three against tenure, and two in favor. Dean Dovidio counted the votes. The 3-2 vote resulted in an unfavorable decision on Plaintiff's tenure case.[59]

24. As required by Step 12 of the FASTAP process, Valis and Dovidio later met with Plaintiff to tell her about the results of the tenure vote.[60]

25. On 3/2/16 and 3/8/16, Plaintiff submitted appeals of the tenure decision.[61] In April 2016, Provost Polak appointed a Faculty Review Committee to investigate the appeal.[62] On 7/25/16, after a review of Plaintiff's appeals, the Faculty Review Committee provided a report to the Provost,[63] which stated that it "found no evidence that the decision in this case was based on anything other than academic grounds."[64]

26. The Faculty Review Committee noted the steps Yale had taken to ensure a fair process. For example: the appointments of Bloch and Mazzotta to evaluate Plaintiff's tenure case, based on their "independence and relevant expertise;" the active role taken by the FAS Dean's Office and Humanities Divisional Chair in selecting

---

[57] Adorno Tr., p. 208:24 – 209:10 (Ex. 15).
[58] Ex. 25; Valis Tr., pp. 143:23 – 144:7 (authenticating summary of February 9 meeting).
[59] Ex. 25, at BYRNE009057.
[60] Valis Tr., p. 173:14-18 (Ex. 3).
[61] Byrne 3/2/16 Appeal Letter, at P755 – P770 (attached as Ex. 26); Byrne 3/8/16 Appeal Letter, at BYRNE009152 – 9165 (attached as Ex. 27).
[62] Polak Tr., p. 29:8 – 30:13. Cited pages from Benjamin Polak's deposition are attached as Ex. 28.
[63] Faculty Review Committee Report, dated 7/25/16, at Byrne009113 – 9117, attached as Ex. 29.
[64] Ex. 29, at Byrne009115.

external referees; and the Dean of Academic Affairs attending the departmental meeting and final vote.[65] The Faculty Review Committee also could "not find evidence that [Plaintiff] suffered retaliation in this tenure review process because of anything she may have said or not have said specifically regarding sexual harassment or discrimination in the workplace."[66]

27. On August 23, 2016, Provost Polak accepted the committee's findings of fact and conclusions and communicated that decision to Plaintiff.[67]

28. Plaintiff applied for a position with the University of Nevada-Las Vegas in Fall 2015,[68] well before the tenure decision. On 3/16/16, Plaintiff accepted UNLV's employment offer.[69] In his August 23rd letter, the Provost approved Plaintiff's request for an unpaid leave, with permission for her to work at another institution.[70]

29. On or about 3/24/15, Yale launched a Climate Review of the Department.[71] Yale directed Barbara Goren and Jamaal Thomas to explore the "educational and employment environment in the department of Spanish and Portuguese."[72] Attorneys Goren and Thomas asked people associated with the Department to speak to them voluntarily;[73] Plaintiff agreed to do so in the spring of 2015.[74]

30. Plaintiff spoke to Goren and Thomas about "intellectual harassment," "social harassment," and the alleged sexual conduct Gonzalez Echevarria.[75] Plaintiff

---

[65] Ex. 29, at Byrne009115.
[66] Ex. 29, at Byrne009115.
[67] 8/23/16 Polak Letter, at P652, attached as Ex. 30.
[68] 11/9/2015 E-mail from Ileana Jara Yupanqui, at BYRNE018980 (attached as Ex. 31).
[69] 3/7/16 Offer Letter from UNLV, at BYRNE018999 – 19001 (attached as Ex. 32).
[70] Ex. 30.
[71] 3/24/15 E-mail from Polak, Cooley and Gendler, at P1374 (attached as Ex. 33).
[72] Ex. 33.
[73] 3/27/15 E-mail from Office of the Provost, at BYRNE003138 (attached as Ex. 34).
[74] Byrne Tr., p. 44:7 – 24 (Ex. 4).
[75] Byrne Tr., p. 46:25 – 47:11 (Ex. 4)

8

principally described "intellectual harassment" as her telling Dean Miller that Adorno should no longer be chair, followed by the Department determining that "all of a sudden the same work that was good is no longer good."[76] More broadly, she described it as the "imposition of one person's thoughts on another person…."[77] She described "social harassment" as having to socialize with Adorno.[78]

31. Plaintiff stated that Gonzalez Echevarria: had once played with her hair in the 2008-2009 academic year; had once kissed her on the mouth at a party celebrating Dean Miller; and had once told her a joke about having sex while standing up.[79] She told Goren and Thomas about a 2014 incident when Gonzalez Echevarria had asked her to sit next to him on a two-person couch.[80]

