# Exhibit 7

CONFIDENTIAL

# DEPARTMENT OF SPANISH AND PORTUGUESE, YALE UNIVERSITY CLIMATE REVIEW REPORT

## INTRODUCTION

Recent awards and honors received by faculty and students in the department of Spanish and Portuguese display the department's remarkable strengths: in 2015 Prof. Rolena Adorno became the first Hispanist to win the MLA's highest award[1] and a graduate student in the department won the top award in a Yale competition for innovative use of technology in language teaching;[2] in 2013, Prof. Roberto González Echevarría received the National Literary Criticism award from the Cuban Instituto del Libro and in 2011 received the National Humanities Medal from President Obama; and in 2010 the Spanish and Portuguese doctoral program was ranked first in the nation by the National Research Council. Yet, other recent events signal difficulties in the department: the so-called 'anonymous letter,'[3] criticisms of the department aired in *Yale Daily News* articles,[4] calls by several faculty for external review of a tenure decision, petty vandalism of departmental property, faculty members yelling at each other, a dearth of new graduate students. The University launched this broad climate review to assess whether "the educational and employment environment in the department of Spanish and Portuguese matches its scholarly reputation."[5]

The numerous interviews we conducted suggest that affiliates have widely varying opinions on how well the department is functioning. Some students and faculty thrive; they regard this review as an unwarranted overreaction to unfounded allegations, particularly those of sexual harassment and discrimination, made in the anonymous letter. Some believe the review is designed to give the administration an excuse to reorganize the department and perhaps even to abolish it as a distinct entity as part of a plan to create a new department of Romance Languages and Literature.[6] These students and faculty worry that this review will lead to changes for the

---

[1] The Award for Lifetime Scholarship Achievement.

[2] Student 11                    graduate student, won Redacted

[3] On March 6, 2015, an anonymous letter was placed in the mailboxes of the ladder faculty members and graduate students in the department. The letter purported to represent the views of the graduate students, but every graduate student we spoke with denied having knowledge of the letter before receiving it; many witnesses we interviewed speculated the letter may have been written by a person or persons other than graduate students. The anonymous letter, "To Whom It May Concern." 6 March 2015, is attached to this report as Exhibit 1.

[4] A *Yale Daily News* reporter, Student 1    ; has written a series of articles about the department, three of which are attached to this report as Exhibit 2: "Spanish and Portuguese department faces budget woes, chilly environment." *Yale Daily News* 20 November 2014; "Spanish Department under review following anonymous allegations." *Yale Daily News* 6 March 2015; and "Zero grad students accept offer to Spanish and Portuguese Dep't." *Yale Daily News* 23 April 2015.

[5] Polak, Ben, Lynn Cooley, and Tamar Gendler. "Re: Review of the Climate within the Department." Message to Faculty, Staff, and Students of the Department of Spanish and Portuguese. 24 March 2015. Email, attached to this report as Exhibit 3.

[6] Romance languages were overseen by a single department at Yale until 1973, when the current Department of Spanish and Portuguese came into existence. *See* Jackson, K. David. "Portuguese at Yale an

1

CONFIDENTIAL

worse, lowering the department's academic standards and changing its focus to a more popular but less substantive course of study and research.

Other current and former students and faculty describe feeling thwarted in their attempts to function within the department's current structure. They report feeling discouraged and unhappy, and some have left or say they have considered leaving. They characterize the department as akin to a dictatorship, with too much control vested in too few people for too long. Some believe the department's traditional emphasis is outdated and stifling, and will lead to its decline over time. Some believe the department is rife with favoritism; these affiliates contend that those who are in power use purported adherence to rules and standards to justify unfair treatment of those who are out of favor. These department affiliates hope this review will lead to a departmental overhaul.

In conducting this review, we interviewed 57 witnesses in more than 100 hours of interviewing, and reviewed hundreds of pages of documents provided to us by interviewees and the administration. For the most part, those we interviewed came forward of their own accord; in a few instances, we contacted witnesses who we thought could give us a missing perspective to see if they would be willing to talk with us. For reasons of time, we did not attempt to interview every person we felt could shed light on relevant issues. We did speak with all ladder faculty who were in place when the review started,[7] and with 20 out of 24 current[8] graduate students. We also spoke with several former members of the department and some faculty members from the department of Comparative Literature.

Our work has been substantially complicated by our competing interests in assuring witnesses' anonymity – something almost everyone requested as a condition of speaking with us – and in providing persons whose actions have been questioned a full and fair opportunity to respond to the criticisms or accusations. In order to protect witnesses' anonymity, we have not identified most witnesses by name, nor have we recounted details that would reveal their identities.[9] As a result, the content of this report is more general than it would have been, had more witnesses agreed to be identified.

In this report, we first outline the procedures we followed in conducting this climate review, then continue with sections describing what we have learned about the department's working and learning environment from the perspectives of senior faculty, junior faculty, lectors, and students.[10]

---

Historical Sketch." *E-Journal of Portuguese History* 2.1 (Summer 2004*)*, attached to this report as Exhibit 4, 1, also available at <https://www.brown.edu/Departments/Portuguese_Brazilian_Studies/ejph/html/issue3/html/djackson_main.html>

[7] Since then, two junior faculty members (Paulo Moreira and Kevin Poole) have left the department.

[8] That is, current as of when we started this review in Spring 2015.

[9] Three ladder faculty members asked to remain unidentified in our report, so we have refrained from including any specific comments they made during our interviews.

[10] Because there are only two staff members in the department, we do not believe we can protect their anonymity in a discussion of the staff members' perspective on the working environment in the department.

Confidential--Attorneys' Eyes Only                                             BYRNE003065

*CONFIDENTIAL*

## PROCEDURE

On March 24, 2015, Provost Ben Polak, Faculty of Arts and Sciences (FAS) Dean Tamar Gendler, and Graduate School (GS) Dean Lynn Cooley announced a review of the learning and working environment in the department of Spanish and Portuguese to all members of the department. On March 27th, letters were sent to graduate students, ladder faculty, lectors, and staff describing the interviewing process.[11] We began interviewing witnesses on March 31, 2015 and finished our last interview on September 11, 2015. Although we tried to interview first students, then junior faculty, then lectors and staff, and finally senior faculty, scheduling issues sometimes prevented us from adhering to this schedule. We interviewed Prof. Adorno in a series of six interviews for a total of 23 hours. Because of time constraints we did not return to any witness to discuss matters that had been raised in others' interviews.

A number of witnesses provided documents to us for our review. Copies of the documents we cite in this report are attached as exhibits to this report. Prof. Adorno has told us she is submitting to the Provost the more than 400 pages of documents she gave us.

Prior to their scheduled interviews, Prof. Adorno, Prof. González Echevarría, and Prof. Noël Valis requested that we send a statement of the topics we planned to cover during the interviews. (We did not provide statements.)

Most witnesses came alone to their interviews. Kate Stith, the Lafayette S. Foster Professor at Yale Law School, accompanied each professor to the professor's interview, and with our consent recorded the interviews. In addition to helping these professors prepare beforehand, Prof. Stith consulted with them during the interviews, occasionally posed questions, and raised a number of concerns about this review (including its impetus).

A member of the department told us that he[12] overheard Prof. Adorno coaching Prof. Valis about the responses Prof. Valis should provide in her conversation with us; Prof. Adorno denied having discussed interview content with other faculty in the department.

## SENIOR FACULTY PERSPECTIVES

### *Overview*

The senior faculty[13] in the department of Spanish and Portuguese are deeply and passionately divided on the issue of how well the department is functioning. But on some things

---

[11] Goren, Barbara and Thomas, Jamaal. "Re: Departmental Climate Review." Messages to Graduate Students in the Department of Spanish and Portuguese, Members of the Ladder Faculty in the Department of Spanish and Portuguese, Members of the Instructional Faculty in the Department of Spanish and Portuguese, and Virginia Gutierrez, Registrar, and Susan Wheeler, Financial Assistant. 27 March 2015. Email, attached to this report as Exhibit 5. Separate e-mails were sent to the students, ladder faculty, lectors, and staff in the department.

[12] This report will use the masculine pronoun throughout to refer to both male and female witnesses who are not identified by name, in order to help protect their anonymity.

[13] The senior faculty, in order of seniority, are Prof. González Echevarría (who joined the department as a tenured professor in 1977), Prof. K. David Jackson (1993), Prof. Adorno (1996), Prof. Valis (1999), and Prof. González-Pérez (2006).

Confidential--Attorneys' Eyes Only                                                    BYRNE003066

CONFIDENTIAL

the senior faculty agree: The department needs more money. Empty faculty slots in medieval literature and Portuguese need to be filled. The attrition in undergraduate and graduate enrollment is worrisome. The bad feeling between Prof. Aníbal González-Pérez and other senior faculty members has created substantial tension in the department environment, tension that has been exacerbated by recent events involving Paulo Moreira's tenure, Student 5 's dissertation prospectus, the anonymous letter, and this review.[14]

Three of the five senior faculty believe that overall, the environment for working and learning in the department is 'wonderful'[15] (Prof. Valis), 'happy not chilly' (Prof. Adorno), and "excellent" (Prof. González Echevarría) -- except for friction in the department caused by Prof. González-Pérez's hostility toward them, and stress caused by the anonymous letter, *Yale Daily News* articles, and this review, which they deeply resent.[16]  The other two senior faculty, Profs. González-Pérez and K. David Jackson, feel the department has been ailing for years and is in need of a complete overhaul, which they hope this review will bring about.[17]

### *Conflict between Prof. González-Pérez and other professors*

#### *Background:*

In 2005, Josefina Ludmer, a senior professor of Modern Latin American Literature in the department, took emeritus status. To fill the position Prof. Ludmer had vacated, Prof. González Echevarría, then department chair, recruited his friend and former student Prof. González-Pérez, a Puerto Rican native and tenured faculty member at Penn State. As part of Prof. González-Pérez's employment agreement,[18] Profs. González Echevarría and Gonzalez Perez negotiated a 3-year

---

[14] The senior faculty share the perception that, among the Romance languages taught in the academy in this country, Spanish and Portuguese historically have been the least respected. Prof. Adorno told us an old joke: Carlos V, the Holy Roman Emperor, spoke French to his mistress, German to his tutor, and Spanish to his horse. She wonders whether the administration would have launched this review had the anonymous letter been written about the French department.

[15] In this report we use single quotation marks around words or phrases used by witnesses in their interviews, and double quotation marks around words or phrases appearing in written documents.

[16] They invoked the Inquisition, the Gestapo, Kafka, and Orwell in discussing the review process with us.

[17] Profs. González-Echevarría and González-Pérez have starkly contrasting views on the health of the department. Prof. González-Pérez views the department as one that "is aging rapidly and badly, that has grown ever more insular, backward looking, lethargic, and dependent on Yale's name for the prestige and visibility it has left." See González-Pérez, Aníbal. "Re: Chair of Spanish and Portuguese." Message to Mary Miller. 29 April 2014. Email, attached to this report as Exhibit 6.  In the memo that he gave to us, Prof. González-Echevarría wrote that "the graduate and undergraduate programs continue to thrive... At present we have, in my opinion, the best group of graduate students in recent memory. My graduate seminars are of an intellectual level that surpasses that of many a professional symposium that I have attended...Yale's Department of Spanish and Portuguese is very distinguished, with some of its members receiving recognitions and prizes unheard of among Hispanists in the past." See González Echevarría, Roberto. "Memo on Spanish Department." Memo given to Barbara Goren and Jamaal Thomas. 7 May 2015:6 ("RGE Memo"). This memo is attached to this report as Exhibit 7.

[18] See González Echevarría, Roberto. Letter to Aníbal González Pérez. 1 June 2005; and González, Aníbal. Letter to Roberto González Echevarría. 6 June 2005. The letters, attached to this report as Exhibit 8, do not specify whether or not Prof. Meléndez's appointment was renewable.

Confidential--Attorneys' Eyes Only                                                                 BYRNE003067

*CONFIDENTIAL*

appointment as a Senior Lecturer for Prof. González-Pérez's wife, Priscilla Meléndez,[19] also a Puerto Rican and a Modern Latin Americanist who was up for tenure at Penn State. Prof. González-Pérez agreed that he would take on the role of Director of Graduate Studies (DGS) when he began at Yale in September 2006.[20]

According to Prof. Adorno, even before the couple arrived at Yale, things did not go smoothly.[21] In March 2006, Prof. Meléndez, who had just been appointed a full professor at Penn State, asked Prof. Adorno for a salary increase because of her change in status at Penn State; Prof. Adorno referred her to the Provost's office, who declined to reopen the salary negotiation.[22] Also in March 2006, Prof. Meléndez told Prof. Adorno she wanted to organize an international symposium for the fall semester, but Prof. Adorno told Prof. Meléndez that would be impossible.[23]

Profs. González Pérez and Meléndez arrived at Yale in July 2006 and began teaching in September 2006. During this first year of their teaching at Yale, Prof. Meléndez planned a student event and a mini-symposium without first consulting Prof. Adorno; these events caused more friction between the couple and Prof. Adorno.[24] In December 2006, Prof. Adorno called Prof. Meléndez into her office to tell her that in the future, 1) she needed to clear department activities with the chair; 2) the mini-symposium had burdened the graduate students and should not be repeated; and 3) the department needed her to teach undergraduate rather than graduate courses.[25]

---

[19] According to Prof. Adorno, the position of Senior Lecturer (as opposed to Lector) was created for Prof. Meléndez as a 'humanitarian' gesture.

[20] Profs. González Echevarría and Adorno felt Prof. González-Pérez could do the job of DGS because he had been DGS at Penn State and "having been a student here, he would understand the demands of the job." See Adorno, Rolena. "Review of Prof. González-Pérez service as DGS to CLAIS Advisory Committee." Notes for Prof. Adorno's comments to CLAIS. 3 February 2010:1 ("RA 2/3/10 Memo"), and RGE Memo, Exhibit 7, 11. The RA 2/3/10 Memo is attached to this report as Exhibit 9.

[21] Compare Prof. González Echevarría's assertion that "at first things went quite well." See RGE Memo, Exhibit 7, 11.

[22] See Adorno, Rolena. "Memo to E. Bakemeier of events Sept 2006-June 2009 (Priscilla Meléndez 3-yr. non-renewable appointment." Memo to Emily Bakemeier. 2 February 2009 ("RA 2/2/09 Memo"), attached to this report as Exhibit 10, 2.

[23] "I told [Prof. Meléndez] it would be impossible to organize a symposium, seeking funds from within the university, before they are even officially members of the Yale faculty, and that, in any case, it would be better if Aníbal, as the new permanent senior faculty member, would be the organizer. [Prof. Meléndez] objected on every point, but I carried the day." See Ibid., 1.

[24] According to Prof. Adorno, Prof. Meléndez did not clear either the event or the symposium with her before announcing it to the department; Prof. Meléndez wanted the department to pay for the event, which Prof. Adorno told her the department could not afford; Prof. González-Pérez skipped an important departmental meeting to help Prof. Meléndez with the event, a choice Prof. Adorno told him was "unacceptable"; Prof. Meléndez failed to inform Prof. Adorno of the mini-symposium, which conflicted with a ladder faculty meeting. That Prof. Adorno felt the last was deliberate is suggested by the quotation marks Prof. Adorno uses when she mentions Prof. Meléndez's apology for the "oversight." See Ibid., 2-3. We did not interview Prof. Meléndez.

[25] Ibid., 3.

Confidential--Attorneys' Eyes Only      BYRNE003068

*CONFIDENTIAL*

According to Prof. Adorno, Prof. Meléndez responded that the department was interfering with her academic freedom.[26]

At the beginning of the couple's second year of employment, in August 2007 Prof. Meléndez met with Nydia Gonzalez, then Yale's Chief Diversity Officer, and Valarie Stanley of the Office of Equal Opportunity to lodge a national-origin-based complaint against the department regarding her salary; Ms. Stanley and Deputy Provost Bakemeier told Prof. Adorno of Prof. Meléndez's complaint. Also during this academic year, the department failed to renew the contract of Jason Cortes, an assistant professor in his third year who had been a student of Prof. González-Pérez at Penn State.[27]

In November 2008, during the third year of the couple's employment, Prof. Adorno told Prof. González-Pérez she was removing him as DGS[28] after only two years, without (according to Prof. González-Pérez)[29] giving him any explanation. According to Prof. González-Pérez, when he asked then-GSAS Dean Jon Butler whether he had done something wrong that would explain why he had been removed prematurely, Dean Butler told Prof. González-Pérez that removing him was Prof. Adorno's prerogative as department chair.

At the end of January 2009, five months before Prof. Meléndez's appointment was to end, Prof. González-Pérez asked Prof. Adorno to reappoint Prof. Meléndez because the economic downturn had made it difficult for her to find work at another university.[30] Prof. Adorno communicated his request to Deputy Provost Bakemeier, who asked Prof. Adorno to provide her with an overview of Prof. Meléndez's participation in the department and the department's

---

[26] Ibid., 3.

[27] We have not spoken with Prof. Cortes or looked into the department's failure to renew his contract. A contemporaneous article in the *Yale Herald* reported that according to Prof. Cortes, he had been told by the department his research was sociological in nature and not sufficiently related to literature, a description with which Prof. Cortes disagreed; the *Herald* article also stated that Prof. Cortes believed that gossip and disapproval of certain faculty members had been factors in the decision, which was "a fiasco." *See* Barkai, Yotam. "Devoted teachers face uphill tenure battle." *Yale Herald* XLV:2 (April 25, 2008), available at <http://goo.gl/GS9Ful>.

[28] Prof. Adorno told us she had removed Prof. González-Pérez from the DGS position due to his incompetence, for which, she said, he never took responsibility. According to Prof. Adorno and Prof. Valis, as DGS Prof. González-Pérez had missed deadlines and made errors in paperwork, causing serious problems for students and requiring Prof. Adorno to work for several days to remedy the problems. In 2010, Prof. Adorno gave the CLAIS advisory committee, which was considering appointing Prof. González-Pérez as Director of Undergraduate Studies (DUS) for Latin American Studies (LAS), a detailed account of Prof. González-Pérez's deficiencies as DGS (see Prof. Adorno 2/3/10 Memo, Exhibit 9). They appointed him anyway, and he has continued to serve as DUS for LAS. (We did not interview anyone about Prof. González Pérez's performance as DUS.)

