# Exhibit 162
# Filed Under Seal

# Exhibit 162

```
 1                UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3    * * * * * * * * * * * * * *
     SUSAN BYRNE,                   )
 4                                  )
             Plaintiff,             )
 5                                  ) Civil Action No.
        vs.                         ) 3:17-CV-01104 (VLB)
 6                                  )
     YALE UNIVERSITY, INC.,         )
 7                                  )
             Defendant.             )
 8    * * * * * * * * * * * * * *

 9

10

11      **CONFIDENTIAL PORTIONS INCLUDED ON INDEX PAGE**

12

13            DEPOSITION OF:  JAMAAL AHMED THOMAS

14            DATE:  FEBRUARY 19, 2019

15            HELD AT:  MADSEN, PRESTLEY & PARENTEAU, LLC

16                      402 Asylum Street

17                      Hartford, Connecticut  06103

18

19   Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

20

21

22

23            CASSIAN REPORTING, LLC
              21 Oak Street - Suite 307
24           Hartford, Connecticut  06106
                   (860) 595-7462
25          scheduling@cassianreporting.com
```

```
 1                           INDEX

 2   EXAMINATION

 3   Witness Name                                      Page

 4   Jamaal Ahmed Thomas

 5       Direct By Ms. Howard ......................... 6

 6

 7

 8               CONFIDENTIAL TESTIMONY PAGES

 9       Confidential......................23 through 43

10       Confidential......................53 through 57

11       Confidential......................70 through 79

12       Confidential......................84

13       Confidential....................132 through 140

14       Confidential....................148

15

16

17                 PLAINTIFF'S EXHIBITS

18               (Marked For Identification)

19                                                   Page

20   Exhibit 91 Marked ............................... 29
     Email, Bates Numbers BYRNE018797 through 18798
21
     Exhibit 92 Marked ............................... 93
22   Yale University Department of Spanish and
     Portuguese Memo dated June 1, 2015, Bates Numbers
23   BYRNE015789 through 15790

24   Exhibit 93 Marked ............................... 117
     Handwritten notes, Bates Numbers BYRNE017240
25   through 17241
```

```
 1              (Beginning of confidential testimony.)

 2       A.    In terms of I guess direct reports, there

 3   was -- the one that I have the clearest recollection of

 4   is Professor Moira --

 5       Q.    Fradinger?

 6       A.    -- Fradinger.  And I know in terms of just

 7   other people who also mentioned being aware of these

 8   concerns, there would be Professor Jackson, Professor

 9   González-Pérez, Professor Poole.  And that's what I

10   could recall.

11       Q.    Was there also a Professor Trumpener, Katie

12   Trumpener?

13       A.    Yes.

14       Q.    From Comparative Literature; yes?

15       A.    Yes.

16       Q.    Professor Carol Jacobs?

17       A.    Yes.

18       Q.    And did the Comparative Literature Department

19   ask to be interviewed -- to participate, rather, in the

20   climate review?

21       A.    Yes.

22       Q.    And also Professor David Quint, did he

23   participate in the interviews from Comparative

24   Literature?

25       A.    I don't recall.
```

1    Q.    So you said you have the clearest recollection

2  of Professor Fradinger?

3    A.    Yes.

4    Q.    What did Professor Fradinger report or talk

5  about during her climate review interview?

6            MR. SALAZAR-AUSTIN:  And this part is

7  still marked confidential?

8            MS. HOWARD:  Yes.

9    A.    She reported that he had made a number of

10  inappropriate comments over an extended period of time

11  and then it culminated in a single incident in which he

12  made some unwelcome advances, kissed her without her

13  consent and pulled onto her hair, a ponytail, pulled on

14  her hair in a way that she found suggestive and

15  inappropriate, and this was in front of a large -- not

16  in front of a large number of people; it was in front of

17  an audience, and those are the substance of the

18  concerns.

19    Q.    Did you consider -- actually, let's go back to

20  Professor Byrne for one second.

21            Did you consider what Professor Byrne was

22  reporting to be incidences of sexual harassment?

23            MR. SALAZAR-AUSTIN:  Objection.

24            You can answer.

25    A.    I would say that -- I would say that I don't

1  know.

2      Q.    And with Professor Fradinger, did you consider

3  what Professor Fradinger was reporting to be incidences

4  of sexual harassment?

