## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| **SUSAN BYRNE,** | : | **CIVIL CASE NO.: 3:17-cv-01104-VLB** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **YALE UNIVERSITY,** | : | |
| **Defendant** | : | **MAY 15, 2019** |
| | : | |

## <u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO</u>
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

**PLAINTIFF**
**SUSAN BYRNE**

**By:__s/_____**
      **Claire M. Howard (ct29654)**
      **Magdalena B. Wiktor (CT28647)**
      **Madsen, Prestley & Parenteau, LLC**
      **402 Asylum Street**
      **Hartford, CT 06103**
      **Tel. (860) 246-2466**
      **Fax. (860) 246-1794**
      choward@mppjustice.com
      mwiktor@mppjustice.com
      **Attorneys for the Plaintiff**

**ORAL ARGUMENT <u>IS</u> REQUESTED; TESTIMONY <u>IS NOT</u> REQUIRED**

I.      **INTRODUCTION**

Plaintiff, Susan Byrne, submits this Opposition to Defendant's Motion for Summary Judgment (Doc. No. 70). As demonstrated below, Defendant's Motion presents a misleading and incomplete description of the factual record, which is replete with conspicuous and disturbing evidence of retaliation, blatant violation of the contractual terms governing Plaintiff's tenure application, and misrepresentation.   Accordingly, Defendant's efforts to obtain dismissal of Plaintiff's claims for breach of contract, retaliation, and negligent misrepresentation must fail.

This case presents a startling picture of a department marred by long-standing sexual harassment and retaliation.  One of the department's professors who played a key role in the vote denying Plaintiff tenure and whom Plaintiff sought to have recused from her tenure review, was Professor Roberto Gonzalez Echevarria.  As amply demonstrated in the factual record, he subjected Plaintiff and *numerous* other women in the Yale community to sexual harassment. Moreover, according to the findings of a Committee assigned to investigate him, for those who dared speak against him, Professor Gonzalez Echevarria presented "a danger of retaliation against his colleagues, many of whom have spoken against him"—most notably in the context of "tenure and promotion." Plaintiff, in fact, spoke out repeatedly about the harassment and retaliation she suffered, urgently requesting that Professor Gonzalez Echevarria as well as Department Chair Professor Adorno (who also openly expressed extreme animosity toward Plaintiff due to her protected speech) be recused from her tenure review.  In clear

breach of its own contractual obligations, the University turned a deaf ear toward Plaintiff, denying her request for recusal and permitting the retaliation to occur.

For these and other reasons discussed below, Defendant's motion should be denied.

## II.     YALE'S EMPLOYMENT RULES

Yale University's rules and guidelines for tenure and promotion decisions are set forth in its Faculty Handbook ("Handbook"); the Faculty of Arts and Sciences Ladder Faculty Promotion Handbook ("FAS Handbook"). Ex. 2; Ex. 3.  Yale's Handbook, Section IV.I.2 sets the standard for promotion to Associate Professor with Tenure as

> Associate Professor with Tenure. Candidates for this rank are expected to have shown evidence of exceptional accomplishments and future promise that makes the sponsoring department confident that within five years they will merit promotion at Yale to the rank of professor … Associate professors with tenure are expected to develop the qualities of scholarship that earned them their permanent appointments, so that within a reasonable period of time their value to the University and their national or international standing will make them suitable candidates for professor.

Ex. 2 at BYRNE53.  Defendant's Voting Policies and Handbook Section IV.H.1 both forbid faculty members from voting on matters for which they have a conflict of interest. Both the Handbook and FAS Handbook explicitly state "[a] member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual." Ex. 2 at BYRNE48; Ex. 3 at BYRNE17203.

Defendant's Handbook also specifies the methodology used for voting on tenure and promotion, stating that, "voting on all appointments and promotions for terms of more than one year must be conducted with secret ballots … informal, "straw" voting about an individual candidate is prohibited." Ex. 2 at BYRNE36.

Lastly, "The University is obligated to protect people ... from procedural irregularities that produce unfair outcomes." Ex. 164 at 86-7.

III.   <u>YALE'S ORGANIZATIONAL STRUCTURE</u>

The Spanish and Portuguese Department at Yale University ("Department") reports to the Dean of Faculty of Arts and Sciences ("Deans' Office").  Ex. 156 at 9-10, 122-25.  The Dean reports to the Provost, who reports to the University's President.  Ex. 156 at 9-10.

Professor Roberto Gonzalez Echevarria joined the Department in 1977, and since then he has been chair off and on for sixteen years.  Ex. 151 at 109; Ex. 4 at BYRNE3148.   Professor Rolena Adorno joined the Department in 1996 and was chair of the Department from 2005 until she was removed as chair in Fall 2016. Ex. 148 at 14-15; Ex. 131. Professor Noel Valis joined the Department in 1999 and was Director of Graduate Studies for the Department for several years until she was removed in the Fall of 2016. Ex. 150 at 15; Ex. 131.  Gonzalez Echevarria brought Adorno and Valis into the Department and supported their progression at Yale. Ex. 4 at BYRNE3149. Despite the fact that they all had conflicts of interest, Adorno, Gonzalez Echevarria, and Valis all voted against granting Professor Byrne tenure and caused her tenure application to fail by a vote of three to two. Ex. 148 at 208-09; Ex. 151 at 202; Ex. 150 at 165-66; Ex. 5.

Yale's Provosts' Office is headed by Benjamin Polak. Ex. 156 at 7. The Deans' Office, headed by Tamar Gendler, contains several administrators involved in Professor Byrne's tenure and the investigations into the Department and Gonzalez Echevarria: Tamar Gendler, Lynn Cooley, Amy Hungerford, Emily Bakemeier, John Dovidio, and John Mangan. Ex. 3 at BYRNE17179-80.

### IV.   PROFESSOR BYRNE BEGINS AT YALE UNIVERSITY

Around 2007-8, Yale engaged in a national search for a tenure track assistant professor in Medieval/Golden Age Literature.  Ex. 25.  Professor Byrne applied for the job and on December 27, 2007, she was interviewed for the position by Adorno, Valis and Gonzalez Echevarria.  Ex. 26.

By phone and subsequently by letter dated February 19, 2008, Professor Byrne was offered the tenure track position of Assistant Professor of Spanish. Ex. 28.  The offer letter stated

> The appointment as Assistant Professor, as I have indicated, would be for a term of four years.  A description of Yale's ladder faculty ranks, including expectations and schedules for reappointment and promotion, information on leave policy, fringe benefits, and other matters are described Faculty Handbook ... [and] is of continuing importance to all faculty members, and because the policies it contains represent essential employment understanding between you and the University, I urge you to read it with care.

Ex. 28.

Professor Byrne left her position as Assistant Professor at State University of New York at Oneonta to join the faculty at Yale University on the promises that (a) Yale would follow its own rules, and (b) protect her from harassment and retaliation. Ex. 24 at P5110; Ex. 149 at 201, 217.

During her time at Yale, Professor Byrne won numerous awards.  In 2009 she became a Whitney Humanities Center Faculty Fellow; in 2010 she was awarded a Morse Fellowship; in 2009, 2011, and 2014 she was awarded grants by Defendant's Griswold Center; in 2011 she was appointed to be a Research Fellow for the MacMillan Center. Ex. 30; Ex. 31; Ex. 32; Ex. 33.

Up through late 2014, Adorno regularly praised Professor Byrne's work and her scholarship.  Ex. 34; Ex. 35; Ex. 36; Ex. 37.  On October 5, 2014, Adorno wrote a glowing letter of recommendation for Professor Byrne. Ex. 38.  Similarly, on October 12, 2014, Gonzalez Echevarria wrote a complimentary letter of recommendation for Professor Byrne. Ex. 39 at BYRNE5105; Ex. 151 at 48-50.

In the 2012-13 school year Professor Byrne applied for and was promoted to Associate Professor on Term.  Ex. 42; Ex. 40. The Department unanimously voted to promote Professor Byrne and the Deans & Humanities Advisory Committee also unanimously approved her promotion.  Ex. 148 at 181-82; Ex. 40; Ex. 7 at BYRNE3088. On May 21, 2013 the Yale Corporation approved Professor Byrne's promotion to Associate Professor on Term and subsequent reappointments until her tenure review in 2015.  Ex. 41; E. 42.

## V.    PROFESSOR GONZALEZ ECHEVARRIA SEXUALLY HARASSES PROFESSOR BYRNE

Professor Byrne came to Yale unaware that Gonzalez Echevarria's sexual harassment of Yale students and staff members was not only an open secret within the department, but also an open secret among the profession.  Ex. 158 at 38; Ex. 162 at 25; Ex. 153 at 125-26; Affidavit of Susan Byrne ("Byrne Aff.") ¶ 6.

During Professor Byrne's first year at Yale, Gonzalez Echevarria used his power as a tenured Sterling Professor to sexually harass her. Ex. 153 at 39-40; Ex.

149 at 53-57.  He had a history of inappropriate conduct with female students and faculty. Ex. 43 at BYRNE17320-22; Ex. 151 at 13; Ex. 162 at 23-24.

In 2009, Professor Byrne's first year at Yale, Peter Salovey, then Provost and current President, met with Gonzalez Echevarria to tell him about student and faculty complaints about his conduct.  Ex. 44.  Salovey told Gonzalez Echevarria that the best way to proceed with these complaints would be for him to attend a sexual harassment training that Gonzalez Echevarria described as "not particularly illuminating" and in exchange Salovey would "tear up whatever reports he [had] received."  Ex. 44; Ex. 151 at 87-89.

After this sexual harassment training that Gonzalez Echevarria underwent around 2009, Professor Byrne did not experience any harassment from him until 2014.

In May 2014 at a party for Mary Miller, who was stepping down as Dean of Yale College, Gonzalez Echevarria kissed Professor Byrne on the mouth without her consent.  Ex. 149 at 61-62.  Unbeknownst to Professor Byrne, Gonzalez kissed another tenure track professor, Moira Fradinger without her consent.  Ex. 153 at 125-26; Ex. 45; Ex. 162 at 23-24.   Fradinger eventually discussed her concerns about his actions with Miller, even though she was concerned about angering Gonzalez Echevarria since she had not yet received tenure. Ex. 46 at BYRNE17344, 17346; Ex. 153 at 130-31.

Shortly after Gonzalez Echevarria underwent hip surgery, he lamented to Professor Byrne that he was unable to have sex in his favorite position, which he then pantomimed.  Ex. 149 at 61-63.  Separately, when meeting with Gonzalez

Echevarria in October 2014, he attempted to have her sit closely with him on his "love couch." Ex. 149 at 64-65.

