# Exhibit 68

| | |
|---|---|
| **From:** | Rolena Adorno [rolena.adorno@yale.edu] |
| **Sent:** | Friday, December 11, 2015 2:03 PM |
| **To:** | Noel Valis; Stith, Kate |
| **Subject:** | Latest version notes |
| **Attachments:** | Notes for December 13 meeting.docx |

I will see you at 2;45 or 2:50 at Wall St Pizza. I am dashing home to get the big white binder. No wheelbarrow handy!

Till soon,

Rolena

1

Notes for the meeting of December 13, 2015, p. [Page]

Notes for December 13 meeting, 3 pm, Warner House 307:

Taken with Kate on December 12, 1:30/3:00 pm, Yale Law School and transcribed afterward:

Attitude:
1. If needed: "Professor Stith is our adviser. . . . She has been involved with us (Noel and me, Roberto, too) from the beginning and throughout our testimony in the investigation: the subject is the same as the procedure in which she has been involved---namely, the Climate Investigation. Her presence with us today is fully consistent with the norms under which she has participated earlier."
2. SMILE; hypocrisy is a core principle of civilization, second only to godliness.
3. Do not take a defensive posture.
4. Put them on the defensive, always asking for substantiation:
What is the factual basis for the . . . . recusal, etc.?
What is the factual basis for your claim that I am biased against SB?
Actual bias has to be demonstrated and individuals' perceptions are not fact.
If you claim that there is enmity against her, exactly where (From the documentation? Where is this coming from?)
5. You asked us to come in to "discuss" the findings and we expect you to listen to us this time, until we are through. We have had no chance to meet with you over the past nine months, and you must be prepared to hear us out.


Sue Byrne:

6. A person who is a source of hostile invective about others should not be heard to then complain about a "hostile environment," especially when the responses to hostile invective are measured and respectful.
7. If there is hostility and divisiveness, where does it come from? What is the proof?
8. One has to ask, where are the waves of acrimony coming from? Who is saying that the department is full of acrimony? Are the waves of acrimony coming from the people who say there is acrimony? These are the kinds of questions that should have been asked from the beginning.
9. If you claim that there is enmity against SB, exactly where has it been demonstrated?
10. It appears that SB, in her own mind, believes that Roberto, me, and now Noel, so dislike her that we cannot judge her work fairly. We disagree. We have no hostility toward SB. Our mission and responsibility as senior faculty members is to evaluate and judge the work of junior faculty. That judgment is objective and professional, and the principle thing we evaluate is her scholarship (of course, we do not overlook teaching and service).
11. SB claims that we are unduly critical of her work (Oct 16, Jan 7, Apr 1, Nov 7), but we have also been critical of the work of other faculty members, and no one has accused us of being biased in those instances. In other words, SB is not being singled out.
12. SB has demanded the recusals of Rolena and Roberto. But why has she not asked for Noel's? We voted independently and unanimously against her several research proposals for the APL.
13. Her tenure is not dependent on that research proposal; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[redacted]

14. Another thing that is irrelevant to SB's tenure consideration is the fact that she tried to make Rolena the accuser that she, SB, was involved with the creation of the anonymous letter of March 6, 2015. Why did I mention it to the reviewers? Because she made her accusation in the middle of the departmental review, and it was shown to be untrue. But this instance of untruth on SB's part cannot be used to serve to disqualify me from her tenure consideration. What she said regarding Rolena to Anne Cruz was untrue, suggesting that what she was saying to Jamaal and Barbara might also be untrue. Again, none of these claims or accusations are relevant to SB's tenure case. The senior faculty is charged with making academic evaluations and judgments of the work of junior faculty members, and that is ALL we are judging.
15. Bear in mind that SB has published three books and a solid number of articles. Her first review of her book has appeared; it is favorable, and in fact she has posted it on her office door. So absolutely no one can jump to conclusions about the outcome of her tenure review.
16. No recusals: SB's actions cannot be the basis for prohibiting RA and RGE from participating in her tenure review. We are all adults here and we know how to judge academic work fairly and objectively, without consideration of any other issues. If we are denied voting rights, it will be a slippery slope with regard to other junior faculty, who will then simply claim that seniors are against the demanding their exclusion from promotion and tenure reviews. And it is an extremely slippery slope with regard to academic freedom.

The consequences of the University review of the department and how to compensate for them:

1. The enormous damage done to the department by the anonymous letter, the University review and the *Yale Daily News* has been incalculable. The first and immediate consequence was, for the first time in our departmental history, the acceptance by zero students admitted to our PhD program.
2. We would like to see your strong support of this department. The protraction of this review to a full nine months has done nothing to dispel the tensions in the department. In fact, it has exacerbated them, making everyone distrustful of one another. Here is what you could do to help us:
3. First: faculty positions: You denied our legitimate request to pursue the search for a tenure track position in Portuguese (this was for the second year running) which is desperately needed. In fact, we are down three faculty members: medieval Spanish literature, lector of Spanish. We do not have enough faculty to offer courses next year, both semesters.
4. IF you want to change the dynamic of this department, we need NEW BLOOD. We say so because we are convinced that you want to help us!
5. WE WANT EXONERATION for the two colleagues (RGE and RA) named in the anonymous letter: "There is no factual basis for the allegations of wrongdoing by RA and RGE"/"Not borne out by facts." What is stated here at Yale, because of the *YDN* and Facebook, affects us seriously in the wider world. And with that:
6. NO recusals.
7. How can you base conclusions on witnesses' perceptions? How are they borne out by facts? How can you determine the climate of the department if you base your conclusions on perceptions, not facts? How do you judge the worthiness of perceptions? On what basis?
8. It appears to us that your only concern is avoiding lawsuits or unfavorable publicity. But why be afraid of that? Yale has got tons of it recently. And our department has already suffered irreparable damage.

Notes for the meeting of December 13, 2015, p. [Page]

9. Give us a decent quota for the admission of graduate students, and we need that number NOW.
10. How do you plan to proceed? What are you planning to announce publicly? How do you plan to do so after we have met with you and you have digested what we have to say?
11. On receivership:
    What is the basis for receivership?
    What does it mean?
    What does the administration hope to accomplish with receivership? These people will never change. What we need to do is to change the dynamic of the department. For that, two things are needed: first, that we ourselves continue to improve the working relationship among members of the department, <u>with the support of the administration</u> and second, that the administration approve our requests for ladder faculty positions, which will bring new blood to the department.