# Exhibit 109

# Yale *Department of Spanish & Portuguese*

Susan Byrne
Associate Professor of Spanish
203-432-1162
susan.byrne@yale.edu

PO Box 208204
New Haven CT 06520-8204
T 203 432-1151
F 203 432-1178
span-port.yale.edu

*courier*
82-90 Wall Street
New Haven CT 06511

Ben Polak
Provost
William C. Brainard Professor of Economics
Office of the Provost
Yale University
2 Whitney Avenue, Suite 400, Room 432
New Haven, Connecticut

March 2, 2016

Dear Provost Polak,

Pursuant to Yale Faculty Handbook ("FH") section III.L.3.a, I submit this petition for a review of a determination made by Faculty of Arts and Sciences Dean Tamar Gendler on January 19, 2016 regarding my tenure review. On that date, Dean Gendler violated University policy regarding eligibility for voting (FH III.L.3.a.i), as well as policy governing adequate and fair consideration in matters of promotions (FH III.L.3.a.ii) by allowing and condoning the participation in, and vote on my tenure review by colleagues known to have prejudgmental biases against Yale's Faculty of Arts and Sciences Tenure and Appointments Policy ("FASTAP") generally, against the tenuring of any individual at Yale, and against me specifically for arbitrary and capricious reasons unrelated to my merits. Further, the participation of those same persons allowed them to retaliate against me for my having spoken out against abuses of university and public policy perpetrated by them, including sexual harassment and discrimination (FH III.L.3.a.iii), and witnessed by me.

All Yale procedures governing appointment, reappointment and promotion afford me the reasonable expectation of a fair and unbiased process on the merits for tenure review. Dean Gendler's failure to grant a recusal request filed with her office on April 1, 2015 allowed known bad actors Rolena Adorno and Roberto González Echevarría to improperly defeat my reasonable expectation of a fair hearing on the merits.

On February 23, 2016, prior to filing this appeal and pursuant to FH III.L.3.b, I sought an equitable solution to this problem through informal consultation with Dean Gendler. On that date, I told Dean Gendler that "as I stated in my recusal request, it was clear to me then [on April 1, 2015] that they [Adorno and González Echevarría] would do what they had now done." On Feb. 23, Dean Gendler told me that my case "was sufficiently complicated for me to go ahead and appeal" to the provost. I do so now in regard to Dean Gendler's failure to grant my recusal request, a determination communicated to me by email on January 19, 2016.

Byrne000406

RELEVANT POLICIES AND PROCEDURES

Yale policy regarding voting on appointments and promotions is governed by FH II.K.2 and the document titled "Yale Voting Policies" linked to the Yale Faculty of Arts and Sciences Steps for Promotion document ("Steps"), specifically to Step 3: http://facultyadmin.yale.edu/fas-voting-policy. Respectively, those standard procedures state:

> "A member of the faculty who has a conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual." (FH 34, note *)

> "A member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual." ("Steps," step 3)

Oxford defines "conflict of interest" as "an incompatibility between the concerns or aims of different parties" (*OED Online*, December 2015). Connecticut law provides a code of ethics for public officials and summarizes the "conflict of interest" phrase with: "Interest in conflict with discharge of duties" (Connecticut General Statutes § 1-85).

The interest of Yale University is described in the FH: "Yale University's mission is to create, disseminate and preserve knowledge through research and teaching" (FH I.b). The express duties to be discharged by Yale faculty immediately follow that statement of interest and purpose: "The Yale faculty bears primary responsibility for preserving the conditions necessary to advance" the university's mission by, in part, assuring "the application of fair and consistent standards and processes in matters of promotion and tenure" (FH II.B) and, as further stated in a subsequent section on ethical standards of conduct for faculty members, by participating "constructively and without discrimination in hiring and promotion decisions" (FH II.B.3). A conflict of interest in this regard is described as conduct inconsistent with Yale Faculty Standards of Conduct, and includes: "Evaluating the professional competence of colleagues using criteria that do not directly reflect professional performance" (FH II.b.3.j). Thus, Yale faculty are expected to not allow a conflict of interest to interfere with the proper discharge of their duties regarding promotions and tenure: they are to guard against the interference of incompatible concerns or aims, to not discriminate, and to abide by all Yale procedures and policies regarding appointments and promotions.

In 2007, Yale University instituted a tenure track system of hiring and promotions called Faculty of Arts and Sciences Tenure and Appointments Policy ("FASTAP"), details of which are found in the 2007 Report to the Faculty (http://facultyadmin.yale.edu/checklists-forms-templates, FASTAP Report Feb. 2007). FASTAP governs all hiring and promotions of Yale ladder (tenured and tenure track) faculty.

Yale's Faculty Appointment Procedures provide that "specific details and documents... found on the Faculty of Arts and Sciences Web site" are to be followed for all appointments of ladder faculty (FH III.K.1), so as to provide "written documentation of the entire search process" and those documents "must be reviewed by the Provost's authorized representative before an appointment is offered" (FH III.C). Each department must begin with a consideration of its needs, and is instructed to discuss the particulars of any ladder faculty search with the relevant

Byrne000407

dean, who will authorize the appointment (FH III.K.1). Further, "No offer of appointment or promotion is final until approved by the Corporation upon the recommendation of the President or Provost" (FH III.D).

