# Exhibit 122

Notes on May 24, 2016 Meeting with SB Tenure Review Panel

Noël Valis

The meeting began at 11:30 and ended at approximately 12:40 p.m. I was unable to go through, point by point, the comments to SB's March 8, 2016 provostial letter.

The discussion focused a good deal on the APL proposal, but first the chair Steven Wilkinson, who asked many of the questions, asked about her initial hiring, whether we saw in her the potential for tenure and star quality. I replied that we hope and expect every junior hire to have potential for tenure, and this case is no different, but that it is very difficult to predict whether someone will be a star. We chose the best candidate at the time, but we could only choose from the pool of candidates we had. Wilkinson came back to this question near the end, saying this was probably hindsight, but would we have hired SB had we known what we know now. I said we thought she was a good candidate at the time. At the time, she had one book and some articles, but it was impossible to predict whether she would become a star. He asked whether there were some signs prior to her tenure review of potential problems. I noted that Rolena, Mary Miller, the Humanities Division had all told SB that she needed to work on her writing and her scholarship. Sue knew that she needed to improve. Someone asked whether that advice was in writing, and I said that Rolena would be able to answer that question better than I.

I noted that while we had unanimously voted to recommend her promotion to Associate on term, there was little enthusiasm for her case, that it was considered a solid case for that particular promotion but not a pre-tenure decision. I said that one senior colleague thought the book on Cervantes was competent but not well written. Another said that the Ficino project was rather conventional, a source and bibliographical study.

They asked me to comment on the APL proposal. I said the first one was in 2013; it was considered poorly done, and Sue herself had said it was "half-baked." Rolena asked then-dean Mary Miller to let SB have her leave later, for 2015-16. Mary agreed, and told Sue she should come up with a proposal in the spring so that there would be plenty of time to revise. Sue did not do so. I said that the panel had read our reports on the subsequent proposals, so I wouldn't comment on that, but that in any event, the APL proposal was completely irrelevant to her tenure, that the proposal was for a future project, that it did not figure at all in the tenure dossier materials submitted, that we did not discuss the APL proposal at the Internal Tenure Review Committee or later, that the only materials we considered for her tenure was completed work.

At another point I noted how much SB resisted our mentoring, that the process of the APL proposal was an example of mentoring, that if the person being mentored wasn't receptive, there isn't much that can be done. But again, we only judged the tenure dossier, for her tenure. Additionally, I noted that beyond the yearly mentoring session that RA held with junior faculty, there was unofficial mentoring going on with RA, NV, RGE (also her official mentor), and probably others.

Byrne000483

I was asked whether the same process for an APL proposal was followed in other, previous cases, and I said I honestly couldn't remember, but that there hadn't been a lot of them, that I believed that in a number of cases faculty promoted to Associate on term had taken positions at other institutions and may not have taken the APL. Paulo Moreira had taken his. But again, I reiterated that it was completely irrelevant. Marianne LaFrance asked me, as "devil's advocate" she said, whether the negative outcome of the APL proposal might have produced some bias against SB in the matter of her tenure, and I replied, firmly, that that was not the case, that would not be professional. I said that we judged her work.

The matter of the IP address search came up. I explained a bit of the chronology: that on February 9th the tenure decision had been made, that I had written to SB on the 11th to meet with her (along with FAS Dean of Faculty Affairs Jack Dovidio) on February 15th. SB did not reply until late that evening on the 11th, and I saw her message on the morning of the 12th. She said she had been out of town. I learned later that it was for a job interview.

