# Exhibit 137

Dear Alex:

I write to bring to your attention, and through you the other relevant Officers of the University, an on-going apparent violation of the rights of senior tenured members of a department of the Faculty of Arts & Sciences that enjoys a well-deserved international reputation for excellence. I refer to the Department of Spanish and Portuguese.

I have served as a volunteer adviser to three of the Department's senior tenured professors in connection with a so-called "climate" investigation of the Department that was initiated by the Provost, the Dean of the Faculty of Arts & Sciences, and the Dean of the Graduate School on March 24, 2015. That investigation now appears to be closely related to the effort by a candidate for tenure to deprive two of these professors—both holders of Sterling professorships,

[Page]

BYRNE017053

the University's highest academic rank—of their right to participate in that matter, on the basis of an alleged "conflict of interest." The professors were taken off any participation in the tenure matter, pending the conclusion of the "climate" investigation. The suggestion of disqualification is without merit and without a basis in University norms, regulations, traditions, or "common law." It is a species of professional defamation of these two distinguished scholars, and it is a serious violation of the canons of fairness and due process guaranteed to tenured members of Yale's faculty. I write as someone who has worked closely with four successive Yale administrations in sensitive projects and inquiries, and who respects Yale's academic leadership, in order to help forestall any further baleful consequences.

BYRNE017054

I.

First, a contractual and procedural point: I have been unable to find a basis in the Faculty Handbook for any disqualification in these circumstances. On April 1, 2015, Associate Professor Susan Byrne sent a letter to Professor Rolena Adorno, the Department chair, asserting that she and Professor Roberto González Echevarría be recused from the projected tenure consideration of Professor Byrne due to conflicts of interest. At the time, the Faculty Handbook provided in section IV.H.1 that "A member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all votes taken on that individual." (emphasis added).[1] The

---

[1] That provision was deleted in the September 18, 2015 version of the Faculty Handbook, and was replaced with a starred footnote in new section IV.F.1. (there is no "call" for this footnote). The footnote states, "A member of the faculty who has a conflict of interest concerning an individual on whom a vote is to be taken must absent him or herself from all discussions and all votes taken on that individual."

provision did not define what constitutes a "conflict of interest." However, section XX. 1.D. of the Handbook provided (and continues to provide):

> It is expected [ ] that one member of a family will not be present during discussion of, nor participate in decisions affecting, the appointment promotion, salary, or other terms of employment of another member of that family. . . . [and other] persons sharing an intimate relationship similarly must avoid being present during, or participating in, such decisions affecting the terms of employment of each other. In cases of doubt or conflict of interest, employment judgments should be determined by other qualified professional persons. In the case of academic appointments, these persons would act under the supervision of the Provost and the appropriate Dean.

(emphasis added).

BYRNE017056

In other words, being a member of the same family, or having an intimate relationship with a candidate, creates a conflict of interest, and such persons are (understandably) recused from promotion deliberations. But what of cousins, brothers-in-laws, and the like? Or of a close friendship that is no longer intimate? Or of a failed or successful intimate relationship by one party with a family member of the other? Or of persons who jointly own a private venture whose value will be reduced if one of them must leave Yale? These presumably would be cases in which the Provost or Dean could decide whether recusal is appropriate in light of the particular relationships and circumstances presented. (I have difficulty understanding what the difference is between a "professional" conflict of interest and a "personal" conflict of interest, and note that this distinction is not made in the current Faculty Handbook.)

No other conflicts of interest discussed in the Faculty Handbook mention promotion or other employment decisions. These other conflict-of-interest provisions relate primarily to outside activities (whether or not for remuneration), and they do not explicitly anticipate such conflicts having a bearing on promotion deliberations.

Of course, there may be other reasons, grounded in violation of Yale policies, as stated in the Faculty Handbook, for the Provost or Dean to ask a faculty member to recuse him or herself—for example, if a professor announced that he or she would vote for no person of a particular race or ethnicity or gender. But surely in a university worthy of the name, there can be no "conflict of interest" or other basis for recusal simply because of a disagreement as to the interpretation of tenure standards, disagreement on the quality of a candidate's scholarship, disagreement as to the academic fields as to which a candidate has done his or her strongest work

BYRNE017058

to date, or disagreement as to the merits of a candidate's previous research proposals.

The on-going, *de facto* disqualification of these two Sterling professors (pending completion of an unprecedented "climate" review, which is now in its eighth month, with no signs of completion soon) is a continuing violation of Yale's policies and its guarantees of academic freedom.

II.

