# Exhibit 148

```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
 2

 3    * * * * * * * * * * * * * *
      SUSAN BYRNE,                    )
 4                                    )
               Plaintiff,             )
 5                                    ) Civil Action No.
         vs.                          ) 3:17-CV-01104 (VLB)
 6                                    )
      YALE UNIVERSITY, INC.,          )
 7                                    )
               Defendant.             )
 8    * * * * * * * * * * * * * *

 9

10

11             DEPOSITION OF:  ROLENA ADORNO

12             DATE:  FEBRUARY 22, 2019

13             HELD AT:  MADSEN, PRESTLEY & PARENTEAU, LLC

14                       402 Asylum Street

15                       Hartford, Connecticut  06103

16

17

18

19   Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

20

21

22

23             CASSIAN REPORTING, LLC
                21 Oak Street - Suite 307
24             Hartford, Connecticut  06106
                    (860) 595-7462
25           scheduling@cassianreporting.com
```

Case 3:17-cv-01104-VLB   Document 82-148   Filed 05/15/19   Page 3 of 40

```
1    in the Spanish and Portuguese Department?

2        A.    Do you mean current members in the department?

3    Do you mean of the current faculty who was there at the

4    time?

5        Q.    So what I mean is actually just at that time

6    in 1996, who was on the faculty?  And then separately we

7    will go through how that membership has changed.

8        A.    Okay.  So in 1996, there were Full Professors

9    Maria Rosa Menocal, Roberto González Echevarría,

10   Josefina Ludmer, David Jackson.  Those are full

11   professors.  Maria Rosa, Roberto, Josefina, David

12   Jackson.

13           Now you'll ask me about other ranks, I would

14   have to check on that because I'm a bit confused as to

15   was somebody there as an assistant professor at the time

16   or did that person come on the following year.  But this

17   is the senior faculty.

18       Q.    We can simply focus on the senior faculty,

19   that's fine.

20           Currently, who are the senior faculty members

21   in the Spanish and Portuguese Department?

22       A.    Okay.  We have David Jackson, Roberto González

23   Echevarría, myself, Nöel Valis and Anibal

24   González-Pérez, and let's see, the three of us were

25   hired in that order of the current professor faculty.  I
```

Case 3:17-cv-01104-VLB   Document 82-148   Filed 05/15/19   Page 4 of 40

1    was hired in '96.  Nöel Valis in '99, and Anibal

2    González-Pérez in 2006.  I'm thinking about the year

3    2006.  So may I say 2005 or 2006.

4         Q.    Sometime around --

5         A.    But that was the time period, and as I recall,

6    yeah, so that's the source of my confusion, when the

7    appointment was made and when he came on full-time.

8         Q.    At any point during the time that you've been

9    at Yale, were you chair of the Spanish and Portuguese

10   Department?

11        A.    At any time since I've been at Yale?

12        Q.    Yes.

13        A.    Yes.

14        Q.    During what time period?

15        A.    The period was 2005 to 2016.

16        Q.    And who appointed you chair?

17        A.    The president of the university.  In this

18   case, there were two of them, Richard C. Levin, followed

19   by Peter Salovey.  The reason for that is that the term

20   of chair in the faculty of arts and sciences is a

21   three-year term, and so that meant I was appointed four

22   times.

23        Q.    And did you resign as chair in 2016?

24        A.    My fourth term ended, and this is the way it

25   ended.  The final year would have been -- was 2016, '17,

Case 3:17-cv-01104-VLB  Document 82-148  Filed 05/15/19  Page 5 of 40

 1    restating that question?

 2       Q.    Are you aware of any complaints in 2009 by

 3    students and/or faculty members regarding them being

 4    offended by RGE's conduct?

 5       A.    No.

 6       Q.    Are you aware of any complaints in 2009 by any

 7    member of the Yale community regarding them being

 8    offended by RGE's conduct?

 9       A.    No.

10       Q.    And at some point, you received a copy of an

11    anonymous letter in early March 2015?

12       A.    That's right.

13       Q.    And when did you first see that letter?

14       A.    It was distributed on the Friday, I think that

15    was Friday, March 6th.  I was in Washington, D.C.  And

16    the first I knew of it was an email written by a

17    graduate student saying, I disavow the whole thing.  I

18    had no idea what he was talking about.  I was on a

19    train.

20            And then it was when I got home, that would

21    have been a Saturday, I guess that's the 7th of March, I

22    went to the department.  I'd been away to the meeting of

23    the National Council on Humanities in Washington, and

24    then I found the letter in my mailbox.  It was a paper,

25    paper copy, paper letter.

Case 3:17-cv-01104-VLB   Document 82-148   Filed 05/15/19   Page 6 of 40

1   Q.   And what was your response when you saw the

2   letter?

3   A.   I was horrified.

4   Q.   Did you share the letter with anyone else at

5   that point?

6   A.   I didn't need to.

7   Q.   Because the letter had been sent

8   department-wide; correct?

9   A.   Yeah.  And when I picked it out of my mailbox,

10  my mail slot, I saw that it was obviously in all the

11  other mail slots.  It wasn't in an envelope.  It was

12  just distributed like this.

13  Q.   And there were also subsequent Yale Daily News

14  articles about the anonymous letter; correct?

