# Exhibit 151

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3   * * * * * * * * * * * * * *
     SUSAN BYRNE,                    )
 4                                   )
                  Plaintiff,         )
 5                                   )  Civil Action No.
         -vs-                        )  3:17-CV-01104 (VLB)
 6                                   )
     YALE UNIVERSITY, INC.,          )
 7                                   )
                  Defendant.         )
 8   * * * * * * * * * * * * * *

 9

10

11

12

13        DEPOSITION OF:  ROBERTO GONZÁLEZ ECHEVARRÍA

14        DATE:       DECEMBER 14, 2018

15        HELD AT:    MADSEN, PRESTLEY & PARENTEAU, LLC
                      402 Asylum Street
16                    Hartford, Connecticut   06103

17

18

19      Reporter: Bethany A. Carrier, RMR, CRR, CSR #071

20

21

22

23                  CASSIAN REPORTING, LLC
24                21 Oak Street - Suite 307
                  Hartford, Connecticut 06106
25                     (860) 595-7462
                  scheduling@cassianreporting.com
```

```
 1        Q    Did you review any documents in preparation for
 2   your deposition today?
 3        A    Yes.
 4        Q    What documents?
 5             MS. CHAVEY:  I'm going to instruct
 6        you not to answer the question to the extent
 7        it would ask you documents that I selected and
 8        provided to you, because that's protected by
 9        the attorney work-product doctrine.  But to
10        the extent you reviewed documents outside of
11        our meeting, then you may answer the
12        question.
13   BY MS. HOWARD:
14        Q    You're shaking your head.  Did you -- so did you
15   review any documents outside of your meeting with Attorney
16   Chavey?
17        A    No.
18        Q    Okay.  And aside from Attorney Chavey, are you
19   being represented by any other counsel?
20        A    No.
21        Q    What is your current position?
22        A    I am the Sterling Professor of Hispanic and
23   Comparative Literature at Yale University.
24        Q    And when did you become a Sterling Professor?
25        A    I don't really remember.  In the '90s at some
```

```
 1        Q    And then for the 2014/2015 school year, between
 2   that school year and the 2015/2016 school year, is it your
 3   testimony that you only received a 1 to 2 percent pay
 4   increase?
 5        A    As far as I can remember, yes.
 6        Q    Has there been any time period in the last ten
 7   years that you've received more than a 1 to 2 percent pay
 8   increase between school years?
 9        A    I don't think so.  I don't think so.  But I
10   can't remember.  It's never been anything worth
11   remembering.
12        Q    Do you know Professor Kate Stith?
13        A    Yes, I do.
14        Q    How do you know Professor Stith?
15        A    I have known her for quite a few years.  She's
16   in the law school at Yale.  She's also married to Judge
17   Jose Cabranes, who has been a friend of mine for many
18   years.
19        Q    Did you become introduced to Professor Stith
20   through Judge Cabranes?
21        A    Yes.
22        Q    And so have you known Professor Stith for over
23   ten years?
24        A    I would say, yes.
25        Q    And Professor Stith was your advisor with
```

```
 1    respect to the recent climate review of the Spanish and

 2    Portuguese department?

 3                 MS. CHAVEY:  Objection.  Go ahead.

 4                 THE WITNESS:  Yes, she was.

 5    BY MS. HOWARD:

 6         Q    Was Professor Stith your advisor in any other

 7    respect?

 8         A    No.

 9         Q    So was Professor Stith your advisor in the Title

10    IX complaint process during the late 2015 -- during --

11    strike that.

12                 So was Professor Stith your advisor during the

13    UWC, University-Wide Committee process -- complaint

14    process during 2016?

15         A    If I understood you correctly, I missed the

16    initials there.

17         Q    The UWC.  The University-Wide Committee.  There

18    was a UWC panel.

19         A    Yes.

20         Q    And she was your advisor in that process?

21         A    Yes.  I think so.  Yes.

22         Q    Were there -- was there any other area in which

23    Professor Stith was your advisor, other than the two areas

24    we just talked about?

25         A    No.
```

```
 1        Q    And during the time period that Professor Stith

 2   served as your advisor, did you listen to her advice?

 3        A    Yes.

 4        Q    Did you follow her advice?

 5                  MS. CHAVEY:  Objection.  You can

 6        answer it.  I'm objecting to the form.

