# Exhibit 152

```
                    UNITED STATES DISTRICT COURT

                       DISTRICT OF CONNECTICUT

                                    :
      SUSAN BYRNE                   :  CIVIL ACTION
              Plaintiff             :
      VS.                           :  3:17-CV-01104
                                    :
      YALE UNIVERSITY, INC,         :  (VLB)
              Defendant.            :




      DEPOSITION OF:  TAMAR GENDLER

      DATE:  FEBRUARY 21, 2019

      TIME:  10:30 A.M.

      HELD AT:  YALE UNIVERSITY

                2 WHITNEY AVENUE

                NEW HAVEN, CONNECTICUT




             Reporter:  Margaret A. Bull, LSR 00023


                       CASSIAN REPORTING, LLC
                    21 OAK STREET, SUITE 307
                       HARTFORD, CT  06106
                          860-595-7462
```

1    A    I'm not qualified to pass judgments on human
2    nature.
3    Q    Okay, fair enough.  So if a senior faculty member, a
4    voting member of some department is voting on a tenure
5    application of a junior faculty member who is coming up for
6    tenure, if say the senior faculty member is related, you
7    know, in a sort of family way, you know, blood relative of
8    the junior faculty member, is there some principle or policy
9    that guides whether or not the senior faculty member should
10   or should not vote on his or her family member's tenure
11   application?
12        MS. CHAVEY:  Objection.  Go ahead.
13        THE WITNESS:  We have a norm that people do not vote
14   on cases of individuals to whom they are related by blood or
15   marriage.
16   BY MS. WIKTOR:
17   Q    Now, is it -- so that norm, how is that norm applied
18   or implemented?
19   A    I don't understand the question.
20   Q    Okay. So if the norm is that senior faculty member
21   should not or does not vote on the tenure or promotion
22   application of someone he or she is related to by blood or
23   marriage, is it automatic that that person is left out of the
24   vote; or is it a matter of, you know, the senior faculty
25   member says, I am not going to vote on this because of X, Y,

```
 1   Z?
 2           MS. CHAVEY:  Objection.
 3           THE WITNESS:  So we have many departments which have
 4   married couples in those departments.  When those departments
 5   have votes about faculty member A, the spouse who is faculty
 6   member B, steps out of the room.
 7      Q    And is the expectation that faculty member B steps
 8   out of the room on his or her own initiative?
 9           MS. CHAVEY:  Objection.
10           THE WITNESS:  That hasn't arisen as a concern.
11   BY MS. WIKTOR:
12      Q    Okay. So when you say it hasn't arisen as a concern,
13   is the implication that faculty member B always leaves him or
14   herself out of it?
15           MS. CHAVEY:  Objection.
16           THE WITNESS:  I couldn't know about every case in
17   all fifty FAS departments.
18   BY MS. WIKTOR:
19      Q    But it is the case that it has never come to your
20   attention where faculty member B refuses to exclude him or
21   herself from a vote on his wife or her husband or --
22      A    I have not heard of any such case.
23      Q    Okay.  Now, are there -- so other than that norm
24   where relatives should not vote on one another's tenure or
25   promotion candidacies, are there any other categories where
```

1    there's a norm that's set, you know, that indicates that
2    someone should not participate in a vote?
3        A    If you are divorced from that person.
4        Q    Okay.  So other than blood, marriage, or former
5    marriage, are there any other instances where there's a norm
6    that says you shouldn't vote?
7        A    None that I know of.
8        Q    Is there some policy, procedure, or practice that
9    governs the participation or not in voting on a tenure and
10   promotion candidacy that relates to conflict of interest,
11   other than the ones that have to do with marital or familial
12   relations that you just described?
13            MS. CHAVEY:  Objection.
14            THE WITNESS:  I don't know.
15   BY MS. WIKTOR:
16       Q    Now, in an instance where, so let's say the senior
17   faculty member in the -- use a fake department -- the
18   underwater basket weaving department.  So there's a junior
19   faculty member who is coming up for tenure in underwater
20   basket weaving, and that junior faculty member is the subject
21   of a strong negative, animus by a senior faculty member
22   because the junior faculty member had an affair with the
23   senior faculty member's spouse.  The senior faculty member is
24   justifiably very unhappy about that fact.  Is there some norm
25   or rule or policy that governs the senior faculty member's

