# Exhibit 153

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF CONNECTICUT

 3

 4   --------------------------------x

 5   SUSAN BYRNE                    : C.A. NO.

 6                                  : 3:17-CV-01104(VLB)

 7   VS.                           :

 8                                 :

 9   YALE UNIVERSITY, INC.         :

10   --------------------------------x

11

12

13

14        DEPOSITION OF:  STEPHANIE SPANGLER

15        DATE:  JANUARY 23, 2019

16        HELD AT:  MADSEN, PRESTLEY & PARENTEAU, LLC

17                  105 HUNTINGTON STREET

18                  NEW LONDON, STATE 06320

19

20

21        Reporter:  MARY Z. ARMANDO, LSR # 00222

22            CASSIAN REPORTING, LLC

23             21 Oak Street, Suite 307

24           Hartford, Connecticut 06106

25               (860) 595-7462
```

```
 1        A     Some.

 2        Q     And what is your understanding of what those

 3   claims are?

 4        A     My understanding is her claims relate to her

 5   being denied tenure and that the denial may have

 6   related to retaliation.

 7        Q     And are you familiar with Susan Byrne?

 8        A     Yes.

 9        Q     And you met her on at least one occasion?

10        A     Yes.

11        Q     On how many occasions have you met

12   Susan Byrne?

13        A     Three, to the best of my knowledge.

14        Q     And you are currently employed by Yale

15   University; is that correct?

16        A     Yes.

17        Q     What is your title currently?

18        A     Deputy Provost for Health Affairs and

19   Academic Integrity; Clinical Professor of Obstetrics,

20   Gynecology, and Reproductive Sciences; and the

21   university Title IX coordinator.

22        Q     And can you -- the deputy provost title, can

23   you just repeat that so I make sure I got the words all

24   correct?

25        A     Yes.  Deputy Provost for Health Affairs and
```

Case 3:17-cv-01104-VLB   Document 82-153   Filed 05/15/19   Page 4 of 36

Stephanie Spangler

```
 1   have roles in the Title IX areas; is that fair to say?

 2       A    Yes.

 3       Q    So then is it the case that the other people

 4   who have Title IX roles have other university roles as

 5   well?

 6       A    Yes.

 7       Q    Other than Ksenia Sidorenko, how many other

 8   deputy Title IX coordinators are there?

 9       A    There are two senior deputy Title IX

10   coordinators and approximately 18 deputy Title IX

11   coordinators.  This is my rough estimation in the

12   professional schools and the graduate school.  Let me

13   make that 20.

14       Q    Does that include the seniors or no?

15       A    Twenty does not include the seniors, but it

16   is a rough estimate.

17       Q    Do some or all of the deputy or senior deputy

18   Title IX coordinators also hold positions on the

19   faculty at Yale?

20       A    Some do.

21       Q    So then is it fair to say it is not -- there

22   is not a rule either way whether somebody is on the

23   faculty or not?

24       A    Yes.

25       Q    Other than the deputy and senior deputy
```

Case 3:17-cv-01104-VLB   Document 82-153   Filed 05/15/19   Page 5 of 36

```
1    Title IX coordinators we have talked about and the

2    Title IX program manager, what other positions or roles

3    are there that people are either hired or appointed to

4    under your oversight in the Title IX area?

5         A    The people who report to me directly are the

6    deputies with regard to their Title IX

7    responsibilities.  The senior deputies with regard to

8    their Title IX responsibilities.  In the case of

9    Valarie Stanley, who is also the director of the Office

10   of Equal Opportunity Programs, in which capacity she

11   does not report to me.  Jason Killheffer, who is the

12   other senior deputy Title IX coordinator who reports to

13   me for all of his responsibilities, which also include

14   academic integrity responsibilities.  Cynthia Smith,

15   who is an associate provost who reports to me and has

16   taken on programming responsibilities and oversees

17   Maria Gutierrez.  Those are the people who directly

18   report to me with regard to Title IX to the best of my

19   knowledge.

20        Q    And do people who you've identified as

21   reporting to you in their Title IX capacities, do they

22   have people who report to them in their Title IX

23   capacities?

