# Exhibit 154

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
 2

 3   * * * * * * * * * * * * * * *
     SUSAN BYRNE,                       )
 4                                      )
                   Plaintiff,           )
 5                                      )  Civil Action No.
          -vs-                          )  3:17-CV-01104 (VLB)
 6                                      )
     YALE UNIVERSITY, INC.,             )
 7                                      )
                   Defendant.           )
 8   * * * * * * * * * * * * * * *

 9

10

11

12

13            DEPOSITION OF:   DAVID JACKSON

14            DATE:       FEBRUARY 15, 2019

15            HELD AT:    MADSEN, PRESTLEY & PARENTEAU, LLC
                          402 Asylum Street
16                        Hartford, Connecticut  06103

17

18

19        Reporter: Bethany A. Carrier, RMR, CRR, CSR #071

20

21

22

23
                          CASSIAN REPORTING, LLC
24                       21 Oak Street - Suite 307
                        Hartford, Connecticut 06106
25                           (860) 595-7462
                     scheduling@cassianreporting.com
```

```
 1   issue.  One of the -- I'll say more about that later, but
 2   it says here, quote, big picture.
 3             As we noticed from the other document, we're
 4   talking about filigree, pain-staking research.  The
 5   question of a bigger picture didn't -- was not brought up
 6   before.  Didn't seem to be objectionable.  And now a
 7   rather than valued detailed research, we have negative
 8   opinion of detailed research because now we want the big
 9   picture.
10             And the question on page 2, What difference has
11   the presence of Ficino in Spain made?  Well, one would
12   suggest that a reader of the book could then draw that
13   conclusion from all of the evidence in the book rather
14   than make a statement at the beginning that the whole
15   purpose of the book was to show, quote/unquote, a
16   difference, whatever that could be.
17             I find that to be not only vague, but to be kind
18   of a preparation for a general complaint about the book
19   that ignores its scholarly method and its potential
20   importance in the field.
21             My other overall comment about this, given of
22   course its true that I thought she should be promoted, but
23   not more for the intentions than the result of her
24   scholarship.  I defended what she actually did rather than
25   what they might have wanted her to do.  So my support for
```

1　remember any specific comment.  Could have also been

2　Professor Valis who commented on the deficiency in

3　writing.  But I have an opposite opinion.  I think that

4　the book was -- the writing was extremely well done.

5　　　Q　And do you recall any discussion on the external

6　letters at this first meeting?

7　　　A　Obviously, there was.  In the minutes it says, I

8　reviewed the letters individually, noting salient points.

9　I don't recall what points she brought out, but I do

10　recall reading the letters and nearly all of them were

11　extremely positive.  Some were laudatory, over the top

12　laudatory.  There was a middle range of letters that were

13　all positive, and some letters quite extensive.  There

14　was, as I recall, only one letter that had reservations.

15　And there's only one of the writers who concluded that he

16　would not recommend her for tenure at Yale.

17　　　Q　Other than what we've already discussed, is

18　there anything else in Exhibit 78, these minutes from the

19　February 3rd meeting, that are inaccurate?

20　　　A　I feel that the way this is written, for

21　example, The committee members admired her productivity

22　and archival zeal, but felt that the scholarly,

23　intellectual focus was unduly narrow.

24　　　　Well, that doesn't include me and I'm one of the

25　four members.  So at least 25 percent disagrees with this

1  statement of the committee members.
2        So I would say that -- I would characterize this
3  document as being misleading.
4    Q    Is there anything that you recall from the
5  discussion that we have not covered already that is
6  missing in terms of discussion points mentioned that's
7  missing from Exhibit 78?
8    A    No.  As I can recall, some of these general
9  observations concluded this set of letters are not shine.
10 I don't think those words were actually used.  I think
11 this seems to be a concentrated version perhaps of
12 comments.  But since I don't recall any of the
13 individuals, then I can't really say anything more about
14 it.
15       I see there was a straw vote here at the end.
16 That also I feel now was not necessary and perhaps not
17 even appropriate on the basis of what was a preliminary
18 discussion.  But there it is.
19   Q    Why would the straw vote be inappropriate at
20 this first meeting?
21   A    Well, this is a very small group.  So when you
22 present -- I suppose the idea is arguments will be
23 presented to the full group when it comes down for an
24 actual vote that would be based on some of these.  But
25 this is in a way so general that I wouldn't consider it to

1  be the basis of argumentation.  It's really just sort of

2  reactionary or general opinion, particularly when it comes

3  to something done to the difference between pain-staking,

4  careful work and work that's going to, quote, make a

5  difference or show a big picture.  It's very vague

6  categories on which to base an important and influential

7  committee vote like that as if it were a recommendation.

8           Obviously, I disagreed with the vote, so my

9  characterization of it is more doubtful.  But there's -- I

10 don't think there was any obligation for this committee to

11 take a preliminary vote.

12      Q   And it looks like Jack Dovidio, Professor

13 Adorno, and RGE were not present for --

14      A   Not present, no.

15      Q   And after this initial meeting on February 3rd,

16 there was another meeting subsequently where there's an

17 actual vote taken --

18      A   Yes.

19      Q   -- on Professor --

20      A   That would be the meeting.  Right.

21      Q   Let me show you Exhibit -- let's mark this as

22 Exhibit 79.

23           (Plaintiff's Exhibit 79, Notes

24      from tenure deliberation:  Marked for

25      identification.)

