```
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
 2


 3


 4    SUSAN BYRNE,                      )
              Plaintiff,                )  Civil Action No.
 5                                      )  3:17-CV-01104(VLB)
      VS                                )
 6                                      )
      YALE UNIVERSITY, INC.,            )
 7            Defendant.                )


 8


 9


10       DEPOSITION OF:   Kate Stith
         DATE:            January 17, 2019
11       HELD AT:         Madsen, Prestley & Parenteau, LLC
                          105 Huntington Street
12                        New London, Connecticut


13


14


15


16


17


18


19


20


21          Reporter:  Robin Balletto, RMR, CSR #230


22


                     Cassian Reporting, LLC
23                       21 Oak Street
                 Hartford, Connecticut   06106
24                       860-595-7462


25
```

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 2 of 32

```
 1   ironic comment at a deposition.

 2              MS. CHAVEY:  It doesn't translate well

 3      on the record usually.

 4   BY MS. WIKTOR:

 5      Q   I've been known to make that mistake myself,

 6   but go on.

 7      A   Whatever the reviewers wanted to ask her

 8   about, which seems to have been all events in the

 9   department over the last -- over the previous several

10   years, and sometimes events longer ago than that.

11      Q   Would it be fair to say that Rolena Adorno

12   was not pleased about the scope of inquiry?

13              MS. CHAVEY:  Objection.

14              THE WITNESS:  I don't know.  I never

15      heard her say I'm displeased.  She was very

16      concerned that the inquiry seemed to have no

17      focus, or no clear focus, and seemed to be

18      interminable.

19   BY MS. WIKTOR:

20      Q   What was your understanding about what it was

21   that had prompted this climate review to be

22   undertaken?

23      A   My understanding is that the Yale Daily News

24   got it right, that in the wake of the anonymous

25   letter, the provost, I believe with two deans, decided
```

```
 1    to undertake an unprecedented thorough review of the,

 2    quote, climate, sometimes the word environment was

 3    used, of the department.

 4         Q    Rolena Adorno was interviewed in person by

 5    the people conducting the climate review on a number

 6    of occasions; is that right?

 7         A    Correct.

 8         Q    Did you attend those interviews?

 9         A    I did.

10         Q    How many interviews did you attend with

11    Rolena Adorno?

12         A    At least four, perhaps five.  I attended

13    every interview she had with them.

14         Q    And over what span of time was Professor

15    Adorno interviewed, and by that I mean, you know,

16    month and year versus the length of time?

17         A    I would have to check my calendar and emails,

18    but I think it began in June, her interviews began in

19    June and ended in late July, early August.

20         Q    And Roberto González Echevarría was also

21    interviewed in connection with this climate review,

22    correct?

23         A    That's correct.

24         Q    And did you attend his interview or

25    interviews with him?
```

```
 1   with anyone else?

 2        A    Not interviews conducted by the climate

 3   review investigators.

 4        Q    Some other interviews?

 5        A    Not interviews.  I did attend a meeting in

 6   the provost's office in December of that year, I

 7   believe it was December of that year, in connection

 8   with the completion of the climate review.

 9        Q    And who else attended that meeting?

10        A    The dean of the graduate school, the dean of

11   the Faculty of Arts and Sciences, and Rolena Adorno

12   and Noël Valis.  There may have been other staff

13   people there.

14        Q    And at that time the dean of the Faculty of

15   Arts and Sciences was Tamar Gendler?

16        A    Correct.

17        Q    And the dean of the graduate school was?  Was

18   it Amy Hungerford?

19        A    No.  An impressive scientist, a female

20   scientist.

21        Q    If it's a memory test, I'm not passing any

22   better than you are, so...

23        A    I haven't looked at this material.

24        Q    So there might have been other staff, but in

25   terms of people from the Department of Spanish and --
```

1   faculty in the Department of Spanish and Portuguese,

2   or administration, anyone other than the dean of the

3   graduate school, Tamar Gendler, Rolena Adorno and Noël

4   Valis?

5       A   And the provost.

6       Q   And the provost.  And was the provost

7   conducting the meeting?

