# Exhibit 156

1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
2


3


4    SUSAN BYRNE,                      )
              Plaintiff,              )  Civil Action No.
5                                      )  3:17-CV-01104(VLB)
     VS                                )
6                                      )
     YALE UNIVERSITY, INC.,            )
7              Defendant.              )


8


9


10      DEPOSITION OF:   Benjamin Polak
        DATE:            December 3, 2018
11      HELD AT:         Madsen, Prestley & Parenteau, LLC
                         105 Huntington Street
12                       New London, Connecticut


13


14


15


16


17


18


19


20


21          Reporter:  Robin Balletto, RMR, CSR #230


22


                     Cassian Reporting, LLC
23                        21 Oak Street
                  Hartford, Connecticut   06106
24                        860-595-7462


25

1     Q   And if for any reason you need a break today

2  at any point for any reason, let me know; we can take

3  a break.  The only exception is, if there is a

4  question pending, I'll need you to answer the question

5  before we can break; is that fair?

6     A   Yes.

7     Q   And you are currently the provost of Yale

8  University; is that correct?

9     A   Yes.

10    Q   And how long have you been provost?

11    A   Since January 2013.

12    Q   And how long have you been employed by Yale

13  University?

14    A   Since 1994.  Probably July 1, 1994.

15    Q   So what positions have you held during your

16  employment with Yale?

17    A   I came as an assistant professor.  At some

18  point I was promoted to be associate professor on

19  term, and at some point I was promoted to be professor

20  with tenure.  I think the tenure date is either '99 or

21  2000, or thereabouts.

22    Q   So prior to being appointed provost in 2013,

23  did you hold any positions in the administration at

24  Yale?

25    A   I was chair of the economics department

 1    budget plans for the university, including capital

 2    plans.  So I'm responsible for the financial -- the

 3    budget, the finances of the university.

 4         Q   If I do accidentally speak over you, please

 5    note that if you would.

 6             So in terms of your role as -- or the provost

 7    role as chief academic officer, what does that mean?

 8         A   It means that the academic side of the

 9    university -- that means the schools roll up to me on

10    the org chart so that the deans of the schools have a

11    reporting relationship to me, and certain other units

12    as well, such as the art galleries.

13         Q   When you say that the schools roll up to the

14    provost office, does that include everything one would

15    think of?  So medical school, dental school,

16    humanities, and all of the other schools in the

17    university?

18         A   Yes.  So we don't have a dental school.

19         Q   Sorry.

20         A   And there's no school of humanities, but in

21    the spirit of the question, yes.  So the medical

22    school rolls up to a dean of the medical school, who

23    then has a relationship to me.  The example of the

24    humanities then rolls up to the dean of the arts and

25    sciences, faculty of arts and sciences as it's called,

```
 1    and that rolls up to me.  Some of the other schools,

 2    such as law and business, through the dean.

 3         Q   So is it the case, then, that the dean of the

 4    faculty of arts and sciences reports to you?

 5         A   Yes.  The appointment is made by the

 6    president of the dean of the arts and sciences, and

 7    the salary is set by the president, and the annual

 8    goals meeting for that dean is jointly with me and the

 9    president.  So, yes, but with that caveat.

10         Q   And as provost, to whom or to what office do

11    you report?

12         A   To the president.

13         Q   And does the president report to someone or

14    some entity, or is the president -- does the buck stop

15    at the president?

16         A   Also a good question in the university. I

17    don't know if report is the correct term, but the

18    university has a board of trustees.

19         Q   Now, obviously I see many references to the

20    Yale Corporation.  What exactly is the Yale

21    Corporation?

22         A   It's essentially that board of trustees.  The

23    corporation is the name given to the board of

24    trustees.

25         Q   So if we say Yale Corporation, or we say
```

```
1         A    Actually, ask the question.  I granted her --
2    so examples of decisions.  I granted her that unpaid
3    leave of absence.  I believe that was in the late
4    summer of 2016, but I'm guessing there's a letter with
5    a date on it, I believe that was maybe August, but we
6    should check, of 2016.  So that was a decision to
7    grant her that leave of absence, and I -- at
8    approximately the same time, maybe even exactly the
9    same time turned down the appeal of the tenure case.
10   I think for completeness I need to be careful here
11   because you said any decisions regarding her
12   employment, so all -- it is not true now but when I
13   started as provost all salary decisions ran formally
14   through the faculty and formally through me and I
15   would have written and signed the letter with her
16   salary in it.  There are hundreds and hundreds of
17   letters but I must have written the letter at least in
18   2013 and possibly in 2014, I don't know exactly when
19   the transition took place, in which I would have
20   officially been signing off on her salary.
21        Q    So to clarify when I asked the question did
22   you make any decisions about her employment, I'm
23   referring to directly about Susan Byrne rather than if
24   you have a stack of 400 faculty salary letters, that
25   isn't included?
```

Case 3:17-cv-01104-VLB  Document 82-156  Filed 05/15/19  Page 7 of 43

```
 1      A   Right.  So I definitely, so again I made

 2   the -- I would have made the decision to turn down the

 3   tenure appeal in 2016.

 4      Q   So other than your decision to grant her the

 5   unpaid leave for the '16-'17 academic year and to turn

 6   down her --

 7      A   Yes, and I think prior to the -- okay, so

 8   prior to that in the summer of '16 there was an

 9   earlier request -- yes, that's right -- there was an

10   earlier request in the summer of '16 while that case

11   was still going on in the process -- the appeal case

12   was in the process for unpaid leave and at that time I

13   turned down the request for unpaid leave pending the

14   outcome of the appeal.

15      Q   Okay.  So we have the -- first you denied her

16   request for unpaid leave.

17      A   Yes.

18      Q   You later granted the request for unpaid

19   leave, and you turned down her tenure appeal.  Other

20   than those three decisions were there any others?

21      A   I don't recall any others.  I don't offhand.

22      Q   Now, with respect to the decision about

23   unpaid leave, in between the initial denial and then

24   later the granting of the request, did Susan Byrne

25   make a second request or renew her request or was it a
```

1      Q    This is March 8, 2016, and this is Bates

2    Number Byrne 000422 through Byrne 000435.  So this is

3    six days after the Exhibit 11 that I showed you.

