# Exhibit 157

```
 1                 UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT
 2


 3


 4   SUSAN BYRNE,                      )
              Plaintiff,               )  Civil Action No.
 5                                     )  3:17-CV-01104(VLB)
     VS                                )
 6                                     )
     YALE UNIVERSITY, INC.,            )
 7           Defendant.                )


 8


 9


10     DEPOSITION OF:    Amy Hungerford
       DATE:             January 4, 2019
11     HELD AT:          Madsen, Prestley & Parenteau, LLC
                         105 Huntington Street
12                       New London, Connecticut


13


14


15


16


17


18


19


20


21        Reporter:  Robin Balletto, RMR, CSR #230


22

                    Cassian Reporting, LLC
23                       21 Oak Street
                  Hartford, Connecticut  06106
24                       860-595-7462


25
```

```
 1         A    No.
 2         Q    So in the time that you have been overseeing
 3   tenure applications, has there ever been a recusal
 4   from a voting member?
 5         A    I do not know.
 6         Q    Would you, in your role as -- well, in your
 7   role overseeing tenure applications, would you know?
 8         A    Not necessarily.
 9         Q    Now, is there a procedure by which recusal
10   happens, like a certain person that has to be notified
11   or any such thing?
12         A    Nothing formal.  I presume the chair would
13   need to be notified by the person recusing themselves
14   so the chair was aware that they weren't going to come
15   to the meeting and vote.
16         Q    And so when you describe recusal, does it
17   assume a voluntary recusal, you know, the voting
18   member decides that he or she should and will recuse
19   him or herself?
20              MS. CHAVEY:  Objection.
21              THE WITNESS:  It's the case of married
22         faculty members in one department that is -- or
23         romantically involved faculty members in one
24         department, that is most common cause for recusal,
25         and in that case it's just voluntary; it's
```

```
 1       culture.
 2   BY MS. WIKTOR:
 3       Q   Now, is there an expectation that one spouse
 4   will recuse him or herself from voting on the other
 5   spouse's tenure application?
 6             MS. CHAVEY:  Objection.
 7             THE WITNESS:  When a spouse recuses
 8       themself from voting on their partner or partner's
 9       promotion, it's considered an act of integrity.
10   BY MS. WIKTOR:
11       Q   I mean, would it be outside the norms and
12   expectations that faculty members have for one another
13   if a faculty -- a voting faculty member did not recuse
14   him or herself from voting on his or her partner's or
15   spouse's tenure application?
16             MS. CHAVEY:  Objection.
17             THE WITNESS:  It's too vague a question.
18       There are too many versions of what couples are
19       like in different departments.  It's hard to say.
20       It's respected when it's done.  If and when it
21       ever isn't done, you know, it's hard -- I don't
22       hear complaints about it.  I think people read the
23       culture of their department and kind of act
24       accordingly.
25   BY MS. WIKTOR:
```

1  dysfunction within that department, is it?
2       A    That's correct.
3       Q    And I apologize because I might have had
4  three double negatives in there, so let me ask you a
5  clearer question, which is, were you aware prior to
6  being informed of the climate review that there was
7  some degree of dysfunction in the Spanish and
8  Portuguese department?
9       A    Yes.
10      Q    And how did you come to be aware that there
11 was some degree of dysfunction in that department?
12      A    It was widely known that there was conflict
13 in that department.
14      Q    So what was the nature of the conflict that
15 you were aware of in the Spanish and Portuguese
16 department prior to the time that you were informed
17 that the climate review would occur?
18      A    I was aware that there was conflict between
19 the Spanish part of the department and the Portuguese
20 part of the department.
21      Q    And did you have an understanding of who was
22 on which side?
23      A    Yes.
24      Q    So then you understood that Sue Byrne was on
25 one side, and Rolena and Roberto were on the other

```
 1  side?
 2      A   No.  The conflict I understood was between
 3  the tenured members of those two different fields.
 4  Two in Portuguese, three in Spanish.  I did not have
 5  any sense of where the untenured faculty members sat
 6  in relation to those conflicts.
 7      Q   At some point did you come to have an
 8  understanding of where the untenured faculty members
 9  sat in terms of that conflict?
10      A   I came to.
11      Q   At what point did you come to have that
12  understanding?
13      A   About the time when Sue's case was going
14  through, her letter and other, you know, talk about
15  Paulo Moreira that was related to thinking about Sue
16  Byrne's case.
17      Q   When you say Sue Byrne's letter, what letter
18  are you talking about?
19      A   Sue Byrne's letter asking for recusal, but
20  she also did send a comment in February to the FASTAP
21  review committee that I saw that Katy Lofton shared
22  with me, and so that brought up Paulo's case, that
23  letter, and that helped me to understand sort of where
24  junior faculty might be in that conflict.
25      Q   Okay.  And then you would have come to
```

```
 1   BY MS. WIKTOR:
 2      Q   Was any action taken by the university after
 3   the climate review to address the environment in the
 4   department?
 5      A   Yes.
 6      Q   What was done?
 7      A   An external director of graduate studies was
 8   put in, Ed Kamens, from East Asian languages and
 9   literatures, and this was meant to improve the
10   environment for graduate study in the department.
11      Q   Was any action taken by the university after
12   the climate review that was designed or intended to
13   address the environment in the Spanish and Portuguese
14   department as it related to junior faculty?
15              MS. CHAVEY:  Objection.  I'm not sure if
16       you had finished your prior answer, so I just want
17       to make sure that you have a chance to do that,
18       and I'm objecting to the form of this question.
19              THE WITNESS:  I do not recall
20       immediately what the other provisions were coming
21       out of the climate report.  What I know for a
22       certainty is that there was nothing that I was
23       supposed to change about my conduct of Sue's case
24       and the procedures that we had put in place
25       exceptionally in the summer to ensure the fairness
```

