# Exhibit 158

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
 2

 3    * * * * * * * * * * * * * *
      SUSAN BYRNE,                    )
 4                                    )
              Plaintiff,              )
 5                                    ) Civil Action No.
         vs.                          ) 3:17-CV-01104 (VLB)
 6                                    )
                                      )
 7    YALE UNIVERSITY, INC.,          )
                                      )
 8            Defendant.              )
      * * * * * * * * * * * * * *
 9

10

11     **CONFIDENTIAL PORTIONS INCLUDED ON INDEX PAGE**

12

13         DEPOSITION OF:  ANÍBAL GONZÁLEZ-PÉREZ

14         DATE:  APRIL 10, 2019

15         HELD AT:  MADSEN, PRESTLEY & PARENTEAU, LLC

16                   402 Asylum Street

17                   Hartford, Connecticut  06103

18

19   Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

20

21

22

23              CASSIAN REPORTING, LLC
               21 Oak Street - Suite 307
24           Hartford, Connecticut  06106
                   (860) 595-7462
25         scheduling@cassianreporting.com
```

1    top, it reads, Not only does it contribute to the

2    negative atmosphere in the department, but it is an

3    overt case of sexual harassment that has been

4    witnessed by a large number of people in the

5    department.

6          Do you see that?

7    A.    Yes, I do.

8    Q.    And so was RGE's sexual harassment of Yale

9    students and staff members an open secret within the

10   department -- openly known I should say?

11          MR. SALAZAR-AUSTIN:  Objection.

12   A.    I would say it could be characterized as

13   such.  I would go even further and say it was an open

14   secret among the profession.

15   Q.    So you heard from people outside of Yale

16   about RGE's sexual harassment?

17   A.    Yes.

18   Q.    When did you first hear about RGE's sexual

19   misconduct and sexual harassment from people outside

20   of Yale?

21   A.    I began hearing that almost as soon as I

22   was approached by Yale to come to Yale, and I shared

23   what I thought were the good news with people I knew,

24   people who had been associated with the department at

25   a high level, including a senior professor, a female

1    A.    They reacted I think with -- this is my

2    recollection -- that they reacted with a sense of

3    outrage.  They were outraged by that.  They feel they

4    were being, you know, accused falsely.  Again, I have

5    that from one of my students who talked to me about

6    the meeting.  The meeting, if it took place indeed,

7    it was never an announced meeting.

8    Q.    And did anyone say that they thought that

9    Professor Byrne was involved in the anonymous letter?

10    A.    I heard that accusation at one point from

11    Professor Adorno, yeah, at a meeting.

12    Q.    Which meeting are you referring to?

13    A.    I believe it was one of the early tenure

14    meetings, in the last period of Professor Byrne's

15    tenure.

16    Q.    During one of the last meetings while

17    Professor --

18    A.    Yeah, the tenure review.

19    Q.    I'm sorry, I'm going to ask just to make

20    clear, are you referring to a meeting about Professor

21    Byrne's tenure application, or are you referring to a

22    meeting that happened during the time period that

23    Professor Byrne was still at --

24    A.    During the time period, yeah.

25    Q.    Was this meeting before or after your

Case 3:17-cv-01104-VLB   Document 82-158   Filed 05/15/19   Page 5 of 26

1  climate review -- the climate review took place?

2      A.    It was shortly before the climate review.

3      Q.    And tell me everything that you recall

4  about this meeting.

5      A.    There is not much to tell.  It was just a

6  regular meeting, but there was a difficult atmosphere

7  at the meeting, and mention was made of the letter,

8  and then there was speculation that perhaps one of

9  the assistants had done it, and then Professor

10  Byrne's name was mentioned.

11      Q.    By Professor Adorno?

12      A.    That's my recollection.

13      Q.    Was Professor Byrne present for this

14  meeting?

15      A.    No.  This was among the senior faculty.

16      Q.    And so you were present, Professor Adorno

17  was present?

18      A.    Yes.

19      Q.    Who else was present?

20      A.    I believe RGE, Valis and possibly Jackson.

21      Q.    And when Professor Adorno mentioned that

22  Professor Byrne had possibly been involved in the

23  letter, what was the reaction of people in the room?

24      A.    There was not much reaction.  I think I

25  heard Professor Jackson exclaim something, you know,

```
 1    surprise, and there was no further comment from

 2    anybody.  It was just like a throw-away comment.

