# Exhibit 159

```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF CONNECTICUT

 3

 4    --------------------------------x

 5    SUSAN BYRNE                     : C.A. NO.

 6                                    : 3:17-CV-01104(VLB)

 7    VS.                             :

 8                                    :

 9    YALE UNIVERSITY, INC.           :

10    --------------------------------x

11

12

13

14          DEPOSITION OF:  30(b)(6) DAVID POST

15          DATE:  MARCH 1, 2019

16          HELD AT:  MADSEN, PRESTLEY & PARENTEAU, LLC

17                    105 HUNTINGTON STREET

18                    NEW LONDON, CONNECTICUT 06320

19

20

21          Reporter:  MARY Z. ARMANDO, LSR # 00222

22                CASSIAN REPORTING, LLC

23                  21 Oak Street, Suite 307

24                 Hartford, Connecticut 06106

25                       (860) 595-7462
```

```
 1  anyone other than Attorney Chavey about today's
 2  deposition?
 3       A    No.
 4       Q    And when you indicated that you had reviewed
 5  some materials, you gestured to the folder that you
 6  have in front of you that contains some documents;
 7  correct?
 8       A    Yes.
 9       Q    What is contained in that folder?
10       A    Documents related to the UWC case that's
11  discussed here.  Also the UWC procedures.
12       Q    Did you get those documents from a file
13  that's maintained by the UWC?
14       A    No.
15       Q    Did you have those documents maintained on
16  your own?
17       A    No.
18       Q    So how were these documents that you have
19  with you compiled?
20       A    They were provided by my lawyer.
21       Q    And so in 2016, you were the chair of the
22  UWC; correct?
23       A    That is correct.
24       Q    And in 2016 the UWC had a proceeding related
25  to Roberto Gonzalez Echevarria; is that correct?
```

```
 1        A    I believe so, yes.
 2        Q    So that proceeding, is there a term that the
 3   UWC uses to describe such a proceeding?
 4        A    It is a case.
 5        Q    And Professor Echevarria was a respondent in
 6   that case; is that right?
 7        A    That is correct.
 8        Q    And the complainant was who?
 9        A    The complainant was a Title IX coordinator
10   named Carl Hashimoto.
11        Q    And Carl Hashimoto, he didn't bring a
12   complaint on behalf of himself, he brought a complaint
13   on behalf of others; is that right?
14        A    That is correct.
15        Q    And there were multiple individuals on whose
16   behalf he brought the complaint; is that right?
17        A    That is correct.
18
19   (Plaintiff's Exhibit 114, Bates Nos. Byrne017317
20   through Byrne017459, marked for identification.)
21
22   BY MS. WIKTOR:
23        Q    Showing you what is being marked Plaintiff's
24   Exhibit 114.  This is Defendant's Bates Numbers
25   Byrne017317 through Byrne017459.  And for the record
```

1   this is a -- these are redacted -- this is a redacted
2   version of this group of Bates numbers.  This was
3   previously marked in an unredacted form as Plaintiff's
4   Exhibit 16.  So these are documents that were produced
5   by the university in connection with this litigation.
6           And so I will turn your attention to the
7   first two pages, which is a letter from or appears to
8   be a letter from Ben Polak, the provost of the
9   university, to Roberto Gonzalez Echevarria.  Have you
10  seen this document before?
11       A    I have.
12       Q    And it was relative to the case in which
13  Professor Echevarria was the respondent in 2016 and
14  Provost Polak was the decision-maker; is that right?
15       A    That is correct.
16       Q    And is it always the case that the provost is
17  the decision-maker relative to the outcome of a UWC
18  case?
19       A    No.
20       Q    So what is the universe of possible
21  decision-makers?
22       A    The decision-maker is determined in large
23  part by the position of the respondent of the
24  university.  So for students it is the dean of the
25  school of which the respondent resides.  For staff it

1    A    Not that I'm aware of.

2    Q    Now, in a UWC case, what is the chair's role

3 throughout the process?

