# Exhibit 161

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
2

3        * * * * * * * * * * * * * *
     SUSAN BYRNE,                    )
4                                    )
              Plaintiff,             )
5                                    ) Civil Action No.
          vs.                        ) 3:17-CV-01104 (VLB)
6                                    )
     YALE UNIVERSITY, INC.,          )
7                                    )
              Defendant.             )
8        * * * * * * * * * * * * * *

9

10

11       **CONFIDENTIAL PORTIONS INCLUDED ON INDEX PAGE**

12

13            DEPOSITION OF:  JAMAAL AHMED THOMAS

14            DATE:  FEBRUARY 19, 2019

15            HELD AT:  MADSEN, PRESTLEY & PARENTEAU, LLC

16                      402 Asylum Street

17                      Hartford, Connecticut  06103

18

19   Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

20

21

22

23            CASSIAN REPORTING, LLC
              21 Oak Street - Suite 307
24            Hartford, Connecticut  06106
                   (860) 595-7462
25          scheduling@cassianreporting.com

```
 1                          INDEX

 2    EXAMINATION

 3    Witness Name                                    Page

 4    Jamaal Ahmed Thomas

 5        Direct By Ms. Howard ......................... 6

 6

 7

 8              CONFIDENTIAL TESTIMONY PAGES

 9        Confidential......................23 through 43

10        Confidential......................53 through 57

11        Confidential......................70 through 79

12        Confidential......................84

13        Confidential....................132 through 140

14        Confidential....................148

15

16

17                   PLAINTIFF'S EXHIBITS

18                (Marked For Identification)

19                                                    Page

20    Exhibit 91 Marked ............................. 29
      Email, Bates Numbers BYRNE018797 through 18798
21
      Exhibit 92 Marked ............................. 93
22    Yale University Department of Spanish and
      Portuguese Memo dated June 1, 2015, Bates Numbers
23    BYRNE015789 through 15790

24    Exhibit 93 Marked ............................. 117
      Handwritten notes, Bates Numbers BYRNE017240
25    through 17241
```

 1        Q.    More than five conversations?

 2        A.    Yes.

 3        Q.    And that means with five different

 4   individuals?

 5        A.    I do recall it coming up in conversations

 6   with -- those concerns coming up in conversations with

 7   at least five individuals.

 8        Q.    And how do you recall these concerns about

 9   sexual harassment and RGE coming up during the climate

10   review, during these conversations?

11        A.    I recall them coming up in multiple contexts,

12   both of someone who raised a concern about their

13   experience and people who spoke to rumors or things that

14   they had heard, things that they've heard from people

15   who allegedly had experiences.

16        Q.    Do you recall concerns about sexual harassment

17   and RGE coming up in any conversations with Professor

18   Byrne during the climate review?

19        A.    Yes.

20        Q.    And do you recall how -- strike that.

21              How did concerns about sexual harassment and

22   RGE come up in these conversations with Professor Byrne?

23        A.    She spoke of this in two contexts, both of

24   rumors that she was aware of and in relation to an

25   incident that she observed with another faculty member

1   and with some comments that she heard him make on a

2   number of occasions.

3        Q.    Make to Professor Byrne?

4        A.    Yes -- or not necessarily make to Professor

5   Byrne, but that Professor Byrne heard directly.

6        Q.    What rumors did Professor Byrne report being

7   aware of?

8        A.    From what I recall, the rumors were related to

9   his comment -- to his conduct with other faculty members

10  and his reputation in terms of conduct with students.

11       Q.    And with respect to comments, what comments

12  did Professor Byrne report having heard?

13       A.    Comments about the appearance of other women

14  who are part of the department, about their physical

15  appearance, a comment about his sexual prowess.

16       Q.    And these comments were made in front of

17  Professor Byrne?

18       A.    I don't recall.

19       Q.    And the incident with another faculty member

20  that Professor Byrne observed, what did she say about

21  that incident?

22       A.    She said that she observed RGE behaving

23  inappropriately with a faculty member.

24       Q.    Did Professor Byrne ever report RGE trying to

25  kiss her?

 1      A.    I don't recall.  I would have to review my

 2    notes.

 3      Q.    Did Professor Byrne ever mention RGE remarking

 4    on hip surgery and his inability to utilize certain

 5    positions?

 6      A.    Yes.

 7      Q.    Other than Professor Byrne, who are the other

 8    individuals that reported concerns about sexual

 9    harassment and RGE?

10      A.    I don't recall the specific names of everyone

11    who reported those concerns.

12      Q.    Which names do you recall?  I can ask you

13    about -- sorry.

