## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **SUSAN BYRNE** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:17-CV-1104 (VLB)** |
| **v.** | : | |
| | : | |
| **YALE UNIVERSITY, INC.** | : | **March 27, 2020** |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Susan Byrne ("Plaintiff" or "Professor Byrne") brings this action for claims of retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat § 46a-60 *et seq.*, and common law claims for breach of contract and negligent misrepresentation arising from her employment as a faculty member at Yale University (the "Defendant" or "University" or "Yale"). The Defendant moves for summary judgment pursuant to Fed. R. Civ. P. 56. [Dkt. 70-1 (Def. Mem.)]. For reasons that follow, the Court GRANTS Defendant's motion in part and DENIES in part.

## Background

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties. The facts are read in the light most

1

favorable to the non-movant, Professor Byrne. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiff was hired as an Assistant Professor on Term in Yale University's Department of Spanish and Portuguese (the "Department") starting in the Fall 2008 semester. [Dkt. 70-44 [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 1]; *See also* [Def. Ex. 2, (02/19/2008 offer letter)][1]. Plaintiff was promoted to Associate Professor on Term in July 2013, following the publication of her second book, LAW AND HISTORY IN CERVANTES' DON QUIXOTE (2012), the previous year. [Def. D. Conn. Civ. L. R. 56(a) statement ¶¶ 1,3]; *See* [Def. Ex. 8 (09/26/2013 email from Adorno to Miller)]. Plaintiff was reviewed for promotion to Professor with tenure during her eighth year. This matter arises from Plaintiff's tenure review, starting in the Spring 2015 semester. [Def. Ex. 17 (03/30/2015 Adorno letter to Byrne.)].

A. Yale University's structure and tenure process

At the time of Plaintiff's tenure review, there were five senior faculty members in the Department: Rolena Adorno, Roberto González Echevarría, Anibal González-Pérez, David Jackson, and Noel Vallis. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 2]. The Department chair, Professor Adorno, reported to the Dean of Faculty of Arts & Sciences, Tamar Gendler. [Pl. Ex. 156 (Polak Depo.) at 4:8-6:16].

---

[1] For ease of reference, exhibits will refer to evidentiary exhibits included with the Defendant's Motion for Summary Judgment [Dkt. 70] and Plaintiff's Opposition [Dkt. 81] by exhibit numbers only. i.e. [Def. Ex.1] and [Pl. Ex. 2]. Citation to the Defendant's. D. Conn. Civ. L. R. 56(a) statement is applicable where the parties agree as to the fact stated.

Dean Gendler reports to Provost Benjamin Polak, who in turn reports to the University's president. *Id.*

Yale sets a high standard for tenure: "Tenured faculty at Yale are expected to stand among the foremost leaders in the field throughout the world." [Def. Ex. 16 ("Yale FAS Steps for promotion…")]. The Yale Faculty Handbook (Jul. 1, 2014 ed.)[Def. Ex. 6 and Pl. Ex. 2] states that "[c]onsideration for tenure emphasizes the impact and continuing promise, at the very highest levels, of the candidate's research and scholarship…" [at 31-2].

The tenure process for Faculty of Arts and Sciences ("FAS") is governed by a protocol referred to at Yale as "FASTAP." [Pl. Ex. 2 ("FAS Ladder Faculty Promotion Handbook, ed. Dec. 2015")]; [Def. Ex. 16 ("Yale FAS Steps for promotion…")]. The process begins with the department chairperson notifying the candidate of the process by letter in March of the preceding academic year. [Def. Ex. 16 at 2]. By the end of March break, the candidate must submit: a detailed curriculum vitae, the names of up to three individuals who might serve as "arm's length" external referees to assess the candidate's work and up to three individuals who the candidate believes will not offer a fair assessment of their work, and a brief statement of research interest to guide the department in selecting referees. *Id.*

Then, the department chair forms a departmental faculty review committee among those eligible to vote on the tenure case, which is submitted to the Area Committee and the FAS Dean for approval. *Id.* The departmental faculty review committee then selects 10-15 outside scholars, who must be "…leading

scholars…," and subject to additional qualifications. *Id.* at 3. The department faculty review committee also identifies three comparison candidates who are "stars-rising or established-of the field broadly conceived." *Id.* This information is submitted by the department chair to the Area Committee and to the FAS Dean for approval. *Id.*

The tenure candidate then uploads their materials in August for distribution to the approved external referees who agreed to write an evaluation letter. *Id.* at 5-7. The candidate's materials and the external referees' evaluation letters are reviewed and discussed by the departmental faculty review committee for the purposes of making a recommendation to the department's faculty for a vote. *Id.* at 8. All eligible tenured faculty members may vote at the formal department meeting. [Faculty Handbook at 37]. *Id.* Voting is conducted by secret ballot. *Id.* Professor Byrne's tenure case did not progress past the departmental vote. [Def. D. Conn. Civ. L. R. 56(a) statement ¶¶ 23-24]

If the departmental vote was favorable, Plaintiff's tenure case would proceed to the Humanities Area Committee, then the Joint Board of Permanent Officers, and then the Yale Corporation for additional review. [Pl. Ex. 2 at 23, figure 6]; [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 42].

B. <u>Events leading up to the tenure review</u>

Plaintiff's brief erroneously cites the standard for promotion to Associate Professor with Tenure [Dkt. 81 (Pl. Opp.) at 3] (citing to page 32 of the Faculty Handbook). Plaintiff was promoted to Associate Professor on Term, the standard

for which is on page 31 of the Faculty Handbook. *See* Def. Ex. 5 (FAS Departmental Case Summary, for Professor Byrne's Promotion to Associate Professor of Spanish & Portuguese on Term for four years). For promotion to Associate Professor on Term "…candidates must present significant published research and scholarship representing early demonstrations of disciplinary and interdisciplinary leadership…" [Faculty Handbook at 31]. The distinction is significant; unlike the standard for associate professor with tenure, the department need not be confident of the candidate's likelihood for promotion to full professor to promote the candidate to associate professor on term.