32. Plaintiff has no information as to whether Goren and Thomas told Professor Gonzalez Echevarria what she had told them during her interview.[81] Thomas testified that he never spoke to Professors Gonzalez Echevarria, Adorno or Valis regarding Plaintiff's sexual harassment allegations.[82]

33. Plaintiff alleges that she participated in the Title IX process that Yale initiated in connection with allegations against Gonzalez Echevarria.[83] She recalled three or four separate meetings with the Title IX office, beginning on December 1, 2015 and ending in Spring 2016.[84] During this Title IX process, she shared the same details

---

[76] Byrne Tr., p. 47:21 – 48:2 (Ex. 4).
[77] Byrne Tr., p. 48:19-49:1 (Ex. 4).
[78] Byrne Tr., p. 49:16 – 50:25 (Ex. 4).
[79] Byrne Tr., pp. 52:17 – 53:9; 61:7-21; 63:7 – 63:12 (Ex. 4).
[80] Byrne Tr., pp. 63:23 – 65:15 (Ex. 4).
[81] Byrne Tr., pp. 57:21-24 (Ex. 4).
[82] Thomas Tr., p. 107:11 – 20. Cited pages from Mr. Thomas's deposition are attached as Ex. 42.
[83] Byrne Tr., pp. 70:2 – 15 (Ex. 4).
[84] Byrne Tr., pp. 70:15 – 25; 74:15 – 74:24 (Ex. 4).

9

she had previously shared with Goren and Thomas.[85] The Title IX officer with whom Plaintiff spoke first, Stephanie Spangler, asked Plaintiff if she wished to bring a complaint against Gonzalez Echevarria. Plaintiff declined, explaining her "complaint with him was more the intellectual harassment…."[86] In Spring 2016, a Title IX investigator told her that Gonzalez Echevarria had responded to her allegations. This is the only information she has to suggest that the Title IX office had shared her complaints with the Department.[87] This occurred after the Department had voted against tenure and after it had informed Plaintiff of the outcome of the vote.[88]

34. In early 2015, Plaintiff attended a University meeting regarding FASTAP. There is no evidence that any tenured faculty member in her Department was present or otherwise was aware of her statements at the meeting. Plaintiff allegedly spoke about her concerns that the Department was not honoring the FASTAP process, and that certain professors were not acting responsibly, were not granting fair hearings, and were "retaliating" against people.[89] She later summarized her concerns in an e-mail to a Yale colleague, Kathryn Lofton, and did not refer to any Title VII issue.[90]

35. In early 2015, Provost Benjamin Polak held a meeting regarding FASTAP. Plaintiff was the only member of the Department who attended. During this meeting, Plaintiff allegedly complained that the FASTAP process was being abused in the Department, but she did not identify those responsible for abuse of the process.[91]

---

[85] Byrne Tr., pp. 78:8 – 17 (Ex. 4).
[86] Byrne Tr., 72:8 – 72:22 (Ex. 4).
[87] Byrne Tr., p. 73:11 – 22 (Ex. 4).
[88] Byrne Tr., p. 81:3 – 25 (Ex. 4).
[89] Byrne Tr., p. 202:10 – 203:5 (Ex. 4).
[90] Byrne Tr., pp. 203:23 – 204:2; BYRNE013578 – 579 (Ex. 4). Plaintiff admits that the summary included all of the concerns she raised at the meeting. Byrne Tr., pp. 203:23 – 204:2 (Ex. 4).
[91] Byrne Tr., 204:3 – 16, 205:7 – 15 (Ex. 4).

36. In May 2014, Dean Miller met with Plaintiff, as she did with other members of the Department, as part of her effort to determine the next Department chair.[92] During the meeting, Plaintiff told Dean Miller that Adorno should not continue as chair, because she engaged in "little wars" with two of her colleagues, Jackson and Gonzalez Perez.[93] Plaintiff told Dean Miller "[o]nly that she should not make Rolena [Adorno] chair again."[94] Later, she recalled identifying Valis, Jackson and Gonzalez Perez as potential replacements for Adorno.[95] Plaintiff also recalled discussing with Dean Miller the "harassment" of graduate students.[96] Plaintiff recalled that, at the time, her concern was that Adorno "had a tendency to tell students what they had to work on as opposed to getting them to produce their best work."[97]