[29] See González, Aníbal . Letter to Dean Butler. 19 November 2008, attached to this report as Exhibit 11.

[30] See González, Aníbal. "Re: Priscilla." Messages to Rolena Adorno. 11 January 2009 and 30 January 2009. Emails, attached to this report as Exhibit 12. In these documents, Prof. González-Pérez did not specify the length of the extension he was requesting; Prof. Adorno described it in her June 10, 2015 memo to us as a request for a one-year appointment. See Adorno, Rolena. "RE: AGP & PM appt 2005 to PM non-reappt 2009." Memo to Barbara Goren and Jamaal Thomas. 10 June 2015. ("RA Memo 6/10/15"), attached to this report as Exhibit 13.

Confidential--Attorneys' Eyes Only                                                          BYRNE003069

staffing needs for the following year.[31] In February 2009, Prof. Adorno told Prof. González-Pérez that the administration had decided not to extend Prof. Meléndez's appointment.[32] According to Prof. Adorno, Prof. González-Pérez then went to the Provost to see if the university could find another year of employment for Prof. Meléndez; the Provost agreed to circulate Prof. Meléndez's CV internally to look for a match in another department. Prof. Adorno says that when she learned of this, she told the Provost she would resign as department chair if he circulated Prof. Meléndez's CV to other departments in the university without having first gotten the department's approval. On April 13, Deputy Provost Bakemeier told Prof. González-Pérez that she and the Provost had explored the matter extensively, but for a variety of reasons had been unable to find Prof. Meléndez an additional year of teaching at the university.[33]

On May 8, 2009, toward the end of the couple's third year at Yale and shortly before Prof. Meléndez's appointment was to expire, Profs. González-Pérez and González Echevarría exchanged emails[34] about details for a symposium they had been preparing together. Responding to Prof. González Echevarría's invitation to have lunch to discuss the symposium, Prof. González-Pérez declined, stating that he was "profoundly hurt and upset" by the department's treatment of him and Prof. Meléndez,[35] by Prof. González Echevarría's "negative comments, which cross the line, regarding Puerto Rico and Puerto Ricans," and by the "injustice" of the department's dismissal of his former student, Prof. Jason Cortes. On May 9, Prof. González Echevarría responded, denying Prof. González-Pérez's allegations about unfair treatment and discrimination against Puerto Ricans, and adding, "I think your reaction is excessive and I refuse to accept that you are going to throw away such a long friendship and such a sustained and fruitful collaboration as ours. My friendship remains firm and I ask that you reconsider."[36] In a follow-up email on May 10, Prof. González-Pérez wrote, "…[G]ratitude cannot extend to renouncing my right to express freely and with seriousness and respect my disagreement with that which I consider improper, nor to approving of unjust actions like those that I have seen occur in

---

[31] See Ibid., 5-6. The information Prof. Adorno gave Deputy Provost Bakemeier appears in RA Memo 2/2/09, Exhibit 10. It includes a four-page summary of Prof. Adorno's interactions with Prof. Meléndez (many involving perceived personal slights), an explanation that Prof. Meléndez was not a necessary member of the faculty because she was not needed to teach any courses, and concerns about Prof. González-Pérez's performance as DGS.

[32] See Adorno, Rolena. "Re: Priscilla." Message to Aníbal González. 4 February 2009. Email, attached to this report as Exhibit 14.

[33] See Bakemeier, Emily. "Re:." Message to Aníbal González. 13 April 2009. Email, attached to this report as Exhibit 15.

[34] See (in Spanish and in reverse chronological order) González Echevarría, Roberto. "Re: simposio." Messages to Aníbal González. 9 - 10 May 2009. Emails. See also the partial translations into English (and in chronological order) given to us by Prof. González Echeverría ("RGE translations of May 2009 emails"). All are attached to this report as Exhibit 16.

[35] In his email, Prof. González-Pérez mentioned "the negative way in which the department has responded to my requests to extend by one year Priscilla's appointment"; Prof. González Echevarría's failure "in his capacity as director at the time of [Prof. González-Pérez's] hire" to "extend[] a renewable appointment to Priscilla"; "an environment of unequal treatment, unfriendly, and lacking in respect and collegiality both for me and for my wife"; and "verbal harassment of Priscilla for little things like the use of my office." See Ibid., 1-2.

[36] Ibid., 2.

CONFIDENTIAL

our department. The truth is that I have lost confidence in you."[37] Following this email exchange, Prof. González-Pérez stopped interacting with Profs. González Echevarría and Adorno,[38] except as necessary for work, a practice that continues to this day.

About two months later, on July 7, 2009, a student from Puerto Rico, Student 2        , was informed that a paper she had written to regain entrance to the program after taking a year's medical leave had not passed muster and that therefore she would be required to withdraw from the program. Prof. González-Pérez wrote to Associate Dean Pamela Schirmeister, urging her to reconsider the decision.[39] In October 2009, Prof. González-Pérez went with two of his 6th year graduate student advisees to Prof. Adorno's office to discuss teaching opportunities for his students in the spring semester. What occurred during this conversation is a matter of dispute; Prof. Adorno refers to this as a "harassment incident"[40] and complained about the incident to administrators.[41]

In March 2012, in an issue of *Revista de Estudios Hispánicos,* Prof. González-Pérez published papers from the symposium he and Prof. González Echevarría had co-directed, preceded by an Introduction, apparently[42] without consulting with or informing Prof. González Echevarría prior to publication; Prof. González-Pérez's failure to consult, and failure to mention Prof. González Echevarría's involvement in the symposium in the *Revista,* angered Profs. González Echevarría and Adorno.[43] In May 2013, the department rejected the dissertation prospectus of one of Prof. González-Pérez's dissertation advisees, Student 5      , and dismissed her from the program.

### Discussion:

The senior faculty agree that the atmosphere in the department is infused with tension caused by bad feeling between Prof. González-Pérez and other senior professors.

---

[37] Ibid., 3.

[38] According to Profs. Adorno and González Echeverría, Prof. González-Pérez also stopped speaking to Prof. Menocal, did not contact Prof. Menocal when she became terminally ill, and continued not to be in touch with her even as she lay dying.

[39] See González, Aníbal. "Student 2        ." Message to Pamela Schirmeister. 5 July 2009. Email, attached to this report as Exhibit 17.

[40] See, for instance, the cover page ("Packet four [:] AGP - RA harassment incident [10/21/09])" that Prof. Adorno used to identify a packet of emails concerning this incident. The heading page and the emails ("RA Packet four") were given to us on 3 June 2015, and are attached to this report as Exhibit 18.

[41] See Ibid., 18. This incident is discussed in more detail later in this report.

[42] We were not able to consult with Prof. González-Pérez about this.

[43] See RGE Memo, Exhibit 7, 5-6. See also a symposium brochure given to us by Prof. González Echevarría, announcing the symposium: *Beyond the Nation in Twenty-First Century Latin American Literature and Criticism.* New Haven, CT: Whitney Humanities Center, Yale University, 9-10 October 2009., and photocopies of pages from the *Revista* given to us by Prof. González Echevarría, including the Introduction: González, Aníbal. "Introducción." *Revista de Estudios Hispánicos* 46:1 (March 2012): 51-53. These are attached to this report as Exhibit 19. According to Prof. González Echevarría, then-Yale College Dean Mary Miller described Prof. González-Pérez's failure in the *Revista* to acknowledge Prof. González Echevarría's involvement as "actionable." Prof. Adorno described it to us as 'unethical.'

8

*CONFIDENTIAL*

Profs. González Echevarría, Adorno, and Valis deny bearing any blame for lack of collegiality in the department; they hold Prof. González-Pérez wholly responsible.[44] They say that despite their efforts to be cordial, Prof. González-Pérez ignores their salutations in the hallways and at department functions, and has little to do with the functioning of the department, often missing department meetings or arriving unprepared, sitting grimly without interacting, and not offering his opinions.[45] Profs. González Echevarría and Adorno identify the department's refusal to reappoint Prof. Meléndez as central to Prof. González-Pérez's decision to stop speaking with them. Prof. Adorno also suspects that her decision to remove Prof. González-Pérez from his position as DGS contributed to Prof. González-Pérez's anger and resentment.

According to Prof. González-Pérez, from the moment he and Prof. Meléndez arrived at Yale, the department kept telling them 'no,' something they weren't used to; Prof. González-Pérez felt he was being treated as if were still Prof. González Echevarría's student rather than the respected scholar he had become, and Prof. Meléndez felt she was not being given due respect for her professional status and accomplishments. Prof. González-Pérez says he feels marginalized in the department; he says the strain resulting from the tension over the years has taken a toll on him. Prof. González-Pérez maintains that he so strongly disapproved of how Profs. González Echevarría and Adorno had behaved toward himself, his wife, and students, that ending his relationships with the two was his only recourse.[46] Prof. González-Pérez says that the final straw

---

[44] According to Prof. Adorno, "If there is any 'hostility' in our department, it has been created by Aníbal González, who has refused categorically to speak to three of us – Prof. González Echevarría, our now-deceased colleague Maria Rosa Menocal…and myself – since the end of Priscilla's Yale appointment." Adorno, Rolena. "Re: Department discussion." Memo to Benjamin Polak, Lynn Cooley, and Tamar Gendler. 23 March 2015 ("RA 3/23/15 Memo")(emphasis in original), attached to this report as Exhibit 20, 2.
   According to Prof. Valis, "The [anonymous] letter talks about an appalling level of collegiality, either without understanding or deliberately ignoring the fact that the lack of collegiality resides in one senior professor, and one senior professor alone." Valis, Noël. "March 23 commentary on anonymous letter of March 6, 2015, written up by Noël Valis on behalf of herself and Rolena Adorno." Memo. 23 March 2015 ("NV 3/23/15 Memo"), attached to this report as Exhibit 21, 2.
   According to Prof. González Echevarría, "Concerning the environment of learning in the Department of Spanish and Portuguese and the general collegial climate in it, I must begin by emphasizing that it is excellent, and has been so for the past ten years … -- with one exception that will be discussed below.[…]Then we come to Aníbal González, who is a source of a negative attitude and behavior in the Department." RGE Memo, Exhibit 7, 1, 5.

[45] Many professors, including Prof. González-Pérez, agree that faculty meetings are more pleasant when Profs. González Echevarría and González-Pérez are not both in attendance. Because we interviewed Prof. González-Pérez before we interviewed Profs. González Echevaria and Adorno, we did not ask him about their descriptions of his behavior toward them.

[46] Prof. González-Pérez says that he could not continue to be on speaking terms with Profs. González Echevarría and Prof. Adorno because he had to make clear he did not support their behavior in the department. He says that Prof. González Echevarría is image conscious and manipulative; Prof. González-Pérez thinks that if he hadn't broken with them visibly, Prof. González Echevarría would be able to say that 'everything is fine and dandy.' He feels that Profs. González Echevarría and Prof. Adorno treat students 'like inmates at a reformatory,' and play games with students' lives. Prof. González-Pérez told us that the differences between him and the other two professors are so great that he has 'no disposition to listen' to them.

Confidential--Attorneys' Eyes Only　　　　BYRNE003072

*CONFIDENTIAL*

for him was not the department's failure to reappoint his wife,[47] but rather the behavior of Profs. González Echevarría and Adorno toward a former student of Puerto Rican descent in 2009.

Profs. González Echevarría and González-Pérez each implied during their interviews that the other suffers from a professional jealousy that may feed the tensions between them. Prof. González Echevarría implied that Prof. González-Pérez's envy of his and Prof. Adorno's accomplishments has played a role in Prof. González-Pérez's hostility toward them.[48] During his interview with us, Prof. González-Pérez implied that his arrival in the department threatened Prof. González Echevarría's dominance of the department, because (according to Prof. González-Pérez) Prof. González Echevarría feared that Prof. González-Pérez would become the new department hotshot to whom students would flock, just as Prof. González Echevarría, when he first arrived at Yale as a new professor, had drawn attention away from the more senior professors. According to Prof. González-Pérez, students find Prof. González Echevarría and Prof. Adorno difficult to work with and come to work with him instead; he suggests Profs. González Echevarría and Adorno may be threatened by the fact that he has more advisees than they have.[49]

Prof. González-Pérez believes that his advisees and junior faculty protégés may have been mistreated because of their affiliation with him; as cases in point, he mentioned the circumstances that led to the dismissal of Student 5 ; his two 6th year advisees who were told at the last minute that there would be no teaching assignments for them in the department;[50] and his former student Prof. Jason Cortes, who did not make it past his third year as an assistant professor in the department.[51]

Profs. González Echevarría, Adorno, and Valis[52] deny disfavoring students who work with Prof. González-Pérez, pointing to positive relationships with, and positive letters they have

---

[47] During his interview with us, Prof. González-Pérez did not mention his wife's contract at all until we asked him about it directly. He said that the department had given his wife a nonrenewable 3-year contract, and had acted in good faith; he said that his wife had found a job at Trinity College and they had learned to commute. He categorically denied that issues concerning his wife's contract had been a factor in his decision to stop speaking with Prof. González Echevarría. Prof. González-Pérez did not give us copies of the emails he and Prof. González Echevarría had exchanged in May 2009, see Exhibit 16; we had not yet seen these emails when we interviewed Prof. González-Pérez, so we were not able to ask him to explain the apparent discrepancies between the comments he made during his interview and his statements in the emails. One student told us that Prof. González-Pérez frequently complains about the department's decision to not renew his wife's contract.

[48] See RGE Memo, Exhibit 7, 6-7: immediately after discussing Prof. González-Pérez's animosity, Prof. González Echevarría writes: "There is another element at play here that should not be dismissed...[cites honors given to himself, Prof. Adorno, and Prof. Valis] These awards are the only significant ones received by faculty members of the Department. It would be naïve – immature – not to think that such glittering recognitions are not a cause for envy and resentment and the ultimate source of the anonymous letter, which I do not believe was written by graduate students."

[49] Prof. Adorno volunteered that she does not care about having fewer advisees because they are so much work.

[50] At the time, 6th year teaching was not guaranteed.

[51] See discussions of Student 5 and the 6th year students below. We did not interview Prof. Cortes or look into his situation.

[52] NV 3/23/15 Memo, Exhibit 21, 2.

Confidential--Attorneys' Eyes Only                                    BYRNE003073

*CONFIDENTIAL*

written for, his advisees. Profs. González Echevarría and Adorno say it is Prof. González-Pérez who tries to create divisions among the students, by not inviting Prof. González Echevarría's students to gatherings sponsored by Prof. González-Pérez, and by regarding 'his' students with a proprietary attitude rather than understanding that his advisees are students of all the faculty members.

Student 5

Student 5  , who arrived at Redacted  , was an advisee of Redacted  who had done extremely well in her coursework and qualifying exams,[53] was a good citizen of the department, and was well-respected by her peers. After the first draft of her dissertation prospectus failed to win approval from the senior faculty in Redacted , Ms. Student 5 was given a month[54] to complete a second draft. She revised the draft after consulting with several faculty members, and resubmitted it in Redacted. On Redacted  , four out of the six[55] voting faculty members found the second draft unacceptable.

For the first time in seventeen years,[56] the department was faced with the dilemma of a student whose prospectus had not passed on the second try. Prof. Poole (as DGS) consulted Prof. Adorno as to how to proceed;[57] Prof. Adorno consulted with then-Assistant Dean Allegra di Bonaventura on several issues of procedure,[58] who in turn consulted with Associate Dean Schirmeister.[59] Although Assistant Dean di Bonaventura and Associate Dean Schirmeister told Prof. Adorno that university rules would permit the (voting) faculty members to vote on whether or not to allow Ms. Student 5 a third try on a prospectus,[60] it appears that Profs. Adorno and Poole chose not to present that option to the voting faculty, but instead presented only the option of

---

[53] Ms. Student 5 received 15 Honors and 1 HP; she passed her qualifying exams on the first try.

[54] The requirement that the student complete a second draft within a month appears in the rules set forth in the contemporaneous handbook (2012-2013), but not in the rules set forth in the handbook that applied when Ms. Student 5 entered the program in Redacted. See Student 5  . Letter to [then-GSAS] Dean Thomas Pollard. Redacted  , with attachment, "Graduate Student Handbook 2007-2008, Department of Spanish and Portuguese, Yale University," ("Student 5  's Grievance"), 9. The letter and attachment are attached to this report as Exhibit 22.

[55] In Spanish and Portuguese, the dissertation advisor (in Ms. Student 5's case, Redacted  ) is not involved in the faculty's consideration of and does not vote on the prospectus. Profs. González Echevarría, Adorno, Jackson, and Poole voted against accepting the prospectus; Profs. Byrne and Harkema voted for.

[56] According to Prof. Adorno. See Adorno, Rolena. "Re: Dissertation proposal #2." Message to Kevin Poole. 3 June 2013 at 10:48 am. Email, attached to this report as Exhibit 23.

[57] Poole, Kevin. Message to Rolena Adorno. 3 June 2013 at 10:31 am. Email, attached to this report as Exhibit 24.

[58] Adorno, Rolena. Message to Allegra di Bonaventura. 3 June 2013 at 11:48 am. Email, attached to this report as Exhibit 25.

[59] di Bonaventura, Allegra. Message to Rolena Adorno. 3 June 2013 at 1:20 pm. Email, attached to this report as Exhibit 26.

[60] Ibid.

Confidential--Attorneys' Eyes Only   BYRNE003074

*CONFIDENTIAL*

voting on whether or not to permit Ms. [Student 5] to withdraw voluntarily rather than administratively.[61] The faculty voted unanimously to allow Ms. [Student 5] to withdraw voluntarily. Prof. Poole wrote Ms. [Student 5] and Prof. González-Pérez on the morning of June 4 to inform them that Ms. [Student 5] had failed on the second try and would need to withdraw from the program.[62]

Prof. González-Pérez registered his dissatisfaction that afternoon, and suggested that Ms. [Student 5] be given a third opportunity to submit her prospectus;[63] Profs. Jackson and Harkema[64] agreed. Prof. Poole told the voting faculty that a third opportunity would require the approval of the Executive Committee of the Graduate School.[65] Prof. Adorno responded, "The Department has its procedures, as does the Graduate School and they have been applied…resolution of the case stands."[66] Associate Dean Schirmeister told Prof. Adorno that Prof. Poole's interpretation of Graduate School policy was incorrect,[67] but it appears that his assertion was not corrected in any subsequent email to the faculty.