5              MR. SALAZAR-AUSTIN:  Objection.

6      A.    I would also say that I don't know.

7      Q.    Okay.  So let's go to Professor Jackson.

8              What did he discuss in terms of concerns of

9  sexual harassment regarding RGE?

10             MR. SALAZAR-AUSTIN:  Objection.

11             THE WITNESS:  Shall I answer it?

12             MR. SALAZAR-AUSTIN:  Yes.  It's for the

13  record.

14             MS. HOWARD:  So unless you are instructed

15  not to answer.

16             THE WITNESS:  Absolutely.  I've been

17  trying to do the right thing.

18             MS. HOWARD:  I understand.

19             MR. SALAZAR-AUSTIN:  As Attorney Howard

20  indicated, if there is ever a time when I'm instructing

21  you not to answer, I'll be specific about that.

22             THE WITNESS:  Okay, cool.

23      A.    There were rumors of intimate relationships

24  with students, inappropriate comments, inappropriate

25  behavior in a general sense.

 1    BY MS. HOWARD:

 2        Q.    With respect to the inappropriate comments,

 3    inappropriate behavior that Professor Jackson discussed

 4    during his interview, would you have considered that to

 5    be examples of sexual harassment?

 6                  MR. SALAZAR-AUSTIN:   Objection.

 7        A.    I do not recall enough about the specific

 8    details to draw a conclusion.

 9        Q.    And Professor González-Pérez, what did he

10    discuss with respect to RGE and sexual harassment during

11    his climate review interview?

12                  MR. SALAZAR-AUSTIN:   Objection.

13        A.    He referenced inappropriate, inappropriate

14    behavior, a past intimate relationship with a student

15    and an effort to -- and some actions that may have had a

16    negative impact on the career of a woman with whom he

17    had an intimate relationship.

18        Q.    His wife?

19        A.    No.  With whom RGE had an intimate

20    relationship.

21        Q.    The actions that Professor González-Pérez

22    mentioned that may have had a negative impact on the

23    career of a woman that RGE had an intimate relationship

24    with, what were those actions?

25        A.    That at the close of the intimate relationship

1    that RGE took some steps to negatively impact that

2    person's career.

3        Q.    What steps?

4        A.    Speaking to colleagues and other universities

5    in order to spread something negative about her.

6        Q.    Were there any other steps that Professor

7    González-Pérez mentioned?

8        A.    I don't recall specifically.

9        Q.    Do you recall generally?

10       A.    I recall that there were other steps; I just

11   don't recall the specifics of what those were.

12       Q.    And the inappropriate behavior that Professor

13   González-Pérez referenced, what was he describing?

14       A.    Sexualized jokes, comments about the physical

15   appearance of colleagues and students, behavior that he

16   would characterize as demeaning, targeting women who

17   were support staff for the department.

18       Q.    And going back to what Professor Jackson

19   discussed during his interview, did he ever mention

20   discussing the sexual misconduct or this behavior by RGE

21   with Professor Adorno?

22       A.    I don't recall.

23            MR. SALAZAR-AUSTIN:  I'm sorry,

24   objection.

25       Q.    And then Professor González-Pérez, did he ever

Case 3:17-cv-01104-VLB   Document 80-34   Filed 05/15/19   Page 10 of 22

```
 1    Fradinger, Professor Fradinger; is that correct?

 2         A.    Yes.

 3         Q.    And Professor Trumpener also reported during

 4    her interview to you that Professor Jacobs detailed

 5    sexually charged and inappropriate remarks that RGE made

 6    to her?

 7         A.    Yes.

 8         Q.    Professor Jacobs.

 9               And the last thing that Professor Trumpener

10    reported to you during her climate review interview was

11    that she had problematic interactions with RGE?

12         A.    Yes.

13         Q.    During Professor Trumpener's interview, did

14    she report having heard that Professor Fradinger

15    reported to administrators about RGE's inappropriate

16    behavior with her?  Strike that.  Let me ask a

17    better-phrased question.

18               During Professor Trumpener's interview, did

19    she discuss having heard that Professor Fradinger

20    complained about Professor RGE to administrators?

21         A.    Yes.

22         Q.    And so in her email, she in fact states that

23    she, Professor Trumpener, heard many times Professor

24    Fradinger complain of his attentions, passed on to

25    various administrators, (Emily Bakemeier, Mary Miller,
```

1    A.    Yes.

2    Q.    And when was the first time you saw this

3  document?