## VI.   PROFESSOR BYRNE COMPLAINS ABOUT SEXUAL HARASSMENT AND RETALIATION

Before her first instance of protected speech, Professor Byrne began to express concerns about the Department to administrators.  On February 5, 2015 at a meeting regarding the tenure system and a subsequent email to Professor Kathryn Lofton, she expressed concerns about the tenure system.  Ex. 12; Byrne Aff. ¶ 22.

Lofton forwarded that email to Amy Hungerford, with a note that "I want to flag that two departments have been consistently marked as horrendous... in the Humanities, it's Spanish ... [Professor Byrne's email] documents something we could, with one small procedural adjustment, improve." Ex. 12. Ms. Hungerford replied with ideas that the administration failed to implement until after Professor Byrne was denied tenure and her appeal of the denial rejected, namely that "[m]aybe there have to be more voters ... Maybe if there are fewer than X voters, the DD/Dean/HTAPC reps must supplement somehow at the dept lvel? We'll talk ... but in the meantime, the suffering is utterly palpable here." Ex. 12.

### a.   Professor Byrne Is Blamed for Anonymous Letter and Speaks Out A Yale Daily News Article

On March 6, 2015, an anonymous letter was distributed to members of the Spanish & Portuguese Department's faculty and members' of Yale's administration. Ex. 47; Ex. 148 at 34-35.  The letter, in part stated

> Many issues related to Spanish and Portuguese [Department] are blatant acts of discrimination and harassment and really should be investigated by the university administration...

7

Professor Adorno as chair and Professor Valis as DGS [Director of Graduate Studies] do what is required to maintain a facade of inclusion ... if we do not follow the senior professors' mandates exactly as given, they can and will either provide us with negative letters of recommendation or simply find a way to have us dismissed from the program.  This has happened in the recent past ... The level of harassment against the department's secretaries are also appalling ... His [Roberto Gonzalez-Echevarria] offhand comments to female graduate students have not gone unnoticed either.   Professor Adorno has witnessed this and has heard about it from others, yet she refuses to say anything to him about it.  This is an issue that MUST be investigated further.  Not only does it contribute to the negative atmosphere in the department but it is an overt case of sexual harassment that has been witnessed by a larger number of people in the department.  For a university so aware of sexual harassment issues as Yale tries to make itself appear, the administration has done a good job of looking over what goes on in Spanish and Portuguese.

Ex. 47. Ultimately this letter was the catalyst for Yale's administration to decide to have a review of the climate of the department. Ex. 153 at 43-47; Ex. 156 at 86-87; Ex. 155 at 39-40.

Gonzalez Echevarria and Valis described the anonymous letter as "fabrications, defamation, distortions, damning, accusatory, [and] malevolent." Ex. 7 at BYRNE3082 (internal citations removed).  Adorno referred to the writer of the letter as a "criminal" and said that she had never felt so personally attacked and intimidated.  Ex. 7 at BYRNE3082.

Three weeks after the anonymous letter was distributed, the Yale Daily News ("YDN") published an article on March 25, 2015 about the anonymous letter entitled, "Spanish Department under review following anonymous allegations," written by Emma Platoff. Ex. 48; Ex. 46 at BYRNE17448-17454. In the article, Professor Byrne is quoted as stating that "she has heard harassing comments

made by professors both to their colleagues and to students, though she declined to name any perpetrators in particular." Ex. 48.

Adorno was angry at faculty members who participated in the interview, even if they did not criticize the department.  Ex. 155 at 68; Ex. 7 at BYRNE3082. She accused the faculty members who spoke with the Yale Daily News reporter of harming the department.  Ex. 7 at BYRNE3083.

Adorno, Gonzalez Echevarria, and Valis constantly speculated as to the identity of the anonymous letter's author. Ex. 155 at 64-65; Ex. 7 at BYRNE3105. As early as March 22, 2015, Adorno began comparing the language used by Professor Byrne in prior emails to the language in the anonymous letter, concluding that they had strong similarities. Ex. 148 at 54-57; Ex. 51; Ex. 52. Eventually Adorno, Gonzalez Echevarria and Valis believed that Professor Byrne was one of the authors of the letter. Ex. 155 at 64-65; Ex. 50; Ex. 158 at 46-48; Ex. 59.

As Adorno, Gonzalez Echevarria and Valis became more convinced that Professor Byrne's complaints, involvement in the anonymous letter, and YDN article caused the investigations, their personal and professional conflict of interest deepened.  Ex. 58. On April 16, 2015, at a faculty meeting, Professor Adorno went "ballistic" and pointed a finger at Professor Byrne saying "you caused this." Ex. 148 at 88-90; Ex. 59; Ex. 151 at 150.  Separately, at a senior faculty meeting before the Climate Review began, Professor Adorno blamed Professor Byrne for writing the anonymous letter.  Ex. 158 at 46-48.

On April 1, 2015, Professor Byrne sent a letter to Adorno and Gonzalez Echevarria requesting that they recuse themselves from her tenure candidacy on

9

the basis that they had personal and professional conflicts of interest, in violation of Yale's conflict of interest policy in the Handbook Section IV.H.1 ("recusal request").  Ex. 13. *See also, infra*, Section VI.a.i.  Adorno rejected this request on behalf of herself and Gonzalez Echevarria.  Ex. 165.

During this process, Adorno, Gonzalez Echevarria and Valis had their friend Kate Stith, Professor of Law at Yale University, serve as an adviser.  Ex. 150 at 86, 176-77; Ex. 151 at 16-18; Ex. 148 at 125-29; Ex. 10. After receiving the recusal request Adorno, Stith and Valis also began to hypothesize that Professor Byrne was mentally unstable, an opinion that Valis continued to harbor even when she voted on Professor Byrne's tenure.  Ex. 60; Ex. 150 at 227, 237; Ex. 52. In May 2015 Adorno provided excerpts of the recusal request to Lorraine Siggins, the head of psychiatry at the Yale Health Service, to get an assessment of Professor Byrne's mental state.  Ex. 155 at 219; Ex. 61; Ex. 62.

In a continuing personal conflict of interest and deepening paranoia Adorno also thought that Professor Byrne's husband was behind an incident where an object was thrown through a window at her home and, separately, tracks were left in the snow from the street to the broken window. Ex. 155 at 71-75, 201-02; Ex. 7 at BBYRNE3079.

Revealing Adorno's deep personal and professional conflict of interest against Professor Byrne, in an April 26, 2015 email to Stith, she links Professor Byrne to a variety of actions, writing, "I think, Kate, that it's all about Sue Byrne … It's clear that the YDN is the best weapon, even better than breaking my windows and trespassing on my property."  Ex. 108.  Adorno's personal conflict of interest

and vitriol against Professor Byrne continued to increase and in a July 16, 2015
email to Stith, she wrote

> Her Feb 14 note to EP [Emma Platoff] ("I liked your Nov 20 YDN article) was
> an invitation to further conversation … And her claims were going to be
> brought to the YDN, with the others chiming in, at SB's prompting … This
> IS unusual, and we can thank the unusual SB for pretty much all of it ...
> Boy, this could really add up to a lynching

Ex. 63.  Even as Adorno publicly denied any conflict with Professor Byrne, she
further demonstrated her professional conflict of interest by sending negative
emails about Professor Byrne to several professors at other universities.  Ex. 64;
Ex. 142; Ex. 148 at 98-101; Ex. 65; Ex. 148 at 121-23; Ex. 66; Byrne Aff. ¶¶ 7-10.  In
a similar show of personal and professional conflict of interest, Professor
Gonzalez Echevarria wrote a pejorative email about Professor Byrne on July 22,
2015 to Anke Birkenmaier, Associate Professor of Spanish and Portuguese at
Indiana University, Bloomington, writing, "[t]he whole thing in the department has
been the work of Anibal, and <u>some juniors who didn't get tenure or fear they are
not going to get it,</u> above all, Sue Byrne, who has turned out to be diabolical."  Ex.
151 at 154; Ex. 67.

Adorno, Gonzalez Echevarria and Valis' personal and professional conflict
of interest with Professor Byrne continued into the deliberation and voting on
Professor Byrne's tenure.  Ex. 68; Ex. 60; Ex. 150 at 227, 237; Ex. 69.  In December
2015 notes from a meeting between Adorno, Stith and Valis, Adorno refers to
Professor Byrne as a source of "hostile invective" and writes, "[a]nother thing
that is irrelevant to SB's tenure consideration is the fact that she tried to make
Rolena the accuser that she, SB, was involved with the creation of the
anonymous letter of March 6, 2015." Ex. 68; Ex. 148 at 140-41.

In the weeks before the vote on Professor Byrne's tenure, Gonzalez Echevarria's Wikipedia page was edited on January 20, 2016, to include references to allegations of sexual harassment against him.  Ex. 46 at BYRNE17439; Ex. 151 at 181, 191.  Gonzalez Echevarria was aware of the editing to his Wikipedia page a few days before the tenure vote and instructed a student to re-edit the page to remove the allegation around February 3, 2016.  Ex. 151 at 179-81, 191-92; Ex. 46 at BYRNE17443-44.

In an ongoing display of personal and professional conflicts of interest with Professor Byrne, days after the vote against granting Professor Byrne tenure, between February 11-14, 2016, Adorno, Stith and Valis attempted to find Professor Byrne's IP address, as they suspected her of editing Gonzalez Echevarria's Wikipedia page.  Ex. 72 at BYRNE477;Ex. 73; Ex. 148 at 211-12; Ex. 155 at 79; Ex. 122 at Byrne484.

b.  <u>Professor Byrne Speaks Out During Climate Review Investigation</u>

Shortly after the anonymous letter, Provost Polak assembled members of the Deans and Provosts office - Tamar Gendler, Lynn Cooley, Pamela Schirmeister, John Mangan and Allegra di Bonaventura - along with Attorney Jamaal Thomas from Defendant's Title IX office to plan for conducting a review of the climate of the Spanish and Portuguese Department.  Ex. 162 at 36-40.

As part of conducting the climate review, Attorneys Barbara Goren and Thomas interviewed 57 witnesses in over 100 hours of interviews and reviewed hundreds of pages of documents produced to them by the interviewees.  Ex. 7 at BYRNE3065.  Professor Byrne was interviewed by the climate review reporters for several hours and discussed the sexual harassment that she faced from Gonzalez

Echevarria and her fears of jeopardizing her chances of tenure.  Ex. 149 at 44 & 47; Ex. 161 at 19, 120-21; Ex. 8; Ex. 75.