Each search for a ladder faculty appointment includes a "Faculty Search Questionnaire" to be filed with the Provost's office for candidates who will reach the second stage of the process and be interviewed on campus (http://facultyadmin.yale.edu/checklists-forms-templates, "Faculty Search Questionnaire"). This form contains a description of the subfield of specialization, and an evaluation of how the qualifications of each interviewee fit the requirements of the advertised position.

For reappointments and promotions, "Schools and departments are expected to make a careful evaluation of each candidate's work and promise, as well as the programmatic needs of the school or department, before deciding whether or not to recommend reappointment or promotion" (FH III.G). Yale procedures demand that an advertisement for a faculty position must include a description of "the targeted area(s) or field(s)" and that "the selected candidate must fit the description" (Advertisement Checklist and Guidelines for Faculty Positions, items to include in the posting, http://facultyadmin.yale.edu/checklists-forms-templates). Thus, prior to appointment, all candidates are vetted for departmental need in the precise area of specialization, by both the department, the relevant dean, and the Provost. When reappointed, they are vetted again for the same concerns.

A promotion to Associate Professor on Term demands all of the above procedures plus an additional step of approval by the Tenure Appointments and Promotions Committee of the Divisional Committee for the Humanities (FH III.K.1.a). Submissions to that committee at the time of a recommendation for promotion include the Departmental Case Summary Form, on which the department justifies the importance of a given faculty member's area of research to the discipline, to the department, and to the undergraduate and graduate curriculum in the department and at Yale. This form is submitted first to the Divisional Area Committee, then to the Joint Board of Permanent Officers, and finally to Yale Corporation. In sequence, each of those groups must vote to approve the specific candidate's promotion in their department, and in full recognition of their field and subfield, before the promotion is granted. At each step, each subsequent vote confirms the vetting for departmental need in the precise area of specialization.

Regarding the Associate Professor Leave: "Assistant professors in the Faculty of Arts and Sciences who are promoted to the rank of associate professor on term are eligible for an Associate Professor Leave ("APL"), a full year's leave at full salary, provided that two semesters of full-time teaching in residence have elapsed since their last paid leave. Faculty members appointed to Yale at the rank of associate professor on term are eligible for the Associate Professor Leave in the second, third, or fourth year of appointment. These leaves may be awarded to associate professors who present, during the fall of the previous academic year, a research proposal that is approved by the department chair and the FAS Dean" (FH XVII.B.5.b). The importance of the APL leave to the FASTAP system is highlighted with the following statement: "Morse Fellowships, Junior Faculty Fellowships, and Associate Professor Leaves – where the benefit to the faculty member is paramount – will not be disallowed or delayed by reason of adverse effect on the department, program, or school" (FH XVII.A.1). Yale promises its associate professors on term a fair hearing for the approval of an Associate Professor Leave, and recognizes the benefits – of "paramount" importance – such a leave will bring. A denial of an APL for arbitrary reasons is indicative of bias.

STATEMENT OF FACTS

In 2007, I responded to an advertisement in the Job Information List of the Modern Language Association that read: "The Department of Spanish and Portuguese at Yale University proposes to make a tenure track assistant professor appointment in Medieval/Golden Age Literature to begin July 1, 2008." Materials were to be sent to Rolena Adorno. I replied to that advertisement with a letter that specifically mentioned my ongoing projects, among them a manuscript-in-progress on the topics of law and history in the writings of author Miguel de Cervantes.

On December 27, 2007, I was interviewed for the position by a committee consisting of Professors Rolena Adorno ("RA"), Noël Valis ("NV"), and Roberto González Echevarría ("RGE"). We spoke in detail about my research, and specifically my book project on law and history in the writings of author Cervantes. During the interview, RGE asked if I would move to New Haven if given the job. He said he knew he was not allowed to ask the question, but he was going to ask it anyway. Then he added that if I ever said he asked it, he would deny that he had and so would "everyone else in this room," that is, RGE flatly asserted that RA and NV would lie for him.

Following that first interview, I was invited for a campus visit on February 4-5, 2008. During that campus visit, I spoke individually and collectively with multiple faculty members, and met privately for one full hour with RA, during which time she and I spoke at length about my ongoing research projects, and specifically my book on Cervantes.

On February 5, 2008, I gave a job talk at Yale's Whitney Humanities Center to the members of the Department of Spanish & Portuguese. The topic was law and history in Cervantes' *Don Quijote*.

In a phone call on February 8, 2008, RGE offered me the position. I asked him why I was being hired, given that he had also written on Cervantes, and had not indicated that he intended to retire. He replied that the position was available because the last person to hold it had not published anything.

My initial letter of appointment, dated February 19, 2008, referenced both the Faculty Handbook and the FASTAP document, providing electronic links to both for further information on the rules and procedures that would govern my employment.

At the time of the advertisement, interviews, and notice of initial appointment, department Chair RA (fall 2007) and Acting Chair RGE (spring 2008) filed a "Faculty Search Questionnaire" justifying my appointment (http://facultyadmin.yale.edu/checklists-forms-templates, "Faculty Search Questionnaire"). This form as filed contains a description of the subfield in which I work, and an evaluation of how my qualifications fit the requirements of the advertised position.