I explained that the IP address had to do with the malicious manipulation of Roberto González Echevarría's Wikipedia page, that we had learned on the 13th February of that manipulation, after the tenure decision. (I was asked twice when we had learned of the Wikipedia manipulation. I pointed out that the two edited insertions were from January 20 and 28, 2016, before her tenure decision, but that we did not know about the manipulation of RGE's entry until February 13.) It had absolutely nothing to do with her job interview, and we certainly did not want to sabotage her job prospects. We wanted to find out who had edited his page, so we checked the editorial history, finding that it was a Yale IP address. We tried to see if it matched any number of possible people at Yale, such as *YDN* reporters Victor Wang and Emma Platoff, but we also considered people in the department, but Sue was not singled out. Near the end, Julie Dorsey returned to this matter, asking why SB was included, and I replied that she had become hostile toward RGE, in particular because of the APL proposal. When he met with her to go over the inadequacies of the proposal, she would not listen or accept any of our criticisms. I also noted that until that moment, the fall of 2014, we had all been collegial.

Julie Dorsey asked that if we had endorsed her APL proposal, would it have been possible SB might have produced an article from the leave, which might have made a difference in her tenure consideration. I replied that it was possible she might have produced an article, but that would not have made any difference in the tenure outcome, since what was important here were the books. We all know it takes years to produce a book.

Wilkinson asked me to comment on the tenure review process. I noted that SB's review was delayed a short time because of the climate review of the department, but that the administration clearly realized it needed to get going on the review, so I was appointed chair of the Tenure Review Committee on July 24 by Tamar Gendler, that by July 30 the Internal Review Committee was set up and approved (Gendler, Dovidio, Hungerford), that I consulted with TG, AH, and JD throughout, as well as the Steps for Promotion to tenure guidelines repeatedly, that the external

Byrne000484

evaluators were selected and approved by August 6. I was asked to explain how they were selected. I said that I consulted with members of the Internal Review Committee, with Amy, Jack and Tamar.  REDACTED

I suggested to SB that she might want to provide hard copies of her books to the Internal Review Committee, that it was not required, but would probably help, as it was easier to read them that way than on a computer screen or in the office where the only hard copy of the dossier was held. I also said to the panel that I made this suggestion because I thought it would benefit SB, so she would get the advantages of a careful reading. By early September the committee had the copies of the books. I said the materials were also made available in a timely manner on Interfolio, despite technical problems in uploading them.

Wilkinson asked what I thought about the addition of two external members (Howard Bloch and Giuseppe Mazzotta) to the Internal Review Committee. I said I was very happy with it. They provided an objective view of her case, as they had no ax to grind or stake in the matter. GM in particular was a good choice because he is a leading expert in the Italian Renaissance, knows Spanish and Spanish literature well; SB's latest book is on Ficino in Spain.

I was asked about the discussion at the February 3rd meeting of the Internal Review Committee. I said the Summary reflected that discussion, that we individually discussed SB's scholarship, that we considered the outside letters as well. I recalled that Howard was appalled at SB's poor understanding of medieval law; he himself is a medievalist. He too commented on the primer quality of the writing. Giuseppe thought she did not have a profound understanding of Ficino, but there were other problems as well. Three of the four of us did not consider her tenurable. It was ironic that David, who supported her tenure, nonetheless basically agreed that she was narrowly focused and did not produce a paradigm shift in the field. That she was competent and productive but not stellar, as is expected at Yale.

I was asked what I personally thought about her tenure case? I said she wasn't tenurable. I noted that they had seen my report, as well as the other reports and notes, and that I thought her writing was poor, that she was not particularly brilliant or original. The second book, on Cervantes and the law, was probably the best of the three, but that in producing the book on Ficino in Spain she had taken several steps backward. One would have expected this latest book to be even better than the second one, and that wasn't the case.

I was asked how the membership of the Internal Review Committee came about, in particular the two internal members. I said that, first, I was appointed chair, and that only left two senior people in the department to choose from, as we are five senior members and SB had asked that Roberto and Rolena recuse themselves. So that left only David and Aníbal to choose from.