Turning to the merits of the matter: Professor Byrne in her April 1, 2015 letter (which was the first time that Professors González Echevarría and Adorno were alerted to her accusations against them) presents no actionable basis for recusal. My own conversations with these two professors and with Professor Noël

BYRNE017059

Valis—and their testimony before the climate reviewers on this matter—leaves me confident beyond any reasonable doubt that Professor Byrne's over-the-top allegations, presumably made under great personal stress, are untrue if not libelous. It is a great disappointment that the Provost and Deans set in motion an Orwellian "climate" review—a review without definition of terms and without stated limits—on the basis, in part, of such allegations.[2] After months of reviewing testimony and materials, the reviewers and the University's officials should by now have a clear idea of who is telling the truth and who is not.

But let me suspend disbelief as to the accuracy of Professor Byrne's allegations. As to Professor González Echevarría: None of the alleged statements

---

[2] I infer, given what I learned over the course of the last seven months, that these allegations (and possibly the request for disqualification) were communicated to the University before the decision was made in late March 2015 to launch a "climate" review of the Department, a review that seems to have focused only on Professors González Echevarría and Adorno.

[Page]

regarding Professor Byrne and tenure prospects at Yale can possibly be a basis for recusal. Let us assume, for the argument, that Professor González Echevarría said that he considered Professor Byrne to be a "Cervantista"; that he counseled her that "no one ever gets tenure at Yale"; and that he remarked at some time, "No one will ever get tenure in our department." We are in a sorry state, indeed, if such informal oral comments—and in the last instance, a prediction that no individual professor has the power to make come true—could properly be the basis for the denial of the rights of a tenured professor and the academic freedom and autonomy of a department.

As to Professor Adorno, it's not even clear what allegations Professor Byrne has made, so I have no "disbelief" to suspend. Professor Byrne's April 1, 2015 rendition of her accusations against Professor Adorno was full of conclusory words

[Page]

that were meant to startle or outrage the uninformed.[3] I infer from these blunderbuss phrases that Professor Byrne intends to suggest that Professor Adorno was "out-to-get-her" (after years, it must be noted, of extended formal and informal mentorship). But stripped of the heavy-handed, abusive language, there are no material allegations. In hours of recorded testimony before the "climate" reviewers and submissions of emails, reports, and summaries, Professor Adorno has proven—in a process that no professor should ever endure in the future—that her dealings with Professor Byrne, and judgments of her work, were undertaken in complete good faith. It is shocking that this distinguished scholar and long-time servant of the University has been put through such an ordeal—regarding not only her past dealings with Professor Byrne but also just about every other aspect of the

---

[3] See, e.g., "colluded", "combined political interest," "defaming", "professional libel," "calculated attempt", "sabotage" "FASTAP be damned" [not clear if that's meant to be an alleged quotation], "contrived", "fabricated", "scheme", "pretenses", "ploys and feints", "mal intent," "forethought, predisposition and prejudicial acts".

BYRNE017062

Department's life, including those over which a chair has no individual authority to act without a vote of her colleagues.

At least Professor González Echevarría testified before the reviewers for only one hour, and Professor Valis for less than four. Professor Adorno testified for 24 hours, over the course of six sessions between May 4 and July 7, 2015. In preparing for these sessions, she had to spend literally hundreds of hours finding, retrieving, collating, summarizing, and appending scores of emails, contemporaneous telephone conversation notes, meeting notes, submitted materials (not just to Yale), and other documents that might conceivably be relevant to a "climate review" that was apparently triggered by a carefully-timed "anonymous" letter (about the origins of which the reviewers seemed curiously uninterested) and Professor Byrne's nearly contemporaneous request to disqualify Professors González Echevarría and Adorno.

Yale can and should prohibit a variety of forms of discrimination. It has no authority, however, in public or university law to prohibit discrimination on the basis of academic judgments and standards. Were it to be learned that Yale had taken away the vote of tenured professors on a promotion because they allegedly had exceedingly high standards for tenure,[4] I assure you that faculty at Yale and elsewhere would be as shocked as I am.

If the University wants professors to use a lower standard of tenure for internal candidates, it should do this forthrightly by changing its articulated standard(s).

---

[4] As allegedly evidenced (the reviewers' topics of interest suggested) in a previous tenure vote—as to which the Provost did not ask for reconsideration and the candidate did not seek a review—and in the professors' evaluation of research proposals of the candidate at hand.

[Page]

I urge you and other Officers to avoid any suggestion that Yale has violated its covenant of good faith and fair dealing with its faculty.

Thank you for your consideration.

Sincerely,

Kate Stith

Lafayette S. Foster Professor of Law

BYRNE017065