15  A.   And how.

16  Q.   More than one article?

17  A.   Oh, yes.

18  Q.   More than three articles?

19  A.   I'll just say probably.

20  Q.   Likely several articles?

21  A.   I'd say if I can put it at several, I'd be

22  glad because I think that's pretty much it, yes.

23  Q.   And did you ever embark on trying to figure

24  out exactly who wrote the anonymous letter?

25  A.   No, because malevolence -- I've been waiting

```
 1   between yourself and Professor Valis --

 2       A.    Yes.

 3       Q.    -- dated March 22nd, 2015.

 4             Have you seen -- I'm assuming that you've

 5   seen -- strike that.

 6             Have you seen Exhibit 135 before, as it is, a

 7   series of emails between yourself and Professor Valis?

 8       A.    Have I seen it before?

 9       Q.    You've seen these documents before; correct?

10   Strike that.

11             So at the bottom, it is an email from you that

12   you wrote; correct?

13       A.    Correct, yes.

14       Q.    And in your email, you say, I pull out in the

15   following paragraph an excerpt from an email that I

16   shared with you when you were at the clinic.  I believe

17   it is a gun that smokes if you compare it with two

18   statements on page 1 of the anonymous letter.

19             Do you see where I'm reading from?

20       A.    I do.

21       Q.    And this was your attempt to compare two

22   statements, it sounds like?

23             MR. SALAZAR-AUSTIN:  Objection.

24       Q.    You say, If you compare it with two

25   statements.
```

```
 1        A.    Two statements on page 1 of the anonymous

 2   letter, uh-huh.

 3        Q.    So you were comparing a statement on page 1 of

 4   the anonymous letter with what other document?

 5        A.    An email that I received from Sue Byrne, also

 6   sent to Jack Dovidio, on Friday, January 9th.

 7        Q.    And this was an email that Sue Byrne had sent

 8   you about the APL proposal issue?

 9        A.    Yeah, she sent it to me and to Jack Dovidio,

10   yes.

11        Q.    Why were you trying to compare page 1 of the

12   anonymous letter with an email that you had received

13   from Sue Byrne in the past?

14        A.    Well, right now I can't tell who the subject

15   of "find a way to have us dismissed from the program"

16   is, in the first paragraph.

17        Q.    When you are quoting from some document?

18        A.    Yeah, it looks like I'm quoting from two

19   statements on page 1 of the anonymous letter.

20        Q.    Was this to try to ascertain whether Professor

21   Byrne was involved in the writing of the anonymous

22   letter?

23        A.    No.

24        Q.    What was the purpose of this comparison?

25        A.    Well, the purpose of the comparison was,
```

```
 1    wasn't it coincidental?  Because something is
 2    coincidental doesn't make it causal.
 3         Q.    So my question was whether you were trying to
 4    ascertain whether Professor Byrne was involved in the
 5    writing of the anonymous letter, not whether you had
 6    decided.
 7              Do you understand the difference?
 8         A.    I do.
 9         Q.    Okay.
10         A.    I do.  No.  What I'm, you could say, certainly
11    frustrated about is how the same wave of, the same
12    resonance comes through more than one kind of thing we
13    have.  One is the anonymous letter, it talks about
14    censoring any attempts to make complaints known.  Then
15    here in Sue's memo to Jack and me talking about,
16    claiming she's seen the same gag order tactic in the
17    past.  That sounds like censor, gag order; okay, I see
18    those.
19         Q.    But this is not you comparing the language
20    between those two documents to see if there are any
21    similarities?
22         A.    I'm looking for similarities, but coincidence
23    doesn't mean that they are causally related, but I was
24    certainly concerned to see resonances of these things,
25    which come up, come up -- come up, yeah, because one is
```

1  before the other.

2     Q.    So was it through the examination of these two

3  documents that you determined that Professor Byrne was

4  not involved in the writing of the anonymous letter?

5     A.    I didn't determine anything on this basis.

6     Q.    So what was the purpose of engaging in this

7  exercise if not to reach some sort of determination?

8     A.    It was a simple -- this is March, okay.  So if

9  this is March, we are going back to January.  Times were

10  tough.  And when you see these things repeating

11  themselves, variations obviously, censorship, gag order,

12  getting people removed from the program, those are --

13     Q.    Themes?

14     A.    -- themes, yeah, yeah.

15     Q.    So it sounds like you were more trying to see

16  whether there were consistent patterns between this

17  January email to yourself and Jack Dovidio and the

18  anonymous letter.

19     A.    The subsequent anonymous letter and many other

20  documents too.

21     Q.    You are nodding your head yes; I just want to

22  make sure we pick that up.