 7                  THE WITNESS:  Yes.

 8   BY MS. HOWARD:

 9        Q    Has there been any time -- strike that.

10             During the time period that Professor Stith

11   served as your advisor, was there any time that you

12   disregarded her advice?

13                  MS. CHAVEY:  Objection.

14                  THE WITNESS:  I don't recall.

15   BY MS. HOWARD:

16        Q    And did you ever sign any sort of legal

17   representation agreement with Professor Stith?

18        A    I think I did.

19        Q    Do you recall when you signed this agreement?

20        A    Not exactly when, no.

21        Q    Do you recall why you signed this agreement?

22        A    It seemed that it was needed or something and

23   that's why I signed it.

24        Q    Was -- did you -- strike that.

25             Did you sign the agreement before or after the
```

Case 3:17-cv-01104-VLB   Document 82-151   Filed 05/15/19   Page 7 of 21

1              You see where I am?

2       A    Yes.  I am aware.

3       Q    And you recall writing those parts?

4       A    Oh, yes.  Yes.

5       Q    And at the time that you wrote these words, was

6  that an accurate statement?

7       A    Oh, yes.  Yes.  This was a letter that was

8  trying to be generous for a junior colleague who is going

9  for a position elsewhere and I'm trying to help her.

10      Q    Was this an accurate statement however?

11      A    As accurate as can be, yes.

12      Q    And overall, the letter of recommendation that

13  you wrote for Sue Byrne, was it an honest letter?

14      A    Oh, yes.  I always write honest letters of

15  recommendation.  And it is an honest letter at that point

16  and -- for what it was.

17      Q    When you say "for what it was," what do you mean

18  by that?

19      A    Meaning for a job at Duke University.  She did

20  not get the job.

21      Q    And so you continue on in that next sentence to

22  say, Her work is sustained and of laudable quality and her

23  scholarly interests genuine and enduring.  Sue Byrne

24  speaks near-native Spanish.

25      A    That is true; her Spanish is good.  Near native,

```
 1    but not native.

 2         Q     And so that statement was also accurate?

 3         A     Yes.

 4                    MS. CHAVEY:  Objection.

 5                    THE WITNESS:  Objection?

 6                    MS. CHAVEY:  I'm objecting to the

 7              form of the question.  But you're entitled to

 8              answer it.

 9                    THE WITNESS:  Sure.

10    BY MS. HOWARD:

11         Q     Unless your attorney instructs you not to answer

12    the question, you're to answer the question.

13                    MS. CHAVEY:  If at any point I

14              instruct you not to answer the question, I'll

15              make that clear to you; otherwise, I'm

16              objecting to the form for the record and that

17              will be resolved later.

18    BY MS. HOWARD:

19         Q     In looking at your letter of recommendation that

20    you wrote for Sue Byrne, as you sit here now, is there

21    anything that you disagree with in your letter?

22                    MS. CHAVEY:  Objection.

23                    MS. HOWARD:  Let me actually

24              rephrase that, because that's a bit of an

25              awkwardly phrased question.
```

Case 3:17-cv-01104-VLB   Document 82-151   Filed 05/15/19   Page 9 of 21

```
 1   BY MS. HOWARD:

 2       Q    In looking at your letter of recommendation,

 3   Exhibit 26, that you wrote for Sue Byrne, as you sit here

 4   now, is there anything that you disagree with?

 5              MS. CHAVEY:  Objection.  I don't

 6         understand the question, so I'm objecting to

 7         the form.

 8   BY MS. HOWARD:

 9       Q    Do you understand my question, Professor?

10       A    Why don't you ask me again.

11       Q    As you sit here now, is there anything that you

12   disagree with in Exhibit 26?

13              MS. CHAVEY:  Objection.

14              THE WITNESS:  No.  I mean, I think

15         that it was a letter in which I was trying to

16         be generous for a junior person who is vying

17         for a job at Duke University.

18   BY MS. HOWARD:

19       Q    But as you testified earlier, it was a letter

20   that you were being -- in which you were being honest.

21   Correct?

22       A    Oh, yes, yes, yes.  I always try to tell the

23   truth in the letter of recommendation.

24       Q    Is there anything inaccurate in your letter?

25       A    I don't think so.
```

```
 1   occurred?