1  been about how long the review would take?
2      A    No, but it was expected to be shorter than it was.
3      Q    And in the end, the duration of the review was
4  several months; is that right?
5      A    I don't know.  That's -- that's an easy question to
6  answer, but I'm not the one to answer it.
7      Q    So at or after the conclusion of the investigation,
8  you were given a report of the investigation or review; is
9  that correct?
10     A    At the conclusion of the review, I was given a copy
11 of the review.
12     Q    Okay.  So this is what was previously marked
13 Plaintiff's 14.
14     A    Um-hum.
15     Q    This is the climate review report and exhibits.
16     A    Um-hum.
17     Q    It's already been identified.  Is this -- when you
18 said that you were given a copy of the review, is this what
19 you were given a copy of?
20     A    I'm not sure I've even seen the exhibits.
21     Q    Okay.  So let's --
22     A    May I unclasp this?
23     Q    Yes, of course.  The first forty-eight pages of the
24 document.  There are, in addition to the Bates numbers, there
25 are on the actual report, there are page numbers in the

1  middle.

2       So beginning on 3112, that's the Bates Number on the

3  right list of exhibits.

4       A    Yes.

5       Q    Okay.  So the other group of documents, the first

6  forty-eight pages that you have in your left hand, I will ask

7  you to look at that.  I'm going to ask you if this is -- if

8  you received a copy of this report after the conclusion of

9  the climate review?

10           MS. CHAVEY:  Can I take a quick look at that?

11           THE WITNESS:  I can't tell you whether these were

12  the exact forty-eight pages.  I did receive a copy of the

13  report with this title.

14  BY MS. WIKTOR:

15      Q    Okay. And was the report, do you recall if it was

16  signed by Barbara Gorin and Jamaal Thomas?

17      A    I recall that it was signed by the people who

18  conducted the review.  I didn't recall that those were their

19  names.

20      Q    Okay.  And so when you received the copy of the

21  report that you reviewed, did you read it?

22      A    Yes.

23      Q    Okay.  Did you read it fairly closely?

24      A    Yes.

25      Q    Okay.  And so if you -- so looking at the remaining

1  relations with the secretarial staff.  So that doesn't make

2  such allegations.  Otherwise, I don't know what was brought

3  to my attention when.

4       But it certainly the case that the Yale Daily News

5  articles, to which you directed my attention, make reference

6  to certain sorts of allegations.  And those -- yes, actually

7  in the debrief that I gave to the community after the climate

8  report was put out, reference I believe was made to some such

9  allegations.

10  BY MS. WIKTOR:

11    Q  Okay.  So --

12    A  I'm looking at the climate, right.  So anything that

13  was referred to in the climate review, I obviously had heard

14  about because I read that climate review closely.  So I'm

15  looking to see what concerns, sexual harassment and

16  misconduct.  Yes.  So here we see on Page 30, byrne 003093 a

17  discussion of that issue.

18    Q  Okay.

19    A  So I had certainly seen that on March 24th or

20  whenever this was given to me.  March -- so, yes, I had seen

21  these exact paragraphs that we have here previously in March

22  of 2015 or March of 2016, whenever this was given.

23    Q  Well, so the -- well, the anonymous letter was March

24  of 2015, correct?

25    A  Okay.  Sorry, but the anonymous letter -- my reading

```
 1   STATE OF CONNECTICUT      :

 2   COUNTY OF HARTFORD        :

 3

 4           I, MARGARET A. BULL, a Commissioner duly commissioned
     and qualified in and for the State of Connecticut, do hereby
 5   certify that pursuant to notice there came before me on the
     21st day of February, 2019, the following-named person, to
 6   wit:  Tamar Gendler, who was by me duly sworn to testify to
     the truth and nothing but the truth; that she was thereupon
 7   carefully examined upon her oath and her examination was
     reduced to writing under my supervision; that this deposition
 8   is a true record of the testimony given by the witness.

 9

10           I further certify that I am neither attorney nor
     counsel for nor related to nor employed by any of the parties
11   to the action in which this deposition is taken;  and
     further, that I am not a relative or employee of any attorney
12   or counsel employed by the parties hereto or financially
     interested in this action.
13

14           IN WITNESS THEREOF, I have hereunto set my hand and
     affixed my seal this 4th day of March, 2019.
15

16

17

18

19                                  [signature: Margaret A. Bull]

20

21                                  _____

22                                  MARGARET A. BULL, Commissioner

23

     My Commission Expires: November 30, 2021
24

25
```