24        A    Yes.

25        Q    And so what are the positions?  So I'm not
```

```
 1   of the Department of Spanish and Portuguese.  Responded
 2   to an email where they offered a conversation with the
 3   Title IX office regarding matters that Susan brought up
 4   in the course of the climate review.  Susan responded
 5   to that offer and met with me and Jason Killheffer.
 6            MS. WIKTOR:  Off the record.
 7
 8        (A recess was taken from 11:09 a.m. to 11:27 a.m.)
 9
10   BY MS. WIKTOR:
11        Q    Dr. Spangler, you understand you're still
12   under oath?
13        A    Yes.
14        Q    Before the break there was one question and
15   an answer about the circumstances of your meetings with
16   Susan Byrne.  Now the three occasions on which you met
17   with Susan Byrne, were they all related to the
18   communication that -- or the communication that she had
19   gotten from Jamaal Thomas about meeting with you about
20   some things that had come out in the climate review?
21        A    No.
22        Q    What were the circumstances -- what were the
23   circumstances of each of the three meetings that you
24   had with Susan Byrne?
25        A    The first meeting was in response to the
```

Case 3:17-cv-01104-VLB   Document 82-153   Filed 05/15/19   Page 7 of 36

```
 1    communication from Jamaal Thomas.  Jason Killheffer and

 2    I met with Susan Byrne to understand her experiences

 3    and what -- based on what she had reported in the

 4    climate review or anything else she wanted to tell us.

 5    The second time I saw Susan Byrne she was in a group

 6    that was receiving training in the resources and

 7    underpinnings of sexual harassment, so she was part of

 8    the group of faculty.  That training was required by

 9    the climate review.  And I presented Yale's resources

10    in that review.  And the third was a meeting where

11    Susan Byrne met again with Jason Killheffer and me

12    after she had been denied tenure.

13        Q    Now that third meeting that you had with

14    Susan Byrne that Jason Killheffer was also present for,

15    who requested the meeting?

16        A    I don't recall.

17        Q    What was discussed in the meeting?

18        A    I don't recall all the meeting.  I do recall

19    that Susan Byrne reported that colleagues had advised

20    her to talk to me about the fact that she had been

21    denied tenure and what the options were, and we told

22    her there was a provost grievance procedure that we

23    would not be participating in, but the provost would

24    assign someone to participate in it.  I don't recall

25    the rest of the meeting.
```

```
 1       Q    Now during that meeting was there any
 2  discussion about -- what it was about the circumstances
 3  of the tenure denial that had any relation to what the
 4  sorts of things that the Title IX office is responsible
 5  for?
 6       A    Not that I recall.
 7       Q    Now in that first meeting, the first meeting
 8  that you had with Susan Byrne that Jason Killheffer
 9  also attended that was in response to the email from
10  Jamaal Thomas and Barbara Goren, when did that meeting
11  happen?
12       A    As I recall that was the beginning of
13  December of 2015.
14       Q    And tell me everything you can recall about
15  the discussion in that meeting?
16       A    I can't recollect in detail, but Susan Byrne
17  told us about experiences she had had with or observed
18  relating to Roberto Gonzalez Echevarria.
19       Q    And what experiences related to
20  Roberto Gonzalez Echevarria did she tell you about?
21       A    Among others she told us about him kissing
22  her on the mouth in front of people at a gathering.
23  She told us about -- I believe about him touching her
24  hair early on when she was in the department.  She told
25  us that he had tried to direct a project that she was
```

```
 1   proposing that would make her eligible for a leave and

 2   try to direct it in a way that was not -- in align with

 3   what she wanted to do.  She put much of her report in

 4   the context of power plays and that he used his power

 5   over junior people in the department.  I recall that

 6   she was concerned about tenure because Roberto -- she

 7   claimed Roberto said, Nobody ever gets tenure in this

 8   department.  I can't go on without reference to notes,

 9   so I don't want to misstate.

10        Q    When you say you can't go on without

11   reference notes, is there a particular set of notes

12   that you're referring to?

13        A    I'm sure there were notes from that meeting.

14        Q    Did you take notes in that meeting?

15        A    Yes.

16        Q    Handwritten or typed?

17        A    Handwritten.

18        Q    And do you have a particular habit or

19   practice with respect to what you do with notes that

20   you might take in a meeting that is related to your

21   role in a Title IX area?

22        A    I would not call it a habit or practice, but

23   generally when Jason Killheffer and I meet with

24   someone, he takes the more comprehensive notes and I

25   engage in the conversation.  I may also take notes.  I
```

```
 1   climate review, are you talking about the review itself

 2   or the report?

 3           MS. CHAVEY:  Objection.

 4      A    I'm having difficulty making your

 5   distinction.

 6   BY MS. WIKTOR:

 7      Q    So I'll withdraw that question.

 8           When you say you did not have access to the

 9   actual climate review, what is it that you're talking

10   about when you say actual climate review?

11      A    I was not involved in the climate review

12   process.  I had been involved in an initial meeting

13   about the anonymous letter that led to the climate

14   review.  I was not involved in the process of the

15   climate review.  I did not receive the report of the

16   climate review.

17      Q    Now you said that you participated in an

18   initial meeting about -- I'm sorry, did you say it was

19   about the anonymous letter?

20      A    An anonymous letter had been placed in

21   mailboxes, I believe, in the spring, late winter,

22   spring of 2015.  I participated in a meeting to discuss

23   the process to address those.