```
 1   even commented on the letters by citing adjectives he had
 2   read, but he did not quote any of the letters.  David was
 3   working from half a sheet of paper.  There's a similar
 4   comment in the following document.  My notepad, right?
 5   And also working from -- I didn't have to have a long
 6   sheet of paper with a text prepared in order to
 7   participate and make comments in the meeting.
 8            The blow-by-blow refutation of both her books
 9   and the letters seems to be overblown here and overstated.
10            One of the things that surprised me about this
11   meeting was that RGE and Professor Adorno came in with
12   several pages of single-spaced text to be read.  Very
13   devastating negative evaluation, somewhat in these terms,
14   but in an opening statement.  And Professor Valis then
15   said that she had 13 pages of notes that she wouldn't
16   bother to present but all on negative observations.
17            That's not a way that one begins a meeting for a
18   discussion and analysis.  That's one way to present a fait
19   accompli, an intimidation.  And that simply, to my mind,
20   is substantiated by the kind of comments I'm reading in
21   this document.
22       Q    Now, on the first page of Exhibit 79 that we're
23   going through, towards the bottom there's a paragraph that
24   starts, Jack asks if the letters were considered and the
25   answer was a resounding, collective yes.
```

1                Is that accurate?

2        A    It seems to me the words "resounding" and

3   "collective" seem overblown to me.  There's no reason to

4   put those adjectives there, except to emphasize the

5   difference that this document is trying to bring out

6   between a virtuous set of opinions and a negative set.

7                It's very easy to see how Anibal and me are

8   being characterized as opposed to the rest of the

9   evaluators here.

10       Q    I just want to make sure was that actually

11  accurate, though, that the letters had been considered --

12  previously considered, this statement?

13       A    Considered.  Well, again, depends on what you

14  mean considered.  In the previous meeting we read that

15  Noël said that she went through them, and then in one of

16  these documents it says that Rolena presented them.

17               So I would say the letters were presented.  They

18  were certainly considered by those two colleagues.  But I

19  think, again, that's part of why we characterize this as a

20  misleading comment.

21       Q    But not considered by the whole of the

22  committee?

23       A    Well, as I said, Noël just says, They're on the

24  server.  You're supposed to go and read them.  Well, if

25  that's consideration.  But consideration is, again, a

```
 1   find a jugular point, right, and bring the whole thing to
 2   a negative conclusion.
 3       Q   Would it be fair to describe these criticisms as
 4   hyper scrutiny of criticisms -- and criticisms not
 5   previously expressed --
 6               MR. SALAZAR-AUSTIN:  Objection.
 7   BY MS. HOWARD:
 8       Q   -- to Professor Byrne?
 9               MR. SALAZAR-AUSTIN:  Objection.
10               THE WITNESS:  My opinion would be
11       yes.
12   BY MS. HOWARD:
13       Q   So moving on to Exhibit 80.  These appear to be
14   notes by Professor Valis.  And I believe you testified
15   earlier that you had not seen -- previously seen Exhibit
16   80?
17       A   No.
18       Q   Okay.  If you'd like to take a moment to review
19   Exhibit 80 again.  Please let me know.
20       A   Sure.  All right.
21       Q   So now that you've had a chance to look at
22   Exhibit 80, why don't we start with -- you haven't seen --
23   strike that.
24           Have you ever seen Exhibit 80 before?
25       A   Not that I remember.  I don't believe so.
```

```
 1              In a sentence on the bottom of page 3 she
 2   repeats, There is very little real literary analysis
 3   either.
 4              That, to me, is a telling point.  They don't say
 5   what they consider.  What would be real literary analysis?
 6   So is this what -- what kind of literary analysis is this
 7   if they don't consider it real?
 8              The keywords that come up later seem to be --
 9   they seem to be looking for things that are going to make
10   a vital difference, contribution, change in the field.
11   And certainly that's a valid criterion as well, as long as
12   it's made apparent from the beginning that it's an
13   essential criterion.  But to be a sudden basis of a whole
14   value judgment at the end when it wasn't included as a
15   criterion in the other promotion event, or even as far as
16   I can see in the evaluation of her work while at Yale,
17   seems to be raising an unexpected objection at the last
18   minute.
19       Q    So in terms of the conversations and meetings
20   that you were a part of regarding promotion or evaluating
21   Sue Byrne's progression as a tenure-track employee, up to
22   this 2016 meeting, were there any discussions on assessing
23   Professor Byrne on the criterion whether she would make a
24   vital difference, contribution, or change in her field?
25              MR. SALAZAR-AUSTIN:  Objection.
```