8       A   Each Yale official had something to say that

9   was --

10      Q   So would it be fair to say that the first

11  interview that you attended in the context of the

12  climate review was the interview of Noël Valis?

13      A   That is my recollection closely followed by

14  Roberto González.  It's possible I've gotten the order

15  confused, but I believe it was Noël then Roberto.

16      Q   So between the time of the first interview

17  that you attended in the context of the climate review

18  and the meeting that you attended in December of 2015

19  with Yale administrators, did you attend any other

20  meetings during that time frame that related to the

21  climate review?

22      A   No.

23      Q   So between the time that you first learned

24  that a climate review is to be undertaken, and when

25  you actually attend the first interview, did you

```
 1   attend any meetings with anyone about the climate

 2   review or the Yale Daily News article or the anonymous

 3   letter?

 4                  MS. CHAVEY:  Objection.

 5                  THE WITNESS:  I met with Rolena helping

 6        her to gather documents responsive to the request

 7        of the climate reviewers.  I may have also met

 8        with Noël prior to her interview and/or Roberto.

 9        I believe I reviewed a document that Roberto

10        submitted to the climate reviewers.

11   BY MS. WIKTOR:

12        Q   So during the period of time, March 25, 2015,

13   the publication of the Yale Daily News article, and

14   the meeting in December of 2015 that you attended that

15   Ben Polak and the deans were present at, did you have

16   any meetings or discussions with anyone in the

17   university administration about the climate review,

18   the Yale Daily News article or the anonymous letter?

19                  MS. CHAVEY:  Objection.

20                  THE WITNESS:  Yes.

21   BY MS. WIKTOR:

22        Q   And who did you meet or discuss the climate

23   review, the Yale Daily News article, or the anonymous

24   letter with?

25                  MS. CHAVEY:  Objection.
```

```
 1              THE WITNESS:  I spoke with Emily

 2       Bakemeier.

 3  BY MS. WIKTOR:

 4       Q    And who is Emily Bakemeier?

 5       A    She has many titles.  She was in the

 6  provost's office and/or the newly appointed dean of

 7  the Faculty of Arts and Sciences office or both.  She

 8  had been in the provost's office when I first got to

 9  know her.  I think she had a double role.

10       Q    And so the FAS dean, that was a newish

11  position at this point, correct?

12       A    Correct.

13       Q    So when did you -- was it one discussion with

14  Emily Bakemeier or multiple?

15       A    I recall one discussion.

16       Q    And when did it occur?

17       A    It would have occurred in early April of

18  2015, conceivably late March.

19       Q    And was it an in-person discussion or on the

20  telephone?

21       A    On the telephone.

22       Q    Did you call her or did she call you?

23       A    I called her, and I believe she called me

24  back.

25       Q    How long did the conversation or the
```

1   discussion that you had with her last?

2       A   It was not long.  Four minutes, question

3   mark.

4       Q   So tell me everything that you can recall

5   discussing, or that you can recall was said during

6   that telephone conversation?

7       A   Yes, I told her that the chair and other

8   members of the department were very concerned about

9   this open-ended climate review, why it was being

10  undertaken, what its purpose was, and that I did not

11  think -- I had been convinced by them that it was not

12  going to be helpful to the department to seek out any

13  dirty laundry that could be found, or complaints that

14  one member of the department might have about another,

15  that I had never heard of such a thing happening

16  before, and what was the purpose.

17      Q   Okay.  And what did Emily Bakemeier say?

18      A   The only thing I recall her saying, that I

19  presently recall is, it's not just the anonymous

20  letter.

21      Q   Did you have an understanding of what she

22  meant by that?

23      A   She did not further explain.

24      Q   What did you take it to mean?

25      A   I took it to mean that there had been

1  complaints, I don't know from whom, previous to or in

2  addition to the anonymous letter.

3      Q    And what sorts of complaints did you take it

4  to mean that there had been?

5      A    I had no idea.

6      Q    Did you ask her what she meant by it's not

7  just the anonymous letter?

8      A    No, but I -- I believe that I had said that

9  the administration had acted precipitously, and she

10  was responding to the word precipitously.