4      A    Right.

5      Q    So Exhibit 11, if you look at the first

6    paragraph of it, it sets out, I think, what the letter

7    is about.

8      A    Yes.  So my understanding of the timing of

9    this is that the tenure vote had already taken place

10   before the March 2nd letter, and the process at that

11   point is that the faculty member who wishes to appeal

12   their tenure can do so by appealing to the provost to

13   have -- appeal the process that that tenure process

14   has a procedural error in it, and I believe that

15   that's what the March 8th letter does.  There isn't

16   really a process to recuse somebody from a vote -- the

17   process after a tenure vote has taken place is not to

18   have a letter come through and say -- after the vote

19   in the department denying tenure, the process by which

20   an appeal can take place is that the candidate can

21   appeal to the provost to review that tenure process,

22   and that's what the March 8th letter does.

23      Q    Just to be clear, and for the record, and as

24   noted by Attorney Chavey, it is not disputed when the

25   tenure vote happened.

Case 3:17-cv-01104-VLB  Document 82-156  Filed 05/15/19  Page 9 of 43

 1        A    Right, right.

 2        Q    And both of these letters are dated after the

 3    tenure vote.

 4        A    Afterwards, and so what we -- and what the

 5    second letter does, which is the appropriate thing, is

 6    it submits a petition for review of that.

 7        Q    Okay.  So the first letter, the March 2nd

 8    letter, you didn't consider this to be an appeal of

 9    the tenure decision, correct?

10        A    It doesn't formally do that.  It doesn't

11    formally do that, and we have to formally make sure

12    these processes are fair; we need to make sure that

13    there was, in fact, a formal letter asking for review

14    of that tenure process.

15        Q    And in your view, the March 8th letter is a

16    formal request for review of the tenure denial?

17        A    Yes.

18        Q    So looking again at Exhibit 11, the March 2nd

19    letter, Susan Byrne does make some request in this

20    letter for relief.  Again, you can review the entire

21    letter, if you wish, but you might turn to the last

22    page to find what she is requesting.

23        A    Yes.  So the process doesn't -- our tenure

24    process and our appeal process does not allow for the

25    request here; it does not allow for us to recuse

```
 1   people, in particular, ex post, but it does allow for

 2   a repeal of the tenure process, and that's what this

 3   subsequent letter does.  So there is nothing in our

 4   procedures, in fact, that would allow me to -- what it

 5   says in specific is, I demand that the recusal request

 6   be granted.  That's not something I can do within our

 7   procedures, and the correct process for reviewing a

 8   tenure case is that you appeal the tenure case, and it

 9   go to a -- and then trigger a review of the tenure

10   case itself, which is what happened in the subsequent

11   letter.

12       Q   So let me unpack that.  When you say that the

13   procedures -- well, you say our procedures.  Who is

14   the "we"?

15       A   Yale, but in the faculty handbook, and the

16   faculty handbook has a section on the appeals

17   processes around tenure and promotion decisions, and

18   it lists their possible grounds for appeal.  So the

19   process that needs to take place of a request for a

20   review within a certain time interval, and so on.

21       Q   So when you say that the process does not

22   allow for us to recuse people, are you referring to

23   the appeal process?

24       A   I was.  When I answered that question I was

25   referring to the appeal process.  I was assuming you
```

```
 1   were specifically asking about the appeal process.

 2       Q   Now, do you -- after you received this

 3   letter -- let me ask a background question.

 4           Did you receive the March 2nd letter at some

 5   point close in time to the date of it?

 6       A   I would have to go back and check the

 7   records.

 8       Q   Do you have any reason to believe that you

 9   didn't?

10       A   No.

11       Q   And so with respect to -- I have mentioned a

12   couple times Bates numbers.  So I'll just explain

13   them.  What a Bates number is, is an identifying

14   number that is used in the exchange of documents in

15   litigation.  So those are the numbers in the lower

16   right-hand corner.  So this document was provided to

17   us, to Professor Byrne, by the university's attorneys.

18   That was not a question.

19           My question is, do you have any reason to

20   believe that you did not receive this letter at some

21   time near March 2, 2016.

22       A   No, I think I -- no, I have no reason to

23   think I didn't receive the letter.  Sorry, I'm

24   mumbling.

25       Q   After you had received this March 2, 2016,
```

1　letter, did you inform Professor Byrne what you told

2　me about the appeal process not permitting the

3　granting of a recusal request ex post?

4　　A　I do not recall.  I do not recall.  I do not

5　even recall at this point whether -- these came in

6　rapid succession, and I do not recall whether I

7　replied to this one before this one came in.  I don't

8　recall.  They came in within a week.

9　　Q　Do you recall at any point notifying

10　Professor Byrne that it was not provided for in the

11　processes to grant a recusal request?

12　　A　I do not recall any communication with

13　Professor Byrne at this point.

14　　Q　With respect to Exhibit 11, the March 2nd

15　letter, did you take any action after receiving it in

16　light of what is stated in this letter?