1    Q    What do you mean when you say he is an expert
2    on Ficino?
3    A    I think he writes and teaches on Ficino.  I
4    would have to go back and look at Giuseppe's
5    publication record.  As I say, these are two
6    incredibly eminent scholars who have really broad
7    range, and they were chosen because we felt that they
8    had the kind of expert knowledge to help evaluate
9    Sue's scholarship fairly.
10   Q    And whose idea was it to include Professor
11   Mazzotta on the review committee?
12   A    So Rolena suggested him, and I, myself,
13   wanted to think hard about whether he would be helpful
14   if the suggestion came from her, but the suggestion
15   also came from others.  Tamar and Mary Miller thought
16   that he would be a good member, and my knowledge of
17   his reputation was that he was always a wonderful
18   mentor to junior faculty.  In his own department he
19   has legions, especially of female students over the
20   years, who just revere him and whose careers he has
21   always promoted, so I really trusted him both as a
22   scholar and as a citizen, teacher, member of the
23   community.
24   Q    Now, you said the suggestion to include him
25   came from others.  Did Tamar Gendler and Mary Miller

1  pointing to isn't the report's conclusion and
2  recommendation --
3      Q   You never found out what the conclusions or
4  recommendations were because you never bothered to
5  read it, right?  You never read that report.
6      A   I was not allowed to read that report.
7           MS. CHAVEY:  Just a second.
8  BY MS. WIKTOR:
9      Q   You didn't ask to read it, did you?
10          MS. CHAVEY:  Objection.  That's been
11     asked and answered.  Please don't raise your
12     voice, Magdalena.
13 BY MS. WIKTOR:
14     Q   So when you say you were not allowed to read
15 it, what do you mean you were not allowed to?
16     A   It was confidential.  It was commissioned by
17 the provost, and it was the dean of faculty affairs at
18 the time, who was Emily Bakemeier, Tamar, Lynn Cooley,
19 Pam Schirmeister, who were on the inside of that
20 report, not me.  I was not in the circle of that
21 confidentiality.
22     Q   So then why didn't one of those other people
23 decide whether the actual contents of the report had
24 some impact on Sue Byrne's tenure application?
25     A   They did, Tamar did.  I said, "What's the big

```
 1   pointing to isn't the report's conclusion and
 2   recommendation --
 3       Q   You never found out what the conclusions or
 4   recommendations were because you never bothered to
 5   read it, right?  You never read that report.
 6       A   I was not allowed to read that report.
 7           MS. CHAVEY:  Just a second.
 8   BY MS. WIKTOR:
 9       Q   You didn't ask to read it, did you?
10           MS. CHAVEY:  Objection.  That's been
11       asked and answered.  Please don't raise your
12       voice, Magdalena.
13   BY MS. WIKTOR:
14       Q   So when you say you were not allowed to read
15   it, what do you mean you were not allowed to?
16       A   It was confidential.  It was commissioned by
17   the provost, and it was the dean of faculty affairs at
18   the time, who was Emily Bakemeier, Tamar, Lynn Cooley,
19   Pam Schirmeister, who were on the inside of that
20   report, not me.  I was not in the circle of that
21   confidentiality.
22       Q   So then why didn't one of those other people
23   decide whether the actual contents of the report had
24   some impact on Sue Byrne's tenure application?
25       A   They did, Tamar did.  I said, "What's the big
```