 3        Q.    And then after that anonymous letter, you

 4    were interviewed for an article in the Yale Daily

 5    News about the anonymous letter; is that correct?

 6        A.    Yes.

 7              (Exhibit 33, previously marked.)

 8    BY MS. HOWARD:

 9        Q.    So I'm going to hand you what's been

10    previously marked as Plaintiff's Exhibit 33, which is

11    a copy of the March 25th, 2015 Yale Daily News

12    article; is that correct?

13        A.    Yes.

14        Q.    And Professor Byrne was also interviewed

15    for this article; correct?

16        A.    Yes.

17        Q.    Did Professor Adorno support faculty

18    members participating in Yale Daily News articles?

19              MR. SALAZAR-AUSTIN:  Objection.

20        A.    She made no comments either way.

21        Q.    And after you participated in the

22    March 25th, 2015 article, did Professor Adorno say

23    anything to you about being interviewed for the

24    article?

25        A.    No, no.
```

1      A.     No, no.  It's -- I think it's being used in

2   a purely descriptive manner.  And with regard to

3   Latin, it's also linguistic competence, which means

4   that the person knows the language well enough to

5   speak it or use it regularly.

6      Q.     Is there anything that was discussed at the

7   meeting with respect to Professor Byrne's scholarship

8   that is not covered in Section 6?

9      A.     Not to my recollection, no.  It's very

10  complete.

11     Q.     And were there any critical comments made

12  regarding Professor Byrne's scholarship that are not

13  included in this section, Section 6?

14     A.     I don't recall any.

15     Q.     And broadly speaking, during the entire

16  meeting, so not just for scholarship, but in the

17  entire meeting, were there any concerns about

18  Professor Byrne raised by anyone present at the

19  meeting?

20     A.     Not to my recollection.  In fact, I

21  recollect our vote was unanimous.

22     Q.     In favor of promoting Professor Byrne?

23     A.     In favor of promoting Professor Byrne.

24     Q.     And from that time period on, so the

25  meeting that was held for Professor Byrne's promotion

```
 1   to associate professor until the vote on Professor

 2   Byrne's tenure application, did anyone within the

 3   faculty of Spanish and Portuguese ever discuss any

 4   concerns about Professor Byrne's scholarship with

 5   you?

 6        A.    Not in my hearing, no.

 7        Q.    And during that same time period, so from

 8   the meeting that was held for Professor Byrne's

 9   promotion to associate professor until the vote on

10   her tenure application, did anyone within the faculty

11   of Spanish and Portuguese ever discuss any negative

12   comments about Professor Byrne's scholarship with

13   you?

14        A.    No.

15        Q.    So as a tenured member of -- strike that.

16              As a senior member of the Spanish and

17   Portuguese Department, did you also participate in

18   the vote for Professor Byrne's tenure application?

19        A.    Yes.

20        Q.    And there was one meeting to discuss and

21   vote on her tenure application; is that correct?

22                    MR. SALAZAR-AUSTIN:  Objection.

23        A.    Yes.

24        Q.    And that meeting was held in February 2016;

25   is that correct?
```

Case 3:17-cv-01104-VLB   Document 82-158   Filed 05/15/19   Page 9 of 26

1    A.    I believe so, yes.

2    Q.    And tell me everything that you recall

3    about that particular meeting.

4    A.    The meeting was attended not just by the

5    senior faculty, but also by two faculty members from

6    outside the department, one was Professor Mazzotta --

7    excuse me, two faculty members, Mazzotta and Bloch,

8    and then also Dean Dovidio was present at the

9    meeting.  And that was something that made the

10   meeting somewhat unusual in that regard, although I

11   knew that this would be taking place.

12   Q.    How did you know that that would be taking

13   place?

14   A.    I'm not exactly sure how; I heard about it

15   from someone, but I don't remember.

16   Q.    And Professors Mazzotta and Bloch were

17   nonvoting participants in the deliberations; correct?

18   A.    Dean Dovidio was also there and he was

19   nonvoting.

20   Q.    Is Professor Bloch considered an expert in

21   Spanish literature?

22   A.    No.  He is an expert on French Medieval

23   literature.

24   Q.    And Professor Mazzotta, is he considered an

25   expert in Spanish literature?

```
 1        A.    He is an expert in Italian Renaissance

 2   literature.

 3        Q.    But not Spanish literature?

 4        A.    No.

 5        Q.    And the atmosphere of the meeting -- strike

 6   that.

 7              What was the atmosphere of the meeting?

 8        A.    It was clearly tense.  Yeah, I would

 9   characterize it as tense.