4         MS. CHAVEY:  I'm going to object to the form

5      of the question because it is so broad, but you can

6      tackle it if you understand it.

7    A    Yeah.  I mean, that's a very broad question.

8 If you can break that down, I will be happy to answer

9 it.

10 BY MS. WIKTOR:

11   Q    Does the chair investigate a complaint that's

12 brought?

13   A    No.

14   Q    Does the chair communicate -- so once the

15 complaint is brought, is there a communication between

16 the chair of the UWC and the complainant?

17   A    There can be.

18   Q    Now, is it typically the case that a

19 complaint is addressed to the chair of the UWC?

20   A    Yes.

21   Q    Is there an expectation that a complaint will

22 be addressed to the chair of the UWC?

23   A    Yes.  I think our procedures specify that the

24 complaint should be addressed to the chair of the UWC.

25   Q    So in this case, you, the chair of the UWC,

```
 1  appointed the fact-finder; is that correct?
 2      A    That is correct.
 3      Q    And is that the typical case?
 4      A    That is correct.
 5      Q    And so who are the pool of -- who is the pool
 6  of people from whom you might select a fact-finder?
 7      A    We have a number of potential fact-finders.
 8  I don't remember the number at this time, but it is
 9  typically four or five depending on their availability.
10  They all have legal training and they are all outside
11  of the university, from outside the university.
12      Q    And in this case, Miriam Berkman was selected
13  as the fact-finder; correct?
14      A    That is correct.
15      Q    And what is her -- how did she wind up being
16  on the list of possible fact-finders?
17      A    Clarify that, list as in when the UWC was
18  formed or list as in the day I decided to appoint her?
19  What time frame are you talking about?
20      Q    So on the day that you decided to appoint
21  her.
22      A    I don't remember.
23      Q    So at the time that you appointed
24  Miriam Berkman as the fact-finder, was there a group of
25  people from whom you were selecting a fact-finder?
```

```
 1      Q    And was that the case in this case?
 2      A    As far as I'm aware, yes.
 3      Q    Now, once the fact-finder concludes his or
 4   her investigation, prior to the issuance of a report of
 5   the fact-finder, is there a consultation with the UWC
 6   about what was found in the investigation before that
 7   report is provided?
 8           MS. CHAVEY:  Objection.  Go ahead.
 9      A    Again, you're going to have to define what
10   you mean by consultation and what is found.
11   BY MS. WIKTOR:
12      Q    Okay.  So in this case at some point a report
13   was -- Miriam Berkman provided a report based on her
14   investigation; correct?
15      A    Correct.
16      Q    Were there any drafts of that report provided
17   to the UWC before the final was issued?
18      A    Yes.
19      Q    And to whom was that draft or those drafts
20   provided?
21      A    Those drafts were provided to me as chair of
22   the UWC, to the secretary in the case, Aley Menon, and
23   to the legal adviser for the case, Susan Sawyer.
24      Q    Does Susan Sawyer work for the university?
25      A    She does.
```

```
 1   what to include in their report.
 2       Q   Once the report is final and it is issued by
 3   the fact-finder, who gets a copy of it?
 4       A   The fact-finder's report goes to the
 5   respondent, the fact-finder's report goes to the
 6   complainant, and the fact-finder's report goes to the
 7   hearing panel.  After the hearing panel it goes on to
 8   the decision-maker, but at that point in time, those
 9   are the entities that receive it.
10       Q   Who decides who is on the hearing panel?
11       A   The chair of the UWC.
12       Q   And was that the case regarding RGE; did you
13   as the chair determine who was going to be on the
14   hearing panel?
15       A   I did.
16       Q   And is the hearing panel composed of members
17   of the UWC?
18       A   Yes.
19       Q   Now, is the hearing panel given instructions
20   or a charge about what they are supposed to do once
21   they are selected?
22       A   Yes.
23       Q   And who gives them that charge or those
24   instructions?
25       A   The legal adviser for the case.
```

```
 1        A    It appears to be a draft of the fact-finder's
 2   report.  I don't sitting right here remember it, but
 3   that's what it appears to be.
 4        Q    So the first page of it is an email from
 5   Miriam Berkman to David Post, Aley Menon, and
 6   Susan Sawyer, and the subject is Confidential
 7   Echevarria draft report?
 8        A    Correct.
 9        Q    Do you recall receiving this email?
10        A    Not while I sit here, but I don't doubt that
11   I did.
12        Q    And so the rest of the exhibit -- and this is
13   how it was produced to us by the university in
14   discovery -- the rest of the exhibit appears to be the
15   attachment to the email and it certainly looks a lot
16   like the format of the fact-finder's report that was
17   issued by Miriam Berkman.
18             So what I will ask you to do is -- so this is
19   also there are comments in the margins as would appear
20   if somebody was using like the track changes function
21   of Microsoft Word; is that what this looks like to you?
22        A    Yes.
23        Q    And do you know whose comments are in the
24   margins where there are comments in boxes?
25        A    They appear to be Miriam's.
```

```
 1        Q    So in Exhibit 114, looking at the final
 2   fact-finder's report, which you have there in front of
 3   you.  So in this section -- so under the heading,
 4   Method, which is on -- so there are also numbers, the
 5   fact-finder report numbers 3 and 4, and it is on the
 6   same page as in Exhibit 115.
 7        A    Okay.
 8        Q    So do you have both method sections in front
 9   of you?
10        A    I do.
11        Q    And in Exhibit 115 on page 4 of the
12   fact-finding report, there is a comment that reads --
13   it starts, "I would like to avoid" -- I think you have
14   it there; do you see that?
15        A    I see it.
16        Q    And it reads, "I would like to avoid
17   providing a list of people who stated they were afraid
18   of the respondent because that in itself could put them
19   at risk.  Is this okay?"  And that comment is connected
20   with the end of a sentence that reads, "A large number
21   of those who refused stated that they feared any
22   comment they made would lead to retaliation against
23   them and an end to their prospective academic careers;"
24   do you see that?
25        A    I do.
```