14      A.    One thing that I would say is through this

15    process, the concern -- and this is something I want to

16    mention is that people were -- I think we wanted to be

17    very cautious around confidentiality to protect the

18    people who raised concerns of any kind with us, and that

19    was something that we wanted to really protect through

20    this process, which is why I think we tried to be as

21    careful as we could in not disclosing the identities of

22    anyone.  I mean, we offered resources, but in terms of

23    disclosure, that was something we were very cautious and

24    very concerned about.

25      Q.    Why don't we mark this portion of the

```
 1   transcript confidential, if that will help allay

 2   concerns that you may have about confidentiality even

 3   now.

 4       A.    Okay.

 5             MS. HOWARD:  So let's mark this portion

 6   confidential.

 7             MR. SALAZAR-AUSTIN:  Is that sufficient

 8   from your perspective?

 9             MS. HOWARD:  So it simply means that

10   everything would be marked under seal which means -- so

11   if we use portions of this transcript, it would not be

12   publicly available.  It would be marked under seal and

13   only available to the attorneys to review.

14             THE WITNESS:  Okay.

15         (Confidential testimony on next page.)

16

17

18

19

20

21

22

23

24

25
```

```
1   climate review?

2        A.    He was one of the three people who authorized

3   the review and who we were to report to.

4        Q.    Who were the other two people who authorized

5   the review?

6        A.    Lynn Cooley and Tamar Gendler.

7        Q.    What is the authorization process for?  When

8   you refer to "authorized the review," what do you mean

9   by that phrase?

10       A.    Sorry.

11       Q.    That's okay.

12       A.    I don't know -- well, I can speak to what I

13  know, which is simply that they asked us to do the

14  review.

15       Q.    So it was Provost Polak, Lynn Cooley and Dean

16  Gendler who asked you to conduct the climate review; is

17  that a fair description?

18       A.    The decision -- they were the ones who made

19  that decision.

20       Q.    After the May, June meeting with Pam and

21  Allegra, what was the next meeting that you had

22  regarding the climate review?

23       A.    I don't recall.

24       Q.    Did you have any other meetings about the

25  climate review?
```

1      Q.    And what was the purpose of this meeting?

2      A.    It was to provide a briefing and to discuss

3   any specific recommendations that we might have.

4      Q.    Did you have specific recommendations?

5      A.    We did not.

6      Q.    Why not?

7      A.    It was beyond the scope of -- it was beyond

8   the scope of the review.

9      Q.    What was the scope of the review?

10     A.    It was to get the perspectives of all of the

11  different constituents of the department, the graduate

12  students, the faculty, the staff and, you know, it

13  expanded to some people who were formerly affiliated

14  with the department.  But with a climate review, we are

15  not really in a position to offer those kinds of

16  substantive recommendations.

17     Q.    And who set the scope of the review?

18     A.    Provost Polak and Deans Gendler and Cooley.

19     Q.    And at this briefing meeting, were any

20  documents distributed?

21     A.    No.

22     Q.    So it was an oral briefing of the report?

23     A.    Yes.

24     Q.    And what exactly did you cover in your

25  briefing, your portion of the briefing?

Case 3:17-cv-01104-VLB   Document 82-161   Filed 05/15/19   Page 10 of 36

```
 1        A.    I don't recall specifically.

 2        Q.    Did you and Barbara Goren do the briefing

 3    jointly, together?

 4        A.    Yes.

 5        Q.    Did you have an outline going into this

 6    briefing?

 7        A.    I don't recall if we had something in writing

 8    specifically.

 9        Q.    Did you have anything -- so how did you

10    structure your remarks for the briefing?

11        A.    I had a basic -- I had a sense of the

12    different issues that were presented throughout the

13    report, the concerns and -- you know, the concerns that

14    came up and those were the ones that we were both really

15    prepared to talk about, I think.

16        Q.    So what issues did you talk about during the

17    briefing?

18        A.    From what I recall, the general health of the

19    department, the concerns that were raised by both junior

20    and senior faculty along with the grad students.

21        Q.    Did you discuss sexual harassment at all

22    during the briefing?

23        A.    Yes.

24        Q.    How so?

25        A.    That some concerns had come to our, you know,
```