The parties dispute the characterization of the Department's prior assessment of Professor Byrne's scholarship during her candidacy for promotion to associate professor on term. *Compare* [Dkt. 70-1 (Def. Mem.) at 11-12]; [Pl. Ex. 2 (Byrne Aff.) at ¶ 16.]. Nevertheless, she was unanimously approved for promotion by the Department and from the Deans and the Humanities Advisory Committee. [Pl. Ex. 40 (05/10/2013 Email from Adorno to Byrne informing her of the favorable votes)].

Two months after her promotion, Plaintiff sought Associate Professor Leave ("APL Leave") to work on a fourth book. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 7]; [Def. Ex. 7 (09/30/2013 E-mail from Adorno to Miller discussing Byrne's APL proposal)]. Professor Adorno's email to Dean Mary Miller summarizes criticism from herself and Professors González Echevarría and Vallis, wherein she states that "…independently we found it quite poor..[and]…quite inadequate." *Id.* Plaintiff

resubmitted the proposal the following year. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 7].

Plaintiff submitted a third draft of the proposal in November 2014, which was also denied. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 8]; [Def. Ex. 11 (Byrne APL proposal)]. Plaintiff vehemently disagreed with the criticism of the revised APL proposal and responded with a dear colleague letter the next day. [Def. Ex. 10]. Plaintiff testified that the denial of her APL leave was the first instance that Professors Adorno, González Echevarría, and Vallis directed what she characterized as anger towards her. [Def. Ex. 4 (Byrne Depo.) at 88:1-7].

Plaintiff met with Yale College Dean Mary Miller in May of 2014 to discuss whether Professor Adorno should remain chair of the Department as part of a routine three year review process. [Def. Ex. 4 (Byrne Depo.) at 11:21-14:18, 28:1-25]. Plaintiff objected to Professor Adorno remaining the Department's chair because of ongoing conflicts among the faculty and graduate student complaints. [*Id.* at 28:1-12.].

In February 2015, Professor Byrne attended a university meeting regarding the tenure system. [Pl. Ex. 12 (02/06/2015, Byrne email to Lofton)]. In a follow-up email, Professor Byrne complains about the FASTAP tenure system and hostility among three senior members of the faculty to granting tenure generally. *Id.* She states that her "…comments yesterday related to the problem of senior colleagues who have simply decided that they will never grant tenure to anyone, irrespective of the merits." *Id.* She cites the example of a male colleague in the Department who

received twelve positive letters from external reviewers but was denied tenure on a 3-2 vote. *Id.*

Plaintiff suggests that the administration intervene, noting her upcoming tenure review. *Id.* Plaintiff writes that "…they are desperately trying to "create" a reason to deny me tenure where (and because) none exists." *Id.* (quotations and parenthetical in original). Professor Lofton forwarded the email to Dean of Humanities, Amy Hungerford. *Id.* None of this exchange references sexual harassment or discrimination. *Id.*

On March 6, 2015, an anonymous letter purporting to be on behalf of graduate students was distributed to the Department's faculty members and administration. [Pl. Ex. 46 (anonymous letter)]. It contains five grievances related to the negative atmosphere within the Department. *Id.* The final numbered grievance alleges that Professor González Echevarría made offhand comments to female graduate students and that Professor Adorno turned a blind eye to sexual harassment. *Id.*

Two weeks later, Provost Polak and Deans Gendler and Cooley announced a review of the "learning and work environment" in the Department (hereinafter the "Climate Review"), which was conducted by Attorneys Jamaal Thomas of the University's Office of Equal Opportunity Programs and Barbara Goren, an outside attorney. [Pl. Ex. 7, (Climate Report) at 3]. Attorneys Goren and Thomas interviewed 57 witnesses, over 100 hours. *Id.* at 2.

A week after the Climate Review commenced, Yale Daily News published an article written by an undergraduate student about the anonymous letter. [Pl. Ex. 48]. The article quotes Professors González-Pérez, Poole, and Byrne. *Id*. The article states that: "Byrne said she heard harassing comments made by professors to colleagues and to students, though she denied naming any perpetrators. She added that since December-when all faculty and staff received a memo asking them to report inappropriate behavior they witnessed-she has not seen any such behavior." *Id*. The article also quotes Plaintiff's concerns about the tenure system generally, but that she also described many points in the anonymous letter as "gross exaggerations," and some "fully inaccurate." *Id*. Plaintiff emphasized that she was not involved in the anonymous letter. *Id*.

Shortly after the anonymous letter and news article, Professor Adorno, as Department chair, requested that Plaintiff submit her preliminary tenure dossier, with the final materials due August 18, 2015, pursuant to FASTAP. [Pl. Ex. 87 (03/30/2015 Adorno letter to Byrne)].

On April 1st, Plaintiff sent a letter to Professor Adorno, copied to the Department's tenured faculty, the Provost, and several deans, demanding that Professors Adorno and González Echevarría recuse themselves from all matters related to her candidacy for tenure pursuant to the conflict of interest clause of the departmental voting provision in the Faculty Handbook. [Def. Ex. 12 (recusal letter)](citing Faculty Handbook at 37). Like Plaintiff's email to Professor Lofton, Plaintiff alleges that Professors Adorno and González Echevarría are predisposed to oppose her tenure because of a uniform view that "no one will ever get tenure in

our department," but does not raise any claims of personal animus or sexual harassment. *Id.*

In a joint letter, Professors González Echevarría and Adorno refused to recuse themselves from the Department's vote. [Def. Ex. 14 (04/13/2015 Adorno letter to Byrne)]. However, Professor Adorno did not chair Plaintiff's departmental review committee. The parties dispute whether Professor Adorno voluntarily recused herself or whether Dean Gendler recused her pending the completion of the climate report. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 11]; [Pl. Obj. to Def. D. Conn. Civ. L. R. 56(a) statement ¶ 11]. The evidence on the issue is inconclusive. *See* [Pl. Ex. 11 (administration's email correspondence on recusal issue)].

The following months show a deterioration in the relationship between Plaintiff and three of the senior professors in the Department: Professors Adorno, González Echevarría, and Valis. The collective email correspondence reflects deep-seated, mutual distrust and animosity regarding the Plaintiff.