37. Plaintiff communicated with a student reporter from the Yale Daily News during Fall 2014/Spring 2015, culminating in an article that mentioned Plaintiff.[98] In addition to e-mail exchanges, Plaintiff recalled one conversation in which she told the reporter about Gonzalez Echevarria and his alleged sexual harassment.[99] Plaintiff could not recall which examples she shared.[100] Aside from the article published 3/25/15,[101] Plaintiff has no information to suggest that the reporter informed Gonzalez Echevarria or Adorno about her conversation with Plaintiff.[102]

---

[92] Byrne Tr., p. 11:21-12:19 (Ex. 4).
[93] Byrne Tr., pp. 13:18-14:7 (Ex. 4).
[94] Byrne Tr., p. 14:14-18 (Ex. 4).
[95] Byrne Tr., p. 22:16 – 23:2; 29:1-4 (Ex. 4).
[96] Byrne Tr., p. 28:1-9 (Ex. 4).
[97] Byrne Tr., p. 28:18-25 (Ex. 4).
[98] Byrne Tr., pp. 31:18 – 32:5 (Ex. 4).
[99] Byrne Tr., p. 34:2 – 34:15; 41:18 – 19 (Ex. 4).
[100] Byrne Tr., p. 35:15 – 36:11; 42:17 – 43:5 (Ex. 4).
[101] 3/25/15 Yale Daily News Article, at BYRNE003123-3127 (attached as Ex. 35).
[102] Byrne Tr., p. 37:12 - 38:7 (Ex. 4).

11

38. The 3/25/15 Yale Daily News article[103] includes a section regarding alleged harassment; Plaintiff's contribution was that she had heard "harassing comments made by professors," unconnected to protected class. She did not name any perpetrators and stated she had not seen any such behavior since December 2014.

39. Those who participated in Plaintiff's tenure review had reviewed the external letters at the time of the tenure review meeting.[104]

40. External Referee RF spoke at Yale in 2002, and Professor Adorno spoke at RF's university in 2017.

41. Notes taken by professors during the tenure review meeting on February 9, 2016, reflect their impressions of Plaintiff's scholarship.[105]

42. To obtain tenure, a candidate needs approval from the Department, then the Tenure and Appointments Committee (which conducts a robust de novo review of the candidate's tenure file),[106] then the Joint Boards of Permanent Officers, and finally a favorable vote from the Yale Corporation.[107] Not every candidate who clears the Department level gets tenure at Yale.[108]

43. Professor Bloch is the former chair of the Tenure and Appointments Committee.[109]

---

[103] Ex. 35.
[104] Adorno Tr., p. 209:11-17 (Ex. 15); Valis Tr. p. 136:18 – 137:4 (Ex. 3); Bloch Tr. p. 38:19-39:7 (Ex. 19); Mazzotta Tr., p. 18:10 – 19:1 (Ex. 24); Ex. 23, Ex. 25.
[105] RGE Notes dated 2/9/16, at Byrne000377-379, attached as Ex. 37; RGE Tr., 205:2 - 207:6 (Ex. 9) (authenticating notes); Adorno Notes from 2/9/16 Meeting, at BYRNE009059 – 61, attached as Ex. 38; Adorno Tr., p. 208:4-13 (Ex. 15) (authenticating notes); Valis Notes on Ficino Book, at BYRNE009037 – 49 (attached as Ex. 39); Valis Tr., pp. 149:17 – 151:7 (Ex. 3)(discussing her notes); Bloch Notes from 2/9/16 Meeting (attached as Ex. 40); Bloch Tr., pp. 23:9 – 33:19 (Ex. 19)(authenticating and discussing notes).
[106] Bloch Tr., p. 10:11 – 11:20 (Ex. 19).
[107] FAS Ladder Faculty Promotion Handbook, at Byrne017192 (attached as Ex. 41); Byrne Tr., p. 111:5-20 (Ex. 4).
[108] Byrne Tr., p. 115:14 – 21 (Ex. 4).
[109] Bloch Tr., p. 11:17 – 12:11 (Ex. 19).

**DEFENDANT,**

**YALE UNIVERSITY**

By: */s/David C. Salazar-Austin*
**Victoria Woodin Chavey (ct 14242)**
**David C. Salazar-Austin (ct 25564)**
**Jackson Lewis P.C.**
**90 Statehouse Square, 8th Floor**
**Hartford, CT  06103**
**Tel: (860) 522-0404**
**Fax: (860) 247-1330**
**chaveyv@jacksonlewis.com**
**salazard@jacksonlewis.com**

**CERTIFICATION OF SERVICE**

I hereby certify that on April 1, 2019, a copy of foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

*/s/David C. Salazar-Austin*
**David C. Salazar-Austin**