On June 7, Prof. González-Pérez circulated to the voting faculty a critique of the comments made by those who had rejected Ms. [Student 5]'s second draft, and urged the faculty members to reconsider their votes or allow Ms. [Student 5] to submit a third draft before the end of the summer.[68] Prof. Harkema agreed with his suggestion.[69] Prof. Jackson attempted to change his

---

[61] According to Prof. Poole's e-mail to the voting faculty, a student who withdraws voluntarily leaves the Department in good standing with a notation of "Withdrawn" on their transcript. Students who are withdrawn administratively have a note that indicates that they were withdrawn for academic cause on their transcripts. See Poole, Kevin. "Re: Important – Please read and respond (Results of Dissertation Prospectus Evaluations)." Message to Rolena Adorno et al. 3 June 2013 at 4:58 pm. Email, attached to this report as Exhibit 27.

[62] See Poole, Kevin. "Re: Dissertation Prospectus and Withdrawal from Program." Message to [Student 5] , et al. 4 June 2013 at 9:42 am. Email, attached to this report as Exhibit 28. Being dismissed for failing to pass with a second prospectus apparently had no recent precedent in the department. Prof. González-Pérez said this hadn't happened in the department since he arrived in 2006; he was 'flabbergasted.'

[63] González-Pérez, Aníbal. Message to Kevin Poole. 4 June 2013 at 2:03 P.M. Email., attached to this report as Exhibit 29.

[64] Harkema, Leslie. Message to Kevin Poole. 4 June 2013 at 3:36 pm. Email; Jackson, K. David. Message to Aníbal González-Pérez et al. 4 June 2013 at 2:22 pm. Email. Both documents are attached to this report as Exhibit 30.

[65] See Poole, Kevin. "Re: Dissertation Prospectus and Withdrawal from Program." Message to Aníbal González, et al. 4 June 2013 at 2:41 pm. Email, attached to this report as Exhibit 31.

[66] Adorno, Rolena. Message to Colleagues. 4 June 2013 at 6:18 pm. Email, attached to this report as Exhibit 32.

[67] See Schirmeister, Pamela. "Re: Dissertation Prospectus and Withdrawal from Program. Message to Rolena Adorno, 5 June 2013 at 9:31 am. Email., attached to this report as Exhibit 33.

[68] González-Pérez, Aníbal. Message to Colleagues. 7 June 2013 at 7:41 am. Email, attached to this report as Exhibit 34.

[69] Harkema, Leslie. Message to Colleagues. 7 June 2013 at 8:39 am. Email, attached to this report as Exhibit 35.

Confidential--Attorneys' Eyes Only                                                    BYRNE003075

CONFIDENTIAL

vote on the following day,[70] but Prof. Adorno told him that he was not allowed to change his vote.[71] Ms. [Student 5] withdrew voluntarily.[72] On June 12, she filed a grievance against the department, claiming that the department had violated its procedures in requiring her withdrawal;[73] the grievance committee found against her. Ms. [Student 5] also successfully applied for transfer to the doctoral program in the Redacted                           , where she now is working on her thesis.

By all accounts, Ms. [Student 5]'s withdrawal rattled the students,[74] who had no information[75] to help them understand why a student who had apparently done so well in the department had been required to withdraw. The case also increased the tension among the ladder faculty.  Profs. González-Pérez and Jackson believed that Ms. [Student 5] had been treated unfairly,[76] and suspected that the department's inflexibility toward Ms. [Student 5] might have been driven at least in part by faculty animosity toward Prof. González-Pérez. Ms. [Student 5]'s dismissal also increased the hostility Profs. González-Pérez and Jackson felt toward the other senior faculty. Prof. González-Pérez says that students who had wanted to work with him chose instead to work with Prof. Valis, which he attributes to their fear that his advisees are treated harshly by the department, and he thinks the department's treatment of Ms. [Student 5] was 'a blatant abuse of power, scandalous, a justification for intimidating and controlling whom students work with.' He feels that the department did not show due deference to his judgment that the prospectus could be made to work as a dissertation. Prof. Jackson feels that the department had marginalized Prof. González-Pérez, a respected scholar, and his student by taking an inflexible approach to Ms. [Student 5] that required her to withdraw.

Profs. González-Pérez and Jackson say the department's actions with regard to Ms. [Student 5]'s prospectus also demonstrate a lack of transparency in the procedures, and resistance to

---

[70] Jackson, K. David. Message to Kevin Poole. 9 June 2013 at 6:14 pm. Email, attached to this report as Exhibit 36.

[71] Adorno, Rolena. Message to K. David Jackson. 10 June 2013 at 8:15 am. Email, attached to this report as Exhibit 37.

[72] Student 5     . Message to Kevin Poole. 10 June 2013 at 9:54 am. Email, attached to this report as Exhibit 38.

[73] See Student 5     's Grievance, Exhibit 22.

[74] More discussion of the student response to Ms. [Student 5]'s situation appears later in this report. One of Prof. González-Pérez's students told him, 'this is the last straw.' Associate Dean Schirmeister had warned Prof. Adorno this would happen if Ms. [Student 5] were dismissed. See Schirmeister, Pamela. Message to Rolena Adorno. 4 June 2013 at 4:34 pm. Email, attached to this report as Exhibit 39.

[75] That information was confidential and could not be shared by the faculty with the students.

[76] Profs. González-Pérez and Jackson thought that Ms. [Student 5]'s prospectus was no weaker than other students' that had been passed. They could recall no other student being forced out of the program because of a weak prospectus, and felt the decision contradicted standards of good pedagogical practice as well as typical practice at peer institutions. They also felt that the department had had a more lenient interpretation of the rules available to them that would have allowed Ms. [Student 5], a student who otherwise had done extremely well in the program, another chance, but instead had opted for a stricter interpretation that forced her to leave.

Confidential--Attorneys' Eyes Only                                    BYRNE003076

*CONFIDENTIAL*

open dialogue about problems. Prof. González-Pérez says that before Ms. [Student 5]'s case 'there had not been a sense that the prospectus was a terminal document, but instead was something that could be revised as needed within the time frame.' Prof. Jackson told us that in his experience, Ms. [Student 5]'s case was the first time there had been formal voting on a prospectus since he arrived in the department.[77] Profs. Adorno and Poole had relied on language in the 2012-2013 handbook limiting the time for resubmission of a prospectus to a month, rather than on language in the handbook that was in effect when Ms. [Student 5] entered the program in [Redacted] that made no mention of that time limit; Profs. González-Pérez and Jackson told us that the time limit had been inserted into the more recent version without discussion, a vote, or notice of the change to them or to students. They also believe that Prof. Adorno's rebuke[78] of Prof. González-Pérez for exceeding his authority by writing to Prof. Poole (with copies to the faculty) to request reconsideration of the faculty's vote against Ms. [Student 5]'s prospectus,[79] and of Prof. Jackson for "leak[ing]"[80] his desire to change his vote from fail to pass to the other faculty, illustrate the department's resistance to open dialogue. Prof. Poole, after consulting with Prof. Adorno, also rebuked Prof. Harkema for sending emails dissenting from the department's decision to require Ms. [Student 5] to withdraw.[81] Most faculty members told us that the changes to the handbook to clarify the process were implemented without any discussion or vote.

Profs. Adorno and Poole believe they scrupulously followed department procedures for reviewing the prospectus,[82] citing the university's rejection of Ms. [Student 5]'s grievance as support for their view. Prof. Adorno feels that faculty members were free to request that procedures be clarified or changed, by raising the issue face to face, and at appropriate times.

Ms. [Student 5] agreed to share her perspective on this matter.[83] She reported that when the voting faculty in the department[83] did not pass her first prospectus, she was advised to revise and resubmit in a month. She was not given any indication that her status in the department was in jeopardy. She met with Profs. Adorno, González Echevarría, and Harkema to get their feedback

---

[77] Prof. Jackson raised this point in a 9 June 2013 email to Prof. Poole; Prof. Adorno responded, "We have always voted on the prospectuses; that's what 'approval by the faculty' means." See Jackson, K. David. "Re:Prospectus vote." Message to Kevin Poole. 9 June 2013 at 6:14 pm. Email, and Adorno, Rolena. "Re: On the Prospectus vote." Message to K. David Jackson. 10 June 2013 at 8:15 am. Email. Both are attached to this report as Exhibit 40.

[78] Adorno, Rolena. "Re: Dissertation Prospectus and Withdrawal from Program." 5 June 2013 at 12:07 pm. Email, attached to this report as Exhibit 41.

[79] See González, Aníbal. Message to Kevin Poole et al. 4 June 2013 at 2:03 pm. Email, attached to this report as Exhibit 42.

[80] See Adorno, Rolena. Message to K. David Jackson. 10 June 2013 at 10:14 am. Email, attached to this report as Exhibit 43.

[81] See Poole, Kevin. "Commentary on Student 5 's Prospectus." Message to Leslie Harkema. 7 June 2013 at 10:19 am. Email, attached to this report as Exhibit 44.

[82] Prof. Poole told us that he spent hours carefully constructing all of his correspondence and memos on this matter (and others) with Prof. Adorno. He described it as a grueling process that took time away from his research.

[83] That is, all ladder faculty other than Prof. González-Pérez (her advisor) and Prof. Valis (who was on leave).

Confidential--Attorneys' Eyes Only

BYRNE003077

CONFIDENTIAL

on the prospectus, but not with Profs. Byrne, Jackson (he cancelled) or Poole. She incorporated faculty comments, worked with Prof. González-Pérez to refine the project, and submitted her second draft to the department a month later, at the end of May. While she was planning a research trip for her dissertation, she was informed that the department had not passed her second version of the prospectus and had given her two weeks to withdraw from the program in good standing. Ms. Student 5 told us that she was devastated, particularly because she knew a few students (advised by Profs. Menocal, Valis and Adorno) who had been allowed to make substantial revisions to their projects in response to concerns raised by faculty members about their prospectuses. She consulted the Dean's office, where she was told about the option of transferring to the Redacted                              and advised she could file a grievance. She indicated that she was passionate about Spanish literature, and the decision to transfer was a difficult one, but she did ultimately transfer. Ms. Student 5 believes that the department changed the purpose of the prospectus from an "evolving plan for research" to an examination.[84] She learned after this incident that Prof. González-Pérez was 'alienated' from Profs. Adorno and González Echevarría, and thinks that Prof. González-Pérez's relationship with the two professors may have had an impact on her experience.[85]

### *Prof. González-Pérez's 6th year graduate students*

Profs. Adorno and González-Pérez each told us about a 2009 incident involving two 6th year graduate students as an example of the negative impact that the other professor had on the department's climate. At the time, the Spanish and Portuguese doctoral program offered five years of financial support to students; the department offered students who needed a sixth year to complete their dissertations an opportunity to teach a class for financial support when slots were available. In October 2009, the Language Program Director advised two of Prof. González-Pérez's 6th year students that they might not have an opportunity to teach in Spring 2010, causing financial problems for both and visa issues for one. According to Prof. González-Pérez, he and one of the graduate students dropped into Prof. Adorno's office to discuss the problem; Prof. Adorno refused to discuss the matter with them without an appointment and angrily demanded that they leave her office. According to Prof. Adorno, Prof. González-Pérez stormed into her office with one of the students and complained about the lack of teaching opportunities for his student in a "loud and threatening manner";[86] when Prof. Adorno tried to explain the reasons for the decision to inform the two students about the possibility of no teaching opportunities, Prof. Adorno says Prof. González-Pérez responded by loudly accusing her of targeting his students.[87] Prof. Adorno reported the incident to the Provost's office.[88] Prof. González-Pérez told us he was

---

[84] Student 5  Grievance, Exhibit 22, 1.

[85] Ms. Student 5 also strongly suggested that the department provide more support and guidance to students, as well as faculty advisors, regarding the prospectus submission process.

[86] See Adorno, Rolena. "Subject: incident." Message to Peter Salovey et al. 21 October 2009. Email, in RA Packet four, Exhibit 18.

[87] Witnesses to the incident supported Prof. González-Pérez's version of events in conversations with us.

[88] According to Prof. Adorno, the Provost's office offered her the option of filing a grievance, informally resolving the matter via conversations with senior staff in the Provost's Office, or taking no action (but maintaining a record of the incident). Prof. Adorno told us that she declined to file a formal complaint because she still hoped to heal her relationship with Prof. González-Pérez. Prof. Adorno added that Deputy Provost Bakemeier had a conversation with Prof. González-Pérez and indicated that he would be contacting her to apologize. Prof. González-Pérez told us that he met with Deputy Provost Bakemeier and was

15

*CONFIDENTIAL*

able to find teaching opportunities for his students in other departments by making two phone calls. Prof. González-Pérez believes that Prof. Adorno intentionally deprived his students of an opportunity to gain teaching experience and earn income while completing their dissertations in order to hurt him. Prof. Adorno believes that Prof. González-Pérez was attempting to harass and intimidate her because of his hostility toward her.

## *Vandalism*

Profs. Adorno and González Echevarría told us they had been the targets of a string of vandalism incidents occurring from August 2014 to July 2015. A copy of a poster announcing one of Prof. González Echevarría's lectures was defaced in August and again in September 2014. In January 2015, a copy of an announcement of Prof. Adorno's MLA award was torn off a department bulletin board. On a number of occasions in February and March 2015, Prof. Adorno's nameplate was removed from her door and the nameplate on her department mailbox was scratched off. Prof. Adorno said that two possibly related incidents had occurred at her home, which she reported to her local police department: on March 14, 2015 several windows in her house were broken, and on March 28, someone paid a "stalking or surveillance visit"[89] to her home. Profs. Adorno and González Echevarría told us that the nameplates were removed from their doors on four more occasions between April and July 2015. Both professors reported that these incidents, which Prof. Adorno described as "acts of intimidation,"[90] contributed to an uncomfortable work environment; a few department members also told us that the vandalism had had a negative impact on the department's working and learning environment. Prof. Adorno told us these incidents have unsettled her and made her wary of being alone in the department's offices. She began reporting the incidents to the Yale Police Department (YPD) and the Provost after the anonymous letter was distributed on March 6, 2015. The YPD told her they could not take action, but our understanding is that at her request, security video cameras have recently been installed, and since then no other incident has occurred.

## *The Portuguese program*

Problems concerning the Portuguese program have less impact on the department's environment than do those concerning Profs. González Pérez, Adorno, and González Echeverría. For the most part the Portuguese faculty are cordial to each other and to Spanish program faculty, who at least pay lip service to the importance of Portuguese to the department. There appears to be general agreement that the empty Portuguese faculty slots[91] urgently need filling and the

---

surprised to hear that Prof. Adorno had raised concerns about the meeting. Deputy Provost Bakemeier suggested he apologize, but he declined, because he thought that apologizing would create the false impression that he had done something wrong.

[89] Adorno, Rolena. "RE: Request re Security Camera in the Department UPDATED." Memo to Barbara Goren and Jamaal Thomas. 9 July 2015, updated 11 July 2015: 2, attached to this report as Exhibit 45.

[90] Ibid., 2-3.

[91] With the departures last spring of Prof. Moreira and Selma Vital, Portuguese currently has only one ladder faculty member, Prof. Jackson, and one lector, Ms. Almeida. See also Student 1      "Departures leave Portuguese program understaffed." *Yale Daily News* 9 September 2015, attached to this report as Exhibit 46.

Confidential--Attorneys' Eyes Only                                    BYRNE003079

*CONFIDENTIAL*

Batchelor funds[92] should be returned. Prof. Adorno describes the Portuguese program as an 'absolutely essential' element of the department, and says she has done everything in her power to promote it, including 'pitching' an extra lector and 'bringing Prof. Moreira through' in 2005-2006.

Prof. Jackson, however, says the Portuguese program remains marginalized in the department.[93] Since arriving in 1993, Prof. Jackson has not had a single Ph.D. student in Portuguese, and has supervised only three dissertations.[94] Prof. Jackson told us that out of the five students who were accepted into the Fall 2015 doctoral program, two had told him they wanted to work with him on their dissertations, but neither chose to come to Yale. According to Prof. Jackson and another department member, at least one of these students decided to go elsewhere because the student was told by Profs. González Echeverría and Adorno that the student would not be permitted to do a dissertation under Prof. Jackson's supervision[95] – even though the department's website and graduate student handbook state that the department offers a doctoral program in combined Luso-Brazilian and Spanish literatures.[96]

Prof. Jackson would like more say in staffing the Portuguese program: he says the department has not consulted him when it hires lectors, and has hired Brazilian Fulbright scholars as TAs against his opposition;[97] according to Prof. Jackson, Prof. González Echevarría overrode

---

[92] The Malcolm C. Batchelor Fund of the Department of Spanish and Portuguese was established by Prof. Malcolm Batchelor upon his retirement from Yale after 38 years of teaching Portuguese. The fund sponsors an annual conference on Luso-Brazilian language and culture. According to Prof. Jackson, the fund also had been used to support students enrolled in the Portuguese study abroad program, but after the economic crisis in 2008, the Provost's office decided to use part of the fund to support salaries and fringe benefits for lectors. Prof. Adorno told us that she has been trying to recover the funds, with limited success.

[93] Perhaps in response to this feeling, Prof. Jackson at one point printed "David Jackson, Portuguese Department" business cards; Prof. Adorno told him to stop using them.

[94] Overall enrollment in the department vastly favors Spanish (although one year Portuguese had more majors than Spanish).

[95] See Jackson, K. David. Letter to Tamar Gendler, Lynn Cooley, and Pamela Schirmeister. 24 April 2015, attached to this report as Exhibit 47. Prof. Jackson also noted that he discovered this by reading a comment to an article in the *Yale Daily News*. See Exhibit 2: Hildegard, Comment to "Zero grad students accept offers to Spanish and Portuguese Dept.," *Yale Daily News*, April 23, 2015. <http://yaledailynews.com/blog/2015/04/23/zero-graduate-students-accept-offers-to-spanish-and-portuguese-departments/#comment-1983969371>. A faculty member told us that he heard about this from one of the student's relatives who was 'disgusted' at the Department's 'dishonesty.'