4    A.    I would say towards the end of March in 2015.

5    Q.    And do you recall how you ended up seeing a

6  copy of this document?

7    A.    Yes.  I received a copy from Harold Rose.  He

8  is part of our Office of General Counsel.

9    Q.    And when was the first time you had a

10  discussion about Exhibit 32 with anyone?

11    A.    Roughly around the same time frame.

12    Q.    And who did you discuss Exhibit 32 with?

13    A.    Well, I had the conversation with Harold about

14  whether --

15            MR. SALAZAR-AUSTIN:  I would just caution

16  the witness not to testify regarding conversations he

17  may have had with Yale's in-house counsel.

18            THE WITNESS:  Yes, sorry.

19    Q.    Other than Harold Rose, did you have any

20  conversations -- strike that.

21            What was the first conversation that you had

22  about Exhibit 32 with an individual who was -- with

23  anyone other than Harold Rose?

24    A.    It was during a meeting with some senior staff

25  within the university to discuss the climate review.

1      Q.    So by the time you had this meeting, you
2  already knew that you would be participating --
3  conducting the climate review?
4      A.    Yes.
5      Q.    When did you first discover that you would
6  be -- strike that.
7            Did you first discover that you would be
8  conducting the climate review when you received a copy
9  of Exhibit 32?
10     A.    Yes.
11     Q.    And so the meeting that you had with some
12  senior staff to discuss the climate review, what was the
13  purpose of that meeting?
14     A.    To discuss the purpose and scope of the
15  review.
16     Q.    And was this a meeting where you all came to a
17  consensus, or was someone telling you what the purpose
18  would be at the climate review?
19     A.    In terms of the purpose, we were informed.
20     Q.    And who informed you of the purpose of the
21  climate review?
22     A.    The provost, Ben Polak.
23     Q.    Was Ben Polak at the meeting?
24     A.    Yes.
25     Q.    Who else was at the meeting?

Case 3:17-cv-01104-VLB  Document 80-34  Filed 05/15/19  Page 13 of 22

```
 1               Was Tamar Gendler at the meeting?

 2        A.    Yes.

 3        Q.    Other than Provost Ben Polak and Tamar

 4   Gendler, who else was at the meeting?

 5               Was Jack Dovidio at the meeting?

 6        A.    I don't recall.

 7        Q.    Was Lynn Cooley at the meeting?

 8        A.    Yes.

 9        Q.    Was Amy Hungerford at the meeting?

10        A.    No.

11        Q.    Do you recall anyone else who was at the

12   meeting?

13        A.    Yes.  I recall that Pamela Schirmeister was at

14   the meeting and Allegra di Bonaventura was at the

15   meeting and that John Mangan was at the meeting.

16        Q.    And who called this meeting?

17        A.    I don't know.  I was invited by OGC, by the

18   Office of General Counsel, but I don't know who convened

19   it.

20        Q.    Tell me everything that you recall about this

21   meeting.

22        A.    We discussed the purpose of the review.  We

23   were given some context about potential issues within

24   the department, and we had a conversation about the

25   approach to conducting the review, just in terms of
```

Case 3:17-cv-01104-VLB   Document 80-34   Filed 05/15/19   Page 14 of 22

```
 1   procedure.

 2       Q.    And in terms of the context that you were

 3   given about potential issues within the department, who

 4   gave that context?

 5       A.    Both Pamela and Allegra.

 6       Q.    And what sort of context did they give about

 7   potential issues within the department?

 8       A.    Some expressions of dissatisfaction from

 9   students as well as from faculty members.

10       Q.    How so?  So how do you mean?  Strike that.

11             When you say "expressions of dissatisfaction,"

12   what do you mean?

13       A.    Concerns that they had been made aware of from

14   students and from faculty members, that they were

15   unhappy or that they were dissatisfied.

16       Q.    Were either of them more specific about who

17   expressed these concerns of dissatisfaction?

18       A.    Yes.

19       Q.    Who did they say expressed this

20   dissatisfaction?

21       A.    I don't recall the names.

22       Q.    But they did say it was students and faculty

23   members?

24       A.    Yes.

25       Q.    And in terms of the approach procedure for
```

1   conducting the climate review, who discussed what the

2   approach procedure should be?

3      A.    We were all part of that conversation.

4      Q.    And was there a consensus reached about what

5   the approach should be for the climate review?