Climate review interviewers found that retaliation was common and known to the administration.  Ex. 162 at 26-7, 32, 38, 53; Ex. 161 at 52, 62.  All of the junior untenured faculty, including Professor Byrne, expressed concerns about retaliation from Adorno, Gonzalez Echevarria, and Valis.  Ex. 162 at 53-55; Ex. 161 at 118-121; Ex. 75 at BYRNE17215-16.

Adorno, Gonzalez Echevarria and Valis also participated in the climate review.  Stith reviewed and edited documents the three professors submitted to climate reviewers; accompanied them to all of their interviews, tape recorded each of their interviews, and shared information among and between the three regarding the topics and questions raised during the interviews.  Ex. 10; Ex. 76; Ex. 7 at BYRNE3066; Ex. 77; Ex. 78; Ex. 148 at 155-58; Ex. 161 at 110-11. Unbeknownst to the climate review interviewers, Stith also instructed the three Professors on what sexual harassment incidents to admit having prior knowledge of. Ex. 79; Ex. 161 at 141.

Thomas and Goren had concerns about collusion among all three professors because of the recording of their interviews which they discussed with Yale's General Counsel.  Ex. 161 at 110-12.  Compounding this concern, it was reported to them during an interview that Adorno was observed telling Valis what to say in her climate review interview.  Ex. 162 at 137-8; Ex, 7 at BYRNE3066.

The climate review report specifically identifies Professor Byrne as someone who reports experiencing sexual misconduct from Gonzalez Echevarria. Ex. 7 at BBYRNE3097; Ex. 161 at 114.  Even though Professor Byrne expressed

concerns about retaliation, Thomas and Goren never contacted any of the administration who were tasked with reviewing employment decisions to alert them to concerns regarding retaliation. Ex. 161 at 102-04, 120, 121, 125.

Adorno believed that the Climate Review was commenced to settle scores and influence pending appointments decisions. Ex. 80.  The only pending appointments decision during this time period was Professor Byrne's tenure decision.

By December 11, 2015, Adorno was aware that Professor Byrne was interviewed by the climate reviewers. Ex. 68 at BYRNE3817. In a December 11, 2015 email to Stith and Valis, Adorno wrote, "[w]hat she said regarding Rolena to Anne Cruz was untrue, suggesting that what she was saying to Jamaal and Barbara might also be untrue." Ex. 68 at BYRNE3817.  *See also* Ex. 81.  Adorno and Valis were told about complaints regarding sexual misconduct at a December 2015 meeting with Dean Gendler, Cooley and Provost Polak.  Ex. 155 at 42-43; Ex. 82 at BYRNE3822; Ex. 147 at BYRNE18949.

Copies of the Climate Review report were given to Provost Polak, General Counsel Harold Rose, and Dean Gendler. Ex. 162 at 76-77; Ex. 156 at 98-99; Ex. 152 at 82-83, 102. Rose at least met with Dr. Spangler and briefed her on the Climate Review Report. Ex. 153 at 59-60.   Attorneys Goren and Thomas provided an oral briefing on the reports of sexual harassment and retaliation that were raised during the interviews. Ex. 161 at 51-52. Deans Allegra di Bonaventura, Pamela Schirmeister, Lynn Cooley, Tamar Gendler; Polak; and Rose attended the briefing.  Ex. 161 at 60.  During this meeting, while concerns about retaliation

14

were discussed, no specific actions were taken to protect individuals from retaliations following this meeting. Ex. 161 at 52, 62, 104.

      c.  <u>Professor Byrne Speaks Out During the Title IX Investigation</u>

After the Climate Review was completed in November 2015, the Title IX office was tasked with investigating and interviewing individuals about sexual harassment incidents with Gonzalez Echevarria that came up during the Climate Review.  Ex. 161 at 152; Ex. 6; Ex. 156 at 172-3; P5697.

Professor Byrne was interviewed by Dr. Spangler and Jason Killheffer, Senior Deputy Title IX Coordinator, as part of this investigation.  Ex. 153 at 18, 37-40, 66, 79-81, 124-9; Ex. 84.  Professor Byrne testified about Professor Gonzalez Echevarria using sexual harassment techniques for power plays and kissing her on the mouth without her consent.  Ex. 153 at 39-40, 74-75, 79-81, 124-9; Ex. 84.

During the interview, Dr. Spangler said that they were going to bring a Title IX complaint against Professor Gonzalez Echevarria and asked whether Professor Byrne wanted to be named as the complainant.  Ex. 149 at 71-73; Ex. 153 at 79-81; Ex. 84.  While Professor Byrne declined to bring a Title IX complaint, she told Dr. Spangler that they had her permission to use her name.  Ex. 149 at 71-73, 78; Ex. 153; Ex. 84.

Despite knowing that Professor Byrne complained about sexual harassment by Gonzalez Echevarria, that Professor Byrne asked for him to be recused from her tenure review, and that Professor Byrne was coming up for tenure, Dr. Spangler did not talk to anyone at the university about Professor Byrne's upcoming tenure review to ensure it was free from retaliation.  Ex. 153 at 93-94, 142-43.

### d.  Professor Byrne Speaks Out During the UWC Investigation

Shortly after the Title IX office finished its investigation, Carl Hashimoto, a Title IX Coordinator, worked with Yale's General Counsel to draft and file a Complaint against Professor Gonzalez Echevarria with the University Wide Committee on Sexual Misconduct ("UWC"). Ex. 159 at 11-12; Ex. 153 at 121. In response to the Complaint, the UWC was impaneled to assess whether Gonzalez Echevarria's conduct constituted sexual harassment that created a hostile environment. Ex. 43 at BYRNE17320. Miriam Berkman was hired by the UWC Chair as a fact finder to investigate Hashimoto's Complaint. Ex. 159. at 18-19; Ex. 132.

During the UWC investigation, Berkman interviewed Professor Byrne who testified to the same three instances of sexual misconduct by Gonzalez Echevarria that she had also testified to in the climate report and Title IX office interviews: 1) that he came behind her to play with her hair in an unwelcome fashion; 2) that he kissed her on the mouth at a party in 2014; and 3) that he told Professor Byrne that after a hip surgery he needed to get back to his favorite sexual activity of having sex standing up and then pantomimed the act. Ex. 9; Ex. 43 at BYRNE17322-17325; Ex. 46 at BYRNE17340-17344; Ex. 49.  These allegations became part of Berkman's report. Ex. 46 at BYRNE17340-17344.

Berkman provided drafts of her report to the UWC hearing panel. In a draft of Berkman's report, she removed references to retaliation, writing a comment on the margins of the removed sentences which said, "I would like to avoid providing a list of people who stated they were afraid of the Respondent because that in itself could put them at risk." Ex. 159 at 49-51.

16

Once the report was completed on June 7, 2016, it was issued to Gonzalez Echevarria, Hashimoto, the UWC hearing panel, and Polak. Ex. 159 at 13, 28; Ex. 46. Berkman's report connected her investigation to the anonymous letter and resultant Climate Review, noting that there had been anger and unrest for the past year and a half in the department, the time frame of Professor Byrne's tenure review.  Ex. 46 at BYRNE17335.  Displaying a continuing personal and professional conflict of interest, Gonzalez Echevarria also linked the three proceedings in a written statement to the UWC investigation, noting that the investigation "has its roots in fundamentally academic conflicts about tenure ... [and] is related to two other proceedings involving the latter department: the 'climate investigation' by the Provost's office... and the ongoing investigation into the denial of tenure to Associate Professor Susan Byrne." Ex. 46 at BYRNE17373.

On June 20, 2016, the UWC panel provided a report of their findings and recommendations for Polak to review and issue a decision, principally finding that

> [B]y a preponderance of the evidence that, Professor Gonzalez Echevarria violated Yale's sexual harassment policy by creating a hostile environment for women in the departments of Comparative Literature and of Spanish and Portuguese through his unwelcome, persistent, and pervasive actions of touching the hair and bodies of women, of approaching women's bodies in ways that made them uncomfortable, and of commenting about women's bodies.  This conduct was made more severe by the fact that it was carried out by an individual whose status as a Sterling Professor and as a long-time departmental chair endowed him with the authority to set standards of behavior for the entire community in his departments.

Ex. 43 at BYRNE17320; Ex. 159 at 13, 25, 49-51.  The panel based its findings on an assessment of several incidents, including: 1) Professor Byrne's report that Gonzalez Echevarria came up behind her and played with her hair in an unwelcome fashion, which the panel accorded some weight; 2) Professor Byrne's

report that Gonzalez Echevarria told her that he needed to get back to his favorite sexual activity of sex standing up and then pantomimed the act. Ex. 43 at BYRNE17320-21, 25.

The UWC panel recommended that Gonzalez Echevarria 1) be issued a letter of reprimand; 2) be suspended for one semester without pay; 3) not be allowed to hold any leadership positions of authority within his departments; 4) not be allowed to participate in hiring, promotion or reappointment decisions for five years; and 5) participate in a series of sessions to help him understand the concerns that were the bases for the UWC panel's finding that his actions produced a sexualized, hostile environment.  Ex. 43 at BYRNE17326-27.

By letter dated July 29, 2016, Polak fully adopted the UWC panel's recommendations. Ex. 86.

### VII.   RETALIATION AGAINST PROFESSOR BYRNE

#### a.  Denial of Tenure

##### i.  Professor Byrne's Accuses Adorno and Gonzalez Echevarria of Personal and Professional Conflicts of Interest

To begin the tenure review process, on March 30, 2015, Professor Adorno requested that Professor Byrne submit her tenure materials.  Ex. 87. Unbeknownst to Professor Byrne, on that same day Adorno also recused herself only from the departmental faculty review committee, referred to as the "Internal Review Committee" in Defendant's Motion, which was tasked with reviewing Professor Byrne's tenure materials in advance of the Departmental vote on her candidacy.  Ex. 3 at BYRNE17192; Ex. 101; Def. Mem. Summ. J. 7, 8, 11.  As Adorno did not recuse herself from voting on Professor Byrne's tenure

candidacy, on April 1, 2015 Professor Byrne sent a letter to the senior faculty in the Department; Deans' Office; and Provosts' Office asking that Adorno and Gonzalez Echevarria recuse themselves from her voting on her tenure due to their conflict of interest.  Ex. 13.  Adorno rejected the recusal request on behalf of herself and Gonzalez Echevarria.  Ex. 165.  Other than a response from Adorno, Gonzalez Echevarria never addressed Professor Byrne's request – he gave short shrift to Yale's Conflict of Interest policy, calling it "irrelevant." Ex. 151 at 100.