Pursuant to the policies and procedures outlined above, and following all interviews and vetting of my candidacy, in July 2008 I was appointed as Assistant Professor of Spanish with a specialization in Golden Age Studies after the department, the Yale College Dean, the Provost, and the President had so recommended to the Yale Corporation Counsel, and the latter had voted in favor of my appointment.

In 2012, pursuant to the same set of procedures, I was reappointed to the same rank and with the same field of specialization.

In 2013, I was promoted to Associate Professor on Term with the same field of specialization. At no point was my field of specialization an impediment to this promotion, which was vetted and approved by my department, the Yale College Dean, the Divisional Committee on the Humanities, the Provost, the President, and the Corporation Counsel. I was vetted for departmental need in my specific area of specialization at each and every one of those points, and found to fit that need.

Further, through each of the processes related to my appointment and promotion from 2008 through 2013, my department chair informed me that all members of my department voted unanimously to appoint, reappoint, and promote me.

On April 22, 2013, for my promotion to Associate Professor on Term, RA filed a Departmental Case Summary and Department Faculty Vote Form with the Divisional Committee for the Humanities justifying the importance of my area of research to the discipline, to the department, and to the undergraduate and graduate curriculum in the department and at Yale. This filed form includes critical evaluation of my teaching and scholarly contributions to research and scholarship, as well as a justification for the department's needs for me (Departmental Case Summary). The Faculty Vote Form shows the unanimous tally of votes in my favor for the 2013 promotion, and the Departmental Case Summary praises the quality of my scholarship.

Despite those multiple reviews for departmental need, and the filed documentation justifying my fitness to fill that need, on January 7, 2014, RA said to me: "The problem with your tenure review is that we don't need another Cervantista in the department." My husband witnessed this exchange which clearly indicated that RA would oppose my tenure application for an improper reason.

A full six years after having vetted and hired me as a specialist working in Spanish Golden Age literature, a period known for its most canonical author, Miguel de Cervantes, and after multiple conversations regarding, as well as specific encouragement to proceed working on my second book, titled *Law and History in Cervantes' Don Quixote*, and published in 2012, RA single-handedly and without regard for Yale procedures indicated her intent to change the vetting for my position. In so doing, she showed that vetting to be arbitrary and capricious. One year after promoting me to Associate Professor on Term with all the procedural documentation necessary for such a step, including justification of departmental need for my position along with my suitability to fill it, and in bad faith, RA shifted the standard and showed that she intended to allow an incompatible concern – a conflict of interest – to interfere with her proper discharge of duties in her evaluation of my professional competence. RA stated her intent to apply unfair and inconsistent standards and processes to my tenure review, a full year before the first step in that review had been taken.

On August 13, 2014, RGE said to me: "As to this mentoring thing: no one ever gets tenure at Yale, so you should keep looking for another job." This blanket statement flies in the face of Yale's FASTAP system, and clearly demonstrates a conflict of interest: "an incompatibility between the concerns or aims of different parties" (*OED Online*, December 2015) and an "Interest in conflict with discharge of duties" (Connecticut General Statutes § 1-85). With FASTAP, its tenure track system, Yale pledges a fair hearing on the merits during a tenure

review. Yale hired me in 2008 with that promise. Both the FH and the FASTAP document offer a reasonable expectation of a fair and unbiased decision maker during tenure review. RGE flatly refuses to comply with Yale policy, and openly flaunts his disagreement with it. Multiple newspaper stories in the Yale Daily News during 2015 attest to RGE's contempt for FASTAP provisions on tenure. Witnesses to RGE repeating this statement on multiple occasions include Professors Kevin Poole and Paulo Moreira, as well as a number of other persons in the department, of whom more than 60 testified to attorneys Jamaal Thomas and Barbara Goren during a departmental climate review that took place from March through December 2015. The climate review report provides ample evidence of this oft-repeated dictum of RGE, and his opposition to FASTAP was noted and discussed at a December 15, 2015 information session on that report.

From September 11, 2014 through February 25, 2015, RA and RGE made unsupported statements defaming my research work that directly contradicted their previous praise for the same body of work. While refusing to offer any independent assessment, as she normally had on previous occasions, NV signed her name to those statements as a member of the review panel for my proposal for a year-long sabbatical leave for which I had become eligible due to my promotion to Associate Professor in 2013. The same group of RA, RGE, and NV arbitrarily and unfairly denied me the benefit of that leave, which is a key part of Yale's FASTAP system, and this arbitrary and capricious denial constitutes additional evidence of the conflict of interest tied to a refusal to consider any candidate for tenure on the merits in order to maintain the balance of power in the department. Full details follow below.

ARBITRARY AND CAPRICIOUS DENIAL OF APL LEAVE DEMONSTRATES BAD FAITH KNOWN BY THE DEAN'S OFFICE

On September 11, 2014, I submitted to RA a request for an Associate Professor Leave ("APL"), to work on a project titled *From Law to Literature in Spain*. The proposed time frame for the leave was academic year 2015-2016. I attached the proposal to the request form.

On the evening of October 16, 2014, RA asked me to meet the following morning with RGE to discuss the proposal. I responded to ask for individual comments from each reader, as is the norm in our department. RA said there would be no individual comments this time.