Wilkinson said the panel was charged with considering the climate review of the department in relation to the tenure decision. He asked about the December 15, 2015, meeting with Gendler, Cooley and the ladder faculty. I had the opportunity to refute SB's characterization of the statements that Gendler made at that meeting. I noted that their statements were temperate, even neutral. I read aloud the single written document we have, that of Lynn Cooley, and said that basically this was what was said at the meeting with the ladder faculty on the 15th December. I also noted that Rolena's notes of the meeting, which RA had given me in December, do not reflect that intemperate language; and that Gendler said the administration did not "second guess" the decisions of the department in tenure matters. I noted that Wilkinson (and others) paid especial attention to that statement, and I repeated it. I also said that no one in the department had seen the climate review report, that no one was going to be able to see it, and that there were no written documents summing up the report save the one statement from Cooley.

Near the end, I was asked about some of the circumstances that had led to the climate review. I said it went back initially to the issue of hiring the wives of David Jackson and Aníbal González. I said successive chairs had refused to hire David's wife, as it was nepotism. We had offered Aníbal's wife a one-time, non-renewable three-year lector contract, but he had disputed that and become embittered. Then later, he burst into the chair's office, accompanied by a male graduate student, shouting and intimidating Rolena, saying she had shown bias toward "his" students in their sixth year by not giving them teaching assignments (those students whose dissertation he was directing). That was not the case, as no sixth year students had gotten teaching assignments, as at the time there weren't any available slots, this was before the new sixth year, and it was, additionally, very difficult to ask for TFs in literature courses because of the 30 student minimum enrollment. Emily Bakemeier knew about this, asked AG to apologize to RA, but he never did. This is all documented. (LaFrance paid especial attention to this account of AG's behavior.) With hindsight, perhaps RA should have filed a complaint against AG, as EB suggested she might want to do, but perhaps he still would have ended up even more embittered. I said his embitterment increased with the Sarah Piazza case. I explained her failed attempts at producing an acceptable prospectus; ironically, I was not DGS at the time and did not participate in the evaluation. At any rate, she did all right, as she is now in the Comp Lit program. AG took it personally, however.

Then there were the two tenure cases, Paulo Moreira and SB. My point, I said, was that aside from the personal motives of DJ and AG (the matter of hiring their wives), in these other cases, there were faculty disagreements on matters of substance (a graduate student's prospectus; two tenure cases), and the minority could not accept the majority view. I said I was very grateful that Jack Dovidio had said at the February 9th meeting when the tenure vote occurred that faculty can

have disagreements on matters of substance, but that that did not necessarily indicate bias. That was important. Colleagues have to accept such disagreements.

I said the climate review came about because of an anonymous letter, filled with misinformation and lies. That I, along with others in the department, was very upset that a full-fledged review would occur on the basis of an anonymous letter. That it was compounded by the *YDN* article. I asked them if they knew how many *YDN* articles had appeared on our department. No, they said. Eight, I replied, since March 2015. Eight. And each time the reporters repeat the same unsubstantiated allegations without ever bothering to find out if they are true or not.

Asked what I thought could be done to improve the situation, I said I just wanted our colleagues to be colleagues. I myself would be happy to sit down and talk individually with AG and DJ. But the single thing that could improve matters would be to hire new people, that we were down a number of positions, that we desperately needed new blood, that we had been asking for these hires even before the events of the last year. Should they be junior or senior faculty? I said I thought it would be good to hire a senior person to replace the late, great María Rosa Menocal, but that we also needed a couple of junior hires, in Portuguese/Brazilian and one other. I also mentioned that the solution was not to get rid of senior faculty, as appeared to be the desire of the minority, who to begin with did not like RA as chair. I pointed out that it was precisely the people who were most visible in the department, nationally and internationally, and who were directing a good many of the dissertations against whom a campaign was being waged.

I said I would be happy to appear again in front of the panel, as there were many things in the two SB letters that were not covered and that there were lies SB had written in them. I noted that I had said that an hour would not be sufficient. After I left the room, I was asked (by Kim Zarra, I think) whether I would be available the afternoon of May 31st, from 2:00 to 5:30, and I said, yes of course, though it was not clear exactly what the purpose was.

Byrne000487