23     A.    Yeah, yeah, yeah.  I'm not looking for

24  causality there, but I'm looking for patterns and themes

25  that are emerging over this very, as I said, distressing

```
 1        A.    No.  I don't, no.

 2              MS. HOWARD:  I think this is a good time

 3   for a lunch break.

 4              (Whereupon, the witness was excused and a

 5   lunch recess was taken at 1:11 p.m.)

 6

 7                        *  *  *

 8                     AFTERNOON SESSION

 9                        1:53 p.m.

10   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11   R O L E N A   A D O R N O,

12        having been previously duly sworn and/or affirmed,

13        resumed the stand, testifying further on her oath

14        as follows:

15   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

16        DIRECT EXAMINATION BY MS. HOWARD (continued):

17        Q.    So we are back on the record, Professor

18   Adorno, and just like before, you are still subject to

19   the same oath that you swore earlier.

20        A.    I am aware.

21              (Exhibit 35, previously marked.)

22        Q.    I'm going to hand you what was previously

23   marked Exhibit 35, which is an email from yourself to

24   Professors Stith, Valis and Echevarría and Judge

25   Cabranes.
```

```
 1              Please take a moment to look at the document

 2    and let me know when you are done.

 3                          (Pause.)

 4        A.    Okay, all set.

 5        Q.    So Exhibit 35 appears to be an April 19th,

 6    2015 email from you to Professor Stith, Valis and

 7    Echevarría, as well as Judge Cabranes.

 8              Did you ever send the attachment, the

 9    memorandum that you've attached, to anyone other than

10    these four recipients?

11        A.    I may have included it in the documentation

12    for the climate review, but I cannot affirm that; I

13    don't know.

14        Q.    And on the second page of the document, so the

15    beginning of the memorandum, the second header, which is

16    April 16th, 2015, Pursuit of RA by SB, exchanges with

17    her in Roberto's office.

18        A.    Yes.

19        Q.    So the text that follows that header, is there

20    anything contained in that text that is inaccurate?

21              MR. SALAZAR-AUSTIN:  Objection.

22        A.    Would you like me to read the whole memo?

23        Q.    Just the portion under that header, April 16,

24    2015, Pursuit of RA by SB.

25        A.    Okay, so I've read this and so you'd like me
```

```
 1    to go through --

 2        Q.    Up through the third header, April 17.

 3        A.    Yeah, thank you.

 4                    (Pause.)

 5        A.    There is nothing inaccurate in my own remarks,

 6    no.  And I see this as an accurate account of that

 7    meeting.

 8        Q.    And during the ladder faculty meeting, did you

 9    ever point to Professor Byrne and say words to the

10    effect of, You did this?

11        A.    No, not at all.

12                    (Exhibit 116, Emails, Bates Number

13                    BYRNE004838, marked for identification.)

14    BY MS. HOWARD:

15        Q.    So I'm handing you what's been marked

16    Plaintiff's Exhibit 116.  Please take a moment to review

17    it and let me know when you're done.

18                    MR. SALAZAR-AUSTIN:  Claire, while the

19    witness reads that, I just noticed that there are

20    initials of a student's name here, that probably should

21    be redacted.  It wasn't caught because initials are hard

22    to catch in the QC.  So we might request to substitute

23    this if you don't object and just redacting those

24    initials.

25                    MS. HOWARD:  I think we'd reserve the
```

```
 1        A.    Okay.

 2        Q.    Do you recall any other additional

 3   conversations that you had with individuals outside of

 4   the Yale community about Professor Byrne during 2015?

 5        A.    I don't know whether I'm answering the

 6   previous question again or another question.

 7        Q.    So let me rephrase the question then and try

 8   again.

 9              Did you have any conversations with any

10   individuals outside of the Yale community about

11   Professor Byrne during 2015?

12        A.    Yes.  Regina Harrison.

13        Q.    Other than Regina Harrison, did you have

14   conversations with anyone else?

15        A.    Not to my recollection.

16        Q.    Who is Regina Harrison?

17        A.    She is a colleague at the University of

18   Maryland, long, longtime friend.

19        Q.    What does Professor Harrison teach?

20        A.    She teaches Latin America literature and --

21   yeah.

22        Q.    You are pointing to a particular section.

23        A.    Yeah, I'm sorry.  I'm pointing to -- because

24   this is -- I see where it all began, when Reggi writes

25   to me, I reread the topic of conversation, but I had a
```

1    good time analyzing the problem because I care about

2    what happens.

3            And that is because I was -- this was in the

4    thick of the climate review, and I'm with all of these

5    colleagues from other institutions at the John Carter

6    Brown Library in Providence.  Reggi Harrison was there

7    as well, and she and I were good friends for a long

8    time.  And I asked her just to be my bodyguard, because

9    I didn't want to get involved in conversations about the

10   climate review, about the Yale Daily News, about what

11   was going on in the department at the time.

12       Q.    So what --

13       A.    The anonymous letter, you know, because this

14   is what, May?  Yeah, this is May of 2015.  So these were

15   all ripe topics for conversation.  We had the anonymous

16   letter; we had the announcement of the climate review;

17   we had it reported in the Yale Daily News and that was

18   it, and so, you know, people are kind of buzzing around,

19   so yes, I spoke with her.

20       Q.    What problem did Professor Harrison help you

21   analyze?

22       A.    Yes, what problem did she help me analyze?

23   Well, it was the problem of this whole constellation of

24   things that were happening at the same time and getting

25   a longer view on it.  She is about my age and so she has

1    several years in the academy, in the university as well,

2    and it was about when things go sour, how do you deal

3    with them?  And that included Sue Byrne.

4        Q.    And what advice did Professor Harrison offer

5    you?

6        A.    Her advice, as I recall it, was just to hang

7    on, see where things went, stay cool, don't talk to the

8    Yale Daily News.

9        Q.    And how did it include Professor Byrne?

10       A.    Well, obviously we had -- in that case, we had

11   the March 25th letter and the Yale Daily News in which

12   she is cited, so it certainly included her, and she was

13   one, as you remember as we looked at it, was one of

14   those people who gave positive comments, saying that she

15   got along and the department meetings were always civil

16   and so forth, but she was there.