 2        A     No.  I don't remember the date.

 3        Q     Do you recall the year?

 4        A     It could be 2015.  Yes.

 5        Q     It was after the climate review was completed?

 6        A     Right.  Yes.

 7        Q     Other than the training in 2015, have you

 8   under -- have you -- other than the training in 2015, have

 9   you taken any other sexual harassment training as a Yale

10   employee?

11        A     Not that I can remember.

12        Q     So you didn't undergo any sexual harassment

13   training in 2009?

14        A     Not that I can remember.  I may have, but I

15   don't remember.

16        Q     Are there any other documents that would help

17   you recall?

18        A     Not that I can recall.

19              MS. HOWARD:  All right.  We're at

20        Exhibit 30.

21              (Plaintiff's Exhibit 30,

22        Confidential letter, June 15, 2016:  Marked

23        for identification.)

24   BY MS. HOWARD:

25        Q     Okay.  You've been handed what's been marked
```

```
 1   Plaintiff's Exhibit 30.  And this is a letter from

 2   yourself to Professor Michael Della Rocca, the chair of

 3   the UWC panel.  Is that correct?

 4        A    Excuse me.  Yes.

 5        Q    Would you like a moment to read the document?

 6        A    Yes.

 7        Q    Okay.  Let me know when you're done.

 8        A    Yes.

 9        Q    So do you recall -- you recall this document?

10        A    Yes.

11        Q    So this is a memo that you wrote on June 15,

12   2016.  Correct?

13        A    That's correct.  Yes.

14        Q    And in the memo you state that -- in the third

15   full paragraph, As best I recall, in 2009 or so,

16   then-provost Peter Salovey with Jon Butler, then-dean of

17   the graduate school also in attendance, told me that some

18   students and/or faculty members had reported being

19   offended by my conduct.

20             Do you see where I'm reading?

21        A    Yes.

22        Q    And then the paragraph continues on a couple of

23   sentences later to say, The best way to proceed, the

24   provost told me, was for me to take sexual harassment

25   training.
```

```
 1              Do you see --
 2        A    Yes, I remember that.
 3        Q    So do you now recall taking sexual harassment
 4   training in 2009?
 5        A    Yes.  Yes.
 6        Q    What was that training?
 7        A    I went to a meeting with many other people.  And
 8   it was a general presentation about sexual harassment and
 9   this and that.  It was, you know, general, as I said.  Not
10   exactly very illuminating, but, you know, fine.
11        Q    Was it a day-long meeting?
12        A    No.  No.  It was not a day-long meeting.
13        Q    It lasted shorter than a day?
14        A    Oh, yes.  I don't remember exactly how long it
15   lasted.
16        Q    And you describe it in your letter, and also
17   just a moment ago, as "not particularly illuminating."
18        A    Yes.
19        Q    Why?
20        A    It wasn't specific enough.  It was very general,
21   as I recall now.
22        Q    And the training that you did in 2005 with
23   Stephanie Spangler, the department did --
24        A    No.  No.  2015.  2015.
25        Q    I'm sorry.  So the training you did in 2015 with
```

```
 1        A     No.  I mean, I -- you know, frankly, I didn't
 2    think much about it.
 3        Q     When you say "it," you mean the letter?
 4        A     Yes.
 5        Q     So after you received the letter, you didn't
 6    think about it afterwards?
 7                 MS. CHAVEY:  Objection.
 8                 THE WITNESS:  That is impossible to
 9         say.  How could I not think about it?  Of
10         course.  We were voted the best department in
11         Spanish and Portugese in the United States a
12         few years ago.  I don't know if you read that
13         somewhere.
14    BY MS. HOWARD:
15        Q     Which year?
16        A     I don't know.  Two, three years before this.
17    Which meant the best department in the world.  And I was
18    very proud because the department as it was became what it
19    was under my chairmanship.  I was chair for 16 years off
20    and on.
21        Q     So then were you concerned about your reputation
22    after receiving this letter?
23        A     Not my reputation.
24        Q     Were you concerned about the department's
25    reputation?
```