24      Q    And had you read the anonymous letter?

25      A    Yes.
```

```
 1        Q    And how did you -- was the anonymous letter
 2   -- was your mailbox one of the mailboxes it was in?
 3        A    No.
 4        Q    How did you come to review the letter?
 5        A    I don't recall precisely.  I just recall
 6   being called to the meeting, so it was likely at the
 7   meeting, but I don't recall.
 8        Q    And when did that meeting take place?
 9        A    Sometime in the early spring semester of
10   2015.
11        Q    Who attended the meeting?
12        A    I don't recall all the attendees.  Members of
13   the graduate school and arts and sciences
14   administration.
15        Q    In terms of university administrators who
16   were there, who do you recall being there?
17        A    I can't recall.  I can't recall who was
18   there.
19        Q    Can you recall anyone who was there other
20   than you?
21        A    I believe the dean of the graduate school was
22   there and members of her staff, but I don't recall who.
23        Q    Were there any faculty from the Department of
24   Spanish and Portuguese present?
25        A    Not that I recall.
```

```
 1        Q    Was it a meeting of administrators and their

 2   staffs?

 3        A    That's what I recall.

 4        Q    Who called the meeting?

 5        A    I don't recall.

 6        Q    Where did the meeting happen?

 7        A    To the best of my knowledge it happened at

 8   One Hillhouse Avenue.

 9        Q    And is there a university office that is

10   located at One Hillhouse Avenue where the meeting was?

11        A    That address was the provost's office.  I

12   can't recall when we moved.  And also is now the office

13   of the dean of the graduate school, the dean of FAS,

14   and the dean of Yale College.  The dean of Yale College

15   just moved in, so the dean of Yale College could not

16   have been in that building at that time.  And I am just

17   basing this on my recollection, which could be faulty

18   in terms of the location of the meeting.

19        Q    So you're not sure that it happened at

20   One Hillhouse Avenue?

21        A    I'm not sure.

22        Q    Was it a small meeting?

23             MS. CHAVEY:  Objection.

24        A    Define small.

25   BY MS. WIKTOR:
```

```
 1      Q    Were there more than ten people there?

 2      A    I don't know.

 3      Q    Were there more than five people there?

 4      A    Probably.

 5      Q    Was the provost there?

 6      A    Not that I recall.

 7      Q    Was Tamar Gendler there?

 8      A    To the best of my recollection, yes.

 9      Q    Was Amy Hungerford at the meeting?

10      A    I don't recall.

11      Q    Were any other Title IX coordinators at the

12   meeting?

13      A    I don't recall.

14      Q    And the purpose of the meeting was to discuss

15   the anonymous letter?

16           MS. CHAVEY:  Objection.

17      A    That's what I recall.  It was not my meeting,

18   so I can only speculate.

19   BY MS. WIKTOR:

20      Q    Well what was your understanding of what the

21   purpose of the meeting was?

22      A    My understanding was that the purpose of the

23   meeting was to discuss the anonymous letter.

24      Q    And the anonymous letter had to do with the

25   Department of Spanish and Portuguese; correct?
```

```
 1        A    Yes.

 2        Q    Was there a discussion during that meeting

 3   about what the response from any university

 4   administration at any level would be relative to the

 5   anonymous letter?

 6        A    I don't recall the discussion.

 7        Q    Tell me everything you do recall about the

 8   discussion in that meeting?

 9        A    To the best of my recollection, it was

10   decided to do some sort of climate survey of the

11   department based on the multiple allegations in the

12   anonymous letter and concerns about the department, and

13   I was asked if I knew people who might be fact-finders

14   for that process.

15        Q    Who asked if you knew of people who might be

16   fact-finders for that process?

17        A    I don't recall.

18        Q    And did you identify any individuals who you

19   knew of who might be fact-finders for that process?

20        A    I believe that I mentioned that the UWC used

21   fact-finders who were experienced in fact-finding, and

22   that also the Office of Equal Opportunity Programs had

23   done investigations.

24        Q    Now, the fact-finders that the UWC used that

25   you were referring to, were they people who were
```

```
 1          (A recess was taken from 12:11 p.m. to 12:12 p.m.)

 2

 3   BY MS. WIKTOR:

 4       Q    So during the pendency of the climate review,

 5   did you have discussions with anyone about the climate

 6   review?

 7       A    Not that I recall.

 8       Q    So at some point after the climate review was

 9   concluded, would it be fair to say that you were

10   advised that it had come to an end?

11       A    I knew it had come to an end.

12       Q    How did you know that?

13       A    I don't recall.

14       Q    And did you discuss with anyone what the

15   findings of the climate review had been?

16       A    Yes.

17       Q    And who did you discuss that with?

18       A    General counsel's office of Yale.

19       Q    Other than general counsel's office, did at

20   any point you have a discussion with anyone about what

21   the findings of the climate review had been?