```
 1                THE WITNESS:  I never heard any.
 2         This is a lot more detailed than what happened
 3         at the Paulo Moreira evaluation meeting, which
 4         was, I suppose, the first one our department
 5         ever had for promotion to tenure, which was
 6         also negative.
 7   BY MS. HOWARD:
 8         Q    When you say it was more detailed, can you
 9   explain?
10         A    Well, I think they voted against Paulo without
11   really giving any reasons at all, which is their perfect
12   right to do.  And it made me feel that in order to make
13   sure they would get the result they wanted, they came
14   prepared this time.
15         Q    Now, earlier you testified that Professor
16   Echevarría, so RGE, that his comments at the February 9th
17   meeting were the closest to substantive comments that you
18   could find.  Are there any comments you can point out in
19   Exhibit 80 that would be what you consider substantive
20   comments?
21                MR. SALAZAR-AUSTIN:  Objection.
22                THE WITNESS:  There are some that
23         are between general and substantive.  The lack
24         of critical insight is, of course, his
25         evaluation.  If it contains clichés and
```

1    of this paragraph says -- which is referring to Professor
2    Bloch -- states, Adding that he judged there to be three
3    and a half negative letters out of eight.
4        A    Here it is.  Yes.
5        Q    Is that something that you found -- is that
6    something that Professor Bloch stated?
7        A    It may be.  I don't recall.
8        Q    Do you recall that there was any disagreement
9    about how -- about the tone of the letters, whether the
10   letters were negative or positive?
11       A    I recall that there was -- how shall I say? --
12   more assents on the other members of the committee that
13   the letters were more negative than I thought they were.
14   I thought there was only really one negative letter.  I
15   think that there was a lot of reading between the lines.
16   And this is, to some extent, understandable in academic
17   letters because it's such a commonplace; it's almost
18   impossible to write a sincere, positive letter of
19   recommendation.  So I thought my colleagues were trying to
20   read between the lines to find negative implications when,
21   in my opinion, they weren't there.
22       Q    So I'm trying to do this in the most streamlined
23   possible way.  I think what we'll do is I'll mark all of
24   the external letters and then we'll take a five-minute
25   break, five-, ten-minute break for you to review all the

```
 1        and broad even, nature of her work.
 2                 I think Bruce Burningham is a Yale
 3        Ph.D. if I'm not mistaken.  I may be wrong.
 4                 MS. HOWARD:  Let's take a
 5        five-minute break.
 6                 (Recess: 2:08 p.m. to 2:16 p.m.)
 7   BY MS. HOWARD:
 8        Q    So Professor Jackson, we're back on the record.
 9   I'll just remind you again that you're still subject to
10   the oath that you took earlier.
11        A    Right.
12        Q    So before the February 3rd meeting, did you have
13   any conversations with anyone about Sue Byrne's tenure
14   application?
15        A    There was one moment when RGE came to my office
16   and just popped his head in and said, There's been a
17   negative letter.  But I didn't have any discussion with
18   anyone about it.
19        Q    Was RGE happy or --
20        A    I couldn't say.
21        Q    And then in between the February 3rd and
22   February 9th meeting, did you have any conversations with
23   anybody about Sue Byrne's tenure application?
24        A    I don't recall that period, but it's quite
25   possible I would have exchanged a few words with Professor
```

```
 1  STATE OF CONNECTICUT

 2       I, Bethany A. Carrier, RMR, CRR, CSR #071, a Notary

 3  Public, duly commissioned and qualified in and for the

 4  State of Connecticut, do hereby certify that pursuant to

 5  Notice, there came before me on the 15th of February,

 6  2019, the following-named person, to wit:  DAVID JACKSON,

 7  who was by me duly sworn to testify to the truth and

 8  nothing but the truth; that he was thereupon carefully

 9  examined upon his oath and his examination reduced to

10  writing under my supervision; that this deposition is a

11  true record of the testimony given by the witness.

12       I further certify that I am neither attorney nor

13  counsel for nor related to nor employed by any of the

14  parties to the action in which this deposition is taken,

15  and further that I am not a relative or employee of any

16  attorney or counsel employed by the parties hereto, or

17  financially interested in this action.

18       IN WITNESS THEREOF, I have hereunto set my hand

19  this 28th day of February, 2019.

20

21                    [signature: Bethany A. Ca___]

22              _____
                Bethany A. Carrier, RMR, CRR, LSR #071
23                           Notary Public

24  My Commission Expires:
    October 31, 2023
25
```