11      Q    Can you recall anything else that was said

12  during this conversation with Emily Bakemeier?

13      A    I remember something that I said.

14      Q    Okay.  What do you remember that you said?

15      A    That they should have spent the spring

16  vacation checking on the bona fides of easily

17  ascertainable allegations that were not true -- that

18  were easily ascertainably not true, and that they

19  should have consulted the chair of the department who

20  was a devoted Yale citizen as they well knew.

21      Q    Did you tell Emily Bakemeier what allegations

22  you were referring to in that statement?

23      A    I did not.

24      Q    What allegations were you referring to?

25      A    I believe it related to the procedures and

```
 1    which they all three noted suggested there were lots

 2    of assailants roaming around.  They have a whole list,

 3    which I think they had already begun to prepare before

 4    this phone call of falsities in that letter.

 5         Q    And did they give that list to you?

 6         A    I certainly reviewed it.  I remember reading

 7    it.

 8         Q    And was it a piece of paper, or was it an

 9    electronic list?

10         A    A piece of paper.

11         Q    And who had the piece of paper?

12         A    I believe Rolena and Noël each wrote their

13    own list and showed them to me.

14         Q    Did you keep a copy of either or both of

15    them?

16         A    I do not think I did, but I'm not sure.

17         Q    Do you recall if they were typed or

18    handwritten?

19         A    Typed.

20         Q    Now, in the telephone conversation that you

21    had with Emily Bakemeier, did you discuss with her

22    anything that had to do with allegations related to

23    sexual harassment or sexual misconduct in either the

24    Yale Daily News article or the anonymous letter?

25              MS. CHAVEY:  Objection.
```

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 11 of 32

```
 1              THE WITNESS:  I may have used words like
 2       while, ambiguous, unsupported allegations.  I was
 3       referring there not just to the sexual misconduct
 4       allegations, but to the allegations about
 5       hostilities and alleged malfunctioning of the
 6       department.
 7   BY MS. WIKTOR:
 8       Q   Was it your understanding that there were not
 9   hostilities among the faculty in that department?
10       A   No.  There were some hostilities, but not to
11   the extent alleged.
12       Q   And what was your understanding -- at the
13   time that you had this phone call with Emily
14   Bakemeier -- of what the nature of any hostilities
15   among the faculty in that department were?
16       A   The one that Roberto had told me of, which I
17   think may have been alluded to by the other two, was
18   that Anibal had not spoken with him for many years and
19   refused to look at him in the hallway.
20       Q   And this is Anibal González-Pérez?
21       A   Correct.
22       Q   And he is a tenured professor in that
23   department; is that right?
24       A   That's right.
25       Q   Was there only four tenured professors in
```

1  of, it purported to have been written by graduate

2  students in the Department of Spanish and Portuguese;

3  is that your understanding?

4      A    That's my understanding.

5      Q    And was there -- in your discussions with

6  Rolena Adorno, was there any discussion about who

7  might have authored that anonymous letter?

8      A    Oh, there was constant speculation by me and

9  by each of the three members of the department.  I

10  believe Roberto told me about speculation among the

11  graduate students.  Rolena and Roberto and Noël all

12  told me about conversations or emails with graduate

13  students in which they, at least one person doubted it

14  had been written by graduate students -- a graduate

15  student doubted that it had been written by graduate

16  students, so yeah, there was, yes.

17      Q    Now, were there ever names in these

18  discussions, to the extent that you participated in

19  them, did either you or the three departmental

20  members, Noël Valis, Rolena Adorno, Roberto González

21  Echevarría, ever name any individuals that they

22  thought, individual or individuals that they thought

23  or they were speculating might have written this

24  letter?

25      A    Yes.

1      Q    And who were those individuals who were named

2   as possibly writing the letter?

3      A    I want to stress the possibly and

4   speculatively because to this day they will tell you

5   they do not know, and they do not know.  The names I

6   recall are -- there are a couple of graduate students

7   or recent graduate students, whose names I do not

8   have, and faculty members mentioned were Anibal, Sue

9   Byrne, Kevin Poole, and David Jackson, as, "Well,

10  let's think, is there something in here that only

11  David knew."  Those names would come up.

12     Q    Okay.  And so in the instances where Sue

13  Byrne was brought up as "is this the person who could

14  have written the letter," what was the discussion to

15  the extent that you were present for or participated

16  in?