17　　A　I don't rec- -- as I read the letters I

18　couldn't clearly distinguish -- clearly remember the

19　separation between these two letters, and I do not

20　recall if I took any action specifically on the

21　Exhibit 11 letter prior to receiving the Exhibit 12

22　letter.

23　　Q　At any point did you take action in light of

24　the March 2nd letter, the one that talks about the

25　recusal?

1        A    I don't recall having done so.  I don't

2    recall.

3        Q    So we'll come back to Exhibit 11, if you want

4    to just leave it to the side, but for the moment I'm

5    going to ask you some questions about Exhibit 12.

6        A    Can I state they basically came in very rapid

7    succession, these two letters.

8        Q    Now, after receiving this letter, did you

9    take any action in light of it?  Now, the "this"

10   letter is the March 8th letter, Exhibit 12.

11       A    Yes.  So this letter is a formal letter,

12   referring to the parts of the faculty handbook to do

13   with appeal processes around tenure decisions, and I

14   have processes that are triggered by such letters.  I

15   want to be careful here, because I don't remember in

16   exact details of this particular one, but I can tell

17   you what I would have done in general, which would be

18   suggestive of this.

19            The procedure, when somebody has appealed,

20   there are essentially two paths one can take, I can

21   take at that point.  One is to deny the appeal if it

22   does not fit into one of the possible categories for

23   appeal, and the other is to impanel a -- form a panel

24   of the review -- of the FAS review committee, and on

25   this occasion I did the latter; that is to say, a

1    panel was formed to review this case with the members

2    of the panel drawn from the FAS review committee, a

3    panel of five people, I believe.

4       Q   Okay.  And so that panel, the term that's

5    used for it, is it faculty review committee?

6       A   I don't recall the exact term for it.  It

7    probably has an official name in the handbook.  I

8    would have to look up its formal name, but it is a

9    committee who -- it is a committee we form every year,

10   and that committee's purpose is to review appeals on

11   tenure and promotion cases.  It's not just tenure

12   cases, but also promotion cases, prior and post

13   tenure.

14      Q   So that committee -- is it the same committee

15   for any appeal that might come up that year?

16      A   It's a standing committee that has a

17   substantial number of people on it, and from it, from

18   its members, we draw the specific panels, typically

19   five people, for particular cases.  I believe that

20   within the handbook we can also draw people from

21   outside of that committee, if necessary, and I don't

22   recall in this case whether we did or didn't.  But

23   there's a standing committee of FAS senior faculty,

24   and from that a panel is formed for a particular case.

25      Q   Now, does the standing committee change --

```
 1        A    Yes, but I would always consult with the
 2   deputies before appointing someone to assist -- to
 3   assist the provosts.
 4        Q    And how many deputy provosts are there
 5   currently?
 6        A    I want to say six, but I don't want to be --
 7   in the order of magnitude, you know, a half a dozen.
 8        Q    My question is -- I'm not looking for an
 9   exact number, just an approximate.
10        A    Order of magnitude, a half dozen.
11        Q    And then associate provosts?
12        A    Somewhat fewer, actually.  So I think the
13   associates and assistants are probably roughly the
14   same number as the number of deputies at this point.
15        Q    So between the two associate and assistant,
16   probably about the same number of deputies?
17        A    Yeah.  I'm guessing there's about a dozen
18   people with a provost title.  I want to go back and
19   check that, but that's not going to be far off.
20        Q    And all of those people with provost titles
21   report to you; is that correct?
22        A    That's correct.
23        Q    And the Office of the Provost has oversight
24   over Title IX compliance at Yale; is that correct?
25        A    It does.
```

Case 3:17-cv-01104-VLB  Document 82-156  Filed 05/15/19  Page 16 of 43

 1  dean?

 2      A   Delegate may sound like an active vote there.

 3  I think there are certain procedures at Yale that are

 4  dealt with within the school.  So, again, to take it

 5  away from the arts and sciences a second.  If there

 6  was a faculty member who is rude, say, in the school

 7  of management, or who did not show up to class in the

 8  school of management, that would typically be handled

 9  within the school of management.

10      Q   Now, as provost, since you oversee the dean

11  of the -- you do oversee the dean of the school of

12  management, correct?

13      A   Yes.

14      Q   If, for example, there was a situation where

15  the dean of the school of management did not

16  discipline a faculty member in a situation that

17  clearly violated some policy and procedure of the

18  university, do you, as provost, have the authority to

19  override the decision of the dean?