1  takeaway?"  The implication is, do we need to change
2  all this stuff that we've been talking about for the
3  last six months, and the answer was no; we did not
4  have an actionable indictment out of that report that
5  would have us make that change to that fundamental
6  voting right, which is so deeply ingrained in the
7  institutional structure.  This report did not come out
8  with that recommendation, and, therefore, it did not
9  change what I did.
10     Q  But there was a way, other than stripping the
11  voting rights of faculty, to change the voting block,
12  wasn't there?
13     A  When a receivership is put into place, that
14  is a way of changing the voting block, yes.
15     Q  But that wasn't done in Sue Byrne's case?
16     A  No, and it was done for the whole department,
17  and as I think I explained to you before, I've never
18  seen it done in a weird sort of partial way where one
19  decision was hived off with a special set of voters
20  and structures.  So when we did it in 2017 in January
21  when Howard was put in as chair, and when the program
22  committee was set into place, it was for the whole
23  department and for all business of the department.
24     Q  So why wasn't the department placed into
25  receivership in 2016?

```
 1   write doesn't have a private audience for all time.
 2        Q    Which is a true fact.
 3        A    Yes.
 4        Q    And I certainly -- I didn't suggest anything
 5   was wrong, but...  So as early as July 26, 2015, you
 6   thought this might -- we might be talking about court,
 7   and discovery, and litigation, and lawyers in the
 8   context of Sue Byrne's tenure case?
 9        A    Yes.
10        Q    Now, had you ever been involved in a tenure
11   case that was then the subject of litigation?
12        A    I do not know the answer to that because I
13   don't always know whether cases I've been involved
14   with in the future get appealed.  That's a
15   confidential process, so I don't know.
16        Q    So when I say litigation, I mean in court, so
17   something like this, so beyond the university's appeal
18   process.
19             So to your knowledge, has any tenure case
20   that you've been involved in, led to a lawsuit or a
21   court proceeding?
22        A    No.  Other than this one.
23        Q    Now, who selected, or who made the decision
24   that Noël Valis would be heading up the departmental
25   process surrounding Sue Byrne's tenure application?
```

1      A    Rolena made that recommendation, and I
2    approved it.
3      Q    Did it concern you that the person who Sue
4    Byrne had asked not be involved in her tenure
5    consideration was the one who suggested, I guess, the
6    third of the group of three as taking over the role
7    that would otherwise be held by Rolena?
8      A    Yes.  So I paused over that for sure.  My
9    understanding of Noël's place in the conflict was that
10   she was not hardened into one of the camps or the
11   other at all times.  She was in Sue's area and had
12   been her mentor.  I thought probably that was the best
13   way to manage the case as long as I felt like there
14   were strong others on the committee who would be
15   looking out for the integrity and looking out for that
16   list of referees.
17     Q    Did you take any steps or any action to
18   ensure that there wasn't sort of a hardening of Noël's
19   position one way or another or influence by Rolena on
20   Noël during the process?
21              MS. CHAVEY:  Objection.  Go ahead.
22              THE WITNESS:  In interacting with Noël I
23        had a very sharp eye out at all times in what she
24        was saying, what she was recommending, what she
25        was doing.

```
 1            CERTIFICATE OF REPORTER

 2       I, Robin Balletto, a Registered Professional

 3   Reporter/Notary Public within and for the State of

 4   Connecticut, do hereby certify there came before me,

 5   on the 4th day of January, 2019, the following named

 6   person, to wit:  AMY HUNGERFORD, who was by me duly

 7   sworn to testify to the truth and nothing but the

 8   truth; that she was thereupon carefully examined upon

 9   her oath and her examination reduced to writing under

10   my supervision; that this deposition is a true record

11   of the testimony given by the witness.

12       I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties to the

14   action in which this deposition is taken; and further,

15   that I am not a relative or employee of any attorney

16   or counsel employed by the parties hereto, nor

17   financially or otherwise interested in the outcome of

18   the action.

19       WITNESS my hand and affixed my seal this 18th day

20   of January, 2019.

21
                            /s/ Robin L. Balletto
22

23

24                          Robin Balletto, RMR

25       My commission expires:  October 31, 2023
```