10        Q.    Did Professor Valis read from prepared

11   notes during the meeting?

12        A.    Yes.  And so did RGE and Adorno.

13        Q.    Let's start with Professor Valis.  Did she

14   read her comments about Professor Byrne from prepared

15   notes?

16        A.    Yes.

17        Q.    And RGE, his comments about Professor Byrne

18   were also from prepared notes?

19        A.    Yes.

20        Q.    Professor Adorno, her comments about

21   Professor Byrne were also from prepared notes?

22        A.    Yes.

23        Q.    Did Professor Valis stray from her prepared

24   notes at any point to offer any comments about

25   Professor Byrne?
```

```
 1                   MR. SALAZAR-AUSTIN:  Objection.

 2       A.    Not to my -- I don't have any clear

 3  recollection of that.

 4       Q.    Do you have any recollection of RGE

 5  straying from his prepared notes to offer comments

 6  about Professor Byrne?

 7                   MR. SALAZAR-AUSTIN:  Objection.

 8       A.    There was one point when Professor Bloch

 9  raised the point that, as he heard negative comments

10  about Professor Byrne coming from RGE as well as the

11  others, and he said, especially about the event,

12  including the Cervantes book, the Book on Law and

13  Literature and Cervantes, and he said -- he objected.

14  He said, but you in the previous meeting that you

15  had, you praised this book very highly and how come

16  now you think it's not worth anything?  And

17  González-Echevarría replied something to the effect

18  that he had a right to change his mind.  And I

19  remember that conversation very clearly.

20       Q.    And did Professor Adorno stray from her

21  prepared notes at any point to offer comments about

22  Professor --

23       A.    Not to my recollection.

24                   MR. SALAZAR-AUSTIN:  Objection.

25       Q.    In your experience at prior universities in
```

Case 3:17-cv-01104-VLB   Document 82-158   Filed 05/15/19   Page 12 of 26

```
 1   has been more customary in my experience at this

 2   department is that generally the three faculty,

 3   senior faculty members RGE, Adorno and Valis always

 4   read from prepared text, unless they are happy with

 5   the candidate, and then there is less of a

 6   structural, you know, element to it.  There is a more

 7   relaxed atmosphere.  But whenever there is a tendency

 8   to be negative about a candidate, the reviews come

 9   out basically.  They sound a lot like bad book

10   reviews.

11        Q.    Did you take notes during the meeting?

12        A.    No.  I did come prepared to the meeting

13   with some statements that I wanted to make.  I have

14   copies of those I can provide, but no, I did not take

15   notes during the meeting.  I was very much trying to

16   understand what was going on and, you know -- but it

17   was clear to me what was going on.

18             I should mention also the tendency, and

19   it's a pronounced tendency in my department to --

20   especially in cases such as Byrne's -- to devalue the

21   letters from very distinguished people who wrote

22   mostly in her favor.  There was just one letter that

23   was lukewarm and one that was negative, and there

24   were eight letters, and the rest were extremely

25   positive.  And this was a pattern that was repeated
```

```
 1   don't know.

 2        Q.    Were you present for any meetings where the

 3   criticisms mentioned at this meeting were

 4   communicated to Professor Byrne?

 5        A.    No.

 6        Q.    And were you present for any meetings where

 7   these criticisms mentioned at the meeting were

 8   discussed at all?

 9        A.    No, no.

10              (Exhibit 78, previously marked.)

11   BY MS. HOWARD:

12        Q.    So I'm handing you what's been previously

13   marked Plaintiff's Exhibit 78.  Please take a moment

14   to read it and let me know when you are done.

15              (Pause.)

16        A.    I had not read this report before.

17        Q.    So that was going to be my first question,

18   which is whether you had seen Exhibit 78 before.

19        A.    No.

20        Q.    So Exhibit 78 are notes that Professor

21   Valis took of the internal review committee.  These

22   were produced by the defendants during discovery.  So

23   as you said, you've never seen these before.