| | |
|---|---|
| 1 | Q    So that sentence is not in the method section |
| 2 | of the final report that you have at your left, is it? |
| 3 | A    It is not in that paragraph.  I don't know if |
| 4 | it is in the rest of the report, but it is not in that |
| 5 | paragraph.  That is correct. |
| 6 | Q    Why was it taken out of that paragraph? |
| 7 | A    I do not know. |
| 8 | Q    Are you familiar with Susan Byrne, who was a |
| 9 | professor at Yale? |
| 10 | A    I have never met her that I know of. |
| 11 | Q    Did you become aware of her or the |
| 12 | circumstances of her employment at some point other |
| 13 | than in the context of this lawsuit? |
| 14 | A    Yes. |
| 15 | Q    Was that in the context of the case with RGE? |
| 16 | A    Yes. |
| 17 | Q    And you were aware that as of the time of the |
| 18 | fact-finding by Miriam Berkman or during the |
| 19 | fact-finding by Miriam Berkman that Susan Byrne had |
| 20 | filed an appeal of her tenure denial? |
| 21 | A    I became aware of that when I read Miriam's |
| 22 | report. |
| 23 | Q    So at the time that you read Miriam's report, |
| 24 | did you know whether or not a decision on that tenure |
| 25 | appeal had been made? |

CERTIFICATE OF REPORTER

I, Mary Z. Armando, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me, on the 1st day of March, 2019, at 10:09 a.m., the following named person, to wit: DAVID POST, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my seal this 8th day of March, 2019.

*Mary Z. Armando*

_____

Mary Z. Armando, Notary Public
CT License No. 00222
My Commission expires: 5/31/22