Case 3:17-cv-01104-VLB  Document 82-161  Filed 05/15/19  Page 11 of 36

```
 1    our attention that could potentially constitute some

 2    form of, you know, perhaps sexual harassment or other

 3    kind of sexual misconduct.

 4        Q.    Did you discuss sexual harassment with any

 5    more -- any specificity during your presentation?

 6                    MR. SALAZAR-AUSTIN:  Objection.

 7                    You can answer.

 8        A.    No, we did not.  Well, we did not discuss it

 9    with any more detail than was provided in the report.

10        Q.    So other than what you just testified to, did

11    you discuss sexual harassment in any more specificity?

12                    MR. SALAZAR-AUSTIN:  Objection.

13        A.    I don't recall.

14        Q.    Did you discuss retaliation in your oral

15    briefing?

16                    MR. SALAZAR-AUSTIN:  Objection.

17        A.    Yes.

18        Q.    How did you discuss it?

19        A.    In the context of what was shared with us,

20    that people had the -- that there were people who had

21    that concern around retaliation, and there were some

22    people who reported experiencing it.

23                    MS. HOWARD:  Let's mark this portion

24    confidential.

25                    (Confidential testimony on next page.)
```

```
 1   concerns about retaliation?

 2              MR. SALAZAR-AUSTIN:  Objection.

 3       A.   No.

 4       Q.   Are you aware of Barbara Goren taking any

 5   actions to address Susan Byrne's concerns about

 6   retaliation?

 7              MR. SALAZAR-AUSTIN:  Objection.

 8       A.   Not that I'm aware of.

 9       Q.   And the briefing meeting that you had after

10   the climate review was done, who was present for that

11   meeting?

12       A.   From what I recall, Allegra, Pam, Ben, Lynn,

13   Tamar, Harold.  That's the best that I can recall from

14   memory.

15       Q.   Was Stephanie Spangler there?

16       A.   No.

17       Q.   Amy Hungerford?

18       A.   No.

19       Q.   Valerie?

20       A.   No.

21       Q.   Carl Hashimoto?

22       A.   No.

23       Q.   John Mangan?

24       A.   No.

25       Q.   John Dovidio?
```

```
 1    overall impressions about the -- our impressions about

 2    the overall health of the department, whether people --

 3    yeah, just our overall feelings about that.

 4        Q.    Were there any questions about the sexual

 5    harassment concerns that you discussed during your

 6    briefing?

 7        A.    I don't recall.

 8              MR. SALAZAR-AUSTIN:  Objection.

 9        Q.    Were there any questions about the retaliation

10    concerns that you discussed during your briefing?

11              MR. SALAZAR-AUSTIN:  Objection.

12        A.    Yes.

13        Q.    What were those questions?

14        A.    Whether anything had been -- it was relating

15    to confidentiality, whether anything had been shared

16    with -- whether anything at all had been shared with any

17    of the senior faculty, whether there was any sense that

18    anyone knew exactly who did and didn't participate in

19    the review.

20        Q.    Did Sue Byrne's name come up during Professor

21    Adorno's interview?

22        A.    Yes.

23        Q.    How so?

24        A.    She discussed her in -- she discussed her in a

25    number of different contexts.
```

1      Q.    Do you recall Professor Adorno stating that

2   they had spoken to the majority of the graduate students

3   who stated that they were not involved with the letter?

4      A.    Yes.

5      Q.    Do you recall Professor Adorno stating that

6   the letter contained details that only a faculty member

7   would know?

8      A.    Yes.

9      Q.    And on page 20, in the first full paragraph,

10   going back to the same paragraph as before, but a

11   different sentence, third full sentence, it reads:

12   Professor González-Pérez said that Professor Adorno

13   literally pointed a finger at Professor Byrne and

14   Professor Poole at a faculty meeting and said, you

15   caused this.

16         Do you see where I'm reading from?

17      A.    I do.

18      Q.    Were you present for Professor

19   González-Pérez's interview where he stated this?

20      A.    Yes.

21      Q.    Did anyone else also testify that they saw

22   Professor Adorno in fact do this?

23      A.    Yes.

24      Q.    Who else?

25      A.    I know both Professors Byrne and Poole did

```
 1   mention that.

 2       Q.    Did Professors Byrne and Poole mention this

 3   without prompting or did you ask them?

 4       A.    I did not ask them.

 5       Q.    And in the sentence that I had asked you about

 6   earlier, where it reads, The two had a shouting match

 7   overheard by students and faculty, there is a footnote

 8   that states, In Professor Jackson's words, Professor

 9   Adorno went ballistic.

10           Do you see that footnote?

11       A.    Yes.

12       Q.    Again, was this something that Professor

13   Jackson volunteered?

14       A.    Yes.

15       Q.    In what context did Professor Jackson

16   volunteer this information?

17       A.    During his interview when discussing the

18   impact that the review has had on the work environment

19   or just the department as a whole.

20       Q.    And Professor Adorno, did she discuss what

21   impact the review had on the working environment in the

22   department or on the department as a whole?

23       A.    Yes.

24       Q.    And how did she discuss the impact of the

25   review?
```

Case 3:17-cv-01104-VLB  Document 82-161  Filed 05/15/19  Page 16 of 36

1    Q.    Were you aware of these issues prior to being

2    appointed a fact-finder in the climate review?