Professors Adorno, González Echevarría, and Valis suspected that Plaintiff was the author of the anonymous letter fairly early in the Climate Review, suggesting that it was related to her upcoming tenure review. [Pl. Ex.50 (03/08/15 email Adorno to Vallis, Vallis repl.)]("…Roberto expects the name of Sue")("Roberto is no doubt right. Another learning curve: tenure complaints.")

Plaintiff testified that two weeks after the recusal letter, Professor Adorno "blew up and said, you're the one to blame for the anonymous graduate student letter." [Def. Ex. 4 (Byrne Depo) at 200:9-23]. The Climate Review report also finds

that the anonymous letter provoked strong emotions among senior faculty; one senior professor stated that Professor Adorno "literally pointed a finger at Prof. Byrne and Prof. Poole at a faculty meeting and said, 'You caused this.'" [Pl. Ex. 7 (Climate Report) at 20].

Plaintiff was interviewed by Attorneys Thomas and Goren for the Climate Review on May 4, 2015. [Pl. Ex. 8 (Scheduling email)]. Plaintiff testified that she told the attorneys about four instances of alleged sexual harassment by Professor González Echevarría directed towards Plaintiff:

1. During her first year at the University, Professor González Echevarría approached her from behind and played with her hair;
2. On May 8, 2014, he kissed her on the mouth without consent at a party for Mary Miller;
3. That month he also allegedly made a comment about engaging in sexual activity in a standing position following his hip surgery; and
4. In October 2014, he directed her to sit on a two-person couch which had a pillow on a side that would have directed her to sit on his lap.

[Pl. Ex. 149 (Byrne Depo.) at 44:5-24, 53:2-55:12, 61:7-65:25]

Later that summer, in an email exchange between Professor Adorno and another faculty member, Professor Adorno suggests that Professor Byrne was engaged in "evil-doings" after her APL proposal was denied. [Pl. Ex. 63 (07/16/2015, Adorno email to Stith)]. Adorno speculates about what Plaintiff told Attorneys Thomas and Goren and states that it may result in adverse consequences for Adorno. *Id.* ("Boy, this could really add up to a lynching…").

Meanwhile, Plaintiff's tenure case proceeded through the summer and into the fall semester. In July 2015, the departmental review committee was formed with input from Professor Adorno, consisting of Professors Vallis and David Jackson

from the Department, and Professors Howard Bloch and Giuseppe Mazzotta from French and Italian, respectively. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 12]. Professor Adorno recommended Professor González Echevarría for membership on the committee, but he was not selected. [Pl. Ex. 101 (04/11/2015 email from Adorno to Mangan suggesting Vallis, Mazzota and González Echevarría].

Professor Vallis and Dean Hungerford proceeded with the FASTAP steps for securing external referees. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 14]. The Department ultimately received eight external referee letters. *Id.* ¶ 16.

In December 2015, Professors Adorno and Vallis attended a meeting in the Provost's office to discuss the completion of the Climate Review. [Pl. Ex. 155 (Stith Depo) at 42:5-43:9]. The meeting outline covers, *inter alia*, reports of sexual harassment, but notes that "the University has a separate process for the adjudication of complaints regarding sexual misconduct." [Pl. Ex. 147]. The meeting outline also addresses concerns about potential retaliation. *Id.*

Professor Adorno's notes for this meeting expressly address her view that: Plaintiff created the anonymous letter, that the Department was harmed by the Yale Daily News Article and the Climate Review, Plaintiff was likely untruthful to Attorneys Goren and Thomas, and that Plaintiff's actions should not result in Professors Adorno or González Echevarría's recusal from her tenure vote because it would erode academic freedom. [Pl. Ex. 68].

Around the same time, Attorney Thomas asked Plaintiff if she would be willing to participate in a Title IX investigation into the sexual harassment

allegations against Professor González Echevarría. [Def. Ex. 5 (Byrne Depo) at 78:8-19]. Plaintiff testified that she told Stephanie Spangler, the University's Title IX coordinator, that she did not want to bring a Title IX claim in her own name, noting that her complaint concerned more "intellectual harassment," but Plaintiff consented to her name being used in the complaint. *Id.* at 72:8-73:10.

Plaintiff was interviewed by the University's Title IX coordinators four times, starting in December 2015. *Id.* at 70:16-25. Plaintiff repeated the allegations that she previously told Attorneys Thomas and Goren during the Climate Review investigation. *Id* at. 78:8-17. Plaintiff testified that she is unaware of any direct evidence that any of the University's Title IX staff told Professor González Echevarría about her allegations, but, in a subsequent meeting with Title IX personnel, she was told that Professor González Echevarría responded to her allegations. *Id.* at 73:11-19.

On February 3, 2016, the departmental review committee conferred to review Plaintiff's dossier and external referees' letters. [Def. Ex. 23 (02/03/2016, Vallis meeting sum.)]. Professors Vallis, Mazotta, and Bloch voted against recommending Plaintiff for tenure; Professor Jackson voted in favor. *Id.* At his deposition, Professor Bloch cited scholarly reservations held by two or three of the eight external referees. [Def. Ex. 23 (Bloch Depo.) at 36:8-37:43.]. Professor Mazotta held a similar sentiment. [Def. Ex. 25 (Mazotta Depo.) at 18:10-20:21].

The Department's tenured faculty met and voted on Plaintiff's tenure candidacy on February 9, 2016. [Def. Ex. 25 (02/09/2016, Vallis meeting sum.)].

Professors Adorno, González Echevarría, and Vallis voted against granting tenure; Professors Jackson and González-Pérez voted in favor. *Id.* Professor Vallis's meeting notes reflect a tense exchange. *See Id.* at 2 ("…launched baseless allegations of non-transparency and unfairness in the evaluation of SB's candidacy."). Criticism of Plaintiff's candidacy primarily concerned her third book, FICINO IN SPAIN (2015), the quality of her writing, and the external reviews. *Id.* at 2-6. FAS Dean of Academic Affairs Jack Dovidio collected the ballots and counted the votes. *Id.*

The following month, Plaintiff appealed the denial of her recusal request and the Department's adverse vote to Provost Polak, alleging, *inter alia*, retaliation for speaking out against sexual harassment and discrimination. [Pl. Ex. 109 (Byrne Appeal-recusal, 03/02/2016)]; [Pl. Ex 23 (Byrne Appeal-tenure vote, 03/08/2016)]. Provost Polak then formed a Faculty Review Committee, pursuant to Section III.L.3 of the Faculty Handbook, to investigate the circumstances of Plaintiff's consolidated appeals. [Pl. Ex. 123 (07/25/2016, Faculty Review Committee report to Provost)].