[96] See Yale University, Department of Spanish and Portuguese, Graduate Student Handbook, pg. 9 (accessed 12 October 2015), <http://spanport.yale.edu/sites/default/files/files/Graduate%20Student%20Handbook%20searchable%281%29.pdf>, attached to this report as Exhibit 48.

[97] Prof. Jackson told us he felt the department was exploiting the Fulbrighters by requiring them to teach two courses when they were only supposed to teach one. Prof. Adorno told us that Prof. Jackson was opposed at first but has since come around. We did not get a chance to ask him about this because we interviewed him before interviewing Prof. Adorno.

Confidential--Attorneys' Eyes Only                                    BYRNE003080

CONFIDENTIAL

Prof. Jackson's opposition to rehiring Ms. Almeida for a three-year contract when Prof. Jackson requested she be hired for a single year to evaluate her progress in getting along with other people in the program.

The department of Spanish and Portuguese is perhaps unique among Yale departments in that the spouses of two out of its five senior faculty[98] have also wanted jobs in the department, creating a source of ongoing tension in the department's environment. For years Prof. Jackson petitioned the department to add his wife, Prof. Elizabeth Jackson, to the faculty; he told us that the department's failure to do so is inconsistent with his understanding of Yale's policy of encouraging the hiring of faculty spouses in adjunct positions. In 2005, when Prof. Adorno was on leave and Prof. González Echevarría was acting chair, Prof. Jackson arranged to appoint his wife as faculty for the summer program; Prof. Adorno, returning as chair, protested to the summer session organizers that this was 'irregular' because there were other Yale faculty in Portuguese who could have been hired instead, and because the department had not approved Prof. Elizabeth Jackson's appointment.[99] Nevertheless, Prof. Elizabeth Jackson has continued to teach in the summer program. Prof. Adorno has asked Prof. Jackson to hire Prof. Moreira, Tania Martusceli, and Selma Vital, all Brazilians, as faculty for the summer program instead of his wife, to no avail.[100] According to Prof. Jackson, the summer program is the highlight of the Portuguese program. He reports good enrollment and feels the program gets students excited about the language. It seems to be the one place in the department over which he feels he can exercise some control.

According to Prof. Adorno, when in 2005-2006 the department hired Ms. Martusceli instead of Prof. Elizabeth Jackson for a newly created lector position, Prof. Jackson told her, 'Well, Rolena, I guess this means it's going to be impossible to work with you.'[101] Prof. Adorno says Prof. Jackson then lobbied the Provost (unsuccessfully) to create a separate Department of Portuguese. Profs. Jackson and Adorno have had other disagreements over the years, including over Prof. Jackson's decision to teach most Portuguese undergraduate classes in English, something he feels is essential to attracting Portuguese majors. Prof. Jackson also told us that the

---

[98] I.e., Prof. González-Pérez's wife Priscilla Meléndez, and Prof. Jackson's wife Elizabeth Jackson.

[99] She says that when she asked the summer session people how this could have happened, they gave her 'non-persuasive' answers. She told us she does not know whether or not other departments hire non-faculty to staff summer sessions.

[100] She says these other faculty have neither requested to be hired for the summer program nor complained about not being hired; Prof. Adorno says they knew the request would have to go through Prof. Jackson and were 'reticent to make their druthers known.'

[101] Prof. Adorno reports that Prof. Jackson, Prof. Moreira, and Ms. Almeida then 'ganged up' against Ms. Martusceli and were 'beastly' to her. According to Prof. Adorno, Prof. Jackson cancelled a popular and successful course on Portuguese and Social Issues usually taught by Ms. Martusceli; the three made Ms. Martusceli do all the work for the Halloween party because they had children and she didn't; and Ms. Almeida, who had been belittling Ms. Martusceli, treated Ms. Martusceli even worse after Prof. Adorno told Ms. Almeida to stop it. 'Wicked, wicked, wicked, a band of barracudas,' was Prof. Adorno's characterization to us of their behavior. Prof. Adorno said that she spends more time dealing with the Portuguese language program than the Spanish language program because of a variety of personality conflicts. We have not been able to ask Prof. Jackson for his response to these accusations.

18

*CONFIDENTIAL*

Department suppressed his salary for a number of years,[102] which contributes to his belief that he is undervalued. The department's failure to tenure Prof. Moreira has been a recent source of discord. Prof. Jackson felt Prof. Moreira deserved tenure; additionally, had Prof. Moreira joined the tenured faculty, Yale would have had a very strong undergraduate program in Portuguese, and possibly even a graduate program. Prof. Jackson suspects that "the much stronger role that Portuguese would have had in the Department and the graduate program"[103] may have been a consideration that led to what seemed to Prof. Jackson to be the department's last minute about-face on whether or not it would recommend Prof. Moreira for tenure.[104]

        Despite these tensions, Prof. Jackson does not view himself as a rebel. In contrast with Prof. González-Pérez, who calls himself the Department's 'resident dissident,' he continues to speak with Profs. Adorno and González Echevarría, even after Prof. Adorno yelled at him for providing a quote to Student 1       for her November 2014 *Yale Daily News* article about the department.[105] Prof. Adorno reports that Prof. Jackson's relationships with all the faculty are cordial, and she feels that unlike Prof. González-Pérez, Prof. Jackson has been able to rise above his disappointment over his wife's not getting hired. Prof. González Echevarría, in his memorandum written for this review, complimented Prof. Jackson.[106] But Prof. Jackson told us that he believes the inflexible control of the department by Profs. Adorno and González Echevarría for more than 20 years has been detrimental, and he feels that everything he has worked for in his 22 years at Yale is 'going down the drain.'

*The anonymous letter, Yale Daily News articles and climate review*

        The anonymous letter, *Yale Daily News* articles, and this climate review have provoked strong emotions among senior faculty in the department.[107] Profs. González Echevarría, Adorno, and Valis feel the letter is a defamatory personal attack on Profs. González Echevarría and Adorno, full of lies and 'flame words' such as "harassment" and "discrimination" that were included in order to force the administration to conduct an investigation such as this review. They are angry with the letter writer or writers who they believe hid behind a cloak of anonymity while falsely claiming to represent the views of the graduate students. They are angry with the faculty members who spoke with the *Yale Daily News* reporter, even those who did not criticize the department. And they are very angry with the administration for launching this climate review, which they feel 'smears' the department by treating the accusations made in the anonymous letter

---

[102] Prof. Jackson reported that then-Deputy Provost Charles Long informed him of this prior to Long's retirement.

[103] See Jackson, K. David. Letter to Ben Polak, et al. 26 March 2015, attached to this report as Exhibit 49. The letter was also signed by Profs. González-Pérez, Byrne and Poole.

[104] See discussion of Prof. Moreira's tenure case later in this report.

[105] See Student 1      . "Spanish and Portuguese department faces budget woes, chilly environment." *Yale Daily News* 20 November 2014, Exhibit 2.

[106] See RGE Memo, Exhibit 7, 4.

[107] In their interviews, Profs. González Echevarría and Adorno used words like 'lies,' 'fabrications,' 'defamations,' 'distortions,' 'damning,' 'accusatory,' 'malevolent' to describe the anonymous letter; in her interviews, Prof. Adorno referred to the writer of the letter as 'the criminal' and told us she has never before felt so personally attacked and intimidated.

Confidential--Attorneys' Eyes Only                                    BYRNE003082

seriously;[108] by describing the department environment as characterized by a "level of acrimony that cannot be ignored"[109] or a "divisiveness that appears to be undermining the department's efforts,"[110] which they feel displays the administration's prejudgment of the department; and by putting departmental affairs on hold and under supervision, which they feel unfairly punishes the department even before the review has concluded.[111] Profs. González Echevarría and Prof. Adorno told us in no uncertain terms that they feel this review is an Orwellian exercise that deprives them of the due process right to be confronted by and have an opportunity to respond to accusations and complaints made against them.

The anonymous letter, *Yale Daily News* articles and this review have seriously impaired the working/learning environment in the department.[113] Prof. Adorno told us she feels 'demoralized' and 'paralyzed.' Tempers in the department are frayed. Prof. González-Pérez said Prof. Adorno literally pointed a finger at Prof. Byrne and Prof. Poole at a faculty meeting and said, 'You caused this.' Faculty who spoke with the *Yale Daily News* reporter have been accused by other faculty of harming the department. Prof. Byrne believes that Prof. Adorno has accused her of writing the anonymous letter; the two had a shouting match overheard by students and faculty.[114] Prof. Jackson reported that in a faculty meeting, after it was announced there would be no new graduate students, Prof. Adorno made comments that he felt were inappropriate: 'People are trying to destroy the department'; 'Anyone who reveals a departmental vote has committed a serious offense'; and 'We view this as just a temporary setback. We will overcome. We will crush this.' A faculty member reported hearing that Prof. González Echevarría had shoved books off Prof. Jackson's desk and yelled at him for violating the department's confidentiality. Students and faculty report feeling pressured to disavow any connection to the anonymous letter or agreement with its content.

The anonymous letter and this review are the subject of gossip in the field. All senior faculty (as well as junior faculty and students) say colleagues from around the world are contacting them to ask about this review and the health of the department. Questions and comments about the department, many anonymous, appear on more than a few internet sites. Profs. González Echevarría, Adorno and Valis believe the letter, articles and review are

[108] Prof. Adorno told us that she has warned the administration that it has dignified the anonymous letter by launching this review. She says that the administration responded by telling her that it is a response to events that occurred prior to circulation of the letter. Prof. Adorno wonders why, if that is the case, the administration reappointed Prof. Adorno as chair and didn't initiate this review earlier.

[109] Adorno, Rolena. "RE: Dean Cooley's Friday, April 24, 2015, request for 'back story' documentation." Memo to Ben Polak, Lynn Cooley, and Tamar Gendler. 26 April 2015, 2, attached to this report as Exhibit 50.

[110] See Polak, Benjamin. "RE: A Prophecy Self-Fulfilled: Graduate Admissions Spanish 2015." Message to Rolena Adorno, Lynn Cooley, and Tamar Gendler. 23 April 2015. Email, attached to this report as Exhibit 51.

[111] During her interview, Prof. Adorno suggested that every department has an embittered faculty member and grad students feeling insecure about the job market. She acknowledged that a tenure denial can send shockwaves through the faculty in a department, but didn't think that it merited calling for a departmental review.

[113] Prof. Adorno said she'd 'just rather sit under the table than be good and glad and I will be but it doesn't come from the heart as it used to'; she hopes no other department has to go through something like this.

[114] In Prof. Jackson's words, Prof. Adorno 'went ballistic.'

*CONFIDENTIAL*

responsible for chasing away the accepted graduate program applicants for this academic year, all of whom declined the department's offers. Prof. Adorno is worried that the department will not be able to enroll any new graduate students for the next academic year as well. There is widespread worry among students and faculty about the effect the department's international notoriety may have on their future employment prospects. Prof. Adorno feels the damage to the department has been 'incalculable' and will take years to repair.

Profs. Jackson and González-Pérez are hoping this review will lead the administration to loosen, or end entirely, Profs. González Echeverría's and Adorno's long-held control over the department, which they feel has been deleterious to its academic quality and learning/working environment. Both are concerned that if the administration does nothing to alter the departmental structure, then Profs. González Echeverría and Adorno, whom Prof. González-Pérez described to us as 'vindictive,' will find ways to retaliate against every student and faculty member who they perceive to have been critical of them or their authority.

*Power struggles among senior faculty: who controls the department*

Of the current senior faculty, only Profs. González Echeverría and Adorno have ever served as department chair: Prof. González Echeverría for sixteen[115] years, and Prof. Adorno for ten. The strongest dispute among the senior faculty is over this centralization of power in the two Sterling professors.[116]

According to Prof. Jackson, Prof. González Echeverría is the power in the department. Prof. Jackson's view is that Prof. González Echeverría sees the department as a family over which he rules as patriarch.[117] Prof. Jackson says that 'usually departments have two big egos fighting it out;[118] here, it's the one, with no dialogue or competition for a long period of time.' Prof. Jackson believes this quarter century of centralized authority has left no room in the department for other perspectives.[119] According to Prof. Jackson the faculty rarely meet, and when they do meet it's usually because they need to vote on admissions or appointments; no minutes are taken at the meetings. Topics such as department operations, barriers to promotion in the department, problems recruiting majors, and changes made by Profs. Adorno and Valis to the department's handbook are not discussed at faculty meetings. In Prof. Jackson's view, Prof. González Echeverría should retire, Prof. González-Pérez should be made chair,[120] and the

---

[115] Prof. González Echeverría also acted as chair three times when Prof. Adorno was on leave.

[116] Prof. González Echeverría wrote that he was "proud to say that as chair, I radically changed the direction of the Department, and take some credit for the number one nationwide ranking that it received in 2010: I, as chair, had the leading role in the hiring of every one of its members." See RGE Memo, Exhibit 7, 3. In his interview, Prof. González-Pérez suggested that Prof. González-Echevarría's role in hiring faculty members has led to a 'quid pro quo' mentality in the department.

[117] A faculty member outside the department said he has heard students in the department expressing worry about what 'Mommy and Daddy' (Profs. Adorno and González Echeverría) will think or do.

[118] Prof. Jackson used the phrase 'malice in Blunderland.'

[119] Prof. Jackson says that since 1996, the last time the department had a visiting professor, the department has not even benefited from the fresh perspective a visitor might bring.

[120] Prof. González-Pérez said about the prospect of serving as chair, 'I couldn't do worse than they have done.'

Confidential--Attorneys' Eyes Only                    BYRNE003084

*CONFIDENTIAL*

administration should open new lines of hire for adjunct professors, new PhDs, and perhaps tenured faculty as well. He believes that these changes will create more opportunities for faculty discussions and collaborations between the department and the Jackson Institute for Global Affairs.

Prof. González-Pérez agrees that Prof. González Echeverría is 'the dominant personality' in the department. Prof. González-Pérez's view is that a strong person like Prof. González Echeverría wouldn't be a problem 'if it weren't reflected in governance' of the department; he wouldn't mind the concentration of power in Profs. González Echeverría and 'if it didn't lead to abuses of power and there were more consultation' with other faculty members. In larger departments, 'bigger egos can be shoved to one side'; in small departments like this one, that can't be done so easily.[121] As Prof. González-Pérez wrote to then-Dean Miller in April 2014, urging her not to reappoint Prof. Adorno as chair, "Practically all the issues that afflict the Department...are the end result of years, if not decades, of assigning the department's leadership to the same two individuals: Roberto and Rolena.  This has produced in these colleagues an extreme sense of entitlement, a belief that they are accountable to no one (least of all, their colleagues), and a paranoid management style that sees an enemy in anyone who dares to express his disagreement with their views and actions."[122] Prof. González-Pérez describes faculty meetings as 'tightly structured; it's viewed as disruptive if you bring up something not scheduled.' He says the department is run like 'the Chinese politburo': "our faculty meetings (when they are held at all) are tightly scripted by the chair, lacking in substantive discussion, and the result of every vote is assured well beforehand."[123] Prof. González-Pérez feels there should be a change in the balance of power to give every member of the ladder faculty a vote in decisions, better communication among faculty, open faculty discussion of issues in the department, and a more inclusive management style. He thinks increasing the number of senior faculty might help.

On the other hand, Prof. González Echeverría says Prof. Adorno's leadership is "excellent" and "skillful"[124] and thinks the department has thrived under Prof. Adorno while she has been chair. Prof. Adorno says she would prefer not to be chair but that 'it's hard to say no when you're asked by the President of the University.' She says she is 'a stickler, borne by the others with good humor.' As chair, Prof. Adorno thinks her role is to help people get along and do their work, which 'requires a very light touch intervention-wise,'[125] and to represent the department with dignity. Prof. Adorno says she is not a born administrator and was trained as a scholar rather than a manager of people.[126] She is upset that she has been accused of secrecy

---

[121] One senior professor outside the department has suggested that Prof. Ludmer, whom Prof. González-Pérez replaced, was a strong personality who had kept Prof. González Echeverría from completely dominating the department, while Prof. González-Pérez, for whatever reason, has not been the same counterbalance, leaving Prof. González Echeverría's dominance unchecked.

[122] This correspondence summarizes Prof. González-Pérez's feelings about the department. See Exhibit 6.

[123] Ibid.

[124] RGE Memo, Exhibit 7, 1,6.

[125] Several members of the department described Prof. Adorno to us as a micromanager.

[126] One of the students interviewed indicated that Prof. Adorno tries hard, but has 'a lack of a knack' in dealing with people.

Confidential--Attorneys' Eyes Only                                          BYRNE003085

*CONFIDENTIAL*

about the functioning of the department, and says that if the administration retains her as chair, she plans to create a memo for everyone in the department that explains how everything works, so that even though she has been 'accused of secrecy, at least she won't be convicted.'

Prof. Adorno contrasts complaints about the department made in the anonymous letter with the manner in which students dealt with the 6th year teaching issue. According to Prof. Adorno, those students circulated a petition among their peers and presented the signed petition to Prof. Adorno; she held a meeting with them to discuss the issue. She made a Power-point presentation, and talked about the decline in the foreign language requirement. She described it as a good discussion (though in her interview she also called it a 'session with whining'), with constructive, interesting and legitimate questions. She felt the meeting disabused the students of misinformation.[127]

*Tenure*

All ladder faculty agree that it is hard to get tenure at Yale, but disagree as to whether it is unreasonably hard in their department. Prof. González Echeverría says that in his experience during his 42 years at Yale, tenure decisions always create friction and dissatisfaction. 'It's harsh, because professors only have a certain amount of time to become a star – not just to do well, because this is Yale.' He remarks that there is 'general malaise among junior faculty at Yale' because of the remoteness of getting tenure.[128] Prof. González Echeverría denies telling junior faculty that 'no one gets tenure at Yale,' dismissing the allegation as 'puerile' and 'made up.'[129] Instead, Prof. González Echeverría says, the standard is that a junior professor needs to be a star[130] to get tenure at Yale. Prof. González Echeverría says the last internal candidate to be given

---

[127] Two former students who came forward to talk to us said that the first slide in Prof. Adorno's presentation was a copy of the petition. She magnified the signatures and referred to the students who had signed the document as the 'New Haven 10.' One former student said that she called the petition 'illegitimate' because it was addressed to the department instead of individual professors. They told us that the second series of slides consisted of the acceptance letters signed by the last four cohorts of graduate students. Prof. Adorno highlighted the portion of the letters that indicated that the doctoral program only guaranteed five years of funding. They reported that she told them that they 'should be happy' and that this was 'how it is.' One former student reported that she criticized the students for behaving like 'mistreated factory workers.' The two former students reported that she spoke for about an hour. One student recalled that Prof. Adorno shouted at students who tried to comment, and told them to 'sit down' and 'stop talking.'