6      A.    Yes.

7      Q.    And what was that consensus?

8      A.    The plan was to have an email inviting members

9   of the department to reach out and schedule

10   conversations with myself and with Barbara Goren, who I

11   worked with on this project, and that the response would

12   come -- the response in the scheduling would happen

13   centrally through someone who was, you know, affiliated

14   with UWC and was well-versed in dealing with

15   confidential matters of all kinds, and the original plan

16   was to have a series of meetings with members of the

17   department at a location in the graduate school, and we

18   would start by having conversations with the students,

19   then move on to instructional faculty, then to ladder

20   faculty and finally to the senior tenured faculty.

21      Q.    When you say "original plan," was there some

22   sort of modification that was made from --

23      A.    Yes.

24      Q.    What sort of modification?

25      A.    We had to -- well, the two most significant

```
 1              (Beginning of Confidential testimony.)

 2      Q.    What people reported concerns about

 3   retaliation during the climate review interviews?

 4      A.    I would say that all of the junior faculty,

 5   you know, the ladder faculty who were -- the ladder

 6   faculty who were not tenured; they all expressed that

 7   concern.

 8      Q.    So Kevin Poole?

 9      A.    Yes.

10      Q.    Susan Byrne?

11      A.    Yes.

12      Q.    Who are the other faculty you are referring

13   to?

14      A.    Paulo Moreira and there were a number of

15   students who also reported similar concerns.

16      Q.    Graduate students?

17      A.    Graduate students, yes.

18      Q.    In terms of the junior faculty, did they

19   report concerns about retaliation from any particular

20   individual?

21              MR. SALAZAR-AUSTIN:   Objection.

22      A.    Yes.

23      Q.    Professor Adorno?

24      A.    Yes.

25      Q.    Did they also mention Professor Valis?
```

Case 3:17-cv-01104-VLB   Document 80-34   Filed 05/15/19   Page 17 of 22

```
 1       A.    Yes.

 2       Q.    And Professor RGE?

 3       A.    Yes.

 4       Q.    Did the junior faculty report concerns about

 5   retaliation from any other individual?

 6             MR. SALAZAR-AUSTIN:  Objection.

 7       A.    No.

 8       Q.    Starting with Professor Adorno, what concerns

 9   did Kevin Poole report -- strike that.

10             Starting with Professor Adorno, did Kevin

11   Poole report any concerns about retaliation from

12   Professor Adorno?

13             MR. SALAZAR-AUSTIN:  Objection.  Sorry,

14   objection.

15       A.    Yes.

16       Q.    What concerns did Kevin Poole report?

17       A.    I don't recall.

18       Q.    Did Kevin Poole report any concerns about

19   retaliation from Professor Valis?

20             MR. SALAZAR-AUSTIN:  Objection.

21       A.    No.

22       Q.    Did Kevin Poole discuss any concerns about

23   retaliation from Professor RGE?

24             MR. SALAZAR-AUSTIN:  Objection.

25       A.    Yes.
```