A tenure candidate's review begins at the Departmental level with the departmental review committee meeting to deliberate on the tenure candidate with a goal of forming a recommendation for the larger department to consider in their deliberations.  Ex. 3 at BYRNE17192.  Then the departmental faculty meet to deliberate and vote on whether the candidate should receive tenure. Ex. 3 at BYRNE17192.

Professor Byrne's request circulated between the Deans' and Provosts' office - two days after her request the Deans' Office consulted with Defendant's General Counsel.  Ex. 88; Ex. 89; Ex. 90.   Shortly thereafter a self-described "FAS Steering Committee," made up of Deans Gendler and Cooley;  Bakemeier and Lloyd Suttle from the Provosts' office; and others in the administration came up with a response to Professor Byrne's request noting that they would not make any decisions on the composition of the review committee until the climate review was completed.  Ex. 91. As Professor Byrne was told to submit tenure materials in accordance with the set schedule, on April 14, 2015, she submitted her tenure materials to Adorno.  Ex. 92.

From April 15, 2015 onward, Hungerford, Gendler, Dovidio and Bakemeier from the Deans' Office debated how and when to move forward with Professor Byrne's tenure case. While Dovidio wanted to "push the review along," Hungerford questioned how it could be pushed along without a committee. Ex 93. As the individual responsible for overseeing the tenure and promotion processes in the Faculty of Arts and Sciences, Hungerford knew the feasible routes to ensure that Professor Byrne received a fair tenure review. Ex. 94; Ex. 95. During July 2015 Hungerford set forth three options to ensure a fair tenure review for Professor Byrne: 1) Put the department in receivership; 2) Take review of Professor Byrne's tenure out of the department or 3) Delay review of Professor Byrne's tenure. Ex. 94. She also proposed having a committee made up of individuals outside of the department, including former Dean Miller or Professor David Quint. Ex. 94. Dovidio advocated for waiting until the Climate Review was completed to avoid a fight with the department and suggested that he sit in on the tenure deliberations. Ex. 96.

By July 27, 2015, Gendler recused Adorno and Gonzalez Echevarria from voting on Professor Byrne's tenure as a "legal protection" pending completion of the Climate Review. Ex. 11. This decision was supported by Defendant's Handbook which provides that "[a] member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual." Byrne48. This decision was never communicated to Professor Byrne – rather her recusal request was connected to the results and completion of the Climate Review. Ex. 97; Ex. 98.

While Adorno claimed to be "hands off" on Professor Byrne's tenure case because the administration did not allow her to be involved, the reality was different.  Ex. 72 at BYRNE478-8.

First, Adorno selected and recommended Valis to chair Professor Byrne's tenure review committee.  Ex. 157 at 193-4; Ex. 99.  Once Valis was made chair of Professor Byrne's internal review committee, Adorno and Stith regularly discussed and planned aspects of Professor Valis' role as chair.  On July 22, 2015, Stith wrote to Adorno brainstorming about membership on the departmental faculty review committee, stating that she's "been thinking about Noel's task ... Noel says that she's considered that this is only a "temporary" committee ... [s]o for now, it should be a two-person committee -- NV [Professor Valis] and GM [Professor Mazzotto] ... As to Anibal, he's not "suitable" for "many" reasons.  Noel need not say more, but if in a phone call she is asked to explain, since we have no reason to think that Tamar would have paid attention to these matters, she could mention Animal's utter bitterness and hostility to the department ... Frankly, I think it would be great if Tamar [Gendler] called Noel to ask her to explain why neither DJ [Professor David Jackson] nor Anibal could be on the committee." Ex. 100.

Second, Adorno repeatedly pushed for Giuseppe Mazzotta, a Professor in the Italian Department, to be added to the departmental faculty review committee, who were tasked with reviewing Professor Byrne's tenure materials in advance of the Departmental deliberation and vote. Ex. 157 at 104; Ex. 101; Ex. 102; Ex. 3 at BYRNE17192; Ex. 160 at 6.  By his own admission, Mazzotta did not consider himself to be a Spanish literature expert or a Hispanist.  Ex. 160 at 43-44.  While

the Deans office considered adding Professor Quint, a Cervantes expert, to the review committee, they decided not to do so because he "would be perceived as hostile by Rolena [Adorno]."  Byrne12904-05.  Ultimately Mazzotta and Harold Bloch, Professor in the French Department were added to the departmental faculty review committee, even though neither were Spanish literature experts. Ex. 160 at 11, 43-44; Ex. 163 at 6, 19, 87.

Lastly, even though Adorno removed herself from the departmental faculty review committee on March 30, 2015, she still received access to files for the committee in advance of any other committee member.  Ex. 101; Ex. 104.  Valis forwarded her copies of external reviewer letters before the letters were even posted onto the Interfolio system for members of the departmental faculty review committee to access.  Ex. 104.

In November 2015, Hungerford reached the opinion that because the Climate Report did not specifically recommend that Adorno and Gonzalez Echevarria's voting rights be removed or changed, there was no reason to recuse them from voting on Professor Byrne's tenure candidacy. Ex. 105; Ex. 157 at 183-84.  Hungerford reached this conclusion without even seeing the Climate Review and even though the scope of the Climate Review was to "get the perspectives of all of the different constituents of the department … with a climate review, we are not really in a position to offer those kinds of substantive [specific] recommendations." Ex. 161 at 50.

In December 2015, the administration notified Adorno and Gonzalez Echevarria that they would not be recused from Professor Byrne's tenure vote. Byrne3816; Byrne6800.  Professor Byrne was not formally notified that her

recusal request was denied until January 19, 2016. Ex. 106; Ex. 107.  She attempted to appeal this denial of her recusal request on March 2, 2016, well within the forty-five day time limit for appeals.  Ex. 109; Ex. 107. However, by that point, the three professors with the conflicts of interest had already voted on her tenure.  Ex. 156 at 24-28, 59, 80, 119; Ex. 149 at 290.

ii.  Deliberations and Voting on Professor Byrne's Tenure

Despite the fact that Professor Byrne met the standards for tenure, Ex. 2 at BYRNE53; Ex. 114; Ex 23, in a two in favor and three against vote, the Department voted against granting Professor Byrne tenure. Ex. 148 at 208-09; Ex. 151 at 202; Ex. 150 at 165-66; Ex. 5. Adorno, Gonzalez Echevarria and Valis voted against granting Professor Byrne tenure and Professors David Kenneth Jackson and Anibal Gonzalez Perez voted in favor of granting Professor Byrne tenure. Ex. 148 at 208-09; Ex. 151 at 202; Ex. 150 at 165-66; Ex. 5.

The departmental faculty review committee met on February 3, 2016, with Jackson, Valis, Mazzotta, and Bloch.  E111. Even though the Faculty Handbook specifies that "voting on all appointments and promotions for terms of more than one year must be conducted with secret ballots … Informal, "straw" voting about an individual candidate is prohibited," Ex 2 at BYRNE36, the review committee's meeting ended with a straw vote on Professor Byrne's tenure candidacy. Byrne376; Jackson Dep. at 59-61; Byrne36. Professors Mazzotta and Bloch participated in the straw vote despite not being members of the Department.  Ex. 111; Ex. 154 at 59-61; Ex 2 at BYRNE36.

Several days later, on February 9, 2016, the full department met to vote on Professor Byrne's tenure candidacy. Ex. 158 at 53-54.  Mazzotta and Bloch joined

the deliberations but were not allowed to vote and Dovidio was present to observe the deliberations. Ex. 158 at 54-55.

At the unusually tense tenure deliberations meeting, Adorno, Gonzalez Echevarria and Valis read from prepared statements and there was very little discussion. Ex. 154 at 64-65; Ex. 158 at 55, 96. To Gonzalez Perez and Jackson it felt as though the three professors had come prepared with a justification for a decision that had already been reached – that Professor Byrne would not receive tenure. Ex. 154 at 73; Ex. 158 at 88; Ex. 160 at 72 & 73.

Adorno, Gonzalez Echevarria and Valis continued to harbor personal and professional conflicts of interest which made it impossible for them to objectively assess Professor Byrne's tenure candidacy. *See generally*, *supra,* Section V.A. Days after voting on Professor Byrne's tenure, Adorno and Valis considered her to be the likely culprit in the editing of Gonzalez Echevarria's Wikipedia Page. Ex. 72 at BYRNE477; Ex. 155 at 79; Ex. 122 at BYRNE484.  At the meeting to vote on Professor Byrne's tenure review Valis felt that Professor Byrne was mentally unstable. Ex. 60; Ex. 150 at 227, 237-38. Months before the full departmental meeting and vote, Gonzalez Echevarria had decided that Professor Byrne should not receive tenure – at his Climate Review interview he attempted to explain why she should not receive tenure.  Ex. 155 at 139-42, 144-45; Ex. 7 at BYRNE3093.

According to Gonzalez Perez, there was a "pronounced tendency" by Adorno, Gonzalez Echevarria, and Valis "[to] devalue the letters from very distinguished people who wrote mostly in her favor." Ex. 158 at 58.   In fact, before the tenure deliberations, Gonzalez Echevarria specifically came by Jackson's office to point out that a negative external letter had arrived.  Ex. 154 at

112.  However, "[t]here was just one letter that was lukewarm and one that was negative, and there were eight letters, and the rest were extremely positive." Ex. 158 at 58; Ex. 154 at 79.   One negative letter was not uncommon in tenure cases and was not sufficient to deny tenure.  Ex. 158 at 58, 67-69, 89-90; Ex. 163 at 63; Ex. 114.

In some cases, the same individuals wrote positive letters for Professor Byrne's 2013 promotion and her 2015 tenure candidacy.   Gonzalez Echevarria was dismissive of the positive letters from those individuals in 2015, when he had not been dismissive of those individuals during the 2013 promotion deliberations. For instance, Professor Bruce Burningham, wrote an external letter for Professor Byrne's 2013 promotion and also for her 2015 tenure candidacy, Gonzalez Echevarria was critical of the letter in 2015 while he was not critical in 2013.  Ex. 158 at 73; Ex. 115; Ex. 116.  Similarly, Professor Frederick de Armas wrote letters for Professor Byrne's 2013 promotion and 2015 tenure candidacy – Professor Gonzalez Echevarria dismissively referred to the 2015 tenure letter. Ex. 117 at BYRNE9060; Ex. 118; Ex. 119. At the tenure deliberations, Bloch confronted Gonzalez Echevarria abut the radical change in his position about Professor Byrne's scholarship, to which Professor Gonzalez Echevarria simply replied that he had the right to change his mind.  Ex. 158 at 56.