On October 17, 2014, I met with RGE at 10:45 a.m. He mentioned that the *Siete Partidas* were not highlighted in the proposal, and I replied that that collection of laws had been a key part of my book on Cervantes, work that I had already published and on which I might want to expand, but not simply repeat. RGE expressed surprise, and said he had not noticed the presence of the *Partidas* in my book. RGE conveyed to me the committee's minimal comments on my proposal. I took notes. Directly following that meeting, at 11:34 a.m., I sent an email to RA and NV, with copy to RGE. I noted the requested changes communicated to me by RGE: an additional three books in the bibliography, and four minor edits to the text of the proposal: 1) delete my description of RGE's book on Cervantes as "a full and fruitful thematic literary study" that had "engendered much critical interest and commentary," along with the note that listed critical praise for that book (although RGE did ask if he could keep a copy of the proposal, to have that list); 2) expand my statement on the ahistorical perspective of prior law-literature studies; 3) find synonyms to avoid repetition of the word 'detail' on page 3, and; 4) change the wording of the

phrase "in dialogue with" on page 4. I asked RA and NV to send any additional suggestions they might have.

On October 17, 2014, at 4:41 p.m., having had no reply to the above, I submitted to all three committee members the amended proposal.

On October 17, 2014, at 6:04 p.m., RA wrote to say: "It is still Friday, October 17, 2014, and we will respond to your request of 11:34 a.m. shortly." RA followed up at 7:16 p.m. that same evening, with an attached memo from RGE regarding my proposal. The memo included a list of four criticisms of the proposal, two of which had not been mentioned in our meeting that morning: 1) a note that the concept of literature is "not relevant to the Spanish Golden Age"; 2) a complaint about my description of RGE's book; 3) a complaint that my list of texts to study included both canonical and non-canonical works, with specific criticism of the *Filosofía antigua poética* of Alonso López Pinciano, along with a suggestion that I include the *Siete Partidas* and/or Tirso's *El burlador de Sevilla*, and; 4) a complaint about my style of writing, with the only specific the use of the word "detail" on page 3. In this last point of his memo, RGE criticized my book on Cervantes, a book he had repeatedly praised in the past, most recently as I was promoted in spring 2013, that he included on his course syllabi for his students, and that he simultaneously had on 24-hour reserve for his students at Bass library during the same fall 2014 semester when he wrote this memo.

On October 18, 2014, I responded to RA, RGE, and NV. I noted that both the concept and the word 'literature' were used to refer to literary works of all time periods, going back much further than the Renaissance. In fact, in RGE's own book on Cervantes, he repeatedly uses the concept and the term: "This kind of writing not only strives to direct the attention of the reader outside of **literature**, but its appeal is based precisely on the fact that it originates outside of **literature**, a perspective familiar to his or her own reality"; "**Literature** is its own best context in this regard..."; "This kind of writing makes a claim to truth and authenticity not only from outside of **literature** but because it is from outside of **literature**"; "Hence it was **literature** ruling social behavior and social behavior behaving as **literature**"; "**Literature, Renaissance literature**, in its effort to revive the classical age, misses the mark by a wide margin"; "To my mind, Cervantes' take on the picaresque and on **literature** in general is more independent of religious concerns and of **literature** itself" (RGE, *Love and the Law in Cervantes*, pp. xv, xvi, 29, 37, 78, 270, my emphasis). I referred my senior colleagues to my own analysis of the use of the word 'literature' in Renaissance Spain, as found in the conclusion to my book on Cervantes. I pointed out that the memo's complaint number 2 was already moot, as I had deleted mention of RGE's book from the revised version of my proposal. On the memo's point 3, I noted that "individual intellectual choice is crucial to a good project" and that RGE had accepted my choice of texts when we spoke in his office. I added that the only text on the list of eight I proposed to study that RGE had criticized in his memo was the *Filosofía antigua poética*, a volume that was, in actuality, itself a masterpiece as a re-write in dialogue form combining Aristotle's *Poetics* with multiple other ancient and classical theoretical treatises. I said that this volume was a standard reference for scholars, including RA in her last book, *Polemics of Possession*, published in 2007. To address the last of the memo's points, I included quotes from five recent reviews of my book on Cervantes that praise the clarity and style of my writing and analyses, as well as an excerpt from a recent letter sent to me by Yale Professor Emeritus Manuel Durán that also praises my writing in that same book.

On October 18, 2014, RA responded to say that the deadline to submit the proposal had been

extended. She failed to address any of the substantive concerns I raised in my message to the committee.

On October 18, 2014, I asked Associate Dean John Mangan ("Mangan") for a meeting to discuss the committee's inexplicable actions regarding my proposal.

On October 20, I met with Mangan regarding the possibility of removing the APL leave from the jurisdiction of the departmental committee, on the basis of its irrational behavior. I noted that the same proposal had already been granted $12,000 in research funds from two different Yale committees, and that the departmental committee's reaction to it was inexplicable.