17            But remember that -- I'm remembering now that

18   by this time she had demanded -- let me add -- she had

19   demanded our recusal, Roberto's and my recusal from the

20   tenure consideration and that -- to which I make

21   reference here.  And that would have occurred, yeah, a

22   month before that.

23       Q.    So the problem that Professor Harrison was

24   helping you solve with respect to Professor Byrne was

25   the recusal request --

```
 1        A.    Yes.

 2        Q.    -- and her involvement in the March 25th Yale

 3   Daily News article?

 4        A.    Yeah, but now that I look at this more

 5   carefully, I will tell you that it was even more than

 6   the news article.  It was the demand for recusal because

 7   senior faculty members, you know, are commissioned to

 8   participate in the academic judgment of their peers.

 9   And remember, this was the -- she had asked -- she had

10   demanded -- she had asked -- demanded you might say our

11   removal from her tenure case at that point.  And I spoke

12   about this issue of being recused or having the recusal

13   demanded of one and what the university administration

14   had not done, wouldn't do, didn't do in the end.  This

15   is a very serious matter for academics.

16        Q.    And did --

17        A.    And -- excuse me, sorry.  And she is not just

18   somebody that I kind of met.  You know, this is a friend

19   of about 35 years time.  So it's an intimate friend.

20        Q.    And this idea of senior faculty members being

21   commissioned to participate in academic judgment of

22   their peers, is this idea something that you gleaned

23   from the assistance of Professor Stith?

24        A.    No.  I as a tenured senior faculty member

25   since 1985, I know exactly how this works.  The tenured
```

```
 1   plane, it was the same flight, right, then she got

 2   acquainted with Dr. D, whom I was with there, on the

 3   plane, and then the three of us went together by cab to

 4   whatever various hotels we were going to for the

 5   meeting.

 6         And let's see -- so what else would you like

 7   to ask me?  That's the context for this, Dragiyski.

 8   Q.    So in your email to Dr. D, you say in the

 9   second full sentence, April Fool's day blow.  SB demands

10   my recusal from her tenure consideration.  Another

11   missive, like the anon letter of March 6th, filled with

12   vicious accusations, all lies.

13         Do you see where I'm reading from?

14   A.    I do.

15   Q.    And so again, you are comparing a document

16   written by Professor Byrne to the anonymous letter; is

17   that correct?

18   A.    Uh-huh.

19         MR. SALAZAR-AUSTIN:  Objection.

20   Q.    So you murmured again.

21   A.    It is like, yes, another missive, like the

22   anonymous letter filled with vicious accusations, yes.

23   Q.    Okay.  But yet you did not think that

24   Professor Byrne actually wrote the anonymous letter when

25   you -- in April 2015?
```

```
 1       A.    No, I did not.

 2       Q.    Why were you comparing her April 1st letter to

 3  the March 6 anonymous letter --

 4       A.    Because of the language.

 5       Q.    I have to finish.

 6             MR. SALAZAR-AUSTIN:  Allow her to finish

 7  the question.

 8       Q.    Why were you comparing Professor Byrne's

 9  April 1st letter to the March 6th anonymous letter if

10  you did not think that Professor Byrne had a hand in

11  writing the anonymous letter?

12       A.    Because the language was so over the top,

13  "over the top" meaning to say something like the

14  language was so negative and vicious that I could not --

15  I'm a literary critic; I could not help but compare the

16  language of those two things.

17       Q.    You compared the language of those two things?

18       A.    Yeah.

19       Q.    But you still did not think that Professor

20  Byrne actually wrote or had a hand in writing the

21  anonymous letter?

22       A.    No.

23       Q.    Because in April 2015, you had not reached any

24  conclusions about who the writer's identity of the

25  anonymous newsletter could be?
```

```
1      A.    And I did not then and I never have.

2      Q.    And who is Dr. D?

3      A.    Boncho Dragiyski is a Hispanist like myself,

4  we are in the same field, Professor Byrne as well, so

5  let's call it Spanish literature.  He was at the time

6  assistant professor at Duquesne University -- yes,

7  Duquesne, I see by the email, but it's definitely in

8  Pittsburgh, and he and I are friends.

9      Q.    Did you ever tell Dr. D that you suspected

10  Professor Byrne of being associated with the anonymous

11  letter?

12      A.    No, not that I recall.  That's, no, I don't

13  recall.  I'm just looking at this memo.

14      Q.    Which memo are you pointing at?

15      A.    Excuse me, Document Exhibit 118, yeah, where I

16  have compared the language "vicious accusations" and

17  then the interpretation "all lies."

18      Q.    So just so I'm clear, it's that you don't

19  recall whether or not you ever told Dr. D that you

20  suspected Professor Byrne of being associated with the

21  anonymous letter?

22            MR. SALAZAR-AUSTIN:  Objection.

23      A.    I don't recall.  I don't say that there.

24      Q.    So I'm actually a little confused by your

25  answer, that's why.  Let me ask a slightly different
```

1      Q.    So the April 7th email that you sent to Dr. D,

2   was that before the April party that you had for

3   Professor Valis?

4      A.    I believe that it was, but I cannot be sure.

5   I don't know.

6      Q.    So at some point, Professor Stith served as

7   your advisor; is that correct?

8      A.    She is my friend, yes.

9      Q.    But she also served as your advisor; is that

10  correct?

11     A.    Are you -- well, in the lay sense of the word,

12  yes, she was my -- I'm not sure I would say advisor.