```
 1        A    Well, yeah.  She's already a professor when I
 2   sent her this.  Yes.
 3        Q    So I saw you laughing while you're reading the
 4   email.  What part of the email made you laugh?
 5        A    I forget now what it was.
 6        Q    So what I'd like for you to do is since the
 7   email is written in Spanish, your portion of the email,
 8   that first paragraph at the top that you write -- wrote to
 9   Professor Birkenmaier, if you wouldn't mind translating
10   and reading for the record your email to Professor
11   Birkenmaier.
12        A    Dear Anke, you are very disciplined and know how
13   to administer your time.  My method was to get up very
14   early, do my work, my research and writing, and around 11
15   to call Sandra -- it was a typo there -- to ask her how
16   things were going in the department.  By the way, Sandra,
17   died a little over a month ago.  It has hurt me greatly.
18   The whole thing in the department has been the work of
19   Anibal, A-n-i-b-a-l, and some juniors who didn't get
20   tenure or who fear they are not going to get it, above
21   all, Sue Byrne, who has turned out to be diabolical.  But
22   the administration legitimated them, ordering an
23   investigation of the department.  I know that I have your
24   support and that of many other former students of mine.  I
25   miss you greatly.  Kisses.  Roberto.
```

```
 1        A    I think it may have been my graduate student and
 2   TA, Matthew Tanico, T-a-n-i-c-o, who discovered it, and
 3   actually who also changed it for me.
 4        Q    So by the time Matthew Tanico came to you to
 5   tell you about the alteration, he had already changed it
 6   back?
 7        A    No.  He changed it back after that, I think.
 8        Q    So just so I understand the sequence, Mr. Tanico
 9   came to you, told you about an alteration to your
10   Wikipedia page, got your approval to make the change
11   back?
12        A    I think that's the way it went.  But, again, the
13   memories here are not specific.
14        Q    As far as you recall?
15        A    Yes.  As far as I recall.
16        Q    That's the sequence.  Well, would Mr. Tanico be
17   able to make changes to your Wikipedia page without your
18   approval?
19        A    I think so.  I mean, they can do anything they
20   want.  We can be --
21        Q    I mean, to rectify a problem?
22        A    Yes.  Yes.
23        Q    But you do recall Mr. Tanico coming to you to
24   tell you about the problem?
25        A    If it was he who told me.  But I know it was he
```

```
 1   who changed it.

 2              (Plaintiff's Exhibit 40, Robert

 3       González Echevarría Wikipedia page:  Marked

 4       for identification.)

 5   BY MS. HOWARD:

 6       Q    So you've just been handed what has been marked

 7   Plaintiff's Exhibit 40.  Please let me know when you've

 8   had a chance to review the document.

 9       A    Yes.  I've seen it.  This is what it was.

10   Yes.

11       Q    So this is the Wikipedia page that Mr. Tanico

12   told you had been altered?

13       A    Or somebody told me.  And he changed it.

14       Q    But someone told you that it had been altered?

15       A    Yes.

16       Q    And in particular, the last paragraph above,

17   "Works"?

18       A    Yes.

19       Q    That is the paragraph that was altered and added

20   into your Wikipedia page without your permission?

21       A    Right.  Yes.

22       Q    And just so we're clear, it's the paragraph that

23   starts, In March, 2015, Echevarría was accused of ongoing

24   sexual harassment.  Okay.

25              And so after you were told about that paragraph
```

```
 1   being added to your Wikipedia page, you then had

 2   Mr. Tanico remove that paragraph?

 3       A    And replace it with something more flattering.

 4       Q    As you can actually see at the top of Exhibit

 5   40, there's a box and it says, This is an old revision of

 6   this page as edited by 130.132.173, open paren, talk,

 7   close paren, at 2:38, 20 January 2016.

 8            Do you see that?

 9       A    Yes.

10            (Plaintiff's Exhibit 41, Robert

11       González Echevarría Wikipedia page:  Marked

12       for identification.)

13   BY MS. HOWARD:

14       Q    You've been handed what's been marked

15   Plaintiff's Exhibit 41.  Please let me know when you're

16   done reviewing the document.

17       A    This is the same thing.

18       Q    So this is actually a -- let me actually start

19   with a couple of basic questions.

20            Do you recognize this document?

21       A    Well, but it's the same one you showed me

22   before.

23       Q    So, in fact, if you look at Exhibit 41 at the

24   top, which is the one that's in your hand, at the top it

25   says, This is an old revision of the page, right before
```

```
 1                   THE WITNESS:  No.  Actually, I am

 2        surprised that permission was needed, because

 3        I thought people just made changes to

 4        Wikipedia at will.  But I am not an expert on

 5        Wikipedia or care very much about it.

 6   BY MS. HOWARD:

 7        Q    But it must have been embarrassing to have

 8   that?