22       A    Not that I recall.

23       Q    So is it the case that any knowledge that you

24   have about what was in the climate review or what had

25   come out of the climate review came to you from general
```

```
 1    counsel?

 2         A    Yes.

 3         Q    Did you ever review any portion of the

 4    climate review report?

 5         A    I did not read any portion.

 6         Q    So my question was whether you reviewed it,

 7    do you distinguish read and review?

 8         A    Yes.

 9         Q    So tell me where that -- where you draw that

10    distinction and how?

11         A    I will tell you what my thinking was relative

12    to the climate review.

13              MS. CHAVEY:  Well, why don't you answer the

14         question.

15              THE WITNESS:  Yes.

16              MS. CHAVEY:  So you're answering her

17         question?

18              THE WITNESS:  Which was am I making a

19         distinction between reading and review?

20              MS. CHAVEY:  Right.

21              THE WITNESS:  Yes.

22    BY MS. WIKTOR:

23         Q    So what is that distinction?

24         A    I was made aware of whether there were

25    complaints in the climate review that related to sexual
```

```
 1          with you about that later anyway, so today or --

 2                MS. WIKTOR:  Okay.  It is an issue for

 3          another time other than this minute?

 4                MS. CHAVEY:  Yes.  Exactly.

 5    BY MS. WIKTOR:

 6          Q    So do you remember the question?

 7          A    Why don't you repeat it for me.

 8          Q    So the individuals who, in fact, contacted

 9    you after being given the opportunity to do so by

10    Jamaal Thomas and Barbara Goren, I would like you to

11    identify them, please?

12          A    There were two former students, Susan Byrne,

13    Kevin Poole, and Moira Fradinger.

14          Q    And do you know whether or not there were

15    other individuals who had been contacted by

16    Jamaal Thomas and Barbara Goren who hadn't reached out

17    to you?

18          A    I don't know.

19          Q    So I'm not asking what their names were, I'm

20    asking whether or not you ever had a conversation --

21          A    I don't know.

22          Q    If we can just talk one at a time.

23          A    I'm sorry.

24          Q    So it didn't come to your attention, you

25    know, well, there are five others who they contacted
```

```
 1   who didn't get in touch with you?

 2        A    Not that I recall.

 3        Q    And once these people had made contact with

 4   you -- well we'll take them in turn.  So the two former

 5   students, did they reach out to you by email?

 6        A    To the best of my recollection, yes.

 7        Q    And did you subsequently meet with them or

 8   have conversations with them?

 9        A    We either met with them or had telephone

10   conversations with them.

11        Q    And when you say we, who is we?

12        A    Jason Killheffer and me.

13             MS. WIKTOR:  Why don't we take lunch now.

14

15        (A recess was taken from 12:26 p.m. to 1:25 p.m.)

16

17   BY MS. WIKTOR:

18        Q    Dr. Spangler, you understand you're still

19   under oath?

20        A    Yes.

21

22   (Plaintiff's Exhibit 64, 3/1/16 email, marked for

23   identification.)

24

25   BY MS. WIKTOR:
```

Stephanie Spangler

1    but I just want the record to reflect that you're

2    pointing at the date on the page that ends in 53?

3         A    Yes.

4         Q    And so does that indicate, the date there,

5    does that indicate to you that Jason Killheffer took

6    these notes in a meeting on March 7, 2016?

7         A    Yes.

8         Q    So I'll ask you to set that exhibit to the

9    side for a moment.  I'm going to hand you what is being

10   marked Plaintiff's Exhibit 65, which is Defendant's

11   Bates Nos. Byrne 018763 through 66.  And I'll ask you

12   if you recognize the document?

13        A    Yes.

14

15   (Plaintiff's Exhibit 65, 12/1/15 notes, marked for

16   identification.)

17

18   BY MS. WIKTOR:

19        Q    And what do you recognize it to be?

20        A    It appears to be notes that I made in my

21   handwriting on December 1, 2015 related to a

22   conversation with Susan Byrne.

23        Q    And this is an entirely handwritten document

24   except for the Bates numbers and the confidential

25   stamp.  Is all of the handwriting in Exhibit 65 your

```
 1    handwriting?

 2         A    Yes.

 3         Q    And did you make these notes during a meeting

 4    with Susan Byrne or subsequent to a meeting with

 5    Susan Byrne?

 6         A    During.

 7         Q    And this is the meeting that you testified

 8    earlier about that Jason Killheffer was also present

 9    for?

10         A    Yes.

11         Q    And I do apologize for the tedium of the

12    exercise of reading the handwriting, but --

13         A    It is okay.

14         Q    Just so we all know what it says from the

15    person who wrote it.  So the first -- where it says

16    under Susan Byrne 12-01-2015, that first line there?