17     A    Well, I recall that after seeing Sue Byrne's

18  letter of April 1st requesting recusal of at least

19  Roberto and Rolena, I thought to myself, and

20  articulated to them, that the person who wrote that

21  could have participated in the writing of the

22  anonymous letter.

23     Q    The person who wrote that being --

24     A    Sue Byrne.

25     Q    Okay.  So having seen Sue Byrne's April 1st

# Exhibit 155

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 15 of 32

1   given -- and I don't remember Sue Byrne's words as

2   recounted to me, but given what Sue Byrne said to

3   Rolena in the doorway of her office, which are two

4   different things.

5       Q   So as recounted to you by Rolena, the

6   reference that Rolena made in the faculty meeting

7   about people who had, or faculty who participated in

8   the Yale Daily News article, did you get a sense that

9   she was taking a positive view of this participation

10  or a negative view?

11      A   No, a negative view because all the faculty

12  quoted said negative things.

13      Q   Okay.  So Sue Byrne was quoted and named in

14  the article, correct?

15      A   Yes.  Although she said the most positive

16  things of anybody in the article, positive about her

17  own relationship.

18      Q   Did you discuss with Rolena Adorno the sort

19  of relative positivity or negativity of Sue Byrne's

20  statements to the Yale Daily News?

21      A   No, but I do think that I remarked to Rolena,

22  or she remarked to me, and I agreed, that Sue Byrne's

23  comments about getting along with people and expecting

24  to get tenure were strategically smart on her part to

25  have in the article.

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 16 of 32

```
 1        A    Yes, she did.

 2        Q    And was it your understanding that she

 3   thought or suspected it had something to do with the

 4   climate review or someone -- strike that.

 5            It had -- it was in some way connected to the

 6   climate review or the anonymous letter?

 7                 MS. CHAVEY:  Objection.

 8                 THE WITNESS:  I'm not allowed to ask

 9        questions, but I would like to ask.  As I recall,

10        this was -- there were two events, and one

11        involved snow, suggesting that this was before the

12        anonymous letter.  Is that right?

13   BY MS. WIKTOR:

14        Q    So would you describe for me, please, what

15   your understanding of the events that were -- that

16   occurred at -- were they both at Rolena's home?

17        A    My understanding is yes.

18        Q    So what were the circumstances as you

19   understood them?

20        A    The first was that Rolena discovered that

21   someone had thrown an object through a window breaking

22   it.  I believe there was a second event that someone's

23   footsteps were seen in the snow going up from the

24   street to the place where that window is.  Footsteps

25   seen by, I believe, a neighbor.
```

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 17 of 32

```
 1        Q    So were the footsteps seen close in time to

 2   when the window was broken?

 3        A    Close in time, but my recollection is being

 4   told that they're two separate days.

 5        Q    Did you have any discussions with Rolena

 6   Adorno about who may be responsible for these

 7   incidents at her home?

 8        A    Yes.

 9        Q    What individual or individuals were named as

10   possibly being involved?

11        A    One person that we speculated about was Sue

12   Byrne's husband.

13        Q    Any other individuals?

14        A    I remember asking Rolena, well, maybe it can

15   be a graduate student, and her looking at me with

16   exasperation and saying, I do not have hostile

17   relations -- none of my graduate students would do

18   such a thing.  Now, you have to understand these

19   conversations occurred some months after the broken

20   window.

21        Q    Now, did you have any dis- --

22              MS. CHAVEY:  Had you finished your

23        answer?

24              THE WITNESS:  Yes.

25   BY MS. WIKTOR:
```

```
 1    back of the house and could not be seen from the

 2    street.  So it was in the back half of the house and,

 3    as I recall, there was a wall, there is a wall,

 4    concrete wall, then a little walking area, and then

 5    the house with the window in it.  So one would have

 6    had to go around -- maybe there are even stairs there

 7    to go down to the little walking area, and one would

 8    have had to go around the house and pick this window,

 9    which cannot be observed from the street, or I believe

10    from the neighbors, because of this concrete wall.

11    That's my best recollection.

12           I don't remember discussing that particular

13    fact with Rolena, but the removed presence of the

14    window was obvious to both of us, removed location,

15    excuse me.

16       Q   So it was -- how did Sue Byrne's husband come

17    up as the possible culprit?

18              MS. CHAVEY:  Objection.

19              THE WITNESS:  I do not know how he came

20       up.  Remember, this occurred before I got

21       involved.  So I would be speculating if I -- I

22       don't know how Rolena came up with that.

23    BY MS. WIKTOR:

24       Q   Did she tell you anything that she knew or

25    understood about Sue Byrne's husband that led her to
```