20      A   Again, I don't know if it's written so

21  explicitly, but things can be appealed to the provost,

22  and I don't know any case that fits so cleanly in what

23  you said, but it certainly is the case that a

24  complaint could be appealed to me if we're not

25  comfortable with the findings of the dean, if it's a

```
 1        A    In a case in which the respondent on a sexual

 2   misconduct case is a faculty member, it goes to the

 3   university-wide committee; it's the same committee,

 4   and they make their recommendations to me.

 5        Q    So do you have discretion to follow or not

 6   follow the recommendations of the university-wide

 7   committee?

 8        A    So, again, I'm going to be careful here to

 9   avoid the confusion we just had.  There's the

10   committee and then there's the panel.  In the case of

11   the panel, the university-wide committee forms a

12   panel, and it's the panel that makes the

13   recommendations.  They make findings of fact, and they

14   make recommendations.  I accept the -- I have to

15   accept the findings of fact, but I can alter the

16   recommendations.  They are, in fact, recommendations.

17        Q    So, in any event, you do have the authority

18   of provost to impose discipline on a faculty member in

19   the context of a sexual misconduct proceeding?

20        A    I do, provided that it has gone through the

21   process of the UWC, the university-wide committee.

22        Q    So the university-wide committee, has that

23   been in existence the entire time you've been provost?

24        A    Yes.

25        Q    Now, is the UWC administered or overseen by
```

```
 1   the Title IX office?

 2       A    Yes.  There's a little -- certainly it

 3   reports into the provost's office.  I don't recall

 4   immediately whether the chair of the university-wide

 5   committee reports directly to me or reports through

 6   the Title IX office, which is part of the provost's

 7   office.  It may be it reports directly to me.  I'm not

 8   sure.

 9       Q    So the Title IX office is overseen by

10   Stephanie Spangler?

11       A    Correct.

12       Q    And she is a deputy provost?

13       A    She is a deputy provost, and she's also the

14   university's Title IX officer.

15       Q    And has that been --

16       A    And in her capacity -- sorry.  And in her

17   capacity as the university's Title IX officer, she

18   reports to the president.

19       Q    So in her capacity as deputy provost she

20   reports to you, but in her capacity as Title IX

21   officer she reports directly to the president?

22       A    That is correct.

23       Q    And has Stephanie Spangler been the Title

24   IX -- how long has she been the Title IX officer?

25       A    I don't know.
```

1    who is involved in any of these circumstances.

2        Susan Byrne is basically saying that the

3    chair of her department retaliated against her for

4    complaining about sexual harassment, did she not?

5     A   Not quite. I think she's saying that these

6    people should have been recused. I think the contents

7    of this letter, including the last requested relief

8    paragraph you had me read earlier, is making a

9    specific request that they be recused from her tenure

10   case, and this is all being -- everything in the

11   letter, and in the subsequent letter, which is the

12   March 8th letter documenting reasons for the specific

13   request. In the March 2nd letter, all of the

14   information documented is to justify the request, or

15   to argue for the request of them being recused from

16   her voting committee. It was subsumed by the

17   March 8th letter, in fact, you yourself have them

18   confused, but it was subsumed by the letter which came

19   in six days later that then requested that we -- where

20   similar information was provided with a different

21   request, mainly that the request -- that there be a

22   review of her tenure case, which is indeed what we

23   did.

24     Q   So regardless of which letter the allegations

25   are in, would it be fair to say that Susan Byrne

```
 1    available to -- they would not have been available to

 2    anybody until that report came out, which I believe

 3    was the summer of 2016.  So I want to make sure the

 4    timing is clear.

 5         Q   Well, Susan Byrne gave information in what's

 6    called the climate review; correct?

 7         A   That's correct, but some of the things that

 8    are referred to in this paragraph are not in the

 9    title -- some of these events referred to in this

10    paragraph are not, I believe, in the -- I have to go

11    back and check, but I believe they are in the UWC

12    review and not in the climate review.

13         Q   So Roberto Gonzalez Echevarria knew that he

14    was the subject of a UWC investigation before the

15    report actually came out in the summer of 2016?

16         A   He would have been informed of it when it was

17    initiated, and I don't recall exactly, but I think it

18    was March of 2016, I believe.

19         Q   So are you saying that Susan Byrne was

20    investigated in the context of a UWC investigation

21    that hadn't started?

22              MS. CHAVEY:  Objection.

23              THE WITNESS:  I don't understand the

24       question.  She was investigated --

25    BY MS. WIKTOR:
```

1          or the other.  I know that the climate review was

2          a more general review of the department directed

3          to many things, including -- it had to do with the

4          climate in that department and --

5      BY MS. WIKTOR:

6          Q    Including sexual harassment, correct?

7               MS. CHAVEY:  Let him finish, please.

8          Had you finished your answer?

9               THE WITNESS:  It looked into several

10         things in that department, including the issue of

11         whether there was a climate -- sorry, including

12         the issue of hostile climate in that department.

13     BY MS. WIKTOR:

14         Q    A sexually hostile climate.

15         A    Sexually.

16         Q    And in that climate review it came to light

17     that there were people who were accusing Roberto

18     Gonzalez Echevarria of behaving in a sexually

19     inappropriate way?

20         A    Of creating a hostile climate, which is a

21     formal term, yes.