24              My question is:  Was some sort of summary

25   of the internal review committee's meeting given at
```

1    Research 1 institutions in the country routinely

2    recruit, retain and promote good candidates.  Yale

3    should not be in the position of just skimming the

4    cream of the top of the U.S. system.  Any great

5    university has to show that it can recruit, retain

6    and promote.  And I think that understanding is clear

7    to the administration.  I think it's certainly clear

8    now with regard to the Spanish Department, which has

9    not been doing that, and that was the point I was

10    trying to make there.

11       Q.    A couple of paragraphs down, David was

12    working from a half sheet of paper with a few words

13    scribbled on it; Aníbal had a stack of papers in

14    front of him that was apparently a section of the

15    Faculty Book.  He glanced at it a couple of times,

16    but did not cite from it.

17         Do you see that?

18       A.    Yes.

19       Q.    Is that also accurate?

20       A.    Not quite.  I don't think I brought the

21    Faculty Handbook along, but I did have a stack of

22    papers at that time.  I had taken notes from the

23    letters and so on.  I have them still; I could

24    provide them if necessary.

25       Q.    The notes that you have, you still have

1    those in your possession?

2        A.    Yes, yes.  I had prepared -- knowing that

3    my colleagues prepared statements, I decided to

4    prepare one, but then when I saw the tenor of the

5    meeting, it felt strange for me to start reading from

6    something prepared.  I wanted to address the issues

7    as they were coming up, so I just -- I just kept my

8    papers as references, yeah.

9        Q.    And the notes that you have, these are

10   handwritten notes that you took on the letters as you

11   were reading through the letters?

12       A.    No.  I actually took passages from the

13   letter and wrote them down for my own use.

14       Q.    So you typed them up?

15       A.    Yeah, I typed them up, yeah.

16       Q.    And then you said you had prepared notes

17   also aside from the notes on the letter; is that

18   correct?

19       A.    Yes, yes.

20       Q.    And are those prepared notes also

21   typewritten or handwritten?

22       A.    Handwritten, yes.

23       Q.    And you have all of these notes in your

24   possession?

25       A.    Yes.  Yes, I do.

```
 1              MS. HOWARD:  So, David, we haven't
 2    gotten any of those notes.
 3              MR. SALAZAR-AUSTIN:  If you have them,
 4    you can certainly give them to me, and I'll look at
 5    them.
 6              THE WITNESS:  Sure.  I'll be glad to
 7    provide them.
 8              MS. HOWARD:  Okay.  Since we've gotten
 9    notes from other people who were present, it would
10    make sense for us --
11              THE WITNESS:  Yes, I'll make
12    arrangements for you to get them.
13              MS. HOWARD:  Yes, please do.
14              MR. SALAZAR-AUSTIN:  Thank you.
15    BY MS. HOWARD:
16         Q.   So on the second page of these notes, it's
17    the third paragraph up from the bottom, the sentence
18    starts midpoint through the sentence, where it says
19    Aníbal claimed that the letters were unfair, unfair
20    in the readings by us and in their contents; that if
21    the writers had known the weight they would carry,
22    they would not have written them as they did.
23         Do you see that?
24         A.   Yes.
25         Q.   Is that an accurate statement?
```

1    pattern occurred, this sort of behavior occurred.

2    Neither at Michigan State, nor at Penn State.  When

3    we reviewed complaints about tenure at Penn State,

4    you know, nothing like that would ever arise.

5         Q.   And so aside from the typical comments that

6    he made at Professor Byrne's tenure meeting, he

7    didn't make those kinds of negative typical comments

8    he made at the promotion meeting in 2013?

9         A.   No.

10        Q.   And when it came to the individual letters

11   in the 2013 meeting, was Professor Echevarría -- was

12   RGE dismissive of the external letters at all?

13        A.   No, no.

14        Q.   Including the positive external letters in

15   2013?

16        A.   Not that I can recall, yeah.

17        Q.   Was there ever any discussion during the

18   meeting on Professor Byrne's tenure application about

19   the fact that at least one of the letter writers,

20   Professor Bruce Burningham, had also written a letter

21   for Professor Byrne's 2013 promotion which had not

22   been criticized by Professor González-Echevarría?

23        A.   Yeah, no, there was no comment on that,

24   yeah.

25        Q.   But your experience was that once Professor

```
 1    tenure application were fair?

 2        A.    I'm sorry, could you repeat that again for

 3    me?

 4        Q.    Sure.  In terms of your overall impressions

 5    of the February 9th, 2016 meeting, did you feel that

 6    the deliberations on Professor Byrne's tenure

 7    application were fair?

 8        A.    No, no.

 9        Q.    Let's go a little bit more deeper.  So why

10    did you feel that the deliberations weren't fair?

11        A.    Because I felt that my three other senior

12    colleagues were -- had already decided that they did

13    not wish to give tenure to Professor Byrne, and that

14    the procedure that I had already observed in other

15    tenure meetings at my department was going to be

16    applied again.