3    A.    No.

4    Q.    When is the first time that you became aware

5    of any of these issues?

6              MR. SALAZAR-AUSTIN:  Objection.  When you

7    say "these issues" --

8              MS. HOWARD:  The issues he outlined just

9    a minute ago.

10   A.    When I was asked, around the time that I was

11   asked to do the climate review.

12   Q.    And that's also when you first saw the

13   anonymous letter?

14   A.    Yes.

15   Q.    So in Exhibit 5 of the climate report, which

16   is -- so it is a unique numbering system.  In the bottom

17   left-hand corner, there are Bates Numbers.  So at Bates

18   Number 3138, which is Exhibit 5 of the climate review

19   report, I had a couple of questions, so let me know when

20   you've gotten to that page.

21              So in Exhibit 5 of the climate review report,

22   it's the last full paragraph of that first page, the

23   email states, In addition to preserving confidentiality,

24   the university has asked Senior Associate Dean of the

25   Graduate School Pamela Schirmeister and Professor Anders

```
 1    Winroth to review academic decisions made during and

 2    after our review to make sure that they have not been

 3    influenced by considerations other than academic

 4    performance.

 5            Do you see that?

 6    A.    Yes.

 7    Q.    So what was your understanding of how

 8    Professor Winroth and Associate Dean Schirmeister would

 9    actually review academic decisions?

10    A.    I don't know.

11    Q.    Did you have any discussions with

12    Ms. Schirmeister regarding how this review would be

13    undertaken?

14    A.    No.

15    Q.    How did you gain an understanding that --

16    strike that.

17            Did you have any discussions with Professor

18    Winroth about how this review would be undertaken?

19    A.    No.

20    Q.    And I notice in your discussion of meetings

21    that you held about the climate review, you did not

22    mention Professor Winroth.  Was he not involved

23    subsequently after this email in discussions regarding

24    the climate review?

25    A.    Not that I'm aware of.
```

1     Q.    So did Allegra di Bonaventura take the role of

2  reviewing academic decisions along with Pam Schirmeister

3  then instead of Professor Winroth?

4     A.    I don't recall.  I don't recall.

5     Q.    Do you recall Professor Winroth being at any

6  of the meetings that we discussed earlier?

7     A.    No, he was not.

8     Q.    And do you recall having any discussions with

9  Professor Winroth about the climate review report?

10    A.    No.

11    Q.    Did you have any discussions with

12 Ms. Schirmeister or Ms. di Bonaventura about specific

13 academic decisions that needed to be reviewed?

14    A.    No -- actually, not no.  I would say that I

15 don't recall.

16    Q.    So there is a possibility that you had

17 discussions; you just can't recall if you did?

18    A.    Yes.

19    Q.    After conducting all of the interviews for the

20 climate review, did you have any concerns about

21 potential retaliation in any academic decision?