Pursuant to the Faculty Handbook, the Faculty Review Committee has limited purview into a tenure decision. [Faculty Handbook at 18-21]. For example, the Provost will reject any complaint based on the professional judgment of the department. *Id.* at 18. The "Review Committee…will deliberate in closed session and will present to the Provost a written report stating its findings of fact and conclusion about whether University policy has been violated or the appointment or promotion was not fairly or adequately considered." *Id.* at 20.

Here, the Faculty Review Committee undertook thirteen interviews and concluded that Plaintiff's tenure case complied with FASTAP procedures and was decided on the merits. [Pl. Ex. 123 (07/25/2016, Faculty Review Committee report to Provost)]. The committee specifically found no evidence of retaliation. *Id.* No reference is made to the University's recusal policy. *Id.* The Provost adopted their report on August 23, 2016 and provided Professor Byrne with an unpaid leave of absence to teach elsewhere until her faculty appointment expired on July 30, 2017. [Pl. Ex. 125 (08/23/2016, Polak letter to Byrne)].

## Legal Standard for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to

present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

## Analysis

Defendant moves for summary judgment on Plaintiff's retaliation claims because: (1) some of Plaintiff's generic complaints are not protected activity, (2) Yale can establish a legitimate non-retaliatory basis for denying Plaintiff's tenure, (3) Plaintiff cannot establish pretext and cannot show a retaliatory motive, and (4)

Plaintiff cannot establish a prima facie case of retaliation as to denial of APL. [Dkt. 70-1 (Def. Mem.) at 18-33].

Defendant moves for summary judgment on Plaintiff's breach of contract claim arguing that: (1) Plaintiff cannot establish breach because Plaintiff cannot establish a "Conflict of Interest" to mandate recusal, and (2) Plaintiff cannot establish damages because she cannot prove that she would have prevailed at the additional levels of review in the tenure process. *Id.* at 34-40.

The Defendant also argues that Plaintiff cannot establish negligent misrepresentation because Plaintiff cannot show reasonable reliance on the Defendant's statements. *Id.* at 44-16.

1. <u>Retaliation under Title VII and CFEPA</u>

First, the Court emphasizes that Title VII does not impose a "general civility code" on the workplace. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Nor, does the "…jury sit as a "super personnel committee" to second guess business decisions or an employee's disagreement with his employer's assessment of his qualifications…" *See Zimmitti v. Aetna Life Ins. Co.*, 64 F. Supp. 2d 69, 80, n. 18 (D. Conn. 1999).

The concern about second guessing employers' business judgment and policing workplace civility is more acute in the context of a university's tenure decision. The Second Circuit has further emphasized that:

A university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom. Although

academic freedom does not include the freedom to discriminate, this important freedom cannot be disregarded in determining the proper role of courts called upon to try allegations of discrimination by universities in teaching appointments. The Congress that brought educational institutions within the purview of Title VII could not have contemplated that the courts would sit as Super–Tenure Review Committee[s].

*Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (internal quotation and citations omitted).

Tenure decisions are fundamentally tied to subjective professional judgments. *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) (contrasting the tenure process to other employment decisions). The Second Circuit's opinion in *Zahorik* captures some of the tension at issue in Plaintiff's tenure review:

[T]enure decisions are a source of unusually great disagreement. Because the stakes are high, the number of relevant variables is great and there is no common unit of measure by which to judge scholarship, the dispersion of strongly held views is greater in the case of tenure decisions than with employment decisions generally. As the present record amply demonstrates, arguments pro and con are framed in largely conclusory terms which lend themselves to exaggeration, particularly since the stauncher advocates on each side may anticipate and match an expected escalation of rhetoric by their opponents. Moreover, disagreements as to individuals may reflect long standing and heated disputes as to the merits of contending schools of thought or as to the needs of a particular department.

*Zahorik*, 729 F.2d at 93 (2d Cir. 1984)

Congress did not exempt universities' tenure decisions from Title VII. The Court must "steer a careful course between excessive intervention in the affairs of the university and the unwarranted tolerance of unlawful behavior." *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 148 (D. Conn. 2012) (citing *Powell v. Syracuse Univ.*, 580 F. 2d 1150, 1154 (2d. Cir. 1978). To do so in "the context of disagreement about the scholarly merits of the candidate's academic work…[Plaintiff must show that] disagreements or doubts

17

are influenced by forbidden considerations such as sex or race." *Zahorik,* 729 F.2d at 94.

Title VII prohibits employers from retaliating against employees who oppose discriminatory practices, file complaints of discriminatory treatment, or participate in an investigation. 42 U.S.C. § 2000e-3(a). When analyzing retaliation claims, courts apply the *McDonnell Douglas* burden-shifting framework. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Initially, the plaintiff must establish a prima facie case by demonstrating: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Thereafter, there is a presumption of retaliation that the defendant must rebut by articulating "a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. Finally, if the defendant proffers such a reason, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Ibid*.

Plaintiff must prove that the University took adverse retaliatory action "because" a plaintiff engaged in protected activity under Title VII. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "'[B]ut-for' causation does not, [however,] require proof that retaliation was the only cause of the employer's

action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015).

A. <u>Protected activity</u>

It is well established that, "to prove that [s]he engaged in protected activity, the plaintiff need not establish that the conduct [s]he opposed was in fact a violation of Title VII." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). Rather, the employer must have been able to reasonably understand that Plaintiff's opposition or testimony was directed at conduct prohibited by Title VII. *Rajaravivarma*, 862 F. Supp. 2d at 164.