[128] Prof. González Echeverría said that he himself left Yale as junior faculty because he recognized the difficulty of getting tenure.

[129] Two junior faculty disagree, and another told us that Prof. González Echevarría said that no one gets tenure in his (emphasis added) department unless they are stars in their field.

[130] Prof. Adorno echoed this formulation: Prof. Adorno says Prof. González Echeverría's 'legendary statement' is: 'if you want to get tenure at Yale, you have to be a star'; she says Prof. González Echevarría tells people, 'if you're untenured, you'd better be looking for a tenure track job and be on the job market the previous year [before your tenure comes up], because if you get an offer, you may choose to take it,' which she says is standard operating procedure in the humanities. According to FASTAP, "At all ranks, appointments meeting the highest standards must continue to distinguish the faculty if Yale is to secure and enhance its stature among the world's preeminent universities in the next half-century." Butler, Jon et al. "The Report of the Faculty of Arts and Sciences Tenure and Appointments Policy Committee." (5 February 2007) ("FASTAP Report"), attached to this report as Exhibit 52, 3.

23

CONFIDENTIAL

tenure was Prof. Nicolas Shumway[131] – 'my mistake,' because, according to Prof. González Echeverría, although Prof. Shumway was tenured as a language teaching expert, he stopped serving as language director (saying he couldn't be fired for doing so) and announced he wanted to teach Argentinian literature, a subject Prof. Josefina Ludmer already was teaching.

Prof. Adorno says that she doesn't use the 'star' language. Instead, she tells the junior faculty that 'this is a very hard climb to be tenured at Yale, a steep hill,' but she does not discuss this with them when they first come to Yale, because 'it's eight years down the road.' She says that 'the hardest thing' is to 'temper expectations without crushing them,' and FASTAP makes that task more difficult because, by making the system less byzantine, it raises the junior faculty's expectations.

Prof. González-Pérez believes that the department sets the tenure bar too high. He views the example given by Prof. González Echeverría of a tenurable candidate – a recently tenured professor in Comparative Literature whose second book was the subject of a symposium – as unreasonable because it takes most people more time than the tenure clock allows to develop an international reputation. According to Prof. González-Pérez, 'Yale needs to show it can nurture its own,' as he says some Yale departments already are doing; Prof. González Echeverría's response to this, according to Prof. González-Pérez, is 'Our standards have to be much higher.' Prof. González-Pérez feels this is reminiscent of the old-boy networking system of fifty years ago in which tyrannical professors had a 'sink or swim' mentality toward junior faculty. He feels it is a good thing that FASTAP has made it more difficult for the department to get rid of junior faculty after their third year, something the department had frequently done before the implementation of FASTAP. Professor Jackson feels that the Department has always been reluctant to promote junior faculty, and that nothing in the department changed after FASTAP was introduced.

### Tenure and Paulo Moreira

Prof. Moreira's tenure case in March 2014 split the senior faculty.[132] Although Prof. González Echeverría claims that no one could know what the tenure vote was because voting was by secret ballot,[133] it seems to be widely agreed that the vote was 3:2, with Profs. Gonzalez Echeverria, Adorno, and Valis voting against, and Profs. Jackson and González-Pérez voting for. Prof. Jackson said that the day before the vote, Prof. González Echeverría called Prof. Jackson into his office to tell Prof. Jackson he had changed his mind about Prof. Moreira and would vote

---

[131] Prof. Shumway became a tenured professor in 1987. He left Yale in 1993 and now teaches in Texas; we haven't spoken with him.

[132] Profs. Jackson and González-Pérez requested an external review of Prof. Moreira's tenure case. See Exhibit 49. Prof. Moreira requested a copy of the external evaluations that were submitted for his application from Prof. Adorno (and copied Associate Dean Schirmeister and senior staff at the Provost's office). See Moreira, Paulo. "Requesting to see external evaluations for tenure review." Message to Rolena Adorno. 7 March 2015. E-mail, attached to this report as Exhibit 53.

[133] See RGE Memo, Exhibit 7, 4. We were told second-hand that Prof. González Echeverría, angry that Prof. Jackson had discussed the vote distribution, yelled at him for violating the confidentiality of the vote and swept books off Prof. Jackson's desk. Prof. Adorno noted in a faculty meeting that any faculty member who revealed any information from a confidential faculty meeting was 'committing a serious offense.'

Confidential--Attorneys' Eyes Only                                              BYRNE003087

CONFIDENTIAL

against tenure.[134] Although junior faculty members told us that Prof. Adorno had given them the impression she thought Prof. Moreira would have no trouble getting tenure, Prof. Adorno said that she was encouraging, but realistic.[135] She added that 'sometimes people just hear what they want to hear'. Profs. González Echevarría and Adorno both told us that the vote on Prof. Moreira's 6th year promotion had been 'deeply divided.' Prof. Adorno said that to her regret, she had transmitted the committee's concerns to Prof. Moreira only orally, so she now does not have documentation to show us. Prof. Jackson thought Prof. Moreira had 'everything required' for tenure.[136] Prof. González-Pérez thought Prof. Moreira 'was a shoo-in': a true scholar, a great teacher, two wonderful books, and eight to ten letters from scholars in the field who didn't know Prof. Moreira personally, who spoke with great enthusiasm about his work. Prof. González-Pérez said that Prof. González Echevarría 'enumerated everything that was wrong with Prof. Moreira 's second book – quibbles, it was really nothing.'

Profs. Jackson and González-Pérez suggested that the faculty members who voted against approval were motivated by a fear that Prof. Moreira was not a 'yes man' and would be a potential threat to their control, and that adding Prof. Moreira to the faculty would shift more weight in the department to Portuguese.

### APL Leave Proposals, Tenure, and Susan Byrne

*Prof. Byrne's sixth year promotion:* Prof. Byrne told us that in May 2013, when she was up for promotion to associate professor on term, Prof. Adorno praised Prof. Byrne's teaching, research and service to the department, and told Prof. Byrne that feedback from the external reviewers had been similarly positive. Prof. Adorno, on the other hand, told us that the committees' feedback was more mixed.[137] Prof. Adorno said she advised Prof. Byrne that Prof. Byrne's work was good 'for this level'; that Prof. Byrne needed to work on her writing; that Prof. González Echevarría had described Prof. Byrne's work as 'good, not brilliant – in a sense, predictable'; and that then-Deans Mary Miller and Thomas Pollard had suggested that Prof. Byrne work to improve the quality and precision of her writing. Prof. Adorno also told Prof. Byrne that Dean Miller had suggested that Prof. Byrne exchange drafts of her work with junior

---

[134] See Exhibit 49. After we interviewed Prof. Jackson, we heard a second-hand version of this conversation, in which Prof. González Echevarría told Prof. Jackson that he expected the other senior faculty to follow his lead in voting against Prof. Moreira's tenure. Prof. González Echevarría told us that no one could lay the responsibility for denying Prof. Moreira tenure at his feet because each senior faculty member had only one vote. See RGE Memo, Exhibit 7, 4. We did not re-interview Prof. Jackson to ask him whether this account was accurate.

[135] In general, the junior faculty's perspective is that Prof. Moreira was encouraged by the senior faculty as he approached tenure review. Prof. Adorno says she is concerned that junior faculty members may misinterpret her friendliness and socializing, and the enthusiasm she must show when she is bringing a candidate up to the committee for 6th year review, as endorsement of the person's prospects for tenure. The remarks junior faculty said Prof. Adorno made about Prof. Moreira's tenure prospects, though, were explicit endorsements.

[136] Prof. Adorno said that Prof. Jackson had said about Prof. Moreira, 'Maybe we can't do any better,' which she said was the 'kiss of death' in her view, because that is not the standard at Yale. We did not reinterview Prof. Jackson, so we were not able to ask him about this.

[137] The reviewing committees were the Departmental Review Committee and the Humanities Divisional Committee.

Confidential--Attorneys' Eyes Only          BYRNE003088

CONFIDENTIAL

professors in other departments. Prof. Byrne did not do this; she told us that she didn't want to share her work with other junior faculty.

*Prof. Byrne's APL leave.* Prof. Byrne submitted three proposals for an APL to the department, all of which the department rejected. [138] According to Prof. Byrne, in September 2013, a few months after she had been promoted and while she was working on her third book, she asked Prof. Adorno if she could wait until fall of 2014[139] to apply for the leave. Prof. Byrne says Prof. Adorno told her it would be better if she could apply in fall of 2013; Prof. Byrne replied that she 'could do it, but it's going to be sketchy' because she had only a week to prepare the proposal. (According to Prof. Adorno, it was Prof. Byrne who decided to submit the proposal in fall of 2013, and only acknowledged that the proposal was problematic after having received negative feedback from then-Dean Miller and the reviewing departmental committee.) Prof. Byrne submitted her first proposal, *From Good to Beautiful Letters: Another History of Literature*[140] on September 23, 2013; two days later, the committee[141] rejected the proposal.

Prof. Byrne submitted her second proposal, *From Law to Literature in Spain*,[142] on October 1, 2014.[143] Prof. Byrne had not sought guidance from senior faculty during the year following the rejection of her first proposal, although Prof. Adorno had suggested to Prof. Byrne that she should consult in the interim with Prof. González Echeverría because of his expertise in the second proposal's subject matter. Prof. Byrne says she simply didn't have the time to meet with Prof. González Echevarría because of the work she needed to do on her third book. Prof. Adorno viewed Prof. Byrne's refusal of help as an example of Prof. Byrne's characteristic rejection of the department's attempts to mentor her.

On October 16, 2014, Prof. Adorno told Prof. Byrne that the committee, after reviewing *From Law to Literature*, had concluded the proposal needed more work. Prof. Adorno said Prof.

---

[138] In their report, the FASTAP Committee recommended "a one-year leave at full pay for each new associate professor on term to be taken in the first or second year following the promotion...after presenting a research proposal approved by the department chair and the cognizant dean." Exhibit 52, FASTAP Report, 14. While FASTAP does not guarantee an APL, our understanding is that Prof. Byrne's APL was the first to be denied following the implementation of FASTAP.

[139] APL proposals are submitted in the fall.

[140] See Adorno, Rolena. "RE: Documentation." Message to Tamar Gendler. 11 February 2015. Email, and the first of the documents accompanying that email, "Calendar of events Spring 2013 to Spring 2015.docx." Memo to Tamar Gendler. Both are attached to this report as Exhibit 54. Prof. Byrne agreed the proposal was 'half-baked.' Exhibit 54, 2.

[141] Prof. Adorno says that she selected the faculty members on the committee – Profs. González Echevarría, Adorno, and Valis – for their expertise in the subject matter of SB's proposal.

[142] Prof. Byrne received $8,000 in support for this project from the MacMillan Faculty Research Grants Committee on April 8, 2014 and $4,000 in funding from the Griswold Research Fund Committee on February 24, 2014. See Shapiro, Ian. Letter to Susan Byrne. 8 April 2014; and Lofton, Kathryn. Letter to Susan Byrne. 24 February 2014. Both letters are attached to this report as Exhibit 55.

[143] Profs. Byrne and Adorno differ as to the deadline suggested by Dean Miller for Prof. Byrne's second proposal: according to Prof. Adorno, Dean Miller wanted Prof. Byrne to submit a second proposal in spring 2014, so that there would be ample time for her to refine it before it was due that fall; according to Prof. Byrne, the resubmission was first due in Fall 2014.

Confidential--Attorneys' Eyes Only                                   BYRNE003089

*CONFIDENTIAL*

González Echevarría would discuss the committee's feedback with Prof. Byrne on October 17, and her revised proposal would be due on November 1. Prof. Byrne met with Prof. González Echeverría on October 17 at 10:45 am to discuss the committee's comments, which, according to Prof. Byrne, were minor criticisms of the bibliography and suggestions for text edits.[144] At 11:34 am, Prof. Byrne emailed to the committee a list of what she had understood to be the committee's recommended changes, adding "Should any of the other committee members wish to add to the [list], please let me know." At 4:41 pm, "having had no further word from any of you on changes beyond those suggested by [Prof. González Echevarría] in all of your names and re-capped in my earlier [email]," Prof. Byrne submitted a second draft of her proposal, incorporating what she says she believed to be the committee's (minor) suggestions. At 6:16 pm, Prof. González Echeverría wrote Prof. Byrne to indicate that the committee's substantive objections had not been addressed in her second draft.[145] At 7:16 pm, Prof. Adorno sent Prof. Byrne an email to the same effect, and attached a written summary of the committee's comments.[146]

The following day, on October 18, Prof. Byrne sent the committee a letter rebutting the concerns about her proposal raised in Prof. González Echevarría's written summary, and emailed the committee to tell them that she expected them to submit the second draft to the Dean's office by November 1.[147] Prof. Adorno replied that the Dean's office had extended the deadline to November 7.[148] On November 3, Prof. Byrne sent Prof. Adorno a third draft in which she had made minor revisions.[149] On November 6, the Committee rejected this third draft, and forwarded

---

[144] As Prof. Byrne wrote in an e-mail to the committee, "The changes, as I understand them, involve adding three names to the bibliography [listed], and making minor deletions/edits to certain sentences [listed]. Roberto explained that his own choice of texts would be different, but I prefer those I have chosen, and explained my reasoning to him." Byrne, Susan. "Re: Tomorrow, Friday, October 17." Message to Rolena Adorno, Roberto González Echevarría, and Noel Valis. 17 October 2014 at 11:34 a.m. Email, attached to this report as Exhibit 56.

[145] "Dear Sue: I got [the new draft], I think, I wish that you had taken more time to address our substantial objections. R" See González Echevarría, Roberto. "Re: Edited proposal is in your mailboxes." Message to Susan Byrne. 17 October 2014 at 6:16 pm. Email, attached to this report as Exhibit 57.

[146] Prof. Adorno wrote, "It is important for you to understand now that your reduction of the contents of your meeting with Roberto to some four minor editorial points does not reflect the contents of that meeting nor the views of the full committee, which are contained in his summary." See Adorno, Rolena. "Fwd: Edited proposal is in your mailboxes." 17 October 2014 at 7:16 pm. Email; and González Echevarría, Roberto. Letter to Rolena Adorno. 17 October 2014, both of which are attached to this report as Exhibit 58.

[147] See Byrne, Susan. Letter to Colleagues. 18 October 2014, attached to this report as Exhibit 59. Both Prof. Byrne and Adorno told us they were under the mistaken impression that the FAS Dean had the authority to override a Departmental Review Committee's decision to not endorse an APL proposal. See, Byrne, Susan. "Dear Colleagues." Message to Colleagues. 18 October 2014 at 12:14 pm. Email; and Dovidio, John. Message to Susan Byrne. 8 January 2015 at 2:09 pm. Email. Both emails are attached to this report as Exhibit 60.

[148] Prof. Adorno replied that she had received Prof. Byrne's letter and told Prof. Byrne that the Dean's office had extended the deadline to November 7. See Adorno, Rolena. "Re: Edited proposal is in your mailboxes." Message to Susan Byrne, Noël Valis, and Roberto González Echevarría. 18 October 2014 at 2:08 pm. Email, attached to this report as Exhibit 61.

[149] Byrne, Susan. Message to colleagues. 3 November 2014 at 2:08 pm. Email, attached to this report as Exhibit 62.

Confidential--Attorneys' Eyes Only                                                      BYRNE003090

CONFIDENTIAL

the draft to the Dean's office for review;[150] on November 17, the committee notified Prof. Byrne that it had rejected this third draft of her proposal.[151]

After the Committee's rejection of the proposal on November 6, the Dean's office and the Office of General Counsel took a more active role in the situation. Staff members from those departments encouraged the department to allow Prof. Byrne to further refine her draft. The department rejected this suggestion; Dean Dovidio told Prof. Adorno he understood and supported the rejection.[152] By December 2014, however, Dean Dovidio let the department know that the administration had additional concerns about the APL denial, as it was unprecedented; senior staff in both offices eventually persuaded the department to allow Prof. Byrne to submit an entirely new APL proposal.

In a meeting held on January 7, 2015, Prof. Adorno, Prof. Byrne and Dean Dovidio[153] agreed that Prof. Byrne would submit the new proposal on a topic that Prof. González Echevarría had identified as being 'ripe for analysis' in the feedback he had given Prof. Byrne on October 17. Prof. Adorno suspected that Prof. Byrne chose this subject as a 'semi-trap' because Prof. Byrne thought the department would be less likely to reject a proposal based on an idea Prof. González Echevarría had suggested; Prof. Byrne said that she chose the topic because she wanted to avoid further conflict with the department over her proposals. Dean Dovidio wrote up a summary of the meeting; Prof. Byrne edited the summary so that it explicitly gave her permission to seek "intermediate feedback from review committee members" and advised all committee members that they could provide feedback.[154] According to Prof. Byrne, the department usually allowed for individual feedback, so she "asked for notes early in the process … but was told that it wasn't possible" and that "members were … not allowed to speak with me individually."[155] Prof. Adorno disagreed with this account, and stated that the Departmental Committee typically gave collective feedback.[156]

---

[150] Adorno, Rolena. Letter to Tamar Gendler. 6 November 2014, attached to this report as Exhibit 63.

[151] Adorno, Rolena. "Re: APL research proposal." Message to Susan Byrne, Noël Valis, and Roberto González Echevarría. 17 November 2014. Email, attached to this report as Exhibit 64.

[152] In email correspondence between Prof. Adorno and Dean Dovidio, Prof. Adorno informed Dean Dovidio that the department was unwilling to grant Prof. Byrne an opportunity to submit a fourth draft; Dean Dovidio indicated that he supported this decision: "…I am fully convinced that you and the department have been fair and have offered valuable guidance to the candidate. Unfortunately, Sue chose not to be sufficiently responsive. I communicated that to Tamar after you and I met, and we are behind you." Adorno, Rolena. "Re: Susan Byrne APL leave proposal and related documents." Message to John Dovidio. 23 November 2014. Email; and Dovidio, John. "Re." Message to Rolena Adorno. 24 November 2014. Email, both attached to this report as Exhibit 65.