Case 3:17-cv-01104-VLB   Document 80-34   Filed 05/15/19   Page 18 of 22

```
 1        Q.     What concerns did he discuss?

 2        A.     I don't recall.

 3        Q.     Did Susan Byrne discuss any concerns about

 4   retaliation from Professor Adorno?

 5        A.     Yes.

 6               MR. SALAZAR-AUSTIN:  Objection.

 7        Q.     What concerns did she discuss?

 8        A.     I don't recall.

 9        Q.     Did Susan Byrne discuss any concerns about

10   retaliation from Professor Valis?

11               MR. SALAZAR-AUSTIN:  Objection.

12        A.     Yes.

13        Q.     What concerns did she discuss?

14        A.     I don't recall.

15        Q.     Did Susan Byrne discuss any concerns about

16   retaliation from Professor RGE?

17        A.     Yes.

18               MR. SALAZAR-AUSTIN:  Objection.

19        Q.     What concerns did she discuss?

20        A.     I don't recall.

21        Q.     And did Paulo Moreira discuss any concerns

22   about retaliation from Professor Adorno?

23               MR. SALAZAR-AUSTIN:  Objection.

24        A.     I don't recall.

25        Q.     Did Paulo Moreira discuss any concerns about
```

```
 1        A.    We were instructed to do so.

 2        Q.    By the provost?

 3        A.    No.

 4        Q.    Did you have any sort of timetable for the

 5   climate review report?

 6        A.    No.

 7        Q.    And in terms of your understanding of how to

 8   handle any reports of sexual harassment or sexual

 9   misconduct during interviews, from whom did you gain

10   this understanding.

11        A.    I don't recall.

12        Q.    After you and Barbara Goren got to a final

13   draft, after it was sent -- strike that.

14              After you and Barbara Goren had a final

15   climate review report, was the actual report sent to

16   anyone?

17        A.    Yes.

18        Q.    Who?

19        A.    Harold.

20        Q.    Other than Harold, did anyone else get a copy

21   of the final climate review report?

22        A.    I don't know.

23        Q.    Did you send a copy of the climate review

24   report to anyone other than Harold?

25        A.    No.
```

```
 1   or might not say during interviews?

 2        A.    I don't recall.

 3        Q.    And did you ask Professor Valis if she had

 4   conversations with her colleagues about what they might

 5   or might not say during interviews?

 6        A.    I don't recall.

 7        Q.    Did you have any concerns about collusion

 8   between Professors Valis, Adorno and RGE with respect to

 9   their testimony at the climate review since they all had

10   the same individual participate in their interviews?

11        A.    Yes.

12              MR. SALAZAR-AUSTIN:  Objection.

13        Q.    Did you discuss that concern with anyone?

14        A.    Yes.

15        Q.    Who?

16        A.    With Harold.

17        Q.    Did you discuss that concern with Barbara

18   Goren?

19        A.    Yes.

20        Q.    Did you and Barbara come to any decision

21   regarding how to address those concerns?

22        A.    Yes.

23        Q.    What was the decision?

24        A.    To be clear, I guess to be transparent about

25   Professor Stith's involvement to the degree that it was
```

1    there.  Also to have a specific reference to the

2    concerns that were raised by that faculty member about

3    coaching, and that, you know, just to put those -- to

4    ensure that those facts were there for whoever might be

5    making any decisions, you know, based on the report.

6         Q.    Were there any actions that you undertook to

7    address your concerns about collusion between Professors

8    RGE, Adorno and Valis?

9         A.    There were not.

10        Q.    And as far as you know, were there any actions

11   that Barbara Goren undertook to address any concerns she

12   may have had about collusion between Professors RGE,

13   Adorno and Valis?

14        A.    Not other than what I described earlier, no.

15        Q.    And who was the faculty member who mentioned

16   that they had overheard Professor Adorno coaching

17   Professor Valis?  Strike that question.

18              MS. HOWARD:  Let's mark this

19   confidential.  Or are we still in confidential?

20              THE REPORTER:  Yes.

21              MR. SALAZAR-AUSTIN:  We still are.

22        Q.    Okay.  So who was the faculty member that

23   mentioned that they overheard Professor Adorno coaching

24   Professor Valis?

25        A.    It was Professor Poole.

```
 1              C E R T I F I C A T E

 2    STATE OF CONNECTICUT

 3            I, SANDRA SEMEVOLOS, a Registered Merit
      Reporter and Notary Public within and for the State of
 4    Connecticut, do hereby certify that I reported the
      deposition of JAMAAL AHMED THOMAS on FEBRUARY 19, 2019,
 5    at the offices of MADSEN, PRESTLEY & PARENTEAU, LLC, 402
      Asylum Street, Hartford, Connecticut  06103.
 6
              I further certify that the above-named
 7    deponent was by me first duly sworn to testify to the
      truth, the whole truth and nothing but the truth
 8    concerning his knowledge in the matter of the case of
      SUSAN BYRNE, vs. YALE UNIVERSITY, INC., now pending in
 9    the UNITED STATES DISTRICT COURT, for the DISTRICT OF
      CONNECTICUT.
10
              I further certify that the within testimony
11    was taken by me stenographically and reduced to
      typewritten form under my direction by means of COMPUTER
12    ASSISTED TRANSCRIPTION; and I further certify that said
      deposition is a true record of the testimony given by
13    said witness.

14            I further certify that I am neither counsel
      for, related to, nor employed by any of the parties to
15    the action in which this deposition was taken; and
      further, that I am not a relative or employee of any
16    attorney or counsel employed by the parties hereto, nor
      financially or otherwise interested in the outcome of
17    the action.

18
              WITNESS my hand this 1st day of March, 2019.
19

20

21

22    _____
      Sandra Semevolos, RMR, CRR, CRC, CSR #74
23    Notary Public
      My Commission Expires:  September 30, 2020
24

25
```