None of the criticisms that Adorno, Gonzalez Echevarria and Valis articulated during the February 9th deliberation had ever been raised before.  Ex. 158 at 52-53, 60; Ex. 154 at 56; Ex. 150 at 159-60.  And the criterion being used to assess Professor Byrne's scholarship had never been previously articulated.  Ex. 154 at 72-73. Instead, Adorno, Gonzalez Echevarria and Valis cherry picked from

the external letters to hyper scrutinize Professor Byrne's scholarship above and beyond what was required in the Handbook to justify their negative vote for her tenure candidacy. Ex. 154 at 68; Ex. 158 at 78-79.

### b. Professor Byrne's Appeal of Tenure Denial

After Professor Byrne's tenure was denied, she met with Dr. Spangler to get advice on how to proceed. Ex. 153 at 38. Dr. Spangler told Professor Byrne that her only option was to file an appeal of the denial of tenure and that she would be recusing herself from that process. Ex. 153 at 38.

Several days later, on March 8, 2016, Professor Byrne submitted an appeal of the tenure denial to the Provost. Ex. 23; Ex. 156 at 118. By this time, the Provost had reviewed a copy of the climate review report, which contained Professor Byrne's complaints of sexual harassment, and he knew that she was claiming retaliation for having spoken out during the Climate Review. Ex. 156 at 90, 99-100.

Defendant's Handbook specifies that any complaint "based on a disagreement with the professional judgment of the department" will be rejected by the Provost. Ex. 2 at BYRNE39. As Professor Byrne's appeal was not based on a disagreement with professional judgment, in April 2016, the Provost notified Professor Adorno that a Review Committee would be constituted to examine Professor Byrne's tenure denial. Ex. 121.

There were several instances of inconsistent testimony and incomplete information provided to the Review Committee. First, Adorno and Valis admitted to the Review committee that their IP address spying was in response to sexual harassment allegations on Gonzalez Echevarria's Wikipedia page – they thought

26

Professor Byrne might have made those changes.  Ex. 72 at BYRNE477; Ex. 122 at BYRNE484.  While they claimed to not know about the Wikipedia page until after the tenure vote, Gonzalez Echevarria authorized his Wikipedia page to be edited on February 3, 2016, several days before the vote on Professor Byrne's tenure. Ex. 151 at 192; Ex. 72 at BYRNE477; Ex. 122 at BYRNE484. Second, while Professor Byrne alleged retaliation, the Review Committee was unaware that Adorno, Valis and Gonzalez Echevarria suspected Professor Byrne of authoring the anonymous letter and participating in the Climate Review.  *See, supra*, Section V.A.  Third, the Review Committee was entirely unaware that Adorno and Gonzalez Echevarria maligned Professor Byrne about her involvement in the anonymous letter and Climate Review to others in their field.  *See, supra*, Section V.A.

After receiving the UWC Title IX panel's report, but before receiving the Review Committee's report, the Provost asked the UWC panel to consult and provide him a clearer articulation for their recommendation that "Professor Gonzalez Echevarria be precluded from participating in hiring, promotion, or reappointment decisions at Yale for a period of five years." Ex. 71.   In response, the Chair of the UWC panel explained to the Provost that "the danger of retaliation by [Professor Gonzalez Echevarria] RGE against his colleagues  -- many of whom have spoken against him – is significant and that voting regarding tenure and promotion is a context in which such retaliation may well take place. Thus there is good reason to guard against this possibility."  Ex. 85.

A week after this conversation with the UWC Panel, on July 25, 2016, the Review Committee issued their report to the Provost. Ex. 123.  While the Review

Committee did not find procedural violations, in a series of confidential recommendations to the Provost, the committee stated, "we are deeply troubled by the past and present functioning of this department, and the lack of earlier intervention by FAS leadership." Ex. 123 at BYRNE450. The Provost admitted that there was "definitely an overlap" between the UWC Panel and Review Committee reports and given that they were "happening at similar times … I read it very, very carefully myself, because I was the point of intersection for these two." Polak Dep. at 196-198.  Nonetheless, the Provost kept the UWC Panel and Review Committee separate to avoid addressing those coincidences.  Ex. 156 at 195.  On August 23, 2016, the Provost adopted the Review Committee's finding that there was no procedural violation in the denial of Professor Byrne's tenure and rejected her appeal. Ex. 125.

After Professor Byrne's appeal of her tenure denial was rejected, the administration swiftly changed the Department's constitution.  The UWC recommended that Professor Gonzalez Echevarria be suspended, banished from campus for a semester, banned from holding positions of departmental authority for five years, and prohibited from voting on any tenure and promotion cases for three years.  Ex. 86.  The Provost adopted the UWC's recommendations which Gonzalez Echevarria appealed to President Salovey.  Ex. 126; Ex. 127. Gonzalez Echevarria's appeal was subsequently denied by Salovey.  Ex. 127; Ex. 128; Ex. 129.  Gonzalez Echevarria returned to the faculty in January 2017, and since returning he has had a Title IX harassment complaint filed. Ex. 130; Ex. 158 at 96.

By Fall 2016, Adorno was removed as Chair of the Department and Valis was replaced as Director of Graduate Studies. Ex. 157 at 92; Ex. 163 at 71, 80; Ex.

148 at 145; Ex. 123 at Byrne449; Ex. 131.  The Department was placed into receivership, with an external chair brought in to replace Adorno and a group of eight additional professors from other departments brought in to participate in all department operations and votes. Ex. 163 at 6, 9-10, 67, 69, 71-72, 77-78; Ex. 131. Essentially, the ideas that Hungerford laid out in February 2014, a year before Professor Byrne's tenure denial, to address the conflict within the Department were finally instituted by the administration; however, Defendant delayed the adoption of those recommendations until after it denied Professor Byrne's appeal of her tenure denial. Ex. 12; Ex. 131; Ex. 94.

VIII.    <u>STANDARD OF REVIEW</u>

Summary judgment is a "drastic provisional remedy."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  *See also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172 (2d Cir. 2005) (characterizing summary judgment as a "drastic procedural weapon").  The Court must resolve all factual disputes, and draw all permissible inferences, in favor of the non-moving party. *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo*, 22 F.3d at 1224.  "[A] trial court must be cautious about granting summary judgment to an employer." Id.  "[A]ffidavits and positions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Id*.  Although the court should review the record as a whole, it must disregard all evidence favorable to

the moving party that the jury is not required to believe. *Davis-Garett v. Urban Outfitters, Inc.,* Docket No. 17-3371-cv, 2019 U.S. App. LEXIS 10210, at *39-40 (2d Cir. Apr. 8, 2019)(Internal citations omitted; emphasis in original.)

IX.     <u>DEFENDANT BREACHED ITS CONTRACT WITH PLAINTIFF</u>

The Handbook and FAS Handbook guaranteed Professor Byrne the right to (1) a fair review of her tenure application based on the scholarly merits of her tenure case and (2) recusal of any faculty member with a personal or professional conflict of interest from deliberating or voting on her tenure case. By not recusing individuals with personal conflicts of interest from voting and deliberation on Plaintiff's tenure case, Defendant breached these contract provisions.

Because Defendant's arguments in support of its motion for summary judgment consistently turn to academic freedom as a shield from scrutiny, it must be noted at the outset that university employers are not entitled to any particular deference, on academic freedom grounds or otherwise, where a faculty member seeks to enforce the provisions of a faculty manual. *McConnell v. Howard University*, 818 F.2d 58 (D.C. Cir. 1987), *cited with approval by the Connecticut Supreme Court* in *Craine v. Trinity College*, 259 Conn. 625, 654 (2002). *See Kyriakopoulos v. George Washington University*, 866 F.2d 438, 447 (D.C. Cir. 1989).

The employment relationship between Plaintiff and Defendant is governed by basic principles of contract law.  "[A] faculty manual that sets forth the terms of employment may be considered a binding employment contract." *Craine*, 259 Conn. at 655; *Daley v. Wesleyan University*, 63 Conn.App. 119, 120, (2001). The terms of employment set forth in faculty handbooks give rise to enforceable

employment contract claims in Connecticut. *Craine*, 259 Conn. at 654–56.  "The determination as to what the parties intended to encompass in their contractual commitments is a question of fact." *Barry v. Posi-Seal International Inc*., 36 Conn.App. 1, 6 (1994). Likewise, "[w]hether there was a breach of contract is ordinarily a question of fact." *Saye v. Old Hill Partners, Inc*., 478 F. Sup. 2d 248, 261 (D. Conn. 2007) (*citing Town of Ridgefield v. Eppoliti Realty Co., Inc*., 71 Conn. App. 321, 338, 801 A.2d 902 (2002)).

As in contract law generally, in the context of employment contracts based on provisions of a Faculty Handbook, a jury that must decide what the parties intended and whether there was compliance with agreed upon terms.  *Craine*, 259 Conn. at 654-56.  *See Nayar v. Howard University*, 881 F. Supp. 15, 21-23 (D.D.C. 1995) (questions of fact include whether the university applied the criteria listed in the handbook in the decision to deny tenure).

In a breach of contract action, summary judgment may only be granted if "the language of the contract is unambiguous." *Bouzo v. Citibank, N.A.,* 96 F.3d 51, 58 (2d Cir. 1996). Where the language of the contract may be reasonably interpreted in different ways, the meaning of the contract language is an issue of fact and summary judgment is precluded. *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993); *Saye v. Old Hill Partners, Inc*., 478 F. Sup. 2d 248, 261 (D. Conn. 2007). Here, neither the Handbook nor FAS Handbook define "conflict of interest," a term which is susceptible to multiple reasonable interpretations.

In most academic employment cases, and this case is no exception, the expressed written terms, such as what appears in the Handbook and FAS

Handbook, are rarely the subject of negotiation between employer and employee. Employment agreements that rely upon terms found in boilerplate appointment letters and employer manuals such as faculty handbooks are properly defined as "contracts of adhesion." The hallmark of a contract of adhesion is that its terms "are not subject to the normal bargaining processes of ordinary contracts." *Dainty Rubbish Serv., Inc. v. Beacon Hill Ass'n, Inc.*, 32 Conn. App. 530, 535 (1993). Under a contract of adhesion, if there is ambiguity associated with the expressed terms, and the language is susceptible to two reasonable interpretations, the interpretation favoring the employee will be adopted. *See Schultz v. Hartford Fire Insurance Co.*, 213 Conn. 696, 702 (1990).