On October 30, 2014, I explained to Mangan a number of problems in the department, including its political stance against FASTAP: "Thanks again, and I have read the FASTAP report, with that sentence [regarding mentoring and approval of proposals]. I also appreciate the value of good feedback from a colleague, or a committee, but in this case I don't feel I've had that. As a matter of fact, the only advice my mentor has ever given me came just prior to the start of my seventh year here: "No one ever gets tenure at Yale, so you should keep looking for another job" (Roberto González Echevarría to Byrne, Aug. 13, 2014). That statement was a surprise, as I had thought that the merits of my dossier would actually be considered when I come up for tenure next year. Apparently, however, my department has decided that it is not bound by the FASTAP system under which it hired me. It will never grant tenure to anyone, irrespective of merit. The summary rejection of my APL leave proposal, without any substantive comment and following on that statement, fits this pattern. That is why I came to speak with you. It seems that on their way to denying me tenure without consideration next year, they are now trying to deny me the leave. I found this unreasonable."

On November 3, 2014, still without any communication from the committee, I submitted a third version of the APL proposal.

On November 9 and November 10, I wrote to the committee members to ask for updates on the status of my APL proposal.

During the week beginning on November 10, 2014, I asked RGE in person for an update on the status of my APL proposal. RGE replied that as he was not chair of the department, he could not tell me anything.

On November 17, 2014, RA told me that the proposal had been rejected by the committee. RA added that the FAS Dean's office would reevaluate the proposal and make a final determination.

On November 17, 2014, in a message to Mangan, I asked the FAS Dean's office to review the departmental committee's rejection of my APL proposal.

On November 25, 2014, Mangan replied that there was no procedure to allow for such an independent review. I responded with an offer to defend my proposal either in person or in writing, with or without the departmental committee members present to debate it with me. The offer was not accepted.

On December 16, and December 18, I asked Mangan for further updates.

On December 17, 2014, I asked RA for an update on the final determination. She replied that same day to say that as soon as she had received the determination from the FAS Dean's office, she would inform me.

During the week of December 29, 2014, RA received notice that the FAS Dean's office had not overturned the departmental committee's rejection of my APL proposal. RA failed to inform me of this update.

On December 30, 2014, RA asked me to meet with her and someone named Jack Dovidio on January 7, 2014. In this email, RA did not identify Dovidio, and she again failed to mention the final determination on my recusal request.

From December 30, 2014 through January 6, 2015, having discovered that Jack Dovidio was Dean of Academic Affairs in the FAS Dean's office, I prepared to defend my APL proposal at the January 7th meeting.

On January 6, 2015, at 2:10 p.m., I wrote to ask RA and Dovidio for any further agenda items for the January 7 meeting, noting that I had prepared to defend my APL proposal.

On January 6, 2015, at 5:28 p.m., RA responded to tell me that my APL proposal would not be discussed at the next day's meeting, but rather an "alternative suggestion," unspecified.

On January 7, 2015, during the meeting with Dovidio, RA told me that my APL proposal had been rejected. RA and Dovidio then offered me the "extraordinary opportunity" to write another proposal, to be submitted to the same departmental committee by February 4, 2015. I accepted the challenge, and stated that I would prepare the precise proposal requested by RGE in his October 17 memo, that is, a law-literature study of Tirso de Molina's *El burlador de Sevilla*. Dovidio suggested getting interim feedback from the committee members as the proposal was prepared, and RA agreed that such feedback should be sought. I agreed to do so.

On January 24, 2015, I wrote individually to each committee member (RA, RGE, NV), with an advance copy of the proposal, requesting feedback.

On January 24 and 25, 2015, each committee member (RA, RGE, NV) wrote back without feedback on the proposal, explaining the difficulty in providing any due to illness, and/or an impending snowstorm.

On January 27, I again asked all committee members for any feedback on the proposal. A few hours later, RA replied to arrange a meeting for January 29 with me, and two committee members: RA and RGE.

During the January 29 meeting, RA told me that, contrary to standard department practice, there would be no separate commentaries on the proposal. NV did not attend this meeting, and RA said she was speaking for NV. RGE stated that the proposal might yield an article, and noted that an unstudied manuscript I had found, one that outlined legal proscriptions regarding sexual crimes and that I proposed to study in relation to Tirso's work, was interesting but that he was not familiar with it, and so could not comment on it. I pointed out that the manuscript, a recent find, would allow me to say something new about the work, and thanked RGE for noting its importance. RGE spoke about Menéndez Pidal's psychological study of Tirso's Don Juan

character, and noted that his own work on incest in *Don Quijote* had been based on Menéndez Pidal. I pointed out that a lot of work had been done since Menéndez Pidal, and that I would be happy to add something new to existing studies. RGE explained that when he had asked for a law-literature study, he really meant a psychological character study, like the kind that he himself does. I noted our different approaches to work, and my understanding of a law-literature study as one that looked at laws and at literature. RA criticized my plan to include legal texts in a law-literature study, and indicated that she had failed to understand my proposal. Both RGE and RA insisted, inexplicably, that the Council of Trent had no bearing on subsequent marriage and inheritance laws. I pointed out that Augustin Redondo, of the Sorbonne, had made that connection quite clear, but RGE and RA were not aware of that very well-known scholar's work. RGE admitted that he "might have heard the name." RA criticized the language of the proposal, including my use of the word 'dramaturge' as a synonym for 'playwright'; when asked why, RA replied in re 'dramaturge' that "we don't use that word," without any legitimate rationale whatsoever. Throughout the meeting, I maintained a positive attitude, repeatedly indicating my interest in addressing their criticisms, asking for specific explanations of points raised, and thanking RA and RGE for their commentaries. Nonetheless, I found the discussion to be completely void of substance.