13     Q.    How would you describe the relationship during

14  2015 with Professor Stith?

15     A.    I would say one good friend helping another

16  because one of them is a lawyer and the other one is

17  not.

18     Q.    But you would not describe Professor Stith as

19  your attorney?

20     A.    No.

21     Q.    So you would not describe Professor Stith as

22  your advisor, just to be clear?

23     A.    Okay, because that's the question I couldn't

24  ask you, if "advisor" was a legal term.

25     Q.    So what I would say is that when I'm asking

 1   you for your opinion, I'm asking for it based on your

 2   understanding of the term.

 3              So with that being said, how do you define

 4   "advisor"?

 5      A.    Depends on the situation.  I mean, I can be an

 6   advisor to a graduate student, which is different from

 7   being an advisor.  I go back to this is one good friend

 8   helping another, and the one who is helping is a lawyer

 9   and the one who needs the help is not.

10      Q.    So she was a friend helping you as an

11   attorney?

12      A.    She was a friend helping me as a friend.

13      Q.    Who happens to be an attorney?

14      A.    Who happens to be an attorney, that's right.

15      Q.    But not an advisor, and I mean that in a

16   layperson sense of the term "advisor."

17      A.    No, not an advisor, no, because -- no.

18              MR. SALAZAR-AUSTIN:  Could we just take a

19   two-minute break?

20              MS. HOWARD:  I just want to get through

21   this particular thread and then absolutely.

22              MR. SALAZAR-AUSTIN:  It's just that I

23   would just like to speak to my client on an issue that

24   bears on where you are right now testimony-wise.

25              MS. HOWARD:  Okay.

Case 3:17-cv-01104-VLB   Document 82-148   Filed 05/15/19   Page 23 of 40

```
 1                    MR. SALAZAR-AUSTIN:  I just want to

 2     clarify something which I think will help the record,

 3     that's up to you.

 4                    MS. HOWARD:  I think this next thing will

 5     help the record also so -- I think.

 6                    (Exhibit 23, previously marked.)

 7     BY MS. HOWARD:

 8        Q.    I'm just going to hand you what's been

 9     previously marked as Plaintiff's Exhibit 23.  It is an

10     email from Judge Cabranes to Professor Valis, yourself,

11     Professor Stith, Professor RGE.

12        A.    Okay.

13                    MS. HOWARD:  I'm sorry, there are two

14     copies of the same thing?

15                    MR. SALAZAR-AUSTIN:  I have it, thanks.

16                    MS. HOWARD:  Is this also a copy you

17     don't need?

18                    MR. SALAZAR-AUSTIN:  Yes, I have it right

19     here.  Thank you.

20                    (Pause.)

21        A.    Yes, I've finished.

22        Q.    So Exhibit 23, as I said before, is an

23     April 2nd email from Judge Cabranes, you are included in

24     the cc line, and the email starts, I think a short

25     letter from each of the three professors asking Kate to
```

```
 1    serve as his/her advisor and to accompany the professor

 2    to any meeting with university administrators would

 3    serve adequately.

 4            Do you see where I'm reading from?

 5    A.    Yes.

 6    Q.    It seems like Judge Cabranes was recommending

 7    that Professor Stith serve as your advisor.

 8            Is that a fair reading of this email?

 9    A.    It is a fair reading.

10    Q.    Having reviewed Exhibit 23, did Professor

11    Stith in fact serve as your advisor?

12    A.    Well, we -- does this -- I can't ask a

13    question.

14    Q.    If you are confused about my question, please

15    let me know.

16    A.    Yeah.

17    Q.    You don't have to raise it as a question.  You

18    can just tell me exactly how you are confused.

19    A.    Thank you.  This is very helpful.  So I was

20    under the understanding that to count as advisor in this

21    sense, there would need to be a letter of request and

22    acknowledgment.

23    Q.    A representation agreement?

24    A.    Yes.

25    Q.    Some sort of documentation?
```

1    A.    Yeah.

2    Q.    Okay.  And so that's why I had asked earlier

3    if she was your advisor in a layman's term

4    understanding.  So I was specifically not asking in a

5    legal context whether she was your advisor.

6    A.    Yes.

7    Q.    And earlier, you had testified that even as a

8    layperson -- in terms of a layperson understanding of

9    the term "advisor," that Professor Stith was not your

10   advisor.

11   A.    I was --

12   Q.    Would you like to revise that testimony?

13   A.    I would like to say that if you consider as an

14   advisor somebody who helps read through, review what

15   you've written for logic, coherence, sometimes spelling,

16   if that counts as an advisor, then she would be my

17   advisor.

18   Q.    My questions, to be clear, as I said before,

19   are simply whether you would consider, what your opinion

20   is.

21   A.    What my opinion is, yeah.

22   Q.    You don't need to answer with respect to what

23   I would consider.  I'm looking for what you consider,

24   for us to be clear.

25   A.    Right.

1        Q.    And then on the next page, the header The

2    Consequences Of The University Review Of The Department

3    and How To Compensate For Them.

4        A.    Uh-huh.

5        Q.    Yes?

6        A.    Yes, thank you.

7        Q.    So under the header Sue Byrne, which is on

8    3816, you have a kind of numbered list, so Number 6 on

9    that list reads, A person who is a source of hostile

10   invective about others should not be heard to then

11   complain about a hostile environment, especially when

12   the responses to hostile invective are measured and

13   respectful.