 9        A    Yes, it was, once I found out.  Yes.

10        Q    And since the paragraph that I read before, the

11   one that starts, In March, 2015, Echevarría was accused of

12   ongoing sexual harassment, since that paragraph has been

13   removed from your Wikipedia entry, have you -- has anyone

14   asked you about your Wikipedia page --

15        A    No.

16        Q    -- and that allegation?

17                   (Plaintiff's Exhibit 42, Robert

18        González Echevarría Wikipedia page:  Marked

19        for identification.)

20   BY MS. HOWARD:

21        Q    And you have just been handed what's been marked

22   as Plaintiff's Exhibit 42.  Please take a moment to read

23   it and let me know when you're done.

24        A    Yes.

25        Q    So this is a different copy of your Wikipedia
```

```
 1   page.  Correct?

 2        A    That's correct.

 3        Q    With the paragraph that we discussed before, the

 4   one about the sexual harassment allegations -- I'm

 5   sorry -- sexual harassment accusations were removed.

 6   Correct?

 7        A    Deleted, yes.

 8        Q    This revision, if you look at the top, is dated

 9   February 3, 2016.  Correct?

10        A    That's correct.

11        Q    Did you ever have Mr. Tanico investigate who

12   made these -- who added the paragraph about the ongoing

13   sexual harassment accusations to your Wikipedia page?

14        A    I don't think so.  But he may have done it on

15   his own, but I wouldn't know.

16        Q    Did you ever talk to Professor Adorno about the

17   addition of this paragraph of the ongoing sexual

18   harassment allegations on your Wikipedia page?

19        A    I may have but I don't remember.

20        Q    Did you ever talk to Professor Valis about the

21   addition of this paragraph in Exhibit 40?

22        A    I don't remember.  I don't remember.

23        Q    And did you ever talk to Professor Stith about

24   the addition of this paragraph to Exhibit 40?

25        A    I don't remember if I did or not.
```

1   but nothing specific.

2           I made a specific criticism of her work, which I

3   find to be inferior.  And so did Professor Adorno, and so

4   did Noël Valis.  So did Giuseppe Mazzotta, who is an

5   expert -- greatest Italiianist probably alive, and an

6   expert on Ficino.  He had just given the keynote lecture

7   at the Ficino symposium in New York.

8           And Howard Bloch.  What I remember about Howard

9   Bloch is his saying that he was so appalled about how poor

10  the writing was that he asked us, Why did it take you so

11  long to get rid of her?  That was Bloch's -- this is the

12  words that I remember from Bloch.

13          It came to the vote.  Bloch and Mazzotta could

14  not vote.  And it came out 3 to 2; 3 against, 2 in favor.

15  Of course it's anyone's guess who the 3 and the 2 were,

16  because these were little pieces of paper, but of course

17  we can speculate about it.  But that is what I remember of

18  the vote and of the meeting.

19      Q    And you're one of the three that voted against

20  Sue Byrne's tenure application?

21      A    I know that I voted against because I'm telling

22  you here.

23      Q    Yes.

24      A    Although it is supposed to be secret.  I

25  assume -- we can only assume who the other two against her

```
1                        STATE OF CONNECTICUT

2          I, Bethany A. Carrier, RMR, CRR, CSR #071, a Notary

3     Public, duly commissioned and qualified in and for the

4     State of Connecticut, do hereby certify that pursuant to

5     Notice, there came before me on the 14th of December,

6     2018, the following-named person, to wit:  ROBERTO

7     GONZÁLEZ ECHEVARRÍA, who was by me duly sworn to testify

8     to the truth and nothing but the truth; that he was

9     thereupon carefully examined upon his oath and his

10    examination reduced to writing under my supervision; that

11    this deposition is a true record of the testimony given by

12    the witness.

13         I further certify that I am neither attorney nor

14    counsel for nor related to nor employed by any of the

15    parties to the action in which this deposition is taken,

16    and further that I am not a relative or employee of any

17    attorney or counsel employed by the parties hereto, or

18    financially interested in this action.

19         IN WITNESS THEREOF, I have hereunto set my hand

20    this 2nd day of January, 2019.

21

22

23                 _____
                      Bethany A. Carrier, RMR, CRR, LSR #071
24                               Notary Public

      My Commission Expires:
25    October 31, 2023
```