17         A    In my notes or in his notes?

18         Q    I'm looking at Exhibit 65, so your notes.  So

19    if you want to just put 64 aside, we'll focus on this.

20    So that first line.

21         A    Power play using sexual harassment

22    techniques.

23         Q    And does that refer to something that

24    Susan Byrne said in this meeting?

25         A    Yes.
```

```
1            follow-up questions later.

2                 THE WITNESS:  In reference to both documents?

3                 MS. WIKTOR:  Yes.  So we'll take it just to

4            get the handwriting in the record.

5                 THE WITNESS:  Okay.

6   BY MS. WIKTOR:

7       Q    So beginning with first year, if you would,

8   please.

9       A    "First year RGE played with hair.  Creepy.

10  Watched and asked -- watched as he did it to

11  undergraduates and said -- and quote, Oh isn't she

12  beautiful.  Every day on way to restroom greeted

13  Sue Byrne -- SB -- with kisses on cheek.  Air kisses

14  normal.  And then I say not in a position to tell him

15  to stop.  Felt at, quote, at his bidding.  Like power

16  play versus sexual feeling.  One moment that led to

17  disgust, Mary Miller stepping down May 2014 SB went as

18  DUS.  RGE came up to her in front of hundreds of people

19  and kissed her right at mouth.  Caught off guard.  Made

20  her feel really horrible, quote, horrible.  Quote, look

21  she's mine too.  Waited two weeks to tell husband.  He

22  has no boundaries.  Invading professional/physical.

23            Strategy is, quote, You are lesser and I am

24  trying to make you feel lesser.  Colleague

25  (Kevin Poole) said always go to -- go with the sterling
```

```
 1  professor.  RE and Adorno and Noël Valis keep revolving
 2  door versus tenure track.  Quote, he goes around saying
 3  that no one is going to get tenure in our department.
 4  Took SB out in 7th year to tell her to look for other
 5  job.  (RGE was her supposed, quote, mentor, but he was
 6  not interested in her work.)  October 2014 there is a
 7  diagram of RGE's office, RGE's desk, RGE's couch, RGE's
 8  table.  Directs her to couch.
 9       Q    I don't want to -- pardon me for interrupting
10  you.  The words that you just said were your
11  descriptions of the drawing and not something that is
12  written in the document?
13       A    Correct.  When I said diagram, I described --
14  okay.
15       Q    I just wanted to clarify that for the record.
16  Thank you.
17       A    Fine.
18       Q    Go ahead.
19       A    Back to text.  Directs her to couch to inside
20  with -- I can't even read my own writing.  It looks
21  like some kind of big pillow which she moved.  "Told
22  her she should be -- told her she should be studying.
23  In the margin it says January 2015 RGE, quote, sexual
24  transgressions in the Don Juan story.  Told her that
25  she should be studying, quote, sexual transgressions in
```

```
 1    the Don Juan story.  I just repeated that.  Unquote.

 2    (Without his knowing it, SB had found manuscript in

 3    Spain regarding law for sexual transgressions.)  Abuse

 4    of me as an object.  Objectifies women.  Junior

 5    colleague told SB that it was creepy that RGE always

 6    commenting on clothing.  Does not want to bring sexual

 7    harassment claim for herself.  Was not physically

 8    attacked but was emotionally and professionally

 9    attacked but her department.  1999 RGE had a sexual

10    relationship with grad student (who graduated 2004).

11    Woman got job at Columbia with professor whose lover

12    got job here.  Grad student in complaint.  He

13    physically accosted her.  She did complain and

14    university found a place for her at Harvard.  He is a

15    liability.  Paulo Moreira denied tenure.  Made

16    situation unbearable.  Quote, scorched earth -- I don't

17    know what that word is -- unquote.  We all work in

18    offices with doors closed and then we all come out and

19    lie to each other.  SB had asked that REG and Rolena be

20    recused from her review.

21        Q    Thank you.  So there are -- in the document

22    there are -- in Exhibit 65 there are numbers -- so on

23    the first page there is a 1 circled in the top left

24    margin; do you see that?

25        A    Yes.
```

```
 1        Q    Now, so that set of circumstances or that

 2   complaint not using a formal term-of-art type

 3   definition of complaint, was that part of the complaint

 4   to the UWC that was brought by Carl Hashimoto?

 5             MS. CHAVEY:  Objection.

 6        A    Not to my knowledge.

 7   BY MS. WIKTOR:

 8        Q    And was that -- was there a decision made

 9   about not -- strike that.

10             Was there a discussion within your office

11   regarding what to include or not in the complaint that

12   was brought by Carl Hashimoto to the UWC?

13        A    Could you be more specific?

14        Q    Well, who decided what would be included in

15   the complaint?