1  something like the usual suspects, or something, or

2  the possible suspects, and planned to get the IP

3  addresses of Sue Byrne and recent graduate students

4  who didn't like Roberto, colleagues such as Anibal who

5  didn't like Roberto, but as I say, I never got that

6  far, because it turns out that these were people using

7  Yale servers, and they don't have a unique IP address.

8      Q   Why was Sue Byrne on the list of the usual or

9  possible suspects, as you describe it?

10     A   Because she had written very hostile things

11 about him in her April 1st letter and wanted him

12 recused and would have an interest in -- or would not

13 be adverse to having something written that's

14 embarrassing to him.

15     Q   Well, at this point it's almost a year after

16 her April 1, 2015, letter.  Is that your understanding

17 of the amount of time that's passed?

18     A   Okay.  Now that you say that I think that's

19 right.  So this is 2016 we're talking about?

20     Q   Yes.

21            MS. CHAVEY:  And that's not disputed

22     between the parties, those dates.

23            MS. WIKTOR:  Thank you, Tory.

24            THE WITNESS:  Well, you have to

25     understand that there were people obviously out to

```
 1   thinking that these people would not vote on the

 2   merits, this would have been a good time to bring it

 3   up.

 4       Q   Now, is there some written policy or

 5   procedure by which a junior faculty member can bring a

 6   motion to the provost about his or her tenure vote?

 7              MS. CHAVEY:  Objection.

 8              THE WITNESS:  No.  In fact, I think the

 9       conflict of interest policy is stated with -- that

10       it's the decision of the tenured faculty member

11       whether he has a conflict of interest.  I don't

12       think there's any procedure for determining -- for

13       somebody else to determine whether there is a

14       conflict of interest.  That's the written law.  In

15       practice, I think that deans and department chairs

16       probably say, given he divorced your cousin, you

17       know, it's just going to look better if you're not

18       on this, and that's not forcing anybody off, but

19       that's just reasoning with people.

20   BY MS. WIKTOR:

21       Q   Now, so to use your example where, I guess,

22   the junior faculty -- so who -- is it the senior

23   faculty member who divorced the cousin, or the junior?

24       A   No, the junior.

25       Q   So the junior faculty member divorced the
```

```
 1   attended with Noël Valis and with Roberto González
 2   Echevarría, were either of -- was Sue Byrne's name
 3   brought up in either of those interviews?
 4        A   I'm sorry, I must have missed, interviews
 5   with --
 6        Q   With Noël Valis and Roberto González
 7   Echevarría in the context of the climate review?
 8        A   Yes.
 9        Q   And so was Sue Byrne's name brought up in
10   both interviews?
11        A   I'm sure it was.  I don't recall specifically
12   what came up with Noël.  I know that with Rolena it
13   was a long -- I mean, it was the whole lead process,
14   it was the letters from Sue Byrne in, if I'm recalling
15   right, January, it was the recusal letter, it was --
16   yeah, they went through everything.  All of the
17   documents mentioned her name as the subject of
18   questioning.
19        Q   And did you have a belief about whether or
20   not the climate review, the convening of the climate
21   review, or the ordering of it, I suppose, had
22   something to do with Sue Byrne?
23        A   Well, I suspected.  As I mentioned, that she
24   complained to somebody about Roberto and Rolena being
25   biased against her or whatever, but I did not have any
```

1    basis in fact for that other than Emily's statement to

2    me, and followed by her -- well, I had already seen

3    her January letter, so I probably could have -- it

4    would have been odd, maybe, if she didn't bring that

5    to somebody else's attention, but it didn't occur to

6    me then.  I mean, really, it was the April letter.