22         Q    And there was also -- there were other

23     contexts in which these allegations were propounded

24     that were not confidential.  There was a Yale Daily

25     News article that said this, there was the anonymous

```
 1    letter back in March of 2015 that accused him of

 2    sexual harassment?

 3                 MS. CHAVEY:  Objection.

 4                 THE WITNESS:  I don't think that's quite

 5        correct, but there was a Yale Daily News article

 6        from an anonymous letter in early 2015 prior to

 7        the formation of the climate review of the

 8        department.  It was about -- I don't recall

 9        whether it was about him specifically, but it

10        certainly was about the department, and it led to

11        the climate review of the department.

12    BY MS. WIKTOR:

13        Q   So well in advance of Susan Byrne's tenure

14    vote, Roberto Gonzlez Echevarria would have known,

15    because these allegations were public, he would have

16    known that people were accusing him of sexual

17    harassment?

18                 MS. CHAVEY:  Objection.

19                 THE WITNESS:  I want to be careful,

20        because I don't think he would have known that

21        people -- necessarily people were accusing him of

22        sexual harassment.  He was aware that there was a

23        complaint made about the department in general, in

24        that newspaper article, and he was aware that

25        there was a climate review of the department that
```

```
 1   such rapid succession, but I was aware that one of the
 2   grounds on which she claimed that there should be a
 3   review of her tenure case was to do with the possible
 4   conflicts caused by her having spoken to the climate
 5   review of the department.
 6        Q   Okay.  And if --
 7        A   I believe that was one of the grounds on
 8   which she wanted the review.
 9        Q   Okay.  If, in fact, a senior voting faculty
10   member was accused -- was the subject of a complaint
11   of sexual harassment by a junior faculty member, and
12   the senior faculty member knew about it, would it be a
13   conflict to have the senior faculty member voting on
14   the junior faculty member's application for tenure?
15        A   I want to be careful.
16             MS. CHAVEY:  Objection.
17             THE WITNESS:  It seems they're all
18        hypotheticals.  One is if he knew about it, and
19        the second is the notion of a conflict.  You -- I
20        would not want to have a rule at Yale, or anywhere
21        else, that said that anyone could remove a member
22        of a tenure appointment committee, or a tenure
23        voting committee, by making an accusation.  So we
24        have to be careful and make sure these rules are
25        fair at Yale on both sides, and it's not -- in my
```

```
 1              MS. CHAVEY:  Thank you.

 2              MS. WIKTOR:  How long do you need?

 3              MS. CHAVEY:  We'll be back in a half an

 4     hour.

 5              (Recess:  1:02 p.m. to 1:36 p.m.)

 6              (Plaintiff's Exhibit 14, Climate Review

 7     Report Bates Byrne 003064 through 003389:  Marked for

 8     Identification.)

 9     BY MS. WIKTOR:

10        Q   Dr. Polak, you understand you're still under

11     oath this afternoon?

12        A   Yes.

13        Q   I am handing you what I've marked Plaintiff's

14     Exhibit 14, which is Department of Spanish and

15     Portuguese Yale University Climate Review Report, and

16     the exhibits to the climate review report.  It's Bates

17     Number Byrne 003064 through Byrne 003389.  Do you

18     recognize this document?

19        A   I recognize the front part.  Certainly the

20     main part of the report.  There are many, many

21     exhibits in here.

22        Q   So just with respect, then, to what you refer

23     to as the front part, are you talking about the

24     pages -- it's the first 48 pages, it's through Bates

25     Number 3111, there's also a 48 at the bottom of that
```

1    page.

2         A    Correct.

3         Q    So this is -- so you recognize these first 48

4    pages to be what's called the climate review report?

5         A    Yes.

6         Q    And did you get a copy of this report at the

7    time that it was issued?

8         A    Yes.

9         Q    And when was it issued?  This doesn't appear

10   to have a date on the head of it.

11        A    Okay, that's a problem.  I don't exactly

12   remember, but it's -- we would have to go back and

13   check.  It's definitely the Joint -- it's towards the

14   end of 2015.

15        Q    Okay.  And so at the time that you got a copy

16   of the report, did you also get a copy of the

17   exhibits, the 78 exhibits that are attached to it

18   here?  There's a list of the exhibits beginning on

19   page 48, the 49th page?

20        A    I honestly don't remember.

21        Q    At some point before you met with the

22   attorneys last week, did you get a copy of the

23   exhibits to the climate review report?

24        A    Again, I don't remember.  There was so many

25   things, that I just don't remember.  I certainly got

1   the -- what you're calling the first 48 pages; I do

2   not remember the exhibits.  There are many, many.  It

3   seems like there's hundreds of pages of exhibits.  I

4   just don't remember.

5        Q   Now, did you actually read the report, the

6   first 48 pages?  Did you actually read it word for

7   word, you sat down and actually read it?

8        A   Yes.

9        Q   Okay.  And so you'll see that it does refer

10  to various of the exhibits in the footnotes to the

11  report?

12       A   Yes.

13       Q   Now, is it -- so if you're reading something

14  that has footnotes that reference source material, is

15  it your practice to look at the source material?

16       A   Not always, not always part of it, because

17  source material can be long, and it can make it very

18  hard to read.  So I would say not always.

19       Q   But is it the case that -- well, in this case

20  would you have wanted -- did you want to look at the

21  source material that is referenced in the report?

22       A   I don't recall.  I mean, I know that I read

23  the front part, and I do not recall either whether or

24  not I did look at the source material, or what my

25  wishes were at the time, so I just don't recall, and

1      A    Even if I'm cc'd.   Sorry.

2      Q    Okay.   So in the event that there is a

3 decision -- so a request for some change or exception

4 to who would be on the committee made to the dean of

5 FAS, and the faculty member disagreed with that

6 decision, could he or she then bring it to your

7 office?

8      A    They could bring it to my attention.   I

9 believe the correct procedure in a case like this

10 would be it would go first to the dean, whether or not

11 I or anyone else was cc'd.   It is the dean's

12 responsibility, the dean and the dean's designator,

13 associate deans and so on, to handle the tenure

14 process up until the point of the, in this case a

15 tenure denial, in this case by the department, at

16 which case it can be appealed to me.   So I don't

17 know if -- so I think the correct procedure would be

18 run the process through, then you can bring that -- if

19 you believe that's grounds for an appeal, you can

20 bring that under those grounds for appeal.