17        Q.    And did it also appear to you that these

18    three senior colleagues that we discussed already,

19    that they used the external letters to hyperfocus on

20    any concerns raised in the letters about Professor

21    Byrne's scholarship?

22                  MR. SALAZAR-AUSTIN:  Objection.

23        A.    Yes, I would say so.  I would say there was

24    a -- "hyperfocus" is a good term; it sounds more

25    better than cherry-picking, which in some ways is
```

1　what they were doing, and I would say they did not do

2　in the prior meeting, you know, when the question of

3　promotion to associate without tenure came up.

4　　　Q.　And this cherry-picking of any concerns

5　expressed in the letters, external letters, that was

6　something that you protested during the meetings; is

7　that correct?

8　　　A.　Yes.　I protested it because, I mean, these

9　were not books that were published in --

10　self-published or published in some unknown

11　university press.　The University of Toronto Press is

12　a reputable press.　It has its own readers; it has

13　its own high level scholars who read these things.

14　And so these books have already gone through an

15　editorial process to make sure that they are up to a

16　high scholarly standard.　Scholars may quibble and

17　they should, you know, that's part of our business.

18　You know, we disagree with one another, with our

19　ideas and so on.　But then to claim -- to make claims

20　that the writing is awful, that there are things

21　missing here and there and so on, especially in

22　humanistic research, a lot of things can't always be

23　said to be missing if it's somebody else's favorite

24　author.　So in a sense, yes, there is a whole

25　question as to how these texts were being presented

1    for.  They looked for certain things, and then they

2    looked for similar things in the letters.  So that

3    was I think the way the discussion went.

4         Q.    And so the discussion centered on the

5    comments that Professors Adorno, RGE and Valis had

6    come prepared with written statements regarding?

7                    MR. SALAZAR-AUSTIN:  Objection.

8         A.    I think those in some ways predetermined

9    their reading of the letters.

10        Q.    So the way Professors Adorno, RGE and Valis

11   presented their statements was that they had these

12   concerns about Professor Byrne's scholarship and here

13   is where the external letters support these concerns?

14                    MR. SALAZAR-AUSTIN:  Objection.

15        A.    Are you asking me if the external

16   letters --

17        Q.    Let me rephrase the question to make it a

18   little bit clearer, because I don't think my question

19   was very clear.

20             Did it appear to you in listening to

21   Professors Adorno, RGE and Valis's comments about

22   Professor Byrne's scholarship that they had -- strike

23   that.  Actually, I don't think I need to ask that

24   question.

25        A.    Okay.

1      Q.    Did you consider any of the external

2  letters to be devastating?

3      A.    Perhaps the one that came closest to that

4  was Folger's.  That was the one that was most

5  explicit in terms of -- but I didn't think it was

6  upsetting in the sense that it changed my mind about

7  the candidate; it certainly did not.

8      Q.    Have you ever -- I'm sorry.

9      A.    Sure, no, go ahead.

10      Q.    Have you ever encountered a letter similar

11  in tone as Professor Folger's letter was in your

12  experience on tenure committees?

13      A.    Oh, yes.  I remember a case years ago at

14  Penn State where a medievalist candidate -- there was

15  one letter that was clearly inimical to the

16  candidate.  The person seemed to be -- just didn't

17  like anything about the candidate and said so in a

18  letter that was too long.  I remember that our

19  colleague said, you know, the length of the letter

20  itself was damning for the writer of the letter more

21  than for the person who the letter was about.

22      Q.    And was the letter fatal in terms of the

23  candidate's --

24      A.    No, no, because in that particular case

25  that I cite from my days at Penn State, the other

1  letters were excellent letters, were very solid,

2  positive letters, and we took them at their word, and

3  we knew who the reviewers were, people of high

4  quality, and so that wasn't sufficient in any way.

5      Q.   So in your experience, one negative letter

6  is not sufficient to deny a tenure -- a candidate

7  tenure and promotion on the basis of that one

8  negative letter?

9             MR. SALAZAR-AUSTIN:  Objection.

10     A.   It's hard to say.  There could be

11  circumstances, I'm sure, when there are other

12  uncertainties that come into play.

13     Q.   But outside of those factors, if the only

14  factor is a negative letter -- strike that.  Let me

15  ask a clearer question.

16             In your experience, is one negative letter

17  taken on its own sufficient to deny a candidate

18  tenure?

19     A.   No.

20             MR. SALAZAR-AUSTIN:  Objection.

21     Q.   And were any of the laudatory comments in

22  the six positive letters discussed by RGE at all?

23     A.   No, no.

24     Q.   Were any of the laudatory comments in the

25  six positive letters discussed by Professor Adorno at

1           MR. SALAZAR-AUSTIN:  Objection.

2     A.    Yeah, from being in the department already

3  since 2006, I had experience with several tenure

4  reviews, and I always knew when they were coming to

5  essentially vote no, because they entered in a very

6  solemn way, no joking, no friendly comments.  It was

7  just very solemn, you know, like a tribunal of sorts.

8  So, you know, I felt that same atmosphere, so I knew

9  what was coming.

10    Q.    And earlier, you testified that in January

11 2018, you had reported RGE to the Title IX office

12 with respect to him harassing a student; correct?

13    A.    Yes.

14           MR. SALAZAR-AUSTIN:  Objection.

15    A.    Yes.

16    Q.    And other than that incident, did you

17 report RGE to any officials at Yale for any other

18 incidents involving students?

19    A.    No.

20    Q.    And did you report RGE to any officials at

21 Yale for any incidents involving staff or faculty

22 members?

23    A.    No.

24    Q.    And did you ever discuss any concerns about

25 RGE and sexual misconduct with Professor Adorno?

C E R T I F I C A T E

STATE OF CONNECTICUT

         I, SANDRA SEMEVOLOS, a Registered Merit Reporter and Notary Public within and for the State of Connecticut, do hereby certify that I reported the deposition of ANÍBAL GONZÁLEZ-PÉREZ on APRIL 10, 2019, at the offices of MADSEN, PRESTLEY & PARENTEAU, LLC, 402 Asylum Street, Hartford, Connecticut 06103.

         I further certify that the above-named deponent was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth concerning his knowledge in the matter of the case of SUSAN BYRNE, vs. YALE UNIVERSITY, INC., now pending in the UNITED STATES DISTRICT COURT, for the DISTRICT OF CONNECTICUT.

         I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of COMPUTER ASSISTED TRANSCRIPTION; and I further certify that said deposition is a true record of the testimony given by said witness.

         I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

         WITNESS my hand this 23rd day of April, 2019.

_____

Sandra Semevolos, RMR, CRR, CRC, CSR #74
Notary Public
My Commission Expires: September 30, 2020