22               MR. SALAZAR-AUSTIN:  Objection.

23    A.    Yes.

24    Q.    What decisions?

25    A.    I'm afraid I don't recall the specifics.

```
 1    that RGE had not done anything to violate Yale's

 2    policies around sexual misconduct?

 3         A.    No, I do not.

 4         Q.    And did the topic of sexual harassment and RGE

 5    come up during your interview with Professor Valis?

 6         A.    I don't recall.

 7         Q.    How many interviews did you have with RGE for

 8    the climate report?

 9         A.    One.

10         Q.    So why did you have six interviews with

11    Professor Adorno?

12         A.    She requested to -- there were two scenarios

13    where she would either request an additional meeting

14    or -- and there were some instances in which she wanted

15    to meet for a longer period of time than we had in our

16    schedules.  We needed to split up the meeting.

17         Q.    Did Kate Stith accompany Professor Adorno to

18    all six interviews?

19         A.    Yes.

20         Q.    Did she tape all six interviews?

21         A.    I don't recall.

22         Q.    Did anyone else tape interviews?

23         A.    No.

24         Q.    Kate Stith taped Professor Valis's interview;

25    correct?
```

```
 1      A.    Yes.

 2      Q.    And Kate Stith also taped Professor RGE's

 3   interview; is that correct?

 4      A.    Yes.

 5      Q.    Were you concerned about confidentiality with

 6   Kate Stith taping your interviews for the climate

 7   report?

 8      A.    Yes.

 9      Q.    Did you discuss that concern with Professor

10   Stith?

11      A.    Yes.

12      Q.    Can you describe that conversation?

13      A.    I don't recall the specifics of that

14   conversation.

15      Q.    Do you recall the general of the conversation?

16      A.    From what I recall, I shared -- we shared our

17   concerns and she shared her perspective on the matter.

18      Q.    What was her perspective on the matter that

19   she shared?

20      A.    That she felt -- I mean, essentially she felt

21   that it was appropriate, that it was an appropriate step

22   to take just given the -- yeah, given the circumstances,

23   that it was appropriate.

24      Q.    Did you have any conversations with Professor

25   Stith about whether she -- strike that -- who would
```

```
 1    maintain possession of these tapes?

 2        A.    I don't recall.

 3        Q.    Do you recall ever being concerned about who

 4    would maintain possession of these tapes?

 5        A.    Yes.

 6        Q.    Did you have any conversations with Professor

 7    Stith about -- strike that.

 8              Did you have any conversations with anyone

 9    else about your concerns regarding these interviews

10    being taped?

11        A.    Yes.

12        Q.    Who?

13        A.    We consulted with Harold.

14        Q.    After the first interview where it was taped?

15        A.    Yes -- actually, I don't recall specifically.

16    I don't recall.

17        Q.    Do you recall knowing that the interviews were

18    going to be taped before the interviews took place?

19        A.    Yes -- no, no, no.  I did not know that.  I

20    knew that like as it happened, that's when I found out.

21        Q.    So then it's reasonable that you consulted

22    with somebody after the interview?

23        A.    Yes.

24        Q.    Unless you recall cutting short an interview.

25        A.    I don't recall.
```

```
 1        Q.    On page 34 of the climate review, Exhibit 14,
 2  under the header Professor Gonzaléz Echevarría's
 3  behavior towards women, the first sentence reads:  All
 4  the junior faculty are aware that Professor Gonzaléz
 5  Echevarría makes some students uncomfortable by
 6  frequently commenting on women's attractiveness,
 7  clothing and physical appearance and by touching or
 8  kissing women.
 9           Do you see that?
10        A.    Uh-huh.
11        Q.    There is a footnote to that sentence, Footnote
12  181, and it states, Professor Byrne has experienced this
13  kind of attention from Professor Gonzaléz Echevarría,
14  but she did not report feeling threatened or feeling
15  that her professional relationship with Professor
16  Gonzaléz Echevarría had been affected by his behavior.
17           Do you see that?
18        A.    I do.
19        Q.    So is this something that multiple people
20  reported other than Professor Byrne?
21        A.    I don't recall actually.
22        Q.    Well, the only attribution --
23        A.    Well, yeah, given the way this was written,
24  no.
25        Q.    The only attribution is Professor Byrne?
```

```
 1      Q.    Yes, please.

 2      A.    No, they are not.

 3      Q.    Okay.

 4                  (Exhibit 95, Handwritten notes, Bates

 5                  Numbers BYRNE017206 through 17227, marked

 6                  for identification.)

 7   BY MS. HOWARD:

 8      Q.    I'm handing you what's been marked Plaintiff's

 9   Exhibit 95 and take a minute to flip through just to

10   make sure none of the pages contain your handwriting,

11   but the question is the same, whether these are your

12   handwritten notes.

13      A.    They are.

14      Q.    Okay.  And are these your handwritten notes

15   from the climate report -- climate review report --

16   strike that.

17            Are these your handwritten notes from the

18   climate review interviews that you took?

19      A.    Yes.

20      Q.    So it looks like the entirety of these notes

21   are from your interview with Professor Byrne, but if you

22   could flip through and just confirm that, that would be

23   helpful.

24      A.    Yes, these are.

25      Q.    So can you show me where or how you indicated
```