Here, Defendant argues that that Plaintiff's complaints about the tenure process and the Department are "general allegations of mistreatment, wholly unrelated to any protected class." [Dkt. 70-1 (Def. Mem.) at 20-22]. The Court agrees. Plaintiff's criticism of the Department at the University-wide FASTAP meeting in early 2015, Provost Polak's FASTAP "listening session," and objection to Professor Adorno remaining Department Chair could not reasonably implicate any Title VII concerns because there is no reference or implication of any protected class.

Defendant argues that Plaintiff cannot establish that her communications with the student newspaper reporter constitute protected activity because they repeat generalized harassment allegations. [Dkt. 70-1 (Def. Mem.) at 22-23]. Plaintiff urges the Court to permit her to pursue a "perceived protected activity" theory

based on the mistaken assumption that Plaintiff authored the anonymous letter. [Dkt. 81 (Pl. Opp'n.) at 40-42]. The Court need not resolve either issue because the Plaintiff participated in protected activity when she opposed discrimination during the University's investigation into sexual harassment during the Climate Review. *See Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015)(quoting *Crawford v. Metropolitan Government of Nashville & Davis County*, 555 U.S. 271, 276 (2009) (*Crawford* stated that any activity designed "to resist or antagonize ...; to contend against; to confront; resist; [or] withstand" discrimination prohibited by Title VII constitutes a protected oppositional activity").

### B. Knowledge and adverse action requirements

Yale concedes that it had "institutional knowledge" of Plaintiff's alleged protected activity. [Dkt. 87 (Def. Rep.)] at 7-8]. Instead, Yale argues that the senior faculty members lacked knowledge of Plaintiff's protected activity, which undercuts claims of causation. *Id.* Yale does not challenge the "adverse action" prong of Plaintiff's prima facie case.

### C. Causation

"Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester Cty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). A genuine issue of material fact exists

as to whether Plaintiff's protected activities caused Professors Adorno, González Echevarría, and Vallis to vote against Plaintiff's tenure candidacy based on direct evidence that could be construed to show a retaliatory animus.

First, although these senior faculty members were unaware of precisely what Plaintiff said during her Climate Review interview, they speculated that Plaintiff's statements to the investigators would be averse to their interests. [Pl. Ex. 63 (07/16/2015) Adorno email to Stith]. Professor Adorno speculated that the Climate Review could lead to her "lynching," a term used by Clarence Thomas to describe the consequences of a sexual harassment claim lodged against him after his nomination to the Supreme Court. *Id.* Professor Adorno also stated Professor Byrne was engaged in "evil-doings." *Id.* The Yale Daily News article quoted Professor Byrne as having said she overheard professors sexually harassing students and colleagues. [Pl. Ex. 40] Together, they had an intensely negative reaction to the University's investigation and openly blamed Plaintiff for initiating the inquiry, which itself contained the allegation of sexual harassment. See [Pl. Ex. 7 (Climate Report) at 20]. A reasonable jury could draw an inference that Professor Adorno, as well as her close colleagues in whom she confided and confederated, would have believed Plaintiff made statements against them both as part of the climate study and in or prompting the anonymous article published in the Yale university newspaper, in which she was quoted.

Plaintiff testified that she was told that Professor González Echevarría responded to her allegations of specific instances of misconduct, and, therefore assumes that he would have been able to identify her as the source. [Def. Ex. 5

(Byrne Depo.) at 73:11-19]. **Plaintiff learned this information after the adverse tenure vote.** *Id.* **Professor González Echevarría was notified of the University Wide Committee on Sexual Misconduct's proceeding, arising from the Title IX investigation, on February 18, 2016, after Plaintiff's tenure vote. [Pl. Ex. 46 (Letter to González Echevarría regarding UWC investigation)].**

A reasonable juror could find a causal link between Plaintiff's participation in the Title IX investigation and the adverse tenure vote.  Although there is no evidence to support that any of the senior faculty members voting against her were aware of the Title IX proceeding at the time they voted, a reasonable jury could infer they believed she was interviewed because she was quoted in the campus newspaper article. Construing ambiguities in favor of the Plaintiff, a reasonable jury could find that the senior faculty members speculated about the content of the statements to Climate Review investigators concerning sexual harassment and were angered by her participation in the investigation. This is based on the commonsense notion that an alleged harasser may not know the precise content of an accuser's statement yet still retaliate against them based on the subject's assumptions of its adverse content.

A jury could reasonably find a subjective retaliatory intent based on a culmination of email correspondence concerning the Plaintiff in the ten months leading up to her tenure vote.

### D.  Legitimate non-retaliatory explanation

Because a reasonable juror could conclude that Plaintiff established a prima facie case of retaliation, the burden of production shifts to the University to proffer a legitimate, non-retaliatory basis for the adverse action. *Jute*, 420 F.3d at 173

Here, the University argues that Plaintiff's scholarship misses the exceptionally high mark for tenure at Yale. The University cites Professors Mazzotta and Bloch's criticism at the departmental review level and three external reviews as evidence showing Plaintiff's academic deficiency. [Dkt. 70-1 (Def. Mem.) at 6-14].

During the Departmental vote, Professors Vallis, Adorno, and González Echevarría offered an academic explanation for their position on her tenure candidacy. [Def. Ex. 25 (Vallis meeting sum., 02/09/2016)]. Professor Adorno, for example, pointed to shortcomings in Plaintiff's third book, ON FICINO (2019), which was the subject of criticism by Professor Mazzota and the external referees. *Id*. Professor Echevarría echoed the same criticism that he directed at Plaintiff's APL proposal. *Id*. Professor Vallis shared similar sentiments. *Id*. Of course, two senior professors found her tenurable. *Id*. Without more, this is the type of academic disagreement contemplated by *Zahorik* and its progeny.

E. <u>Evidence of Pretext</u>

By proffering a legitimate, non-retaliatory basis for the adverse action "the presumption of retaliation dissipates," and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Ya-Chen*

*Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015) (citing *Jute*, 420 F. 3d 166 at 173 and *Nassar,* 570 U.S. at 352).

"Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more*." Percoco v. Lowe's Home Centers, LLC*, 208 F. Supp. 3d 437, 444 (D. Conn. 2016).