[153] By this point, Prof. Adorno had asked Dean Dovidio to become involved as an observer.

[154] Prof. Adorno, Prof. Byrne and Dean Dovidio discussed this matter in a series of emails sent on January 8 and 9, 2015. Emails, attached to this report as Exhibit 66.

[155] See Byrne, Susan. "Re: Wednesday's meeting." Message to John Dovidio and Rolena Adorno. 8 January 2015. Email, attached to this report as Exhibit 67.

[156] See Adorno, Rolena. "RE: Summary of meeting, Thursday, January 29, 2015, 4 pm, 82-90 Wall St., Rm. 229." Memo to Noël Valis, Roberto González Echevarría and John Dovidio, attached to this report as Exhibit 68.

Confidential--Attorneys' Eyes Only                                                     BYRNE003091

On January 24, 2015, Prof. Byrne submitted her third proposal, *Tirso de Molina's Legal Commentary in "El buriador de Sevilla o convidado de piedra": Sex Lies and Promises of Marriage*. Profs. Byrne, Adorno, and González Echevarría, and Dean Dovidio, met to discuss the proposal on January 29. According to Prof. Byrne, nothing of substance was discussed and all criticisms by the committee related to her style of research and writing – aspects of her work that in the past Profs. González Echevarría and Adorno had praised.[157] According to Prof. Adorno's summary of the meeting, in addition to criticizing her writing, the committee members made substantive objections to Prof. Byrne's approach to the topic. Prof. Adorno also asserted that Prof. Byrne argued against all of their points on substantive grounds while insisting that she would do whatever they wanted her to do because she "want[s] this APL."[158] Prof. Byrne submitted a revised version of the proposal on February 3, which was rejected by the committee three days later; the committee cited Prof. Byrne's thesis, execution, and writing style.[159] Prof. Byrne then requested a triennial leave, which the Dean's office approved.[160]

*Tenure and Susan Byrne:* On March 30, 2015, Prof. Adorno asked the Dean's office for permission to appoint an extra member to the review committee for Prof. Byrne's tenure application, explaining that she was taking this step due to the circumstances surrounding Prof. Byrne's APL leave proposals and Prof. Adorno's concerns about references to retaliation in the University's announcement of the department climate review. Prof. Adorno expressed willingness to recuse herself from the tenure review committee but did not want to lose the right to vote as a member of the department on Prof. Byrne's candidacy. Associate Provost John Mangan informed Prof. Adorno that the FAS Dean had exclusive authority to appoint outside committee members.[161]

On April 1, 2015, Prof. Byrne sent Profs. Adorno and González Echevarría a letter asking them to recuse themselves from "all matters related to tenure review" because of their "aversion" to FASTAP and their conduct during her APL review.[162] Prof. Adorno told Prof. Byrne and the

---

[157] See Prof. Byrne's letter sent to the Committee on October 18, 2014 after they had voted against approving her second proposal, in which she notes, "just about one and one-half years ago, this same committee recommended me for promotion on the basis of my body of work," Exhibit 59.

[158] Ibid.

[159] Adorno, Rolena. Minutes of Departmental Committee Meeting to evaluate Sue Byrne's fourth and final APL research proposal. 6 February 2015. Memo, attached to this report as Exhibit 69.

[160] Profs. Byrne and Adorno informed us in their interviews that Prof. Byrne was granted triennial leave.

[161] Prof. Adorno told us that she suggested Prof. Guiseppe Mazzotta as a replacement because of his background in Golden Age literature. Adorno, Rolena. "Departmental committee for Byrne tenure review." Message to John Mangan. 30 March 2015. Email. See also Mangan, John. Message to Rolena Adorno. 31 March 2015. Email. See Adorno, Rolena. Message to John Mangan. 11 April 2015. Email. These emails are attached to this report as Exhibit 70.

[162] Byrne, Susan. Letter to Rolena Adorno. 1 April 2015, attached to this report as Exhibit 71. ("Susan Byrne's recusal letter.")

Confidential--Attorneys' Eyes Only BYRNE003092

*CONFIDENTIAL*

Dean's office that she refused to recuse herself from the full department vote.[163] On April 13, Dean Tamar Gendler informed Prof. Adorno that the Dean's office would not make any decisions about the composition of the review committee until after the climate review had been completed.[164] On April 16, Prof. Adorno submitted Prof. Byrne's material to the Division of the Humanities and requested confirmation that she would not be held responsible for any undue delays caused by the review, a confirmation provided on May 6.[165]

Prof. Byrne says that Prof. González Echevarría has made a number of comments during her time in the department that demonstrate his antipathy toward FASTAP and his opposition to granting any junior faculty member tenure. She said that during a lunch meeting with Prof. González Echevarría in August 2014, he told her "FASTAP be damned,"[166] and advised her, "[n]o one ever gets tenure at Yale, so you should keep looking for another job." Prof. Byrne also says that Prof. Adorno had told her (and Prof. Byrne's spouse) at a dinner at Prof. Adorno's house that "we don't need two Cervantistas in the Department."[167] Profs. González Echevarría and Adorno have denied making these comments; Prof. Adorno explained that she does not view Prof. Byrne as a 'Cervantista.'

*Sexual harassment/misconduct*

All senior faculty in the department say they have not, themselves, witnessed any behavior on the part of Prof. González Echevarría or any other faculty member, including physical contact, comments about appearance, or discussion of erotic subjects, that they would consider to be sexual misconduct, inappropriate, or conduct that has made students uncomfortable. Prof. González Echevarría denies that anyone has ever made such a complaint about his behavior, and says he has not received any documents from anyone making him aware of any such complaint. Prof. Adorno says she has no knowledge of any complaints ever having been made about Prof. González Echevarría's behavior.[168]

As department chair, Prof. Adorno has had formal sexual misconduct training. She says she was 'aghast' at what she learned, and it has made her much more careful about her own conduct. She feels the entire faculty could benefit from sexual misconduct training, and thinks

---

[163] Adorno, Rolena. Letter to Susan Byrne. 13 April 2015, attached to this report as Exhibit 72. See also Adorno, Rolena. "Fwd: Departmental committee for Byrne tenure review." Message to John Mangan and FAS Dean. 11 April 2015 at 5:44 pm. Email, attached to this report as Exhibit 73.

[164] See Gendler, Tamar. Message to Rolena Adorno and John Mangan. 13 April 2015 at 10:08 pm. Email, attached to this report as Exhibit 74. We understand that since then, the review committee's composition has been determined.

[165] See Dovidio, John. Message to Rolena Adorno. 6 May 2015 at 8:43 am. Email, attached to this report as Exhibit 75.

[166] See Susan Byrne's recusal letter, Exhibit 71.

[167] Ibid.

[168] Based on our interviews with senior faculty and other witnesses, we have reasons to question the accuracy of these statements by Profs. González Echevarría and Adorno, but confidentiality considerations prevent us from further discussion of this matter in this report. No one has been willing to speak on the record in this review about such behavior experienced firsthand.

Confidential--Attorneys' Eyes Only                    BYRNE003093

CONFIDENTIAL

sexual misconduct is a problem 'across FAS, and particularly in NELC.' Prof. Adorno says that
she herself maintains formality in her approach to students and colleagues, insisting upon being
spoken to with the formal 'usted,' which in Latin America is used only with male professors, and
sitting around a table when meeting with colleagues. If she sees a Latin American man
approaching her, she 'extends her hand and ducks so he won't kiss her' (kissing being a
conventionally acceptable form of greeting in Hispanic culture) 'because they're in the United
States.' Prof. Adorno feels there is nothing in particular for her to do as chair vis-à-vis educating
faculty about sexual misconduct issues, beyond giving examples of inappropriate behavior to the
faculty.[169] She has not discussed with any members of the faculty, with a corrective intent,
differing cultural conventions about physical contact. As a result of sexual harassment training,
her watchfulness has changed, and she feels it is part of her role as chair to protect faculty
members from doing something perfunctorily that could be regarded as inappropriate.

　　　　Profs. González-Pérez and Jackson are aware of rumors that Prof. González Echevarría
has engaged in sexual misconduct.[170] Prof. González-Pérez says that even though Prof. González
Echevarría rebuilt the department, previously an all-male bastion, to include many women as
professors, that has not resulted in an appropriate departmental climate. Prof. Jackson says that
rumors of Prof. González Echevarría's misbehavior cause female graduate students to think twice
before coming to the department.

　　　　Profs. González Echevarría and Adorno point to the gender composition of the faculty as
evidence that Prof. González Echevarría is not misogynistic.[171]


## JUNIOR FACULTY PERSPECTIVES

### Overview

　　　　At the start of this review, the department had four junior faculty members. Two left at
the end of spring term 2015: Prof. Moreira, one of the two ladder faculty in Portuguese, whom the
department voted against recommending for tenure, and Prof. Poole, who withdrew before his

---

[169] Prof. Adorno says that after her own sexual misconduct training, she gave professors examples of what
'counts as crossing the line,' but when we asked whether behavior that 'crossed the line' would constitute
sexual misconduct as Yale defines it, she said she'd need to revisit her notes from the workshop and needed
a refresher. She was sure that 'touching in inappropriate places on the body' or 'an engaged smooch' would
constitute sexual misconduct; while she regarded complimenting a woman on her appearance as 'a
dangerous thing,' she said she'd need to consult a Title IX coordinator as to whether or not such a comment
would constitute sexual misconduct, a determination that is 'difficult for a lay person' to make. She said
that, hypothetically, if someone came to her with a complaint about a faculty member's behavior, she
would tell the person to go straight to the Title IX coordinator. This would be true as well if the conduct
being complained of were culturally conventional:  she 'wouldn't try to explain it away; if it's offensive,
it's offensive.'

[170] Prof. González Pérez said that when he was Prof. González Echevarría's PhD student at Yale, Prof.
González Echevarría would brag about his exploits, so he thought the rumors were plausible. 'Coming from
a Puerto Rican machista culture, I could understand; the years have educated all of us.'

[171] Prof. González Echevarría says that "I am proud that I drastically transformed the gender composition of
the Department...[W]hen I completed my service as chair, the Department consisted of four senior women
and two senior men, Professor David Jackson and me." RGE Memo, Exhibit 7, 3.

31

CONFIDENTIAL

sixth year review. Two are still in place for this academic year: Prof. Byrne, currently up for tenure, and Prof. Harkema, in her fourth year and currently DUS for Spanish.

The junior faculty report an atmosphere of supportive collegiality among themselves, but say their work environment has been infected by the palpable animosities and factionalism that exist among the senior faculty. According to the junior faculty, Prof. González Echevarría retains tight control of the department, sitting at the top of a hierarchical structure that provides few opportunities for junior faculty to affect the workings or intellectual direction of the department. Some feel that Prof. González Echevarría and Prof. Adorno, who follows Prof. González Echevarría's lead, are older scholars who are behind the times in their approaches to the field, to students, and to issues involving work/life balance.

The junior faculty believe that Prof. González Echevarría has established a culture in the department in which virtually no one gets tenure, a culture that persists despite FASTAP; the department's vote against Prof. Moreira 's tenure has reinforced this belief and demoralized the junior faculty.

The junior faculty are aware that Prof. González Echevarría's behavior toward women makes some students uncomfortable. Some junior faculty members wonder whether the behavior violates Yale's policies against sexual misconduct; others feel the behavior is merely inappropriate, or simply to be expected from a man of his generation and culture. All feel in the dark as to how to handle student complaints about the behavior.

### _Effect on junior faculty of animosities and factionalism among senior faculty_

Junior faculty are acutely aware that some senior faculty members in the department do not get along with others. They observe that Prof. González-Pérez does not speak with Profs. González Echevarría, Adorno or Valis except as necessary, does not participate in many facets of the department, and appears ostracized and unhappy. The primary animosity seems to be between Profs. González Echevarría and González-Pérez, but junior faculty also report observing friction between Profs. González Echevarría and Jackson, and Profs. Adorno and Jackson, part of a larger pattern of struggle over the role of Portuguese in the department.

Junior faculty say the department is divided into two factions, the Profs. González Echevarría/Adorno/Valis faction and the Profs. González-Pérez/Jackson faction. According to the junior faculty, Prof. González Echevarría, the most senior member of the faculty, seems to control the department;[172] Prof. Adorno follows his lead; and Prof. Valis, although more independent of Prof. González Echevarría, usually votes with them. Thus, unsurprisingly to the junior faculty, the departmental vote on Prof. Moreira 's tenure was split 3:2 along factional lines, with the Prof. González Echevarría-led faction prevailing. As one junior faculty member explained, even when the factionalism doesn't completely explain a contentious vote, it 'conditions the conversations that happen in the aftermath.'

The junior faculty work hard to stay neutral and to avoid angering the senior faculty, in whose good graces the junior faculty feel they must stay for the sake of their careers. Staying

---

[172] As one junior faculty member put it in an interview, 'Once Prof. González Echevarría sets his mind on something, it'll happen that way'; another, in a letter to the Provost, "…[I]t seems that his word is that which rules in the department." See Poole, Kevin. Letter to Tamar Gendler and Ben Polak. 7 April 2015, attached to this report as Exhibit 76, 2.

Confidential--Attorneys' Eyes Only                                                BYRNE003095

CONFIDENTIAL

neutral is difficult. Some junior faculty report that Profs. Adorno and González-Pérez have initiated discussions with them about the origins of the dispute between Profs. González Echevarría and González-Pérez, in attempts, the junior faculty feel, to persuade them to take sides.[173] Some junior faculty report feeling pressured by one faction to work against the other, and at least one feels his reluctance to comply resulted in adverse consequences to his career; some feel simply caught in the crossfire. Because of the palpable antagonism and challenges to remaining neutral, junior faculty report not wanting to spend much time in the department's offices.

Junior faculty say recent events, including publication of *Yale Daily News* articles, circulation of the anonymous letter and the launching of this review, have exacerbated tensions in the department[174] and frayed the tempers of senior faculty. Junior faculty have been been rebuked by senior faculty for speaking with the *Yale Daily News* reporter; some junior professors feel senior faculty suspect them of writing, or contributing to, the anonymous letter.

The junior faculty appreciate that the strong views and personalities of famous professors often lead to power struggles and disputes. In their view, the difference in this department is not in kind, but in degree. Other departments manage to maintain a collegial atmosphere and to function despite professors' disagreements because the professors nonetheless permit debate, behave professionally, and retain at least a veneer of cordiality – not the case, according to the junior faculty, in this department.

## *Power structure and academic freedom*

According to the junior faculty, Profs. González Echevarría and Prof. Adorno are in 'uncontested control of the department.'[175] In their view, the Sterling professors maintain their control by hiring and promoting faculty who the professors believe will not challenge their dominance or academic views, by dismissively and sometimes angrily rejecting such challenges when they occur, and by requiring all matters involving the department to be routed first through the department chair.

As a result, the junior faculty say, intellectual diversity in the department is stifled; one junior faculty member commented that Profs. González Echeverría's and Adorno's repression of dissent reminded him of a Latin American dictatorship. A junior professor felt reluctant to seek mentoring from professors outside the department because he thought 'that would not be well received.' Members of the junior faculty say they would like to be able to offer students courses that offer an alternative to Profs. González Echeverría's and Adorno's traditional approach to

---

[173] As Prof. Poole put it in his letter to the Dean and Provost, "A few years later, when Leslie Harkema came to the department, Rolena called each of us, individually, to her office to explain exactly how the perceived negativity had come about. Neither Leslie nor I wanted to know since we considered ourselves separate from that matter, but Rolena insisted that we must know. To me, that meeting was more an attempt to present Roberto as the 'good guy' and Aníbal as the 'bad guy' than to explain past events from an objective point of view." Ibid., 3.

[174] In the November 2014 *Yale Daily News* article, Prof. González-Pérez criticized the "department's atmosphere of arrogance and intimidation;" in the March 2015 *Yale Daily News* article Prof. Jackson commented that points raised in the anonymous letter "deserve discussing." See Exhibit 2.

[175] These are the words of one junior faculty member. Another says colleagues outside the department ask him, 'So how is life in the little Cuban dictatorship?'

33

CONFIDENTIAL

studying literature. The junior faculty occasionally feel frustrated by what they report to be the department chair's tendency to micromanage the department.

The junior faculty are split on the issue of whether or not the more powerful senior professors are open to their ideas for changes in departmental policies. One professor reported that the senior faculty adopted his suggestions for an improvement; another, that Profs. González Echevarría and Adorno 'shut him down' when he tried to participate in a dialogue about a change in policy.

_Tenure_[176]

The junior faculty say they understand getting tenure at Yale is difficult, but were under the impression when they were hired[177] or elected to proceed[178] under FASTAP that the new system was designed to make getting tenure easier and to improve morale among junior professors. They feel that the department has resisted the changes that were supposed to result from FASTAP.[179] One junior faculty member mentioned that Prof. González Echevarría said during a discussion of FASTAP, 'things might have changed in the university, but not in my department.' In a letter addressed to Prof. Adorno and copied to the senior faculty and administrators, Prof. Byrne wrote, "[h]iring me under a set of procedures and policies (FASTAP) that you are hostile to and willing to disregard is fraudulent," and stated that Prof. González Echevarría had told her, "As to this mentoring thing: no one ever gets tenure at Yale, so you should keep looking for another job."[180] The rejection of Prof. Moreira's bid for tenure has left the junior faculty very discouraged and under the impression that the department's standards for granting tenure are impossibly high.

_Prof. González Echevarría's behavior toward women_

All the junior faculty are aware that Prof. González Echevarría makes some students uncomfortable by frequently commenting on women's attractiveness, clothing and physical appearance, and by touching or kissing women.[181] One junior faculty member attributed this behavior to Prof. González Echevarría's age and culture and does not feel the behavior is inappropriate or abusive; other junior professors feel the behavior is inappropriate but are unsure if such behavior violates Yale's policies against sexual misconduct. All seem unclear as to how to handle student complaints of discomfort, particularly when the students are reluctant to come

---

[176] Discussions of tenure issues involving Profs. Moreira and Byrne appear in the senior faculty section.

[177] Profs. Byrne, Poole and Harkema.

[178] Prof. Moreira was given the choice, and chose FASTAP.