As with all contracts, performance of duties arising under employment academic contracts, including employment agreements that incorporate faculty handbooks, is to be considered with reference to the implied covenant of good faith and fair dealing, an interpretive guide that instructs neither party will take any action that will defeat the reasonable expectations of the other party to the agreement. *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 566-67 (1984).

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.... Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest

purpose." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432–33 (2004) (internal citations omitted).

Defendant was contractually bound to follow agreed upon guidelines and procedures regarding judging Plaintiff's tenure case on its academic merits alone and without participation in voting and deliberation by any faculty member with a conflict of interest and to do so in good faith, honoring the reasonable expectations of Plaintiff. "[Good faith] is a subjective standard of honesty of fact in the conduct or transaction concerned, taking into account the person's state of mind, actual knowledge and motives…Whether good faith exists is a question of fact to be determined from all the circumstances." *Jaser v. Fischer*, 65 Conn. App. 349, 359–60 (2001) (internal citations omitted).  *See Stern v. Trustees of Columbia University*, 131 F.3d 305, 313 (2d Cir. 1997) (considering procedural irregularity in selection process in determining lack of good faith); *Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir. 1984) (noting "[d]epartures from procedural regularity… can raise a question as to the good faith of the process").

"The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *De La Concha*, 269 Conn. at 433 (internal citations omitted). *See also Nygren v. Greater New York Mutual Ins. Co.*, 2009 U.S. Dist. LEXIS 26078, at *14-15 (D. Conn. Mar. 27, 2009). Here, there are disputes as to the application and interpretation of provisions of the Faculty Handbook and FASTAP, including those relating to conflict of interest and the standards by which a tenure case is to be judged.

33

There is no dispute that the Handbook and FAS Handbook set forth the terms of Plaintiff's employment and the standards according to which her tenure application would be considered. Both documents expressly prohibit faculty from voting on a tenure case where there is a personal or professional conflict of interest and the FAS Handbook additionally prohibits a faculty member from participating in deliberation regarding a tenure case if there is a conflict of interest. Though "conflict of interest" is not defined in either document and its meaning would therefore be a question fact left to a jury, the ordinary meaning of the term, as defined in Merriam Webster's Dictionary is "a conflict between the private interests and the official responsibilities of a person in a position of trust."  *See 24 Leggett Street Ltd. Partnership v. Beacon Industries, Inc*., 239 Conn. 284, 295 (1996) (Contract language "must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.").

Yale University acknowledges that there would be a conflict of interest in the case of a faculty member considering the tenure application of his or her spouse. Evidence in the record demonstrates that Yale administrators responsible for implementing the Handbook and FAS Handbook recognized that various types of personal relationships would lead to conflict of interest, some which would presumably lead to bias in favor of a candidate (in the case of marriage or blood relatives) and others which might lead to bias against a candidate (in the case of an ex-spouse or in the case of faculty member having an affair with the spouse of another faculty member). *See* Ex. 156 at 133-135; Ex. 157 at 57-58; Ex. 152 at 47-49; Ex. 155 at 125.   The examples offered by

Defendant's administrators in their deposition testimony are linked by a common thread: instances where a typical person would likely harbor deeply felt emotions or personal opinions which may lead even a reasonable person to bias but which have no place in tenure deliberations.

In this case, the evidence demonstrates that the private interests and personal bias of Professors Adorno, Gonzalez Echevarria, and Valis, demonstrated in their own words, in ridding the Department of Professor Byrne, the object of their personal hatred, conflicted with their official responsibilities, as defined by the Handbook and FAS Handbook, to judge her tenure case on its scholarly merits alone. There is evidence, as described more fully above, in the record of a strong hatred borne by Professors Adorno, Gonzalez Echevarria, and Valis against Professor Byrne. Statements of these faculty, each of whom voted to deny promotion to Professor Byrne, demonstrate that each wanted Professor Byrne gone. To Gonzalez Echevarria, Byrne was a "diabolical" figure who he wanted to "flush out." To Adorno, Byrne was "the criminal" and her "arch nemesis" who caused a "lynching." There is evidence that Professor Adorno went "ballistic" during a faculty meeting, literally pointing a finger at Plaintiff and blaming her for the Climate Review, and in another meeting, for the anonymous letter. There is also evidence that Professor Valis considered Plaintiff to be "mentally unstable" even as she voted on her tenure case. A reasonable jury could find that conflicts of interest were present.

Based on their personal feelings and non-scholarly opinions about Professor Byrne, each of the three had a conflict of interest and was therefore prohibited by the Handbook and FAS Handbook from voting on Plaintiff's

tenure case and from participating in deliberations regarding Plaintiff's tenure case. There is no dispute that of Professors Adorno, Gonzalez Echevarria, and Valis participated in the deliberations and voting on Plaintiff's tenure case.

Defendant breached the covenant of good faith and fair dealing in subjecting Plaintiff's tenure application to a scholarship standard that had not previously been articulated to Plaintiff nor even to some senior faculty voting on her tenure case. *See* Ex. 154 at 72-73. Defendant's bad faith is further demonstrated in evidence that the criticisms of Professor Byrne's scholarship by Professors Adorno, Gonzalez Echevarria, and Valis did not come about until after the three had expressed personal and professional hatred and animosity against Professor Byrne beginning in 2015. Notably, in the cases of Adorno and Gonzalez Echevarria, the criticism levied against Professor Byrne's scholarship were contradictions and even direct reversals of their pre-2015 assessments of Professor Byrne's scholarship and of external reviews.

### a. Defendant Breached the Contract by Failing to Enforce the Conflict of Interest Policies

The Office of the Dean of the Faculty of Arts and Sciences is responsible for administering and implementing FAS Handbook Likewise, it was the FAS Dean who made the decision to deny of Plaintiff's request for the recusal of Professors Adorno and Gonzalez Echevarria despite knowing that there was deep conflict and division among the five senior faculty department, with Professors Adorno, Gonzalez Echevarria, and Valis on one side of the division and Professors Gonzalez Perez and Jackson on the other and that Professor Byrne was understood to be associated with the latter faction. Ex. 157 at 63-64.

While Defendant now argues that there was no "mechanism" to enforce the prohibition on voting and deliberation by faculty with conflicts of interest, the record evidence demonstrates that there are disputes of fact as to the authority of Yale's administration to order recusals and also that there were a number of avenues available to Defendant to enforce this contractual provision, including appointing faculty from other department to vote on tenure and appointment cases in the Department. Notably, Yale did in fact appoint a number of outside faculty to act as voting members in the department beginning with the Fall 2016 Semester, after Plaintiff's appeal was denied. Yale's Provost testified that a refusal by a faculty member to recuse him or herself did not end the inquiry as the refusal could be challenged by an appeal. Ex. 156 at 136.

A failure by a university to abide by its own institutional policies in a tenure decision has been held to constitute breach of contract under circumstances analogous to those in Professor Byrne's case. In *Craine v. Trinity College*, the Connecticut Supreme Court upheld a jury verdict in the plaintiff's favor where the jury concluded that the defendant breached the parties' contract by failing to apply the College's affirmative action policy in considering the plaintiff's candidacy for tenure. Craine, supra, at 660. Here, a reasonable jury could find that Yale University breached its contract with Professor Byrne when it failed to follow the conflict of interest policy.

> b.  <u>There is Sufficient Evidence of Contract Damages</u>

Defendant argues that Plaintiff cannot demonstrate that she suffered damages as part of her breach of contract claim, arguing that Plaintiff's alleged damages are "speculative" and "remote". Defendant's argument is not only

37

purely conclusory but is founded upon Defendant's attempt to impose a heightened standard of proof that is contrary to the well-settled standard applicable to Plaintiff's claim. Damages are "reasonable" where "the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." *24 Leggett Street Ltd. Partnership v. Beacon Industries, Inc*., 239 Conn. 284, 308-209 (1996). Damages are not "speculative" so long as there is some evidence by which the damages may be calculated. *Bronson & Townsend Co. v Battistoni*, 167 Conn. 321, 326-27 (1974). Here, the record evidence, including an economist's calculations of Plaintiff's damages, easily provides a basis upon which to calculate Plaintiff's damages. *See* Ex. 144.

### c. Defendant's Breach of the Contract was Material

A breach of employment agreement is material "where there is an unjustified reduction of rank or a material change in duties." *Fishman v. Smartserv Online*, 2003 Conn. Super. LEXIS 338, at *27-29 (Super. Feb. 11, 2003) (*citing Hayes v. Resource Control, Inc.,* 170 Conn. 102 (1976)). The denial of Plaintiff's tenure application resulted in her no longer having the rank of Associate Professor or of faculty member generally at Yale and in her being separated from employment. Defendant argues that the breach in this case was not material. However, Defendant undermines its own position by noting that "the ultimate purpose of the alleged contract between the parties was to ensure that Yale would grant or deny Plaintiff tenure based on a fair application of Yale''s tenure standard." Def. Mem. Summ. J. 36. It is the violation of this "ultimate purpose" upon which Plaintiff's breach of contract claim is founded.  The breach here was not merely incidental, it was central to the failure of Defendant to

consider Plaintiff's tenure application based on a fair application of Yale's tenure standard which required that Plaintiff's tenure case be considered only its scholarly merits and absent any faculty member with a personal or professional conflict of interest in deliberation or voting.

### X.  Defendant Subjected Plaintiff to Retaliation in Violation of Title VII and CFEPA

"In order to establish a prima facie case of retaliation, [a plaintiff] must show that: (1)she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 123 (D. Conn. 2007).  The legal elements required to prove retaliation in violation of 42 U.S.C. § 1981, Title VII, and the Connecticut Fair Employment Practices Act are all the same.  *Schanfield v. Sojitz Corp. of America*, 663 F. Supp. 2d 305, 341 (S.D.N.Y. 2009).

#### a.  Plaintiff Engaged in Protected Activity of Which Defendant Was Aware

Section 704 of Title VII makes it unlawful for any employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  In order to be protected, "an employee 'need not establish that the conduct he opposed was in fact a violation of Title VII, but rather, only that [he] had a 'good faith,

reasonable belief,' that the underlying employment practice was unlawful." *Reed v. A.W. Lawrence & Co., Inc*., 95 F.3d 1170, 1178 (2d Cir. 1996).