Specifically, RA's and RGE's bending over backwards to invent semantic battles over the words 'literature' and 'dramaturge' demonstrated overt hostility towards me. As shown above, RGE uses the word 'literature' repeatedly in his own writing on the same time period. The word 'dramaturge' (two accepted spellings, with or without the final 'e') is a synonym for 'playwright,' and a search of the Modern Language Association bibliography easily turns up published articles with titles such as "The Reconstructed Dramaturg" [2014], "Directing like a Dramaturg" [2013], "Dramaturgs Like to Talk..." [2009], "Shakespeare the Dramaturge" [2008]. There is no reasonable explanation for such philological twisting and turning on these points.

After the meeting on January 29, 2015, Mangan wrote to ask me how it had gone. I replied that I had made and would continue to make every effort to meet my senior colleagues' demands, but that their criticisms were without substance.

On February 3, 2015, I turned in a revised version of the proposal.

From February 4 through February 25, 2015, I received no word from the committee (RA, RGE, NV).

On February 25, 2015, Dovidio wrote to tell me that the proposal on Tirso had been rejected. There was no explanation of why the committee had rejected this proposal, a plan that one of its own members had directed me to prepare.

WHISTLEBLOWING ON DEPARTMENTAL ABUSE OF UNIVERSITY AND PUBLIC POLICY, PRIOR AND SUBSEQUENT TO THE RECUSAL REQUEST

On May 7, 2014, I recommended to Yale College Dean Mary Miller that she change the chair of the Department of Spanish & Portuguese and on May 19, 2014, RA told me she knew I had done that.

Beginning on October 20, 2014 and through February 25, 2015, as outlined above (FACTS), I asked the FAS Dean's office to advise me on the inexplicable behavior of RA, RGE, and NV in their refusal to grant me the APL. RA, RGE and NV were made aware of these complaints throughout that process.

On February 5, 2015, I spoke at a public meeting about FASTAP abuses in the department of Spanish & Portuguese by RA, RGE and NV. I stated that one member of my department had repeatedly proclaimed his contempt for the idea of tenuring anyone, that three members had banded together to refuse tenure to qualified candidates, most recently in spring 2014, and that they did so in the interest of maintaining their power base in the department. That meeting was attended by a number of faculty members and administrators.

On February 6, 2015, I wrote to the chair of the FASTAP review committee with further specific details about the same departmental abuses of the FASTAP system by RA, RGE, and NV.

On March 25, 2015, I was referenced in a story in the Yale Daily News as having "heard harassing comments made by professors both to their colleagues and to students" and for having said that "hearing that no junior faculty member will be granted tenure in the department is worrying." I was also directly quoted in the piece: "'I would hope that anyone who has anything to do with my tenure case will give me a fair and equitable hearing,' she [Byrne] said."

During the last week of March, 2015, I signed a petition to the Provost asking that Paulo Moreira's denial of tenure case be reviewed. That petition infuriated RGE and RA, who both clearly indicated later that they knew who had signed it. RGE threw books around in one faculty member's office, and RA yelled at me in front of other members of the department.

On April 1, 2015, as noted above, I submitted to RA a request that she and RGE recuse themselves from all matters related to my tenure review, with copy sent to other senior faculty in the department, the Provost, and the relevant deans.

On Apr 22, 2015, I was interviewed by attorneys Thomas and Goren, who conducted the departmental climate review. My own testimony to those attorneys regarding mismanagement and abuse of university and public policy in the department included but was not limited to: RA's violation of federal anti-age discrimination statutes during annual recruitment of graduate students, a violation witnessed by multiple members of the department (Poole, González, Jackson, RGE) gathered for that meeting; NV's silent role as DGS and committee chair allowing that age discrimination to take place; RGE's sexual intimidation and bullying of undergraduate students, graduate students, and colleagues, with specific identifiable detail regarding his acts towards me; RA's cover-ups of RGE's sexual harassment; RA's excessive requests for extra social activities two or three times a week, and particularly her constant demands on Prof. Kevin Poole's time for those events; RA's engineering of refusals to re-admit when graduate students apply for re-instatement, with particulars on Diana Arambaru in 2008-2009, including my own individual report on Arambaru's work submitted to RA in 2008; NV's willingness to do whatever RGE and RA tell her to do; RA's long-standing abuse of power in the department, including public humiliation of colleagues and requests that I provide her with unflattering information on colleagues and departmental administrative staff; the fraudulent denial of tenure to Paulo Moreira in spring 2014 engineered and orchestrated by RGE, RA, and NV; the general lack of scruples shown by the same three persons in the service of maintaining majority power in the department; RGE's violation of interview protocol during my interview for the position at Yale,

when he told me that I would have to move to New Haven if I wanted the job, and his assurances that RA and NV, in the room when he asked it, would lie for him if I ever alleged that he had asked the question; professional harassment of me by RGE, RA and NV as they denied me the APL in fall 2014 and, for this last, I provided copies of specific correspondence between the parties during that period of harassment, correspondence easily identifiable as coming from me, as only RA, RGE, NV and me had been included in that correspondence; RA's explosion at a faculty meeting on April 16, 2015, when she tried to blame me for an anonymous letter of complaint sent by the department's graduate students; the dates and attendees at annual (2008, 2009, 2010, 2012) junior professor meetings held by RA, and at which RGE said "no one ever gets tenure at Yale."