14           Do you see where I'm reading from?

15       A.    Yes.

16       Q.    So when you are saying a person is a source of

17   hostile invective, are you describing Professor Byrne?

18       A.    Yes.

19       Q.    Invective, that's an interesting choice of

20   word, very specific.  How do you understand the term

21   "invective" to mean.  Strike that.

22           What do you understand the term "invective" to

23   mean?

24       A.    False accusations I think is what I'm

25   thinking, but it's late in the day and I don't have a

 1  dictionary.  Invective, yeah, I would say something like

 2  that, vituperation.

 3      Q.    And so are these notes for you to bring into

 4  your meeting with the administrators to have a set of

 5  talking points?

 6      A.    I believe that's how they were prepared, yes.

 7      Q.    So that you felt prepared going into the

 8  meeting?

 9      A.    Yes.

10      Q.    As opposed to the March 23rd meeting where you

11  were blindsided?

12      A.    Exactly.

13      Q.    So the last page of Exhibit 119, again, on

14  your numbered list, Number 11, you have a discussion

15  about receivership.  You say, On receivership, what is

16  the basis for receivership?  What does it mean?  What

17  does the administration hope to accomplish with

18  receivership?

19          Do you see that?

20      A.    Where are we.

21      Q.    Last page, Bates Number 3813.

22      A.    3813.

23      Q.    It's the absolute final page.  It's a

24  front-and-back document.

25      A.    Sorry.

```
 1    that is coming forward.  I'm sure that we did that in

 2    December of 2016, because remember, in December of 2015,

 3    there is no appointment to be made.  There is no nothing

 4    to be done at that point.

 5        Q.    Were you ever asked about recommendations for

 6    who the new chair of the department should be?

 7        A.    No, that is never done.  Never done.  You cut

 8    off the dead hand.  Haven't you heard that expression?

 9    Get that one down, it's good, you cut off the dead hand,

10    yeah.

11        Q.    And that's what you felt the administration

12    was doing in appointing a new chair?

13                MR. SALAZAR-AUSTIN:  Objection.

14        A.    No.  I just know that you don't get -- you

15    don't get to name your own replacement.  The president

16    of the university doesn't get to name his own

17    replacement and nobody else does either, right down to

18    the humble, wood-chopping, water-carrying chores of the

19    chair of an academic department, no.

20                THE REPORTER:  Is this a good time for a

21    break?

22                MS. HOWARD:  Yes, let's take a break now.

23        (Recess taken from 3:39 p.m. to 3:50 p.m.)

24    BY MS. HOWARD:

25        Q.    We are back on the record, Professor Adorno.
```

```
 1        Q.     Well, I'm asking about your recollection.

 2        A.     Okay.  My recollection is no, I didn't advise

 3   her on what to say, no.

 4        Q.     And during the climate review interviews, were

 5   you told by the interviewers to keep the information

 6   that you were asked confidential?

 7        A.     I think so, because they had to file a

 8   confidential report.

 9        Q.     And so they assured you that they would also

10   keep your information confidential?

11        A.     They did.  They did, which is why I gave them

12   so much.

13        Q.     Did the interviewers express any concern about

14   Professor Stith taping the interviews?

15        A.     No.

16                    (Exhibit 120, Emails, Bates Numbers

17                    BYRNE012153 through 12154, marked for

18                    identification.)

19   BY MS. HOWARD:

20        Q.     Did you ever talk with Professor Stith about

21   what was discussed during RGE's interview?  Strike that.

22   I believe I already asked you that question.

23                I'll just show you Exhibit 120.  So 120 is a

24   front and back, a series of emails between yourself and

25   Professor Stith on April 30th, 2015.
```

```
 1        A.     Okay.   Do we start on the backside?

 2        Q.     If you want to go sequentially, it will start

 3   from the back and work its way to the front.

 4        A.     Yes.   And they made sure they were not

 5   fact-finders, uh-huh.   Eager to hear about their visits.

 6   Okay.   Well, there you are.

 7                        (Pause.)

 8        A.     All right.

 9        Q.     So Exhibit 120 as I mentioned is a series of

10   emails between yourself and Professor Stith on

11   April 30th.

12             So on the first page, Bates Number 12153,

13   Professor Stith states, Please see comments below, and

14   so her email continues in fact to the back page, which

15   is Bates Number 12154.

16        A.     Right.

17        Q.     And so it looks like what Professor Stith is

18   doing is taking your email and then responding in

19   italics.

20        A.     Oh, I see, yes.

21        Q.     So your email starts, Good morning, Kate, and

22   you have a numbered list.   She is responding in italics

23   to each of the items on your list.

24        A.     Right.

25        Q.     Is that correct?
```

1    A.    Yeah, I think that is absolutely right,

2    absolutely correct.

3    Q.    And so on Number 4 of this numbered list, you

4    say, I nevertheless will be connected, quotation marks,

5    with all of you throughout these days, eager to hear

6    about Nöel's and Roberto's visits.

7    A.    Right, so I guess we could say that I would

8    have heard about them.  But yeah, I have no recollection

9    of them, but maybe you have more documents that will

10   tell me what I learned.

11   Q.    So on Number 7 of the numbered list, also on

12   Bates Number 12154, you say, Would you send me and Nöel

13   your final edited version of Roberto's memo.  And then

14   underneath, Professor Stith says, Will do, once I get to

15   my office where the memo is, and it continues on, So I

16   shall send it today to both of you.