16        A    Carl Hashimoto working with likely general

17   counsel would finalize the complaint letter.  And as I

18   said previously, the complaint letter does not have to

19   list all the details of complaints, just what the

20   complaint -- just what the behavior is that was

21   complained of.

22        Q    So prior to the letter being finalized, did

23   you have any discussion with Carl Hashimoto about what

24   would be included?

25        A    I don't recall that I did.
```

```
 1    who were the complainants in those complaints that

 2    Carl Hashimoto received to Miriam Berkman?

 3          A    I do not believe -- I did not.

 4          Q    Do you know if anyone in the Title IX office

 5    did?

 6          A    When you say Title IX office, that's -- I

 7    don't know if Carl provided them to her.  I don't know.

 8    Our office has the people I talked about that I employ,

 9    so.  I don't know.

10          Q    So let me ask it a different way.  Do you

11    know if anyone who is one of the deputy or senior

12    deputy Title IX coordinators provided those two names

13    to Miriam Berkman?

14          A    I don't know.

15

16    (Plaintiff's Exhibit 68, 12/3/15 handwritten note,

17    marked for identification.)

18

19    BY MS. WIKTOR:

20          Q    I'm showing you what is marked as Plaintiff's

21    Exhibit 68.  It is Bates Nos. Byrne 08786 through 89.

22    It is a handwritten document or at least there are

23    handwritten notes on this document.  Is this your

24    handwriting?

25          A    Yes.
```

Case 3:17-cv-01104-VLB   Document 82-153   Filed 05/15/19   Page 26 of 36

1        Q    So the date on the top is 12/3/2015, that's

2    on the first page; do you see that?

3        A    Yes.

4        Q    And do you know what this document relates

5    to?

6        A    Yes.

7        Q    And what is that?

8        A    It is a conversation with Moira Fradinger.

9        Q    So what I would like to have you do is read

10   it into the record; again, it is your handwriting.

11       A    You don't happen to have Jason's version too,

12   do you?

13       Q    So I won't -- unless, you know, there is,

14   again, like a diagram and we need to get it on the

15   record, I'm just going to let you read it without

16   asking you any questions about it.

17       A    Okay.  Thank you.

18       Q    So if you would.  Thank you.

19       A    Bear with me.  It is my handwriting.  RGE

20   complaints times 20 years.  MF came 2005 to 2013.  MF:

21   very well-known for permanently harassing women in

22   every environment he is in outside of Yale.  This is a

23   scandal.  I am in awe that this is not a scandal.  1990

24   and there is stuff blanked out.  Were graduate students

25   -- I don't know what this says.  Case while he was

1    graduate student where Yale offered a female graduate

2    student a position at Harvard because RGE cornered her

3    and said he wanted to have a child with her.  Piles and

4    piles of info.  Talked to PPS, it could be a J, and

5    Mary Miller and Jon Butler.  Attorney told her that she

6    has a case against Yale.  Emails episodes from 2005 to

7    it looks like 2013, not clear, EG, walking along Wall

8    Street.  RGE grabbed her by shoulders and said, Your

9    husband will never get tenure.  You should drop him and

10   come with me.  Grabs her hair and says in Spanish, your

11   hair gets me so hot, in quotes.  Colleagues observed

12   this.  Carol Jacobs talked to MM.  MM and JB very

13   supportive.  Argentina okay for comments, touch

14   shoulders, waist, mouth in parking lot.  She is coming

15   towards building, he is coming out of building, grabs

16   her and kisses her on the lips.  She had to push him

17   away.  After Xmas party his hand landed on her

18   buttocks.  Question, 2011.  So disturbed she went to

19   David Quint who was so upset that he wanted to talk to

20   administrators.  She said no because she did not have

21   tenure and RGE would do everything in his power to deny

22   her tenure if she brings case forward.  Thinks

23   generally no safe way for assistant professors to bring

24   complaints because of way references are given.  Will

25   lie.  RGE told Parisian colleague that he had written

```
 1   this person's book.  Things escalated from there.

 2   Blank came up for tenure in 2012.  During the fall of

 3   2012 he was still harassing her by email.  In a

 4   conference in 2011 RGE had arranged -- organized, sorry

 5   -- conference in 2011 RGE had organized and asked MF to

 6   present a paper.  Said no too busy.  Anabel Gonzalez

 7   knew about this.  Spring party right after this.  RGE

 8   coming out of party to blank, blank, blank, blank,

 9   going into party RGE raised his hand and said in

10   Spanish, quote, you are going to pay for this.  Then

11   went to David Quint and said she wanted to tell every

12   person in the department.  Got an email from

13   Mary Miller who said, quote, I hear you have to tell me

14   something.  Filing for associate without tenure.