7         Q    So based on your interactions with the three

8    senior faculty in Spanish and Portuguese, did you have

9    an understanding of whether Rolena Adorno believed

10   that the climate review was somehow connected to

11   complaints Sue Byrne had made, or possibly had made?

12              MS. CHAVEY:  Objection.

13              THE WITNESS:  As I mentioned, I do not

14       recall discussing my informed speculation about

15       that with Rolena.  I think, as I already

16       mentioned, that both of us speculated that she

17       might have participated in the anonymous letter,

18       and that certainly was a triggering event, so --

19       and I do not recall if the climate reviewers

20       specifically asked that question of Rolena or

21       anyone else.

22   BY MS. WIKTOR:

23        Q    Now, in the interview of Roberto González

24   Echevarría that you attended, did Sue Byrne's name

25   come up?

```
 1        A   Yes.

 2        Q   And what was -- tell me everything you can

 3   recall that had to do with Sue Byrne that was brought

 4   up in that interview?

 5        A   I do not recall much.  That interview was

 6   itself only an hour, Roberto read his statement; they

 7   seemed uninterested.  They did ask him whether he had

 8   ever engaged in inappropriate sexual conduct, sexual

 9   harassment.  They asked this generally, did not attach

10   any name to it, and did not attach any statute of

11   limitation; it was very broad ended.  They may have

12   gone through the list of other faculty members or

13   graduate students, but initially they asked very

14   broadly, and I remember thinking ever in his life, but

15   there was nothing -- and he denied that he had ever

16   done so to anyone.

17        Q   Okay.  So specifically to the extent that Sue

18   Byrne came up in Roberto González Echevarría's

19   interview, what was the context?

20        A   What I just -- the name Sue Byrne, let me

21   think.  I do not recall, other than, again, possibly

22   listing her as one of the people that you ever had

23   misconduct towards in the list of names, I do not

24   recall.  They did not seem particularly interested in

25   his explanation of why he thought she did not deserve
```

```
 1   tenure, so that was cut off, because they really

 2   didn't ask it.  He sort of volunteered it.  So I

 3   assume they covered this in their climate review

 4   report.  I do not know how accurate that report is

 5   since I have not seen it.

 6       Q   Now, this listing of people who --

 7       A   This possible listing because they did that

 8   for at least one of the people.  I think it was

 9   Roberto.  I think it was Jamaal who said, okay, now

10   you've been asked generally, but let me ask you, and I

11   think he asked with respect to a whole bunch of names,

12   but also a whole bunch of different activities, you

13   know: sexual touching, sexual harassment, quid pro

14   quo, something else, stalking.  I think he listed the

15   whole thing.

16       Q   So who were the names on the list of names

17   he --

18       A   For some reason I do recall that it was not

19   just faculty, because I recall that a lector was -- a

20   lector's name was among the people.

21       Q   Were the people on the list all female?

22       A   I believe so.

23       Q   And was it more than ten people?

24       A   I cannot recall, and I am really building a

25   memory here, just because I remember Jamaal
```