21      Q    So if I'm hearing you correctly, or

22 interpreting your testimony correctly, is it the case

23 that there is not a process by which a faculty member

24 can appeal some sort of intermediate decision prior to

25 the final -- if it's a denial at whatever step the

```
 1   denial came?

 2       A    I want to be careful and check everything I'm

 3   saying in the faculty handbook at some point, so I'm

 4   saying that is my memory of the faculty handbook, but

 5   I want to check if that's correct, because I don't

 6   have it memorized, but my loose understanding of the

 7   faculty handbook is that the process would run its

 8   course with supervision from the dean until such time

 9   an appeal is appropriate, which in this case would be

10   after the tenure denial, which could be at this stage

11   or the tenure appointment committee -- tenure

12   appointment committee stage, at which point it could

13   be appealed to me, and that is, in fact, what happened

14   in this case.

15       Q   So would it be fair to say that there was not

16   oversight of the tenure procedures in Susan Byrne's

17   case until such time as you got the formal appeal,

18   March 8, 2016?

19               MS. CHAVEY:  Objection.

20               THE WITNESS:  I'm not comfortable with

21       the word oversight.  This is the formal process.

22       The formal process is laid out in a certain

23       sequence.  I don't think I want to imply the word

24       oversight or lack of oversight from that.  It's

25       just this is the process, and this is the point of
```

```
 1              THE WITNESS:  I don't know about
 2         reliance here.  I do think that -- so I worry
 3         about these terms like reliance and self-policing,
 4         they all seem too strong to me.
 5              I do think in a moral -- in a system in
 6         which people -- in which recusal is self-recusal,
 7         be it that system, the judicial system, or be it a
 8         system, the academic system, self-recusal relies
 9         on self-recusal, that's what it says.  So it is up
10         to people to -- self-recusal means it's up to
11         people to recuse themselves.
12    BY MS. WIKTOR:
13         Q   So what if someone -- what if a faculty
14    member recognizes that there is some nonacademic
15    factor that he or she will be unable to put out of the
16    analysis.  Okay, so Professor Jones is the chair of
17    the department, and Professor Smith is an associate
18    professor coming up for tenure.  So Professor Smith,
19    the junior faculty member, had an affair with
20    Professor Jones's wife who subsequently left him to
21    run off with Professor Smith, the junior faculty
22    member, and Professor Jones is -- you know, while
23    there are no good -- you know, happy marriages don't
24    tend to end in this sort of thing, Professor Jones is
25    mad about this, I mean, rightfully so, this is a bad
```

```
 1    thing that happened in his life.  Should Professor

 2    Jones, if every time he looks at Professor Smith, he

 3    sees their happy wedding photos, and thinks about what

 4    a jerk Professor Smith is for running off with his

 5    wife, Professor Jones -- I mean, you would agree that

 6    Professor Jones in this situation should recuse

 7    himself from voting on Professor Smith's tenure

 8    application?

 9                 MS. CHAVEY:  Objection to the form.  Go

10         ahead, please.

11                 THE WITNESS:  It is my view that if I

12         am -- is this what you just said?  If I'm a

13         faculty member and another --

14    BY MS. WIKTOR:

15         Q   I didn't want to use you.  It's an extreme

16    hypothetical.

17         A   That's okay.  Let me use me.  If I'm a

18    faculty member and there's a person coming up for

19    tenure or some kind of promotion who has --

20         Q   Run off with your wife.

21         A   -- run off with my wife, that I would think

22    that I should recuse myself from that case?  I

23    personally would choose to recuse myself from that

24    case.

25         Q   Do you think it would be the thing a
```

Case 3:17-cv-01104-VLB   Document 82-156   Filed 05/15/19   Page 31 of 43

 1   reasonable faculty member would do, to recuse him or

 2   herself from that case?

 3              MS. CHAVEY:  Objection.

 4              THE WITNESS:  I do not think it would be

 5         unreasonable to recuse yourself from that case.  I

 6         think I said that in the negative.  I do not think

 7         it would be unreasonable to recuse yourself from

 8         that case.

 9   BY MS. WIKTOR:

10        Q    So in your role as provost, you're not

11   Professor Jones anymore, you're the provost again, so

12   Professor Smith, the junior faculty member who has run

13   off with Jones's wife, comes to you and says, I asked

14   Jones to recuse himself, because every time I see him,

15   he sneers at me because I ran off with his wife, I

16   asked him to recuse himself, but he refuses, and I

17   can't get a fair shake in this department, because

18   this guys hates me so much he'll never -- he wants to

19   get rid of me.  What authority do you as the provost,

20   or does anyone in the administration at the university

21   have, to protect Professor Smith?