```
 1   BY MS. HOWARD:

 2       Q    So my question is whether you personally

 3   communicated any of your concerns with respect to

 4   Professor Byrne's scholarship at the mentoring lunches

 5   that you had with her?

 6                   MR. SALAZAR-AUSTIN:  Objection.

 7                   THE WITNESS:  Again, I answered this

 8            earlier.  And I was not chair.  I am not

 9            chair.  I was not chair of -- in any respect

10            whether of a committee or a department.  And

11            it was not my part of what I was supposed to

12            be doing for the promotion to associate

13            professor on term.  That was something that

14            Professor Adorno, as the chair of the

15            department, was supposed to be doing and

16            representing the views of the committee, which

17            included me, which included me.

18   BY MS. HOWARD:

19       Q    Did you understand my question?

20       A    I thought I did because I answered it.

21       Q    You actually did not.  So let me ask it a

22   slightly different way.

23            Earlier you testified that you had mentoring

24   lunches with Professor Byrne.  Is that correct?

25       A    Yes.
```

Noel Valis

```
 1        Q    During those mentoring lunches did you ever

 2   mention any concerns about Professor Byrne's scholarship

 3   to her?

 4        A    Most of those mentoring lunches, if not

 5   practically all -- I'm thinking as I recall the chronology

 6   here -- occurred before we had that meeting in 2013 for

 7   her promotion to associate on term.

 8        Q    So then no, you never communicated those

 9   concerns during your mentoring lunches with Professor

10   Byrne?

11        A    If those lunches occurred before the actual

12   meeting for her to make the decision about her promotion

13   to associate on term.  So those concerns were noted at

14   that meeting.  But the lunches occurred before that

15   meeting.

16        Q    So you never had any lunches with Professor

17   Byrne --

18        A    I did have one lunch.

19        Q    I have to finish the question.

20             So did you have any lunches with Professor Byrne

21   after the deliberations for Professor Byrne's promotion?

22        A    I believe I had one.

23        Q    And at that one lunch you had after the

24   deliberations for Professor Byrne's promotion, did you

25   ever mention to her any of the concerns about her
```