Case 3:17-cv-01104-VLB   Document 82-161   Filed 05/15/19   Page 24 of 36

```
 1    whether the entirety or a portion of Professor Byrne's

 2    interview was to remain confidential?  And please take a

 3    few minutes to read it through.

 4         A.   Okay.

 5                        (Pause.)

 6         A.   Yeah, I'm not seeing anything specifically

 7    that indicates it.

 8         Q.   Is there anything in your notes that indicates

 9    that Professor Byrne consented for her name to be -- for

10    her to be attributed to specific comments or specific

11    statements?

12         A.   There is not.

13         Q.   So if you turn to Bates Number 17215, there is

14    a redaction, Student 12, and there is text underneath

15    there that continues onto the next page, at the top of

16    the next page.

17              Can you read that text?  It looks like it

18    starts, The grad student with the something --

19         A.   With the lengthy emails.

20         Q.   Okay.  So right underneath that sentence, if

21    you could read into the record what you have written?

22         A.   Sure.  It's, Does his sexual -- and it's

23    supposed to be kind of shorthand for intimacy thing.

24    RGE got behind her and grabbed her hair, open parens,

25    lift it up in a demeaning way, close parens.  Never let
```

```
 1   him behind her after.  And Miller retiring from being

 2   dean.  Party happened -- it's the party which RGE was

 3   interim dean which is the time in which that happened.

 4   He did an air kiss thing.  RGE does two typically.  At

 5   this party, kisses directly on mouth, found it really

 6   insulting, felt horrified.  Then makes inappropriate

 7   comments.  Hip injury, asked about how that was going,

 8   said it was fine, can't wait to get -- and then -- ah,

 9   okay, sorry.  Then the line below that is saw him do the

10   same hair thing to grad student during talk, talk at

11   the -- it says something American Society of New York.

12   Then she makes a specific reference to a student.  And

13   it says, says pretty, that's what that's supposed to

14   say, says pretty.  And then below that, distracting to

15   look at in class.

16            The following page is, Said nothing to RGE/RA,

17   didn't want to jeopardize her possibility for tenure.

18   During second year, would go out to dinners with KP and

19   RA.  RA would say vague things regarding RGE's behavior.

20       Q.    The next line right under that, it says

21   something about Anibal with a question mark.

22       A.    I apologize, I didn't know you wanted me to

23   continue that.

24       Q.    No, no.  I just want to know what that line

25   is.
```

```
 1        A.     It says, War with Anibal, question mark.

 2        Q.     Does that indicate a question that you asked

 3   Professor Byrne?

 4        A.     I don't recall.   Yeah, I don't recall.

 5        Q.     So it sounds like that second page where your

 6   notes say that Professor Byrne did not say anything to

 7   RGE RA because she did not want to jeopardize her

 8   possibility for tenure, that she is expressing concern

 9   about retaliation; is that a fair reading of your notes?

10        A.     Yes.

11               MR. SALAZAR-AUSTIN:   Objection.

12        Q.     Did you report this concern that Professor

13   Byrne expressed to Dean Schirmeister?

14        A.     I don't recall.

15        Q.     Would you recall if you had reported this

16   concern to Dean Schirmeister?

17        A.     I would not.

18        Q.     Do you recall if you reported this concern

19   that Professor Byrne expressed to Ms. di Bonaventura?

20        A.     No, I don't.   I don't recall.

21        Q.     Did you report this concern that Professor

22   Byrne expressed to anybody?

23        A.     I don't recall.

24        Q.     Did you do anything after Sue Byrne expressed

25   this concern, in terms of actions to follow up on this?
```

1    retaliation to Dean Schirmeister?

2        A.    No -- well, can you clarify "concerns about

3    retaliation"?  Just general concerns or specific

4    concerns from specific individuals?

5        Q.    Let's start with general concerns.

6        A.    Yes.

7        Q.    And did you convey specific concerns from

8    specific individuals about retaliation to Dean

9    Schirmeister?

10       A.    No.

11       Q.    Why did you only convey general concerns to

12   Dean Schirmeister?

13       A.    Because we didn't -- I didn't mention -- I

14   guess when we go through these kinds of processes in

15   general, unless someone specifically asks me to do

16   something to take an affirmative action in terms of, you

17   know, having a conversation or something along those

18   lines, I don't -- I wouldn't identify who I spoke to to

19   Dean Schirmeister, unless someone said, I need you to do

20   X, Y, Z for me, you know.

21       Q.    So how would someone know that they are

22   supposed to ask you to talk to Dean Schirmeister?

23       A.    Well, they can contact -- I mean, they can

24   contact her on their own.  It's a separate part of

25   the -- it was a separate part of the process entirely.

```
 1     (Exhibit 97, Emails, Bates Numbers BYRNE004827 through

 2          4828, marked for identification.)

 3   BY MS. HOWARD:

 4     Q.    I'm handing you what has been marked

 5   Plaintiff's Exhibit 97.  Take a moment to look at it and

 6   let me know -- actually, strike that.

 7          Before we start there, I just want to make

 8   sure, you remember that you are under oath, the same

 9   oath as you took earlier?

10     A.    Yes, I do.

11     Q.    So just take a moment to look through

12   Exhibit 97 and let me know when you're done.

13                    (Pause.)

14     A.    Yes.

15     Q.    Okay.  So this was a series of emails that

16   were produced by the defendants.  I'm assuming --

17   actually, strike that.

18          Have you seen this document before?

19     A.    No, I've not.

20     Q.    And this is an email from Kate Stith to Rolena

21   Adorno on May 6, 2015.

22          So in that email, which is the one right on

23   top from Kate Stith to Rolena Adorno, it reads, in the

24   second full paragraph:  On RG, in response to their

25   questions probably, you will advise of only two
```

1    complaints you have heard of:  1, being informed some

2    years ago that AG told university of a graduate student

3    matter and you have no idea how or if university

4    followed up with graduate student or with Roberto or,

5    more generally, whether true; 2, EB (and MM?) telling

6    you of allegation of Virginia and informal resolution,

7    and have no idea if true or whether letter given as

8    planned; advise of situation with V at that time.