The issue of establishing pretext is particularly challenging in the context of a tenure denial. Any reason given, other than the stated reason, is pretextual by definition. *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337 (2d Cir. 1997), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000). Title VII distinguishes between those reasons that are factually false and those that are false in order to hide discriminatory or retaliatory motives.

> But discrimination does not lurk behind every inaccurate statement. Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility. For example, a member of a tenure selection committee may support a protégé who will be eligible for tenure the following year. If only one tenure line is available, that committee member might be inclined to vote against tenure for a junior faculty member who is *currently* eligible for tenure, thereby ensuring that the tenure line remains open. Any reason given by the committee member, other than the preference for his protégé, will be false. Furthermore, recommenders and decision-makers who are governed by such considerations will not advise the president and regents of the institution that their recommendation or vote was disingenuous.

*Id.* at 1337-38 (italics in original)

Plaintiff's evidence of actionable pretext is thin. She herself stated that senior department members did not want to grant tenure to anyone. She cited the case of a male professor who was denied tenure before the campus newspaper article was published and the Title IX investigation commenced. Notwithstanding, a reasonable jury could still find that the three senior professors' animosity to Plaintiff's candidacy was personal; a reaction to their stated assumptions about Plaintiff's role in the Climate Review.

Collaboration between colleagues is expected in any workplace. But, the Plaintiff produced evidence that could reasonably show or impute a common retaliatory motive among Professors Adorno, González Echevarría, and Vallis. The professors conferred to share intensely negative views on Plaintiff's actual or assumed involvement in the Climate Review, which again is protected activity under Title VII, and strategized on a common response to investigators. *See* [Pl. Ex. 63 07/16/2015, Adorno email to Stith]. Attorney Thomas, for example, testified that he was concerned about potential retaliation arising from the Climate Review, as well as potential collusion. [Pl. Ex 161 (Thomas Depo.) at 104:19-24]. This concern about retaliation was echoed in the Provost's meeting notes. [Pl. Ex. 147]. The senior faculty members explicitly link Plaintiff's participation in the Climate Review with her tenure candidacy. *See, i.e* [Pl. 56 (04/14/2015 Valis email to Adorno); [Pl. Ex. 68 (12/13/2015, Adorno notes for Climate Review meeting)]. The issue is one of credibility, not whether the professors' stated reasons are academically sound.

The University presents ample evidence to challenge Plaintiff's pretext argument. For example, Plaintiff's APL leave was denied prior to any protected activity. Plaintiff's own testimony about FASTAP and animosity with colleagues predates her Title VII protected activity. [Def. Ex. 4 (Byrne Depo.) at 88:1-7]. Plaintiff's promotion to associate professor on term is only marginally related to her tenurability because a higher standard applies for tenure. *Supra* at 4-5.

A jury could also find that Plaintiff's tenure was denied because of partisan conflicts and generalized personal hostility within the Department, not because she engaged in any Tile VII protected activity. Plaintiff participated in these conflicts. See [Dkt. 87(Def. Rep.) Ex. 6 (09/09/14 email from Byrne to Poole)]("She [Professor Adorno] does not deserve any ounce of honesty from me (sic), particularly nothing heartfelt")]. This is precisely the type of gamesmanship and squabbling contemplated in *Fisher v. Vassar Coll.*, 114 F.3d at 1337.

Plaintiff does not posit an explanation for Professors Bloch and Mazzota's views or the critical remarks of two or three of the reviewers. Nevertheless, Professor Bloch and Mazotta were non-voting members of the committee, so they were not outcome determinative.

Witness testimony concerning irregularity in a tenure vote can support a jury's finding of a retaliatory motive. *See Zahorik*, 729 F.2d at 93. Here, Professor Jackson testified that, "in order to make sure they would get the result they wanted, they [three senior faculty members] came prepared this time" and read statements at the Department meeting, which departed from the process used during the last

tenure review. [Pl. Ex. 154 (Jackson Depo.) at 73:8-14]. Dean Dovidio's role was merely to observe the procedure and count votes, and thus was not a substantive safeguard against retaliation. [Def. Ex. 25 (Vallis meeting sum., 02/09/2016)].

The procedural deviations in the Department meeting cited by the Plaintiff are relatively minor and standing alone would be insufficient to carry her burden of showing pretext. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000). However, in the context of the stated animosity towards the Plaintiff and her involvement in the recently concluded Climate Review, a jury could find the departure from the Department's custom in prior tenure meetings and the appearance of a common aim among the three senior faculty members to be indicative of a retaliatory motive. *See Zahorik*, 729 F.2d at 93 ("Conventional evidence of bias on the part of individuals involved may also be available.") Thus, a genuine issue of material fact precludes a grant of summary judgment, as this issue rests substantially on credibility.

Construing ambiguity in favor of the Plaintiff, a reasonable jury could conclude that Professors Adorno, González Echevarría, and Vallis harbored a retaliatory motive based on Plaintiff's opposition to sexual harassment in the University's Climate Review, regardless of whether they knew the precise content that she relayed to the University's attorneys.

The University's precautions and appeal process failed to purge potential retaliation by Professors Adorno, González Echevarría, and Vallis. At issue is whether the exercise of independent judgment by the Faculty Review Committee

is sufficient to negate potential retaliation by the three senior faculty members. The Court concludes that it does not.

To resolve this inquiry, the Court considers the "cat's paw theory." Under cat's paw theory, a plaintiff may hold his employer liable for animus of a supervisor who does not have the authority to make the final employment decision, but instead manipulates the ultimate decision maker to achieve the adverse action. *Rajaravivarma*, 862 F. Supp. 2d at 149 (applying "cat's paw" to a Title VII tenure case)(later adopted by the Second Circuit in *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)).

In *Rajaravivarma*, the Court declined to apply "cat's paw" to impute a discriminatory animus allegedly contained in faculty recommendations when the university president reached an independent conclusion on the merits of plaintiff's tenure portfolio. 862 F. Supp. 2d 127, 161 (D. Conn. 2012)("Since Plaintiff has not shown that President Miller's independent assessment of Rajaravivarma's portfolio and his own conclusion that Rajaravivarma had deficiencies in load credit and creative activity has been "used as the mechanism to obscure discrimination" the Court will not endeavor to make its own determinations about such matters as Rajaravivarma's "teaching ability, research scholarship, and professional stature").