[179] Members of the senior faculty have confirmed that they are concerned that FASTAP will lead to the hiring of professors who are not up to standard. See the discussion of tenure in the senior faculty section of this report. A senior professor outside the department with whom we spoke agreed that this is a concern.

[180] See Susan Byrne recusal letter, Exhibit 71, and the discussion of Professor Byrne's tenure recusal request in the senior faculty section of this report.

[181] Prof. Byrne has experienced this kind of attention from Prof. González Echevarría, but she did not report feeling threatened, or feeling that her professional relationship with Prof. González Echevarría had been affected, by his behavior.

34

BYRNE003097

CONFIDENTIAL

forward.[182] One junior faculty member feels a memo distributed in December 2014 by university administrators advising all faculty to report any sexual misconduct they observed has been helpful in providing guidance, and also noted that after the memo was circulated in the department, he has not noticed Prof. González Echevarría behaving in this manner.

One junior faculty member who feels the behavior is inappropriate reported that Prof. Adorno has reacted to the behavior by laughing and commenting, 'That's the way he is. He can't help it.' Another said that when he asked Prof. Adorno how to deal with a student's discomfort about such behavior, she told him that he should be quiet about it and she would handle it.

*Class/race issues*

According to one junior faculty member, Prof. González Echevarría uses class-based distinctions as a means of disparagement.[183] A junior professor noted that the department has never invited anyone to use available scholarship money to do Afro-American studies, although interesting candidates have been available. A junior professor reported that students interested in ethnic studies are not accepted into the program, and graduate students and junior professors are discouraged from working on topics in ethnic studies.[184]

*Work/life balance*

All the junior faculty have mentioned that when work/life balance issues have arisen, on occasion Prof. Adorno and González Echevarría have displayed attitudes that tilt more heavily toward the 'work' side of the balance than the junior faculty would like.[185] One junior faculty member said that he thinks the generational gap between the older senior professors, who are in their early 70s, and the junior professors, who are in their 30s or early 40s, may account for these differences.

*Mentoring*

The junior professors have such varying experiences – some excellent, some indifferent, some lacking – with their faculty mentors that it is not possible for us to discuss them in this report without betraying the junior faculty members' identities.


## LECTORS' PERSPECTIVES

*Overview*

---

[182] Kevin Poole, in his letter to the Dean and Provost, discusses his confusion about how to handle four different incidents of possible harassment. See Exhibit 76, 3-5.

[183] This professor stated that Prof. González Echevarría had told a student that the student's Spanish had a lower class accent, and had put down classic Mexican melodramas of the 1950s as something 'the maids would watch when I was a kid in Cuba.'

[184] A professor in the Department of Comparative Literature reported that Prof. González Echevarría (who also teaches in Comparative Literature) habitually rejected applicants to the department's graduate program who were Cuban or expressed interest in studying Cuba in their statement of purpose.

[185] Confidentiality considerations preclude our describing any of these incidents in this report.

Confidential--Attorneys' Eyes Only                                BYRNE003098

*CONFIDENTIAL*

We received mixed reports from lectors about the overall work environment in the department. Although most said they are proud to work for Yale, and some feel it is a privilege to work in the department, many described the environment as tense, strict and authoritarian. Many lectors told us that they feel intimidated. Lectors who had worked at the department for a long time said that the departmental climate had grown chilly in the years after Professor Menocal served as department chair.

Almost all lectors describe the department as a vertically structured, hierarchical environment with the language program and administrative support staff occupying the bottom strata. Although some believe this is typical of foreign language departments in major universities, others told us they feel like disrespected second-class citizens. One lector noted that the language program is called the 'bread and butter' of the department but is treated like a factory that provides resources for the literature section. Another told us that senior faculty view lectors as 'low class' and 'failed professors.' These lectors believe that they are excluded from decision-making related to curriculum, course development, or teaching methodology because the senior ladder faculty do not respect their intellect or accomplishments. Some say they are reminded that they are 'here to teach language' whenever they raise concerns about class assignments, methodology or cancellations.

A number of lectors told us they are reluctant to report any concerns or to disagree with any decisions made by Profs. Adorno, Valis, and González Echevarría because of job insecurity or the risk of retaliation. Lectors expressed concern that the department would simply decline to renew their contracts if they were too opinionated or made the wrong enemy in the department. Although none could identify lectors who had lost their positions after disturbing the status quo, some noted that senior faculty (particularly Prof. González Echevarría) remind them on a regular basis that they are expendable.

A few lectors reported that the senior ladder faculty (particularly Profs. Adorno, Valis, and González Echevarría) are excellent and best positioned to make decisions about the department. These lectors feel they are involved in departmental decision-making to an appropriate degree and are not interested in playing a larger role. These lectors find the working environment very collegial and say that senior professors celebrate holidays, birthdays, and other events with department staff.

Those who reported satisfaction with the Department's work atmosphere were far more likely to report feeling recognized by senior ladder faculty for their contributions to the department. Yet, others reported that ladder faculty were uninterested in capitalizing on lectors' skills, particularly skills unrelated to language teaching. A number of lectors reported that the ladder faculty did not support cultural initiatives spearheaded by lectors, including a theater program and a film festival, because they did not think the lectors could do anything other than teach standard language courses. Lectors noted that ladder faculty did not attend or provide financial support for such events.

Incidents mentioned by the lectors that in their opinion illustrate senior faculty's lack of respect for lectors include:

- Prof. Adorno discourages students from referring to lectors as 'profesor or profesora'. They note that in Spain, any teacher who's above the rank of middle school teacher is called 'professor/a', so a number of students, particularly those of Spanish or Latino descent, call lectors 'professor/a'. Lectors state that students who use that phrase to identify lectors are reprimanded by Prof. Adorno, which is humiliating.

36

BYRNE003099

*CONFIDENTIAL*

- The two sections of the Department used to have potluck lunches on a regular basis. Since there are more faculty members in the language section, they were the ones who did much of the cooking. They report that this was a great experience that contributed toward a healthy work environment until Prof. González Echevarría (who never contributed a dish) started to refer to the lectors as 'good cooks' in a disrespectful tone. The lectors still have potluck lunches, but only for the language section of the department.

- Prof. González Echevarría is frequently critical of lectors who 'come here and stay forever and think that they are as good as we [ladder faculty] are.' One lector indicated that Prof. González Echevarría has said lectors should work for the university for a maximum of two years.

*Behavior*

Lectors reported that they had not observed or experienced any inappropriate behavior from other members of the department. One noted that Prof. González Echevarría makes comments about the lector's appearance that the lector thinks are improper, but the lector attributes them to generational differences.

*Input*

The majority of lectors told us they do not believe that department leadership welcomes their input on issues relevant to the language program. Many said they are afraid to provide any input due to a perceived risk of retaliation. Some say Prof. Adorno has weakened the authority of the Language Program Director over the years, and the current director, Ame Cividanes, has less influence in the department than did her predecessor, Sonia Valle. Lectors report that Prof. Adorno excludes lectors from meetings more often than happens in other language departments (at Yale or at other Ivy League universities) that involve lectors and students in decision-making through committee participation. Several lectors reported that Prof. Adorno agreed with them (or was receptive to their ideas) in private meetings, but would adopt a different position (without explanation) when making decisions. A lector observed that Prof. Adorno 'will say wonderful things to your face, but stab you in the back.'

A few lectors reported that the Department does a good job of soliciting and incorporating lector input into the decision-making process. Some think that Prof. Adorno is far more transparent and inclusive as department chair than was Prof. González Echevarría (her predecessor). Some of those who believe that their input is recognized and valued noted that the department has a communication problem and could benefit from having more formal meetings to help lectors understand why decisions are made.

All lectors identified the Department's cancellation of the Advanced Conversational Spanish course in the spring of 2013 as the most meaningful illustration of their concerns about the department's approach to making and communicating decisions. Advanced Conversational Spanish is one of a series of content-based or 'bridge' courses designed to link the language program to the upper level literature courses. Almost all of the lectors raised concerns about the department's decision to stop offering the course after a self-study of the language program.

Lectors described the bridge courses as popular classes that appealed to undergraduate students who tested out of lower level language classes but did not feel ready for more rigorous

37

*CONFIDENTIAL*

literature classes. The lectors viewed these classes as part of a multidisciplinary approach to engaging students and teaching language through the lens of different subjects, such as the law, film, medicine and journalism. Lectors also said the bridge courses provided them with the opportunity to create new classes based on their other interests.

Lectors believe the bridge courses have been under attack for the last decade. A significant number of lectors indicated that the department has systematically eliminated bridge classes over this period. Many speculated that the ladder faculty felt threatened by the rising enrollment numbers in bridge courses in the face of declining enrollment in literature courses. Other lectors think that the ladder faculty lacks confidence in their ability to teach the subjects of the bridge classes. These lectors pointed out that the bridge classes were intended to help students learn the language, not the subject areas referenced in the courses.

However, several lectors noted that most bridge courses were eliminated after the lectors who had developed the courses (who typically had some background in the subject areas) left the department. The lectors who continued to teach bridge courses expressed appreciation to the department for that opportunity.

Lectors report that the program was asked to complete a self-study about the placement exam, curriculum and professional development. Prof. Adorno selected three review committees to review the study and generate their own reports.[186] Prof. Adorno went on to report that the ad hoc committee concluded that Advanced Conversations would not be offered during academic year 2013-14 because it "does not currently align with the paradigm of content-based language learning at the L5 level" and "isolates one language skill and does not reflect the growing trend in higher education today of developing multiliteracies."[187] Prof. Adorno also wrote that all review committees unanimously endorsed the decision.

Lectors expressed concern that the ladder faculty made this decision without consulting the lectors, particularly those who taught the Advanced Conversations class (the self-study submitted by the lectors did not include an evaluation of the course). Some argued that ladder faculty did not sufficiently consider the ways in which the course incorporated reading, writing, grammar review, and cultural material to help students learn the language. Others noted that the rigor of the course was evidenced by the fact that the course curriculum was published by Yale University Press and used in a number of courses offered at other prominent universities. The majority of lectors stated that they would have appreciated an opportunity to defend the course or discuss ways of improving or updating its curriculum. The lectors who defended the department's decision to stop offering the class told us that the classes lacked substantive content and did not

---

[186] The first was composed of Prof. Byrne (serving as DUS at the time), Ame Cividanes (Language Program Director) and Prof. Adorno; the second was the Undergraduate Studies Committee in Spanish, a standing committee composed of Profs. Byrne, Harkema, and Adorno, a student representative, and Ms. Cividanes; and the third was an ad hoc committee composed of Profs. González Echevarría, Valis, Byrne, Poole, Harkema and Adorno. In her memo outlining the final determinations made by the committees, Prof. Adorno noted that she had included Prof. González Echevarría in the ad hoc committee because he was a former department chair, Profs. Valis and Poole because they were former Directors of Undergraduate Studies, Prof. Byrne because she was the current DUS and Prof. Harkema because she taught courses in the Spanish language program.

[187] See Adorno, Rolena. "RE: Acceptance of the Language Program's Self-Study and Final Determinations for Further Action and Implementation". Memo to Ame Cividanes. 7 March 2013, attached to this report as Exhibit 77, 3.

Confidential--Attorneys' Eyes Only                                    BYRNE003101

CONFIDENTIAL

reflect current pedagogy about language teaching. One lector said that Prof. Adorno told her that the department will consider introducing more bridge classes in the future if the department is able to secure additional funding.[188] The lector also suggested that the department should have more informal meetings with its constituencies to explain its decisions.

*Hiring/Reappointment*

The majority of lectors expressed concern about the department's hiring practices. The majority indicated that the department didn't always follow its own hiring policies or practices. Many also complained that lectors were largely excluded from the selection process and stated that new lectors 'just appeared' in the program.

Lectors reported the following irregularities in the hiring process:

- A number of lectors criticized the department's handling of a recent lector hire. They report that a former graduate student from the department with a close relationship to Profs. Adorno and González Echevarría was hired as a temporary replacement for a recently departed lector without a search or formal interview process. The lectors were told that this individual would serve as a lector for one year. After the year ended, the department renewed the lector's contract without conducting a search, which troubled a number of lectors.

- A lector who served on a committee tasked with evaluating candidates also reported that during a 2009 meeting, Prof. Adorno suggested that committee members should consider selecting candidates who did not have a family or who had a visa that needed to be renewed for a vacant lector position because the position was only for a year and the possibility of renewal was uncertain. The lector heard that when this suggestion was included in a draft version of the meeting minutes, Prof. Adorno denied making the statement and demanded that it be excised from the final version of the minutes.

Most lectors reported satisfaction with the reappointment process, although some said that the department routinely renewed the contracts of lectors who were not strong teachers and who had difficulty keeping up with changes in teaching techniques and technology.

Most lectors also reported satisfaction with teaching opportunities in the department's summer programs. Some stated that they believed that the same lectors were selected each year, but others noted that the pool of volunteers was shallow and few lectors were denied the opportunity to teach in a summer program. No lector reported being personally denied an opportunity to teach in a summer program, although one lector indicated that a former graduate student had been offered a position in the summer of 2013 before an offer was made to any of the lectors.

*Fair Treatment*

Lectors reported that they were not treated differently because of their race, ethnicity, gender, sexual orientation or socioeconomic background.

---

[188] Prof. Adorno told us that the department stopped offering the course because the course was non-substantive. She added that the department planned to offer it again in a few years after retooling the course to make it more rigorous.

Confidential--Attorneys' Eyes Only                                                        BYRNE003102

*CONFIDENTIAL*

<u>*Work/Life*</u>

Some lectors said that the department leadership supported their efforts to balance their work and personal responsibilities, particularly with regard to childcare issues. Others said they felt pressured to focus all of their energy on work and were criticized for working full time while raising a young child.

## GRADUATE STUDENTS' PERSPECTIVES

Students who participated in this review offered two conflicting narratives about the department. One group views the department as an intellectually challenging – but rewarding – environment staffed by brilliant and accomplished senior faculty. From the perspective of these students, many of the issues with the learning climate are attributable to disgruntled junior faculty members who are mediocre academics and jealous of the more accomplished senior faculty. Many of the students in this group are advised by Profs. Adorno or González Echevarría, or plan to select them as advisors.

The other group of students views the department in starkly different terms. For them, the department is a repressive, authoritarian environment in which inappropriate behavior is tolerated, innovative thought is discouraged, and decisions are made through a process that is opaque and arbitrary. Many of these students are advised by Prof. González-Pérez, although a number are advised by other faculty members.

<u>*Learning Atmosphere*</u>

Most of the students who participated in this review characterized the overall learning environment in the department as negative. Students described the environment as 'difficult,' 'disillusioning,' 'inappropriate,' 'anxiety producing,' and 'conflicted.' Students identified a wide range of causes. Some students reported that they felt intimidated by arrogant senior faculty members. Others stated that the department was an environment in which questionable behavior was tolerated. A number raised concerns about the lack of communication from department leaders (Profs. Adorno and Valis) and their defensiveness in the face of academic and policy concerns raised by students. Other students said that rumors and gossip spread by department members and others contributed to an unpleasant learning environment.

Some students attribute this negative atmosphere to anxiety caused by the *Yale Daily News* articles, the anonymous letter, and the climate review. These students believe that this external scrutiny has inspired paranoia among faculty members, which has made students afraid to do anything that would create the impression that they had aligned themselves with a particular faculty member or perceived faction. Some of these students also feel that the climate review motivated malcontents among the students and faculty to air grievances and resolve dilemmas through the review process instead of through more traditional channels.

Yet, other students told us that in their experience, the learning atmosphere in the department is positive. These students say the majority of the faculty (particularly Profs. Adorno,

Confidential--Attorneys' Eyes Only

*CONFIDENTIAL*

González Echevarría, Valis and González-Pérez)[189] have been helpful, encouraging and generous with time. These students find the department demanding and intellectually engaging. Many of these students believe that the people who are complaining about the department are disgruntled junior faculty members (particularly Prof. Poole) and students who are not academically successful or who are generally unhappy and antagonistic. Many of these students also have positive relationships with most of the senior professors, although a few believe that Prof. González-Pérez has contributed to the negative climate by complaining about Prof. González Echevarría, Prof. Meléndez's experiences, and other issues he has with the department.

### *Collegiality (Faculty)*

Many students told us they were aware, before the anonymous letter was circulated, of tensions in the department among senior faculty, primarily between Prof. González Echevarría and Prof. González-Pérez.[190] Some students have observed tension between the two professors at department events, or have noticed that Prof. González-Pérez is not present at a number of department functions. Other students report that Prof. Poole discussed the tension with them at informal events that he had organized. A number of students also told us that Prof. González-Pérez had stopped speaking to Prof. González Echevarría, which a few think are related to rumors about Prof. González Echevarría's alleged history of sexual harassment or a conflict over a renewal of Prof. González-Pérez's wife's contract.

Some students report that tension exists between the junior and senior faculty, particularly between Prof. Poole and Profs. Adorno and González Echevarría. Of this group, those who have a generally positive view of the department and its learning environment think this tension is caused by the junior faculty's jealousy of the accomplishments of the senior faculty (particularly Prof. González Echevarría and Prof. Adorno). They told us that junior faculty openly discussed their conflicts with senior faculty during class. One of the other students mentioned that he doesn't believe that the senior faculty respect the junior faculty.

Most students who have observed some tension between faculty members say that it has not had a negative impact on their own experiences in the department. Some students said that this tension contributes to student negativity and an uncomfortable learning environment;[191] other students reported that faculty members behaved in an entirely professional and collegial manner, noting that they frequently mentioned the work of other professors in class and (other than Profs. Poole and Byrne) were not inappropriately critical of one another in public settings. Most students say that the lectors are cordial and professional. A few noted that ladder faculty rarely interact with the lectors.

### *Faculty behavior seen as inappropriate*

Some students reported that they felt intimidated by Prof. Adorno's behavior. They told us that she treats graduate students 'like children,' is harsh and dismissive when providing

---

[189] Many of these students had limited to no experience with Prof. Jackson, who does not work with many graduate students.

[190] Many also told us that Prof. Adorno and Prof. Valis are aligned with Prof. González-Echevarría.

[191] One student felt that faculty members shared negative gossip with students to marginalize other faculty members.