Here, Plaintiff spoke out against sexual harassment prohibited by Title VII by her senior colleague, Professor Gonzalez Echevarria. Plaintiff did so when she told a student reporter who would quote her in an article she was writing about sexual harassment, that she had witnessed harassment in the department. Plaintiff provided detailed testimony in the course of the Climate Review and the Title IX investigation about sexually inappropriate comments and behavior by Professor Gonzalez Echevarria. The Supreme Court has held that providing information by way of an "ostensible disapproving account of sexually obnoxious behavior toward her by a fellow employee" in the course of an investigation constitutes protected activity under Title VII. *Crawford v. Metropolitan*, 555 U.S. 271, 276 (2009). Defendant does not dispute that Plaintiff's speech in the Climate Review and the Title IX investigation was protected activity.

### b. Retaliation for Perceived Protected Activity

Under Title VII and CFEPA, it is unlawful for an employer to retaliate against an employee based on the employee actually engaging in protected activity. It is unlawful for an employer to retaliate against an employee based on a mistaken belief or perception that she engaged in activity that would have been protected under the statute.

Courts have concluded that it is unlawful to retaliate against an employee because of a perception that the employee has engaged in protected activity,

even if the employer's perception is mistaken, or flawed. *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016) (retaliation because of mistaken belief that employee has engaged in protected activity violates First Amendment and 42 U.S.C. §1983).

Other federal courts, including at least one District Court in the Second Circuit, have similarly concluded that anti-retaliation provisions of discrimination statutes prohibit employers from retaliating against employees because of their belief or perception that the employee has engaged in protected activity. *See Grosso v. City Univ*., 2005 U.S. Dist. LEXIS 4089, at *8-9 (S.D.N.Y. Mar. 14, 2005) (holding that an employer's discharge of an employee based on a belief that employee had engaged in protected activity amounts to illegal retaliation even if employer's belief was not factually correct).

The record facts show that agents of Defendant had the mistaken belief or perception that Plaintiff engaged in other activities – e.g. writing the Anonymous Letter, disseminating the Anonymous Letter to the YDN, publishing statements regarding allegations of sexual harassment against Professor Gonzalez Echevarria on Wikipedia – which would have been protected under the statute because those activities relate to and demonstrate opposition to discrimination and sexual harassment.  The record evidence shows that Professors Adorno, Gonzalez Echevarria, and Valis believed, albeit mistakenly, that Plaintiff was the author of the anonymous letter exposing sexual harassment in the department. The record evidence also shows that each of the three harbored animus toward Plaintiff for this perceived activity. Because Title VII's anti-retaliation provisions focus on the subjective intent of an employer, retaliation against Professor Byrne

41

for speaking out against unlawful sexual harassment violated the law; it does not matter whether Yale was correct in believing Plaintiff had engaged in the protected activity it retaliated against her for. *See, e.g. Grosso, supra; Fogelman, supra*.

### c. Defendant Had Knowledge of Plaintiff's Protected Activity

There is no dispute that Defendant had institutional knowledge of Plaintiff's speech in the context of the Climate Review and in the context of the Title IX investigation, nor does Defendant dispute that such speech was protected under Title VII and CFEPA. While claims of unawareness by individual agents of an employer of protected activity "are relevant to the jury's determination of causality, a jury is entitled to disregard such claims if they are unreliable." *Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 92 (2d Cir. 2011). Likewise, a jury can find retaliation where "the agent denies direct knowledge of a plaintiff's protected activities ... [if] jury finds that the circumstances evidence knowledge of the protected activities." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Henry v. Wyeth Pharmaceuticals*, 616 F.3d 134, 147, 148 (2nd Cir. 2010). The knowledge prong of the prima facie case does not require evidence that each faculty member voting against Plaintiff had specific knowledge of what Plaintiff said to particular individuals as part of her protected activities.  Evidence that an individual accused of retaliation was aware that an investigation was being conducted along with evidence that the individual knew, however informally and even through workplace gossip, that the plaintiff had made a complaint that was the subject of the investigation is enough to reasonably conclude that the knowledge prong of

the prima facie case has been met. *White v. City of Middletown*, 45 F. Supp. 3d 195, 216 n.8 (D. Conn. 2014).

Here, the record evidence clearly shows that Adorno, Gonzalez Echevarria, and Valis were aware of the Climate Review investigation into sexual harassment, that they were generally aware that Plaintiff had made complaints to the University and that they understood the Climate Review to have been instigated by Plaintiff's complaints. They also held beliefs that Plaintiff engaged in other activities that are entitled to protection under Title VII.  These facts are sufficient for a jury to conclude that the individual agents of Defendant had knowledge of Plaintiff's protected activity, or perceived protected activity. *See Papelino v. Albany College of Pharmacy of Union University,* 633 F.3d 81, 92-93 (2d Cir. 2011) (evidence of negative change in demeanor and of discussion among faculty about plaintiff's sexual harassment complaint entitled jury to reject denial of knowledge of protected activity).

### d.  Defendant Subjected Plaintiff to Adverse Employment Action

The Supreme Court has adopted a broad interpretation of what constitutes a materially adverse employment action in the context of a retaliation claim, concluding that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (internal citation omitted).  The standard that the Court

adopted was intended to ensure that the scope of adverse employment actions prohibited under the antiretaliation provision "was <u>not</u> limited to discrimination actions that affect the terms and conditions of employment."  *Id.* at 64 (emphasis added).  Here, there is no dispute that Plaintiff suffered an adverse employment action when she was denied tenure.

> **e.   There is a Causal Connection Between Plaintiff's Protected Speech/Perceived Protected Speech and the Adverse Employment Actions**

An inference of retaliation can be established based on temporal proximity between Plaintiff's protected activity and the acts of retaliation against her. *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001); *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003). When there are longer gaps in time between protected activity and adverse employment actions, the Second Circuit has held that inferences of causation can still be drawn from evidence that the employer could have been waiting for an opportune time to retaliate.  *Espinal v. Goord,* 558 F.3d 119, 129-30 (2d Cir. 2009). This is particularly relevant in instances where, as here, opportunities to take action against an employee are only available according to a set time table. *Whaley v. City University of New York*, 555 F. Sup. 2d 381, 406 (S.D.N.Y. 2008) (in university reappointment decision where time frame for reappointment was set by university, leaving for jury the question of whether nearly one year between protected activity and non-reappointment constituted temporal proximity). In this case, Defendant voted to deny Plaintiff tenure in February 2016, approximately eleven months after the first instance of Plaintiff's protected activity in March 2015, nine months after Plaintiff's provided information in the Climate Review,

less than two months after Plaintiff participated in the Title IX investigation, and several days after Professor Gonzalez Echevarria directed a graduate student to remove from his Wikipedia page references to sexual harassment allegations attributed to Plaintiff.

In addition to temporal proximity, a causal connection can be established through other types of circumstantial and/or direct evidence including "circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." Gordon, 232 F.3d at117. Here, there is evidence in the record that, in two separate investigations, the Climate Review and the UWC proceeding, Yale's own investigators found that retaliation was rife within the Spanish and Portuguese Department, particularly where junior faculty spoke out against the faction of senior faculty comprised of Adorno, Gonzalez Echevarria, and Valis  that junior faculty who reported allegations of sexual harassment against Gonzalez Echevarria faced significant danger of retaliation in tenure and appointment decisions. These findings should alone be sufficient to demonstrate causation.

In addition, the record facts show that (1) Adorno, Gonzalez Echevarria, and Valis assumed and believed that Plaintiff was responsible for the complaints and speech that triggered various investigations and reviews that related to subject matter protected under Title VII, (2) that Adorno, Gonzalez Echevarria, and Valis held animosity and anger against Professor Byrne because of this, and (3) took various actions in retaliation, including making disparaging statements about Professor Byrne to scholars outside of Yale, making and disseminating accusations that Professor Byrne was mentally unstable and asking the Director

of Mental Health and Counseling at Yale Health if Professor Byrne was mentally unstable. The record is replete with evidence that Professor Adorno harbored animus in the extreme to perceived "attacks" on herself, her close ally Gonzalez Echevarria and on the Department, including the anonymous letter, the YDN article, the Climate Review, and Professor Byrne's recusal request. Professor Adorno viewed herself as a victim of 'evil doings' by Professor Byrne – the 'evil doings' being protected activity, actual and perceived – to such a degree that Adorno described the Climate Review as "a lynching." *See* Ex. 63. A decision maker equating protected activity and a sexual harassment investigation with mob violence, murder and a symbol of racial terrorism certainly is sufficient to lead to an inference of retaliation.

Upon publication of allegations of sexually inappropriate behavior and gender-based harassment by Professor Gonzalez Echevarria, for which the Department senior faculty blamed Plaintiff, in some cases correctly and in others erroneously, Professors Adorno, Gonzalez Echevarria, and Valis went on the offensive against Professor Byrne. Email communications by these professors evidence hostility and name-calling against Professor Byrne that escalated into the bizarre. Professor Byrne was called "diabolical", "criminal" and was declared Professor Adorno's "arch nemesis" because these senior faculty blamed Professor Byrne's opposition to discrimination and sexual harassment for the instigation of the Climate Review, which was perceived by them as an unforgivable attack on the Department.

### f.  <u>Defendant's Proffered Reason for the Denial of Plaintiff's Tenure is Pretext for Retaliation</u>

Defendant's decisions relating to Plaintiff's employment are not immune from scrutiny or the anti-retaliation provisions of Title VII or CFEPA simply because they relate to Plaintiff's application for tenure.  Defendant cannot avoid liability for its unlawful retaliation against Plaintiff through blanket claims of academic judgment or general principles of academic freedom.  As the Second Circuit made clear decades ago, employment decisions by colleges and universities are not entitled to any special immunity under Title VII. *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1154 (2d Cir. 1978). In that case the Court recognized that "Congress has evidenced particular concern for the problem of employment bias in the academic setting.  Indeed it might be said that far from taking an anti-interventionist position with respect to the academy, the Congress has instructed us to be particularly sensitive to evidence of academic bias." *Id*.

In accordance with those principles, other courts in this Circuit have denied motions for summary judgment in retaliation cases involving a college or university when there was independent evidence of retaliation and animus other than disagreement on a candidates qualifications or a comparison with other faculty who received tenure.  *See, e.g., Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d 304, 325-326 (E.D.N.Y. 2014) (considering independent evidence of retaliation and pretext); *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 407 (S.D.N.Y. 2008). Here, as discussed above, there is robust evidence that the three senior faculty members' harbored retaliatory animus against Plaintiff based on her protected activities, and perceived protected activities.  Based on that evidence, and the other evidence discussed herein, a reasonable jury could conclude that their

asserted justifications for denying Plaintiff tenure are a pretext to cover for their true retaliatory motivation.