From November 13 through December 15, 2015, I joined others on the departmental graduate studies committee to insist on a meeting to vote on changes proposed for dissertation prospectuses. RA and NV vigorously opposed the changes, and resisted calling a meeting.

On December 1, 2015, I testified to Title IX coordinator Stephanie Spangler regarding RGE's sexual harassment of undergraduate students, graduate students, and colleagues, with specific identifiable detail regarding his acts towards me. I informed Spangler that she was free to utilize that information in any way she saw fit. Spangler specifically questioned my willingness to allow identifiable detail to be used. I told her to use it, in the service of improving conditions for graduate students in the department.

On December 2, 2015, I wrote to Harold Rose, Allegra di Bonaventura, and Pam Schirmeister with copy, as members of the departmental graduate studies committee, to RA, RGE, NV, Profs. Harkema, Jackson and González, as well as two graduate students, to defend the graduate students' right to vote as members of that committee, and to inform the administrative and legal university personnel that misrepresentations had been made to them by RA and NV. My email included notification of pressures on junior professors to vote certain ways on department and university-wide matters, as well as the voting bloc habits of RA, RGE, and NV.

During the January 19, 2016 refresher course on sexual harassment attended by all ladder faculty in the department, I commented specifically on case scenarios, including one directly reflective of RA's excessive demands for extra social activities "two and three" times a week.


RETALIATION FOR WHISTLEBLOWING ACTIVITIES THROUGHOUT THE PERIOD OF TENURE REVIEW, AND CONTINUING UP TO FINAL NOTIFICATION TO ME OF THE RESULT OF THAT REVIEW

On April 13, 2015, RA replied to my recusal request with specific note regarding the number and names of persons who had been copied on that request. In that letter, RA alleged that my request for recusal was the equivalent of my harassing her.

On April 16, 2015, in front of multiple faculty members, RA accused me of responsibility for the anonymous graduate student letter. RA created a scene by yelling at me in the department in front of multiple witnesses, including Prof. Poole, undergraduate student Jessica Wu, and department registrar Virginia Gutiérrez. During this tirade, RA stormed into RGE's office. He muttered about me: "oh it doesn't matter, she'll soon be gone anyway."

Byrne000417

As I was interviewed by climate review attorneys Thomas and Goren on April 22, 2015, I was asked specific questions about previous testimonies given by others. Those questions allowed me to deduce the identities of those who gave that earlier testimony. RA was interviewed later, and repeatedly, throughout the summer. Witnesses to statements regarding the "Inquisition" RA said she was undergoing that summer include department administrative staff persons Virginia Gutiérrez and Susan Wheeler. RA would have, as easily as I had, been able to deduce from those question which earlier interviewees had provided that testimony. Specific details and documents I had provided could not have come from anyone but me. RA had further reason to retaliate against me.

On December 15, 2015, during a meeting to inform department members of the report on the climate review, Dean Gendler noted "fear of retaliation" as a problem in the department.

On the dates of February 11-12, 2016, I was out of town interviewing for a position at another university. NV sent me an email request for a meeting to communicate to me the result of my tenure review. I replied with note to being out of town. RA, NV and Yale Law School professor Kate Stith ("KS") strategized to extract the Internet Protocal Address ("IP address") from my emails, inadvertently copying me on some of those messages. The IP address provides location, which would allow RA, NV, and KS to identify the university where I was interviewing, and to attempt to blacklist me there. On my return, I asked RA, NV and KS if they wanted my IP address, as I knew what it was and could provide it. They failed to respond.

On any and all dates from the initiation of the climate review and subsequent title IX review, RGE was in a position to retaliate against me because I testified against him to both interviewing committees regarding, specifically, his unwanted playing with the hair of female students and colleagues, his juvenile attempt to impress his friend Giuseppe Mazzotta by surprising me with a kiss on the mouth in front of Giuseppe and hundreds of other colleagues during a party held for Mary Miller on May 13, 2014, the use RGE tries to make of the little "love couch" in his office, most recently with me when we met to discuss my 2014 APL proposal, and his dirty jokes, such as wishing to recover from a hip replacement surgery so that he might return to his favorite kind of sexual activity, standing up, a technique he pantomimed as he described it to me. Both RGE and RA were aware that I had been interviewed and, as Title IX coordinator Spangler noted, the details I offered were clearly identifiable as having come from me. I consider this type of crass sexual bullying juvenile. Nonetheless, I was asked to provide commentary and I did so, stating that RGE was "a liability to the university." For this testimony I provided in response to a request from Yale university, RGE had reason to retaliate against me.

THE RECUSAL REQUEST

Given the above, on April 1, 2015, I requested that RA and RGE recuse themselves from all matters related to my tenure review. I noted that RA and RGE had, each independently, indicated their clear intent to judge my tenure review in a manner that did not reflect my professional performance, and that together, with the help of NV, they had colluded to deny me a year-long sabbatical leave. I pointed out that they had fully demonstrated that incompatible concerns or aims, and criteria not related to my performance, would be unfairly used to evaluate me in a manner inconsistent with Yale policies and procedures. Further, I noted that their desire

to hold on to a 3-2 majority bloc vote in the department drove their behavior. I pointed out that their resistance was both a personal and a political conflict of interest.

On April 2, 2015, FAS Dean Tamar Gendler said that her office would make a determination on my recusal request, but only after an ongoing departmental climate review, begun on 27 March 2015 in response to a complaint from graduate students in the department, had concluded.

Later that week, on April 4 or 5, 2015, I saw Yale Law School professor Kate Stith consulting with RA in RA's office.

On April 13, 2015, RA wrote to say that she and RGE would not recuse themselves from my tenure review.

On April 13, 2015, Dean Gendler reiterated in another email that her office would determine the composition of the committee for my tenure review, as well as the eligibility of department members to participate, and Gendler again stated that this would be done only after the ongoing departmental climate review had concluded.

On April 19, Dean of Academic Affairs Jack Dovidio told me that the ongoing climate review would delay for several weeks the formation of an internal review committee, and reiterated Dean Gendler's determination to make a decision on my recusal request only at the conclusion of the climate review process.

On April 22, 2015, I was interviewed by the attorneys conducting the climate review. I provided full justification for my recusal request, including documents to show arbitrary and capricious contradictions made by RA and RGE during the 2014-2015 denial of my APL proposal.

On July 16, I asked Dean Gendler for an update on my recusal request. I noted that the linking of my recusal request to the departmental climate review had now led to a delay of three months in coming to a determination on the recusal request, and that in the interim RA had "made her animosity towards me obvious."

On July 24, Dean Gendler replied that NV would "serve as chair of your [my] promotion committee at least until the conclusion of the departmental [climate] review."

On August 12, I noted in a message to NV that I understood my recusal request had been "linked to the ongoing departmental climate review."

On August 13, NV told me that "we are unable to comment on your recusal request at this time" and added that Jack Dovidio would respond to that question.

On August 13, Jack Dovidio told me that the climate review was ongoing and that, therefore, no determination had been made on my recusal request.

On November 6, 2015, I again wrote to ask Dean Gendler for a determination on my recusal request.

On November 11, 2015, Dean Gendler replied to that request for a determination on my recusal request to say that "the issues that emerged from the climate review" would soon be discussed

with members of the department, and that only after those meetings would she be in touch with me and senior faculty in the department regarding my tenure review.

On December 14, 2015, Jack Dovidio informed me of certain non-standard procedures that would be followed for my tenure review such as, for example, his presence as an observer during all discussions. Dovidio indicated that there might not be any recusals, as there "may have been denials" to the issues raised in my recusal request. I noted the presence of witnesses to those statements made, and documents provided to the climate review committee regarding the APL debacle. Jack said that would be something I could bring up on appeal. I asked Jack if I would have a definitive written response to my recusal request, and he said that yes, I would receive the determination in writing from Dean Gendler.

On December 15, 2015, I wrote to ask Jack Dovidio if the 45-day clock to appeal the denial of my recusal request would begin with our conversation on December 14, or with the official written response from Dean Gendler. Dovidio assured me that the determination would be provided in writing, and that my 45 day clock for appeal would begin only on the date of that official document: "A 45-day period would begin on receipt of the day you formally receive information about the decision, as specified in the Handbook. Our discussion yesterday was about procedures and, as I explained, did not imply any particular outcome" (email, Dovidio to Byrne Dec. 15).

On January 19, Dean Gendler wrote to inform me of her decision to deny my recusal request. It is that denial that I herein appeal.

In sum, due to Dean Gendler's failure to grant my recusal request two known bad actors, RA and RGE, whose previous prejudicial actions towards me from September 11, 2014 through February 25, 2015 had been overseen by Gendler's office through John Mangan and Jack Dovidio, and whose comments regarding never granting tenure to anyone were famous in the department and well-known to the university community at large, were given free rein to take adverse employment action against me. They did so for various concerns and aims incompatible and in direct conflict with Yale's interest, policy, and procedures: 1) their existing, and contrary to Yale policy, biases towards the FASTAP system; 2) their prejudicial stance towards me as someone who would upset their power base in the department, and; 3) for retaliation because I spoke out openly on departmental abuses of university and public policy. RA's retaliation escalated, by February 11-12, 2016 and in concert with NV and KS, to spying on my whereabouts with the intent to cause me further professional damage outside of Yale.

From April 1, 2015 through January 19, 2016, Dean Gendler tied my recusal request directly to the departmental climate review. The report on that climate review provides direct corroboration for my recusal request, in the form of, as reported to the ladder faculty on December 15, 2015 by Dean Gendler, problems in the department with fear of retaliation, obvious enmities, evidence of biased discrimination in decision making, and specific abuse of the FASTAP promotion process through the use of subjective judgments on tenuring "as cover for improper motivations" (Gendler to dept. faculty, Dec. 15, 2015). The two senior colleagues who refused to recuse themselves, and who were not made to do so by an administration fully aware of their existing biases towards the FASTAP system and towards me specifically, defeated my reasonable expectation of a fair hearing on the merits.

REQUESTED RELIEF

As redress, I demand that the recusal request be granted, and that my tenure review case be re-submitted to the remaining senior faculty in the department for a fair determination and vote on the merits consistent with Yale policies as indicated by adoption of the FASTAP system.

Yours truly,

Susan Byrne

2 March 2016

Byrne 16

Byrne000421