17         Do you see that?

18   A.    I do.

19   Q.    Then it does look like in fact you did at

20   least receive a copy of RGE's memo to the climate

21   reviewers?

22   A.    Evidently I did.

23         May I add something to my answer there?

24   Q.    Sure.

25   A.    It wouldn't make much difference because what

```
 1    I had to share with the climate reviewers as chair of
 2    department was different than what Nöel and Roberto
 3    would have as faculty members.  I felt that my charge
 4    was very different.  Nöel would have responded as the
 5    director of graduate studies, certainly as a faculty
 6    member, but with that in mind as well, and Roberto, for
 7    his issues, whatever they were, and I for this broader
 8    overview.  This is why I have no recollection of
 9    learning about whatever it was they told me.  I had such
10    a broad agenda to cover.
11        Q.    So knowing what Professor Valis said in her
12    interview did not help you with coordinating what you
13    were going to say during your interview; is that
14    correct?
15              MR. SALAZAR-AUSTIN:  Objection.
16        A.    Insofar as I was not the director of graduate
17    studies, that's a different -- you know, it's a
18    different departmental role and office.
19        Q.    But you are also a faculty member of the
20    department as is Professor Valis.
21        A.    Absolutely, so I would see no reason to
22    coordinate what she was going to say with what I was
23    going to say.
24        Q.    Then why did you want to know what Professor
25    Valis was saying during her interviews?
```

1   there in abundance.

2      Q.    In 2013?

3      A.    When did she go up? I think that was in 2013.

4   Yeah, yeah, yeah. I had high hopes for her.

5      Q.    Actually, speaking of Professor Byrne's

6   promotion to associate professor on term, as chair of

7   the department, were you involved in the decision to

8   promote Professor Byrne?

9      A.    Yes, of course.

10      Q.    How were you involved?

11      A.    I chaired the committee and I was responsible

12   for presenting the nomination for the promotion to the

13   faculty and the humanities, that is, the arts and

14   sciences in humanities that adjudicates those -- that

15   adjudicates those, I want to say nominations --

16   appointments, appointments. Yeah, of course.

17      Q.    And was there a meeting where the faculty

18   members deliberated on whether to promote Professor

19   Byrne to --

20      A.    Absolutely. That's a requirement.

21      Q.    And was there more than one meeting or one

22   meeting?

23      A.    Well, there was one meeting to vote, and that

24   is a secret ballot vote on any promotion, reappointments

25   as well, and that is a requirement of the faculty of

```
 1   arts and sciences regulations and procedures.

 2            The review for her promotion was carried out

 3   by one subcommittee that worked on her scholarship.  We

 4   have the three areas, teaching, scholarship and service.

 5   And so I'm not recalling at the moment.  This was 2013,

 6   but yes, there were those committees.  They presented

 7   their, shall we call them internal subreports we'd like

 8   to say to the full voting faculty; that's the senior

 9   faculty.  And the senior faculty must take a ballot

10   vote, a secret ballot vote, and the names of those who

11   voted is on a list.  But it's not -- you know, because

12   it's a secret ballot.

13            And then after that, I as chair prepared the

14   departmental summary and that -- and the candidate and

15   Sue had to present publications.  We sent them out for

16   eternal review -- external review.  And then when all of

17   this was gathered and the senior appointments committee

18   had the opportunity to read all the materials, then I

19   was called before the committee to present the case.

20            This committee is multidisciplinary faculty.

21   So the questions don't just come from the fields of

22   literary studies and various languages, but, you know,

23   all across the faculty of arts and sciences.

24       Q.    The subreports that the committees did for

25   teaching, scholarship and service, were these conveyed
```

```
 1   orally or by writing?

 2       A.    I think they must have been written down.  I'm

 3   almost positive of that, but I'd have to really go back

 4   into that record again.  So I'm not going to say, but

 5   they were thorough reports that I recall.  They were

 6   presented orally to the whole faculty, because that's

 7   where you do it, you know, the confidentiality of all

 8   those documents.  And then we voted, and yeah, it was a

 9   unanimous vote, as I recall.

10       Q.    And the departmental summary that you

11   prepared, was this departmental summary then distributed

12   to any individual or --

13       A.    This departmental summary is prepared for the

14   next adjudicating body, which would be that senior

15   appointments committee.

16       Q.    And did you have any other documents with you

17   at the meeting of the senior appointments committee to

18   structure your presentation to them?

19       A.    Yeah.  I had -- I had certainly prepared

20   notes, and I certainly consulted with Sue about what

21   major points I didn't want to miss, you know, because

22   the individual scholar can always say, well, yeah, but

23   you should have mentioned that because that's very

24   important, you know, within my community of

25   conversation, of academic conversation.  But as I
```

```
 1      A.    Yes.

 2                 (Exhibit 79, previously marked.)

 3    BY MS. HOWARD:

 4      Q.    I'm handing you what's been previously marked

 5    as Plaintiff's Exhibit 79.  I don't have specific

 6    questions about the content; I just would like for you

 7    to confirm that these are notes that you took of the

 8    deliberations for Professor Byrne's tenure application.

 9      A.    Yes.

10      Q.    And why did you take notes?

11      A.    I took notes -- I took notes after the meeting

12    so that I would have a clear recollection of it and

13    pretty specific.

14      Q.    And did you share your notes with anybody?

15      A.    I see that it's redacted in the way I did with

16    white-out tape.  Yes, to the general counsel's office.

17    And I very likely shared them with Nöel.

18      Q.    Did you share your notes with RGE?

19      A.    I don't believe so.

20      Q.    Did you share your notes with Professor Stith?

21      A.    I don't remember.

22      Q.    Did you share your notes with anybody else?

23      A.    This is from 2016.  Not to my recollection.

24      Q.    And you voted against granting Professor Byrne

25    tenure; is that correct?
```

1     A.    Yes, I did.

2     Q.    And why?

3     A.    The quality of her academic work at that

4 point. I spoke earlier about, yes, a good book in my

5 view for the promotion to associate on term, but that

6 upward trajectory was not met in the subsequent book,

7 the one that is -- the early one for promotion was on

8 Cervantes and then the next one -- for promotion to

9 associate, and then for a promotion to tenure was the

10 Vicino book, Vicino in Spain.

11     Q.    Did the external letters factor into your

12 decision to vote against granting Professor Byrne

13 tenure?

14     A.    Yes, along with many other factors because

15 there is no determinant factor in making such a

16 decision, in my experience, and the way I do it. There

17 is no one factor that can make or break a case.

18     Q.    Was there any factor that was the primary

19 factor in your decision?

20     A.    Yes, there was, and it was, I'm sorry to say,

21 the quality of that book. I had very high hopes for it.

22 When we promoted her the first time, I really did have

23 the very highest hopes for her.

24     Q.    And then at some point, Professor Byrne

25 appealed the denial of tenure; is that correct?

```
 1   general counsel's office might have asked you, then you
 2   should -- and it was an independent reason of your own,
 3   then you should answer the question.
 4                 THE WITNESS:  There was not an
 5   independent reason of my own.
 6                 MS. HOWARD:  Let's mark this.
 7                 (Exhibit 122, Notes, Bates Numbers
 8                 BYRNE000468 through 475, marked for
 9                 identification.)
10                 (Exhibit 123, Notes, Bates Numbers
11                 BYRNE000476 through 479, marked for
12                 identification.)
13                 (Exhibit 124, Notes, Bates Numbers
14                 BYRNE000480 through 482, marked for
15                 identification.)
16   BY MS. HOWARD:
17      Q.    So I'm going to hand you three documents,
18   Exhibits 122, 123 and 124, and I have no questions about
19   the details of these documents.
20      A.    Okay.
21      Q.    I simply am looking for you to confirm whether
22   you've authored that.
23                 MS. HOWARD:  That is Exhibit 122 that
24   I've just handed you, David.  This is 123 and this is
25   124.
```

```
 1                    MR. SALAZAR-AUSTIN:  Thank you.

 2         A.    Yes, indeed.  And --

 3                    MR. SALAZAR-AUSTIN:  I think you can just

 4    wait until --

 5         Q.    Right, so let me know when you are done

 6    flipping through the documents, and then we will get

 7    through them pretty quickly.

 8         A.    Okie-dokie.

 9                         (Pause.)

10         A.    Exhibit Number 122 is of my authorship, yes.

11         Q.    And Exhibit 123, is that also a document that

12    you authored?

13         A.    Exhibit 123, yes, is also of my authorship.

14         Q.    And then Exhibit 124?

15         A.    And Exhibit 124 refers -- yes, it is also of

16    my authorship.

17         Q.    And so it appears that you met with the tenure

18    appeals review committee three times?

19         A.    That's correct, yes.

20         Q.    And was Professor Stith present for any of

21    these meetings?

22         A.    No.

23         Q.    Why not?

24         A.    The climate review was over.  This is a

25    different procedure.
```

```
 1                   C E R T I F I C A T E

 2     STATE OF CONNECTICUT

 3          I, SANDRA SEMEVOLOS, a Registered Merit
       Reporter and Notary Public within and for the State of
 4     Connecticut, do hereby certify that I reported the
       deposition of ROLENA ADORNO on FEBRUARY 22, 2019, at the
 5     offices of MADSEN, PRESTLEY & PARENTEAU, LLC, 402 Asylum
       Street, Hartford, Connecticut  06103.
 6
            I further certify that the above-named
 7     deponent was by me first duly sworn to testify to the
       truth, the whole truth and nothing but the truth
 8     concerning her knowledge in the matter of the case of
       SUSAN BYRNE, vs. YALE UNIVERSITY, INC., now pending in
 9     the UNITED STATES DISTRICT COURT, for the DISTRICT OF
       CONNECTICUT.
10
            I further certify that the within testimony
11     was taken by me stenographically and reduced to
       typewritten form under my direction by means of COMPUTER
12     ASSISTED TRANSCRIPTION; and I further certify that said
       deposition is a true record of the testimony given by
13     said witness.

14          I further certify that I am neither counsel
       for, related to, nor employed by any of the parties to
15     the action in which this deposition was taken; and
       further, that I am not a relative or employee of any
16     attorney or counsel employed by the parties hereto, nor
       financially or otherwise interested in the outcome of
17     the action.

18
            WITNESS my hand this 7th day of March, 2019.
19

20

21

22     _____
       Sandra Semevolos, RMR, CRR, CRC, CSR #74
23     Notary Public
       My Commission Expires:  September 30, 2020
24

25
```