15   Committee appointed Mary Miller contacted David Quint

16   to ask that every member of the department read the

17   file not just the committee.  Warned by Maria Menocal

18   that RGE was going to, quote, over his dead body would

19   she get tenure.  Make hell.  German grad student was

20   RGE's lover.  When she dumped RGE, RGE began pursuit of

21   blank.  Got his lover a job.  Asked Mary M to make sure

22   RGE not have vote for promotion to associate

23   nontenured.  MM said she will have to give RGE the

24   vote.  Fall of 2012, RGE began to email her multiple

25   times.  Quote, we need to talk about cross listing of
```

```
 1   courses so you need to come to my office Friday a.m.,

 2   unquote.  We don't need to go to your office.  Can do

 3   by email or you come to my, MF's, office.  Told

 4   Katie Trumpener and Carol Jacobs.  Christmas 2011 he

 5   insulted her -- I'm going to the lines because the top

 6   of the page is where I ran out of space at the bottom

 7   of the page.  Insulted her.  Did not know the

 8   literature of her company.  Fall 2012 file had been

 9   submitted in 10-2015, went to talk to Dudley Andrew

10   (chair) at her tenure appointment meeting tenure fight

11   (by RGE), vote all positive except RGE.  After the vote

12   RGE will not speak to her in any form.  Criticism of

13   her book was 5/2015.  Regular office hours with grad

14   students who ask is it normal for professors to grab

15   you by the waist.  Undergraduate whom RGE harassed had

16   mental breakdown around 2010.  Went to

17   Pam Schirmeister, Re the student, finally Richard Levin

18   sent him a warning to take sexual harassment course.

19   Two female graduate students came to her, RGE would

20   grab their waists.  RGE uses touching to prevent you

21   from having -- I don't know if that's touching.  I

22   don't know what that word is.  RGE uses something to

23   prevent you from having a career.  A lot of time blank

24   spent in trying to not let this destroy her.  Had to

25   strategize how to avoid him.  P: he should retire.  He
```

```
 1    has written bad letters of recommendation for women who

 2    refuse his advances.  First encounter something you

 3    need to know.  Quote, I was a member of the Bay of Pigs

 4    invasion.  He something that this is a dangerous -- her

 5    thinking that this is a dangerous guy.

 6              MS. CHAVEY:  Do you need to take a break at

 7         all?  It is 3:30.

 8              THE WITNESS:  Yes.  I have 20 of 4.  Yes,

 9         soon.

10    BY MS. WIKTOR:

11         Q    Okay.  So let me just to clarify something

12    that I understood but I just want to make it clear for

13    the record.  When you were reading the last page of the

14    document, the last portion of it that begins, First

15    Encounter.  That is written at the top of the page, but

16    I think you continued it after the end of -- was at the

17    bottom of the page?

18         A    That's what I generally do and it did not --

19    the text flowed from the previous page to the first

20    line text over to that page.

21         Q    I just want to have it for the record that it

22    is -- that what's at the top of the page with 89, the

23    top two lines above the lines of the paper belong at

24    the end; is that correct?

25         A    That's my best presumption since -- yeah --
```

```
 1    it is what I generally do.

 2         Q    And so if we turn to the first page, there is

 3    the initials PS, it is PS plus Mary Miller there?

 4         A    Yes.

 5         Q    Is the PS Peter Salovey?

 6         A    I don't know.  And I don't know if that's an

 7    "S".  It looks like an "S".

 8         Q    Do you recall Moira Fradinger telling you

 9    that she had spoken with Peter Salovey what had

10    happened with her relative to RGE?

11         A    No.  I don't recall that.  PS could be

12    Peter Salovey.

13         Q    So on the page that has 88 --

14         A    Yes.

15         Q    -- right before -- it is about two-thirds of

16    the way down, right before, Asked Mary M., there is

17    what appears to be a white redaction; do you see that?

18         A    Yes.

19         Q    So that says some blank asked Mary M. to make

20    sure RGE not have a vote for her promotion to associate

21    nontenured.  Did Moira Fradinger tell you that she,

22    Moira Fradinger, had asked Mary --

23         A    Yes.

24         Q    Is Mary M. Mary Miller?

25         A    I'm assuming it is Mary Miller.
```

```
 1              MS. CHAVEY:  Objection to the form.  Go

 2       ahead.

 3  BY MS. WIKTOR:

 4       Q    So did in this meeting that you had or this

 5  conversation you had with Moira Fradinger in December

 6  of 2015, did she tell you that she had asked

 7  Mary Miller to make sure RGE didn't have a vote for her

 8  promotion?

 9       A    Yes.

10       Q    And did Moira Fradinger tell you what the --

11  whether her request was granted?

12       A    She told me Mary Miller said she would have

13  to give -- that Mary Miller would have to give RGE the

14  vote.

15       Q    And are you aware that RGE later told the UWC

16  that he, in fact, voted against Moira Fradinger's

17  promotion?

18       A    I am not aware of what RGE told the UWC.

19       Q    Now did this conversation that you had with

20  Moira Fradinger two days after you had spoken with

21  Susan Byrne raise some concern in your mind given the

22  fact that Susan Byrne was soon to have -- soon to be up

23  for tenure?

24       A    The conversation I had with Moira Fradinger

25  raised my concerns about RGE 's behavior.  I don't
```

1    recall linking -- I did not recall linking it to

2    Susan Byrne.

3        Q    So when you say that it raised concerns about

4    RGE's behavior, his behavior in what regard?

5        A    In terms of his -- in terms of the behaviors

6    he described about touching and she described touching,

7    grabbing, sexual commentary.  He also did -- she also

8    did claim that he threatened that things would go badly

9    when she didn't agree to arrange the conference.  And

10   that -- so it was the behaviors we were taking -- we

11   were holding these interviews to get information about

12   the behaviors that had come up in the climate review to

13   decide what to do with them.

14       Q    Now did you understand Moira Fradinger to be

15   raising these issues about RGE's opposition to her

16   tenure application, his criticism of her work, do you

17   understand that -- did you understand her to be linking

18   those behaviors in some way to her not going along with

19   his sexual or romantic advances?

20       A    She linked her concerns about his approach to

21   her tenure with her refusing to participate in the

22   paper, with refusing to organize a conference, and let

23   me just see, I will read to you what she said.  She

24   presumed after, which is why she told David Quint not

25   to go forward, she was concerned that she wouldn't --

```
 1   policy.

 2       Q    So in December 2015 Susan Byrne reports to

 3   you certain experiences that she had that relate to --

 4   what she alleges to be conduct that is sexual

 5   harassment -- would be sexual harassment if it had

 6   occurred; correct?

 7            MS. CHAVEY:  Objection.

 8       A    She reported that she had been kissed on the

 9   mouth without her consent in front of lots of people.

10   BY MS. WIKTOR:

11       Q    Among other allegations that she made about

12   behavior of RGE; correct?

13       A    Right.

14       Q    And you also learned in December 2015 that

15   Susan Byrne didn't want RGE to be on the -- to vote on

16   her tenure; correct?

17       A    She told me that she had asked to have him

18   recused from her review, tenure review.

19       Q    And did you understand that having him

20   recused from her tenure review, that would include the

21   vote?

22       A    I didn't get into that detail.  I assumed she

23   did not want him involved in any part of her tenure

24   review.

25       Q    And you also knew at this point, December
```

```
 1    2015 that the tenure review or the -- she was up for

 2    tenure in that academic year; is that right?

 3            MS. CHAVEY:  Objection.

 4       A    I didn't know precisely when it was going to

 5    happen, but she was already talking about it, so.

 6    BY MS. WIKTOR:

 7       Q    Well, it was in the future in any event; she

 8    didn't have tenure then?

 9       A    Right.  She was coming up for tenure.  The

10    next phase of her academic trajectory.

11       Q    And so understanding that what your office

12    did to protect her from possible retaliation was

13    limited to maintaining confidentiality, did you talk to

14    anyone else in any other area of the university about

15    Susan Byrne's employment situation and her tenure

16    application relative to the university ensuring that it

17    was free from retaliation?

18       A    No.

19

20    (Plaintiff's Exhibit 69, 3/9/15 email, marked for

21    identification.)

22

23    BY MS. WIKTOR:

24       Q    I am handing you Exhibit 69.  This is

25    Defendant's Bates Nos. Byrne 018859 through 61.  And
```

```
 1                      CERTIFICATE OF REPORTER

 2

 3          I, Mary Z. Armando, a Notary Public duly commissioned and

 4     qualified in and for the State of Connecticut, do hereby

 5     certify that pursuant to Notice, there came before me, on the

 6     23rd day of January, 2019, at 10:11 a.m., the following named

 7     person, to wit: STEPHANIE SPANGLER, who was by me duly sworn

 8     to testify to the truth and nothing but the truth; that she

 9     was thereupon carefully examined upon her oath and her

10     examination reduced to writing under my supervision; that this

11     deposition is a true record of the testimony given by the

12     witness.

13          I further certify that I am neither attorney nor counsel

14     for, nor related to, nor employed by any of the parties to the

15     action in which this deposition is taken, and further, that I

16     am not a relative or employee of any attorney or counsel

17     employed by the parties hereto, or financially interested in

18     the action.

19          IN WITNESS THEREOF, I have hereunto set my hand and

20     affixed my seal this 1st day of February, 2019.

21                        Mary Z Armando

22

23                        _____

24                        Mary Z. Armando, Notary Public
                          CT License No. 00222
25                        My Commission expires:  5/31/22
```