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 25 of 32

```
 1   wondering what he thinks he's doing, but...
 2       Q   Okay.  So initially -- I think initially you
 3   said Rolena was not on the list, and then you said she
 4   might be?
 5       A   Yes, because I would have been surprised to
 6   hear Rolena's name on the list, but why would I be
 7   surprised if he's just naming anybody.  I don't
 8   remember if Ginny Gutierrez was.  I do not remember
 9   except for this one lector, and that, again, is a
10   faint memory, but it is a specific one.
11       Q   So you said that the climate reviewers -- so
12   were each of the interviews that you attended with
13   these three faculty members, were Barbara Gorin and
14   Jamaal Thomas both in attendance?
15       A   Yes.
16       Q   Okay.  Other than you, the interviewee,
17   Mr. Thomas, Ms. Gorin, were there any other
18   individuals present during any of those interviews?
19       A   No.
20       Q   So you indicated that Roberto González
21   Echevarría offered, or he put forth an explanation for
22   why he didn't think Sue Byrne should get tenure
23   that --
24       A   He started to put it forth, but they -- I
25   think they were asking not about the ultimate
```

```
 1  decision, but something that he said about Sue Byrne,

 2  or somebody reported that he said about Sue Byrne that

 3  was in a document that they had about Sue Byrne.

 4       Q    Okay.  And so this is in the spring of 2015,

 5  correct?

 6       A    Right.

 7       Q    And Sue Byrne was set to come up for tenure

 8  the following academic year, correct?

 9       A    Yes, as far as I know.  I know that the

10  matter had been put on hold, and I frankly did not

11  know or ask exactly when it would be completed.  I do

12  know that Rolena was upset that the climate review

13  stopped the clock as to some aspects of getting on

14  with Sue Byrne's matter.

15       Q    Now, was there anything concerning about a

16  senior faculty member giving an explanation for why he

17  didn't think a junior faculty member deserved tenure

18  before the tenure application had been submitted?

19       A    No.  They may have asked Roberto but I don't

20  recall this, I have to tell you.  It doesn't mean it

21  didn't happen, but they may have asked him what did

22  you mean, or did you say to Sue Byrne nobody at Yale

23  gets tenure, what did you mean by that.

24       Q    And his response was not -- was about why he

25  didn't think Sue Byrne should get tenure?
```

1   there?

2     A  I believe -- there are two items that Rolena

3   mentioned.  One was ripping down her MLA prize

4   announcement from the department bulletin board, but

5   the more important one was the win- -- when she uses

6   plural, "The windows at home were broken," and as we

7   discussed, I speculated that that was done by -- here

8   I say agents, since I don't know who.  I don't know

9   who else would have this hostility towards Rolena,

10   let's put it that way, besides Sue Byrne, but I don't

11   think she personally did this.

12     Q  Right.  So you think her husband broke the

13   window at Rolena's house?

14     A  I think that is a plausible possibility,

15   that's all.  As an investigator, I would have to do a

16   lot more before I say I think that.

17     Q  At any point from 2015 until we sit here

18   today, have you identified any other individuals that

19   you think it's plausibly possible broke windows at

20   Rolena Adorno's house other than Sue Byrne's husband?

21     A  I asked Rolena if there were any graduate

22   students, and I told you she was taken aback.  No

23   one -- she had positive relationships with all her

24   graduate students.  I left it at that.

25        It's possible that there is -- she got along

```
 1        A    Yes.

 2        Q    So, then, is it still your testimony that

 3   Rolena didn't attribute that action to Sue Byrne?

 4               MS. CHAVEY:  Objection.

 5               THE WITNESS:  Well, she says it's all

 6        about Sue Byrne.  I don't think she attributes the

 7        action; and, of course, she's speculating there.

 8        I think, Kate, that it's all about Sue Byrne, she

 9        thought that at the moment.  I don't think that's

10        saying Sue Byrne did these things.  She mentions

11        the footprints in the snow and the open gate later

12        in the month after the window was broken.  Just

13        strange events, petty events directed at her and

14        at Roberto, she also mentions.  And so she's

15        saying it's all about Sue Byrne there, and exactly

16        what she meant by that, you would have to ask her.

17   BY MS. WIKTOR:

18        Q    Okay.  So you didn't take it to mean that she

19   suspected Sue Byrne of being involved in anything

20   other than the vandalism at her house?

21               MS. CHAVEY:  Objection.

22               THE WITNESS:  I don't know what she --

23        she feels clearly that she and Roberto are the

24        targets of a lot of hostility, and she thinks it

25        relates to Sue Byrne, she says here.
```

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 29 of 32

```
 1        A    Yes.

 2        Q    Is that why you conclude that what you meant

 3   was LS?

 4        A    Yes.

 5        Q    And who is Lorraine Siggins?

 6        A    She is the head of psychiatry at the Yale

 7   Health Service.

 8        Q    And did you know Lorraine Siggins yourself?

 9        A    I have spoken with Lorraine Siggins in

10   connection with students.

11                (Plaintiff's Exhibit 59, Document Bates

12   stamped Byrne 004847 through 48:  Marked for

13   Identification.)

14   BY MS. WIKTOR:

15        Q    Showing you Plaintiff's 59.  This is

16   Defendant's Bates number Byrne 004847 through 48, and

17   this is an email exchange, July 15, 2015.

18            Do you recognize this as an email exchange

19   that you participated in with Rolena Adorno in July

20   of 2015?

21        A    Yes.

22        Q    So turning your attention to your email,

23   which is the second one on the page.  At Number 1

24   there you write, "Did you notice today that Mr. Hines

25   asked for the exact date of the Saturday when you
```

```
 1   who EP is?

 2        A    Yes.  This is about an entirely different

 3   matter.  EP here would be Emma Platoff, a reporter for

 4   the Yale Daily News who wrote the article about the

 5   anonymous letter.  I believe she wrote a November 2014

 6   article, before then she may have written articles

 7   negative of the department.  And by a strange error on

 8   somebody's part, Rolena was given a copy of

 9   correspondence between Sue Byrne and Emma Platoff

10   prior to the March 25th article.

11        Q    What is the reason that you bring this up in

12   this email?

13        A    I'm just always thinking trying to figure out

14   who is behind all this, and who has done what to whom,

15   and I think that it was relatively recently before

16   this date, July 15th, but it could have happened a

17   while ago.  And I'm just still thinking about it, that

18   Rolena was contacted by another professor of Spanish

19   literature named Ann, who I believe is at the

20   University of Miami, and as Ann had had a most curious

21   interaction with Sue Byrne, which included Sue Byrne

22   sending copies to Ann of her correspondence, if I

23   recall this correctly, with Emma Platoff.

24        Q    So would it be correct to infer that sort of

25   what you're getting at in that Number 2 paragraph
```

1    there is that Sue Byrne might be responsible for the

2    anonymous letter?

3       A    Yes.   One hypothesis here is that Sue Byrne

4    gave Emma Platoff this negative stuff about the

5    department, Platoff didn't publish it, and so then Sue

6    Byrne presumably, with others, sent around the

7    anonymous letter.   And the reason for that speculative

8    hypothesis is that Sue Byrne's emails with Emma

9    Platoff included curious statements such as, I didn't

10   want -- I mean, I would have to look at them, but they

11   didn't really make sense about why she was sending --

12   why she was sending to Ann her earlier correspondence

13   with Emma Platoff, which, in fact, sort of suggested

14   that before the anonymous letter Sue Byrne was saying

15   very similar negative things about the department to

16   the Yale Daily News.   In addition and separately from

17   this hypothesis they had to move to the anonymous

18   letter because the initial approach to Emma Platoff

19   didn't pan out.

20       Quite separately there was a strange

21   interaction between Sue Byrne and this professor, Ann,

22   whose last name I forget.   I think her name was Ann.

23      Q    Did you ever ask Sue what her motivations

24   were in talking to Emma Platoff or to this professor

25   Ann?

Case 3:17-cv-01104-VLB   Document 82-155   Filed 05/15/19   Page 32 of 32

1          CERTIFICATE OF REPORTER

2      I, Robin Balletto, a Registered Professional

3  Reporter/Notary Public within and for the State of

4  Connecticut, do hereby certify there came before me,

5  on the 17th day of January, 2019, the following named

6  person, to wit:  KATE STITH, who was by me duly sworn

7  to testify to the truth and nothing but the truth;

8  that she was thereupon carefully examined upon her

9  oath and her examination reduced to writing under my

10  supervision; that this deposition is a true record of

11  the testimony given by the witness.

12      I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties to the

14  action in which this deposition is taken; and further,

15  that I am not a relative or employee of any attorney

16  or counsel employed by the parties hereto, nor

17  financially or otherwise interested in the outcome of

18  the action.

19      WITNESS my hand and affixed my seal this 2nd day

20  of February, 2019.

21

22                    _Robin L. Balletto_

23

24                    Robin Balletto, RMR

25      My commission expires:  October 31, 2023