22              MS. CHAVEY:  Object to the form.

23              THE WITNESS:  I think responsibility --

24         this is how I wish to answer because I'm relieved

25         I'm no longer -- my marriage is now safe again in

```
 1          this example, and that's nice.  But let me answer

 2          as follows -- which is which in this case?

 3          Professor Smith was the person coming up?

 4   BY MS. WIKTOR:

 5          Q    Yes.  And Jones is the chair.

 6          A    So I think Professor Smith, in this case,

 7   would -- if I was an advisor to Professor -- Smith is

 8   the one coming up?

 9          Q    Yes.

10          A    To Professor Smith in this case, I would

11   say -- I suggest you bring that as an app- -- if your

12   case -- tenure is denied, and if you think it was

13   wrongly denied, I suggest you bring that as an appeal

14   to the provost as part of -- as grounds for appeal to

15   the provost, and if you read the text of the appeal,

16   the grounds for appeal in the faculty handbook, that

17   would fit, that allegation would fit under those

18   grounds for appeal.

19          Q    Okay.  So Smith has to wait until the

20   decision has been made, effectively?

21          A    If Jones chooses not to recuse himself, then

22   the recourse is that they should appeal the decision.

23          Q    Now, in your role as provost, would it be

24   within your purview to go to Jones --

25          A    Which is Jones?
```

```
 1   accepted ground for an appeal, an allegation of an
 2   improper motivation, so a motivation that's not
 3   academic merit is an appropriate ground for an appeal,
 4   and a motivation is going to be presumably each
 5   individual has his or her own motivations, how can a
 6   panel fairly review the individual motivations of the
 7   individual voting members if they don't know who voted
 8   how?
 9              MS. CHAVEY:  I'm just going to object to
10          the form and instruct you to answer the question
11          that just came.  There was a lot that preceded it,
12          and I don't know how that relates to the question,
13          but I think there was a question at the end, and
14          that's what you're --
15              THE WITNESS:  The question at the end
16          was how can you tell if somebody's motivations
17          were primarily academic or were primarily
18          improper, for example, and the answer is, I think,
19          you can't prove that; you can't prove that either
20          way, and we're not asking the panel to prove that
21          either way.  So they don't have to show beyond a
22          reasonable doubt.  They have to look at this case
23          and judge it based upon the evidence that they
24          have.  So what they have are the -- in this
25          particular case, they have the testimony not just
```

```
 1        of the people who were accused of having improper

 2        motivations, they have the testimony of people who

 3        had -- who are not accused, but also had improper

 4        motivations, but they weren't accused.  They have

 5        the testimony of outside people, including -- I

 6        think this is important in this case, they had the

 7        knowledge that there was a completely neutral

 8        associate dean, Jack Dovidio, who had been in the

 9        room at all meetings, so was present for all

10        discussions of this case, and was monitoring all

11        discussions to see if at any point the discussion

12        departed from appropriate discussions.  So they

13        had all of that.  That's a lot, actually, because

14        discussions matter.  But let's go to the standard

15        of proof.

16              The standard of proof should not be that

17        the complainant here has to prove beyond a

18        reasonable doubt that the vote was improper, and

19        it should not be that the Defendants, respondents

20        here, in this case RGE, should have to prove

21        beyond a reasonable doubt that his vote was

22        properly motivated, and the reason it should not

23        be beyond a reasonable doubt in either direction

24        is precisely because of what you said; you

25        couldn't prove it beyond a reasonable doubt.
```

```
 1              So you have to actually look at what

 2       evidence there is, including sufficient reasons,

 3       and you have to ask, for example, that the

 4       candidates -- the reasons for their decisions.

 5       They might not tell the truth, but you can ask

 6       them their reasons for their decisions.

 7              In this particular case I was not privy

 8       to those decisions, so I can't say specific, but

 9       to answer it in a hypothetical, if I'm asked how

10       did you vote in this tenure case, I would say I

11       voted against it, truthfully, and they say, but

12       you had a possible other motivation of voting

13       against this -- I'll make something up.  All

14       right, and I say, okay, you're right, I had that

15       motivation, but it didn't -- here's why I don't

16       think it rose to the level of something I should

17       recuse myself from, so I discuss why, I discuss

18       that, and then I say, well, here's why I voted

19       against this case, and I can talk through, in a

20       coherent way, why I think this person's work

21       doesn't reach the standard that's required by

22       Yale, namely, that they are the foremost leader in

23       their field.  I might say, this work is great, but

24       it's not manifestly different from this person's

25       work.  Or, this person's work is very good, and I
```

```
 1        Q   So as a consequence of the climate review,

 2   someone from outside the department was brought in to

 3   be the director of graduate studies for Spanish and

 4   Portuguese?

 5                 MS. CHAVEY:  Objection.

 6                 THE WITNESS:  I've got to be careful on

 7        the wording there, because I don't want the wrong

 8        implication to be drawn there.  It was not

 9        concluded by the -- it was not the conclusion of

10        the -- the climate investigation of the

11        department, it was not, to the best of my

12        knowledge, the conclusion of either of the deans

13        who were directly involved, that would be Dean

14        Gendler and Dean Cooley, that Professor Valis was

15        at fault, but this was not a -- that might have

16        been the implication of the way you said that.

17        That was not, to the best of my knowledge, a

18        finding that was ever made, but rather, it was

19        thought wise to bring in an external director of

20        graduate studies because one of the findings

21        was -- a very large finding of the climate review

22        was that the department was factionalized, and

23        that students were worried about not being treated

24        fairly by different factions.  I'm not referring

25        now to sexual harassment.  I'm referring to
```

```
 1            intellectual differences and so on.

 2                    So those deep factions were something

 3            that came out in the review -- sorry, the climate

 4            review, and it was thought wise, and I still think

 5            it was wise, to bring in an external voice the

 6            graduate students could go to.

 7    BY MS. WIKTOR:

 8        Q   So other than someone from outside the

 9    department being brought in to take that position,

10    director of graduate studies, was there any other

11    action taken by the university relative to the

12    Department of Spanish and Portuguese coming out of the

13    climate review?

14        A   So I don't know.  You would have to go

15    carefully to the other deans to ask, Dean Gendler and

16    Dean Cooley, for the details of this, because they

17    implemented this, not me.  So what I'm about to say is

18    not exhaustive, and I want to be careful to say that,

19    because I don't want it to be misleading, but whether

20    it was out of -- again, I also don't know what was

21    prompted by that climate review, and what was prompted

22    anyway, but certain actions were taken.  One action

23    that was taken was that the Title IX office

24    immediately began to investigate and talk

25    confidentially to graduate students and others in the
```

1    department about sexual harassment and sexual climate,

2    obviously confidentially, because those conversations

3    should be confidential, and that process started, I

4    think, pretty much immediately on the climate review

5    being submitted.

6         Second, I'm blanking on the name of the

7    person who was the Title IX person for the graduate

8    school at the time.  I think it was Carl Hashimoto who

9    started those investigations, but I wouldn't swear to

10   that.  I think that's correct.

11        Second, in the context of Susan Byrne's

12   complaints that were simultaneous to this, Jack

13   Dovidio who was placed into the process to observe all

14   procedural actions, that would not normally happen in

15   a department.  I don't know that was the consequence

16   of what Susan Byrne was writing in letters like this

17   or if it was a consequence of the climate, but it

18   certainly did take place at that time.

19        Q   Now, Jack Dovidio, he was not given a copy of

20   the climate review report; is that correct?

21        A   I do not know.

22        Q   Now, if he testified under oath that he was

23   not given the climate review report, you don't have

24   any reason to dispute that?

25        A   No, I do not have a reason to dispute that.

1    brought -- the official complainant of the UWC case

2    that we just reviewed was the Title IX office, so they

3    were the complainant in that case, and in such cases

4    we would not want the complainant in one case to be

5    the people handling the procedure on a case.

6        Q   I can understand why Stephanie Spangler, as

7    the Title IX officer, was not be involved in Susan

8    Byrne's appeal from her tenure denial.  Is it because

9    of the topic or nature of the appeal?

10       A   No, just because it involves the same people.

11   So because RGE was involved in both cases, and

12   actually Susan Byrne's name appears in both cases; we

13   kept them separate at this point.  So this was us

14   creating a wall inside my office so that the tenure

15   review case could not be influenced by the Title IX

16   office also being the group bringing the complaint in

17   the other case.  So it's just creating a little bit of

18   an information barrier between the two cases at this

19   point.

20       Q   So in terms of that information barrier, what

21   information or documents or materials were you

22   provided or privy to that had to do with the

23   investigation, the UWC investigation regarding RGE

24   during this -- because these two things are kind of

25   going on at the same time, the appeal and the UWC

```
 1   investigation, correct?

 2                 MS. CHAVEY:  Objection.

 3                 THE WITNESS:  Correct.  They're going

 4       on, but the reports come in roughly -- okay.  So

 5       the report of the UWC comes in in June of '16, I

 6       believe, and the report of the review comes in in

 7       July '16, so there's definitely an overlap there.

 8       I should say this is not -- the things I just said

 9       about Stephanie not being -- handling this case

10       are standard.  If there's any tenure or other type

11       of case going through my office where the parties

12       involved are also involved in a Title IX case, we

13       would not have it handled by the person who was

14       Title IX officer.  So it's not just in this case,

15       but in general, if there's a different promotion

16       issue where something has been reported to the

17       Title IX office, we keep a separation there, and

18       that is really to maintain confidentiality.  Among

19       other things, it's to maintain very strict

20       confidentiality of the Title IX process.  We don't

21       want things to accidentally -- confidential things

22       in the Title IX process leaking through or

23       influencing these other cases in either direction.

24       So we're very careful.

25   BY MS. WIKTOR:
```

```
 1        Q   So at the time that you received the report
 2   and recommendations of -- or the findings and
 3   recommendations of the faculty review committee panel
 4   considering Sue Byrne's appeal --
 5        A   Yes.
 6        Q   -- you had already received the report of the
 7   UWC case?
 8        A   Yes.
 9        Q   And was there anything in the report of the
10   UWC case, or any of the materials that you received
11   along with it, that impacted your decision on the --
12   on whether to accept the recommendations of the panel
13   concerning Sue Byrne's appeal?
14        A   No, and also the other direction.  So I did
15   wait until I got both reports, and -- the short answer
16   is no.
17        Q   Okay.  So when you say in the other
18   direction, what do you mean?
19        A   In -- there was nothing in Sue Byrne's tenure
20   review report that influenced my decision to -- my
21   decisions in the UWC case to do with RGE.  So, for
22   example, one of the things I -- there's decisions on
23   RGE, we just went through them in detail, including
24   the suspension without pay, etc., etc., nothing in the
25   review panel report influenced those decisions either,
```

 1    but I had read both.

 2        Q    Now, is there anything in the UWC materials

 3    that raised some concern in your mind about the

 4    fairness or the procedural regularity or correctness

 5    in Sue Byrne's tenure vote?

 6        A    No.  I read them very carefully.  These

 7    things were happening at similar times, so I read it

 8    very, very carefully myself, because I was the point

 9    of intersection for these two, and there was nothing

10    in the UWC report that led me to question the findings

11    of the review panel on the tenure case.

12                    (Plaintiff's Exhibit 21, Letter dated

13    3/4/16:  Marked for Identification.)

14    BY MS. WIKTOR:

15        Q    Showing you Plaintiff's 21, this is Byrne

16    014347 through 349, and this is a letter dated

17    March 4, 2016, addressed to you from Jacques Parenteau

18    regarding Susan Byrne.  Do you recognize this letter?

19        A    Yes.  I think so.  This came in --

20        Q    This is dated between the two Susan Byrne

21    appeal letters that we marked earlier.

22        A    Yes.  This came in the same time as -- so one

23    of the reasons I -- in the interest of being honest,

24    these three letters came in rapid succession, and I've

25    got them a little bit -- in my memory a little bit

```
 1                    CERTIFICATE OF REPORTER

 2         I, Robin Balletto, a Registered Professional

 3    Reporter/Notary Public within and for the State of

 4    Connecticut, do hereby certify there came before me,

 5    on the 3rd day of December, 2018, the following named

 6    person, to wit:  BENJAMIN POLAK, who was by me duly

 7    sworn to testify to the truth and nothing but the

 8    truth; that he was thereupon carefully examined upon

 9    his oath and his examination reduced to writing under

10    my supervision; that this deposition is a true record

11    of the testimony given by the witness.

12         I further certify that I am neither counsel for,

13    related to, nor employed by any of the parties to the

14    action in which this deposition is taken; and further,

15    that I am not a relative or employee of any attorney

16    or counsel employed by the parties hereto, nor

17    financially or otherwise interested in the outcome of

18    the action.

19         WITNESS my hand and affixed my seal this 19th day

20    of December, 2018.

21
                              Robin L. Balletto
22

23

24                            Robin Balletto, RMR

25         My commission expires:  October 31, 2018
```