9             Do you see where I'm reading from?

10   A.    I do.

11   Q.    Did Professor Adorno provide information on

12   either of these complaints as outlined in this email

13   from Professor Stith?

14   A.    I don't recall.

15   Q.    By May 6th, had you already interviewed

16   Professor RGE?

17   A.    I believe that I had.

18   Q.    Because it appears from this email from Kate

19   Stith to Rolena Adorno, they are planning how she should

20   respond to questions about prior complaints.

21             Is that a fair reading of this email?

22             MR. SALAZAR-AUSTIN:  Objection.  I mean,

23   just for the record, you are asking him to say what's a

24   fair reading of an email that he didn't author.

25             MS. HOWARD:  I asked him the question.  I

```
 1   can ask him.

 2        Q.    Do you understand my question?

 3        A.    I do.

 4              MR. SALAZAR-AUSTIN:  I don't think it's

 5   an appropriate question.

 6              MS. HOWARD:  That's fine.

 7        A.    I do think that's what the email says, yes.

 8        Q.    And as Kate Stith is the only individual that

 9   was present at RGE's deposition -- strike that.

10              As Kate Stith is the only individual present

11   at RGE's interview, she would be the only individual

12   between herself and Professor Adorno who would be aware

13   of any potential questions of prior complaints?

14              MR. SALAZAR-AUSTIN:  Objection.

15        Q.    Strike that.  Let me ask a different question.

16              Was Professor Adorno present at RGE's

17   interview?

18        A.    No.

19        Q.    Kate Stith was present at RGE's interview; is

20   that correct?

21        A.    Yes, it is.

22        Q.    And so between the two of those individuals,

23   only Kate Stith would know if there would be questions,

24   potential questions on prior complaints; is that

25   correct?
```

```
 1                  MR. SALAZAR-AUSTIN:  Objection.

 2        A.    No, actually.  No.

 3        Q.    Why?

 4        A.    Because I don't think that -- I don't think

 5   that her presence at the conversation with RGE would

 6   give her a sense as to the specific questions that we

 7   would then -- I'm just trying to think of the question.

 8   I don't think it would give her the specific -- I don't

 9   think that her presence at that meeting gives her the

10   specific questions about prior complaints.  I would say

11   that I guess.

12        Q.    And her presence at RGE's interview would not

13   give her any information -- any inkling that there would

14   be questions about prior complaints of sexual

15   harassment?

16                  MR. SALAZAR-AUSTIN:  Objection.

17                  Go ahead.

18        A.    I couldn't say.

19        Q.    But RGE's interview did cover sexual

20   harassment -- strike that.

21             Did RGE's interview cover the topic of sexual

22   harassment?

23        A.    Yes.

24                  MR. SALAZAR-AUSTIN:  Objection.

25        Q.    Sexual harassment concerns, again, regarding
```

```
 1   RGE; correct?

 2                MR. SALAZAR-AUSTIN:  Objection.

 3        Q.   So to be clear, RGE's interview covered sexual

 4   harassment allegations involving him; correct?

 5                MR. SALAZAR-AUSTIN:  Objection.

 6        A.   No.

 7        Q.   Did RGE's interview cover sexual harassment

 8   concerns involving him?

 9                MR. SALAZAR-AUSTIN:  Objection.

10        A.   No.

11        Q.   Did RGE's interview cover sexual misconduct

12   concerns involving him?

13                MR. SALAZAR-AUSTIN:  Objection.

14        A.   Can you give me a better understanding of what

15   you mean by involve in this context?

16        Q.   Let me ask a better question.  Did RGE's

17   interview -- strike that.

18                How did RGE's interview cover the topic of

19   sexual harassment?

20                MR. SALAZAR-AUSTIN:  Objection.

21        A.   He spoke about the concerns that were -- that

22   he believed were there, you know, amongst the rumor mill

23   relating to his behavior, and he denied doing anything

24   inappropriate, so it came up in that context.

25        Q.   So RGE brought up the topic of concerns
```

Case 3:17-cv-01104-VLB  Document 82-161  Filed 05/15/19  Page 33 of 36

```
 1   regarding his behavior?

 2       A.   Yes.

 3       Q.   Did you ask any follow-up questions?

 4       A.   Yes.

 5       Q.   Did Barbara Goren ask any follow-up questions?

 6       A.   Yes.

 7       Q.   Do you remember any of the follow-up questions

 8   you asked RGE?

 9       A.   I do not.

10       Q.   Do you remember any of the follow-up questions

11   Barbara Goren asked RGE?

12       A.   No.

13       Q.   Did you take notes during your conversation

14   with RGE?

15       A.   Yes.

16       Q.   Handwritten notes?

17       A.   Yes.

18       Q.   Similar to Exhibit 95?  Similar in style.

19       A.   Yes.

20       Q.   Did you ask any follow-up questions about any

21   specific allegations regarding RGE's behavior during his

22   interview?

23       A.   I don't recall.

24       Q.   Did you have any conversations with RGE about

25   specific allegations regarding his behavior?
```

```
 1      A.     Not ones that I started.  I didn't, yeah.

 2      Q.     But ones that RGE started?

 3      A.     About -- yes.

 4      Q.     Which specific allegations?

 5      A.     About concerns, what I recall is he did

 6  indicate concerns relating to some of the comments that

 7  were made in the letter, the anonymous letter from early

 8  March of 2015 about the nature of his interactions with

 9  students and suggestive comments and how he treated --

10  you know, how he treated the support staff.

11      Q.     And so given that RGE talked about specific

12  allegations regarding his behavior during his interview,

13  could that give Professor Stith any inkling that there

14  would be questions -- that the topic of RGE's prior

15  behavior would be covered at all during Professor

16  Adorno's interview?

17              MR. SALAZAR-AUSTIN:  Objection.

18      A.     I couldn't say.  Possibly.

19              (Confidential testimony on next page.)

20

21

22

23

24

25
```

```
 1        A.    No.

 2        Q.    But after the climate review, you did contact

 3   some of the individuals whose names came up during the

 4   climate review; is that correct?

 5        A.    Yes.

 6        Q.    And how did you come up with the idea to

 7   contact these individuals?

 8        A.    I was informed that -- sorry.  I was informed

 9   that -- I was basically instructed to do so essentially.

10        Q.    Who instructed you to do so?

11        A.    General counsel.

12                   (Exhibit 98, Emails, Bates Numbers

13                   BYRNE018817 through 18818, marked for

14                   identification.)

15   BY MS. HOWARD:

16        Q.    I'm handing you what has been marked

17   Plaintiff's Exhibit 98.  Take a moment to look through

18   it.  Let me know when you're done.

19                   (Pause.)

20        A.    I'm done.

21        Q.    And so Exhibit 98, towards the bottom of the

22   first page, is an email from yourself to a redacted

23   named individual where you say, I'm writing to follow up

24   with you regarding some of the concerns that you had

25   about Professor Gonzaléz Echevarría's behavior.
```

```
 1                 C E R T I F I C A T E

 2    STATE OF CONNECTICUT

 3            I, SANDRA SEMEVOLOS, a Registered Merit
      Reporter and Notary Public within and for the State of
 4    Connecticut, do hereby certify that I reported the
      deposition of JAMAAL AHMED THOMAS on FEBRUARY 19, 2019,
 5    at the offices of MADSEN, PRESTLEY & PARENTEAU, LLC, 402
      Asylum Street, Hartford, Connecticut  06103.
 6
              I further certify that the above-named
 7    deponent was by me first duly sworn to testify to the
      truth, the whole truth and nothing but the truth
 8    concerning his knowledge in the matter of the case of
      SUSAN BYRNE, vs. YALE UNIVERSITY, INC., now pending in
 9    the UNITED STATES DISTRICT COURT, for the DISTRICT OF
      CONNECTICUT.
10
              I further certify that the within testimony
11    was taken by me stenographically and reduced to
      typewritten form under my direction by means of COMPUTER
12    ASSISTED TRANSCRIPTION; and I further certify that said
      deposition is a true record of the testimony given by
13    said witness.

14            I further certify that I am neither counsel
      for, related to, nor employed by any of the parties to
15    the action in which this deposition was taken; and
      further, that I am not a relative or employee of any
16    attorney or counsel employed by the parties hereto, nor
      financially or otherwise interested in the outcome of
17    the action.

18
              WITNESS my hand this 1st day of March, 2019.
19

20

21

22    _____
      Sandra Semevolos, RMR, CRR, CRC, CSR #74
23    Notary Public
      My Commission Expires:  September 30, 2020
24

25
```