Unlike the university president in *Rajaravivarma*, the Faculty Review Committee and the Provost were not rendering the same decision as the Department when considering Plaintiff's appeal. Instead, the Faculty Review

Committee's limited inquiry was whether the Department complied with FASTAP. [Pl. Ex. 123 (07/25/2016, Faculty Review Committee report to Provost)]. Thus, the Faculty Review Committee's finding that Plaintiff did not suffer retaliation and the Provost's adoption of that finding does not establish that the "decision" was made by an independent person not alleged to have acted retaliatorily. *Compare Rajaravivarma*, 862 F. Supp. 2d at 166 (excerpted above). The procedural review conducted by the Faculty Review Committee does not implicate the type of scholarly judgments that the Court should refrain from second guessing.

### F. Causation under CFEPA

As the parties reference in their briefs, it remains unsettled whether causation under the CFEPA is analyzed using the "but-for" or "motivating factor" standard. *See Vale v. City of New Haven*, 197 F. Supp. 3d 389, 397-99 (D. Conn. 2016) (documenting the controversy with respect to age discrimination claims). The Court need not weigh in on the debate here because Plaintiff survives summary judgment under the stricter "but-for" standard for Title VII retaliation.

### G. Denial of APL leave

The Court grants Defendant's summary judgment motion as to alleged retaliation under Title VII based on denial of APL because Plaintiff cannot establish a prima facie case on this issue. *See* [Dkt. 33 (Sec. Am. Compl.) ¶ 109].

First, the parties do not brief the issue of whether denial of sabbatical meets the threshold showing for adverse action. Even so, Plaintiff cannot establish a causal link between the denial of APL leave in November 2014 and her *subsequent*

protected activity, beginning in March 2015, because the employer could not have been aware of the protected activity months before it occurred.

### 2. Breach of contract claims

Plaintiff's breach of contract claim rests on two central arguments. First, Plaintiff alleges that the University breached its contract with the Plaintiff by: (1) denying her a fair review of the scholarly merits of her tenure case and (2) failing to recuse any faculty member with a professional or personal conflict of interest. [Dkt. 33 (Sec. Amend. Compl.) ¶¶ 114-16].

Defendant does not challenge Plaintiff's argument that the Yale Faculty Handbook is an employment contract. Rather, Defendant argues that Plaintiff received a full and fair scholarly review of her candidacy, that the professors' decisions not to recuse themselves complied with the Faculty Handbook, and Plaintiff cannot establish damages because she cannot establish that she would have prevailed at the subsequent levels of tenure review. [Dkt. 70-1 (Def. Mem.) at 34-41]

Whether Plaintiff received the "benefit of the bargain" as to the standard applied for her tenure review hinges on whether she can establish a retaliatory motive. Her argument regarding the Faculty Handbook's conflict of interest provision addresses a procedural concern.

### a. Breach

A faculty manual that sets forth terms of employment may be considered a binding employment contract. *See Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 564 (1984); *see also Craine v. Trinity Coll.*, 259 Conn. 625, 655–56 (2002). In the absence of express language that definitively states the parties' obligations, the determination of what the parties intended to encompass as their contractual commitments and their compliance therewith are questions of fact for the jury. *Gaudio v. Griffin Health Services Corp.,* 249 Conn. 523, 533 (1999) ("the trial court correctly submitted to the jury the task of determining the contours of the parties' intentions").

In *Craine v. Trinity Coll.,* 259 Conn. at 654–55, the Connecticut Supreme Court held that a trial judge was correct in declining to instruct the jury that they should not second guess a university's academic judgement on tenure for a breach of contract claim. "A "[u]niversity cannot claim the benefit of the contract it drafts but be spared the inquiries designed to hold the institution to its bargain." The principle of academic freedom does not preclude us from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract." (citing *Kyriakopoulos v. George Washington University,* 866 F.2d 438, 447 (D.C.Cir.1989)).

Here, there is a genuine issue of material fact as to whether Plaintiff was entitled to have Professor Adorno and González Echevarría recuse themselves from her tenure vote. The conflict of interest provision states simply:

> A member of the faculty who has a personal or professional conflict of interest concerning an individual on whom a vote is taken *must* absent himself or herself from all discussions and all votes taken on that individual.

Faculty Handbook § IV(H)(1) FAS Voting Policies, Voting in Departments and Programs, at 37 (emphasis added).

The Faculty Handbook does not define a "conflict of interest." Dean Dovidio testified that Yale relies on faculty members to recuse themselves and there is no mechanism, in policy or practice, for enforcement. [Def. Ex. 13 (Dovidio Depo.) at 73:18-24, 74:15-23, 83:20-24.]. But, the language of the provision expresses a clear mandate: if a conflict of interest exists, the faculty member *must* recuse themselves. Moreover, there is conflicting evidence concerning the administration's involvement with Professor Adorno's recusal from the initial departmental review committee. *See* [Pl. Ex. 11 (07/27/2015, email from Gendler to Dovidio)]).

Whether the University's reliance on faculty member's voluntary recusal complied with this provision is a question of fact. "Interpretation of the written terms of a contract and the degree of compliance by the parties are questions of fact to be determined by the jury." *Craine*, 259 Conn. at 655–56 (interpreting a faculty manual).

To prevail on breach of contract, Plaintiff would still need to show that a conflict of interest existed. Again, this term is left undefined and Plaintiff and Defendant advance competing explanations for the term. [Dkt. 87 (Def. Repl.)12-13]; [Dkt. 81 (Pl. Op.) 33-35].

Defendant argues that a conflict could not have existed because Professors Adorno and González Echevarría did not perceive themselves to have a conflict. [Dkt. 87 (Def. Repl.) at 38]. There is no textual support for the proposition that Yale's Conflict of Interest policy is defined solely by a faculty member's subjective belief. Plaintiff points to the broad, circular definition in Merriam Webster's Dictionary and administration's testimony about faculty relationships for the proposition that "deeply felt emotions or personal opinion" warrant a conflict of interest. [Dkt. 81 (Pl. Opp.) 34-35].

The term "conflict of interest" takes on different meanings in different legal and ethical codes and contexts. The term is neither self-defining nor self-executing. The ambiguity of the meaning of the term "conflict of interest" and whether the administration had the authority to exercise recusal power over faculty members warrants a genuine dispute of material fact.

C. Damages

Defendant argues that Plaintiff impermissibly speculates that Plaintiff would have prevailed at the succeeding levels of review had the Department voted affirmatively. [Dkt. 70 (Def. Mem in Sup) 41-43.]. Plaintiff fails to respond directly to the argument as to the uncertainty of the outcome, but instead introduces expert evidence as what her earnings would have been had she been granted tenure. [Dkt. 81 [Pl. Opp. 37-38].

*Abney v. Univ. of the Virgin Islands,* No. 08-116, 2016 WL 2349108, at *7 (D.V.I. May 3, 2016), cited by Defendant for the proposition that summary judgment is

warranted in a tenure case when damages are speculative, is distinguishable. In *Abney*, the plaintiff received a substantial salary increase when he found substitute employment and sought to recover incidental costs and pain and suffering without evidentiary support. *Id.*

Here, Plaintiff adduces expert evidence as to her wage losses because she was denied tenure. [Dkt. 81 (Pl. Opp. 81] 37-38](citing Pl. Ex. 144 (economist's report)). A reasonable jury could find that Plaintiff was denied tenure because the University's alleged breach of contract by failing to enforce the conflict of interest provision and lost wages are reasonably certain to arise from Plaintiff's resulting termination.

The Defendant is correct in that Plaintiff cannot reasonably assume that she would have been entitled to tenure. But, Plaintiff was entitled to the University's contractual compliance with the terms of the Faculty Handbook. The issue is not whether the lost wage damages are speculative, but whether they are proximately caused by the Defendant's breach, if breach is established. *See Short v. Westport Nat. Bank*, No. 3:09CV1955 VLB, 2014 WL 1316098, at *9 (D. Conn. Mar. 31, 2014) (discussing the requirement for contract damages to be proximately caused by the breach).

The Court must, therefore, deny Defendant's motion for summary judgment as to count 3 for breach of contract.

3. <u>Negligent misrepresentation</u>

Plaintiff argues that there is a genuine issue of material fact as to whether the Defendant misrepresented to Plaintiff that: 1. that she would have to wait until after the Climate Review was complete for action to be taken regarding her recusal request, and 2. that she would receive a fair an unbiased hearing on the merits for tenure review using scholarship standards previously communicated to her. [Dkt. 81 (Pl. Opp) 52]. The Defendant argues that Plaintiff cannot show justifiable reliance. [Dkt. 70 (Def. Mem. in Sup. for Sum. J.) 43-46. The Court agrees with the Defendant.

Under Connecticut law, "[o]ne who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Craine*, 259 Conn. at 661.

Plaintiff cannot show justifiable reliance on Dean Gendler's April 2, 2015 email stating that the FAS Dean's office would not make any final decisions about the composition of the review committee or eligibility of department members to participate in the tenure process until the Climate Review was complete. [Pl. Ex. 17 (04/04/2015, Gendler email to Byrne)]. Plaintiff alleges that Dean Gendler and other administrators failed to communicate their decision to recuse Professors Adorno and González Echevarría until it was too late to appeal. [Dkt. 81 (Pl. Opp.) 53-54].

Regardless of whether Professors Adorno and González Echevarría voluntarily recused themselves from the departmental review committee or whether they were precluded from participating by the University's administration, Plaintiff received the relief requested at that stage. Regarding their subsequent participation in her tenure vote, the Climate Review concluded in November 2015 and she learned that the Dean would not recuse Professors Adorno and González Echevarría on January 19, 2015. [Def. 26 (Pl. 03/02/2016 Appeal to Provost) at 15] ("On January 19, Dean Gendler wrote to inform me of her decision to deny my recusal request. It is that denial that I herein appeal."). Plaintiff had previously written to Dean Dovidio on December 15, 2015 seeking an explanation of when the 45-day appeal period commenced. *Id.* This all occurred well in advance of Plaintiff's tenure vote in February 2016. The Faculty Review Committee and Provost Polak considered Plaintiff's appeal on this issue. [Def. Ex. 29 (07/25/2016, Faculty Review Comm. findings)]. No reasonable juror could find that she was misled as to the administration's position on the recusals, as confused as the administration's position on that issue may have been.

As to allegations that Plaintiff was misled by prior praise of her scholarship, the instant case is distinguishable from *Craine*, 259 Conn. 625. In *Craine*, the college's vague statement of reappointment potentially misled plaintiff into believing that she should continue to work on a single journal article, instead of breaking it up into several smaller articles or bringing one of her other projects to final publication. 259 Conn. at 662 (2002). The plaintiff in *Craine* was then denied tenure on account of the quantity of her work. *Id.*

Here, the standard for promotion to Associate Professor on Term is lower than the tenure standard. *Supra* 4-5. Plaintiff could not justifiably rely on success in seeking a term promotion to predict her success in securing tenure or induce any particular action. Plaintiff does not present evidence showing how reliance on the aspirational statements contained in the Department's review for her promotion to Associate Professor on Term caused her to chart a different course when applying for tenure.

Accordingly, the Court must grant the Defendant's motion for summary judgment on the negligent misrepresentation count.

## Conclusion

Based on the forgoing, the Court GRANTS Defendant Yale University's Motion for Summary Judgment [Dkt. 70] as to Count 3 of the Second Amended Complaint for Negligent Misrepresentation and as to Counts 1 and 2 for Retaliation in violation of Title VII and CFEPA based on the denial of Plaintiff's Associate Professor Leave. The Court DENIES Defendant's motion for summary judgment as to Counts 1 and 2 as it relates to the tenure denial. The Court DENIES Defendant's motion for summary judgment as to Count 3 for breach of contract.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 27, 2020