Confidential--Attorneys' Eyes Only                                                          BYRNE003104

*CONFIDENTIAL*

feedback on their work and intimidates them by referring to the amount of money that Yale has invested in them. Other students reported that Prof. Adorno is a demanding but hard-working professor who gives detailed and thoughtful feedback.

A number of students reported that Prof. Adorno's comments during a department meeting in December 2014 about the November 2014 *Yale Daily News* article[192] on the department's atmosphere and finances made them uncomfortable. Although opinion was mixed about Prof. Adorno's explanation of the department's finances (some felt that it was condescending while others found it valuable and informative), a few students said they believe that her comments about students who had spoken to the *Yale Daily News* reporter had a chilling effect on the environment. A student reported that Prof. Adorno proclaimed that she couldn't recognize any of her students 'under the hood of anonymity' and made a number of derogatory references throughout the meeting to those who had cooperated with the reporter. A few students said that Prof. Adorno adopted a 'paranoid style' after the dissemination of the anonymous letter. They reported that she (as well as Profs. Valis and González Echevarría) asked them if they had written the letter, knew who had written the letter, or endorsed the views expressed in the letter. They noted that Prof. Adorno suggested they write emails to faculty denouncing the letter and denying involvement in its writing or dissemination.

A number of students report that Prof. Poole has made derogatory statements (which many deride as 'nasty gossip') about other faculty members (Prof. Adorno, Prof. González Echevarría and Prof. Menocal) and both current and former students. A few students took offense at these comments and view such behavior as unprofessional.

Many students told us that Prof. González Echevarría talks to administrative staff in a loud tone of voice. Some students attribute this to a sexist attitude (all of the administrative staff are female), while others think that it reflects his age and cultural background. Most students said that Prof. González Echevarría frequently makes jokes with sexual overtones and frequently discusses erotic themes in texts discussed in his classes in frank terms. Some are uncomfortable with his comments, while others accept or even value them as reflecting Prof. González Echevarría's interest in exploring the relationship between literature and life.

Most students reported that Prof. González Echevarría often comments on the physical appearance and attire of female students.[193] They say Prof. González Echevarría frequently compliments the beauty of his female students and makes approving comments about their clothing, hair and jewelry. Some students view these comments as harmless reflections of Prof. González Echevarría's age, gender and ethnic/cultural background, noting that such comments are common in Latin American (and Cuban) culture, particularly among men of Prof. González Echevarría's generation. Yet, other students find this behavior inappropriate. Some female students who have been the subject of these comments say that he talked about their appearance when they wanted him to discuss their scholarship. One student told us that after a female student made a presentation in one of his classes during the Fall 2014 semester, the only feedback that Prof. González Echevarría provided was about her hair. There were also some concerns reported about Prof. González Echevarría's use of gender-based stereotypes: a few students noted that he stated that students couldn't use laptop computers in his classes because female students just use them to buy shoes.

---

[192] See Exhibit 2.

[193] Students reported that Prof. González-Echevarría also very occasionally made critical comments about the appearance of male students.

Confidential--Attorneys' Eyes Only                    BYRNE003105

*CONFIDENTIAL*

Some students also said that on occasion Prof. González Echevarría hugged or made requests to hug female students. The opinions of those who were recipients of the hugs were mixed (some were uncomfortable, others were not) but some of the students who observed these interactions felt uncomfortable about them, particularly when they noticed that other senior faculty members who were present failed to intervene. One student told us that Prof. González Echevarría grabbed her waist from behind at a department event in a manner that made her uncomfortable. She said that she could not 'imagine anyone other than her boyfriend' touching her in that way. Another student told us that Prof. González Echevarría put his hand on her lower thigh. She did not find it offensive but thought that it was inappropriate.

No students reported any direct experiences (or observed behavior) with Prof. González Echevarría that made them feel unsafe. Only one student indicated that she felt unsafe around Prof. González Echevarría, and that was not due to direct or observed experience, but was a result of second-hand information. A few students reported that they took protective measures, such as avoiding one-on-one interactions with Prof. González Echevarría and ensuring that the door was open whenever they went to his office, in response to rumors about his behavior and advice from other members of the department.

A number of students reported having heard, prior to the distribution of the anonymous letter, stories about Prof. González Echevarría's behavior that made them uncomfortable, including rumors that Prof. González Echevarría has been sued for sexually harassing other members of the Yale community and has been the subject of internal Title IX complaints. Some students reported that they had heard that Prof. González Echevarría had made an unwelcome advance toward a student or students in the recent past, and that Prof. Adorno had brushed off complaints about this behavior. A few students also told us that they were aware of a rumor that Prof. González Echevarría had made sexual advances toward Virginia Guttierez, a staff member in the department, and was not held accountable for his actions.

Five former students in the doctoral program individually contacted us to share their experiences in the Department. They told us that Prof. Gonzalez-Echevarria had made an unwelcome advance toward one of their fellow students and that Prof. Adorno took no action after she was made aware of the student's concerns. All five requested anonymity.

Prof. Adorno denied ever receiving any reports or concerns from a student alleging that Prof. González Echevarría had engaged in inappropriate behavior.[194] Prof. González Echevarría denied ever having engaged in behavior that could be considered inappropriate or a violation of the University's policies against sexual misconduct.

---

[194] A former student who contacted us reported that when she was considering leaving Yale for another doctoral program, Prof. González Echevarría advised her to leave academia to concentrate on her role as a mother (and told her that his mother had made a similar choice). The former student told us that Prof. Adorno dismissed her concerns and advised that she refrain from referring to the comments on her exit paperwork because 'we will be seeing each other again, in the future and on the lecture circuit.' The former student told us that she had raised her concerns with the Provost's office. She also told us that Associate Dean Schirmeister had informed her that the Graduate School changed the way that they handled student complaints in response to her experience, that Prof. González Echevarría was banned from holding 'positions of authority' within the department, and that Profs. Adorno and González Echevarría would recuse themselves if asked to serve as external reviewers for any future hiring or tenure process involving the former student.

Confidential--Attorneys' Eyes Only                    BYRNE003106

CONFIDENTIAL

A minority of students told us that they have not experienced or observed any behavior on the part of any faculty member that they would consider inappropriate.

*Treatment viewed as discriminatory or preferential*

Most students say that they are not treated differently because of their race, gender, sexual orientation, socioeconomic background, or choice of advisor. These students also do not see other students being treated differently on those bases.

Some students told us that students who work with Prof. González Echevarría or Prof. Adorno get preferential treatment, particularly with respect to teaching opportunities in literature courses. These students give as an example a student advised by Prof. Adorno who concentrated in Spanish American Colonial studies and was chosen as a teaching assistant for a Prof. González Echevarría class on modern Latin American literature over a number of students who concentrated in modern literature. Other students reported that Prof. Valis (who was serving as DGS at the time) discouraged a faculty member from applying, with a student, for the assistant teaching program that Prof. Valis planned to apply for with one of her students, and encouraged the two to apply for the program in the following year instead; they concluded that Prof. Valis had not wanted to compete with the faculty member for the program. A student also expressed concern that students who select Prof. González-Pérez as their advisor risk having a more difficult experience with their prospectuses and dissertations.

A few students also say they believe they have been treated differently because of their gender, though the perceived differential treatment runs in both directions: some students say that Prof. Adorno is tougher and stricter with women while others believe that Prof. González Echevarría favors female students.

A few students told us they believe that Prof. Adorno and Prof. González Echevarría prefer graduate students who attended Yale College to other students. From their perspective, this preference is expressed through comments suggesting that Yale students are special or unique.

*Policies (fairness/transparency)*

A majority of students believe that the department's policies are fair and transparent. Many expressed satisfaction with the graduate school's recent decision to authorize a sixth year of funding for doctoral students[195] and the department's modifications of its policies on teaching opportunities in literature courses. One student raised concerns about unwritten 'rules' in the department, such as an expectation that students stay in New Haven during holiday breaks, attend all departmental events, and volunteer to help with Professor Valis' annual holiday parties.

Other students see the department as troublingly opaque. A student was troubled that Prof. Adorno, speaking for the department as its chair, announced the change to the sixth year teaching policy without communicating the details of the change with students, or providing students with correspondence from the administration that clarified the new policy. A few students also noted that Prof. Adorno had given conflicting information about the department's policy toward teaching opportunities in the two meetings held to discuss the Graduate School's doctoral student survey in November 2013 and February 2014, and was unwilling to acknowledge her mistake.

---

[195] See Student 10    . "Graduate School to provide funding for students in their sixth year." *Yale News* 25 January 2015, attached to this report as Exhibit 78, and available at <http://news.yale.edu/2015/01/29/graduate-school-provide-funding-students-their-sixth-year>

Confidential--Attorneys' Eyes Only           BYRNE003107

CONFIDENTIAL

Students also expressed concern about how the department handled the dismissal of Student 5   :
although students acknowledged that sharing private information about her situation would have
been inappropriate, they expressed concern that the department would summarily dismiss a
student who was widely perceived as 'brilliant' and 'promising' because of a problematic
prospectus (particularly when the prospectus was supported as more than adequate by her
advisor).

A few students also complained that, in their opinion, the student handbook is always
being revised. These students told us they believe that these changes are unfair and create a sense
of uncertainty about the rules. One student told us that the policies that apply to them should be
those found in whichever edition of the handbook was in effect when they accepted the
department's offer of admission.

_Academics_

Although most students registered concerns about the quality of some of the classes,
many appreciate the structure of the department (they are not required to teach until their third
year, which gives them time to focus on academics) and the teaching and research opportunities
at Yale. Many expressed highly positive opinions about their experiences teaching in the
language program and collaborating with the lectors.

Students who did not like their classes typically compared them unfavorably to other
classes they had taken at other institutions, or at Yale as undergraduates. Some criticized the
lecture format, and a number said that the senior faculty have failed to evolve with the times. One
student recommended that the department incorporate more practicums and make more efforts to
update their teaching techniques to reflect current methods in the literature classes offered to
graduate students.

Most students liked the Pedagogy class taught by Ms. Cividanes, which they found
enlightening and challenging, and disliked the History of Spanish Language class taught by Prof.
Poole. These students said that Prof. Poole seemed unmotivated and frequently stopped class half
an hour early.

Students who have done independent study or directed reading with a faculty member
told us they enjoyed the experience.

Some students said that Prof. Adorno had discouraged them from taking classes outside
the department, attending conferences, or attending any event sponsored or organized by the
Council on Latin American and Iberian Studies (CLAIS), particularly when the class, conference,
or event was not directly relevant to their dissertation. One student told us that Prof. Adorno also
discouraged students from taking classes with Prof. Fradinger, a Comparative Literature professor,
and that Prof. Fradinger was 'frozen out' because of her political beliefs.[196] Yet, other students

---

[196] Two of the former students who came to talk to us also said that they (and other students they knew
while enrolled in the program) refrained from proposing innovative dissertation topics because they feared
Profs. Adorno and González Echevarría would reject the topics. A student who was advised by Prof.
Adorno told us that Prof. Adorno had had a list of approved dissertation topics from which students could
select. Another former student told us that Prof. Adorno had discouraged one of her advisees from writing a
dissertation that was couched in critical theory, and instead encouraged the student to write a critical
evaluation, an exercise that the former student described as a 'joke' to anyone familiar with Spanish
literature from that era. The advisee decided to write her dissertation on a third topic. A few years later,

Confidential--Attorneys' Eyes Only                                                    BYRNE003108

*CONFIDENTIAL*

reported that Prof. Adorno is supportive of their interest in outside classes or events; some say they took the classes they wanted to take, despite Prof. Adorno's discouragement.

A number of students expressed concerns that the department does not adequately prepare them for the academic job market. These students say that they don't have enough opportunities to teach literature. Some say the department does not do enough to emphasize the importance of publishing and is not invested in supporting mock job talks to prepare students for the academic interviewing process. Although the department does have job talks and mini-symposia, organized by Prof. González-Pérez, to help students become comfortable with expressing their ideas, a student noted that the symposia are poorly attended.

Some students spoke to us about the department's "language/literature minor" requirement.[197]   Opinions were evenly split between those (including some native English speakers) who think that the rule is fine and students who argued that the rule is unfair to native English speakers because classes that they may want to take in English (such as those offered by the Comparative Literature Department) don't count toward their minor, even if the course is relevant to their planned dissertation. The latter group of students believes that this has a negative impact on their course load.

### *Work/Life Balance in the Department*

Almost all students reported that the department did not make balancing their academic and personal lives more difficult.[198] One indicated that some faculty members expected students to have an absolute focus on the department, but most did not feel pressured to curb personal commitments. Some students reported that individual faculty members - particularly Profs. Adorno, González Echevarría and González-Pérez – were extremely supportive when they faced

---

[197] Two of the sixteen courses that must be satisfactorily completed by students in the doctoral program during the first two years of study must be outside the Department and are considered a "minor" (or "language/literature minor") in another literature or language. The Department permits native Spanish speakers to choose English as their second language, which would allow them to take classes in the Comparative Literature Department. Students who are classified as native English speakers are required to take courses in a language other than English or Spanish to fulfill this minor requirement. Students are also expected to demonstrate reading/translating knowledge in Latin.

[198] The former students who came forward to talk to us had a more negative view of the department's perspective on work/life balance. They told us that Profs. Adorno, González Echevarría and Valis had emphasized productivity and made negative comments about students who participated in sports, discussed their family lives, took vacations, or went home during seasonal breaks. From these former students' perspective, Prof. Adorno set the tone for the Department with comments about the importance of building ones' life around academia and her negative responses to students who asked about extracurricular activities at Yale. Two former students indicated that Profs. Adorno and González Echevarría were hostile toward students with children. One observed Prof. Adorno tell a student that his impending fatherhood was not 'problematic', but 'tragic', which made the observer reluctant to tell anyone in the department when he was expecting a child. Another former student told us that Prof. Adorno encouraged him to bring his newborn to a department event, but that Prof. González Echevarría strongly discouraged him (and other department members) from bringing children (whom the professor referred to as 'spawn') to department events.

according to this former student, Prof. Adorno suggested the advisee's original idea as a topic for another student.

Confidential--Attorneys' Eyes Only

BYRNE003109

CONFIDENTIAL

some significant life challenges, such as a death in the family or an end to a serious romantic relationship.

*Student Input*

A number of students told us that the faculty members responsible for managing the department (Profs. Adorno and Valis) are not receptive to student input or concerns. Many raised concerns about Profs. Adorno's and Valis' behavior during two meetings with the graduate students held to discuss student response to the Graduate School's doctoral student survey. The first meeting was convened in November 2013 to discuss the survey results. These students indicated that the two professors had a hostile response to the results and were dismissive of student concerns about harassment, discrimination, and the learning atmosphere. One student noted that Profs. Valis and Adorno demanded that any students who had concerns about their experience in the department come forward to list specific complaints or explain why they had a negative response to questions. Another was troubled by Prof. Valis's statement that there was something 'Orwellian' about faculty having to 'watch what they say' in response to concerns (reported in the survey) about harassment and inappropriate behavior. This student also told us that he felt uncomfortable when Prof. Adorno informed students that they would be held accountable if they missed any department-sponsored events.

After the first meeting, the graduate students agreed to compile their comments[199] into a single document, which was sent to the department by the end of November 2013. A few students said that Profs. Adorno and Valis did not respond to the document until a student contacted senior staff in the Provost's office for assistance in February 2014. Some students said that the faculty continued to adopt a harsh tone in the second meeting with students. Almost all of the students who were bothered by the department's response to student comments in the two meetings said that the behavior of Profs. Adorno and Valis sent the message that leadership in the department did not respect the students, an impression compounded by Prof. Adorno's statements (which some characterized as harsh) during the departmental meeting in the fall of 2014 about students who had cooperated with Student 1   ˙for her November 2014 *Yale Daily News* article.[200]

A few students criticized the responses of their fellow students to the 2013 graduate survey as too inflammatory and emotional. They argued that instead the students should have emphasized policy issues related to the minor requirement (native and non-native Spanish speakers have different options), the reading list (which some think is too lengthy and outdated), teaching opportunities, or funding for a sixth year in the program (this was prior to the policy change).

A number of students acknowledged that the department and/or the administration did address some of the issues discussed in the survey and response document. The Graduate School approved a sixth year of funding for students who needed to complete their dissertations (starting in the 2015-16 academic year), and the department improved teaching opportunities in the literature section and clarified rules and expectations around the prospectus process.

A substantial minority of students reported that the department was receptive to student input. These students commended the department for its substantive response to student

---

[199] In the compilation of comments, the identities of those who made specific comments were not disclosed to preserve student anonymity.

[200] See Exhibit 2.

Confidential--Attorneys' Eyes Only                                      BYRNE003110

CONFIDENTIAL

complaints and thought that Profs. Adorno's and Valis's tone at the series of departmental meetings was appropriate. Many of these students are advised by Prof. Adorno or Prof. Valis and said that they typically addressed their concerns by talking with their advisor.

A number of students (including those who approved of the department's response to student input) reported that they are more comfortable with providing feedback and sharing opinions with a faculty member directly than during the semiannual DGS meetings or at any of the meetings convened to discuss the graduate survey or the articles published by the *Yale Daily News*. They said that department leadership was defensive in meetings but could be helpful in one-on-one encounters. Many view the DGS as an unnecessary filter and suggested that students should be able to provide feedback and raise concerns with the faculty as individuals (or as a group) without fear of reprisal. However, some students told us that they feared retaliation if they raised concerns about the department in public.

### *A Concluding Remark*

As we discussed at the beginning of this report, several senior faculty members told us they are unhappy that the University is conducting this climate review. We think it is also important to note that most of the other people we interviewed told us they are grateful to have been given a chance to express their views about the department to the University. Our hope is that the interviewing process itself has been salutary. We recognize the deep emotional investment that all the students, staff, and faculty have in the department, and wish them well as they work to improve its working and learning environment.

Respectfully submitted,

Barbara Goren
David Rosen & Associates, PC
400 Orange St.
New Haven, CT 06511
203 787-3513
203 789-1605 (fax)
barbara.goren@gmail.com

Jamaal Thomas
Office of Equal Opportunity Programs
Equal Opportunity Program Representative
Yale University
221 Whitney Avenue
New Haven, CT 06511-3760
203 432-0852
jamaal.thomas@yale.edu

Confidential--Attorneys' Eyes Only

BYRNE003111