While the Second Circuit has noted that courts are "understandably reluctant to review the merits of a tenure decision", it has also made clear that "[t]enure decisions are not exempt under Title VII". *Zahorik*, 729 F.2d at 92-93.  A plaintiff "seeking to show that forbidden purposes lurk in a tenure decision have available methods of challenging such decisions. Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision. Conventional evidence of bias on the part of individuals involved may also be available." *Id*. Here, Plaintiff does not ask the Court to judge the scholarly merits of her tenure case or to resolve differences of scholarly opinion.

Here, as discussed above in regard to Plaintiff's breach of contract claim, Defendant's policies and rules applicable to tenure standards, specifically the requirement that a tenure decision be judged on its scholarly merits and the requirement that any member faculty with a conflict of interest be excluded from voting and deliberating, were not followed in this case. "Where an employer's "deviat[ion] from its normal decisionmaking procedures" resulted in the challenged employment decision, an inference of pretext may arise." *Weiss v. JPMorgan Chase & Co*., 332 F. App'x 659, 664 (2d Cir. 2009).  *See DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir 1993) ("The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly."). The Second Circuit

has recognized that procedural irregularity in arriving at the tenure decision may call into question the legitimacy of the employer's explanation in a tenure case, stating "[w]here the plaintiff has presented evidence sufficient to support an inference of impermissible discrimination and an inference that the reasons given by the defendant for its employment decision were not its real reasons, triable issues of fact are presented." *Stern*, 131 F.3d at 313 (2d Cir. 1997).

Here, there is evidence of a number of procedural deviations. These include the failure to exclude faculty with demonstrated conflicts of interest from voting and deliberation on Plaintiff's tenure case, in violation of the prohibition against preliminary voting, and in violation of requirements that voted be confidential. Notably, there is evidence that Plaintiff's tenure application was reviewed according to a scholarship standard that was different from that set forth in policy and that had never been articulated to Plaintiff.  Testimony of Professor Gonzalez Perez noting the unusually tense and negative nature of senior faculty deliberations on Plaintiff's tenure application along with prejudgment of Plaintiff's tenure case are further evidence of deviation from procedures and norms.

Defendant's reliance on purportedly negative external reviewer letters is suspect as well. Professor Gonzalez Perez testified that Adorno, Gonzalez Echevarria, and Valis implausibly characterized the overwhelmingly positive external reviewer letter as negative. Such characterizations of positive reviews as negative indicating a lack of impartiality may be evidence of retaliatory intent. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1326 (6th Cir. 1988) (Consistently negative interpretations of generally favorable evaluations of scholarship and belief of

49

other decisionmakers that such interpretations indicated a lack of impartiality were evidence of discriminatory intent).

Defendant claims that Plaintiff was denied tenure because her scholarship was inadequate and contends that its criticisms of Plaintiff's scholarship are insulated from judicial scrutiny as academic judgments. However, the evidence shows that the individuals who voted against Plaintiff's tenure application themselves expressed effusive praise toward the very same body of scholarship they later characterized as subpar. There is evidence that, as late as the late fall of 2014, Professor Gonzalez Echevarria was writing glowing recommendations of Plaintiff based on her scholarship. Later, Gonzalez Echevarria's descriptions of the quality of Plaintiff's same body scholarship were wholly negative, a reversal obvious enough that a fellow senior faculty member pointed this out in the deliberations on Plaintiff's tenure case. Gonzalez Echevarria's response was simply that he was entitled to change his mind. Where, as here, the evidence indicates that the reason for this stark change in opinion was Plaintiff's protected activity, neither Gonzalez Echevarria nor Yale University is entitled to avoid scrutiny. *See Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013)("a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage").

g.  Defendant Permitted Retaliation to Occur

Yale University administrators were warned repeatedly, and in sufficient time to protect Professor Byrne from retaliation, that retaliation was a virtual certainty in tenure decisions in the Department of Spanish and Portuguese. An

employer that knows about retaliation and fails to act is liable for violation of Title VII. *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 446 (2d Cir. 1999). It cannot be overstated that Yale University's own investigators warned Provost Polak, just days before he rejected Plaintiff's appeal of her denial of tenure, which was based in part on alleged retaliation, that there was significant danger that Professor Gonzalez Echevarria would use the tenure process to retaliate against junior faculty who had spoken out about his sexual misconduct. Provost Polak knew that Plaintiff was one of the junior faculty who had been in danger of retaliation and that she had identified retaliation as a factor in her tenure denial. The Provost failed to investigate Plaintiff's allegation of retaliation or direct the appeal committee he appointed to do so. Nevertheless, proof that Professor Byrne's allegations of retaliation were legitimate and supported by the facts fell into his lap in late July 2016. In the face of such proof, along with a recommendation that Gonzalez Echevarria be prohibited from voting on any tenure cases for half a decade, the Provost chose not to abate retaliation but to endorse it, by denying Plaintiff's appeal. Defendant implemented various changes to the Spanish and Portuguese Department, including several recommended to protect junior faculty from retaliation after Plaintiff left Yale, having chosen not to do so in time to protect Professor Byrne from retaliation.

h.  <u>A Motivating Factor Causation Standard Applies to Plaintiff's CFEPA Retaliation Claims</u>

Connecticut courts have found "compelling reasons to believe that our state appellate courts would not choose to follow the 'but for' causation standard." *Bissonnette v. Highland Park Market, Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-10-6014088-S, 2014 Conn. Super. LEXIS 228

(January 28, 2014, Peck, J.). This Court has previously applied the motivating factor standard to CFEPA claims in the absence of a Connecticut Supreme Court decision applying a different standard. *Richards v. Groton Bd. of Educ.*, 2015 U.S. Dist. LEXIS 110721, 2015 WL 4999803, at *3 n.3 (D. Conn. Aug. 21, 2015); *Vogel v. CA, Inc.*, 2015 U.S. Dist. LEXIS 157068, at *8-9 (D. Conn. Nov. 20, 2015); *O'Connor v. Town of Guilford*, 2017 Conn. Super. LEXIS 4834, at *13 n.7 (Super. Nov. 7, 2017)( declining to apply "but for" standard to CFEPA retaliation claim). While the Court should apply a motivating factor standard to Plaintiff's CFEPA claim, it should be noted that "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Demoss v. Norwalk Board of Educ.*, 21 F. Sup. 3d 154, 171 n.4 (D. Conn. 2014) (*citing Kwan*, 737 F.3d at 846 n.5).

## XI.   DEFENDANT IS LIABLE FOR NEGLIGENT MISREPRESENTATION

Contrary to Defendant's assertion, there is a genuine factual dispute as to whether Defendant misrepresented to Plaintiff that 1) she would have to wait until after the Climate Review was completed for action to be taken regarding her recusal request; and 2) that she would receive a fair and unbiased hearing process on the merits for her tenure review using the standards for scholarship communicated to her.

"The governing principles [of negligent misrepresentation] are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment ... supplies false

information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.)  *Sturm v. Harb Development, LLC*, 298 Conn. 124, 143–44 (2010).  *See also Nygren v. Greater New York Mutual Ins. Co.*, 2009 U.S. Dist. LEXIS 26078, at *23-24 (D. Conn. Mar. 27, 2009) (setting forth the elements of a negligent misrepresentation claim)

On April 1, 2015, Plaintiff asked that Adorno and Gonzalez Echevarria be recused from her tenure review in reliance on the Handbook provision that, "[a] member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual." Byrne48; Byrne17203.  In response to this request, Defendant made misrepresentations of fact to Plaintiff – Dean Gendler advised Plaintiff that the administration would not make any decisions on the composition of the review committee until the Climate Review was completed. This misrepresentation was echoed repeatedly by the Deans' Office.

Plaintiff reasonably relied on these misrepresentations from the Deans' Office that they would make a decision on her recusal request once the Climate Review was completed.

In late July 2015, unbeknownst to Plaintiff, Dean Gendler decided to exclude Adorno and Gonzalez Echevarria from Plaintiff's tenure case as a "legal protection" pending completion of the Climate Review.  Byrne11056.  Plaintiff was

53

told that a final decision on her request would be deferred pending the completion of the Climate Review but that her tenure review process would continue with the already established deadlines. At no point did the Deans' Office let Plaintiff know that any decision had been made until months later, when it was too late for Plaintiff to appeal the decision.

However, Professor Adorno continued to participate in the process of reviewing Plaintiff's tenure case; the FAS Dean's Office not only was aware of Adorno's continued participation despite orders to the contrary, the Dean's office deferred to Adorno regarding composition of the review committee and provided her with advance access to Plaintiff's tenure files. *See* Section VII.a.i.

Adorno consistently praised Plaintiff's scholarship up through late 2014. *See* Section IV. During the 2012-13 school year the Department unanimously voted to promote Plaintiff to Associate Professor on Term – which was unanimously approved by the Deans & Humanities Advisory Committee.  The Department's Case Summary for her promotion stated that "the colleagues agreed that Byrne's research and scholarship are extremely well focused … we see a clear trajectory in her work that opens out onto ever larger vistas."

These statements made during Plaintiff's promotion preceding her tenure review are especially important in defining Plaintiff's reasonable expectations regarding scholarship, when the Department felt that she was on track to receive tenure. Just as in *Craine*, the Defendant negligently misrepresented to Plaintiff that "as long as the plaintiff devoted her time and energy to the publication process, tenure would be forthcoming." *Craine v. Trinity Coll.*, 259 Conn. 625, 661 (2002).

Despite this unanimous vote two years earlier, Adorno, Gonzalez Echevarria and Valis voted against granting Professor Byrne tenure in a two in favor and three against vote using a criterion to assess Plaintiff's scholarship that had never been previously articulated. None of the criticisms that Adorno, Gonzalez Echevarria and Valis articulated during the February 9, 2016 Departmental meeting about Professor Byrne's tenure had ever been raised before.  .  In fact Professor Bloch confronted Gonzalez Echevarria on the drastic change in his position on Professor Byrne's scholarship.

As Defendant negligently misrepresented the adjudication of her recusal request and the standards for scholarship to be applied in Plaintiff's tenure review, Defendant's Motion for Summary Judgment must be denied.

XII.   **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety.